UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE, A FOREIGN
CORPORATION,

              Plaintiff,

                            HONORABLE PATRICK J. DUGGAN

    v.

                            No. 10-10978

STEVEN WOODWARD,

              Defendant.

_____/


MOTION FOR PRELIMINARY INJUNCTION

Detroit, Michigan --  Monday, April 19, 2010

APPEARANCES:

Eric A. Buikema, Esq.        Steven L. Woodward
Cardelli, Lanfear & Buikema,  In Pro Per
322 West Lincoln           c/o 7211 Brittwood Lane
Royal Oak, Michigan 48067    Flint, Michigan 48507
Tel: (248) 544-1100        steve_l_woodward@yahoo.com
ebuikema@cardellilaw.com
On behalf of Plaintiff


- - -


To Obtain A Certified Transcript, Contact:
Nefertiti A. Matthews, Official Court Reporter
Theodore Levin United States Courthouse
231 West Lafayette Boulevard, Room 867
Detroit, Michigan  48226
www.transcriptorders.com • jodi_matthews@mied.uscourts.gov

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

**Motion For Preliminary Injunction**
**Monday, April 19, 2010**

# I   N   D   E   X

- - -

HEARING:                                              PAGE: VOL:

**Motion for Preliminary Injunction**  ...............**3**      **1**

Argument By Mr. Buikema  ..........................3      1

Response By Mr. Woodward  ......................23      1

Response By Mr. Buikema  ......................30      1

Response By Mr. Woodward  ......................30      1

Response By Mr. Buikema  ......................34      1

Response By Mr. Woodward  ......................35      1

Response By Mr. Buikema  ......................49      1

Response By Mr. Woodward  ......................50      1

Response By Mr. Buikema  ......................53      1

Response By Mr. Woodward  ......................54      1

Response By Mr. Buikema  ......................56      1

Response By Mr. Woodward  ......................56      1

Response By Mr. Buikema  ......................58      1

Response By Mr. Woodward  ......................59      1

**Decision By The Court**  .........................**60**     **1**

Response By Mr. Buikema  ......................61      1


Certification of Reporter  ......................63

*10-10978; American University of Antigua v. Steven Woodward*

```
 1                         Detroit, Michigan

 2                         Monday, April 19, 2010

 3                         1:59 p.m.

 4                  -   -   -

 5        THE CLERK:  Civil action number 10-10978; American

 6    University of Antigua College of Medicine versus Steven

 7    Woodward.

 8        THE COURT:  Identify yourselves, for the record,

 9    please.

10        MR. BUIKEMA:  Good afternoon, Your Honor.  Eric

11    Buikema of Cardelli, Lanfear & Buikema, for the

12    plaintiff and moving party.

13        MR. WOODWARD:  My name is Steven Woodward.

14        THE COURT:  All right.  Counsel, I believe it's

15    your motion.  I'll let you proceed.

16              Motion for Preliminary Injunction

17   ARGUMENT BY MR. BUIKEMA

18        MR. BUIKEMA:  Thank you, Your Honor.

19        First of all, I intend to be relatively brief.

20    I'm largely satisfied with our written pleadings in

21    this regard.  But there are a few things that I need to

22    point out for purposes of today.

23        As you know, Your Honor, this is a motion for

24    preliminary injunction.  We are seeking to have

25    Mr. Woodward cease and desist publication of what we
```

1        regard as an offending website containing information

2        that is damaging to my client as well as its students.

3             Mr. Woodward is very obviously a student who is

4        dissatisfied with his educational experience at

5        American University of Antigua and he's certainly

6        within his rights to express opinions about that.

7             But what he is not permitted to do, under

8        applicable law, are at least three or four things and

9        they include making use of confusingly similar names,

10        domain names, specifically, in this case, that confuse

11        or mislead the public as to the origin of his opinions

12        or remarks or publications.

13             **THE COURT:**  What is that theory of defense?

14             **MR. BUIKEMA:**  Of defense?

15             **THE COURT:**  What's your theory?  You list a number

16        of theories.  Which theory are you talking about now?

17             **MR. BUIKEMA:**  I'm talking about violation of the

18        Lanham Act, specifically the Anticybersquatting

19        Provision under paren (d).

20             **THE COURT:**  Fair enough.  Hold on.  You have your

21        motion in front of you?

22             **MR. BUIKEMA:**  I do, Your Honor.

23             **THE COURT:**  Now, I think page four.

24             **MR. BUIKEMA:**  Yes.

25             **THE COURT:**  At the bottom.

*10-10978; American University of Antigua v. Steven Woodward*

1          **MR. BUIKEMA:**  Yes.

2          **THE COURT:**  You set forth what the Act requires,

3     fair enough?

4          **MR. BUIKEMA:**  Yes.

5          **THE COURT:**  "Cause of action against a person who

6     uses in commerce any reproduction, counterfeit, copy,

7     or colorable imitation of a registered mark in

8     connection with a sale, offering for sale, distribution

9     or advertisement of any goods or services."  How is

10    that involved here?

11         **MR. BUIKEMA:**  My understanding from the case law,

12    Your Honor, is that so long as there is an attempt for

13    pecuniary gain --

14         **THE COURT:**  Do you have a case that supports that?

15    Because you don't cite it and I don't know of any.

16         **MR. BUIKEMA:**  I believe that's given by the <u>Walt</u>

17    <u>Disney Corp.</u> case but I would have to go back and look,

18    Your Honor, to be sure.

19         **THE COURT:**  Counsel, you prepared this brief.  It

20    clearly says, "Goods or services."

21         Now, you don't come in and argue and say, "Okay,

22    well, Judge, that's what it says, let me tell you how

23    it applies."  I mean, why is he using the Lanham Act

24    because in all my experience it involves goods or

25    services?

*10-10978; American University of Antigua v. Steven Woodward*

1     **MR. BUIKEMA:**  Your Honor, the confusion of the

2     origin of the remarks I think is essential to the

3     Lanham Act.  That there be an intention or purpose for

4     financial gain is, I think, a secondary prong under the

5     Lanham Act analysis.

6         **THE COURT:**  Where?  It says specifically, you

7     quoted it, "In connection with the sale of goods or

8     services."

9         **MR. BUIKEMA:**  And Your Honor, with all due

10    respect, this is one factor of several, none of which

11    is dispositive.

12        **THE COURT:**  What do you mean, "One factor"?

13        **MR. BUIKEMA:**  And this is given by the Wynn Oil

14    Company versus Thomas case.

15        **THE COURT:**  What do you mean, "One factor"?

16        **MR. BUIKEMA:**  It's one factor of the likelihood of

17    confusion, we examine eight factors --

18        **THE COURT:**  Likelihood of confusion in connection

19    with the sale of goods or services, that's what it

20    says.

21        **MR. BUIKEMA:**  All right.

22        **THE COURT:**  So, I'm trying to figure out why are

23    you using this as a violation?

24        **MR. BUIKEMA:**  Because Your Honor, the provision

25    (d), under the anticybersquatting --

1    **THE COURT:**  Wait, that's a different theory.

2    **MR. BUIKEMA:**  You asked me specifically about the

3    confusing --

4    **THE COURT:**  We're going to go to each one of your

5    theories because I'm trying to figure out why you're

6    asserting these theories because it doesn't seem to me

7    your Lanham Act has any merit at all.

8    **MR. BUIKEMA:**  The Lanham Act claim is relative not

9    to the use of the confusingly similar web domain name,

10   I misunderstood, Your Honor, apologies.

11   The Lanham Act claim is relative to plaintiff's

12   use, republication of our actual logo, trade name.

13   **THE COURT:**  Where is that set forth here?

14   **MR. BUIKEMA:**  This is set forth in the verified

15   complaint.

16   **THE COURT:**  No, no, I've got your motion.  I'm

17   reading your motion.  Your motion tells me why you're

18   entitled to relief.  Now, you're coming up with

19   something I didn't read in the motion at all.

20   **MR. BUIKEMA:**  That is contained, I believe, at

21   page six, Your Honor -- excuse me, top of page seven.

22   Our motion reads, "Defendant's use of the similar

23   domain name, including copies, reproduction and/or

24   counterfeits of the AUA logo on the site itself has

25   been and continues to be done with the intent to cause

**Argument By Mr. Buikema**
**Monday/April 19, 2010**

8

1    confusion, mistake, or harm as to the source or

2    sponsorship of the information disseminated."

3         That's a factual predicate that's given by a

4    verified complaint attached as Exhibit "A".

5         **THE COURT:**  I understand.  But I still think we

6    have to go back to what you said the Lanham Act

7    involves goods or services.

8         **MR. BUIKEMA:**  For confusion as to origin of the

9    goods and services.  The goods and services here is the

10   education being offered by my client.

11        If he is confusing the origin of the public

12   remarks as to that good and service, that's a violation

13   of the Lanham Act.  He doesn't have to be attempting to

14   sell competing goods or services.  He simply has to be

15   confusing the origin of the goods or services for sale

16   which, in this case, is a medical school education.

17        And in his use of logos, that are our actual

18   logos, he's violated the Lanham Act by republishing

19   information as if it were published by my client.

20        **THE COURT:**  What information did he republish as

21   if it were by your client?

22        **MR. BUIKEMA:**  Specifically if you go to the

23   website, Your Honor, you'll find under a number of

24   links, specifically under the document links or quote,

25   unquote, "Evidence", under the website.  This semester

*10-10978; American University of Antigua v. Steven Woodward*

1       syllabus, course guidelines, self-exams, publications

2       or republications from University materials.

3            Now, incidentally, his republications violates a

4       copyright as well but we've not alleged that.  They are

5       materials generated by my client.  But they actually

6       employ the AUA logo on this cite that contains,

7       hand-in-hand, false and defamatory and damaging

8       information.

9            **THE COURT:**  We'll get to the false and defamatory,

10      don't mix up all your claims.

11           **MR. BUIKEMA:**  It's important to me, Your Honor,

12      because when you bring those things hand in hand you

13      have given credibility to the offending information.

14           So, whereas republishing the course syllabus with

15      its logo is not, in and of itself, damaging to my

16      client's reputation, it is, in fact, the course

17      syllabus.

18           When you employ that logo and attach it to your

19      website as if that website is somehow connected with or

20      sponsored by the University, you have given credibility

21      or caused confusion as to the source of the remaining

22      remarks.

23           **THE COURT:**  I don't know how that's a violation of

24      the Lanham Act.  The Lanham Act really deals with goods

25      and services and normally it's competing.

*10-10978; American University of Antigua v. Steven Woodward*

1          Let's go to your next argument which is

2     anticybersquatting claim?

3          **MR. BUIKEMA:**  That's correct, Your Honor.

4          **THE COURT:**  Tell me about that one.

5          **MR. BUIKEMA:**  Okay.  The defendant's website

6     utilizes as a domain name "aua-med.org" -- or excuse

7     me, "aua-med.com".

8          The actual and authentic website is, "auamed.org".

9     That website -- domain name is not chosen by accident,

10    I submit to you, it's chosen for the very purpose of

11    ciphering off legitimate internet traffic for seeking

12    information about the University or potentially from

13    the University to be redirected to Mr. Woodward's site.

14         Because he has chosen that trade name under this

15    provision of the ACPA, he can be held liable and

16    injunctive relief is available if, in fact, there is

17    bad faith intent to profit from that mark or use that

18    mark and it's confusingly similar or diluted.

19         **THE COURT:**  All right.  Let's go to page seven of

20    your brief, your motion.

21         **MR. BUIKEMA:**  Yes, Your Honor.

22         **THE COURT:**  You said, "Cyber squatting involves a

23    registration as a domain, names of well-known

24    trademarks by a non-trademark holder who then try to

25    sell names back to the trademark."

**Argument By Mr. Buikema**
**Monday/April 19, 2010**                              11

1        **MR. BUIKEMA:**  That is one potential --

2        **THE COURT:**  That isn't happening here, is it?

3        **MR. BUIKEMA:**  It's not.  I agree.  But that's one

4    potential means or method of violating the ACPA, as I

5    understand it.

6        **THE COURT:**  Let's keep going.  It says, "A person

7    shall be liable in a civil action by the owner of a

8    mark...if without regard to the goods or services of

9    the parties."  Again, we're talking about goods and

10   services.

11       **MR. BUIKEMA:**  Your Honor, I agree.  But the goods

12   and services is not focusing from the offender

13   standpoint.  The offender doesn't have to be selling or

14   advertising competing goods or services for it to be a

15   violation.

16       **THE COURT:**  Who says they don't?  What case do you

17   have that says, "The competitor doesn't have to be

18   involved in selling goods or services", what case?

19       Every case I've ever had, the competitor is

20   dealing with goods or services.

21       **MR. BUIKEMA:**  He is competing with us --

22       **THE COURT:**  Everyone I've had is dealing with

23   goods or services, that's what the competition is

24   doing.

25       **MR. BUIKEMA:**  In my view, Your Honor, the goods or

*10-10978; American University of Antigua v. Steven Woodward*

**Argument By Mr. Buikema**
**Monday/April 19, 2010**                                    12

1      services are the domain name itself and the information

2      disclosed thereby.

3          **THE COURT:**  He's not trying to sell the name

4      itself, is he?

5          **MR. BUIKEMA:**  I don't know.

6          **THE COURT:**  Wait.  It's your motion, if you don't

7      know, then you can't say that he is.

8          **MR. BUIKEMA:**  That's correct, Your Honor, there's

9      been no discovery in this case.

10         And as you know, I'm held to a standard of

11     potential success on the merits.  Substantial

12     likelihood of success on the merits, not absolute

13     success on the merits.  There's been no discovery on

14     that issue.

15         I will submit to you, Your Honor, that it's my

16     belief and understanding, I was not counsel in the

17     State Court case.  But my belief and understanding is

18     that Mr. Woodward has attempted to extract profit from,

19     let's say, exploited aspects of that web domain.

20         **THE COURT:**  What's the basis of that

21     understanding?

22         **MR. BUIKEMA:**  From my review of the record, I am

23     appellate counsel in that case and was so appointed

24     after the disposition by the State Court Judge.

25         **THE COURT:**  All right.  Let's go to your next

*10-10978; American University of Antigua v. Steven Woodward*

1    claim which is, "Willful violation of Family

2    Educational Rights and Privacy Act"?

3        **MR. BUIKEMA:**  Correct.

4        **THE COURT:**  I'm reading from your brief, "The

5    Family Educational Rights and Privacy Act of 1974

6    prohibits the federal funding of educational

7    institutions that have a policy of practice of

8    releasing education records without authorized

9    persons."  What's that got to do with this case?

10        **MR. BUIKEMA:**  In my view, Your Honor, it's a

11    wrongful act predicate to a tortious interference

12    claim.  And perhaps that's not made as clear as it

13    should be by our pleadings but that's how I regard this

14    claim.

15        FERPA prohibits disclosures of students'

16    information by the University itself.  And has, as

17    consequence, the termination of federal funding, which

18    my client does receive and some of the students receive

19    benefits under that provision.

20        It's my view that Mr. Woodward's conduct in

21    disclosing student information grades, which he admits

22    to doing and, in fact, has muddied this record by

23    attaching yet more of that information, creates

24    standing to my client -- gives standing to my client

25    the challenge on behalf of its students.

**Argument By Mr. Buikema**
**Monday/April 19, 2010**                              14

1          But more importantly --

2          **THE COURT:**  Why, he's not an agent of the

3     university in any way, shape or form?

4          **MR. BUIKEMA:**  But we are an agent of our students

5     whose information has been --

6          **THE COURT:**  But this prohibits the University from

7     doing it.  How could you possibly argue that the

8     University is doing it, when they're not?

9          **MR. BUIKEMA:**  I'm not sure I understand Your

10    Honor's question.

11         **THE COURT:**  It says, "It prohibits federal funding

12    of educational institutions who have a policy or

13    practice."  You don't contend the education has a

14    policy or practice, do you?

15         **MR. BUIKEMA:**  I do not contend that it has a

16    policy or practice.  But Mr. Woodward's actions in

17    disclosing the student information could cause the

18    federal government to terminate funding --

19         **THE COURT:**  How could that be a policy or practice

20    of the University?  How would anyone ever believe his

21    conduct is a practice or policy of the University?

22         **MR. BUIKEMA:**  I'd rather not find out, frankly,

23    Your Honor.

24         **THE COURT:**  It's just ridiculous.  I don't know

25    why you're arguing that.  His conduct can't be

*10-10978; American University of Antigua v. Steven Woodward*

1    considered a policy or practice of the University.  You

2    said that from the very beginning, it's not.  I don't

3    know why you're arguing these claims that have very

4    little, if any, merit.

5        And the problem is you can -- obviously, an

6    attorney can argue alternate theories, but you've got

7    to have some basis for the alternate theory or what

8    happens is, the Court says, "Wow, he's just throwing

9    everything in there so if they're weak, all his claims

10   must be equally weak."

11       And it's just a bad practice, in my judgment, to

12   assert any claim unless you have solid evidence that

13   there's at least some good merit to it and I don't

14   think there's any merit to this claim at all.

15       **MR. BUIKEMA:**  Again, Your Honor, I think my

16   pleadings are confusing in that regard and I'm not

17   intending to argue to this Court that there is an

18   independent clause of action that exist in my client

19   because of FERPA.

20       What I'm arguing is that Mr. Woodward's

21   publication of private student information which would

22   be violative of FERPA is a tortious interference with a

23   third-party expectancy --

24       **THE COURT:**  It's not tortious interference.

25       **MR. BUIKEMA:**  -- because the federal funding

*10-10978; American University of Antigua v. Steven Woodward*

**Argument By Mr. Buikema**
**Monday/April 19, 2010**                          16

1      consequence of release of that information is

2      potentially damaging to my client and its students.

3          **THE COURT:**  And it's a policy and practice of the

4      University that's to be dealt with, not some person

5      that's acting as you allege he is.

6          Any event, let's go to the next one.

7          **MR. BUIKEMA:**  Go ahead.

8          **THE COURT:**  You've got a defamation claim?

9          **MR. BUIKEMA:**  I do, Your Honor.

10         And if you take any time to peruse Mr. Woodward's

11     website this is a lot more than a gripe site.  A lot

12     more than expression of opinions as is given in the

13     evidence before you, specifically the verified

14     complaint and my written pleadings in this regard.

15         He accuses the University of conspiratorial

16     conduct, the defrauding of students, of falsifying

17     students' grades, the connection with criminal

18     activities and the like.

19         **THE COURT:**  Let's take them one at a time, okay.

20         **MR. BUIKEMA:**  Fair enough.

21         **THE COURT:**  Are they listed on page two?  Are

22     these the defamation statements or whatever you're

23     calling them?

24         **MR. BUIKEMA:**  That's a summary.

25         **THE COURT:**  You say, "A summary"?

*10-10978; American University of Antigua v. Steven Woodward*

1          **MR. BUIKEMA:**  Yes.

2          **THE COURT:**  Well, I'm trying to ask you whether

3     these are listed, "A", "B", are these specific?

4          **MR. BUIKEMA:**  They're not in every instance the

5     words used, but they are words that are used in summary

6     of different links within the website that connote this

7     information.

8          **THE COURT:**  Okay.  Now, he says -- you say he

9     says, I'm now on page two listing the items there

10    starting with small "a".

11         **MR. BUIKEMA:**  Okay.

12         **THE COURT:**  You say he says, "AUA routinely

13    commits fraud upon its students"?

14         **MR. BUIKEMA:**  Yes.

15         **THE COURT:**  I don't have any information from you

16    that they don't.

17         **MR. BUIKEMA:**  I'm sorry?

18         **THE COURT:**  I don't have any information that's

19    false.

20         **MR. BUIKEMA:**  Yes, you do, Your Honor.

21         **THE COURT:**  Where?

22         **MR. BUIKEMA:**  Exhibit "A" is a verified complaint

23    which, as part of the allegations says --

24         **THE COURT:**  Hold on.

25         **MR. BUIKEMA:**  "We've reviewed all of these and the

*10-10978; American University of Antigua v. Steven Woodward*

**Argument By Mr. Buikema**
**Monday/April 19, 2010**                                    18

---

1    allegations in our complaint are true", and it's signed

2    by the President of the University.

3          **THE COURT:**  Hold on.

4          **MR. BUIKEMA:**  In fact, that's the only evidence

5    you have, in this case, thus far.

6          **THE COURT:**  Hold on.  Tell me what the verified

7    complaint says with respect to these individual items.

8          **MR. BUIKEMA:**  I will.

9          If you look at page four of the verified

10   complaint, paragraph 21, Your Honor, reads:

11   "Defendant's website represents, alleges, and

12   publishes, as if true, false and defamatory about AUA,

13   including by way of example and not by limitation

14   that:"

15         And then you see the same subparagraphs "A"

16   through "P" in that allegation.

17         The very last page, of course, is a verification

18   signed, under oath, by the President of the University

19   indicating that the allegations contained in the

20   complaint are, in fact, true.  He's reviewed them and

21   the like.

22         So, he's affirmed that those representations by

23   Mr. Woodward's website are false in sworn testimony.

24         **THE COURT:**  Who signed the affidavit?

25         **MR. WOODWARD:**  The President of the University.

---

*10-10978; American University of Antigua v. Steven Woodward*

**Argument By Mr. Buikema**
**Monday/April 19, 2010**

19

1    His name is Neil Simon, not to be confused with the

2    playwright.

3        **THE COURT:**  Let's go, for example, to small "h":

4    "AUA students are sexually assaulted."  Is that a false

5    statement?

6        **MR. BUIKEMA:**  In and of itself, an AUA student was

7    apparently assaulted.  The connotation of AUA students

8    being sexually assaulted, in the tense, is a false

9    statement.

10       **THE COURT:**  In the what?

11       **MR. BUIKEMA:**  In the tense utilized or represented

12   by the website is a false statement.

13       **THE COURT:**  I'm missing what you're talking about,

14   "Tense".

15       **MR. BUIKEMA:**  The statement in the website

16   connotes a general practice or happening as if "All

17   students" or generally students are sexually assaulted

18   at AUA.

19       **THE COURT:**  That's the spin you put on it.  But

20   the statement itself is true, "AUA students are

21   sexually assaulted", have they?

22       **MR. BUIKEMA:**  An AUA student was sexually

23   assaulted.

24       **THE COURT:**  Only one?

25       **MR. BUIKEMA:**  To my knowledge, yes.

*10-10978; American University of Antigua v. Steven Woodward*

1          **THE COURT:**  Next one, AUA's professors teach

2     students wrong information.  How does the President

3     know that's not true?

4          **MR. BUIKEMA:**  Because he's responsible for

5     generating a curriculum and overseeing the curriculum.

6          **THE COURT:**  Does he know what every professor is

7     saying in class?

8          **MR. BUIKEMA:**  He signed the affidavit based upon

9     his firsthand knowledge and review of the facts to the

10    best of his knowledge, information, and belief, Your

11    Honor.

12         **THE COURT:**  Let's go to page three, paragraph "l":

13    "AUA students pass rate for USMLE medical board exams

14    is only 22.9%."

15         **MR. BUIKEMA:**  Yes.

16         **THE COURT:**  That's false?

17         **MR. BUIKEMA:**  That's absolutely false.  The

18    passage rate is approximately 80 percent or better.

19    USMLE scores are not published by Universities or

20    institutions to begin with.  So, there's no way for Mr.

21    Woodward to make that representation in the first

22    place.  It's reckless.

23         USMLE scores are published by location.  And if

24    you fair it out, that allegation in Mr. Woodward's

25    website, by clicking on the appropriate links, you'll

**Argument By Mr. Buikema**
**Monday/April 19, 2010**

1    go through his purported evidence and video evidence of

2    this, which is a Power Point presentation that doesn't

3    even mention the USMLE scores.

4         And even if you look at non-U.S., Canada, the

5    statistics published on Mr. Woodward's own website in

6    support of this proposition, this lie, they show

7    Canada, non-U.S. USMLE scores in the 70 percent to

8    85 percent range.  It's absolutely false.

9         **THE COURT:**  Okay.  Anything further?

10        **MR. BUIKEMA:**  Yes, Your Honor.  Because I think

11   it's most sensitive from when you're looking at a

12   defamation case, there are a litany of examples that if

13   the Court took the time to review the website, the

14   Court would see are more definite statements of

15   falsehood and defamatory remarks.

16        A couple that I'd like to point out are, in one

17   portion of his website Mr. Woodward indicates or claims

18   that, as if fact, that AUA has disregard for basic

19   civil rights and in support of video, cites the 5th

20   Amendment and says that we've denied the student a

21   right to produce evidence at a fair hearing.

22        First of all, the 5th Amendment doesn't apply to

23   my client.  But having said that, the statement that

24   his civil rights were somehow violated are derived

25   apparently from his belief that he was entitled to the

*10-10978; American University of Antigua v. Steven Woodward*

**Argument By Mr. Buikema**
**Monday/April 19, 2010**

1  same by some hearing he failed to attempt and that's

2  supported by the verified complaint.

3  Most notably to me is in the video index section

4  of his website, Mr. Woodward states, "Antigua Crimes

5  and AUA".  That's the topic of the category, Antigua

6  Crimes and AUA.  And then says, quote, "Learn the truth

7  about AUA's lies and connections with criminal

8  activities on Antigua."

9  He has directly accused, as if fact, my client of

10  being tied to criminal activity on the Island of

11  Antigua.  There's absolutely no support for that

12  proposition.  That proposition is false.  That

13  proposition is per se defamatory.

14  And for those reasons and our reasons in our

15  written pleadings, I believe that preliminary

16  injunction, during the pendency of this case, and just

17  until such time as this case can be heard on all of its

18  merits, is appropriate in this circumstance.

19  My client suffers harm everyday it continues to be

20  up that these lies are published with confusingly

21  similar domain names and confusion as to origin,

22  including use of its own logos, copyright protected

23  information, student's grades and the like.

24  And for those reasons, Your Honor, I ask you to

25  grant our motion.

*10-10978; American University of Antigua v. Steven Woodward*

**Argument By Mr. Buikema**
**Monday/April 19, 2010**                    23

1          THE COURT:  All right.  Mr. Woodward.

2          MR. WOODWARD:  Can I present evidence today, Your

3     Honor?

4          THE COURT:  I don't know how long you're going to

5     take to do it?

6          MR. WOODWARD:  Can I step back and get my box of

7     evidence?

8          THE COURT:  Sure.

9          MR. WOODWARD:  Do I have to come here?

10         THE COURT:  You can stay there.

11    RESPONSE BY MR. WOODWARD

12         MR. WOODWARD:  First off, Your Honor, I think he

13    talked about cyber squatting.  And I believe under 15

14    U.S. -- the code for cyber squatting, there's an

15    exemption for that and that would be for people -- it's

16    15, 1125, page 3, it's an exclusion A (ii), B and C for

17    people that are not-- for criticizing news, et cetera,

18    are just people expressing their civil rights of

19    freedom of speech.

20         THE COURT:  That's why you're supposed to file a

21    response in writing saying that.  You would have

22    alerted the Court this is your basis.  I could have

23    looked at it.

24         MR. WOODWARD:  Your Honor --

25         THE COURT:  I'm not going to look at it now,

_10-10978; American University of Antigua v. Steven Woodward_

1        you're supposed to give it to me ahead of time.

2            **MR. WOODWARD:**  I emailed this but it wasn't

3        formatted properly to the -- I emailed this to

4        Ms. Orem.  This rebuttal was emailed to her.

5            **THE COURT:**  Just brief, I don't want a rambling

6        thing.  Did you say that in the email, just now what

7        you told me?

8            **MR. WOODWARD:**  That is in the file that I attached

9        to Ms. Orem, but not to this file that's here.  It's

10       attached to one of the files that I sent her before I

11       received the entire motion from this attorney.

12           **THE COURT:**  Okay.  What's next?

13           **MR. WOODWARD:**  Okay.  Document, bad faith.  Okay.

14       Your Honor, as far as bad faith, again, under the

15       evidence of registry and use of bad faith,

16       circumstances, limitations found, the first one is for

17       purposes of selling and renting.  I do not sell or rent

18       anything.

19           **THE COURT:**  What are you talking about?  Where are

20       you?

21           **MR. WOODWARD:**  I'm just trying to follow where

22       he --

23           **THE COURT:**  Then tell me what item you're on, I

24       don't know where you are?

25           **MR. WOODWARD:**  The subject of bad faith of having

1    my domain name, sir.

2        **THE COURT:**  Where do you find he's claiming bad

3    faith?

4        **MR. WOODWARD:**  That would be on the -- Your Honor,

5    that would be -- it's not part of cyber squat.  It's

6    part of the ICANN policies, part of ICANN policies for

7    the use of domain names.

8        **THE COURT:**  What part of his motion are you

9    responding to at this point?

10       **MR. WOODWARD:**  The use of my website, aua-med.com.

11       **THE COURT:**  Pull the motion out.  He's got section

12   by section.  He talked about it when he argued.  He

13   took one step at a time.  I don't know what you're

14   talking about.

15       **MR. WOODWARD:**  This is -- I put a reference in

16   here, it's the ICANN document and it's the policy of

17   ICANN.

18       **THE COURT:**  I don't know what ICANN have to do

19   with anything.  What's an ICANN?  Where is that

20   mentioned in his motion?

21       **MR. WOODWARD:**  Well, Your Honor, ICANN is the

22   organization -- the international organization that's

23   responsible for domain names.

24       **THE COURT:**  Okay.  So?

25       **MR. WOODWARD:**  And as far as bad faith policy for

*10-10978; American University of Antigua v. Steven Woodward*

1    those, I'm not in violation of any of their policies --

2        **THE COURT:**  Who say you were?  Where did he say

3    you're in violation of ICANN?  Where did he mention it?

4        **MR. WOODWARD:**  He just said I was in violation of

5    bad faith of using my domain name.

6        **THE COURT:**  Well, which one of the arguments, he

7    gave four basis?

8        **MR. WOODWARD:**  Oh, sorry, Your Honor.  The

9    argument of bad faith.  Number 41, sir, "Defendant

10   has--"

11       **THE COURT:**  Time out.  Number 41 of what?

12       **MR. WOODWARD:**  Forty-one of his complaint.

13       **THE COURT:**  Page number?

14       **MR. WOODWARD:**  Sorry, it's page eight, sir, number

15   41.

16       **THE COURT:**  Hold on.

17       **MR. WOODWARD:**  Yes, sir.

18       **THE COURT:**  Are you on the motion brief?

19       **MR. WOODWARD:**  This is the complaint that he

20   filed.

21       **THE COURT:**  Oh, you're talking about the

22   complaint?

23       **MR. WOODWARD:**  Isn't that what we're going

24   through, Your Honor?

25       **THE COURT:**  No, I'm going through his motion for

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                    27

1      preliminary injunction.

2          **MR. WOODWARD:**  Aren't they one in the same, these

3      motions?

4          **THE COURT:**  No, absolutely not.  That's what I was

5      going through paragraph by paragraph of the motion.

6          **MR. WOODWARD:**  Okay.  The motion I only had five

7      lined items, I thought, on this motion.

8          **THE COURT:**  You have a copy of the motion?

9          **MR. WOODWARD:**  I have this document right here,

10     Your Honor.

11         **THE COURT:**  What's it called?

12         **MR. WOODWARD:**  It's called, "Plaintiff's Motion

13     for Preliminary Injunction", and there's three pages to

14     it.

15         **THE COURT:**  Three?

16         **MR. WOODWARD:**  This is what I thought I had to

17     defend today.  I didn't know that I had to defend this

18     entire paper.

19         **THE COURT:**  Hold on.  Show that to him.

20         **MR. WOODWARD:**  Is this it?

21         **MR. BUIKEMA:**  That's the motion, Your Honor,

22     that's not the brief and exhibits.  And I have proof of

23     service for all of them.

24         **MR. WOODWARD:**  I thought that the other part was

25     this.

_10-10978; American University of Antigua v. Steven Woodward_

**Response By Mr. Woodward**
**Monday/April 19, 2010**

28

 1        THE COURT:  Hold on.  Just hold on.

 2        Counsel, I have a document entitled, "Plaintiff's

 3   Motion for Preliminary Injunction", okay.  And then

 4   attached to it the Plaintiff's brief, fair enough?  Did

 5   you not get the brief?

 6        MR. WOODWARD:  I assumed that the brief was this.

 7        THE COURT:  Don't assume anything.  Did you get --

 8        MR. WOODWARD:  I did, Your Honor, I thought this

 9   is what we were going over today, these five items.

10        THE COURT:  What does the brief say?  What's the

11   title of it in front of you, the brief?

12        MR. WOODWARD:  Oh, I didn't even print it because

13   it was the same as this.

14        THE COURT:  What's, "This"?

15        MR. WOODWARD:  This is his claim that he sent me.

16   This is the Plaintiff's Verified Complaint for Request

17   for Temporary Restraining Order?

18        MR. BUIKEMA:  He appears to be holding up the

19   complaint which is Exhibit "A" to our brief.  But

20   that's certainly not the same of what we're dealing

21   with today, of course.

22        THE COURT:  I'm going by the brief in support of

23   the motion, that's what we're here for today.  That's

24   what I wanted you to respond to, the arguments made in

25   the motion.

*10-10978; American University of Antigua v. Steven Woodward*

1          **MR. WOODWARD:**  Okay.  I was confused that this

2     first page was a motion and there are five items to

3     this page and that's why I wasn't --

4          **THE COURT:**  I don't know of any motion talking

5     about bad faith.  In any event, let's go on.

6          **MR. WOODWARD:**  We just covered bad faith in his --

7          **THE COURT:**  I understand.  I don't know that you

8     have bad faith or not.

9          **MR. WOODWARD:**  Yes, Your Honor.

10         As far as -- yes, Your Honor.  I guess I can go

11    over my claims here that are obviously -- I can show

12    that they are mistaken.

13         When it says, "AUA student rate for USMLE medical

14    board is only 22.9% percent", that is not what my

15    website says and I have evidence to show that.

16         What it is, it's Antigua does.  And it's published

17    information.  There's two medical schools on Antigua.

18    And Antigua has a 22.9% pass rate.  Antigua does.

19         **THE COURT:**  Hold on.  What's the difference

20    between Antigua?

21         **MR. WOODWARD:**  There are two medical schools, Your

22    Honor.  The organizations that release or that have the

23    documentation to support the pass rates will not

24    release those pass scores.

25         **THE COURT:**  So, you never stated that this

*10-10978; American University of Antigua v. Steven Woodward*

Response By Mr. Woodward
Monday/April 19, 2010

30

1          University has a --

2              **MR. WOODWARD:**  No.

3              **THE COURT:**  You never said it?

4              **MR. WOODWARD:**  Never said it.

5              **THE COURT:**  Stop.  Stop.  Counsel, why do you say

6          he said it?

7      **RESPONSE BY MR. BUIKEMA**

8              **MR. BUIKEMA:**  That's my understanding of the

9          website publication.

10             And even if what Mr. Woodward is now saying is

11         true, he's just told you, Your Honor, that there are

12         two medical schools.  And so to say that Antigua's

13         USMLE rate in context to his entire web page that's

14         smearing the reputation of my client, was intentionally

15         misleading and known to be misleading by this person.

16             He's also just said the organization that

17         publishes those scores won't release them.  So, how can

18         he know the pass rate from Antigua if he sought that

19         from the releasing party and they won't release it?

20         That's a reckless statement.  Whether it's intentional

21         or not, if it's reckless, that supports the cause for

22         defamation.

23             **THE COURT:**  Why are you making any reference at

24         all about a pass rate of 22.9%?

25     **RESPONSE BY MR. WOODWARD**

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                    31

1      **MR. WOODWARD:**  Because it was published in the

2      newspaper, Your Honor.

3          **THE COURT:**  What's that got to do with this

4      school?

5          **MR. WOODWARD:**  Because there are two schools on

6      the Island of Antigua, one has a 90% USMLE pass rate

7      for first time test-taking students; another one claims

8      that they have an 80.6% pass rate.  80.6 and 90%

9      doesn't equal 22.9%.

10         **MR. BUIKEMA:**  I couldn't agree more, Your Honor.

11     And Mr. Woodward knows that when he publishes that

12     false statistic.

13         **THE COURT:**  What's the 22.9% got to do with this

14     University?

15         **MR. WOODWARD:**  I don't just talk about this

16     University, Your Honor, on my website.

17         **THE COURT:**  Well, the primary thing on your

18     website is about this University, isn't it?

19         **MR. WOODWARD:**  That's right, Your Honor.  But the

20     ECFMG, which is the governing body for these types of

21     organizations down in the Caribbean, will not release

22     that information, even though I've requested it.

23         **THE COURT:**  I'm not concerned about information

24     that isn't released.  I'm concerned about you making

25     the statement that at least, by some inference, since

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                              32

1    your website is dealing with this University and you

2    talk about a pass rate of 22.9%, someone might say,

3    "Wow".

4         **MR. WOODWARD:**  That's correct, Your Honor, and

5    that's where I go to the data that was released in a

6    Power Point presentation from the school showed that

7    the University only had about a 50 percent pass rate.

8         When I further looked at that information, I found

9    out that for AUA students only, the pass rate was only

10   44%, that's not transfer students, that's just the

11   students that started and ended with AUA.  And that was

12   inside the Power Point presentation, Your Honor.

13        **THE COURT:**  Why talk about 22.9% --

14        **MR. WOODWARD:**  I mean 44% pass rate.

15        **THE COURT:**  Why talk about 22.9%?

16        **MR. WOODWARD:**  Because it demonstrates, Your

17   Honor, that somebody's not telling the truth.

18        **THE COURT:**  A statement that the pass rate for

19   medical board exam of 22.9% tell us somebody is not

20   telling the truth?

21        **MR. WOODWARD:**  If there's only two universities on

22   the island, Your Honor, and the total pass rate for the

23   island is 22.9% and one school claims a 90% pass rate

24   and the other school an 80.6% pass rate --

25        **THE COURT:**  That doesn't mean this defendant did

*10-10978; American University of Antigua v. Steven Woodward*

1    anything wrong.  You're aligning this university with

2    no basis for it.

3           **MR. WOODWARD:**  No, Your Honor, because I further

4    go on to explain that the pass rate, per their release

5    student information, is 44%, Your Honor, not 80.6% like

6    they claim on their website.

7           **THE COURT:**  But you said --

8           **MR. WOODWARD:**  I did not demonstrate anywhere on

9    that island, I'm just saying that the numbers just

10   don't add up.

11          **THE COURT:**  But be fair.  You're attacking this

12   University, people will read this and think you're

13   talking about this university.

14          **MR. WOODWARD:**  No, I also talk about the other

15   university.  I talk about the hospital.  I talk about

16   the ECFMG not releasing student grades so that people

17   know what kind of university they're getting into, Your

18   Honor.

19          **THE COURT:**  What's your --

20          **MR. WOODWARD:**  The hospitals that they deal with

21   and the businesses that they deal with, that's on the

22   front cover of my page.

23          **THE COURT:**  In his brief in support of the motion,

24   he lists what they believe are false statements by you.

25   And number "A" is:  "AUA routinely commits fraud upon

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**

34

1    its students."  What's the basis for that?

2         **MR. WOODWARD:**  Well, I don't know the basis for

3    routinely commits fraud, Your Honor.

4         But on the documentation that I just turned in

5    today, Your Honor, as far as all of the -- that

6    contained all of the student information that was

7    released, I can demonstrate that I earned an 80 percent

8    on my final grade and AUA gave me an "F".

9         **THE COURT:**  Hold on.  One thing to say you believe

10   you were.

11        Counsel, why do you say in here:  "AUA routinely

12   commits fraud"?  Does he say that on the website?

13   **RESPONSE BY MR. BUIKEMA**

14        **MR. BUIKEMA:**  I do say that and he does say that.

15   And the home page says, "You'll find evidence of fraud.

16   Contains evidence of AUA committing fraud."

17        If you click on the link and then either the

18   evidence links or the video links to these Youtube

19   videos which, by the way, are narrated by Mr. Woodward

20   and published by Mr. Woodward as well.  He goes through

21   these synopsis of how AUA commits fraud upon its

22   "Students", plural.  And it's about an eight-minute

23   video, I think, in that particular circumstance.

24        And the characterization of my motion is an

25   accurate characterization of his website from us and

---

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Buikema**
**Monday/April 19, 2010**

35

1          publications.

2     **RESPONSE BY MR. WOODWARD**

3          **MR. WOODWARD:**  If the data is not released and you

4     have the student grades that the school reported to me

5     on their Power Point presentation that their grades are

6     only 50% and on the internet they're claiming an 80.6%

7     pass rate, they're not telling the truth.  That's false

8     advertisement.

9          If they give a person an "F" on their final grade

10    that earned an 80 percent on their final grade, that's

11    fraud, as far as the definition of cheating a student.

12         They further went on to say, "Failed final exam.

13    Did not have OP rotation."  That is also fraud, Your

14    Honor.  I had an out-patient rotation.  I only had two

15    clinical rotations --

16         **THE COURT:**  Let's stay away from you, I understand

17    you.  On what basis do you conclude whatever happened

18    to you happens to other students?

19         **MR. WOODWARD:**  Because, Your Honor, we were

20    supposed to have clinical rotations and more than just

21    two rotations.  All of these students only had two

22    rotations.

23         They claimed superior, quality education, et

24    cetera.  If you look at this semester program, we had

25    over 20 changes in the schedule of this semester

*10-10978; American University of Antigua v. Steven Woodward*

1    program, Your Honor.  The applications that they had

2    didn't even work, Your Honor.  The testing applications

3    did not work.  The testing applications failed.

4        There was a week time, Your Honor, when I couldn't

5    do any of my work for the testing application because

6    it did not work.  Five days, Your Honor, that their

7    application didn't work.

8        That would be like your employees not being able

9    to do their work for five days.  And I paid $12,000 for

10   this education that is supposedly this quality, great

11   education.  And instead they give me an "F".

12       **THE COURT:**  One thing to complain about the way

13   you were treated, okay.  I'm more concerned about you

14   making generalized statements about other students,

15   without any basis for it.

16       **MR. WOODWARD:**  I am a student.  I was a student.

17       **THE COURT:**  "Other students", okay.  It's one

18   thing to express complaints about the way you were

19   treated, but to go on and generally suggest that this

20   is happening to all kinds of students may be

21   inaccurate.

22       **MR. WOODWARD:**  Your Honor, in my experience it is

23   not because I've just demonstrated that they say on

24   their website about the quality of education and I just

25   gave you an example about the quality education we get,

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**

37

1    its not quality education.

2        **THE COURT:**  That's your opinion.

3        "AUA students--", says, you say, "--are sexually

4    assaulted."

5        **MR. WOODWARD:**  An AUA student was sexually

6    assaulted, Your Honor.

7        **THE COURT:**  Hold on.  Is that what you said on

8    your website?

9        **MR. WOODWARD:**  Yes.

10        **THE COURT:**  Exactly one student was sexually

11    assaulted?

12        **MR. WOODWARD:**  I gave -- the article that's inside

13    this example right here, it's Exhibit No. 4, Your

14    Honor.

15        I showed this one example and I explained and read

16    this one exhibit from Antigua.  I believe it's from the

17    Antigua Sun, Your Honor, that showed that an AUA

18    student was sexually assaulted.

19        I compared that, Your Honor, to an AUA claim as

20    located on a vibrant and modern twin island state of

21    Antigua.  Antigua's ideal location for study.  Serene,

22    secure for studying.  Antigua provides students with

23    the most modern comforts, familiar lifestyle in a

24    stable and safe environment.

25        I compared this to that and other exhibits that

*10-10978; American University of Antigua v. Steven Woodward*

1      show that there is a huge problem on the island.  That

2      the government officials on the island recognize it's a

3      problem.

4          And I'd like you to look at Exhibit 3 that I have

5      here where, "Murder sex offenses top police

6      statistics."  This is December 31st of 2009.

7          And that's totally in contrast to their claims of

8      a stable and safe environment.

9          **THE COURT:**  Well, I don't know that that's

10     necessarily true.  As you well know students,

11     unfortunately, have been sexually assaulted at a number

12     of universities in Michigan.  That doesn't mean that

13     Ann Arbor or East Lansing is a crime ridden environment

14     because on occasion a student has been molested.

15         **MR. WOODWARD:**  Your Honor, I just post information

16     from the news articles.

17         **THE COURT:**  Yeah, but you're trying to convey that

18     this is an unsafe place.

19         **MR. WOODWARD:**  No, Your Honor, what I'm doing is--

20         **THE COURT:**  You're not?

21         **MR. WOODWARD:**  I'm comparing what they write on

22     their website --

23         **THE COURT:**  Aren't you trying to convey that it's

24     an unsafe place?

25         **MR. WOODWARD:**  Your Honor, it is an unsafe place,

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                    39

1      in my opinion.

2          **THE COURT:**  That's what you're trying to convey,

3      isn't it?

4          **MR. WOODWARD:**  It is.  And it's totally different

5      than what they state on their web pages, which what I'm

6      trying to convey.  Which is what they state on their

7      web pages is not true.  It's not as true as like they

8      would like to lead you to believe.

9          They would like to lead you to believe in these

10     pictures that it's all sandy beaches and warm sun and

11     you're going to come down and nothing is going to

12     happen to you.

13         **THE COURT:**  They say in here that your website

14     says that:  "AUA disregards student's civil rights",

15     did you say that?

16         **MR. WOODWARD:**  Disregard for civil rights, yes,

17     Your Honor.

18         **THE COURT:**  What's the basis for that?

19         **MR. WOODWARD:**  The basis for that on the first

20     committee meeting they had against me was a tit for

21     tat.

22         I claimed that one of the professors, Your Honor,

23     and I have the documentation for this, was

24     confrontational to the students and I initiated a

25     grievance committee against the school.  The school, in

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                    40

1      return, initiated a grievance committee against me for

2      this and the professor claimed that I was rude to her

3      during her presentation of the class, it was a test

4      review.

5           And I had the video -- I had the audiotape of that

6      entire conversation, Your Honor.  The audiotape of the

7      entire class.  And during the committee meeting, I was

8      not allowed to present that as evidence.

9           **THE COURT:**  That applies to you.

10          **MR. WOODWARD:**  Right.

11          **THE COURT:**  Well, I'm concerned that you're not

12     saying that on the website.

13          **MR. WOODWARD:**  Another student was also implicated

14     in the same committee meeting, Your Honor, that's two

15     of us.

16          **THE COURT:**  How can you say they conspired against

17     the other student?

18          **MR. WOODWARD:**  That's not a conspiracy, that's the

19     committee meeting.  Civil rights.

20          **THE COURT:**  How do you know that?

21          **MR. WOODWARD:**  I could hear them yelling at him

22     through the door, Your Honor.  I'm sitting outside the

23     door of this committee meeting and hear them talking to

24     this individual outside the door.

25          Okay.  Another example, Your Honor, is they tried

**Response By Mr. Woodward**
**Monday/April 19, 2010**

1    to initiate another committee meeting against me during

2    final week and during that they wouldn't even give me

3    what it was for.

4        I have emails where I'm requesting, "What did I

5    do?  Please, explain what and when I did something?"

6    They never gave me that information, Your Honor, never.

7    And that committee meeting was dropped.

8        During this committee meeting that I had in

9    December of 2007, they denied me the right to counsel

10   even though per their student handbook it says that I

11   have the right to evidence and counsel.

12       **THE COURT:**  Okay.  My concern is this, it's one

13   thing for you to express your dissatisfaction about the

14   way you were treated, okay.

15       But it's not necessarily fair for you to

16   generalize and suggest that what's happening to you is

17   happening to everyone.  You agree with me?

18       **MR. WOODWARD:**  Your Honor, it happened to me and

19   another student --

20       **THE COURT:**  Do you agree that it would be wrong to

21   say that, "What happened to me, happens to all the

22   students", wouldn't that be wrong?

23       **MR. WOODWARD:**  Your Honor, I've seen this school.

24   I've seen --

25       **THE COURT:**  Wouldn't it be wrong to say that,

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                    42

1     "What happened to me, happens to all the students",

2     wouldn't that be wrong?

3          **MR. WOODWARD:**  Not when you witness it happening?

4          **THE COURT:**  To all the students?

5          **MR. WOODWARD:**  I never said, "All the students".

6          **THE COURT:**  Wouldn't it be wrong to make that

7     statement?

8          **MR. WOODWARD:**  If you say, "Every single student

9     this happens to"--

10         **THE COURT:**  I'm not saying, "Every single

11    student".

12         Wouldn't it be wrong to say that, "What happened

13    to me, happens to all the students", wouldn't that be

14    wrong?

15         **MR. WOODWARD:**  How many students need to be

16    destroyed at that place?

17         **THE COURT:**  Wouldn't that be a wrong statement?

18         **MR. WOODWARD:**  If you had said, "Everybody", yes.

19         **THE COURT:**  I said, "All the students", yes, okay.

20         Now, if you said, "What's happened to me, happens

21    to other students", do you have proof of all that?

22         **MR. WOODWARD:**  I have proof that there's a

23    committee meeting issued against me and the other

24    student, that first committee meeting when it was over

25    that tit for tat thing, and they didn't let me produce

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**

43

1     the evidence and they obviously didn't let him.

2          **THE COURT:**  Obviously?

3          **MR. WOODWARD:**  Well, I have the evidence to clear

4     both of us and they didn't allow me to produce it and

5     he didn't have it.  I had the computer with me, I had

6     the evidence.  I was not allowed to produce it.

7          **THE COURT:**  They claim you say:  "AUA conspires

8     against its students."

9          **MR. WOODWARD:**  That's right, Your Honor.  I have

10    documentation evidence, Your Honor, that shows that we

11    were given pagers at St. Joseph Mercy Hospital, Your

12    Honor, this is just another example.

13         We were given pagers September at St. Joseph Mercy

14    Hospital.  Pagers were not part of any of the syllabus,

15    course guidelines, no documentation of the use of

16    pagers, okay.

17         In October, supposedly, Susan Zonia, the director

18    of the program, paged me on a Friday after one o'clock,

19    at two o'clock it says in her email.  She did it again

20    on Monday, which would have been at the end of the

21    program.  The following week, Monday, she paged me

22    twice.  And a committee meeting was written up against

23    me that I missed pages.

24         Your Honor, at one o'clock I would have been

25    excused per the schedule of the whole course.  I was

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**

44

1     done.

2          **THE COURT:**  What's that got to do with the

3     University conspiring against its "Students", plural?

4     What's that got to do with that?

5          **MR. WOODWARD:**  Your Honor, this just demonstrates

6     how this has happened to me.

7          **THE COURT:**  I think your website should say that.

8     Should limit your criticism to that which happened to

9     you, which you do know.

10          I'm not convinced you know about all the other

11     students and all the other things either.  And I think

12     you're generalizing, without any basis for it, based on

13     what happened to you.

14          **MR. WOODWARD:**  Your Honor, I just had so many

15     instances of this happen to me.  I saw also, Bill

16     Stewart, another student that was run out.  Again, I

17     quote this committee meeting that happened --

18          **THE COURT:**  You told me earlier you were leaving

19     to go some place soon?

20          **MR. WOODWARD:**  Yes, Your Honor, I fly out tomorrow

21     at 5:50, Your Honor.

22          **THE COURT:**  Counsel indicated at the end of this

23     presentation that your statement, at least in his

24     opinion, implies that the school is responsible for

25     criminal acts?

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                45

1       **MR. WOODWARD:**  Ties with criminal acts, yes, Your

2       Honor.

3           **THE COURT:**  What's your basis for that?

4           **MR. WOODWARD:**  There's a $7 billion dollar

5       Stanford fraud scheme that's now currently in progress.

6           And matter of fact, there are websites, at least

7       one that I'm very familiar with, where people are

8       trying to get retribution from this fraud scam that

9       happened on Antigua.  This is a Stanford fraud scam.

10      Widely publicized.

11          I forget what government officials were involved

12      on Antigua but I know it also implicated the Caribbean

13      Caucus, Your Honor.

14          The Caribbean Caucus, Your Honor, was chaired by

15      Donald Payne, Congressman Donald Payne out of New

16      Jersey, Your Honor.  Donald Payne has done things for

17      this University, Your Honor.

18          **THE COURT:**  Has what?

19          **MR. WOODWARD:**  He's done things for this --

20          **THE COURT:**  For?

21          **MR. WOODWARD:**  For the University he was the

22      keynote speaker and I believe was last year's keynote

23      speaker for the university.

24          And the last time I checked he was under

25      investigation for implications of changing laws or

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                    46

1    prohibiting laws pertaining to this $7 billion fraud

2    scam.

3         On top of that, Your Honor, if you look at the

4    timeline between the foundation of American University

5    of Antigua, which is 2004 and 2006, Your Honor, I

6    believe it's 2006.

7         After 2004, Donald Payne spoke to congress

8    recognizing American University of Antigua.  And

9    shortly after that, American University of Antigua got

10   their New York certification, Your Honor.

11        **THE COURT:**  What's that got to do with them being

12   involved in criminal activity?

13        **MR. WOODWARD:**  I don't say that they're involved,

14   I say they have ties to criminal activity.

15        **THE COURT:**  Ties, tell me about the ties.

16        **MR. WOODWARD:**  It's the congressman and

17   congresswoman, actually Carol Kilpatrick in Michigan

18   that's involved with this $7 billion dollar fraud scam

19   on Antigua.

20        **THE COURT:**  You don't see that as being very

21   reprehensible saying they're tied to criminal activity?

22   You don't know what their tie is at all.

23        **MR. WOODWARD:**  Their tie is the congressman and

24   the actions that they have with that.

25        **THE COURT:**  That's not criminal activity.

_10-10978; American University of Antigua v. Steven Woodward_

**Response By Mr. Woodward**
**Monday/April 19, 2010**                                    47

---

1        **MR. WOODWARD:**  The $7 billion dollar fraud scam

2    is.

3        **THE COURT:**  Has that been proven?

4        **MR. WOODWARD:**  That hasn't been proven.  And I

5    don't state that -- I just say, "Here are ties to a

6    criminal activity."

7        **THE COURT:**  Don't you think that's really

8    irresponsible to do that to somebody?  No proof at all

9    that they're involved, not at all.  And we're going to

10   paint them all with a black brush?

11       **MR. WOODWARD:**  With everything else that has

12   happened to me on that island, Your Honor, I think it's

13   a very fair statement of them.

14       **THE COURT:**  Well, you're just angry, okay.

15       **MR. WOODWARD:**  I'm very angry, Your Honor.

16       **THE COURT:**  Now, tell me what the harm is if you

17   take down the website 'till you get back?

18       **MR. WOODWARD:**  Your Honor, if you take down my

19   website, first off, I have an appeal going concerning

20   this committee meeting in December of 2007 and --

21       **THE COURT:**  I'm sorry, appeal to whom?

22       **MR. WOODWARD:**  To Oakland County Courts.  It's

23   pertaining to me and the University, Your Honor.

24       **MR. BUIKEMA:**  Sorry to interrupt, Your Honor.

25   It's actually in the Michigan Court of Appeals from the

---

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Woodward**
**Monday/April 19, 2010**

48

1    Oakland County Circuit Court.

2       **MR. WOODWARD:**  I have the number here, I don't

3    know the entire progress of that.

4       **THE COURT:**  It's an appeal from the Oakland County

5    to the Michigan Court of Appeals, okay.

6       **MR. WOODWARD:**  Okay.  So, I believe that the

7    University would use that, if my website was taken

8    down, so that they could say, "He liable and

9    slandered", et cetera, against me to hinder my appeal

10   process.

11      **THE COURT:**  Well, let me say this, if I were to

12   order preliminary injunction, I would condition it on

13   the University not being able to use that in any way,

14   shape or form in the Appellate Court.

15      **MR. WOODWARD:**  Thank you, Your Honor.

16      **MR. BUIKEMA:**  And we'd so stipulate.

17      **MR. WOODWARD:**  Great.  Okay.

18      **THE COURT:**  Okay.  We've made great progress.

19      **MR. WOODWARD:**  That was one of my -- that I had

20   concerns over.

21      **THE COURT:**  Sure.

22      **MR. WOODWARD:**  I would also like it if they not

23   mention this in any of the blogs or public view, et

24   cetera, that are used to communicate information about

25   all the schools in Antigua.  And there are other blogs

*10-10978; American University of Antigua v. Steven Woodward*

1        and Facebook pages, that they can't use that against me

2        to discredit my information.

3               So, if they say, "Ha, ha, we took down your

4        website --"

5          **THE COURT:**  How do you respond to that?

6    **RESPONSE BY MR. BUIKEMA**

7          **MR. BUIKEMA:**  Well, I can assure you that we

8        wouldn't say, "Ha, ha, we took down your website."

9               I think it would be up to my client as to what, if

10       anything, to do with a preliminary injunction ruling.

11       A preliminary injunction ruling is simply that, it's

12       not a finding on the merits of the case, it's simply a

13       preliminary injunction.

14              I think we're entitled, if one so chose, to

15       communicate truthfully that one was granted.  And

16       particularly, under the circumstances, as you've heard

17       at best, Mr. Woodward's defending representations on

18       his website, which have existed for a period of time

19       and have been in the pool of idea, so to speak are, at

20       best, made recklessly.

21              I can't tell you yes we would or no we wouldn't.

22       I would certainly counsel my client not to publish it

23       widely because there's a pending lawsuit to determine

24       the actual truth or falsity of the contents of his

25       website.

**Response By Mr. Buikema**
**Monday/April 19, 2010**                              50

1          But having said that, I think they'd be entitled

2      to inject that, truthfully, into the competing sphere

3      of ideas.

4          **THE COURT:**  Well, I'm not sure what that last

5      phrase mean, "Injecting into the sphere of ideas"?

6          **MR. BUIKEMA:**  In any campaign of information where

7      certain information is inaccurate or has been

8      prohibited, I think that's information that perspective

9      students or consumers should be entitled to.

10         **THE COURT:**  How would your client make this

11     communication?  How would it come out?

12         **MR. BUIKEMA:**  I don't think they would.  To tell

13     you the truth, and I think I started my remarks by

14     saying that I don't think they would.  And I would

15     counsel them not to, pending a final resolution in this

16     case.

17         But having said that, I think that they're

18     entitled to or it's, "Public knowledge", is a better

19     way of saying it, that a preliminary injunction was

20     granted.

21         **THE COURT:**  I think I would condition them on not,

22     until we get this all settled down, them not initiating

23     any kind of information along that line.

24         **MR. BUIKEMA:**  I understand.

25  **RESPONSE BY MR. WOODWARD**

*10-10978; American University of Antigua v. Steven Woodward*

1          **MR. WOODWARD:**  I would appreciate that, Your

2     Honor, because one of my videos demonstrates how they

3     manipulate other websites on the internet to remove

4     information that they don't like.

5          **THE COURT:**  All right.  What else?  Does that

6     solve all your problems?

7          **MR. WOODWARD:**  What I would like to do, Your

8     Honor -- can I use your board?

9          **THE COURT:**  Sure.

10         **MR. WOODWARD:**  Okay.  In doing so, Your Honor, and

11    me taking down my website, it could change the

12    positioning of my website on the internet itself, where

13    currently my website is there.

14         And if it's -- and if I totally delete my website,

15    then it could be on page -- it could end up being on

16    page, like, 56 or whatever, in the listing of the

17    internet.

18         And what I suggest, if I may use the board is --

19    are you aware with how websites are developed and

20    designed, Your Honor?

21         **THE COURT:**  Not completely, but go ahead.

22         **MR. WOODWARD:**  What you have, you have an index

23    page that's called, "Index" on HTML; and underneath

24    that page there's other web pages containing

25    information, Your Honor.

*10-10978; American University of Antigua v. Steven Woodward*

1          This page is called, "www.aua-med.com/index.html",

2     that's its address.

3          If I change this file to just say whatever you

4     feel is fair, "Under Review", I'm currently working,

5     "Under Construction", something that does not say that

6     it has an injunction against it, then when somebody

7     goes here, Your Honor, I have claims made to the

8     Department of Education concerning this institution.

9          I have the Michigan Attorney General, I sent links

10    to him.  The Federal Trade Commission, International

11    Trade Commission, the FBI, I've sent this information

12    to, Your Honor, concerning this school.

13         It took me from December 11th 'til I think the

14    12th before I got a claim form back from the Department

15    of Education concerning the release of these student

16    grades.

17         So, if these people go to a cite that says it has

18    an injunction against it or isn't there, then they

19    won't come back to the site --

20         **THE COURT:**  What do you suggest the website say?

21         **MR. WOODWARD:**  Under construction or maintenance.

22         **THE COURT:**  Okay.  In which case, all this

23    information will be withheld?

24         **MR. WOODWARD:**  What will happen, if I say,

25    "Maintenance" on this page right here, then the only

1      way that this information will be available is if they

2      actually go to whatever this file made was and view

3      that information.  They would have to go to a directory

4      and then into an index directory.

5          So, it wouldn't totally shut -- I mean, you're

6      always going to get this information.  The way to get

7      rid of everything would be to delete everything and it

8      would take months to get this stuff back together --

9      not that long, I take that back.  It would take me a

10     long time to rebuild this site, to upload all these

11     files.  It would take me a long time to rebuild

12     everything.

13         If I said, "Maintenance", then all I need to do is

14     change the wording of this file, change this file to

15     "Maintenance", and then somebody looks at it and it

16     says, "Under Maintenance".  And then they go away.

17         Without knowing the directory structure that they

18     would have to know for downloads, they would have to

19     know, "aua-med.com/download/index/html", then I don't

20     have to tear down my entire site.

21     **RESPONSE BY MR. BUIKEMA:**

22         **MR. BUIKEMA:**  I cannot help the manner in which

23     Mr. Woodward has constructed his site.

24         But if you're asking him to unrob a bank, I think

25     you should ask him to unrob the bank in its entirety.

**Response By Mr. Buikema**
**Monday/April 19, 2010**

54

1       And he should be responsible for the complications

2       associated with that.

3            It's not just the index site that contains false

4       and defamatory information.  It's all these pages with

5       substantive or purportedly substantive facts about my

6       client's business, which go beyond even his website

7       that published Youtube videos that he has narrated and

8       given to other sites.

9            He needs to be prohibited from publishing the

10      false and defamatory information in whatever form or

11      shape that he has published it.  Not simply in a way

12      that's convenient to him or saves him time in

13      reconstruction of the same should he prevail on the

14      merits eventually.

15  **RESPONSE BY MR. WOODWARD**

16      **MR. WOODWARD:**  Your Honor, I'm not guilty of

17      robing a bank yet, I'm just going to work for two

18      months and I leave tomorrow.

19           If I completely delete all this information then

20      my listing is gone; then if I am innocent, then to get

21      back on the first page of that listing on the search

22      engines would be extremely difficult.

23      **THE COURT:**  If you put maintenance where you are,

24      you're going to stay in line there, aren't you?

25      **MR. WOODWARD:**  I'm going to stay in line.  If I

*10-10978; American University of Antigua v. Steven Woodward*

```
 1        just put maintenance on this one page, then I'll stay

 2        in line.

 3             THE COURT:  And then delete the other, you'll

 4        still stay in line, won't you?

 5             MR. WOODWARD:  I don't know, Your Honor.  I can't

 6        imagine deleting all of that information out of there.

 7             THE COURT:  Well, here's my concern.  I'm not

 8        prepared today to go through each and every statement

 9        as to whether it's false or not; it may be, may not be.

10        It could take days and weeks and I'm not going to go

11        through all that.  And you've got to leave, you don't

12        have time to go through that now.

13             However, on the other hand, I'm concerned that if

14        there's some false information on there, it shouldn't

15        be on there.  And if we can put maintenance on there

16        and still hold your page, then maybe you can sit down

17        with brother counsel at a later point and say, "All

18        right, here's what I want to do, I'm going to put this

19        statement, this statement; this is a matter of

20        opinion --"

21             MR. WOODWARD:  How about this, Your Honor, as far

22        as a happy median?  The stuff like I use downloads, for

23        example, the download file or directory, if I rename

24        that to, "Dash-1", then the odds of somebody finding

25        that file, they'd never find that information because
```

1          none of the links that they had would match it.

2    RESPONSE BY MR. BUIKEMA

3          MR. BUIKEMA:  I'm not interested in limited odds

4     of somebody finding false and defamatory information.

5     I'm interested in it being removed from publication.

6          You know, Mr. Woodward being in line or deleting

7     this stuff, it's a red herring, Your Honor.  These are

8     computer files.  They're not being deleted.

9          What he's saying is they need to be deleted from

10    publication, which is exactly the purpose of this

11    motion.  I don't know want them published in any way,

12    shape or form, nor should they be.

13          If he wants to list, "Under Construction", under

14    his primary website, that's fine with me.  I don't need

15    it to say, you know, "Prevented" or "See injunction";

16    under construction is fine.

17          But there needs to be no means to access the

18    links, the derivative information, the Youtube

19    information, by Google search or by any other means.

20    It's in publication.  He needs to remove it from

21    publication.  That does not equal deleting the files

22    themselves.  He can maintain those and republish those

23    at a later date, if the Court finds so entitled.

24          THE COURT:  What about that?

25    RESPONSE BY MR. WOODWARD

*10-10978; American University of Antigua v. Steven Woodward*

1       **MR. WOODWARD:** Like I said, Your Honor, that would

2       be extremely difficult for me.  I'm gone for two

3       months.

4            The plaintiff claims that he has irreparable

5       damage.  I don't understand why he even brought this up

6       now since he's known about my site since June of last

7       year.  Even April of last year, his partners have known

8       about this site.

9            Since April of 2009, I contacted the Management

10      Department of St. Joseph Mercy Hospital and they knew

11      of my website.  They knew of the content of the

12      website.

13           They have discredit me on these public programs,

14      on these public blogs.  Their own people, on their

15      public blogs, is one of my exhibits here, Your Honor.

16      As far back as June of last year, were aware of the

17      contents of my website as far back as that far, they've

18      known about my website.

19           They've had to have known about it because just on

20      the listing of it, I'm five listings down if they just

21      search for it.

22           Now, all of a sudden, I'm creating this

23      irreparable damage and I don't understand where they've

24      said I've caused irreparable damage.

25           **THE COURT:** Tell me again about your solution, you

1           put "Maintenance" and what else you do next?

2                MR. WOODWARD:  Then I'll just rename these

3           directories so that it would be difficult for them to

4           find these directories.  If somebody had a link to the

5           directory, it just wouldn't work any more but the

6           information wouldn't be gone off the server.

7      RESPONSE BY MR. BUIKEMA

8                MR. BUIKEMA:  Your Honor, this is like the New

9           York Times publishing false and defamatory information

10          and then saying, "Your Honor, the cure is we'll only

11          publish it in certain areas or it will be difficult to

12          find our newspapers", it's not appropriate.

13               THE COURT:  I'm not satisfied that they're false,

14          there's your problem; not yours, his too, okay.

15          Because if I do what you're saying I should do, we may

16          be depriving him of the right to publish correct

17          information.

18               MR. BUIKEMA:  I started my remarks by

19          acknowledging that Mr. Woodward has a complete right to

20          express his opinion.

21               THE COURT:  I understand that.  Some of these I

22          think are opinions.  It seems to me that his solution

23          is reasonable, under the circumstances.  It's going to

24          certainly decrease the amount of publication and the

25          amount of people that would be able to see it until

1          further order of the Court.

2                  So, I'm going to order that you make maintenance

3          and then what's the other?

4   **RESPONSE BY MR. WOODWARD**

5                  **MR. WOODWARD:**  And then I'll change the directory

6          names so that they won't be able to -- matter of fact,

7          Your Honor, what I'll do to make it even harder is I'll

8          rename the index file so that they won't even be able

9          to automatically go into the directory and bring up the

10         content of the directory.  That would make it more

11         difficult for them to access more information.

12                 **THE COURT:**  All right.  Then that's the way we

13         we'll proceed.

14                 **MR. WOODWARD:**  Your Honor, can I also address his

15         Youtube issue?

16                 **THE COURT:**  Sure.

17                 **MR. WOODWARD:**  On the videos on Youtube, I'll mark

18         all of them as "Private" and then only myself, I don't

19         have any people that I've given permission to any of

20         this other stuff.  I'll mark all those private so they

21         won't be accessible on Youtube.

22                 **THE COURT:**  All right.

23                 **MR. WOODWARD:**  Everything else on the internet,

24         again, people have copied this stuff and download it.

25         Again, this stuff is on MSN, their video lists, it's

**Response By Mr. Woodward**
**Monday/April 19, 2010**

1    all over, Your Honor.

2        THE COURT:  You can do that what you say you do

3    before you leave?

4        MR. WOODWARD:  I'll work on it as soon as I get

5    home, Your Honor.

6        THE COURT:  So, you can do it before you leave?

7        MR. WOODWARD:  Yes, Your Honor.

8                    **Decision By The Court**

9        THE COURT:  Then do.

10       All right.  With that understanding, I'm not sure

11   that we need a preliminary injunction.  I'm satisfied

12   that what Mr. Woodward says he'll do, he'll do.  And if

13   he does that, that will solve the problem, for the time

14   being, so there won't be a preliminary injunction and

15   that's what you're getting in your favor.  I'm not

16   issuing one.

17       MR. WOODWARD:  Thank you, Your Honor.

18       THE COURT:  Doesn't mean I'm not going to,

19   eventually.

20       MR. WOODWARD:  Yes, Your Honor.

21       THE COURT:  But based on your representation what

22   you will do and do it before you leave, we'll just

23   leave it as is.  And somehow, can you send a

24   communication to the Court and brother counsel as to

25   exactly what you've done?

*10-10978; American University of Antigua v. Steven Woodward*

**Decision By The Court**
**Monday/April 19, 2010**                    61

```
 1        MR. WOODWARD:  Yes, Your Honor, I'll take video
 2    shots of what I've changed, so you'll have a picture
 3    from my screen of everything that's been done.
 4        THE COURT:  Can you do that by way of email to the
 5    Court?
 6        MR. WOODWARD:  I can email that to Ms. Orem.
 7        THE COURT:  Hold on.  My clerk says to describe
 8    what you've done in email by words.
 9        THE CLERK:  It just overwhelms our emails,
10    oversize files.
11        MR. WOODWARD:  I'll describe what I've done, yes,
12    Your Honor.
13        THE COURT:  Copies, of course, to counsel.
14        MR. WOODWARD:  Yes, Your Honor.
15        THE COURT:  All right.  Court's in recess.
16  RESPONSE BY MR. BUIKEMA
17        MR. BUIKEMA:  Your Honor, I'm sorry.
18        THE COURT:  Sure, go ahead.
19        MR. BUIKEMA:  Have we agreed to a stay then while
20    Mr. Woodward is absent?
21        THE COURT:  A stay of what?
22        MR. BUIKEMA:  A stay of proceedings, of discovery.
23        THE COURT:  Sure, yes.  It will be a stay until he
24    gets back.
25        And you're going to get a lawyer, you said, as
```

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Buikema**
**Monday/April 19, 2010**                                    62

1    soon as you get back?

2       **MR. WOODWARD:**  Yes, Your Honor, I should have

3    somebody when I get back.

4       **MR. BUIKEMA:**  And Your Honor, could we just have a

5    date certain as to when the case would be re-opened?

6       **MR. WOODWARD:**  I'll be back no later than the end

7    of June.

8       **THE COURT:**  All right.  Then what I'd like you to

9    do then by July 15th, send an email to the Court and to

10   brother counsel telling us the status of the lawyer

11   search, okay.  I have a lawyer and his or her name is

12   such and such and I need another week or to so we know

13   what's going on.

14      **MR. WOODWARD:**  I'll notify you as soon as I get

15   back too, Your Honor, because it could be earlier than

16   that.  I just don't want to be late.

17      **THE COURT:**  My Clerk reminds me, we scheduled this

18   case so you've got a copy of this.  So, the lawyer you

19   get should get a copy of this and discovery ends on

20   September 15th and witnesses by September 15th.  So,

21   you've got a copy of this and make sure your lawyer

22   gets it quickly.

23      **MR. WOODWARD:**  Yes, sir.

24      **MR. BUIKEMA:**  Thank you, Your Honor.

25      (Whereupon proceedings concluded at 3:13 p.m.)

*10-10978; American University of Antigua v. Steven Woodward*

**Response By Mr. Buikema**
**Monday/April 19, 2010**                                                63

- - -

1                                    -      -      -

2

3

4                              -    -    -

5                    **C E R T I F I C A T I O N**

6          I, Nefertiti A. Matthews, official court reporter

7     for the United States District Court, Eastern District of

8     Michigan, Southern Division, appointed pursuant to the

9     provisions of Title 28, United States Code, Section 753,

10    do hereby certify that the foregoing is a correct

11    transcript of the proceedings in the above-entitled cause

12    on the date hereinbefore set forth.

13          I do further certify that the foregoing

14    transcript has been prepared by me or under my direction.

15

16    Date: August 2, 2010

17

18    s:/Nefertiti A. Matthews
      Nefertiti A. Matthews,
19    Official Court Reporter

20                              -    -    -

21

22

23

24

25

_10-10978; American University of Antigua v. Steven Woodward_