# ORIGINAL

Case 2:10-cv-10978-PJD-MJH



U.S. DISTRICT COURT CLERK
EAST DIST MICH
FLINT

2010 AUG -6  A 9 22

FILED

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA,
COLLEGE OF MEDICINE, a foreign corporation,

Plaintiff,

V

STEVEN WOODWARD,

Defendant,

CASE No.: 2:10-cv-10978-PJD-MJH
Judge Patrick J. Duggan
Magistrate Judge

AMENDMENT TO:
"REQUEST FOR SETTING ASSIDE MOTION FOR DEFAULT
REQUEST FOR DISSMISSAL FOR ON GROUNDS OF PERJURY, OBSTRUCTION
and CONTEMPT."

MOTION FOR DISSMISSAL FOR ON GROUNDS OF PERJURY, OBSTRUCTION
and CONTEMPT

MOTION FOR PRELIMINARY INJUNCTION FOR WWW.AUAMED.ORG

AMENDMENT TO:
"REQUEST FOR SETTING ASSIDE MOTION FOR DEFAULT
REQUEST FOR DISSMISSAL FOR ON GROUNDS OF PERJURY, OBSTRUCTION
and CONTEMPT."
MOTION FOR DISSMISSAL FOR ON GROUNDS OF PERJURY, OBSTRUCTION
and CONTEMPT

This amendment will add supporting evidence.

Amended: List of Exhibits:
Exhibit 7: DEFENDANTS TRINITY HEALTH-MICHIGAN and SUSAN ZONIA'S
CASE EVALUATION STATEMENT

Exhibit 8: CLINICAL CLERKSHIP AFFILIATION AGREEMENT Between
AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE And St.
JOSEPH MERCY_OAKLAND

Exhibit 9: FIFTH SEMESTER INTRODUCTION TO CLINICAL MEDICINE COURSE
SYLLABUS

Exhibit 10: From the Vice President, Jaqbir Nagra

Exhibit 11: From the Vice President, Peter Bell

Exhibit 12: Revised Lecture Schedule

Exhibit 13: Student Statement

Exhibit 14: Email from Jeffrey Yanez, dated December 10, 2007

Exhibit 15: Scholar360 Final Exam grades for Steven Woodward

Exhibit 16: Email from Nicoletti & Associates, P.C., dated December 20, 2007 6:22:22
PM

Exhibit 17: Email from JEC, Jorge E. Calderon, Dean of Clinical Sciences, dated
December 20, 2007 8:53 PM

Exhibit 18: Email from registrar@AuaMed.org date 1/6/2008, Steven Woodward Final
Course Grade.

Exhibit 19: Student Evaluation – Outpatient Rotation

Exhibit 20: In-Patient Student Evaluation

Exhibit 21: Final Grades by Component – Fall, 2007

Exhibit 22: The Department of Health and Human Services and The Department of Justice Health Care Fraud and Abuse Control Program Annual Report for FY 2005

Exhibit 23: Former Payne Intern Guilty of Visa Fraud

Exhibit 24: Schedule of Clinical Rotations

Exhibit 25: Email from Deneen Nicks(McCall), dated September 12, 2007.

Exhibit 26: www.AUA-MED.com

Exhibit 27: "Fifth Semester Preliminary Clinical Medicine Course Guidelines"

Original:
"In accordance with Fed. R. Civ. P. 55(c), and Fed R. Civ. P. 60 (b). I request that the Request Clerk's Entry of Default be set aside.
This is in accordance with the Honorable Judge Duggan's change in time table allowing the defendant, Steven Woodward, time to find legal counsel.  Pure logic dictates that I was not under an obligation to submit a pleading until after July 15th , 2010 because of the time  I was given to obtain legal counsel, per Fed. R. Civ. P. 12 (a), (1).  There have been no dates assigned to me for answering the claim as of yet, since I do not reside inside the United States, I am here only to defend myself.

I have made every effort to defend myself and comply more than timely in these proceedings and as such request the Default be set aside and be adequately notified of the date of which my answer and counter claim has to be filed.

Exhibit 1:
The plaintiff's attorney, Eric A. Buikema, knew I was living abroad per the conversation in the presents of the Honorable Judge Duggan stated that I was living in the "Caribbean", but in "PLAINTIFF'S VERIFIED COMPLAINT AND EX PARTE REQUEST FOR TEMPORARY RESTRAINING ORDER" states in number 3.
"Defendant Steven Woodward is a resident of Flint, Michigan who, upon last information and belief, makes his home on a sailboat in the vicinity of Flint, Michigan."
This statement is perjury USC:18:1621, obstruction and contempt.

The following exhibits is another example of perjury made by the plaintiff.  (Exhibit 2)The plaintiff's own Exhibit C from "INDEX OF EXHIBITS TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION" is proof of this.  The plaintiff states in "PLAINTIFF'S VERIFIED COMPLAINT AND EX PARTE REQUEST FOR TEMPORARY RESTRAINING ORDER".  (Exhibit 3) Number 21. h. "AUA students are sexually assaulted"

Their own Exhibit C(Exhibit 2) states "AUA student sexually assaulted".  The plaintiff's attorney used the excuse of plurality in his defense in the presence of the Honorable Judge Duggan.

Exhibit 4:
This exhibit is my flight itinerary.  This is proof I was living on St Maarten and traveled to Flint, Michigan to defend myself.

Exhibit 5:
This email to Andrea_Teets@mied.uscourts.gov demonstrates my intentions to defend myself and to try and obtain procedural deadlines.

Exhibit 6:
This email also to Andrea Teets demonstrates that I am trying to obtain accurate dates due to my situation of living abroad.

I quote:
"Please advise me on the waiver and motion process and process dates so I can establish dates to defend myself."

The plaintiff's attorney knew I was returning from abroad and was granted time to seek counsel until July 15, 2010.

I request this case be dismissed."

**Amended addition:**
What follows will support the statement that the plaintiff was fully aware of the true residence of the defendant.  This perjury would effect court Rules, both Eric A. Buikema and "Neal S. Simon, JD" are trained in the law.

Exhibit 7 is evidence that both the plaintiff and their attorney were aware of the defendants true residence.
Exhibit 7, page 5 states "**Since December 2007, Woodward has been living on a sailing yacht in St. Maarten, scuba diving**."  This statement was received on January 19th 2009 at the "State of Michigan in the Circuit Court for the County of Oakland".  It is from the "DEFENDANTS TRINITY HEALTH-MICHIGAN and SUSAN ZONIA'S CASE EVALUATION".  Defendants were Trinity Health-Michigan, Susan Zonia, American University of Antigua College of Medicine.
The plaintiff and their attorney were aware of this as shown in their own document file with this court "PLAINTIFF's VERIFIED COMPLAINT AND EX PARTE REQUEST FOR TEMPORARY RESTRAINING ORDER", page 3 number 14 "**The lawsuit was filed in the Oakland County Circuit Court on or about December 20, 2007, where it was known as Case No. 07-088103-CZ and assigned to the Honorable Shalina Kumar**."

4

To continue, on Exhibit 26 www.aua-med.com under the **"Contacts"** there is a link, which clearly states **"Contact Information: info@aua-med.com"** but the plaintiff did not attempt to contact the defendant via the published contact information. Both the plaintiff and their attorney had access and were aware of this contact information, since this "Contacts" link is published on the Uniform Resource Locator, URL on the defendants "Home" page URL "www.aua-med.com" where the plaintiff's own Exhibit C(defendant Exhibit 2) was copied **"http://www.aua-med.com/main.html"** this page is a **"frame"** html file that creates the URL **"www.aua-med.com"** "Home" page. The defendant's URL is also published in the plaintiff's "INDEX OF EXHIBITS TO PLAINTIF'S BRIEF IN SUPPORT OF ITS MOTION FRO A PRELIMINARY INJUNCTION", **"Exhibit C – Copy of www.aua-med.com website."**

I continue

Exhibit 16 contains Neal Simon's email address **"nssimon@auamed.org"** in the "TO" section of this email along with the defendant's alternate email address **"steve_l_woodward@yahoo.com"**, this email address was commonly known and used by AUA and their partners to communicate with the defendant as shown in the "To:" and "From" sections in the Exhibit 12 email.

The plaintiff's "PLAINTIFF'S VERIFIED COMPLAINT AND EX PARTE REQUEST FOR TEMPORARY RESTRAINING ORDER" is evidence that the plaintiff lies again about the defendant by quoting on page 4 number 21(L on page 5). The plaintiff quotes **"AUA student pass rate for the USMLE medical board exams is only 22.9%"**. The plaintiff's own Exhibit C(defendant Exhibit 2) is evidence of this lie **"Antigua only has a 22.9% USMLE Pass Rate!"** this is a hyperlink on the defendants URL www.aua-med.com (Exhibit 26) which links to a video.
The Exhibit 26 URL www.aua-med.com, button **"Video Index"**, **"Part 16 "USMLE Step 1 Pass Rate for AUA, HUGE RED FLAG!!"** at about 0:36 timeframe the defendant states **"AUA administration If you have more accurate data than what I have demonstrated in this video, I am more than willing to modify both this video and www.AUA-MED.com to reflect that data."** The defendant has not received any requests from the plaintiff to correct any data on the defendant's URL.

I will now further support my claim in the following Exhibits, demonstrating the character of the plaintiff. The following will demonstrate that the plaintiff knowingly commits breach of contract, fraud, Internet fraud.

http://www.law.cornell.edu/search/index.html "Contracts: Contracts are promises that the law will enforce. The law provides remedies if a promise is breached or recognizes the performance of a promise as a duty. Contracts arise when a duty does or may come into existence, because of a promise made by one of the parties. To be legally binding as a contract, a promise must be exchanged for adequate consideration. Adequate consideration is a benefit or detriment which a party receives which reasonably and fairly induces them to make the promise/contract. For example, promises that are purely gifts are not considered enforceable because the personal satisfaction the grantor of the

5

promise may receive from the act of giving is normally not considered adequate consideration. Certain promises that are not considered contracts may, in limited circumstances, be enforced if one party has relied to his detriment on the assurances of the other party.

http://www.law.cornell.edu/search/index.html "Breach of contract: The violation of a contractual obligation.  One may breach a contract by repudiating a promise, failing to perform a promise, or interfering with another party's performance."

http://www.thefreedictionary.com
fraud (frôd)
*n.*
**1.** A deception deliberately practiced in order to secure unfair or unlawful gain.
**2.** A piece of trickery; a trick.
**3.**
**a.** One that defrauds; a cheat.
**b.** One who assumes a false pose; an impostor.

http://www.thefreedictionary.com
Internet fraud
The term "**Internet fraud**" generally refers to any type of fraud scheme that uses one or more online services - such as chat rooms, e-mail, message boards, or Web sites - to present fraudulent solicitations to prospective victims, to conduct fraudulent transactions, or to transmit the proceeds of fraud to financial institutions or to others connected with the scheme.

Exhibit 8 is the **contract** between American University of Antigua and St Joseph Mercy-Oakland.  On page 1 of Exhibit 8 it states "**The Hospital clerkship program will include rotations in Internal Medicine, Surgery, Family Medicine, Pediatrics, and Obstetrics and Gynecology and electives.**"
Exhibit 8 page 4 shows this contract was signed by **Neal S. Simon.**

I continue

Exhibit 9 is the Fifth Semester Introduction to Clinical Medicine Course Syllabus.
On page 4 and 5 of Exhibit 9 is section "**C. Objectives**" and "**By the end of the course, students will be able to:**" continued on page 5 number "**11. Start the in-depth study of General Clinical Sciences, including Internal Medicine, Surgery, Pediatrics, Gynecology, Obstetrics, Family Medicine and Psychiatry.**"  The Syllabus defines the 5th Semester course content and grading, for which the students paid for and expect to receive.

I coninue

6

Exhibit 27, page 2 is the course Guideline, section "E  Clinical Rotations –Schedule". This also defines the Clinical Rotations: **"Rotation in hospital wards (H), Emergency Department (ED), hospital outpatient facility (HO), preceptors office (PO)" Rotation in outpatient specialty services (either hospital or preceptor's office) Internal Medicine (IM), Surgery (S), Pediatrics (Ped), GY/OB, Psychiatry (PS)"**

I continue

Exhibit 24 is the "University of Antigua School of Medicine Fifth Semester – Fall 2007 **Schedule of Clinical Rotations**". It shows the students at St Joseph Mercy Oakland hospital were offered only **3** of the at least **6** rotation they paid for per the course Syllabus, Guidelines and the contract between the hospital and university.

I continue

Exhibit 25 is evidence that shows that the course started on **September 13, 2007**. Exhibit 27 page 1 from the course Guidelines, shows that the course should have started on **September 7, 2007**, Exhibit 24 is the Schedule of Clinical Rotations, at the top it states "Week Starting on", " **September 10**".

This is evidence that two students **Steven Woodward** and **Paras Chahal** did not receive an **"Emergency Medicine"**, meaning they were cheated out of approximately **60%** worth of training they paid for, because of the unorganized nature of the plaintiff.  Furthermore, the **"Emergency Medicine"** rotation was not a core predefined rotation, but could only be described as an **"elective"** in the contract between the hospital and the university.

This is evidence of the plaintiff and their partners knowingly committed fraud and breach of contract for not providing services per, both the course Syllabus, course Guideline, and the contract between the hospital and university.

I will now demonstrate another example that the plaintiff knowingly commits breach of contract, fraud, Internet fraud, during the same 5th Semester program.  I will demonstrate the plaintiff did not provide services promised and paid for.  The students paid for examinations that are specifically given to prepare them for the United States Medical Licensing Exam(USMLE).

Exhibit 10 is from www.auamed.org it is titled "From the Vice President" the last sentence of the third paragraph states **"Our faculty prepares every student to succeed on the National Board of Medical Examiners (NBME) Shelf Exams and the United States Medical Licensing Exam (USMLE)"**.  This statement defines the purpose of the **"Shelf Exams"** to be used for preparing the students for the USMLE.

I continue

Exhibit 11 is from www.auamed.org it is titled "From the Vice President" from Peter Bell.  Exhibit 11, page 2, 3rd paragraph, "**National Board of Medical Examiners**

**(NBME) Shelf Exams are used as final exams for the Basic Sciences courses, ensuring that the students meet U.S. medical education requirements.**" This statement also defines the purpose of the "Shelf Exams" to ensure the students meet U.S. medical education requirements.

I continue


Exhibit 12 is an email from Deneen Nicks(McCall) dated October 8, 2007. This email contained a revised course schedule, the course started on September 13, 2007. Exhibit 12 page 4 last lines, 12/11 the students were scheduled to take a "**Shelf Like**" exam and on 12/14 the students were scheduled to take the "**Shelf Exam**". The plaintiff did NOT administer these exams.

I continue

Exhibit 13 is the Statement of Account from the American University of Antigua for Steven Woodward. This statement is dated **3/19/2009**. On date **09/01/2007** Steven Woodward was charge for "**Testing Fees.**" The plaintiff and the hospital did not give either the scheduled "**Shelf Like**" exam or the "**Shelf Exam**" which are used to prepare the student for the USMLE or to meet educational requirements.

I continue

Exhibit 18 is an email from the plaintiff, dated 1/6/2008. The attached file is page 2 of Exhibit 18 this is evidence that the student should have received a "**Shelf**" exam but the University did not administrate the exam.

I continue

Exhibits 10, 11, 12 and 13 is evidence of fraud and false advertisement using the Internet committed by the plaintiff. The plaintiff emailed the statement to Steven Woodward that showed they were billed for services that were not rendered.

I will now show evidence of fraud, Internet fraud, and perjury with intent to commit obstruction by the plaintiff. The evidence that I will produce was from the same 5th Semester program.

http://encyclopedia.thefreedictionary.com/perjury
**Perjury** (also called **forswearing**) is the act of lying or making verifiably false statements on a material matter under oath or affirmation in a court of law or in any of various sworn statements in writing. Perjury is a crime because the witness has sworn to tell the truth and, for the credibility of the court, witness testimony must be relied on as being truthful. Perjury is considered a serious offense as it can be used to usurp the power of the courts, resulting in miscarriages of justice. In the United States, for example, the

8

general perjury statute under Federal law provides for a prison sentence of up to five years, and is found at 18 U.S.C. § 1621 See also 28 U.S.C. § 1746.

http://encyclopedia.thefreedictionary.com/Obstruction+of+justice
Generally, obstruction charges are laid when it is discovered that a person questioned in an investigation, who is not a suspect, has lied to the investigating officers. However, in most common law jurisdictions, the right to remain silent allows any person who is questioned by police merely to refuse to answer questions posed by an investigator without giving any reason for doing so. (In such a case, the investigators may subpoena the witness to give testimony under oath in court) It is not relevant if the person lied to protect a suspect (such as setting up a false alibi, even if the suspect is in fact innocent) or to hide from an investigation of their own activities (such as to hide their involvement in another crime). Obstruction charges can also be laid if a person alters or destroys physical evidence, even if they were under no compulsion at any time to produce such evidence.

Exhibit 14 is an email from Jeffrey Yanez, Course Director, dated December 10, 2007 8:05:42 AM
**"Due to testing irregularities**, AUA will allow you a retake on the **Vocabulary** section"
**"You will need a total score of 560 out of 800 questions.  80%(640) less the 10% curve = 560 questions"**

This email defined the requirements to **PASS** the Final Exam for the 5th Semester.  The final exam was taken using the on-line testing application Schalor360.  This email demonstrates there was to be a **10%** curve added to the Final Exam.  This email also defined the minimal number of questions the students needed to answer to obtain a "Passing" grade.

I continue

Exhibit 15 is the Final Exam Grades for Steven Woodward from the Internet testing application Scholar360.  "Total Points Earned: **568**", "Current Average:**71**", "Final Grade: **71**" and "Test – Final Exam – Block 2C(**Vocabulary**) Grade **88**.  This email is evidence that Steven Woodward **PASSED** the Final Exam.

I continue

Exhibit 16 is an email from Nicoletti & Associates, P.C. Subject: Steven Woodward v. Trinity Health-Michigan, To:billcain@comcast.net; steve_l_woodward@yahoo.com; yanezj@trinity-health.org; nssimon@auamed.org; vhrehorovich@auamed.org; zonias@trinity-health.org
The email is dated: **December 20, 2007 6:22:22 PM**
**"Enclosed please find a copy of the civil action that was filed this afternoon.  I would hope that this matter could be resolved without the need for costly and protracted litigation."**  This email establishes the date of which Steven Woodward initiated the lawsuit against the plaintiff and their partners.  In this email it clearly shows that Steven Woodward desired to resolve the situation without litigation.  Steven Woodward had

9

fulfilled all of his requirements to pass the 5th Semester **PRIOR** to the writing of this email.

I Continue

Exhibit 17 is an email from jecmpark@aol.com this user is Jorge E. Calderon, JEC, Dean of Clinical Sciences.  This email was sent **December 20, 2007 8:53 PM**
"For those of you that took the Final exam using Scholar360, I need you to e-mail me your evaluation of that Program.  **Exclude from it the vocabulary portion** that was not good because we did not have the time to correct it."

This email was sent after the lawsuit notification.  This also demonstrates how corruptly the program is administered.  One entire section of the Final Exam is omitted because the plaintiff  "**did not have time to correct it**".  Steven Woodward earned an **88%** on the "**Vocabulary**" section.  The Final Exam was automatically corrected and was administered on December 7th giving them plenty of TIME to correct it.

I continue

Exhibit 18 is an email from the plaintiff, dated 1/6/2008.  The attached file is page 2 of Exhibit 18  The University assigned an "**F**" to Steven Woodward for the 5th Semester course.  Page 2 is also evidence that the student should have received a "**Shelf**" exam but the University did not administrate the exam.
This evidence shows that the plaintiff used the Internet to commit fraud for purposefully failing the plaintiff and for not administrating exams that were paid for by the student.

I continue

Exhibit 19 is the Student Evaluation – Outpatient Rotation for Steven Woodward
Attendance: **A**, Defined as: "Attended all scheduled sessions"
Medical Knowledge: **79%**
Attitude: **95%** – (90-100%  Outstanding)
Learning Skills: **95%**
Communication Skills: **95%**
Professionalism: **95%**
Exhibit 19 page 2
General observation on the student's performance and suggestions for improvement:
"**Very Computer Literate**"
"**Excellent Student**"
Skills: (80-<90% Superior)
C) Overall skill to perform comprehensive physical examination: **80%**
D) Overall Skill to perform focused Physical examination: **80%**
This evaluation was signed by Dr. Breitenbach on **November 29, 2007**.  This evidence demonstrates that **Steven Woodward** was an **OUTSTANDING** and **EXCELLENT** Student.

I continue

Exhibit 20 is the In-Patient Student Evaluation for Steven Woodward
Attendance: **A**, Defined as: "Attended all scheduled sessions"
Medical Knowledge: **80%** (80-<90% Superior)
Attitude: **90%** – (90-100% Outstanding)
Learning Skills: **90%**
Communication Skills: **90%**
Professionalism: **90%**
This evaluation was signed by Dr. Malloy.  This evidence demonstrates that Steven
Woodward was a SUPERIOR and OUTSTANDING Student.

I continue

Exhibit 9 "Fifth Semester Introduction To Clinical Medicine Course Syllabus"
Pages 11 and 12 contain section "III. Evaluation and Grading"
"A) Passing Grade Minimal requirements

Minimal total course grade     **75%**
Minimal lecture attendance     **85%**
Minimal practical session attendance **85%**
Minimal hospital lecture and other academic sessions attendance **50%**
Minimal Out-patient session attendance **90%**
Minimal Correlation Course questions   **80%**(1,600)
Minimal total quizzes score **60%**
Minimal final written exam score **80%**
Minimal final practical exam score **80%**"

Exhibit 9 defined the MINIMAL requirements for passing the FINAL EXAM.

I continue

Exhibit 21 is the Final Grades by Component – Fall, 2007
Steven Woodward did not have access to Exhibit 21 until after the Depositions of Susan
Zonia, Jeffrey Yanez, and Deneen McCall(Nicks) on February 3, 2009.

Per the predefined rules for grading the 5th Semester Program Final Exam, Exhibit 9:
Bulat, Elizabeth is the ONLY student that should have passed the course.
**Hampel, Nicola** did not achieve the Minimal total quizzes score of 60%, they only
earned a **54%**. This student also failed to meet the required Minimal final written exam
score of 80%, their score was **77%**.
**Jayadeep, Simbia** did not achieve the Minimal total quizzes score of 60%, they only
earned a **57%**.
**Ozuomba, Michael** did not achieve the Minimal total quizzes score of 60%, they only
earned a **56%**.   This student also failed to meet the required Minimal final written exam
score of 80%, their score was **70%**.

11

According to these grades AUA failed this student.

**Chheda, Vishal** should have failed for the grade they received for, "Prac Session" attendance of only **75%**. The required minimal practical session attendance is 85%.   This student should have also failed for their "Practical Ex" grades of only **75%**.  The required Minimal final practical exam score is 80%.

**Evans, Lekedra** only earned a **73%** for the "Written Ex", Minimal final written exam score, the passing requirement was 80%.

**Paras Chahal** did not achieve the Minimal total quizzes score of 60%, they only received a **58%**.  This student also failed to meet the required Minimal final written exam score of 80%, their score was **79%**.

**Hamed, Mousa** received a "0" for the Out-Patient score the Minimal Out-patient session attendance score is 90%.

**Kristen, Nico** received a "0" for the Out-Patient score the Minimal Out-patient session attendance score is 90%.  This student also failed to meet the required Minimal final written exam score of 80%, their score was **78%**.

Without a "**CURVE**" for the Final Written Exam, **6 out of 10** students should have failed the course.  The promised and published curve was **10%** as shown on Exhibit 14, the email from Jeffrey Yanez, Course Director.  The University only applied a 4% curve without any notification.

The plaintiff passed the student that received the LOWEST  Final score for the course, Chheda, Vishal, their score was only 76%, yet the plaintiff assigned them a "C".

Evans, Lekedra, earned an 83%, yet the plaintiff assigned them a "C(-)"

The plaintiff assigned an "**F**" to the Final Grade Adjusted for Steven Woodward even though they earned and **80%**!

The university wrote note (3) next to the grades for the student Steven Woodward. This note states "**Failed Final Exam, Did take remedial and failed**" and "**Did not have OP rotation.  Toal score / 95.**"

Steven Woodward did not "**Failed Final Exam**", Exhibit 14 from the Course Director, is proof of this, stating "**Due to testing irregularities**" and "**less the 10% curve**" and Exhibit 17 from the Dean of Clinical Sciences reinforces this argument "**Exclude from it the vocabulary portion that was not good because we did not have the time to correct it**".  Steven Woodward did retake the "Vocabulary" section due to the poor quality of the testing application.  Exhibit 15 Scholar360 Final Grades shows that Steven Woodward earned an **88%** for the Vocabulary exam that was retaken.

The University added to the note "**Did not have OP rotation**", there were only two rotations one being "**Outpatient**", Steven Woodward earned a **95%** for his Outpatient,OP rotation.

Evans, Lekedra has note (1) added to her records, it states "Failed Final Exam. Remedial score 78. Final Grade: C(-)" and " Failed Final Exam. Has not taken remedial".  This student's Final Written Ex score was only **77%** with the 4% curve, so this student should have failed.

Steven Woodward and Michael Ozuomba should not have been failed.

I have shown how AUA unfairly falsifies and manipulates student grades defrauding their student(s). The plaintiff used the Internet to commit this fraud.

I continue

Exhibit 7 is the Trinity Health-Michigan, Susan Zonia and American University of Antigua "Defendants Trinity Health-Michigan and Susan Zonia's Case Evaluation Statement" submitted to State of Michigan in the Circuit Court for the County of Oakland. Exhibit 7, page 5 **"In any event, in early December 2007, before Dr. Zonias December 17 letter, Woodward took and failed the fifth semester Final Exam. AUA required an 80% score to pass the final exam. Based on AUA's curve for the exam, which was set by AUA in Antigua, Woodward scored a 75% on the final exam. Woodward received an "F" for the fifth semester."** a note (2) was added **"Woodward claims he actually passed the final exam"**
and from page 11 **"Woodward failed the fifth semester course, receiving an "F" for the fifth semester before he was dismissed form AUA."**
This evidence demonstrates that the plaintiff and their partners and attorneys committed fraud and perjury for the purpose of committing obstruction. This evidence was received by Oakland County Circuit Court January 19, 2009

Steven Woodward did not have access to **Exhibit 21,** Final Grades until after the depositions of Susan Zonia, Jeffrey Yanez, and Deneen McCall(Nicks) on **February 3, 2009.**

From the exhibits presented I will now create a timeline further demonstrating that the plaintiff committed fraud with the intent to commit obstruction and perjury.

**Prior to December 10, 2007** the Course Director, Jeffrey Yanez notifies the students of a 10% curve that will be added to the Final Written Exam. Steven Woodward had completed the requirements for passing the 5th Semester prior to December 20, 2007.

**December 20, 2007 6:22:22 PM** The plaintiff is notified of a civil action between Steven Woodward and Trinity Health-Michigan. (Exhibit 16).

**December 20, 2007 8:53 PM** the plaintiff sends out an email stating that the "Vocabulary" portion of the Final Written Exam will be excluded because the plaintiff did not have the time to correct it. The final exam was given on Friday, December 7, 2007. Scholar360 is an Internet testing application, it's automatically graded. Even with "testing irregularities" the plaintiff had from December 7th to December 20th to correct these exams.

The plaintiff adds only a 4% curve, without notifying the students of the change. If they did not add a curve, 6 out of 10 students would have failed the Final Exam.

The plaintiff passes students that should have failed the class per the course Syllabus grading policy.

**January 6, 2008** Steven Woodward's 5th Semester course grades "F" are posted. The plaintiff uses this falsified failing grades in court proceedings.

**January, 19 2009**, Defendants: Trinity Health-Michigan, Susan Zonia, and American University of Antigua publish perjured statements in Exhibit 7, Case Evaluation Statement to the State of Michigan in the Circuit Court for the County of Oakland. **"Woodward took and failed the fifth semester Final Exam."** on page 5 a note (2) was even added **"Woodward claims he actually passed the final exam"** and on page 11 **"Woodward failed the fifth semester course, receiving an "F" for the fifth semester before he was dismissed from AUA."**

Steven Woodward did not have access to Exhibit 21 until after the depositions of Susan Zonia, Jeffrey Yanez, and Deneen McCall(Nicks) on **February 3, 2009**.

Exhibit 22 is "The Department of Health and Human Services and The Department of Justice Health Care Fraud and Abuse Control Program Annual Report For FY 2005. Exhibit 22, page 2, (Page 20 of the report)

"St Joseph Mercy-Oakland Hospital in Michigan agreed to pay $4 million for allegedly violating the anit-kickback statute and Stark law in connection with financial arrangements between the hospital and more than a dozen physician groups. The hospital voluntarily disclosed the potential violations under the HHS/OIG's "Provider Self-Disclosure Protocol."
This evidence demonstrates that the plaintiff's partners commit fraud against the members of their community.

Exhibit 23 News article "Former Payne Intern Guilty of Visa Fraud". This evidence demonstrates that Donald Payne's office is tied to criminal activities.

Exhibit 10 and 11 demonstrate that the content under the Uniform Resource Locator, URL www.auamed.org has been modified.

14

MOTION FOR PRELIMINARY INJUNCTION FOR WWW.AUAMED.ORG

I request a Preliminary Injunction for the Uniform Resource Locator, URL www.auamed.org.

I request that the URL is either shut down or restored using backup recovery files only from a point and time of when the plaintiff filed their claims. I request that the URL be shut down until the site is restored.

I request that any files linked to this URL that are controlled by the plaintiff or any partner be reverted to a point prior to the filing of claims against the defendant. This includes any files that can be downloaded from links under this URL.

I request that the plaintiff is prohibited from making any more modifications of any kind to this URL or any documents linked to this site for the duration of these court proceedings.

15

### STATE OF MICHIGAN
### IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

RECEIVED JAN 1 9 2009

BY:................

STEVEN WOODWARD,

    Plaintiff,

v.



"OAKLAND COUNTY" 07-088103-CZ

JUDGE SHALINA KUMAR
WOODWARD,STEV  v  TRINITY HEAL1

TRINITY HEALTH-MICHIGAN,
a Michigan Nonprofit corporation,
SUSAN CATHERINE ZONIA, an Individual,
AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE,
a Foreign corporation,

    Defendants.

---

NICOLETTI & ASSOCIATES, P.C.
Paul J. Nicoletti (P44419)
*Attorney for Plaintiff*
39520 Woodward Avenue, Suite 200
Bloomfield Hills, MI 48304
248.203.7800

LAW OFFICE OF DAVID B. GUNSBERG, P.C.
David B. Gunsberg (P24235)
*Attorney for Defendants Trinity Health-Michigan and Susan Catherine Zonia; Co-Counsel for Defendant American University of Antigua College of Medicine*
322 North Old Woodward Avenue
Birmingham, MI 48009
248.646.9090

LAW OFFICES OF BRYAN L. SCHEFMAN
Bryan L. Schefman (P35435)
*Attorney for Defendant American University of Antigua College of Medicine*
322 North Old Woodward Ave.
Birmingham, MI 48009
248-723-1650

---

## DEFENDANTS TRINITY HEALTH-MICHIGAN and SUSAN ZONIA'S CASE EVALUTION STATEMENT

### DATE & TIME:

8:40 a.m., January 22, 2009

### EVALUATORS:

Robert L. Stefani, Douglas C. Bernstein, Thomas J. Gagne

*Exhibit 7*
*Pg1*

Steven Woodward filed Defamation and Interference with Contract claims against Dr. Susan Zonia and Trinity Health-Michigan/St. Joseph Mercy Oakland Hospital (SJMO) arising out of a December 17, 2007 letter written by Dr. Susan Zonia to Dr. Ernesto Calderon, of American University of Antigua (AUA) Medical School (**Exhibit 1**).[1]

Woodward was a fifth semester medical student at American University of Antigua (AUA) Medical School, who was assigned to SJMO for AUA's fifth semester (V semester) program.  Zonia was the Director of Medical Education at SJMO and on site AUA Dean of AUA's SJMO program.  Thus, Zonia worked for both SJMO and AUA with respect to the fifth semester program.  Zonia was "in charge" of AUA's fifth semester program at SJMO.

Dr. Jeffrey Yanez was the SJMO Medical Director for the fifth semester program.  Dr. Yanez was also an AUA Assistant Professor with regard to the Fifth semester program.  Deneen McCall was the Program Coordinator for SJMO.

AUA is a private medical school located in Antigua.  Woodward believes it is "owned" by Neil Simon.

The "fifth semester" is an AUA program which placed medical students in hospitals in Miami, Baltimore and Pontiac, where basic sciences are reviewed and students are exposed to clinical medicine.  Passing the fifth semester was a requirement of AUA.  After passing the fifth semester, AUA students would take the first step of the "Medical Boards" Tests (USMLE), which are required of all medical students

---

[1] Woodward also filed a claim against American University of Antigua (AUA) which was dismissed.  The Court allowed an amended complaint to be filed for "breach of contract" which Woodward filed untimely and never served.  AUA is not a party.

2


Exhibit 7

in the United States.  Part of Zonia's/Yanez's job was to evaluate and communicate Woodward's performance (including his professional demeanor).

Woodward, who is 45 years old, came to medical school after an adult work life. Prior to the fifth semester, he was barely hanging on in medical school, having failed three courses and accumulated a 1.83 (out of 4.0) GPA (See **Exhibit 2** – Transcript).

Under the AUA Student Handbook (**Exhibit 9**), there is a student disciplinary process.  On November 2, 2006, Woodward was placed on non-academic disciplinary probation for inappropriate behavior toward a professor (see **Exhibit 3**-Disciplinary Notice).  Woodward appealed the discipline to Neil Simon.  Woodward claimed the disciplinary requirement he have "anger management" treatment was removed and he was told the discipline would be removed from his record after successful completion of the fifth semester.  Woodward was also "brought up" on complaints before the Disciplinary Committee on two other occasions, but Woodward talked the professors involved out of proceeding against him before the Disciplinary Committee.

Woodward did not want to be in Pontiac, Michigan.  He wanted to transfer to the fifth semester program in Miami and concentrate on taking a Kaplan review course for the USMLE.  Woodward tried to transfer to the Miami program, but was unsuccessful. (See **Exhibit 4** – email).  Woodward vocally and repeatedly expressed his dissatisfaction with the fifth semester at SJMO to other students, AUA and SJMO staff, referring to the fifth semester as a "waste of time", a "failure", and "bullshit".  Woodward also created on online test login password of "AUASUCKS".  When confronted about the login as being "unprofessional" by AUA Program Director, Dr. Hrehorovich, Woodward defended the epithet, and issued vitriolic diatribes against AUA (see **Exhibit**

3

Exhibit 7

5 – October 23 emails).  Woodward also sent Dr. Hrehorovich an email on October 28, 2007, acknowledging that Dr. Hrehorovich had "called me (Woodward) unprofessional" with a nasty, curse-filled email about the school (**Exhibit 6**).

Woodward admitted he did not answer pages made to him but claimed it was because his pager didn't work.  Woodward acknowledged that he answered a required 80 question review exam using the <u>same answer</u> for all questions.

Woodward also completed his patient log in a short time and repeatedly asked to not have to do patient clinical rounds so he could study.

In short, Woodward's actions referenced in Zonia's letter are an accurate reflection of Woodward's repeated behavior while in the fifth semester.

At deposition, Woodward acknowledged he "had no idea" why Dr. Zonia wrote **Exhibit 1**, or what motivated Dr. Zonia in writing the letter.

After Dr. Calderon received **Exhibit 1**, AUA referred Woodward to the Grievance and Disciplinary Committee in Antigua.  Specifically, Dr. Cain of AUA notified Woodward of a Committee meeting to be held at 10 a.m. on December 21, 2007 and referred to specific charges of continued inappropriate demeanor, rude and unprofessional behavior toward AUA curriculum, failing to answer hospital pages, and selecting an "unseemly" user name in examinations (AUASUCKS) and defending the epithet when challenged.  (See **Exhibit 7**).  Woodward emailed Dr. Cain that he was "unavailable" on 12/21, although Woodward did not explain why he could not attend.  When Dr. Cain reiterated the 12/21 Hearing date, Woodward again, without explanation, refused to attend (**Exhibit 8**).  The Committee recommended his dismissal from AUA.  Woodward has no information that Zonia appeared at/participated in the Committee hearing.

4



Exhibit 7

In any event, in early December 2007, <u>before</u> Dr. Zonia's December 17 letter, Woodward took and <u>failed</u> the fifth semester Final Exam. AUA required an 80% score to pass the final exam. Based on AUA's curve for the exam, which was set by AUA in Antigua, Woodward scored a 75% on the final exam. Woodward received an "F" for the fifth semester.[2]

Woodward appealed his dismissal (but not the "F" for fifth semester) to Neil Simon at AUA. An appeal hearing was scheduled for July 10, 2008, but (again) Woodward refused to appear. The appeal was (apparently) denied. Zonia was not involved in the scheduling of the appeal procedures.

Woodward has not invoked in any appeals of his failing grade, requested to retake the fifth semester, sought readmission to AUA, or tried to enter any other medical school. Since December 2007, Woodward has been living on a sailing yacht in St. Maarten, scuba diving.

AUA issues a Student Handbook (**Exhibit 9**) which has disciplinary procedures. Woodward claims the Student Handbook is a "contract" between Woodward and AUA which was "interfered with" by Dr. Zonia. Woodward acknowledged that the AUA Disciplinary Committee could consider his unprofessional behavior and discipline him, <u>including dismissal</u> (Woodward Dep., pp. 149-150). In his amended complaint, which was untimely filed and not served, Woodward claims that the "breach" by AUA was that he was not given a "timely" appeal hearing on July 10, 2008, i.e. within 14 days of filing his appeal. Woodward, however, testified that he made a conscious decision not to

---

[2] Woodward claims he actually passed the final exam, but he never appealed his failing grade, although allowed to appeal under the Student Handbook.



Exhibit 7

attend the July 10, 2008 hearing because it "would have made no difference" (Dep. p. 178).

## LIABILITY

Discovery is open in this case until case evaluation. Trinity/Zonia anticipate filing a Motion for Summary Disposition after discovery closes which has a high likelihood of success.

## WOODWARD HAS NO VIABLE CLAIM OF DEFAMATION.

A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Swenson-Davis v Martel,* 135 Mich App 632, 354 NW2d 288 (1984) A *prima facie* case of defamation requires a showing that 1) the defendant made a false and defamatory statement concerning the plaintiff; 2) that the defendant published the defamatory statement to a third party; 3) that the defendant was at least negligent publishing the statement; and 4) either actionability of the statement respective of special harm or existence of special harm caused by publication. *Colista v Thomas,* 241 Mich App 529, 616 NW2d 249 (2000).

A publication, even if false, may be protected by qualified privilege. Essential elements of a qualified privilege are enumerated as 1) good faith, 2) an interest to be upheld, 3) a statement limited in its scope to this purpose, 4) a proper occasion, and 5) publication in a proper manner and to proper parties only. *Bufalino v Maxon Bros., Inc.,* 368 Mich 140, 153, 117 NW2d 150 (1960). A qualified privilege may only become been overcome by a showing of actual malice. Actual malice does not constitute ill will, but a

6

*Exhibit 7*

showing that the publisher knew or should have known that its statements published were false.

Statements of opinion are not defamatory in particular, generalized statements regarding lack of professionalism. *Swenson-Davis*, supra. See, for example, *Johnson v. Millennium Treatment Services, L.L.C.*, 2007 WL 1263981 UNPUBLISHED OPINION; *Mino v Clio School District*, 255 Mich App 60, 661 NW2d 586 (2003).

In this case, the allegations contained in **Exhibit 1** are statements of opinion and did/do not amount to defamation. Moreover, it is unlikely the statement made by Zonia alone would have harmed Woodward's "reputation in the community", i.e. <u>AUA</u>, given that Woodward was already on probation for unprofessional conduct as of November 2006 (see **Exhibit 3**) <u>and</u> Dr. Hrehorovich had already labeled Woodward as "unprofessional" in late October 2007 (see **Exhibits 5 and 6**).

In any event, the asserted facts are <u>substantially</u> true and are so admitted by Woodward.[3]

Woodward admitted he repeatedly expressed his unhappiness and dissatisfaction with AUA, that the fifth semester was a "a failure", "a waste of time", "bullshit", that he used the login "AUASUCKS" and continued to defend the login when challenged by Dr. Hrehorovich, that he did not answer pages, that he sought to discontinue clinical rounds so that he could study upon completion of his patient log (a request which was denied), and that he used the same answer to each question on at least one 80-question review exam. In short, the factual allegations upon which the opinions of Zonia are based are substantially true.

---

[3] In deposition, Woodward claimed that the "entire letter" was defamatory.

7

*Exhibit 7*

Nor did Zonia "publish to a third party". After all, the publication was to Dr. Calderon, another AUA official. Woodward does not state a *prima facie* case of defamation.

Even if the words were defamatory, Zonia's letter was protected by a qualified privilege: Zonia was the head of the AUA Medical Education Program; part of her job responsibilities was to evaluate students. As such, expressing her opinion as to student Woodward's "professionalism" was well within the "interest" encompassed by her job responsibilities. See, for example, *Feaheny v Caldwell*, 175 Mich App 291, 437 N.W.2d 358 (1989) (defendants who were superiors of plaintiff whose responsibilities required them to exercise their independent judgment in evaluating plaintiff's performance and in making recommendations to the Board of Directors exercised a proper interest. The fact that plaintiff's' managerial style differed from his superiors was clear. Plaintiff's opinion regarding how management should behave and what decisions would have been in the best interest of the (Company) may or may not have been better from an objective standpoint. However, defendants' job responsibilities were to make those decisions, and it is not the task of the Court or jury to evaluate the (business) judgment of such individuals). In short, Zonia had an interest, in fact a responsibility, to advise AUA regarding her (and other medical educators') opinion of student Woodward's "professionalism".

Moreover, Zonia's publication was limited to one person, Dr. Calderon, the individual in charge of the fifth semester at AUA in Antigua. Zonia's publication was limited to those who "had an interest". That Dr. Calderon passed along any complaint was of no doing by Zonia.

Exhibit 7

As such, Zonia's statement qualifies for qualified privilege protection.

Nor can Woodward show that Zonia acted with actual malice.  Woodward can identify no basis upon which Zonia knew or should have known that her statements were false.  To the contrary, Woodward substantially admits (although he disagrees with the conclusions reached), and his e-mails acknowledge, the allegations made against him.  Woodward cannot identify any basis upon which Zonia should have known that the allegations were false.  He is unaware of her investigation or the source(s) of her information.  In short, Woodward's defamation claim against Zonia fails.

## WOODWARD STATES NO CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT

Setting aside the question of whether a student handbook published by a private university constitutes a "contract" under Michigan law (and Plaintiff cites no Michigan law to support such proposition), Woodward's claim of Intentional Interference with Contract fails.

To state a *prima facie* case of interference with contract, Woodward must show 1) the existence of a contract; 2) breach of the contract; 3) instigation of the breach by an alleged tortfeasor. *Bonelli v Volkswagen of America, Inc.*, 166 Mich 483, 421 NW 2d 213 (1988). A third-party must intentionally do an act that is per se wrongful or do a lawful act with malice and that is unjustified in law for the purpose of invading the contractual rights of another. *Feaheny* supra. Wrongful conduct means illegal, unethical, or fraudulent conduct.  Where the alleged tortfeasor is also a party to the contract, there is "a very difficult obstacle" to overcome.  Plaintiff needs to prove that Zonia's *actions were strictly for personal reasons* unrelated to the business.

9


Exhibit 7

*Feaheny*, supra.  This is so because Zonia's acts are privileged when acting for and on behalf of AUA.  As such, Woodward must show that Zonia acted "to further strictly personal motives".  Id.  Here, Woodward can show no per se wrongful act.  Woodward testified AUA and Zonia are "one in the same" (Dep., p. 108) and that in her capacity <u>as an AUA professor</u>, she caused AUA to breach the Student Handbook (Dep., p. 143).  As Acting Dean for AUA Zonia had a responsibility, in fact a duty, to address what she, as an educator, believed to be unprofessional/inappropriate conduct by *student* Woodward.  Her actions (writing **Exhibit 1**) were privileged in that she was communicating her opinion to another AUA person in charge of the fifth semester at AUA.  Woodward cannot show she had any personal motive.  When asked, Woodward repeatedly testified that until the letter was written, he had "no problem" with Zonia and he "had no idea" why Zonia wrote the letter (Dep. p. 59).  Moreover, the Disciplinary Committee had an interest in the letter because, as Woodward admitted, the Committee had the authority to discipline/dismiss Woodward for unprofessional conduct and in order to carry out its function, the Committee would need to know what he was charged with.  (Dep. pp. 149-150, 168).  Zonia's actions did not constitute any illegal, fraudulent, or unethical conduct, were privileged, and Zonia is not a third party to the contract because she is an agent/employee of AUA.

No claim for interference with contractual relationship (even assuming there was a contractual relationship) between AUA and Woodward will lie.  *Feaheny*, supra.[4]

---

[4] The AUA Handbook does not create a "contract".  The Handbook refers to <u>students'</u> "obligation" only (**Exhibit 9**, pp. 1, 2).  There is no published Michigan case which stands for the proposition that a student handbook is a contract.  The trial court already dismissed Woodward's claim of implied contact against AUA as no such legal claim exists in Michigan.  Woodward's failed amended complaint against AUA claimed breach by AUA not giving Woodward a hearing within 14 days of filing his appeal in July 2008.

10

*Exhibit 7*

Finally, Woodward cannot show that he was damaged by Zonia's letter.  To the extent that the Committee recommended his dismissal, the Committee had <u>independent</u> information regarding Woodward's lack of professionalism.  After all, Woodward was already on probation for being unprofessional (**Exhibit 2**) and  Dr. Hrehorovich previously stated that he believed Woodward acted unprofessionally, a statement that was published to other AUA management (**Exhibits 5 & 6**).  Woodward failed to appear at either his disciplinary hearing December 21, 2007 or his appeal hearing held July 10, 2008.

Moreover, <u>Woodward failed the fifth semester course, receiving an "F" for the fifth semester before</u> he was dismissed from AUA.  Woodward would have had to retake the fifth semester before he could move forward with his medical education or take the Step 1 USMLE exam.  Rather than appeal or retake the fifth semester, Woodward elected to file suit.  Woodward took no action to reverse his failure of the fifth semester, retake the fifth semester, or seek readmission, all of which he had as potential remedies.  Instead, Woodward appears to be spending his life on his yacht in St. Maarten scuba diving rather than attempting to further his medical education (Dep. pp. 17-18).  <u>He is entitled to no consideration</u>.

---

However, Zonia had nothing to do with scheduling Woodward's appeal hearing (which was held within 14 days) and at which Woodward <u>never intended</u> to appear (Dep., p. 178).

*Exhibit 7*

Respectfully submitted

LAW OFFICE OF DAVID B. GUNSBERG, P.C.

By: _____

David B. Gunsberg (P24235)
*Attorney for Defendants*
322 North Old Woodward Avenue
Birmingham, MI 48009
248.646.9090

Dated: January 16, 2009

12

Exhibit 7

## CLINICAL CLERKSHIP AFFILIATION AGREEMENT
### Between
## AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE
### And
### St. JOSEPH MERCY-OAKLAND

THIS AGREEMENT, made the      of May, 2007 by and between the, American University of Antigua College of Medicine (hereinafter referred to as "College") and St. Joseph Mercy Oakland (hereinafter called "Hospital").

WHEREAS, the College of Medicine, is engaged in the education of physicians at American University of Antigua College of Medicine, Antigua

WHEREAS, the Hospital, organized under the laws of the State of Michigan  with its principal place of business at 44405 Woodward Avenue, Pontiac, Michigan,  is providing health care services in appropriate facilities  for the implementation of a program of clinical clerkships to improve the educational and clinical opportunities of qualified students

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and intending to be legally bound hereby, it is agreed as follows;

The goals of the Program are to (1) improve the opportunities for professional training of students of the College; (2) increase the students' exposure to the clinical discipline at the Hospital; (3) educate the students in such a manner as to maximize the efficiency and success of the students.

This Agreement shall take effect for a period of one year from the signing of this Agreement and is subject to annual renewal upon mutual consent.   The College has the responsibility for preparing the affiliation clerkship curriculum for implementation by the Hospital, appoint the individuals who will be responsible for supervising and monitoring each clinical discipline and who will implement the clerkship program.  The discipline coordinators at the Hospital will receive academic appointments according to the College's criteria and prevailing academic standards, and will be subject to regular review by the College's Committee on Academic Ranking System, and shall receive the same rights, tenure and fringe benefits as clinical faculty staff members of the College.  The College assumes responsibility for the continuity of the program both financially and academically.

The Hospital clerkship program will include rotations in Internal Medicine, Surgery, Family Medicine, Pediatrics, and Obstetrics and Gynecology and electives

The structure of the clerkship program is subject to annual review and modification by the College, provided that such modifications are consistent with the goals and objectives of the program and are in compliance with New York State regulations.

DEPOSITION
EXHIBIT
2369

Exhibit 8 pg1

The performance of each student shall be subject to the College's system of evaluation. Such evaluations shall be submitted to the College within thirty (30) from the completion of the rotation and are requirements for graduation.

Periodic visits will be made to the Hospital by the representative of the College and appropriate clinical department chairmen and vice-versa. The College's coordinator for clerkships at the hospital or his designate will make periodic reports to the College to assure that the objectives of the program are being fulfilled. The cost of periodic visits will be assumed by the College.

The College will maintain student records, updating them as letters of evaluation from the Hospital are received;

Either party may terminate this Agreement, with or without cause, upon sixty (60) days prior written notice to the other Party.

## INSURANCE AND LIABILITY

The College shall at all times maintain or provide professional liability insurance coverage issued on an occurrence basis with limits of not less than $1,000,000 per occurrence and $3,000,000 annual aggregate, and general liability insurance coverage with limits not less than $1,000,000 for personal injury and $100,000 for property damage, in each instance covering the College and any corporation, officer, employee or agent of the College acting within the scope of employment by the College. All insurance maintained hereunder shall be issued from an insurance carrier licensed to do business in the State of New York. The College shall ensure that the Hospital shall receive notice from the College of cancellation or reduction of coverage with respect to any insurance policy maintained hereunder.

The College hereby indemnifies and holds harmless the Hospital and its officers, trustees, directors, employees and agents, from and against any and all liabilities, costs, claims, judgments, settlements and expenses, including reasonable attorney's fees, arising out of or in connection with the negligent act or omission of the College or any of its employees, agents or students.

The college, at its own expense, must also maintain a Student Accident and Health Insurance policy.

## CHOICE OF LAW

Exhibit B pg 2

*This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to choice of law provisions thereof. Any action commenced by a Party hereto relating to this Agreement shall be brought in the United States District Court for the Southern District of New York or in the Supreme Court of the State of New York, County of New York.*

## GENERAL

*The Hospital and the College shall each continue their independent corporate existence and, except as set forth herein, their respective corporate powers shall not be enlarged, impaired, or otherwise affected by this Agreement, they shall continue to be operated under the direction and control of their respective governing boards. Nothing in this Agreement shall impair or modify any existing agreements between any of the parties; or modification of old agreements between any of the parties.*

## COVENANTS

*The College hereby agrees:*

*That each student who participates in this program will have the same rights to examinations and credits as those students who participate in the traditional curriculum of the College.*

*That identification and selection of students qualified to participate in the program will be done by a Faculty Committee selected by the Dean; the Hospital shall have the right to either accept or reject the student.*

*That all selected students will have all the necessary physical examinations and immunizations at American University of Antigua prior to the time of rotation. The College shall ensure that, prior to their affiliation assignment, all students shall have such physical examinations and tests (including, but not limited to, a skin test for tuberculosis and, where positive, a chest x-ray) titers to ensure that students are not in the infectious stage of any communicable disease. The College shall advise its students that they are required to provide proof to the Hospital of drug testing that verifies that they are not habituated or addicted to depressants, stimulants, narcotics, alcohol or other drugs or substances which may alter their behavior. Students shall also be immunized against smallpox, diphtheria and tetanus prior to their rotation.*

*The College will ensure that students participating in the Clinical Clerkship program will have appropriate housing.*

*The medical students shall follow all the rules and regulations and policies of the Hospital. Each student at the Hospital shall carry an identification card issued by the Hospital and shall be responsible for the following:*

    *a.*   *Conforming to and abiding by the administrative policies, rules, regulations, standards and practices of the Hospital.*

b.  *Conspicuously displaying his/her name badge, when engaging in activities at the Hospital.*

*In the event that a student is involved in any situation which requires filing an "incident report" by the Hospital pursuant to the Public Health Law, the College shall be advised of the nature of the situation giving rise to the report and the parties shall discuss the potential impact, if any, on this Agreement, including but not limited to appropriate corrective action to be taken.*

*The hospital agrees to provide support services including counseling for students.*

*College agrees to fund the clinical clerkship program provided to its student in accordance with the provision of exhibit (1) one.*

*IN WITNESS WHEREOF the parties hereto have executed this Agreement on the day and year first above written.*

Signatures,

Neal S. Simon

AMERICAN UNIVERSITY OF ANTIGUA

St JOSEPH MERCY-OAKLAND

Exhibit 8 pg 4

*EXHIBIT 1*

( *College agrees to pay Hospital at the rate of $350 per week per student for all core clinical clerkships provided by Hospital to College's Clinical Students* )

Exhibit 8
Pg 5



AMERICAN
UNIVERSITY
OF ANTIGUA
COLLEGE OF
MEDICINE

KASTURBA
MEDICAL
COLLEGE

**Manipal**
INSPIRED BY LIFE

*C/O Greater Caribbean Learning Resources*

# FIFTH SEMESTER
# INTRODUCTION TO CLINICAL MEDICINE

# <u>COURSE SYLLABUS</u>
# 15 CREDITS

**Administrative Office:** 2 Wall Street 10th Fl
New York, NY 10005
**Tel:** 212 - 661-8899 **Fax:** 212 - 661-8864
1-888-AUA-UMED (1-888-282-8633)
**Email:** info@auamed.org  www.auamed.org

**Manipal Education & Medical Group**
Manipal 576104 India
**Tel:** 91-820 2571978/79 **Fax:** 01-820 2571982/257062
**Email:** kmc_auamed@manipal.edu
www.manipal.edu

Exhibit 9
P31

# TABLE OF CONTENTS

**FOREWORD**

**I. GENERAL** ............................................................. **4 – 11**

   **A PREREQUISITES** ....................................................... **4**

   **B.  PURPOSE** ............................................................ **4**

   **C.  OBJECTIVES** ........................................................ **4 – 5**

   **D.  THEMES AND FINAL OUTCOMES** .................................. **5**

   **E.   COMPONENTS** .................................................. **5 – 10**

       **a)   Course on History and Physical examination**    **5**
       **b)   In-Hospital Clinical Rotation**    **6**
       **c)   Out-Patient Clinical Rotation**    **7**
       **d)   Basic Sciences – Clinical Correlation Course**    **8**
       **e)   Presentation of Clinical Cases**    **9**
       **f)   Portfolio**    **9**
       **g)   Quizzes and Exams**    **10**

**II.  ACADEMIC POLICIES** ................................................. **10 – 11**

**III.  EVALUATION AND GRADING** ........................................ **11**

       **a)   Passing Grade Minimal requirements**    **11**
       **b)   Components included in Grade Calculation**    **12**
       **c)   Student Evaluation of Academic Activities**    **13**

**IV.  BOOKS, LIBRARIES AND ON-LINE RESOURCES** ................. **12**

**V.   STUDENT RESOURCES AND CONTACTS** ............................ **13**



Exhibit 9

**FOREWORD**

## A BRIDGE TO CLINICAL MEDICINE

The purpose of the AUA College of Medicine is to educate excellent physicians who are prepared to deliver effective and compassionate treatment and preventive care to patients and their families. The fifth semester is the beginning of a pivotal time in this process. It encompasses the transition from the basic medical sciences to the clinical disciplines.

This syllabus is carefully designed to provide students with the maximum opportunity to make this transition a productive learning experience. It will serve as the main guide for lectures, practical sessions and definitions of weekly academic goals. The syllabus is complemented by the "Fifth Semester Guidelines" booklet which includes schedules and operational instructions.

The three-fold goal of the fifth semester is a). to help student master the skills of taking a patient's history. b). to develop the art and technique of physical examination and c) to integrate basic science into clinical diagnostics and critical patient evaluation.

The Fifth Semester Course includes lectures, oral and written case presentations, clinical rotations, review of core concepts and facts through quizzes, examinations, clinical discussions and a portfolio that includes the summary and evaluation of students' experiences.

The University strives to offer similar clinical learning opportunities for each student, however exact duplication is impossible. Each student's experience will be slightly different because of the particular characteristics of each practice site. Therefore, students need to be proactive in making their experience as productive as possible. To that end, they will have a variety of resources, including individual counseling.

The teaching and administrative staff has made significant efforts to carefully organize the Fifth Semester Course. The University expects students to respond with punctuality, outstanding professional appearance, and total, full time dedication.

Evaluation of students is based on the actual acquisition of individual skills, development of professional attitudes, efforts to reach the established goals, quizzes and examination scores. Students will have the opportunity to evaluate lectures, practices, and all activities. Their input is critical in developing and advancing the University's academic program.



Exhibit 9

# I. GENERAL

## A. PREREQUISITES FOR ENROLLMENT INTO 5TH SEMESTER

1. Successful completion of four semesters in Basic Medical Sciences, including Anatomy, Embryology, Histology, Behavioral Sciences, Biochemistry, Genetics, Physiology, Microbiology, Immunology, Pathology, Pharmacology, Biostatistics, Doctor, Patient and Society, and Introduction to Clinical Medicine.

2. Completion of Registration procedures via AUA policies and specific requirements of the Hospital training sites.

3. Commitment to <u>full time involvement in and dedication to the academic activities of the Course.</u>

## B. PURPOSE AND GOAL

The <u>purpose of the course</u> is for students to acquire the necessary clinical skills, to formulate diagnostic hypothesis and to correlate the latter with the fundamental facts and concepts of the Basic Sciences.

The goal of the course is to prepare students to successfully complete subsequent clinical clerkships.

## C. OBJECTIVES

By the end of the course, students will be able to:

1. Obtain comprehensive and relevant health histories through effective communication with patients and families.

2. Carry out full general physical examination of all body systems.

3. Distinguish normal conditions from abnormal symptoms and signs.

4. Understand the role of diagnostic testing in the medical examination process.

**Exhibit 9**

5. Collect, logically organize, and document the information related to patients' condition.

6. Formulate working diagnoses expressed as syndromes, specific pathological processes, or diseases.

7. Understand the interaction between physicians and other health professionals.

8. Present in an effective manner clinical cases in both verbal and written form before peers, preceptors and other medical audiences.

9. Identify and learn the links between basic and clinical sciences.

10. Explain symptoms and signs on the basis of physiological, pathological, and biochemical changes occurring in the human body.

11. Start the in-depth study of General Clinical Sciences, including Internal Medicine, Surgery, Pediatrics, Gynecology, Obstetrics, Family Medicine and Psychiatry.

12. Collect clinical data from individual patients related to primary prevention based on life cycles and secondary prevention of prevalent illnesses in the USA.

13. Understand and properly apply the clinical and technical terms used by the medical profession to describe symptoms, signs and syndromes.

## D. THEMES AND FINAL OUTCOMES

The booklet "Fifth Semester Guidelines" includes Schedules, Themes and Final Outcomes by academic activity.

## E. COMPONENTS

The first twelve (12) weeks of the fifteen- week semester are dedicated to lectures and clinical rotations.  Students will use the final three (3) weeks for

**Exhibit 9**

completing their portfolio, reviewing and studying the course materials, testing, and evaluation activities.

a)   **Course on History and Physical Examination**

This course provides an in-depth review of the techniques and methods for the elaboration of clinical histories and the examination of the human body systems.  The course consists of twenty (20) core lectures and nine (9) Practical Sessions by experienced specialists.

b)   **In-Hospital Clinical Rotation**

The objective of the In-Hospital Clinical rotation is to demonstrate the practical aspects of elaborating clinical histories and performing physical examinations on patients admitted to the Hospital.  This is a valuable tool in reinforcing the concepts, theories, techniques and facts presented in Course lectures.

During this rotation the students will engage in proactive learning with the residents and preceptors assigned to them.    Students' responsibilities include:

1.  Observing residents' work, asking pertinent questions and taking notes in their Journal.

2.  Developing a good rapport with patients, attending physicians, nurses and other health professionals

3.   Assisting practicing physicians in examining patients when requested.

4.  Communicating with patients face-to face, taking clinical histories and observing examination techniques.

5.   Accessing and reviewing charts as authorized by physicians and elaborating full write-ups on selected patients. **Due to confidentiality laws and regulations, students cannot use or disclose the names of patients or give other identifying information in the write-up of cases.**

*Exhibit 9*

6.  Assisting in medical procedures when requested.

7.  Participating in case discussions and presentations.

8.  Discussing the interpretation of laboratory tests and other diagnostic exams and procedures.

9.  Discussing differential diagnoses and treatment plans with the residents and attending-physicians.

10.  Attending all available lectures and other academic activities scheduled in the Hospital, including morning rounds, sign-in and sign-out rounds, morning and afternoon lectures.

### c) Out-Patient Clinical Rotation

During this rotation, students will work in pairs to see patients in the offices of physician-preceptors, who will mentor according to the schedule provided by each Course Director.  The physician-preceptors have been in medical practice for several years and will provide students with an exceptional opportunity to observe both the operation of a private practice and the management of patients in an outpatient setting. **Due to confidentiality laws and regulations, students cannot use or disclose patients' names or give other identifying information in writing-up cases during their clinical rotations.**

Under the continuous supervision of the physician-preceptors, students will carry out the following activities:

1.  Observing the preceptors performing physical examination of their patients with special attention to the system presented and discussed during the previous week's lecture.

2.  Performing portions of the examination demonstrated and allowed by the preceptor.

3.  Gathering the necessary information and writing the clinical history of the patients assigned by the preceptor.


Exhibit 9

4. Identifying new patients and following-up with patients on whom the student wishes to do full write-ups using the formats suggested during the Course or included in the textbook.  The preceptor must approve the student's request to use the clinical information contained in the charts.

5. Verbally presenting to the preceptor a minimum of one case per day during the rotation in the preceptor's office.

The Outpatient Rotation Schedule appears in the "Fifth Semester Guidelines" booklet.

**d)   Basic Sciences – Clinical Correlation On-line Course**

This On-line based Course is scheduled and managed at the AUA Headquarters in New York.  It will help students establish the necessary correlation between Basic Sciences and Clinical Sciences. The case studies will challenge students with both diagnoses and management of relevant clinical cases.

Students will answer an average of 200 questions weekly and a total of 2,000 questions within a three- day testing period assigned by the Course Director. The purpose of the test is to identify gaps in students' knowledge.  The On-line Course will provide the correct answers, enabling students to refine study skills, improve basic and clinical science correlations, as well as, provide guidance in addressing individual knowledge needs.

In addition to working on-line individually, students are encouraged to study the questions collectively to optimize academic success.  Ultimately, the On-line course is only one of many tools enabling students to successfully meet the challenge of future evaluations.  There is no substitute for the assiduous study of texts and the regular attendance of lectures.

Although the University will not factor On-line test scores into the final grade for the fifth semester, each student must answer a minimum of 1600 questions in order to obtain a passing grade.

**e)  Presentation of Clinical Cases**

Exhibit 9

The goal of this component is to develop students' ability to write concise and relevant medical histories and to make concise and well-structured verbal case presentations before peers and teaching staff.

To that end, students need to use and apply the knowledge and skills which they have learned and developed in questioning and examining patients during both the In-patient and Out-patient rotations.

Practicing this valuable skill at every opportunity will guarantee success in future clerkships, obtaining the M.D. degree, and securing a residency position.

### f) Portfolio

Students will register all their individual academic and practical experiences in a Portfolio which will be submitted at the end of the 11th week of the Course.

This indexed document will include:

1. Fifteen "two minutes" write-ups of clinical cases the students saw during hospital and outpatient rotations, including two respiratory cases, three cardiovascular cases, two GI cases, and one case related to each one of the other body systems. Out of these cases, the student will pick three for verbal presentation.

2. Fifteen written templates of the most significant illness, syndrome or pathological condition affecting the above patients. (The templates are summaries from Medical Textbooks of the most frequent symptoms, epidemiological (risk) factors, and signs that characterize each entity and of the state of the art diagnostic confirmatory tests and treatments).

3. Two full write-ups of hospital admissions of patients that the student has seen and followed up. They include full descriptions of the Admission History and Physical, the Hospital Course, the discharge disposition and a brief clinical discussion of one of the health issues affecting the patient.

Exhibit 9

4. The form *Clinical Cases Discussed, Observed, and Examined During Fall 2007* which includes the list of all new patients that the student saw during clinical rotations as well as previous patients who presented with new clinical problems.

5. The form *Academic Activities Attended* listing all academic sessions that the students actually attended in and outside the Hospital.

6. The form *Correlation Course Tests Taken* including the number of questions answered and the individual scores.

7. A general student evaluation of the Course and of individual lectures, practical sessions and rotations.

The booklet "Fifth Semester Guidelines" provides detailed suggestions on how to prepare the Portfolio.

### g. Quizzes and Exams

Quizzes and exams will be important tools in the evaluation and grading of students. The Course also uses them as important learning tools. To that end the teaching staff will routinely discuss with students the quizzes and exam questions as part of the core curriculum of the course. The Course provides ample opportunities to reinforce concepts and facts.

Students will take approximately fourteen (14) quizzes and tests related to the Course lectures and practical sessions. The final written exam will include the same material covered by the quizzes. The practical exam will consist on the interview and examination of a patient at the Preceptors' office.

## II. ACADEMIC POLICIES

### A. Mandatory Attendance and Punctual Arrival at Sites

AUA/KMC students must <u>attend at least 85% of lectures</u> and practical sessions. The university permits three (3) absences of clinical sessions per student during

Exhibit 19

the entire semester. **Only the Course Director or the Dean of Clinical Sciences can authorize any deviation from this policy.**

To request an absence from a clinical assignment, students must submit to the Course Director a written request one week prior the requested absence.

**Failure to comply with attendance policy may result in the lowering of the final grade, failing the rotation, or dismissal.**

## B. Conduct

The AUA expects students to exhibit the highest level of professional standards, behavior, and integrity. Professional appearance and attitude are essential to a quality doctor-patient relationship.

## C) Mandatory Attire

**The attire for males is a dress shirt, tie and trousers and for females, a dress, skirt or slacks with blouses. Students must wear white coats and AUA/KMC identification tags when at the Hospital or on its grounds and when seeing patients at any location. Teachers and preceptors will not allow violators to participate in the academic or practical sessions**

## D) Disaster Precautions

A Disaster Preparation Booklet includes a safety plan for students attending the Hospital and is available upon request at the Hospital.

## III. EVALUATION AND GRADING

### A) Passing Grade Minimal requirements

- ❖ Minimal total course grade — 75%
- ❖ Minimal lectures attendance — 85% (18 lectures)
- ❖ Minimal practical sessions attendance — 85%
- ❖ Minimal Hospital lectures and other Academic sessions attendance — 50%*



Exhibit 9

❖ Minimal Out-patient sessions attendance    90%
❖ Minimal Correlation Course questions    80% (1,600)
❖ Minimal total quizzes score    60%
❖ Minimal final written exam score    80%
❖ Minimal final practical exam Score    80%

*During Hospital rotations*

**B)    Components included in Grade Calculation**

❖ Attendance to Course lectures    10 %
❖ Practical session reports    5%
❖ Outpatient Preceptor evaluation    5%
❖ Verbal 2-minutes presentation of clinical cases    5%
❖ Portfolio    1    10%
❖ Quizzes    35%
❖ Final written Exam    20%
❖ Final Practical Exam    10%

**C)    Student Evaluation of Academic Activities**

Students will submit an evaluation of every lecture and academic activity in which they have been involved, making suggestions for improvement. The *Fifth Semester Guidelines* booklet includes the respective forms and instructions.

## IV.    BOOKS, LIBRARIES AND ON-LINE RESOURCES

1. **Mosby's Guide to the Physical Exam**, 6th Edition, Mosby, 2006 and accompanying CD which is the required textbook.

2. **MKSAP for Students 3** Developed by the American College of Physicians - Clerkship Directors n Internal medicine, 2005 and accompanying CD

3. **Harrison's Principles of Internal Medicine**, 16th Edition, McGraw-Hill, 2005 printing

12

Exhibit 9.

4. **The on-site Hospital Library** containing collections of updated books, journals, and modern audiovisual equipment.

5. **American College of Physicians/ACP**: Enroll for a free Student Membership on line or by phone at 800-523-1546, extension 2711.  Some enrollment benefits, in addition to membership in the largest medical specialty society include the opportunity to explore the internal medicine profession, access to members-only sections of ACP Online, free attendance at scientific meetings, a subscription to *IMpact*, an on-line newsletter for medical students, and discount eligibility to some programs and  products.

6. **Exam Master.**  The Fifth Semester entry is:

   **http://www.exammaster2.com/wdsentry/aua-balt.htm**

## V.   STUDENT RESOURCES AND CONTACTS

### A. Student Services Coordinator

Dr. J. Ernesto Calderon, Dean, Clinical Sciences, AUA

| | |
|---|---|
| Office: | 410 636  - 2222 |
| Cellular: | 443 463 – 6182 |
| E-mail: | jecmpark@aol.com |

### B. Academic Counseling

Course Directors (Miami, Baltimore, Pontiac)

Dr. Jorge E. Calderon, Dean, Clinical Sciences

Dr. Victor Hrehorovich, Vice Chancellor and Executive Dean, AUA

Office:   212 661-8899   ext. 119

### C. Psychological Support

The aforementioned faculty is available to provide psychological support and make referrals to specialists.

Exhibit 1

Exhibit 10

From the Vice President | AUA - Mozilla Firefox

File  Edit  View  History  Bookmarks  Tools  Help

http://www.auamed.org/from-vice-president

Most Visited  Getting Started  Latest Headlines  Customize Links  Free Hotmail  RealPlayer  Windows Marketplace  Windows Media  Windows

Of (0 unread) Yahoo! Mail, steve_j_wood...

AUA From the Vice President | AUA  +

QUICK FACTS

FROM THE PRESIDENT

FROM THE VICE PRESIDENT

ACADEMIC PROGRAMS

FACULTY & STAFF

CAMPUS & FACILITIES

FINANCIAL AID

UNIVERSITY AFFILIATIONS

PLYMOUTH STATE
UNIVERSITY AFFILIATION

RESOURCES & SERVICES

CENTER FOR TROPICAL
DISEASES

STUDENT GOVERNMENT
AND CLUBS

NEWS AND EVENTS

CAREERS AT AUA

SPEAKING INVITATION TO
HOSPITAL ADMINISTRATORS

IMAGE GALLERY

# From the Vice President

As the new Vice President of Academic Affairs and Executive Dean, it is my honor to serve with the distinguished administration of the American University of Antigua, one of the finest medical institutions in the Caribbean.

With our new campus now open, students and faculty have access to the most technologically modern medical education facilities. Campus-wide wireless Internet access, Blackboard Learn and Connect, and our new lecture capture service, Echo360, are only a few of the amenities AUA provides to ensure that our students receive the most comprehensive educational experience possible.

Even though the new campus is much larger than our old one, we have not forgotten what matters most our students. We have built every room at the new campus with small class sizes in mind, which allows for greater interaction between our students and our faculty. Our hospital-integrated curriculum is modeled after those of U.S. medical schools and allows our students to interact with patients from the first semester onward. Our faculty prepares every student to succeed on the National Board of Medical Examiners (NBME) Shelf Exams and the United States Medical Licensing Exam (USMLE).

Our illustrious faculty's research has helped advance medical sciences throughout the world. Dr. Segun Dipeolu, the Chair of the Microbiology Department, is a Fulbright Scholar whose research on Dengue Fever has been recognized by the World Health Organization (WHO). Dr. Steven Glasser, the Chair of the Neuroscience Department, has won numerous teaching awards and helped AUA become the first international medical school to administer a web-based NBME exam.

Ultimately, AUA provides each of our students with the tools necessary to succeed in the evolving field of health care, and our success hinges on that of our students.

I look forward to seeing you on campus.

Done

start



Case 2:10-cv-10978-PJD-MJH   ECF No. 27, PageID.490   Filed 00/00/10   Page 48 of 50

From the Vice President | The American University of Antigua - Windows Internet Explorer

File   Edit   View   Favorites   Tools   Help

http://www.auamed.org/from-vice-president

Links   Customize Links   Free Hotmail   Cards & Log-ins

Norton

Y!   Web Search   My Yahoo!   Bookmarks   RealPlayer   Settings   Mail   My Yahoo!   Answers   Games   Anti-Spy   Yahoo! Downloads   Yahoo! Mail   Windows   Windows Marketplace   Windows Media   Yahoo!

Page   Tools

DISEASES

STUDENT GOVERNMENT AND CLUBS

NEWS AND EVENTS

CAREERS AT AUA

SPEAKING INVITATION TO HOSPITAL ADMINISTRATORS

IMAGE GALLERY

Our hospital integrated curriculum is modeled after U.S. medical school curricula and provides the students the opportunity to interact with patients from the very first semester onward.

The state of the art educational equipment in conjunction with the superior library facilities and campus wide wireless internet access supply the students with the resources to advance throughout the challenging academic program.

National Board of Medical Examiners (NBME) Shelf Exams are used as final exams for the Basic Sciences courses, ensuring that the students meet U.S. medical education requirements.

AUA is internationally recognized for its students' and faculty's commitment to research in various areas ranging from Anatomy to Microbiology.

Our faculty is extremely proud of the students' sincere dedication to their medical education and of their concern for the multitude of university's community outreach programs.

Students and faculty are looking forward to the completion of our New Campus Project.

We hope that you are interested in being educated in our institution and discovering the anatomy of your dream.

I look forward to seeing you on campus.

Peter Bell, MD
Vice President Academic Affairs & Executive Dean, Antigua Campus

Internet   100%

start

Exhibit 11 pg 2

http://us.mgr.mail.yahoo.com/dc/launch?freeacct=1&&.g

**From:** Deneen Nicks (NICKSD@trinity-health.org)
**To:** elizabethbulat@comcast.com; m.hamed01@gmail.com; vishal.doctor@gmail.com;
lakedra_evans@hotmail.com; n_hampel@hotmail.com; ozuomba@hotmail.com;
chahalparas@yahoo.com; jaya18_221@yahoo.com; nicokristen@yahoo.com;
steve_l_woodward@yahoo.com;
**Date:** Mon, October 8, 2007 8:10:17 AM
**Cc:** YANEZJ@trinity-health.org;
**Subject:** Revised Lecture Schedule - Pontiac Site

** High Priority **

Good Morning,

Please see the attached revised lecture schedule for Pontiac.  These changes were given to us by AUA,
effective Today.

Sincerely,
Deneen Nicks
Coordinator, Student Services
St. Joseph Mercy Oakland Hospital
Pontiac, Michigan

Exhibit 12
Pg 1

*University of Antigua School of Medicine*
*Course on Physical Diagnosis (September 06 - December 12, 2007)*
*Site:   St. Joseph Mercy Oakland Hospital*
*Pontiac, Michigan*

**SCHEDULE OF LECTURES, PRACTICAL SESSIONS AND QUIZZES**

| Date | Hour | Activity | Theme | Lecturer |
|------|------|----------|-------|----------|
| 09/14 | 8:00-9:00A | Dept. of Medicine | Journal Club | Conf. Rm. E |
| 9/14 | 9:00-11:00A | Lecture | Clinical History | Dr. Yanez |
| 9/14 | 11:00-1:00N | Lecture/Practice | Vital Signs and Practice | Dr. Yanez |
| 9/21 | 8:00-9:00 | Dept. of Medicine | Grand Rounds | Conf. Rm. E |
| 9/21 | 900 – 11 00A | Lecture/Practice | HENT Exam and Practice | Dr. Nicola |
| 9/21 | 11:00-1:00 N | Lecture/Practice | Lungs, Respiratory Syst Exam | Dr. Khan |
| 9/28 | 8:00-9:00A | Dept. of Medicine | Morbidity & Mortality | Conf. Rm. E |
| 9/28 | 9:00-10:00A | Lecture | Imaging (I) | Dr. Saber |
| 9/28 | 10:00-11:00A | Lecture | Heart, CV system Exam (I) | Dr. Diaczok |
| 9/28 | 11:00-12:00N | Presentation | Two-minutes case # 1 | Dr. Yanez |
| 9/28 | 12:00-1:00N | Quizzes 1,2 | Clinical HX, VS, Respiratory | Staff |
| 10/5 | 7:00-8:00A | Lecture | Ethics | Conf. Rm. E |
| 10/5 | 9:00-11:00 | Lecture | Heart, CV System Exam (II) | Dr. Yanez |
| 10/5 | 11:00-12 N | Practice | Heart, CV System Exam | Staff |
| 10/12 | 8:00-9:00 A | Dept. of Medicine | Grand Rounds | Conf. Rm. |
| 10/12 | 9:00-10:00A | Practice | Heart, CV System Exam | Staff |
| 10/12 | 10:00-11:00 A | Lecture | Abdomen, GI System | Dr. Nicola |
| 10/12 | 11:00-12 N | Practice | Heart, CV System Exam | Dr. Yanez |

**Revised 10/08/07 (Per: AUA)**

Exhibit 12
Pg 2