# EXHIBIT

# 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA COLLEGE
OF MEDICINE, a foreign corporation,

        Plaintiff,

                                United States District Court Judge
                                Patrick J. Duggan, presiding
                                Michael Hluchaniuk, referral
v                               Case No.: 2:10-cv-10978

STEVEN WOODWARD,

        Defendant.

---

Eric A. Buikema (P58379)
CARDELLI, LANFEAR & BUIKEMA, P.C.
Attorneys for Plaintiff
322 W. Lincoln
Royal Oak, MI 48067
(248) 544-1100
ebuikema@cardellilaw.com

Steven Woodward
Pro Per
7211 Brittwood Ln.
Flint, MI 48507
Steve_l_woodward@yahoo.com

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO SET ASIDE DEFAULT

        Plaintiff, through Counsel, states its response in opposition to Defendant's Motions to Set

Aside the Default (Docket No. 16) as follows:

        1.       On July 19, 2010, Defendant filed his "Request for Setting Asside Motion for

Default; Request for Dismissal for on Grounds of Perjury, Obstruction and Contempt" (sic)

(Docket No. 16).

        2.       Plaintiff will treat this as a Motion to Set Aside the Default under Fed. R. Civ. P.

55(c).

1

3.      Because Defendant fails to assert any grounds for summary judgment, the instant motion will not be analyzed under Fed. R. Civ. P. 12 or Fed. R. Civ. P. 56.

4.      The Court Clerk entered a default in this matter on July 16, 2010 for Defendant's failure to answer.  (Docket No. 14).

5.      Under Fed. R. Civ. P. 55(c) the Court may set aside an entry of default for good cause.

6.      Here Defendant fails to establish good cause.

7.      Plaintiff is moving for entry of a default judgment in this matter.

Wherefore, Plaintiff respectfully requests that the Court deny Defendant's Motion to Set Aside the Default for his failure to demonstrate good cause (Docket No. 16).

Respectfully Submitted,

/s/  Eric A. Buikema
Eric A. Buikema (P58379)
Cardelli, Lanfear & Buikema, P.C.
322 West Lincoln Avenue
Royal Oak, Michigan 48067
(248) 544-1100
ebuikema@cardellilaw.com

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA COLLEGE
OF MEDICINE, a foreign corporation,

        Plaintiff,

                              United States District Court Judge
                              Patrick J. Duggan, presiding
                              Michael Hluchaniuk, referral
V                                Case No.: 2:10-cv-10978

STEVEN WOODWARD,

        Defendant.

Eric A. Buikema (P58379)
CARDELLI, LANFEAR & BUIKEMA, P.C.
Attorneys for Plaintiff
322 W. Lincoln
Royal Oak, MI 48067
(248) 544-1100
ebuikema@cardellilaw.com

Steven Woodward
Pro Per
7211 Brittwood Ln.
Flint, MI 48507
Steve_l_woodward@yahoo.com

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO SET ASIDE THE DEFAULT

3

## *TABLE OF CONTENTS*

TABLE OF CONTENTS

CONCISE STATEMENT OF THE ISSUES PRESENTED

BRIEF LIST OF CONTROLLING AUTHORITY

OVERVIEW

STATEMENT OF FACTS

DISCUSSION

    I.  Defendant Fails to Establish "Good Cause"

    II.  Defendant's Motion Does Not State a Claim for Summary Judgment

CONCLUSION

4

## CONCISE STATEMENT OF THE ISSUES PRESENTED

I.  Whether the Court should deny Defendant's Motion to Set Aside the Default (Docket No. 16) where he fails to demonstrate good cause for the same?

   Plaintiff says:  Yes.

## *BRIEF LIST OF CONTROLLING AUTHORITY*

Fed. R. Civ. P. 8(b) p.9

Fed. R. Civ. P. 12(b) p. 8

Fed. R. Civ. P. 55(c). p.7, 8

Fed. R. Civ. P. 56(c)p. 10

*Cracco v. Vitran Express, Inc.*, 559 F.3d 625 (7th Cir. 2009)

### *OVERVIEW*

Defendant is in default. (Docket No. 14). The instant motion to set aside the Default (Docket No. 16) fails to comport with the requirement of Fed. R. Civ. P. 55(c). As such the instant motion should be denied.

### *STATEMENT OF FACTS*

Plaintiff's Verified Complaint (Docket No. 1) was filed on March 11, 2010, and served on March 31, 2010. A default was entered by the Clerk of the Court on July 16, 2010, for Defendant's failure to answer. (Docket No. 14).

Defendant filed his "Answer" on July 19, 2010, over 89 days late and after a default had been entered. (Docket No. 15). This "Answer" consisted of a single sentence and did not respond to the allegations in Plaintiff's complaint. For reasons articulated in Plaintiff's Motion to Strike this "Answer" it does not comport with the rules of pleading and does not provide an answer to Plaintiff's allegations.

On July 19, 2010, Defendant filed his "Request for Setting Asside Motion for Default; Request for Dismissal for on Grounds of Perjury, Obstruction and Contempt" (sic) (Docket No. 16).

Sometime around or before July 23, 2010, Defendant republished his defamatory website. Exhibit 1. This is contrary to Defendant's promises to the Court at the April 19, 2010 hearing on Plaintiff's Motion for Preliminary Injunction. Exhibit 2 at 60. Similarly Defendant assured the Court that he would obtain counsel and file an answer. Exhibit 2 at 62. At no point did Defendant obtain counsel or file an answer.

7

### DISCUSSION

#### I.    Defendant Fails to Establish "Good Cause"

Fed. R. Civ. P. 55(c) allows the Court to set aside entry of default for good cause. Defendant fails to demonstrate good cause and the instant motion should be denied.

Under Fed. R. Civ. P. 55(c), a "district court may set aside an entry of default only if the defaulting party can provide a good reason for the district court to do so." *African Methodist Episcopal Church, Inc. v. Ward*, 185 F.3d 1201, 1202-1203 (11th Cir., 1999), citing *Gower v. Knight (In re Knight)*, 833 F.2d 1515, 1516 (11th Cir.1987).

The factors courts consider when deciding whether to set aside an entry of the default are: "(1) good cause for the default; (2) quick action to correct it; and (3) a meritorious defense to the complaint." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 631 (7th Cir. 2009), citing *Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 810 (7th Cir. 2007).

None of these factors favor the defendant. No good cause for the default was presented. Defendant assured the Court on multiple occasions that he would obtain counsel and file an answer. See e.g. Exhibit 2 at 62. Similarly he was on notice that the summons clearly directed him to file an answer. Defendant was participating in the action by opposing Plaintiff's motion for a preliminary injunction. He knew a suit was pending yet neglected to file an answer.

The second factor, quick action to correct the default also favors Plaintiff.    While Defendant did file the instant motion promptly after entry of the default, it does not demonstrate good cause. Instead Defendant purports that default is not proper on jurisdictional grounds, as he is not presently living in the United States. This is not a valid defense, as objections to personal jurisdiction must be raised at the outset of litigation. Fed. R. Civ. P. 12(b)(2). Defendant also claims that he "made every effort to defend [himself] and comply more than timely in these

8

proceedings." This does not present an excuse for failing to timely answer. Similarly, Defendant's "Answer" (Docket No. 15[1]) (filed 89 days late) does not comport with the rules of pleading or "state in short and plain terms its defenses to each claim asserted against it; and admit or deny the allegations asserted against it by an opposing party" as required by Fed. R. Civ. P. 8(b)(1). It also clearly does not "fairly respond to the substance of the allegation" as required by Fed. R. Civ. P. 8(b)(2).

Likewise, the third and final factor does not favor the defendant. Here he presents no evidence of a meritorious defense to the action. Instead his motion focuses solely on procedural aspects of the default and his failure to answer. Nothing in the instant motion addresses Plaintiff's claims that it was defamed by Defendant or that Defendant infringed on its marks. As the Court can see from the attached Exhibit 1, Plaintiff's statements are clearly defamatory. Defendant cannot seriously contest Plaintiff's defamation claims where Defendant's website contains statements such as:

> This site contains evidence about AUA:
> -Fraud
> -Falsifying Student Grades
> -Breach of Contract
> -Disregard for Student Civil Rights
> -Conspires Against Students

Exhibit 1.

Defendant stated to the Court, on the record, that he would remove his website and replace it with an "under construction" logo. Exhibit 2 at 60-1. As evidenced by Exhibit 1, as of July 23, 2010, the website has been republished. This website contains the same defamatory information as before and continues to infringe on Plaintiff's marks. Exhibit 1. Defendant's lies to the Court should not be tolerated. Similarly, the Court has ample authority for entering a

---

[1] A motion to strike this "answer" is pending.

9

default as a sanction for bad faith during pendency of the case. See e.g. *Eisler v. Stritzler*, 535 F.2d 148, 153 (1st Cir. 1976).

As Defendant fails to assert "good cause" as required by the Court Rules for setting aside entry of a default, the instant motion should be denied.

## II. *Defendant's Motion Does Not State a Claim for Summary Judgment*

As the Court is aware, summary judgment is only available in limited circumstances. Defendant does not assert that any such circumstances exist.[2]

As Defendant relies on documents other than the pleadings, his motion for summary judgment is to be treated as one under Fed. R. Civ. P. 56. Summary judgment is proper under Fed. R. Civ. P. 56 when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must construe the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct 1348, 89 L.Ed. 2d 538 (1986).

Here Defendant's motion does not allege that no genuine issue of material fact exists and, as such, does not meet the pleading requirements of Fed. R. Civ. P. 56. There are a number of outstanding material facts in this case, including whether Defendant defamed Plaintiff or infringed on any of its marks.

Defendant's motion should be denied, as it does not properly state a claim for summary judgment under Federal Rule of Civil Procedure 56.

---

[2] Similarly, Defendant's motion does not comply with the rules of pleading or the local rules governing motion practice. See e.g. Fed. R. Civ. P. 7 and ED Michigan LR 7.1.

## *CONCLUSION*

Plaintiff respectfully requests that the Court deny Defendant's Motion to Set Aside the

Default for his failure to demonstrate good cause (Docket No. 16).


Respectfully Submitted,

/s/ Eric A. Buikema
Eric A. Buikema (P58379)
Cardelli, Lanfear & Buikema, P.C.
322 West Lincoln Avenue
Royal Oak, Michigan 48067
(248) 544-1100
ebuikema@cardellilaw.com

11

# EXHIBIT

# 1

# American University of Antigua

This Web site is intended to ensure you are well informed about this institution and the hospitals they do business with.

Hopefully, this prevents you from wasting years of your life and possibly as much as $150,000 in tuition alone.

Consider yourself informed about the business practices of AUA.

## Antigua only has a 22.9% USMLE Pass Rate!

## AUA student sexually assaulted!

### Learn more truth about rape, murder, and other crimes on Antigua!

## This site contains evidence about AUA:

> **-Fraud**
>
> **-Falsifying Student Grades**
>
> **-Breach of Contract**
>
> **-Disregard for Student Civil Rights**
>
> **-Conspires Against Students**

and other unethical practices by AUA and the hospitals they do business with.

"The Memo" is a link to evidence about a letter that had no other than malicious intensions. This demonstrates the pure heinous nature of the administration and academic advisors of both AUA and St Joseph Mercy Oakland hospital of Trinity Healthcare network.

"**Video Index** " is the complete list of videos.

The documents included on this site are: court exhibits, depositions, interrogatories, student records, emails from student and faculty, recordings, pictures, and other documentation.

If these businesses do this to their students, one can only imagine what they do to their patients.

This web site is dedicated to all the students whose lives, careers, and dreams were ruined by AUA.

(This is not the official American University of Antigua, AUA, site.)

# EXHIBIT

# 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE, A FOREIGN
CORPORATION,

          Plaintiff,

                               HONORABLE PATRICK J. DUGGAN

    v.

                               No. 10-10978

STEVEN WOODWARD,

          Defendant.
_____/


MOTION FOR PRELIMINARY INJUNCTION

Detroit, Michigan -- Monday, April 19, 2010

APPEARANCES:

Eric A. Buikema, Esq.          Steven L. Woodward
Cardelli, Lanfear & Buikema,  In Pro Per
322 West Lincoln             c/o 7211 Brittwood Lane
Royal Oak, Michigan 48067    Flint, Michigan 48507
Tel: (248) 544-1100          steve_l_woodward@yahoo.com
ebuikema@cardellilaw.com
On behalf of Plaintiff


- - -


To Obtain A Certified Transcript, Contact:
Nefertiti A. Matthews, Official Court Reporter
Theodore Levin United States Courthouse
231 West Lafayette Boulevard, Room 867
Detroit, Michigan  48226
www.transcriptorders.com • jodi_matthews@mied.uscourts.gov

Proceedings recorded by mechanical stenography.
*Transcript produced by computer-aided transcription.*

Motion For Preliminary Injunction
Monday, April 19, 2010


I  N  D  E  X

-   -   -


HEARING:                                          PAGE:  VOL:

**Motion for Preliminary Injunction ...............3**       1

Argument By Mr. Buikema  .........................3        1

Response By Mr. Woodward  .......................23        1

Response By Mr. Buikema  ........................30        1

Response By Mr. Woodward  .......................30        1

Response By Mr. Buikema  ........................34        1

Response By Mr. Woodward  .......................35        1

Response By Mr. Buikema  ........................49        1

Response By Mr. Woodward  .......................50        1

Response By Mr. Buikema  ........................53        1

Response By Mr. Woodward  .......................54        1

Response By Mr. Buikema  ........................56        1

Response By Mr. Woodward  .......................56        1

Response By Mr. Buikema  ........................58        1

Response By Mr. Woodward  .......................59        1

**Decision By The Court  ..........................60**       **1**

Response By Mr. Buikema  ........................61        1


Certification of Reporter ......................63

*10-10978; American University of Antigua v. Steven Woodward*

1              Detroit, Michigan

2              Monday, April 19, 2010

3                   1:59 p.m.

4              -    -    -

5          **THE CLERK:**  Civil action number 10-10978; American

6     University of Antigua College of Medicine versus Steven

7     Woodward.

8          **THE COURT:**  Identify yourselves, for the record,

9     please.

10          **MR. BUIKEMA:**  Good afternoon, Your Honor.  Eric

11     Buikema of Cardelli, Lanfear & Buikema, for the

12     plaintiff and moving party.

13          **MR. WOODWARD:**  My name is Steven Woodward.

14          **THE COURT:**  All right.  Counsel, I believe it's

15     your motion.  I'll let you proceed.

16              **Motion for Preliminary Injunction**

17     **ARGUMENT BY MR. BUIKEMA**

18          **MR. BUIKEMA:**  Thank you, Your Honor.

19          First of all, I intend to be relatively brief.

20     I'm largely satisfied with our written pleadings in

21     this regard.  But there are a few things that I need to

22     point out for purposes of today.

23          As you know, Your Honor, this is a motion for

24     preliminary injunction.  We are seeking to have

25     Mr. Woodward cease and desist publication of what we

1   regard as an offending website containing information

2   that is damaging to my client as well as its students.

3        Mr. Woodward is very obviously a student who is

4   dissatisfied with his educational experience at

5   American University of Antigua and he's certainly

6   within his rights to express opinions about that.

7        But what he is not permitted to do, under

8   applicable law, are at least three or four things and

9   they include making use of confusingly similar names,

10   domain names, specifically, in this case, that confuse

11   or mislead the public as to the origin of his opinions

12   or remarks or publications.

13        THE COURT:  What is that theory of defense?

14        MR. BUIKEMA:  Of defense?

15        THE COURT:  What's your theory?  You list a number

16   of theories.  Which theory are you talking about now?

17        MR. BUIKEMA:  I'm talking about violation of the

18   Lanham Act, specifically the Anticybersquatting

19   Provision under paren (d).

20        THE COURT:  Fair enough.  Hold on.  You have your

21   motion in front of you?

22        MR. BUIKEMA:  I do, Your Honor.

23        THE COURT:  Now, I think page four.

24        MR. BUIKEMA:  Yes.

25        THE COURT:  At the bottom.

Argument By Mr. Buikema
Monday/April 19, 2010                    5

1          MR. BUIKEMA:  Yes.

2          THE COURT:  You set forth what the Act requires,

3     fair enough?

4          MR. BUIKEMA:  Yes.

5          THE COURT:  "Cause of action against a person who

6     uses in commerce any reproduction, counterfeit, copy,

7     or colorable imitation of a registered mark in

8     connection with a sale, offering for sale, distribution

9     or advertisement of any goods or services."  How is

10     that involved here?

11          MR. BUIKEMA:  My understanding from the case law,

12     Your Honor, is that so long as there is an attempt for

13     pecuniary gain --

14          THE COURT:  Do you have a case that supports that?

15     Because you don't cite it and I don't know of any.

16          MR. BUIKEMA:  I believe that's given by the Walt

17     Disney Corp. case but I would have to go back and look,

18     Your Honor, to be sure.

19          THE COURT:  Counsel, you prepared this brief.  It

20     clearly says, "Goods or services."

21          Now, you don't come in and argue and say, "Okay,

22     well, Judge, that's what it says, let me tell you how

23     it applies."  I mean, why is he using the Lanham Act

24     because in all my experience it involves goods or

25     services?

10-10978; American University of Antigua v. Steven Woodward

1    MR. BUIKEMA: Your Honor, the confusion of the

2    origin of the remarks I think is essential to the

3    Lanham Act. That there be an intention or purpose for

4    financial gain is, I think, a secondary prong under the

5    Lanham Act analysis.

6    THE COURT: Where? It says specifically, you

7    quoted it, "In connection with the sale of goods or

8    services."

9    MR. BUIKEMA: And Your Honor, with all due

10   respect, this is one factor of several, none of which

11   is dispositive.

12   THE COURT: What do you mean, "One factor"?

13   MR. BUIKEMA: And this is given by the Wynn Oil

14   Company versus Thomas case.

15   THE COURT: What do you mean, "One factor"?

16   MR. BUIKEMA: It's one factor of the likelihood of

17   confusion, we examine eight factors --

18   THE COURT: Likelihood of confusion in connection

19   with the sale of goods or services, that's what it

20   says.

21   MR. BUIKEMA: All right.

22   THE COURT: So, I'm trying to figure out why are

23   you using this as a violation?

24   MR. BUIKEMA: Because Your Honor, the provision

25   (d), under the anticybersquatting --

1           THE COURT:  Wait, that's a different theory.

2           MR. BUIKEMA:  You asked me specifically about the

3      confusing --

4           THE COURT:  We're going to go to each one of your

5      theories because I'm trying to figure out why you're

6      asserting these theories because it doesn't seem to me

7      your Lanham Act has any merit at all.

8           MR. BUIKEMA:  The Lanham Act claim is relative not

9      to the use of the confusingly similar web domain name,

10     I misunderstood, Your Honor, apologies.

11          The Lanham Act claim is relative to plaintiff's

12     use, republication of our actual logo, trade name.

13          THE COURT:  Where is that set forth here?

14          MR. BUIKEMA:  This is set forth in the verified

15     complaint.

16          THE COURT:  No, no, I've got your motion.  I'm

17     reading your motion.  Your motion tells me why you're

18     entitled to relief.  Now, you're coming up with

19     something I didn't read in the motion at all.

20          MR. BUIKEMA:  That is contained, I believe, at

21     page six, Your Honor -- excuse me, top of page seven.

22     Our motion reads, "Defendant's use of the similar

23     domain name, including copies, reproduction and/or

24     counterfeits of the AUA logo on the site itself has

25     been and continues to be done with the intent to cause

1    confusion, mistake, or harm as to the source or

2    sponsorship of the information disseminated."

3        That's a factual predicate that's given by a

4    verified complaint attached as Exhibit "A".

5        THE COURT:  I understand.  But I still think we

6    have to go back to what you said the Lanham Act

7    involves goods or services.

8        MR. BUIKEMA:  For confusion as to origin of the

9    goods and services.  The goods and services here is the

10   education being offered by my client.

11       If he is confusing the origin of the public

12   remarks as to that good and service, that's a violation

13   of the Lanham Act.  He doesn't have to be attempting to

14   sell competing goods or services.  He simply has to be

15   confusing the origin of the goods or services for sale

16   which, in this case, is a medical school education.

17       And in his use of logos, that are our actual

18   logos, he's violated the Lanham Act by republishing

19   information as if it were published by my client.

20       THE COURT:  What information did he republish as

21   if it were by your client?

22       MR. BUIKEMA:  Specifically if you go to the

23   website, Your Honor, you'll find under a number of

24   links, specifically under the document links or quote,

25   unquote, "Evidence", under the website.  This semester

10-10978; American University of Antigua v. Steven Woodward

1        syllabus, course guidelines, self-exams, publications

2        or republications from University materials.

3            Now, incidentally, his republications violates a

4        copyright as well but we've not alleged that.  They are

5        materials generated by my client.  But they actually

6        employ the AUA logo on this cite that contains,

7        hand-in-hand, false and defamatory and damaging

8        information.

9            **THE COURT:**  We'll get to the false and defamatory,

10       don't mix up all your claims.

11           **MR. BUIKEMA:**  It's important to me, Your Honor,

12       because when you bring those things hand in hand you

13       have given credibility to the offending information.

14           So, whereas republishing the course syllabus with

15       its logo is not, in and of itself, damaging to my

16       client's reputation, it is, in fact, the course

17       syllabus.

18           When you employ that logo and attach it to your

19       website as if that website is somehow connected with or

20       sponsored by the University, you have given credibility

21       or caused confusion as to the source of the remaining

22       remarks.

23           **THE COURT:**  I don't know how that's a violation of

24       the Lanham Act.  The Lanham Act really deals with goods

25       and services and normally it's competing.

Argument By Mr. Buikema
Monday/April 19, 2010                          10

1          Let's go to your next argument which is

2     anticybersquatting claim?

3          MR. BUIKEMA:  That's correct, Your Honor.

4          THE COURT:  Tell me about that one.

5          MR. BUIKEMA:  Okay.  The defendant's website

6     utilizes as a domain name "aua-med.org" -- or excuse

7     me, "aua-med.com".

8          The actual and authentic website is, "auamed.org".

9     That website -- domain name is not chosen by accident,

10    I submit to you, it's chosen for the very purpose of

11    ciphering off legitimate internet traffic for seeking

12    information about the University or potentially from

13    the University to be redirected to Mr. Woodward's site.

14         Because he has chosen that trade name under this

15    provision of the ACPA, he can be held liable and

16    .injunctive relief is available if, in fact, there is

17    bad faith intent to profit from that mark or use that

18    mark and it's confusingly similar or diluted.

19         THE COURT:  All right.  Let's go to page seven of

20    your brief, your motion.

21         MR. BUIKEMA:  Yes, Your Honor.

22         THE COURT:  You said, "Cyber squatting involves a

23    registration as a domain, names of well-known

24    trademarks by a non-trademark holder who then try to

25    sell names back to the trademark."

1        MR. BUIKEMA:  That is one potential --

2        THE COURT:  That isn't happening here, is it?

3        MR. BUIKEMA:  It's not.  I agree.  But that's one

4    potential means or method of violating the ACPA, as I

5    understand it.

6        THE COURT:  Let's keep going.  It says, "A person

7    shall be liable in a civil action by the owner of a

8    mark...if without regard to the goods or services of

9    the parties."  Again, we're talking about goods and

10   services.

11       MR. BUIKEMA:  Your Honor, I agree.  But the goods

12   and services is not focusing from the offender

13   standpoint.  The offender doesn't have to be selling or

14   advertising competing goods or services for it to be a

15   violation.

16       THE COURT:  Who says they don't?  What case do you

17   have that says, "The competitor doesn't have to be

18   involved in selling goods or services", what case?

19       Every case I've ever had, the competitor is

20   dealing with goods or services.

21       MR. BUIKEMA:  He is competing with us --

22       THE COURT:  Everyone I've had is dealing with

23   goods or services, that's what the competition is

24   doing.

25       MR. BUIKEMA:  In my view, Your Honor, the goods or

1      services are the domain name itself and the information

2      disclosed thereby.

3              THE COURT:  He's not trying to sell the name

4      itself, is he?

5              MR. BUIKEMA:  I don't know.

6              THE COURT:  Wait.  It's your motion, if you don't

7      know, then you can't say that he is.

8              MR. BUIKEMA:  That's correct, Your Honor, there's

9      been no discovery in this case.

10             And as you know, I'm held to a standard of

11     potential success on the merits.  Substantial

12     likelihood of success on the merits, not absolute

13     success on the merits.  There's been no discovery on

14     that issue.

15             I will submit to you, Your Honor, that it's my

16     belief and understanding, I was not counsel in the

17     State Court case.  But my belief and understanding is

18     that Mr. Woodward has attempted to extract profit from,

19     let's say, exploited aspects of that web domain.

20             THE COURT:  What's the basis of that

21     understanding?

22             MR. BUIKEMA:  From my review of the record, I am

23     appellate counsel in that case and was so appointed

24     after the disposition by the State Court Judge.

25             THE COURT:  All right.  Let's go to your next

1    claim which is, "Willful violation of Family

2    Educational Rights and Privacy Act"?

3              MR. BUIKEMA:  Correct.

4              THE COURT:  I'm reading from your brief, "The

5    Family Educational Rights and Privacy Act of 1974

6    prohibits the federal funding of educational

7    institutions that have a policy of practice of

8    releasing education records without authorized

9    persons."  What's that got to do with this case?

10             MR. BUIKEMA:  In my view, Your Honor, it's a

11   wrongful act predicate to a tortious interference

12   claim.  And perhaps that's not made as clear as it

13   should be by our pleadings but that's how I regard this

14   claim.

15             FERPA prohibits disclosures of students'

16   information by the University itself.  And has, as

17   consequence, the termination of federal funding, which

18   my client does receive and some of the students receive

19   benefits under that provision.

20             It's my view that Mr. Woodward's conduct in

21   disclosing student information grades, which he admits

22   to doing and, in fact, has muddied this record by

23   attaching yet more of that information, creates

24   standing to my client -- gives standing to my client

25   the challenge on behalf of its students.

_10-10978; American University of Antigua v. Steven Woodward_

1          But more importantly --

2          **THE COURT:**  Why, he's not an agent of the

3     university in any way, shape or form?

4          **MR. BUIKEMA:**  But we are an agent of our students

5     whose information has been --

6          **THE COURT:**  But this prohibits the University from

7     doing it.  How could you possibly argue that the

8     University is doing it, when they're not?

9          **MR. BUIKEMA:**  I'm not sure I understand Your

10    Honor's question.

11         **THE COURT:**  It says, "It prohibits federal funding

12    of educational institutions who have a policy or

13    practice."  You don't contend the education has a

14    policy or practice, do you?

15         **MR. BUIKEMA:**  I do not contend that it has a

16    policy or practice.  But Mr. Woodward's actions in

17    disclosing the student information could cause the

18    federal government to terminate funding --

19         **THE COURT:**  How could that be a policy or practice

20    of the University?  How would anyone ever believe his

21    conduct is a practice or policy of the University?

22         **MR. BUIKEMA:**  I'd rather not find out, frankly,

23    Your Honor.

24         **THE COURT:**  It's just ridiculous.  I don't know

25    why you're arguing that.  His conduct can't be

1    considered a policy or practice of the University.  You

2    said that from the very beginning, it's not.  I don't

3    know why you're arguing these claims that have very

4    little, if any, merit.

5         And the problem is you can -- obviously, an

6    attorney can argue alternate theories, but you've got

7    to have some basis for the alternate theory or what

8    happens is, the Court says, "Wow, he's just throwing

9    everything in there so if they're weak, all his claims

10   must be equally weak."

11        And it's just a bad practice, in my judgment, to

12   assert any claim unless you have solid evidence that

13   there's at least some good merit to it and I don't

14   think there's any merit to this claim at all.

15        MR. BUIKEMA:  Again, Your Honor, I think my

16   pleadings are confusing in that regard and I'm not

17   intending to argue to this Court that there is an

18   independent clause of action that exist in my client

19   because of FERPA.

20        What I'm arguing is that Mr. Woodward's

21   publication of private student information which would

22   be violative of FERPA is a tortious interference with a

23   third-party expectancy --

24        THE COURT:  It's not tortious interference.

25        MR. BUIKEMA:  -- because the federal funding

| | |
|---|---|
| 1 | consequence of release of that information is |
| 2 | potentially damaging to my client and its students. |
| 3 | **THE COURT:** And it's a policy and practice of the |
| 4 | University that's to be dealt with, not some person |
| 5 | that's acting as you allege he is. |
| 6 | Any event, let's go to the next one. |
| 7 | **MR. BUIKEMA:** Go ahead. |
| 8 | **THE COURT:** You've got a defamation claim? |
| 9 | **MR. BUIKEMA:** I do, Your Honor. |
| 10 | And if you take any time to peruse Mr. Woodward's |
| 11 | website this is a lot more than a gripe site. A lot |
| 12 | more than expression of opinions as is given in the |
| 13 | evidence before you, specifically the verified |
| 14 | complaint and my written pleadings in this regard. |
| 15 | He accuses the University of conspiratorial |
| 16 | conduct, the defrauding of students, of falsifying |
| 17 | students' grades, the connection with criminal |
| 18 | activities and the like. |
| 19 | **THE COURT:** Let's take them one at a time, okay. |
| 20 | **MR. BUIKEMA:** Fair enough. |
| 21 | **THE COURT:** Are they listed on page two? Are |
| 22 | these the defamation statements or whatever you're |
| 23 | calling them? |
| 24 | **MR. BUIKEMA:** That's a summary. |
| 25 | **THE COURT:** You say, "A summary"? |

Argument By Mr. Buikema
Monday/April 19, 2010                    17

1          MR. BUIKEMA:  Yes.

2          THE COURT:  Well, I'm trying to ask you whether

3     these are listed, "A", "B", are these specific?

4          MR. BUIKEMA:  They're not in every instance the

5     words used, but they are words that are used in summary

6     of different links within the website that connote this

7     information.

8          THE COURT:  Okay.  Now, he says -- you say he

9     says, I'm now on page two listing the items there

10    starting with small "a".

11         MR. BUIKEMA:  Okay.

12         THE COURT:  You say he says, "AUA routinely

13    commits fraud upon its students"?

14         MR. BUIKEMA:  Yes.

15         THE COURT:  I don't have any information from you

16    that they don't.

17         MR. BUIKEMA:  I'm sorry?

18         THE COURT:  I don't have any information that's

19    false.

20         MR. BUIKEMA:  Yes, you do, Your Honor.

21         THE COURT:  Where?

22         MR. BUIKEMA:  Exhibit "A" is a verified complaint

23    which, as part of the allegations says --

24         THE COURT:  Hold on.

25         MR. BUIKEMA:  "We've reviewed all of these and the

10-10978; American University of Antigua v. Steven Woodward

Argument By Mr. Buikema
Monday/April 19, 2010                    18

1    allegations in our complaint are true", and it's signed
2    by the President of the University.
3              THE COURT:  Hold on.
4              MR. BUIKEMA:  In fact, that's the only evidence
5    you have, in this case, thus far.
6              THE COURT:  Hold on.  Tell me what the verified
7    complaint says with respect to these individual items.
8              MR. BUIKEMA:  I will.
9              If you look at page four of the verified
10   complaint, paragraph 21, Your Honor, reads:
11   "Defendant's website represents, alleges, and
12   publishes, as if true, false and defamatory about AUA,
13   including by way of example and not by limitation
14   that:"
15             And then you see the same subparagraphs "A"
16   through "P" in that allegation.
17             The very last page, of course, is a verification
18   signed, under oath, by the President of the University
19   indicating that the allegations contained in the
20   complaint are, in fact, true.  He's reviewed them and
21   the like.
22             So, he's affirmed that those representations by
23   Mr. Woodward's website are false in sworn testimony.
24             THE COURT:  Who signed the affidavit?
25             MR. WOODWARD:  The President of the University.

10-10978; American University of Antigua v. Steven Woodward

1        His name is Neil Simon, not to be confused with the

2        playwright.

3            THE COURT:  Let's go, for example, to small "h":

4        "AUA students are sexually assaulted."  Is that a false

5        statement?

6            MR. BUIKEMA:  In and of itself, an AUA student was

7        apparently assaulted.  The connotation of AUA students

8        being sexually assaulted, in the tense, is a false

9        statement.

10           THE COURT:  In the what?

11           MR. BUIKEMA:  In the tense utilized or represented

12       by the website is a false statement.

13           THE COURT:  I'm missing what you're talking about,

14       "Tense".

15           MR. BUIKEMA:  The statement in the website

16       connotes a general practice or happening as if "All

17       students" or generally students are sexually assaulted

18       at AUA.

19           THE COURT:  That's the spin you put on it.  But

20       the statement itself is true, "AUA students are

21       sexually assaulted", have they?

22           MR. BUIKEMA:  An AUA student was sexually

23       assaulted.

24           THE COURT:  Only one?

25           MR. BUIKEMA:  To my knowledge, yes.

1           THE COURT: Next one, AUA's professors teach

2       students wrong information. How does the President

3       know that's not true?

4           MR. BUIKEMA: Because he's responsible for

5       generating a curriculum and overseeing the curriculum.

6           THE COURT: Does he know what every professor is

7       saying in class?

8           MR. BUIKEMA: He signed the affidavit based upon

9       his firsthand knowledge and review of the facts to the

10      best of his knowledge, information, and belief, Your

11      Honor.

12          THE COURT: Let's go to page three, paragraph "1":

13      "AUA students pass rate for USMLE medical board exams

14      is only 22.9%."

15          MR. BUIKEMA: Yes.

16          THE COURT: That's false?

17          MR. BUIKEMA: That's absolutely false. The

18      passage rate is approximately 80 percent or better.

19      USMLE scores are not published by Universities or

20      institutions to begin with. So, there's no way for Mr.

21      Woodward to make that representation in the first

22      place. It's reckless.

23          USMLE scores are published by location. And if

24      you fair it out, that allegation in Mr. Woodward's

25      website, by clicking on the appropriate links, you'll

_10-10978; American University of Antigua v. Steven Woodward_

1    go through his purported evidence and video evidence of

2    this, which is a Power Point presentation that doesn't

3    even mention the USMLE scores.

4         And even if you look at non-U.S., Canada, the

5    statistics published on Mr. Woodward's own website in

6    support of this proposition, this lie, they show

7    Canada, non-U.S. USMLE scores in the 70 percent to

8    85 percent range.  It's absolutely false.

9         THE COURT:  Okay.  Anything further?

10        MR. BUIKEMA:  Yes, Your Honor.  Because I think

11   it's most sensitive from when you're looking at a

12   defamation case, there are a litany of examples that if

13   the Court took the time to review the website, the

14   Court would see are more definite statements of

15   falsehood and defamatory remarks.

16        A couple that I'd like to point out are, in one

17   portion of his website Mr. Woodward indicates or claims

18   that, as if fact, that AUA has disregard for basic

19   civil rights and in support of video, cites the 5th

20   Amendment and says that we've denied the student a

21   right to produce evidence at a fair hearing.

22        First of all, the 5th Amendment doesn't apply to

23   my client.  But having said that, the statement that

24   his civil rights were somehow violated are derived

25   apparently from his belief that he was entitled to the

10-10978; American University of Antigua v. Steven Woodward

1       same by some hearing he failed to attempt and that's

2       supported by the verified complaint.

3               Most notably to me is in the video index section

4       of his website, Mr. Woodward states, "Antigua Crimes

5       and AUA". That's the topic of the category, Antigua

6       Crimes and AUA. And then says, quote, "Learn the truth

7       about AUA's lies and connections with criminal

8       activities on Antigua."

9               He has directly accused, as if fact, my client of

10      being tied to criminal activity on the Island of

11      Antigua. There's absolutely no support for that

12      proposition. That proposition is false. That

13      proposition is per se defamatory.

14              And for those reasons and our reasons in our

15      written pleadings, I believe that preliminary

16      injunction, during the pendency of this case, and just

17      until such time as this case can be heard on all of its

18      merits, is appropriate in this circumstance.

19              My client suffers harm everyday it continues to be

20      up that these lies are published with confusingly

21      similar domain names and confusion as to origin,

22      including use of its own logos, copyright protected

23      information, student's grades and the like.

24              And for those reasons, Your Honor, I ask you to

25      grant our motion.

1           THE COURT:  All right.  Mr. Woodward.

2           MR. WOODWARD:  Can I present evidence today, Your

3       Honor?

4           THE COURT:  I don't know how long you're going to

5       take to do it?

6           MR. WOODWARD:  Can I step back and get my box of

7       evidence?

8           THE COURT:  Sure.

9           MR. WOODWARD:  Do I have to come here?

10          THE COURT:  You can stay there.

11  RESPONSE BY MR. WOODWARD

12          MR. WOODWARD:  First off, Your Honor, I think he

13      talked about cyber squatting.  And I believe under 15

14      U.S. -- the code for cyber squatting, there's an

15      exemption for that and that would be for people -- it's

16      15, 1125, page 3, it's an exclusion A (ii), B and C for

17      people that are not-- for criticizing news, et cetera,

18      are just people expressing their civil rights of

19      freedom of speech.

20          THE COURT:  That's why you're supposed to file a

21      response in writing saying that.  You would have

22      alerted the Court this is your basis.  I could have

23      looked at it.

24          MR. WOODWARD:  Your Honor --

25          THE COURT:  I'm not going to look at it now,

1    you're supposed to give it to me ahead of time.

2        MR. WOODWARD:  I emailed this but it wasn't

3    formatted properly to the -- I emailed this to

4    Ms. Orem.  This rebuttal was emailed to her.

5        THE COURT:  Just brief, I don't want a rambling

6    thing.  Did you say that in the email, just now what

7    you told me?

8        MR. WOODWARD:  That is in the file that I attached

9    to Ms. Orem, but not to this file that's here.  It's

10   attached to one of the files that I sent her before I

11   received the entire motion from this attorney.

12       THE COURT:  Okay.  What's next?

13       MR. WOODWARD:  Okay.  Document, bad faith.  Okay.

14       Your Honor, as far as bad faith, again, under the

15   evidence of registry and use of bad faith,

16   circumstances, limitations found, the first one is for

17   purposes of selling and renting.  I do not sell or rent

18   anything.

19       THE COURT:  What are you talking about?  Where are

20   you?

21       MR. WOODWARD:  I'm just trying to follow where

22   he --

23       THE COURT:  Then tell me what item you're on, I

24   don't know where you are?

25       MR. WOODWARD:  The subject of bad faith of having

1      my domain name, sir.

2              THE COURT:  Where do you find he's claiming bad

3      faith?

4              MR. WOODWARD:  That would be on the -- Your Honor,

5      that would be -- it's not part of cyber squat.  It's

6      part of the ICANN policies, part of ICANN policies for

7      the use of domain names.

8              THE COURT:  What part of his motion are you

9      responding to at this point?

10             MR. WOODWARD:  The use of my website, aua-med.com.

11             THE COURT:  Pull the motion out.  He's got section

12     by section.  He talked about it when he argued.  He

13     took one step at a time.  I don't know what you're

14     talking about.

15             MR. WOODWARD:  This is -- I put a reference in

16     here, it's the ICANN document and it's the policy of

17     ICANN.

18             THE COURT:  I don't know what ICANN have to do

19     with anything.  What's an ICANN?  Where is that

20     mentioned in his motion?

21             MR. WOODWARD:  Well, Your Honor, ICANN is the

22     organization -- the international organization that's

23     responsible for domain names.

24             THE COURT:  Okay.  So?

25             MR. WOODWARD:  And as far as bad faith policy for

1       those, I'm not in violation of any of their policies --

2               THE COURT:  Who say you were?  Where did he say

3       you're in violation of ICANN?  Where did he mention it?

4               MR. WOODWARD:  He just said I was in violation of

5       bad faith of using my domain name.

6               THE COURT:  Well, which one of the arguments, he

7       gave four basis?

8               MR. WOODWARD:  Oh, sorry, Your Honor.  The

9       argument of bad faith.  Number 41, sir, "Defendant

10      has--"

11              THE COURT:  Time out.  Number 41 of what?

12              MR. WOODWARD:  Forty-one of his complaint.

13              THE COURT:  Page number?

14              MR. WOODWARD:  Sorry, it's page eight, sir, number

15      41.

16              THE COURT:  Hold on.

17              MR. WOODWARD:  Yes, sir.

18              THE COURT:  Are you on the motion brief?

19              MR. WOODWARD:  This is the complaint that he

20      filed.

21              THE COURT:  Oh, you're talking about the

22      complaint?

23              MR. WOODWARD:  Isn't that what we're going

24      through, Your Honor?

25              THE COURT:  No, I'm going through his motion for

10-10978; American University of Antigua v. Steven Woodward

1    preliminary injunction.

2         MR. WOODWARD: Aren't they one in the same, these

3    motions?

4         THE COURT: No, absolutely not. That's what I was

5    going through paragraph by paragraph of the motion.

6         MR. WOODWARD: Okay. The motion I only had five

7    lined items, I thought, on this motion.

8         THE COURT: You have a copy of the motion?

9         MR. WOODWARD: I have this document right here,

10   Your Honor.

11        THE COURT: What's it called?

12        MR. WOODWARD: It's called, "Plaintiff's Motion

13   for Preliminary Injunction", and there's three pages to

14   it.

15        THE COURT: Three?

16        MR. WOODWARD: This is what I thought I had to

17   defend today. I didn't know that I had to defend this

18   entire paper.

19        THE COURT: Hold on. Show that to him.

20        MR. WOODWARD: Is this it?

21        MR. BUIKEMA: That's the motion, Your Honor,

22   that's not the brief and exhibits. And I have proof of

23   service for all of them.

24        MR. WOODWARD: I thought that the other part was

25   this.

10-10978; American University of Antigua v. Steven Woodward

1           THE COURT: Hold on. Just hold on.

2           Counsel, I have a document entitled, "Plaintiff's

3     Motion for Preliminary Injunction", okay. And then

4     attached to it the Plaintiff's brief, fair enough? Did

5     you not get the brief?

6           MR. WOODWARD: I assumed that the brief was this.

7           THE COURT: Don't assume anything. Did you get --

8           MR. WOODWARD: I did, Your Honor, I thought this

9     is what we were going over today, these five items.

10          THE COURT: What does the brief say? What's the

11    title of it in front of you, the brief?

12          MR. WOODWARD: Oh, I didn't even print it because

13    it was the same as this.

14          THE COURT: What's, "This"?

15          MR. WOODWARD: This is his claim that he sent me.

16    This is the Plaintiff's Verified Complaint for Request

17    for Temporary Restraining Order?

18          MR. BUIKEMA: He appears to be holding up the

19    complaint which is Exhibit "A" to our brief. But

20    that's certainly not the same of what we're dealing

21    with today, of course.

22          THE COURT: I'm going by the brief in support of

23    the motion, that's what we're here for today. That's

24    what I wanted you to respond to, the arguments made in

25    the motion.

1              MR. WOODWARD:  Okay.  I was confused that this

2         first page was a motion and there are five items to

3         this page and that's why I wasn't --

4              THE COURT:  I don't know of any motion talking

5         about bad faith.  In any event, let's go on.

6              MR. WOODWARD:  We just covered bad faith in his --

7              THE COURT:  I understand.  I don't know that you

8         have bad faith or not.

9              MR. WOODWARD:  Yes, Your Honor.

10             As far as -- yes, Your Honor.  I guess I can go

11        over my claims here that are obviously -- I can show

12        that they are mistaken.

13             When it says, "AUA student rate for USMLE medical

14        board is only 22.9% percent", that is not what my

15        website says and I have evidence to show that.

16             What it is, it's Antigua does.  And it's published

17        information.  There's two medical schools on Antigua.

18        And Antigua has a 22.9% pass rate.  Antigua does.

19             THE COURT:  Hold on.  What's the difference

20        between Antigua?

21             MR. WOODWARD:  There are two medical schools, Your

22        Honor.  The organizations that release or that have the

23        documentation to support the pass rates will not

24        release those pass scores.

25             THE COURT:  So, you never stated that this

1        University has a --

2               MR. WOODWARD:  No.

3               THE COURT:  You never said it?

4               MR. WOODWARD:  Never said it.

5               THE COURT:  Stop.  Stop.  Counsel, why do you say

6        he said it?

7   RESPONSE BY MR. BUIKEMA

8               MR. BUIKEMA:  That's my understanding of the

9        website publication.

10           And even if what Mr. Woodward is now saying is

11       true, he's just told you, Your Honor, that there are

12       two medical schools.  And so to say that Antigua's

13       USMLE rate in context to his entire web page that's

14       smearing the reputation of my client, was intentionally

15       misleading and known to be misleading by this person.

16           He's also just said the organization that

17       publishes those scores won't release them.  So, how can

18       he know the pass rate from Antigua if he sought that

19       from the releasing party and they won't release it?

20       That's a reckless statement.  Whether it's intentional

21       or not, if it's reckless, that supports the cause for

22       defamation.

23              THE COURT:  Why are you making any reference at

24       all about a pass rate of 22.9%?

25   RESPONSE BY MR. WOODWARD

1          MR. WOODWARD:  Because it was published in the

2     newspaper, Your Honor.

3          THE COURT:  What's that got to do with this

4     school?

5          MR. WOODWARD:  Because there are two schools on

6     the Island of Antigua, one has a 90% USMLE pass rate

7     for first time test-taking students; another one claims

8     that they have an 80.6% pass rate.  80.6 and 90%

9     doesn't equal 22.9%.

10         MR. BUIKEMA:  I couldn't agree more, Your Honor.

11     And Mr. Woodward knows that when he publishes that

12     false statistic.

13         THE COURT:  What's the 22.9% got to do with this

14     University?

15         MR. WOODWARD:  I don't just talk about this

16     University, Your Honor, on my website.

17         THE COURT:  Well, the primary thing on your

18     website is about this University, isn't it?

19         MR. WOODWARD:  That's right, Your Honor.  But the

20     ECFMG, which is the governing body for these types of

21     organizations down in the Caribbean, will not release

22     that information, even though I've requested it.

23         THE COURT:  I'm not concerned about information

24     that isn't released.  I'm concerned about you making

25     the statement that at least, by some inference, since

1          your website is dealing with this University and you

2          talk about a pass rate of 22.9%, someone might say,

3          "Wow".

4                MR. WOODWARD:  That's correct, Your Honor, and

5          that's where I go to the data that was released in a

6          Power Point presentation from the school showed that

7          the University only had about a 50 percent pass rate.

8                When I further looked at that information, I found

9          out that for AUA students only, the pass rate was only

10         44%, that's not transfer students, that's just the

11         students that started and ended with AUA.  And that was

12         inside the Power Point presentation, Your Honor.

13               THE COURT:  Why talk about 22.9% --

14               MR. WOODWARD:  I mean 44% pass rate.

15               THE COURT:  Why talk about 22.9%?

16               MR. WOODWARD:  Because it demonstrates, Your

17         Honor, that somebody's not telling the truth.

18               THE COURT:  A statement that the pass rate for

19         medical board exam of 22.9% tell us somebody is not

20         telling the truth?

21               MR. WOODWARD:  If there's only two universities on

22         the island, Your Honor, and the total pass rate for the

23         island is 22.9% and one school claims a 90% pass rate

24         and the other school an 80.6% pass rate --

25               THE COURT:  That doesn't mean this defendant did

1       anything wrong. You're aligning this university with
2       no basis for it.

3              MR. WOODWARD: No, Your Honor, because I further
4       go on to explain that the pass rate, per their release
5       student information, is 44%, Your Honor, not 80.6% like
6       they claim on their website.

7              THE COURT: But you said --

8              MR. WOODWARD: I did not demonstrate anywhere on
9       that island, I'm just saying that the numbers just
10      don't add up.

11             THE COURT: But be fair. You're attacking this
12      University, people will read this and think you're
13      talking about this university.

14             MR. WOODWARD: No, I also talk about the other
15      university. I talk about the hospital. I talk about
16      the ECFMG not releasing student grades so that people
17      know what kind of university they're getting into, Your
18      Honor.

19             THE COURT: What's your --

20             MR. WOODWARD: The hospitals that they deal with
21      and the businesses that they deal with, that's on the
22      front cover of my page.

23             THE COURT: In his brief in support of the motion,
24      he lists what they believe are false statements by you.
25      And number "A" is: "AUA routinely commits fraud upon

        10-10978; American University of Antigua v. Steven Woodward

1      its students."  What's the basis for that?

2          MR. WOODWARD:  Well, I don't know the basis for

3      routinely commits fraud, Your Honor.

4          But on the documentation that I just turned in

5      today, Your Honor, as far as all of the -- that

6      contained all of the student information that was

7      released, I can demonstrate that I earned an 80 percent

8      on my final grade and AUA gave me an "F".

9          THE COURT:  Hold on.  One thing to say you believe

10     you were.

11         Counsel, why do you say in here:  "AUA routinely

12     commits fraud"?  Does he say that on the website?

13     RESPONSE BY MR. BUIKEMA

14         MR. BUIKEMA:  I do say that and he does say that.

15     And the home page says, "You'll find evidence of fraud.

16     Contains evidence of AUA committing fraud."

17         If you click on the link and then either the

18     evidence links or the video links to these Youtube

19     videos which, by the way, are narrated by Mr. Woodward

20     and published by Mr. Woodward as well.  He goes through

21     these synopsis of how AUA commits fraud upon its

22     "Students", plural.  And it's about an eight-minute

23     video, I think, in that particular circumstance.

24         And the characterization of my motion is an

25     accurate characterization of his website from us and

1          publications.

2     **RESPONSE BY MR. WOODWARD**

3          **MR. WOODWARD:**  If the data is not released and you

4          have the student grades that the school reported to me

5          on their Power Point presentation that their grades are

6          only 50% and on the internet they're claiming an 80.6%

7          pass rate, they're not telling the truth.  That's false

8          advertisement.

9               If they give a person an "F" on their final grade

10         that earned an 80 percent on their final grade, that's

11         fraud, as far as the definition of cheating a student.

12              They further went on to say, "Failed final exam.

13         Did not have OP rotation."  That is also fraud, Your

14         Honor.  I had an out-patient rotation.  I only had two

15         clinical rotations --

16         **THE COURT:**  Let's stay away from you, I understand

17         you.  On what basis do you conclude whatever happened  .

18         to you happens to other students?

19         **MR. WOODWARD:**  Because, Your Honor, we were

20         supposed to have clinical rotations and more than just

21         two rotations.  All of these students only had two

22         rotations.

23              They claimed superior, quality education, et

24         cetera.  If you look at this semester program, we had

25         over 20 changes in the schedule of this semester

1    program, Your Honor. The applications that they had

2    didn't even work, Your Honor. The testing applications

3    did not work. The testing applications failed.

4         There was a week time, Your Honor, when I couldn't

5    do any of my work for the testing application because

6    it did not work. Five days, Your Honor, that their

7    application didn't work.

8         That would be like your employees not being able

9    to do their work for five days. And I paid $12,000 for

10   this education that is supposedly this quality, great

11   education. And instead they give me an "F".

12        THE COURT: One thing to complain about the way

13   you were treated, okay. I'm more concerned about you

14   making generalized statements about other students,

15   without any basis for it.

16        MR. WOODWARD: I am a student. I was a student.

17        THE COURT: "Other students", okay. It's one

18   thing to express complaints about the way you were

19   treated, but to go on and generally suggest that this

20   is happening to all kinds of students may be

21   inaccurate.

22        MR. WOODWARD: Your Honor, in my experience it is

23   not because I've just demonstrated that they say on

24   their website about the quality of education and I just

25   gave you an example about the quality education we get,

1        its not quality education.

2                THE COURT:  That's your opinion.

3                "AUA students--", says, you say, "--are sexually

4        assaulted."

5                MR. WOODWARD:  An AUA student was sexually

6        assaulted, Your Honor.

7                THE COURT:  Hold on.  Is that what you said on

8        your website?

9                MR. WOODWARD:  Yes.

10               THE COURT:  Exactly one student was sexually

11       assaulted?

12               MR. WOODWARD:  I gave -- the article that's inside

13       this example right here, it's Exhibit No. 4, Your

14       Honor.

15               I showed this one example and I explained and read

16       this one exhibit from Antigua.  I believe it's from the

17       Antigua Sun, Your Honor, that showed that an AUA

18       student was sexually assaulted.

19               I compared that, Your Honor, to an AUA claim as

20       located on a vibrant and modern twin island state of

21       Antigua.  Antigua's ideal location for study.  Serene,

22       secure for studying.  Antigua provides students with

23       the most modern comforts, familiar lifestyle in a

24       stable and safe environment.

25               I compared this to that and other exhibits that

1              show that there is a huge problem on the island.  That

2              the government officials on the island recognize it's a

3              problem.

4                   And I'd like you to look at Exhibit 3 that I have

5              here where, "Murder sex offenses top police

6              statistics."  This is December 31st of 2009.

7                   And that's totally in contrast to their claims of

8              a stable and safe environment.

9                   **THE COURT:**  Well, I don't know that that's

10             necessarily true.  As you well know students,

11             unfortunately, have been sexually assaulted at a number

12             of universities in Michigan.  That doesn't mean that

13             Ann Arbor or East Lansing is a crime ridden environment

14             because on occasion a student has been molested.

15                  **MR. WOODWARD:**  Your Honor, I just post information

16             from the news articles.

17                  **THE COURT:**  Yeah, but you're trying to convey that

18             this is an unsafe place.

19                  **MR. WOODWARD:**  No, Your Honor, what I'm doing is--

20                  **THE COURT:**  You're not?

21                  **MR. WOODWARD:**  I'm comparing what they write on

22             their website --

23                  **THE COURT:**  Aren't you trying to convey that it's

24             an unsafe place?

25                  **MR. WOODWARD:**  Your Honor, it is an unsafe place,

1    in my opinion.

2         **THE COURT:** That's what you're trying to convey,

3    isn't it?

4         **MR. WOODWARD:** It is. And it's totally different

5    than what they state on their web pages, which what I'm

6    trying to convey. Which is what they state on their

7    web pages is not true. It's not as true as like they

8    would like to lead you to believe.

9         They would like to lead you to believe in these

10   pictures that it's all sandy beaches and warm sun and

11   you're going to come down and nothing is going to

12   happen to you.

13        **THE COURT:** They say in here that your website

14   says that: "AUA disregards student's civil rights",

15   did you say that?

16        **MR. WOODWARD:** Disregard for civil rights, yes,

17   Your Honor.

18        **THE COURT:** What's the basis for that?

19        **MR. WOODWARD:** The basis for that on the first

20   committee meeting they had against me was a tit for

21   tat.

22        I claimed that one of the professors, Your Honor,

23   and I have the documentation for this, was

24   confrontational to the students and I initiated a

25   grievance committee against the school. The school, in

*10-10978; American University of Antigua v. Steven Woodward*

1        return, initiated a grievance committee against me for

2        this and the professor claimed that I was rude to her

3        during her presentation of the class, it was a test

4        review.

5            And I had the video -- I had the audiotape of that

6        entire conversation, Your Honor.  The audiotape of the

7        entire class.  And during the committee meeting, I was

8        not allowed to present that as evidence.

9            **THE COURT:**  That applies to you.

10           **MR. WOODWARD:**  Right.

11           **THE COURT:**  Well, I'm concerned that you're not

12       saying that on the website.

13           **MR. WOODWARD:**  Another student was also implicated

14       in the same committee meeting, Your Honor, that's two

15       of us.

16           **THE COURT:**  How can you say they conspired against

17       the other student?

18           **MR. WOODWARD:**  That's not a conspiracy, that's the

19       committee meeting.  Civil rights.

20           **THE COURT:**  How do you know that?

21           **MR. WOODWARD:**  I could hear them yelling at him

22       through the door, Your Honor.  I'm sitting outside the

23       door of this committee meeting and hear them talking to

24       this individual outside the door.

25           Okay.  Another example, Your Honor, is they tried

1    to initiate another committee meeting against me during

2    final week and during that they wouldn't even give me

3    what it was for.

4         I have emails where I'm requesting, "What did I

5    do? Please, explain what and when I did something?"

6    They never gave me that information, Your Honor, never.

7    And that committee meeting was dropped.

8         During this committee meeting that I had in

9    December of 2007, they denied me the right to counsel

10   even though per their student handbook it says that I

11   have the right to evidence and counsel.

12        **THE COURT:** Okay. My concern is this, it's one

13   thing for you to express your dissatisfaction about the

14   way you were treated, okay.

15        But it's not necessarily fair for you to

16   generalize and suggest that what's happening to you is

17   happening to everyone. You agree with me?

18        **MR. WOODWARD:** Your Honor, it happened to me and

19   another student --

20        **THE COURT:** Do you agree that it would be wrong to

21   say that, "What happened to me, happens to all the

22   students", wouldn't that be wrong?

23        **MR. WOODWARD:** Your Honor, I've seen this school.

24   I've seen --

25        **THE COURT:** Wouldn't it be wrong to say that,

1        "What happened to me, happens to all the students",

2        wouldn't that be wrong?

3              MR. WOODWARD:  Not when you witness it happening?

4              THE COURT:  To all the students?

5              MR. WOODWARD:  I never said, "All the students".

6              THE COURT:  Wouldn't it be wrong to make that

7        statement?

8              MR. WOODWARD:  If you say, "Every single student

9        this happens to"--

10             THE COURT:  I'm not saying, "Every single

11       student".

12             Wouldn't it be wrong to say that, "What happened

13       to me, happens to all the students", wouldn't that be

14       wrong?

15             MR. WOODWARD:  How many students need to be

16       destroyed at that place?

17             THE COURT:  Wouldn't that be a wrong statement?

18             MR. WOODWARD:  If you had said, "Everybody", yes.

19             THE COURT:  I said, "All the students", yes, okay.

20             Now, if you said, "What's happened to me, happens

21       to other students", do you have proof of all that?

22             MR. WOODWARD:  I have proof that there's a

23       committee meeting issued against me and the other

24       student, that first committee meeting when it was over

25       that tit for tat thing, and they didn't let me produce

1       the evidence and they obviously didn't let him.

2              THE COURT:  Obviously?

3              MR. WOODWARD:  Well, I have the evidence to clear

4       both of us and they didn't allow me to produce it and

5       he didn't have it.  I had the computer with me, I had

6       the evidence.  I was not allowed to produce it.

7              THE COURT:  They claim you say:  "AUA conspires

8       against its students."

9              MR. WOODWARD:  That's right, Your Honor.  I have

10      documentation evidence, Your Honor, that shows that we

11      were given pagers at St. Joseph Mercy Hospital, Your

12      Honor, this is just another example.

13             We were given pagers September at St. Joseph Mercy

14      Hospital.  Pagers were not part of any of the syllabus,

15      course guidelines, no documentation of the use of

16      pagers, okay.

17             In October, supposedly, Susan Zonia, the director

18      of the program, paged me on a Friday after one o'clock,

19      at two o'clock it says in her email.  She did it again

20      on Monday, which would have been at the end of the

21      program.  The following week, Monday, she paged me

22      twice.  And a committee meeting was written up against

23      me that I missed pages.

24             Your Honor, at one o'clock I would have been

25      excused per the schedule of the whole course.  I was

1       done.

2               THE COURT:   What's that got to do with the

3       University conspiring against its "Students", plural?

4       What's that got to do with that?

5               MR. WOODWARD:   Your Honor, this just demonstrates

6       how this has happened to me.

7               THE COURT:   I think your website should say that.

8       Should limit your criticism to that which happened to

9       you, which you do know.

10              I'm not convinced you know about all the other

11      students and all the other things either.  And I think

12      you're generalizing, without any basis for it, based on

13      what happened to you.

14              MR. WOODWARD:   Your Honor, I just had so many

15      instances of this happen to me.  I saw also, Bill

16      Stewart, another student that was run out.  Again, I

17      quote this committee meeting that happened --

18              THE COURT:   You told me earlier you were leaving

19      to go some place soon?

20              MR. WOODWARD:   Yes, Your Honor, I fly out tomorrow

21      at 5:50, Your Honor.

22              THE COURT:   Counsel indicated at the end of this

23      presentation that your statement, at least in his

24      opinion, implies that the school is responsible for

25      criminal acts?

1        **MR. WOODWARD:**  Ties with criminal acts, yes, Your

2    Honor.

3        **THE COURT:**  What's your basis for that?

4        **MR. WOODWARD:**  There's a $7 billion dollar

5    Stanford fraud scheme that's now currently in progress.

6        And matter of fact, there are websites, at least

7    one that I'm very familiar with, where people are

8    trying to get retribution from this fraud scam that

9    happened on Antigua.  This is a Stanford fraud scam.

10   Widely publicized.

11       I forget what government officials were involved

12   on Antigua but I know it also implicated the Caribbean

13   Caucus, Your Honor.

14       The Caribbean Caucus, Your Honor, was chaired by

15   Donald Payne, Congressman Donald Payne out of New

16   Jersey, Your Honor.  Donald Payne has done things for

17   this University, Your Honor.

18       **THE COURT:**  Has what?

19       **MR. WOODWARD:**  He's done things for this --

20       **THE COURT:**  For?

21       **MR. WOODWARD:**  For the University he was the

22   keynote speaker and I believe was last year's keynote

23   speaker for the university.

24       And the last time I checked he was under

25   investigation for implications of changing laws or

1    prohibiting laws pertaining to this $7 billion fraud
2    scam.

3         On top of that, Your Honor, if you look at the
4    timeline between the foundation of American University
5    of Antigua, which is 2004 and 2006, Your Honor, I
6    believe it's 2006.

7         After 2004, Donald Payne spoke to congress
8    recognizing American University of Antigua.  And
9    shortly after that, American University of Antigua got
10   their New York certification, Your Honor.

11        **THE COURT:**  What's that got to do with them being
12   involved in criminal activity?

13        **MR. WOODWARD:**  I don't say that they're involved,
14   I say they have ties to criminal activity.

15        **THE COURT:**  Ties, tell me about the ties.

16        **MR. WOODWARD:**  It's the congressman and
17   congresswoman, actually Carol Kilpatrick in Michigan
18   that's involved with this $7 billion dollar fraud scam
19   on Antigua.

20        **THE COURT:**  You don't see that as being very
21   reprehensible saying they're tied to criminal activity?
22   You don't know what their tie is at all.

23        **MR. WOODWARD:**  Their tie is the congressman and
24   the actions that they have with that.

25        **THE COURT:**  That's not criminal activity.

1       **MR. WOODWARD:** The $7 billion dollar fraud scam

2       is.

3       **THE COURT:** Has that been proven?

4       **MR. WOODWARD:** That hasn't been proven. And I

5       don't state that -- I just say, "Here are ties to a

6       criminal activity."

7       **THE COURT:** Don't you think that's really

8       irresponsible to do that to somebody? No proof at all

9       that they're involved, not at all. And we're going to

10      paint them all with a black brush?

11      **MR. WOODWARD:** With everything else that has

12      happened to me on that island, Your Honor, I think it's

13      a very fair statement of them.

14      **THE COURT:** Well, you're just angry, okay.

15      **MR. WOODWARD:** I'm very angry, Your Honor.

16      **THE COURT:** Now, tell me what the harm is if you

17      take down the website 'till you get back?

18      **MR. WOODWARD:** Your Honor, if you take down my

19      website, first off, I have an appeal going concerning

20      this committee meeting in December of 2007 and --

21      **THE COURT:** I'm sorry, appeal to whom?

22      **MR. WOODWARD:** To Oakland County Courts. It's

23      pertaining to me and the University, Your Honor.

24      **MR. BUIKEMA:** Sorry to interrupt, Your Honor.

25      It's actually in the Michigan Court of Appeals from the

1    Oakland County Circuit Court.

2              MR. WOODWARD:  I have the number here, I don't

3    know the entire progress of that.

4              THE COURT:  It's an appeal from the Oakland County

5    to the Michigan Court of Appeals, okay.

6              MR. WOODWARD:  Okay.  So, I believe that the

7    University would use that, if my website was taken

8    down, so that they could say, "He liable and

9    slandered", et cetera, against me to hinder my appeal

10   process.

11             THE COURT:  Well, let me say this, if I were to

12   order preliminary injunction, I would condition it on

13   the University not being able to use that in any way,

14   shape or form in the Appellate Court.

15             MR. WOODWARD:  Thank you, Your Honor.

16             MR. BUIKEMA:  And we'd so stipulate.

17             MR. WOODWARD:  Great.  Okay.

18             THE COURT:  Okay.  We've made great progress.

19             MR. WOODWARD:  That was one of my -- that I had

20   concerns over.

21             THE COURT:  Sure.

22             MR. WOODWARD:  I would also like it if they not

23   mention this in any of the blogs or public view, et

24   cetera, that are used to communicate information about

25   all the schools in Antigua.  And there are other blogs

1        and Facebook pages, that they can't use that against me
2        to discredit my information.
3               So, if they say, "Ha, ha, we took down your
4        website --"
5               **THE COURT:** How do you respond to that?
6        **RESPONSE BY MR. BUIKEMA**
7               **MR. BUIKEMA:** Well, I can assure you that we
8        wouldn't say, "Ha, ha, we took down your website."
9               I think it would be up to my client as to what, if
10       anything, to do with a preliminary injunction ruling.
11       A preliminary injunction ruling is simply that, it's
12       not a finding on the merits of the case, it's simply a
13       preliminary injunction.
14              I think we're entitled, if one so chose, to
15       communicate truthfully that one was granted.  And
16       particularly, under the circumstances, as you've heard
17       at best, Mr. Woodward's defending representations on
18       his website, which have existed for a period of time
19       and have been in the pool of idea, so to speak are, at
20       best, made recklessly.
21              I can't tell you yes we would or no we wouldn't.
22       I would certainly counsel my client not to publish it
23       widely because there's a pending lawsuit to determine
24       the actual truth or falsity of the contents of his
25       website.

1           But having said that, I think they'd be entitled

2     to inject that, truthfully, into the competing sphere

3     of ideas.

4           THE COURT:  Well, I'm not sure what that last

5     phrase mean, "Injecting into the sphere of ideas"?

6           MR. BUIKEMA:  In any campaign of information where

7     certain information is inaccurate or has been

8     prohibited, I think that's information that perspective

9     students or consumers should be entitled to.

10          THE COURT:  How would your client make this

11    communication?  How would it come out?

12          MR. BUIKEMA:  I don't think they would.  To tell

13    you the truth, and I think I started my remarks by

14    saying that I don't think they would.  And I would

15    counsel them not to, pending a final resolution in this

16    case.

17          But having said that, I think that they're

18    entitled to or it's, "Public knowledge", is a better

19    way of saying it, that a preliminary injunction was

20    granted.

21          THE COURT:  I think I would condition them on not,

22    until we get this all settled down, them not initiating

23    any kind of information along that line.

24          MR. BUIKEMA:  I understand.

25    RESPONSE BY MR. WOODWARD

10-10978; American University of Antigua v. Steven Woodward

 1          MR. WOODWARD: I would appreciate that, Your

 2     Honor, because one of my videos demonstrates how they

 3     manipulate other websites on the internet to remove

 4     information that they don't like.

 5          THE COURT: All right. What else? Does that

 6     solve all your problems?

 7          MR. WOODWARD: What I would like to do, Your

 8     Honor -- can I use your board?

 9          THE COURT: Sure.

10          MR. WOODWARD: Okay. In doing so, Your Honor, and

11     me taking down my website, it could change the

12     positioning of my website on the internet itself, where

13     currently my website is there.

14          And if it's -- and if I totally delete my website,

15     then it could be on page -- it could end up being on

16     page, like, 56 or whatever, in the listing of the

17     internet.

18          And what I suggest, if I may use the board is --

19     are you aware with how websites are developed and

20     designed, Your Honor?

21          THE COURT: Not completely, but go ahead.

22          MR. WOODWARD: What you have, you have an index

23     page that's called, "Index" on HTML; and underneath

24     that page there's other web pages containing

25     information, Your Honor.

1           This page is called, "www.aua-med.com/index.html",

2      that's its address.

3           If I change this file to just say whatever you

4      feel is fair, "Under Review", I'm currently working,

5      "Under Construction", something that does not say that

6      it has an injunction against it, then when somebody

7      goes here, Your Honor, I have claims made to the

8      Department of Education concerning this institution.

9           I have the Michigan Attorney General, I sent links

10     to him.  The Federal Trade Commission, International

11     Trade Commission, the FBI, I've sent this information

12     to, Your Honor, concerning this school.

13          It took me from December 11th 'til I think the

14     12th before I got a claim form back from the Department

15     of Education concerning the release of these student

16     grades.

17          So, if these people go to a cite that says it has

18     an injunction against it or isn't there, then they

19     won't come back to the site --

20          **THE COURT:**  What do you suggest the website say?

21          **MR. WOODWARD:**  Under construction or maintenance.

22          **THE COURT:**  Okay.  In which case, all this

23     information will be withheld?

24          **MR. WOODWARD:**  What will happen, if I say,

25     "Maintenance" on this page right here, then the only

1    way that this information will be available is if they

2    actually go to whatever this file made was and view

3    that information.  They would have to go to a directory

4    and then into an index directory.

5         So, it wouldn't totally shut -- I mean, you're

6    always going to get this information.  The way to get

7    rid of everything would be to delete everything and it

8    would take months to get this stuff back together --

9    not that long, I take that back.  It would take me a

10   long time to rebuild this site, to upload all these

11   files.  It would take me a long time to rebuild

12   everything.

13        If I said, "Maintenance", then all I need to do is

14   change the wording of this file, change this file to

15   "Maintenance", and then somebody looks at it and it

16   says, "Under Maintenance".  And then they go away.

17        Without knowing the directory structure that they

18   would have to know for downloads, they would have to

19   know, "aua-med.com/download/index/html", then I don't

20   have to tear down my entire site.

21   **RESPONSE BY MR. BUIKEMA**

22        **MR. BUIKEMA:**  I cannot help the manner in which

23   Mr. Woodward has constructed his site.

24        But if you're asking him to unrob a bank, I think

25   you should ask him to unrob the bank in its entirety.

_10-10978; American University of Antigua v. Steven Woodward_

1    And he should be responsible for the complications
2    associated with that.
3         It's not just the index site that contains false
4    and defamatory information. It's all these pages with
5    substantive or purportedly substantive facts about my
6    client's business, which go beyond even his website
7    that published Youtube videos that he has narrated and
8    given to other sites.
9         He needs to be prohibited from publishing the
10   false and defamatory information in whatever form or
11   shape that he has published it. Not simply in a way
12   that's convenient to him or saves him time in
13   reconstruction of the same should he prevail on the
14   merits eventually.

15   **RESPONSE BY MR. WOODWARD**

16        **MR. WOODWARD:** Your Honor, I'm not guilty of
17   robing a bank yet, I'm just going to work for two
18   months and I leave tomorrow.
19        If I completely delete all this information then
20   my listing is gone; then if I am innocent, then to get
21   back on the first page of that listing on the search
22   engines would be extremely difficult.
23        **THE COURT:** If you put maintenance where you are,
24   you're going to stay in line there, aren't you?
25        **MR. WOODWARD:** I'm going to stay in line. If I

1    just put maintenance on this one page, then I'll stay

2    in line.

3         **THE COURT:** And then delete the other, you'll

4    still stay in line, won't you?

5         **MR. WOODWARD:** I don't know, Your Honor. I can't

6    imagine deleting all of that information out of there.

7         **THE COURT:** Well, here's my concern. I'm not

8    prepared today to go through each and every statement

9    as to whether it's false or not; it may be, may not be.

10   It could take days and weeks and I'm not going to go

11   through all that. And you've got to leave, you don't

12   have time to go through that now.

13        However, on the other hand, I'm concerned that if

14   there's some false information on there, it shouldn't

15   be on there. And if we can put maintenance on there

16   and still hold your page, then maybe you can sit down

17   with brother counsel at a later point and say, "All

18   right, here's what I want to do, I'm going to put this

19   statement, this statement; this is a matter of

20   opinion --"

21        **MR. WOODWARD:** How about this, Your Honor, as far

22   as a happy median? The stuff like I use downloads, for

23   example, the download file or directory, if I rename

24   that to, "Dash-1", then the odds of somebody finding

25   that file, they'd never find that information because

1        none of the links that they had would match it.

2   **RESPONSE BY MR. BUIKEMA**

3        **MR. BUIKEMA:** I'm not interested in limited odds

4        of somebody finding false and defamatory information.

5        I'm interested in it being removed from publication.

6            You know, Mr. Woodward being in line or deleting

7        this stuff, it's a red herring, Your Honor.  These are

8        computer files.  They're not being deleted.

9            What he's saying is they need to be deleted from

10       publication, which is exactly the purpose of this

11       motion.  I don't know want them published in any way,

12       shape or form, nor should they be.

13           If he wants to list, "Under Construction", under

14       his primary website, that's fine with me.  I don't need

15       it to say, you know, "Prevented" or "See injunction";

16       under construction is fine.

17           But there needs to be no means to access the

18       links, the derivative information, the Youtube

19       information, by Google search or by any other means.

20       It's in publication.  He needs to remove it from

21       publication.  That does not equal deleting the files

22       themselves.  He can maintain those and republish those

23       at a later date, if the Court finds so entitled.

24           **THE COURT:**  What about that?

25   **RESPONSE BY MR. WOODWARD**

1        MR. WOODWARD:  Like I said, Your Honor, that would
2    be extremely difficult for me.  I'm gone for two
3    months.

4        The plaintiff claims that he has irreparable
5    damage.  I don't understand why he even brought this up
6    now since he's known about my site since June of last
7    year.  Even April of last year, his partners have known
8    about this site.

9        Since April of 2009, I contacted the Management
10    Department of St. Joseph Mercy Hospital and they knew
11    of my website.  They knew of the content of the
12    website.

13        They have discredit me on these public programs,
14    on these public blogs.  Their own people, on their
15    public blogs, is one of my exhibits here, Your Honor.
16    As far back as June of last year, were aware of the
17    contents of my website as far back as that far, they've
18    known about my website.

19        They've had to have known about it because just on
20    the listing of it, I'm five listings down if they just
21    search for it.

22        Now, all of a sudden, I'm creating this
23    irreparable damage and I don't understand where they've
24    said I've caused irreparable damage.

25        THE COURT:  Tell me again about your solution, you

1       put "Maintenance" and what else you do next?

2           **MR. WOODWARD:** Then I'll just rename these

3       directories so that it would be difficult for them to

4       find these directories.  If somebody had a link to the

5       directory, it just wouldn't work any more but the

6       information wouldn't be gone off the server.

7   **RESPONSE BY MR. BUIKEMA**

8           **MR. BUIKEMA:** Your Honor, this is like the New

9       York Times publishing false and defamatory information

10      and then saying, "Your Honor, the cure is we'll only

11      publish it in certain areas or it will be difficult to

12      find our newspapers", it's not appropriate.

13          **THE COURT:** I'm not satisfied that they're false,

14      there's your problem; not yours, his too, okay.

15      Because if I do what you're saying I should do, we may

16      be depriving him of the right to publish correct

17      information.

18          **MR. BUIKEMA:** I started my remarks by

19      acknowledging that Mr. Woodward has a complete right to

20      express his opinion.

21          **THE COURT:** I understand that.  Some of these I

22      think are opinions.  It seems to me that his solution

23      is reasonable, under the circumstances.  It's going to

24      certainly decrease the amount of publication and the

25      amount of people that would be able to see it until

1           further order of the Court.

2                So, I'm going to order that you make maintenance

3           and then what's the other?

4      **RESPONSE BY MR. WOODWARD**

5                MR. WOODWARD:  And then I'll change the directory

6           names so that they won't be able to -- matter of fact,

7           Your Honor, what I'll do to make it even harder is I'll

8           rename the index file so that they won't even be able

9           to automatically go into the directory and bring up the

10          content of the directory.  That would make it more

11          difficult for them to access more information.

12               THE COURT:  All right.  Then that's the way we

13          we'll proceed.

14               MR. WOODWARD:  Your Honor, can I also address his

15          Youtube issue?

16               THE COURT:  Sure.

17               MR. WOODWARD:  On the videos on Youtube, I'll mark

18          all of them as "Private" and then only myself, I don't

19          have any people that I've given permission to any of

20          this other stuff.  I'll mark all those private so they

21          won't be accessible on Youtube.

22               THE COURT:  All right.

23               MR. WOODWARD:  Everything else on the internet,

24          again, people have copied this stuff and download it.

25          Again, this stuff is on MSN, their video lists, it's

1       all over, Your Honor.

2               **THE COURT:**  You can do that what you say you do

3       before you leave?

4               **MR. WOODWARD:**  I'll work on it as soon as I get

5       home, Your Honor.

6               **THE COURT:**  So, you can do it before you leave?

7               **MR. WOODWARD:**  Yes, Your Honor.

8                         **Decision By The Court**

9               **THE COURT:**  Then do.

10              All right.  With that understanding, I'm not sure

11      that we need a preliminary injunction.  I'm satisfied

12      that what Mr. Woodward says he'll do, he'll do.  And if

13      he does that, that will solve the problem, for the time

14      being, so there won't be a preliminary injunction and

15      that's what you're getting in your favor.  I'm not

16      issuing one.

17              **MR. WOODWARD:**  Thank you, Your Honor.

18              **THE COURT:**  Doesn't mean I'm not going to,

19      eventually.

20              **MR. WOODWARD:**  Yes, Your Honor.

21              **THE COURT:**  But based on your representation what

22      you will do and do it before you leave, we'll just

23      leave it as is.  And somehow, can you send a

24      communication to the Court and brother counsel as to

25      exactly what you've done?

        *10-10978; American University of Antigua v. Steven Woodward*

 1              MR. WOODWARD:  Yes, Your Honor, I'll take video

 2         shots of what I've changed, so you'll have a picture

 3         from my screen of everything that's been done.

 4              THE COURT:  Can you do that by way of email to the

 5         Court?

 6              MR. WOODWARD:  I can email that to Ms. Orem.

 7              THE COURT:  Hold on.  My clerk says to describe

 8         what you've done in email by words.

 9              THE CLERK:  It just overwhelms our emails,

10         oversize files.

11              MR. WOODWARD:  I'll describe what I've done, yes,

12         Your Honor.

13              THE COURT:  Copies, of course, to counsel.

14              MR. WOODWARD:  Yes, Your Honor.

15              THE COURT:  All right.  Court's in recess.

16    RESPONSE BY MR. BUIKEMA

17              MR. BUIKEMA:  Your Honor, I'm sorry.

18              THE COURT:  Sure, go ahead.

19              MR. BUIKEMA:  Have we agreed to a stay then while

20         Mr. Woodward is absent?

21              THE COURT:  A stay of what?

22              MR. BUIKEMA:  A stay of proceedings, of discovery.

23              THE COURT:  Sure, yes.  It will be a stay until he

24         gets back.

25              And you're going to get a lawyer, you said, as

 1      soon as you get back?

 2          MR. WOODWARD:  Yes, Your Honor, I should have

 3      somebody when I get back.

 4          MR. BUIKEMA:  And Your Honor, could we just have a

 5      date certain as to when the case would be re-opened?

 6          MR. WOODWARD:  I'll be back no later than the end

 7      of June.

 8          THE COURT:  All right.  Then what I'd like you to

 9      do then by July 15th, send an email to the Court and to

10      brother counsel telling us the status of the lawyer

11      search, okay.  I have a lawyer and his or her name is

12      such and such and I need another week or to so we know

13      what's going on.

14          MR. WOODWARD:  I'll notify you as soon as I get

15      back too, Your Honor, because it could be earlier than

16      that.  I just don't want to be late.

17          THE COURT:  My Clerk reminds me, we scheduled this

18      case so you've got a copy of this.  So, the lawyer you

19      get should get a copy of this and discovery ends on

20      September 15th and witnesses by September 15th.  So,

21      you've got a copy of this and make sure your lawyer

22      gets it quickly.

23          MR. WOODWARD:  Yes, sir.

24          MR. BUIKEMA:  Thank you, Your Honor.

25          (Whereupon proceedings concluded at 3:13 p.m.)

        *10-10978; American University of Antigua v. Steven Woodward*

Response By Mr. Buikema
Monday/April 19, 2010                               63

1                          -    -    -

2

3

4                          -    -    -

5                    C E R T I F I C A T I O N

6              I, Nefertiti A. Matthews, official court reporter

7        for the United States District Court, Eastern District of

8        Michigan, Southern Division, appointed pursuant to the

9        provisions of Title 28, United States Code, Section 753,

10       do hereby certify that the foregoing is a correct

11       transcript of the proceedings in the above-entitled cause

12       on the date hereinbefore set forth.

13              I do further certify that the foregoing

14       transcript has been prepared by me or under my direction.

15

16       Date: August 2, 2010

17

18       s:/Nefertiti A. Matthews
         Nefertiti A. Matthews,
19       Official Court Reporter

20                          -    -    -

21

22

23

24

25

         10-10978; American University of Antigua v. Steven Woodward

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Plaintiff's Resonse to Defendant's Motions for Subpoenas, Brief in Support, and this Certificate of Service were served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on August 6, 2010.

/s/ Eric A. Buikema
Eric A. Buikema (P58379)
Cardelli, Lanfear & Buikema, P.C.
322 West Lincoln Avenue
Royal Oak, Michigan 48067
(248) 544-1100
ebuikema@cardellilaw.com