

# Gunmen terrorise 'Bosnia'

By Observer Reporter, Wednesday, August 12th, 2010

Article Hits: 523
No Comments

Recommend  1

A shoot-out, reminiscent of the Wild, Wild, West, has left residents in Clare Hall pleading for police protection.

On Monday night, some time after 10 o'clock, residents in the area known as Bosnia, were awakened by gunfire and the sound of a fast-moving vehicle. When it was over, two young men, Kareem 'Radicus' Gardner and Joseph 'Dubai' James were taken to the hospital in serious condition.

Gardner, from Skerrit's Pasture, received shots to his elbow and shoulder when he attempted to deflect the assailants' bullets, and James, who is from Villa was shot in the leg while attempting to flee.

Of the assailants, one resident said, "It's obvious they know who they were looking for." while an eyewitness reported seeing a white Toyota Corolla leaving the scene.

Some villagers speculated that the incident was gang and drug-related.

The incident is being investigated.

*(More on this story in the newspaper. Subscribe today.)*

Pic Source: http://mugshotmagazine.net

Latest Photo Galleries »

Follow Me

91.1 Observer RADIO
THE VOICE OF THE PEOPLE

Popular   Latest   Comments   Issues

Health Offical Warns: Faeces in Country Pond

Goodwin: ABEC is an independent body

'We Need Proper Facilities' Vendors Square tenants cry

EXHIBIT 72



EXHIBIT 73

# CARIBARENA Antigua

The best caribbean news portal

Sunday  Jan 16th          [ Search ]  Text size + × -

HOME  NEWS  CARIBBEAN  WORLD  SPORT  TECH  ENTERTAINMENT  HEALTH  LIFESTYLE  TRAVEL  ART  EDUCATION  AUTO  GOVERNMENT  TOURISM

BUSINESS  WEATHER  OPINIONS  ANTIGUA FLIGHT ARRIVAL  MAPS  RELIGION  ENVIRONMENT  MY ARENA  VIDEOS  FORUMS  GAMES  PHOTOS  JOBS

LATEST  POLITICS  POLICE  ECONOMY  BBC CARIBBEAN

## Family Rules Out Suicide ✉

MONDAY, 26 APRIL 2010 10:55   CARIBARENA NEWS  ANTIGUA NEWS - LATEST

0      Like      Be the first of your friends to like this.



caribarena.com

No Suicide

The family of the medical student who died over the weekend is refuting any suggestions of suicide. The body of 27-year-old Haiber Raza-Rizvi, a former student of the American University of Antigua (AUA), was found floating at Jabberwock Beach on Sunday morning.

This after he was reported missing the day before, when he did not show up for his flight home to New York.

Unofficial reports said Raza-Rizvi was despondent because he feared he did not pass a course at the university.

But his older brother, Bilal, said he does not believe his brother killed himself.

He told Caribarena.com he spoke to Raza-Rizvi at 8:30 on the morning of his trip, and he seemed ecstatic to go home. He admitted that his brother had been sad on Wednesday when he thought he did not pass a difficult exam, but the next day he found out he was in fact successful, and his spirits lifted. He said Raza-Rizvi was happy, and excited to reunite with his family in the US.

The official police report said they do not suspect foul play, but a member of the Strategic Communication Division, Sergeant William Holder, said investigations into the death are still ongoing.

He told Caribarena.com, "We cannot say the cause of death. Investigations are still ongoing. At the end, the police will make a determination as to cause, but not at this time."

Meanwhile, a friend of the deceased told Caribarena.com Monday morning that the situation is very confusing, and everyone is in shock. He said he was told that the deceased went to the beach near his apartment to take pictures and did not return.

The fellow medical student said nothing is making sense, because initially the landlady had said Raza-Rizvi had packed and was ready to go. But on Sunday night, a check of the room showed that nothing was packed. Raza-Rizvi's wallet, green card, passport, and money were lying around.

### Shaping Wow Moments From Sugar



It started with a scuba mask. But instead of being buried in sand or salt, this one was made from sugary goodness. This scuba mask was actually a cake...

read more

The student said this could mean either of two things. Raza-Rizvi could have been leaving everything behind, as is common with several med students who complete their study in Antigua. But it could also mean he was not planning to leave on that day.

The student told Caribarena.com that although he might have struggled, Raza-Rizvi knew he had passed the comprehensive final exam, which many fail.

He also said Raza-Rizvi was extremely stressed, just like all the other medical students. But Raza-Rizvi reportedly had told a

Become a Fan      Recommended      Recent

EXHIBIT BW 74

internship at a hospital in that state.

Reports said a relative was due to arrive today from Miami. Minister of National Security Dr Errol Cort has asked a magistrate to have the body released to the family and flown out to New York for religious obligations. Hence, they are awaiting a response.

An inquest was scheduled for this morning at the funeral home.

**See related stories:**

Med Student Found Dead

**Ads by Google**   View ads about:

5 Foods to never eat:



Cut down a bit of your belly every day by never eating these 5 foods. ➤Never eat

Hits: 2161      Email this      Bookmark      Set as favorite

# Comments (9)

Subscribe to this comment's feed

...
written by Moham, April 29, 2010
Just bc he's Muslim doesn't mean he's incapable of suicide. Arabs these days are so misinformd

+0

the loss of a great human being
written by annonymous, April 29, 2010
Raza was a genuinely good person. He was honest, humble, and worked very hard to achieve his goals. His tragic death is an eye opener to all med students about priorities and life. Live everyday appreciative of the life and opportunities you have. Most importantly, value the real people around you because you never know when they'll be taken away from you. This is the most tragic loss any of those affiliated with Haider could have imagined. May the lord be with his family through these hard times. Miss you every day bro...rest in peace

+1

...
written by Umar Minhas, April 27, 2010
Haider was a good kid. This news is extremely shocking and has put a lot of us into deep thought about the life of a medical school student, especially the ones out in the Caribbean.

May God be with us all, and help the Rizvi family get through this rough time.

RIP Haider

+0

hey...
written by rohin, April 27, 2010
he said he was going to the beach for 20 minutes.. this was in the morning..

he would have had plenty of time to come back and pack his things..
i was on the same flight.. he would have had more than 3 hours to pack his things

+2

Ali and Eye in the sky
written by Pretty Garratt, April 27, 2010
Apparently, you lack reading skills. The statement says, nothing was packed and his wallet etc was lying around. You seem to be looking for reasons to criticize this writing. It is not the best but this person is reporting what they have heard and what appears to have happened. This is done all the time when there are unexplained deaths.

+1

Training
written by Eye in the sky, April 27, 2010
TAMI (author of this piece) needs a crash course in journalistic integrity. Not every souss you hear should be printed for the sake of sensationalism. Some things should be left out especially when there is conflicting evidence.

I am going to go out on a limb here and say it is typical 'antigua' people behavior...some people always neeed to let others know they have the latest and best gossip.

-2

...
written by buss, April 26, 2010
does anyone know if he suffered from any medical condition that might allow him to have had an attack?

FreeClassified

PDV Caribe
Antigua and Barbuda Lt

INVESTMENT
ADVISORS AND
PORTFOLIO
MANAGERS
( / Jobs)
Thursday, 13 January 2011



Townhouse Plaza Space

( / Real Estate)
Thursday, 13 January 2011



TOYOTA COROLLA
FOR SALE


Post Your Ad FREE

Become a Fan      Recommended      Recent

## Academia and Clinic

# Burnout and Suicidal Ideation among U.S. Medical Students

Liselotte N. Dyrbye, MD; Matthew R. Thomas, MD; F. Stanford Massie, MD;
David V Power, MD; Anne Eacker, MD; William Harper, MD; Steven Durning,
MD; Christine Moutier, MD; Daniel W. Szydlo, BA; Paul J. Novotny, MS;
Jeff A. Sloan, PhD; and Tait D. Shanafelt, MD

+ Author Affiliations

## Abstract

**Background:** Little is known about the prevalence of suicidal ideation among U.S. medical students or how it relates to burnout.

**Objective:** To assess the frequency of suicidal ideation among medical students and explore its relationship with burnout.

**Design:** Cross-sectional 2007 and longitudinal 2006 to 2007 cohort study.

**Setting:** 7 medical schools in the United States.

**Participants:** 4287 medical students at 7 medical schools, with students at 5 institutions studied longitudinally.

**Measurements:** Prevalence of suicidal ideation in the past year and its relationship to burnout, demographic characteristics, and quality of life.

**Results:** Burnout was reported by 49.6% (95% CI, 47.5% to 51.8%) of students, and 11.2% (CI, 9.9% to 12.6%) reported suicidal ideation within the past year. In a sensitivity analysis that assumed all nonresponders did not have suicidal ideation, the prevalence of suicidal ideation in the past 12 months would be 5.8%. In the longitudinal cohort, burnout ($P < 0.001$ for all domains), quality of life ($P < 0.002$ for each domain), and depressive symptoms ($P < 0.001$) at baseline predicted suicidal ideation over the following year. In multivariable analysis, burnout and low mental quality of life at baseline were independent predictors of suicidal ideation over the following year. Of the 370 students who met criteria for burnout in 2006, 99 (26.8%) recovered. Recovery from burnout was associated with markedly less suicidal ideation, which suggests that recovery from burnout decreased suicide risk.

**Limitation:** Although response rates (52% for the cross-sectional study and 65% for the longitudinal cohort study) are typical of physician surveys, nonresponse by some students reduces the precision of the estimated frequency of suicidal ideation and burnout.

**Conclusion:** Approximately 50% of students experience burnout and 10% experience suicidal ideation during medical school. Burnout seems to be associated with increased likelihood of subsequent suicidal ideation, whereas recovery from burnout is associated with less suicidal ideation.

## Article and Author Information

**Grant Support:** By an Education Innovation award from the Mayo Clinic.

**Potential Financial Conflicts of Interest:** None disclosed.

**Requests for Single Reprints:** Liselotte N. Dyrbye, MD, 200 First Street Southwest, Rochester, MN 55905.

**Current Author Addresses:** Drs. Dyrbye, Thomas, Sloan, and Shadafelt; Mr. Szydlo; and Mr. Novotny: 200 First Street Southwest, Rochester, MN 55905.

Dr. Massie: 1530 Third Avenue South, FOT 720, Birmingham, AL 35294.

EXHIBIT 75 

Dr. Power: University of Minnesota, 516 Delaware Street Southeast, Minneapolis, MN 55455.

Dr. Eacker: General Internal Medicine Center, 4245 Roosevelt Way Northeast, Seattle, WA 98105.

Dr. Harper: 5841 South Maryland Avenue, MC 3051, Chicago, IL 60637.

Dr. Durning: 4301 Jones Bridge Road, Bethesda, MD 20814-4799.

Dr. Moutier: University of California, San Diego School of Medicine, Medical Teaching Facility Room 180, 9500 Gilman Drive, 0606, La Jolla, CA 92093-0606.

## Related articles

Letter:
**Is There a Connection Between High Educational Debt and Suicidal Ideation Among Medical Students?**
John D. Yoon and Vineet M. Arora
Ann Intern Med February 17, 2009 150:285;

Excerpt   Full Text   Full Text (PDF)

Letter:
**Is There a Connection Between High Educational Debt and Suicidal Ideation Among Medical Students?**
Liselotte N. Dyrbye, Jeff A. Sloan, and Tait D. Shanafelt
Ann Intern Med February 17, 2009 150:285;

Excerpt   Full Text   Full Text (PDF)

## Comments on This Article

In Reply:
Liselotte N Dyrbye and Tait D Shanafelt, Jeff A Sloan
Ann Intern Med published online October 20, 2008

Full Text

**Medical Student Resilience from Burnout**
John D Yoon and Vineet M. Arora, MD, MA
Ann Intern Med published online September 24, 2008

Full Text

**Burnout and Suicidal Ideation Among U.S. Medical Students**
Jay Federman
Ann Intern Med published online September 9, 2008

Full Text

**Burnout rates in each year of medical school**
Ravi Gopal and Allan Prochazka
Ann Intern Med published online September 8, 2008

Full Text

## Articles citing this article

**Medical Student Burnout and Professionalism—Reply**
JAMA January 5, 2011 305:38

Full Text  Full Text (PDF)

**Medical Student Burnout and Professionalism**
JAMA January 5, 2011 305:37–38

Full Text  Full Text (PDF)

**Special Report: Suicidal Ideation Among American Surgeons**
Arch Surg January 1, 2011 146:54–62

Abstract  Full Text  Full Text (PDF)

**Relationship Between Burnout and Professional Conduct and Attitudes Among US Medical Students**
JAMA September 15, 2010 304:1173–1180

Abstract  Full Text  Full Text (PDF)

**Depression, Stigma, and Suicidal Ideation in Medical Students**
JAMA September 15, 2010 304:1181–1190

Abstract  Full Text  Full Text (PDF)

**Association of an Educational Program in Mindful Communication With Burnout, Empathy, and Attitudes Among Primary Care Physicians**
JAMA September 23, 2009 302:1284–1293

Abstract  Full Text  Full Text (PDF)

**Enhancing Meaning in Work: A Prescription for Preventing Physician Burnout and Promoting Patient-Centered Care**
JAMA September 23, 2009 302:1338–1340

Full Text  Full Text (PDF)

**Is There a Connection Between High Educational Debt and Suicidal Ideation Among Medical Students?**
ANN INTERN MED February 17, 2009 150:285

Full Text  Full Text (PDF)

**All you need to read in the other general journals**
BMJ September 9, 2008 337:a1594

Full Text

5/17/2011 9:24 AI



Ads by Google  Medical Degree  Study Medicine  Hotels Antigua  Antigua Resort

Caribbean Medical Schools  European Medical Schools  Foreign Medical Schools  Med

ValueMD Medical Schools Forum >
CARIBBEAN MEDICAL SCHOOLS >
American University of Antigua (AUA)
Crime In Antigua

User Name [User Name]  ☐ Remember Me?
Password [       ]  [ Log in ]

Register    FAQ    Community    Today's Posts    Search

[ Closed ]                          Page 1 of 2  1  2  >

LinkBack   Thread Tools   Display Modes

04-06-2008, 03:07 PM                                    #1 (permalink)

**Angry Indian**
Newbie

Join Date: Apr 2008
Posts: 1
Downloads: 0
Uploads: 0

**Crime In Antigua**

I am outragged that school officials are not taking any steps to protect the students and faculty from the escalating crime levels in this WAR zone. The people of this island are extremely dangerous and the students and faculty of AUA are thier prime targets. I am terrified of these people as are school officials why is it that our president is escorted by armed security when he visits the island is his life life more valuable than us and our profs? If he thinks Antigua is a safe place why does he not move his office here rather than on Wall st. He is ********************. It is only a matter of time before a student or faculty member is slain at the hands of antiguans, that will be the time he is going to wake up and think about safety rather than profit. I think the government of Antigua should take drastic steps and start executing criminals or else they will loose thier precious tourism and forgin investment dollars. ***********************************

*Last edited by Sree Cheruku; 04-06-2008 at 05:19 PM. Reason: multiple tos violations*

04-06-2008, 03:19 PM                                    #2 (permalink)

**SemTuv**
Member

Join Date: Aug 2007
Posts: 156
Downloads: 7

e Navigation 

Sponsor Ad

Uploads: 0

Indeed, you are angry! I think you gone too far in your statements

*Last edited by Sree Cheruku; 04-06-2008 at 05:19 PM. Reason: quoting TOS violation content*

---

🖻 04-06-2008, 03:19 PM                                          **#3 (permalink)**

### islandthrift ○
Moderator

Join Date: Nov 2004
Posts: 3,800
Downloads: 0
Uploads: 0

While I don't think you should go as far as saying to kill them before they kill us, there was an incident a few weeks ago where a student was beaten pretty badly and had a knife pulled on him before the police showed up. Several people have asked the school to make an official announcement about the incident but they have thus far failed to do so. I have suggested to the SGA to start a Police Blotter, like other schools have, where they can recount all events reported to them by the students so we can be aware of everything going on around us. I suggest e-mailing the SGA president as well because he is afraid a Police Blotter will cause chaos and has not decided one way or the other yet of putting one in place. I also believe the security guards on campus should be doing more than just checking our IDs. At other schools in the Caribbean the security guards are there to assist students with any criminal acts against them and facilitate between the students and the police 24hrs a day 7 days a week.

_____

AUA & Ross Forum Moderator

---

🖻 04-06-2008, 03:29 PM                                          **#4 (permalink)**



### Drdiego ○
Member

Join Date: Jul 2007
Posts: 199
Downloads: 0
Uploads: 0

I understand your frustration and concern but when you start talking about killing everyone that is not how a future (hopefully ethical) Physician must speak or address a problem. I know if you were asked this question in your interview you have responded diffrently.
Just to let you know foreign students attending American schools have issues with crime as well.
Becareful of your words.

*Last edited by Sree Cheruku; 04-06-2008 at 05:20 PM. Reason: quoting TOS violation content*

---

🖻 04-06-2008, 03:41 PM                                          **#5 (permalink)**



☐ 04-23-2010, 07:53 PM

**AUA Tipton ●**
School Official

Quote:

Originally Posted by **auastudent01**
*Mr. Woodward Or Tipton?*
*Any inputs on this?*

On what? AUA students denigrating their own school in a public forum where hospital Program Directors, State officials and others get to question the credibility of AUA simply based on what a handful of students write? Mr. Woodward and I will continue to do whatever we can to help address real concerns. I don't think you all realize how significant some of your posts are.

Tipton Carlson
Associate Director of Admissions
tcarlson@auamed.org
☎ 888-282-8633 ●

☐ 04-23-2010, 09:18 PM

**Crane ●**
Member

#28 (permalink)

Join Date: Mar 2010
Location: USA
Posts: 179
Downloads: 0

#27 (permalink)

Join Date: Sep 2006
Posts: 3,798
Downloads: 0
Uploads: 0
● Blog Entries: 4

**Medical Assistant**

Ads by Google

**Medical Assistant Career**
Succeed with in-demand skills!
Start class now in Flint or Davison
RossMedicalAssistant.c...

**MCAT Not Required**
Accredited M.D.,
USMLE
Preparation US
Clinicals, Start
Jan, May, Sept
www.eustatiusmed.edu

**New Transfer Policy/UMHS**

**SGU is the true leader**
SGU stands for true education Not
"rely on self study"
www.sgu.edu



EXHIBIT
2B



EXHIBIT

79

Why New students should NOT go to AUA - Page 8 - ValueMD Medical Schools Forum - Mozilla Firefox

File    Edit    View    History    Bookmarks    Yahoo!    Tools    Help

http://www.valuemd.com/american-university-antigua-aua/19457-why-new-students-should-not-go-aua-8/

Why New students should NOT go to ...

Where else have you been accepted?

bannedjusttsAYNo2caribskools
Permanently Banned

Join Date: Jun 2010
Posts: 19
Downloads: 0
Uploads: 0

07-12-2010, 05:56 PM    #80 (permalink)

Do not go to AUA. I've also gotten replies that are just copied and pasted from the clinical departments previous reply.

That's a good question. Why would the clinical coordinators be in Antigua? They need to coordinate with hospitals in the U.S. It's probably so that students won't come to the office to complain about their 8 month wait time to begin clinicals. Seems like AUA really cares.

AUA is an unprofessional, uncoordinated, and unprepared school, but a great business since they took all your money and are keeping everyone waiting. It's only a years salary the students are losing - no big deal, I'm sure the banks will understand and put a hold on the loan interest during your wait time.

« Previous Thread | Next Thread »

Page 8 of 10    « First    <    6    7    8    9    10    >

DON'T WET YOURSELF!
DOCTORS IN TRAINING.com
LEARN MORE AND SAVE TIME BE AWESOME.
www.DoctorsInTraining.com

SAVE $101
ON IT'S STEP 1
ONLINE REVIEW COURSE
USE "G1SAY101" AT CHECKOUT
Ads by Google

Site Navigation
Sponsored Ad

Ads by Google

Medical Assistant Career
Succeed with in-demand skills!
Start class now in Flint or Davison
RossMedicalAssistant.co

MCAT Not Required
USMLE Preparation US Clinicals. Start Jan, May, Sept
www.aua.edu/usmed.edu

Accredited M.D.

New Transfer Policy/UMHS

SGU is the true leader
Our statistics don't lie 33 years of unparalleled success
www.sgu.edu

start

**Support SOC**

**Home     Get Informed     Get The News     Outreach     Public Policy     Partners     About SOC**

# What Jeanne Didn't Know

by Howard & Connie Clery
Co-Founders of Security On Campus, Inc.



*Jeanne Clery, murdered in her dorm room, April 5, 1986*

During the early morning hours of April 5, 1986, our daughter, Jeanne Ann, was tortured, raped, sodomized and murdered in her dormitory room at Lehigh University. Her killer was a drug and alcohol abuser, a Lehigh student whom Jeanne had never met. He gained access to her room by proceeding, unopposed, through three propped-open doors, each of which should have been locked. He was convicted and sentenced to death.

The aftermath of this crime became for us a learning experience that changed our lives.

We learned that **institutional response to such tragedies could involve callousness, coverups and stonewalling.** Lehigh officials publicly passed off Jeanne's torture/murder as an "aberration". The college, in an ill-conceived attempt to protect its "image", produced a self-serving "report", written by one of its trustees, K.P. Pendleton, which concluded that there was no **negligence** on the part of the university and that "...our present safety policies were complete"; this, despite the administration's knowledge of prior violent crimes on the campus and that there had been **181 reports** of propped-open doors in Jeanne's dormitory in the four months prior to her death.

We learned that **crime on campus was one of the best-kept secrets in the country.** Until 1988, only four percent of America's colleges reported crime statistics to the FBI, or, generally speaking, to students, parents or anyone else.

We learned that **the true picture of campus crime is startling, even horrifying; some examples:** In 1987, there were at least 31 murders, more than 1,500 armed robberies and 13,000 physical assaults on college campuses nationwide. A recent survey, cited by the U.S. House of representatives, reported that **thirty-eight percent** of college women questioned had either been raped or were victims of felony sexual assaults.

<;p>

We learned, to our great relief, that **the law does not tolerate willful indifference to the personal safety of college students.** After learning that Lehigh had unilaterally absolved itself of blame in Jeanne's death, we had no choice but to turn to the courts, suing the college for negligent failure of security and failure to warn of foreseeable dangers on campus. In 1988 Lehigh settled with us and agreed to materially enhance security on its campus. We founded, in living memory of Jeanne, **Security On Campus, Inc.,** the first national, not-for-profit organization dedicated to the prevention of criminal violence at colleges and to assisting campus victim nationwide.

  

*"Our daughter died because of what she didn't know"- Connie & Howard Clery*



*Memorial plaque placed outside Jeanne's Lehigh dormitory Stoughton Hall*

**Our daughter died because of what she didn't know.** The first major initiative of Security of Campus was to ensure that the same fate did not befall other students. In 1987 we began efforts towards enacting laws requiring colleges and universities nationwide to make available, to current and prospective students, complete information about violent campus crimes and drug and alcohol offenses, and, in addition, to provide information about security procedures already in effect.

We learned, to our gratification, that **legislators were more than willing to act in response to our efforts.** Pennsylvania became the first state to pass mandatory reporting legislation; nine states followed with bills addressing that issue. In 1990 President George Bush signed the **Crime Awareness and Campus Security Act of 1990,** now known as the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, requiring all colleges receiving federal funds to report crime statistics.

Our credo is simple: **crime awareness can prevent campus victimization.** This has been proven to work in practice. Chief Michael G. Shanahan of the University of Washington Police Department established, in the late 1980's, a campus crime awareness program, including publishing statistics in the student newspaper. By 1990 he was able to report that violent crime had been reduced by more than 50%, stating: "much of the credit goes to community's increased awareness of crime."

### Search

search...

### Contact SOC

**Security On Campus, Inc.**
133 Ivy Lane, Suite 200
King Of Prussia, PA
19406-2101
**Toll Free: 1-888-251-7959**
Office: (610) 768-9330
Fax: (610) 768-0646
soc@securityoncampus.org
**Staff Contacts**

### Get SOC's E-News

**Sign up for our Email Newsletter**

[                    ] GO

Privacy by SafeSubscribe℠
For Email Marketing you can trust

### Follow Us

**EXHIBIT** 

http://www.securityoncampus.org/index.php?option=com_content&vi...

We learned from the outcome of our lawsuit against Lehigh that campus administrators have a duty to protect their students from crime. In addition, we became convinced that such litigation may be the single most effective way to pressure academic officialdom to: 1) recognize campus violence as the threat that it has become; and, 2) do something about it.

In 1989, we established, as a part of Security On Campus, the Campus Victims Litigation Program. This, the first program of its kind in the nation, has developed a database of case law in civil actions by victims of campus crimes and victims of administrative coverups of such crimes. This, and other legal information, is available to victims themselves, their attorneys and to all other parties who wish to do something constructive about **preventing** campus crime.

We are convinced that much of the current epidemic of campus crime and violence can be curtailed and we intend to continue our efforts to this end. We can do nothing less in memory of Jeanne.

*Connie & Howard Clery*

Connie & Howard Clery
Co-Founders Security On Campus, Inc.

©2008 Security On Campus,Inc. All rights reserved. Powered by Sitecats Web Development

Support SOC

**Home**      **Get Informed**      **Get The News**      **Outreach**      **Public Policy**      **Partners**      **About SOC**

## In Memory of Howard K. Clery, Jr.

### 1930-2008



It is with great sadness that we report that Howard K. Clery, Jr., co-founder of Security On Campus, Inc. (SOC), died peacefully at his Florida home on January 1st at the age of 77. He was the loving husband of Constance B. Clery for 51 years and the father of three adoring children - Howard III, Benjamin and the late Jeanne.

Howard and Connie co-founded SOC in 1987 following their daughter Jeanne's April 5, 1986 murder in her Lehigh University residence hall room by a fellow student she didn't know. For the last two decades they both fought tirelessly to make college and university campuses safer places. They secured the passage of more than 30 state and federal laws, including the landmark federal Jeanne Clery Act which is named in memory of their daughter, that require colleges to report campus crime information and protect victims' rights.

Read more...

## What Jeanne Didn't Know

by Howard & Connie Clery
Co-Founders of Security On Campus, Inc.



During the early morning hours of April 5, 1986, our daughter, Jeanne Ann, was tortured, raped, sodomized and murdered in her dormitory room at Lehigh University. Her killer was a drug and alcohol abuser, a Lehigh student whom Jeanne had never met. He gained access to her room by proceeding, unopposed, through three propped-open doors, each of which should have been locked. He was convicted and sentenced to death.

The aftermath of this crime became for us a learning experience that changed our lives.

**We learned that institutional response to such tragedies could involve callousness, coverups and stonewalling.** Lehigh officials publicly passed off Jeanne's torture/murder as an "aberration". The college, in an ill-conceived attempt to protect its "image", produced a self-serving "report", written by one of its trustees, K.P. Pendleton, which concluded that there was **no negligence** on the part of the university and that "...our present safety policies were complete"; this, despite the administration's knowledge of prior violent crimes on the campus and that there had been **181 reports** of propped-open doors in Jeanne's dormitory in the four months prior to her death.

*Jeanne Clery, murdered in her dorm room, April 5, 1986*

**We learned that crime on campus was one of the best-kept secrets in the country.** Until 1988, only four percent of America's colleges reported crime statistics to the FBI, or, generally speaking, to students, parents or anyone else.

We learned that the true picture of campus crime is startling, even horrifying; some examples: In 1987, there were at least 31 murders, more than 1,500 armed robberies and 13,000 physical assaults on college campuses nationwide. A recent survey, cited by the U.S. House of representatives, reported that thirty-eight percent of college women questioned had either been raped or were victims of felony sexual assaults.

<;p>



*"Our daughter died because of what she didn't know"-Connie & Howard Clery"*

We learned, to our great relief, that the law does not tolerate willful indifference to the personal safety of college students. After learning that Lehigh had unilaterally absolved itself of blame in Jeanne's death, we had no choice but to turn to the courts, suing the college for negligent failure of security and failure to warn of foreseeable dangers on campus. In 1988 Lehigh settled with us and agreed to materially enhance security on its campus. We founded, in living memory of Jeanne, **Security On Campus, Inc.**, the first national, not-for-profit organization dedicated to the prevention of criminal violence at colleges and to assisting campus victim nationwide.



**Our daughter died because of what she didn't know.** The first major initiative of Security of Campus was to ensure that the same fate did not befall other students. In 1987 we began efforts towards enacting laws requiring colleges and universities nationwide to make available, to current and prospective students, complete information about violent campus crimes and drug and alcohol offenses, and, in addition, to provide information about security procedures already in effect.

**We learned, to our gratification, that legislators were more than willing to act in response to our efforts.** Pennsylvania became the first state to pass mandatory reporting legislation; nine states followed with bills addressing that issue. In 1990 President George Bush signed the Crime Awareness and Campus Security Act of 1990, now known as the Jeanne Clery

EXHIBIT 81

Case 2:10-cv-10978-PJD-MJH   ECF No. 156-4, PageID:2357   Filed 05/19/11   Page 15 of 50

http://www.securityoncampus.net/index.php?option=com_content&vi...



**Memorial plaque placed outside Jeanne's Lehigh dormitory Stoughton Hall**

**Disclosure of Campus Security Policy and Campus Crime Statistics Act**, requiring all colleges receiving federal funds to report crime statistics.

Our credo is simple: **crime awareness can prevent campus victimization.** This has been proven to work in practice. Chief Michael G. Shanahan of the University of Washington Police Department established, in the late 1980's, a campus crime awareness program, including publishing statistics in the student newspaper. By 1990 he was able to report that violent crime had been reduced by more than 50%, stating: "much of the credit goes to community's increased awareness of crime."

**We learned from the outcome of our lawsuit against Lehigh that campus administrators have a duty to protect their students from crime.** In addition, we became convinced that such litigation may be the **single most effective way** to pressure academic officialdom to: 1) recognize campus violence as the threat that it has become; and, 2) do something about it.

In 1989, we established, as a part of Security On Campus, the Campus Victims Litigation Program. This, the first program of its kind in the nation, has developed a database of case law in civil actions by victims of campus crimes and victims of administrative coverups of such crimes. This, and other legal information, is available to victims themselves, their attorneys and to all other parties who wish to do something constructive about **preventing** campus crime.

We are convinced that much of the current epidemic of campus crime and violence can be curtailed and we intend to continue our efforts to this end. We can do nothing less in memory of Jeanne.

*Connie & Howard*

Connie & Howard Clery
Co-Founders Security On Campus, Inc.

©2008 Security On Campus,Inc. All rights reserved. Powered by Sitecats Web Development

5/16/2011 4:55 PM



# MARK H. SWARTZ



## Textbook of

# Physical Diagnosis

## HISTORY AND EXAMINATION

### FOURTH EDITION





FREE
CD-ROM
with Video of
Complete
Physical
Examination

about homosexuality. In 1978, only one third of Americans believed that they knew a gay man or lesbian; in 1996, about two thirds of Americans reported that they knew someone who was gay or lesbian. Despite this fact, there is a significant degree of homophobia in society. By definition, *homophobia* is the "irrational fear of, aversion to, or discrimination against homosexuality or homosexuals." The medical and psychological effects of homophobia can pose a significant health hazard to gay or lesbian patients and can be detrimental to establishing a strong doctor-patient relationship. If a gay or lesbian patient feels this discrimination, he or she may become alienated from the health-care system and not use standard screening modalities, thus risking higher mortality and morbidity from disease. A recent study showed that 98% of gay and lesbian patients felt that it was medically important to inform their physicians of their sexual orientation, but 64% believed that, in doing so, they risked receiving substandard care. In the same study, 88% of the patients reported that their physicians made public disparaging remarks about gay and lesbian patients. With all the homophobia that exists in society, a gay or lesbian patient should have the confidence to speak candidly with his or her physician.

*Domestic violence, rape, child abuse, sibling violence,* and *elder abuse* are rampant and have reached staggering proportions. Ninety to 95% of all domestic violence victims are women, and the perpetrators are men. An estimated 2–4 million American women are victims of domestic violence yearly. The violence is often a combination of physical, sexual, and psychological abuse, and the signs and symptoms may be subtle or obvious. It is therefore important to ask all patients if they have ever been emotionally, physically, or sexually abused.

Much of the violence against women is perpetrated by their intimate partners or in relationships that are commonly protective, such as that of father and daughter. U.S. Department of Justice studies indicate that a woman is more likely to be raped, assaulted, or murdered by a male partner or ex-partner than by a stranger. Up to 45% of abused women are beaten during pregnancy. Four percent of all male homicide victims are killed by spouses or female partners. As many as one of seven women seen in emergency rooms has symptoms related to abuse. A national survey indicated that more than 2 million women are severely beaten by their male partners each year. It is recognized that such violence is vastly underreported; the actual number of cases is probably double the number reported. Clinicians frequently treat the injuries only symptomatically and often fail to recognize the abuse. According to the *Washington Post,* from 1981 to 1991 the rate of rape in the United States increased fourfold compared with the overall crime rate. It has been estimated that 60–80% of all college women have been sexually assaulted by dates or friends.

Although many women who are victims of abuse do not volunteer any information, they will often discuss the incidents if asked simple, direct questions in a nonjudgmental way and in a confidential setting. Be aware of the possibility of domestic violence in any woman with multiple medical visits for sexual dysfunction, chronic pelvic pain, fatigue, chest pain, gastrointestinal disturbances, headaches, depression, anxiety, panic attacks, eating disorders, substance abuse, suicidal attempts, and abdominal pain.

Because the perpetrator is often with the victim, ask any other person present to leave while you speak to the patient. Begin with the following direct question: "Since domestic violence is so common, I've begun to ask about it routinely. At any time, has your partner hit, kicked, or otherwise hurt or frightened you?" If the patient answers in the affirmative, encourage her to talk about it. Alternately, you may ask, "Do you feel safe in your relationship?" Always listen nonjudgmentally to encourage the woman to continue talking about the episode. Showing support is very important. A statement such as "You are not alone" or "Help is available for you" shows empathy. It is critical to assess the danger to the patient as quickly as possible before she leaves the medical facility. If the patient is in imminent danger, determine whether she can stay with friends or family. A shelter for battered women may be an alternative. Finally, provide her with the telephone number of the local domestic violence hot line.

If the patient answers no to your introductory query and you suspect some form of domestic violence, be aware of clinical findings that may indicate abuse.

- Injury to head, neck, breasts, abdomen, or genitals
- Multiple injuries
- Delay in seeking treatment
- Unusual explanation for the injury
- Injury during pregnancy

EXHIBIT 82



Page 2 of 3

Jeffers, who is known to the court, has spent one year and six months on remand at Her Majesty's Prison. The court took that into account in passing its sentence.

Jeffers, 22, on 17 May, 2008, about 3 a.m., stopped a medical student at the American University of Antigua (AUA), while she was on her way home.

Reports are the victim slowed down her vehicle in the vicinity of the Lion's Club when Jeffers jumped into her vehicle and told her to give him a ride. Jeffers directed the medical student to an area near a vacant lot where not too many houses were.

She pulled over to the side of the road and stopped her vehicle, at which time Jeffers virtually pulled the lever of her car seat and jumped on top of her. He put his hands over her eyes and started to squeeze into her eyes with his fingers. Jeffers took off his clothes and threatened to kill the woman if she screamed.

The young woman got a hold of the vehicle's cigarette lighter and tried to burn Jeffers with it. He, however, managed to knock it from her hand. Jeffers then placed his penis in the woman's face and told her to engage in oral sex.

The victim pulled away her head, at which time the convicted man pulled off her blouse and panties. He held her down and as he was about to rape her, a security pickup with a number of police officers drove up. Upon seeing the lawmen, Jeffers ran from the vehicle and the area naked.

The police pursued him but he was able to evade them. The victim was taken to the Holberton Hospital, where she was treated and discharged. Jeffers was picked up on 25 May and later arrested and charged.

Vere Bird Jr., speaking on Jeffers' behalf, told the court that the 22-year-old man attended the Pentecostal Church with his family. Bird said Jeffers was exposed to marijuana at the tender age of 10 years. The attorney said his client also used cocaine.

EXHIBIT 83





EXHIBIT 85



## Recreation & Activities

A beautiful place in which to live, Antigua is an ideal location for the study of medicine: serene, secure, and sustaining. Antigua provides AUA students with the most modern comforts and familiar lifestyle in the Caribbean, in a stable and safe environment. Although students should devote most of their time to studies in order to be successful, students also need to balance their life and make time for relaxation and recreational activities.

GEOGRAPHY & CLIMATE
POPULATION
HISTORY & GOVERNMENT
RECREATION & ACTIVITIES
RESTAURANTS & NIGHTLIFE
AIRLINES & TRAVEL
INFORMATION

EXHIBIT 86



African University of Antigua - Medical School Reviews - ... http://www.premed.valuemd.com/surveys.php?do=sumresults&sid=248

**Site Navigation** 

» **Home**
» **Forum**
» **PreMed**
» **USMLE**
» **Residency**
» **Medical Books**

**Follow Us!**



SHARE

**Sponsor Ad**

1.866.DR2B.AUC

| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |
|---|---|---|---|---|---|---|---|
| Quality of teaching in years 1 and 2 | | | | | ☑ | (21) | (25%) |
| Adequacy of curriculum in preparing you for USMLE Step 1 | | | | | ☑ | (21) | (25%) |
| Hours per week in lectures for students in traditional curriculum | | | | | ☑ | (21) | (25%) |
| Opportunities for patient interaction in the year 1 and 2 curriculum | | | | | ☑ | (21) | (25%) |
| [Time] | (19) | (9) | (10) | (10) | (36) | | |
| [Percent] | (22.62%) | (10.71%) | (11.9%) | (11.9%) | (42.87%) | | |

## 7. Academics (Years 3 & 4):

| | **Overall Summary** | | | | | | |
|---|---|---|---|---|---|---|---|
| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |
| Quality of teaching in years 3 and 4 | | | | | ☑ | (12) | (33.33%) |
| Amount of responsibility given to students for patient care | | | | | ☑ | (12) | (33.33%) |
| Overall assessment of the clinical training at your school | | | | | ☑ | (12) | (33.34%) |
| [Time] | (8) | (4) | (4) | (4) | (16) | | |
| [Percent] | (22.22%) | (11.11%) | (11.11%) | (11.11%) | (44.45%) | | |

## 8. Facilities

| | **Overall Summary** | | | | | | |
|---|---|---|---|---|---|---|---|
| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |
| Adequacy of computer labs | | | | ☑ | | (21) | (33.33%) |
| Adequacy of libraries | ☑ | | | | | (21) | (33.33%) |
| Adequacy of study space | | | | ☑ | | (21) | (33.34%) |
| [Time] | (17) | (7) | (10) | (16) | (13) | | |
| [Percent] | (26.98%) | (11.11%) | (15.87%) | (25.4%) | (20.64%) | | |

## 9. Administration

| | **Overall Summary** | | | | | | |
|---|---|---|---|---|---|---|---|
| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |



**EXHIBIT 88**

American University of Antigua - Medical School Reviews - ...   http://www.premed.valuemd.com/surveys.php?do=sumresults&sid=24

**Site Navigation**

» **Home**
» **Forum**
» **PreMed**
» **USMLE**
» **Residency**
» **Medical Books**

**Follow Us!**



SHARE

**Sponsor Ad**

1.866.DR2B.AUC

| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |
|---|---|---|---|---|---|---|---|
| Helpfulness of administration, i.e. Dean of Students | ☑ | | | | | (21) | (25%) |
| Financial aid counseling | | | | ☑ | | (21) | (25%) |
| Administration's support/encouragement of student organizations | ☑ | | | | | (21) | (25%) |
| Student involvement in administrative decisions, i.e. admissions, curriculum, etc. | ☑ | | | | | (21) | (25%) |
| [Time] | (31) | (12) | (23) | (5) | (13) | | |
| [Percent] | (36.9%) | (14.29%) | (27.38%) | (5.95%) | (15.48%) | | |

### 10. Opportunities

**Overall Summary**

| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |
|---|---|---|---|---|---|---|---|
| For research | ☑ | | | | | (19) | (34.55%) |
| To receive career guidance and mentoring | ☑ | | | | | (19) | (34.55%) |
| For experience with underserved populations | ☑ | | | | | (17) | (30.9%) |
| [Time] | (24) | (5) | (7) | (11) | (8) | | |
| [Percent] | (43.64%) | (9.09%) | (12.73%) | (20%) | (14.54%) | | |

### 11. Overall satisfaction

**Overall Summary**

| | Poor | Fair | Average | Above Average | Excellent | [Time] | [Percent] |
|---|---|---|---|---|---|---|---|
| Provide an overall rating of your school | | | | | ☑ | (21) | (100%) |
| [Time] | (7) | (1) | (2) | (3) | (8) | | |
| [Percent] | (33.33%) | (4.76%) | (9.52%) | (14.29%) | (38.1%) | | |

### 12. What do you like least about your school?

**Overall Summary**

• There is NO equipment (CT, Ultrasound, etc), and there is 1 beef jerky looking cadaver per roughly 60 students. The cadavers are dried and some have mold.
• Financial aid, but it gets better and better each semster from what other students tell me.
• lack of organization– no syllabus, thus stating no understanding of what should usually be preread. DPS is a total waste of time how it is set up with the exception of utilizing students as dummies for each other. I feel it is a class just to make credit in lieu of an actual teaching environment which the lectures are not!
• the administration
• There is so much unethical behavior of staff and administration. They treat us like second class citizens, and any time a concern is raised, they respond by saying, "this isn't the US. If you don't like it go home!"
• The faculty, the lack of the school to follow policies. The lies about how good the school is; to cover the truth! The student officers telling people not to tell the truth The "Special Grading" policies, cheating faculty.
• The school claims to have affiliated hospitals in the US, and many students agree. But some have

  

» Site Navigation
» Home
» Forum
» PreMed
» USMLE
» Residency
» Medical Books

Follow Us!

SHARE

Sponsor Ad




had hard time securing clerkships on US mainland.
• Rumors, interpersonal drama (try to avoid), behavioral science (getting new prof).
• "the school location"
• Best school ever...
• can't think of anything
• Financial aid (not enough resources), Insufficient guideline towards 5th semester and clinical rotations
• You name it and it probably goes in this box.
• The fact that all they want from students at the time is their money. If you do not get approved for a loan from the company, the school kicks you out, no matter how great of a student you are.
• they lie all the time about everything, also they change the policy for their best suit, not even thinking of student. because they love MONEY only.
• not enough clinical spots

13. **Please share any other thoughts you may have about your school.**

**Overall Summary**

• Your professors will pressure you into joining them for marathon drinking sessions. You will not be prepared to be anything in the future.
• I feel this school has great potential if they began to get more organized there would be less frustration via students and less misunderstandings. I feel all the lecturers other than DPS are amazing. I never went to class and actually came out with having some form of grasp on the material because a lecturer.
• dont have any more thoughts
• The classes are great because I am interested in what I am learning. Everything else is horrible. To be successful here you have to learn to relax and have NO expectations of people.
• I don't appreciate the greed of the administration: One example: paying $400Ec/$120us to park in mud, when there's no parking laws on the entire island. Many more examples!
• I really like UHSA. But it is meant for the mature student; someone with experience in the medical field. Once in UHSA, you're "on your own."
• Good school for Med, up and coming, think we are building a good program. Pre-meds, there are enough places in the states that have transferrable credits (even comm college). Please understand, not everyone makes it in MD school, and some ppl willingly drop out, don't disadvantage yourselves getting a nontransferrable (as far as I know) premed here if u are not sure about your desicion (eg. not just for mom and dad). College is a great experience and life is short, enjoy!
• I think AUA is ONE of the best administed schools (including teaching) in the Caribbean and that helps most of the students. Every semester, there is meeting btw the students and the school vice presedent/owner ( the guy from Ross). Dr. S
• This is a great school for me
• great school, 15/1 student/cadaver ratio, small group anatomy lab teaching, TA study sessions, great learning environment, great teachers, new campus in progress, hard curriculum tha really prepares u well and i absolutely love this school and place.
• Overall I like AUA.
• AUA is a waste of time. The happiest day of my life was the day I boarded my plane and left that Island for good. EVERY department lack the knowledge to perform their JOB. For any student that thinking about attending this school, PLEASE MAKE SURE YOU DO YOUR RESEARCH, dont just depend on the information you find in this website. Get in contact with current students.
• They need to learn to carter to the needs of students, not just toss decisions at them.
• think of a school which the Chair Department is actually a NURSE no even a Dr. and he's teaching you the subject that you should know as a doctor. how funny is that loool.

Powered by vBulletin® Version 3.8.6
Copyright ©2000 - 2010, Jelsoft Enterprises Ltd.
Search Engine Optimization by vBSEO 3.3.2 ©2009, Crawlability, Inc.
Copyright © 2003-2010 ValueMD, LLC. All rights reserved.

Home | About | Contact us | Disclaimer | Site Map | Advertise

>>> [ Select a Medical School ] <<<

HON CODE

International Foreign and Caribbean medical schools,
ValueMD provides information on medical education from premed to residency

sitemeter
60,189,306




3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
FILED
8/20/09
MICHAEL N. MILBY, CLERK
BY DEPUTY ₵ ˍˍˍˍˍˍˍˍ

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | §    Criminal No. H-09-335 |
| | § |
| JAMES M. DAVIS | § |
| | § |

## PLEA AGREEMENT

The United States of America, by and through its United States Attorney for the Southern District of Texas and the Fraud Section of the Criminal Division of the Department of Justice, the defendant, James M. Davis, and the defendant's counsel, David Finn, have entered into the following plea agreement (the "Agreement") pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

### The Defendant's Agreement

1.    (a)    The defendant agrees to plead guilty to Counts One, Two and Three of the Information.  Count One charges the defendant with conspiracy to commit wire, mail and securities fraud, in violation of 18 United States Code, Section 371.  Count Two charges the defendant with mail fraud, in violation of 18 United States Code, Section 1341.  Count Three charges the defendant with conspiracy to obstruct an SEC proceeding, in violation of 18 U.S.C. § 371.  By entering this

**EXHIBIT 89**

Agreement, the defendant waives any right to have the facts that the law makes essential to the punishment of Counts One, Two or Three either charged in the Information, proved to a jury or proven beyond a reasonable doubt.

      (b)    The defendant agrees that the facts of this case support the following Sentencing Guidelines calculation:

| | |
|---|---|
| Section 2B1.1(a) – Base offense level for wire fraud: | 7 |
| Section 2B1.1(b)(1)(K) – Loss of more than $400 million | 30 |
| Section 2B1.1(b)(2)(B)– More than 250 victims | 6 |
| Section 2B1.1(b)(9)(C, D) – Substantial part of scheme committed outside United States and otherwise used sophisticated means | 2 |
| Section 2B1.1(b)(14)(B) – Affecting safety and soundness of financial institution and endangering solvency or financial security of 100 or more victims | 4 |
| Section 3B1.3 – Abuse of position of trust | 2 |
| Section 2B1.1(b)(14)(C) – Combination of enhancement for more than 250 victims and enhancement for safety and soundness of financial institution and endangering the solvency or security of 100 or more victims, equals 10, therefore reduced to 8 | -2 |
| Section 3E1.1(a, b) – Acceptance of responsibility | -3 |
| | |
| Total Offense Level – Adjusted | 46 |

      (c)    The defendant further agrees to recommend at the time of sentencing that the Sentencing Guidelines provide a fair and just resolution based on the facts of this case, and that no downward departure or variances are appropriate other than the reduction for acceptance of responsibility discussed in Paragraph

Thirteen and the potential for a downward departure based on substantial assistance pursuant to U.S.S.G. § 5K1.1 as discussed in Paragraph Seven.

## Punishment Range

2.     The statutory penalty for the violation of Title 18, United States Code, Section 371, in Counts One and Three, is not more than five years imprisonment and/or a fine of up to $250,000.00. The statutory penalty for the violation of Title 18, United States Code, Section 1341, in Count Two, is not more than twenty years imprisonment and/or a fine of up to $250,000.00. Additionally, on all three counts, the defendant may receive a term of supervised release after imprisonment of up to three (3) years.   Title 18 U.S.C. §§ 3559(a)(4) and 3583(b)(2).   Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentences, then defendant may be imprisoned for the entire term of supervised release, not to exceed two years, without credit for time already served on the term of supervised release prior to such violation. Title 18 U.S.C. §§ 3559(a)(4) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

## Mandatory Special Assessment

3.      Pursuant to 18 U.S.C. § 3013(a)(2)(A), immediately after sentencing the defendant will pay to the Clerk of the United States District Court a special assessment in the amount of $100.00 per count of conviction.  The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

## Fine and Reimbursement

4.      The defendant understands that under the *United States Sentencing Commission Guidelines Manual* (hereafter referred to as "*Sentencing Guidelines*" or "U.S.S.G."), the Court is permitted to order the defendant to pay a fine that is sufficient to reimburse the United States for the costs of any imprisonment or term of supervised release, if any is ordered.

5.      The defendant agrees that becaue the offenses of conviction occurred after April 24, 1996, restitution is mandatory without regard to Davis's ability to pay and that the Court must order Davis to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A, provided, however, that the United States agrees that the value of any property returned to victims through the forfeiture and remission process shall be credited against any

4

order of restitution.

6.     The defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500) prior to sentencing if he is requested to do so. In the event that the Court imposes a fine or orders the payment of restitution as part of the defendant's sentence, the defendant shall make complete financial disclosure by truthfully executing a sworn financial statement immediately following his sentencing.

### Cooperation

7.     The parties understand that the Agreement carries the potential for a motion for departure pursuant to U.S.S.G. § 5K1.1. The defendant understands and agrees that whether such a motion is filed will be determined solely by the United States. Should the defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to U.S.S.G. § 5K1.1. The defendant agrees to persist in his guilty plea through sentencing and to cooperate fully with the United States. The defendant understands and agrees that the United States will request that sentencing be deferred until his cooperation is complete.

8.     The defendant understands and agrees that the term "fully cooperate" as used in this Agreement includes providing all information relating to any criminal activity known to the defendant. The defendant understands that such information

includes both state and federal offenses arising therefrom. In that regard:

(a)   The defendant agrees that this Agreement binds only the United States Attorney for the Southern District of Texas, the Fraud Section of the Criminal Division of the Department of Justice and the defendant; it does not bind any other United States Attorney or any other component of the Department of Justice.

(b)   The defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.

(c)   The defendant agrees to voluntarily attend any interviews and conferences as the United States may request.

(d)   The defendant agrees to provide truthful, complete, and accurate information and testimony; and he understands that any false statements he makes to the Grand Jury, at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes.

(e)   The defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation.

(f)   Should the recommended departure, if any, not meet the defendant's expectations, the defendant understands that he remains bound by the terms of this Agreement and cannot, for that reason alone, withdraw his plea.

### Waiver of Appellate Rights

9.    The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined on all other

grounds set forth in 18 U.S.C. § 3742 except he reserves the right to appeal a sentence above the statutory maximum. Additionally, the defendant is aware that 28 U.S.C. § 2255 affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding, including but not limited to proceedings authorized by 28 U.S.C. § 2255. If at any time the defendant instructs his attorney to file a notice of appeal on grounds other than those specified above, the United States will seek specific performance of this provision.

10.   In exchange for this Agreement with the United States, the defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed, in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates any provision of this Agreement, or (c) the defendant's plea is later withdrawn.

11.   In agreeing to these waivers, the defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the *Sentencing Guidelines* that he may have received from his counsel, the United States, or the Probation Office is a prediction,

not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. The defendant further understands and agrees that the *Sentencing Guidelines* are "effectively advisory" to the Court. *United States v. Booker*, 125 S.Ct. 738 (2005). Accordingly, the defendant understands that, although the Court must consult the *Sentencing Guidelines* and must take them into account when sentencing him, the Court is bound neither to follow the *Sentencing Guidelines* nor to sentence the defendant within the guideline range calculated by use of the *Sentencing Guidelines*.

12.     The defendant understands and agrees that each and all of his waivers contained in this Agreement are made in exchange for the corresponding concessions and undertakings to which this Agreement binds the United States.

### The United States' Agreements

13.     The United States agrees to each of the following:

(a)     At the time of sentencing, the United States agrees not to oppose the defendant's anticipated request to the Court and the United States Probation Office that he receive a two level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) should the defendant accept responsibility as contemplated by the *Sentencing Guidelines*. The United States is not required to make this recommendation if Davis (1) fails or refuses to timely entire his plea and make a full, accurate and complete disclosure to the United States and the Probation Department of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to

8

the United States prior to entering this Agreement; or (3) commits any misconduct after entering into this Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

(b)     If the defendant qualifies for an adjustment under U.S.S.G. Section 3E1.1(a), the United States agrees to file a motion for an additional one level departure based on the timeliness of the plea or the expeditious manner in which the defendant provided complete information regarding his/her role in the offense if the defendant's offense level is 16 or greater.

(c)     The United States agrees that the appropriate Guidelines calculation in this case is the calculation described in Paragraph 1(b) above.

### United States' Non-Waiver of Appeal

14.     The United States reserves the right to carry out its responsibilities under the *Sentencing Guidelines*. Specifically, the United States reserves the right:

(a)     to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to sentencing;

(c)     to seek resolution of such factors or facts in conference with the defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with U.S.S.G. § 6A1.2 and 18 U.S.C. § 3553(a); and

(e)     to appeal the sentence imposed or the manner in which it was determined.  If the United States appeals Davis's sentence, then Davis shall be released from his waiver of appellate rights.

## Sentence Determination

15.    The defendant is aware that the sentence will be imposed by the Court after consideration of the *Sentencing Guidelines*, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a). The defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which the defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable *Sentencing Guidelines*. The defendant understands and agrees that the parties' positions regarding the application of the *Sentencing Guidelines* do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw a guilty plea, and he will remain bound to fulfill all of his obligations under this Agreement.

## Rights at Trial

16.    The defendant represents to the Court that he is satisfied that his attorney has rendered effective assistance. The defendant understands that by entering into this Agreement, he surrenders certain rights as provided herein. The defendant understands that the rights of a defendant include the following:

(a)    If the defendant persisted in a plea of not guilty to the charges, the defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the Court all agree.

(b)    At a trial, the United States would be required to present witnesses and other evidence against the defendant. The defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, the defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for the defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

(c)    At a trial, the defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the defendant desired to do so, he could testify on his own behalf.

**Factual Basis for Guilty Plea**

17.    If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:

(a)    Beginning in at least 1988, **JAMES M. DAVIS (DAVIS)** began serving as Controller of Guardian International Bank, Ltd (Guardian), a bank chartered in Montserrat and owned by Robert Allen Stanford (Stanford).  Soon after **DAVIS** became Controller, Stanford requested that, in order to show fictitious quarterly and annual profits, DAVIS make false entries into the general ledger for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators. In late 1989, Stanford closed Guardian in Montserrat due, in part, because of his concern with the heightened scrutiny being imposed upon Guardian by bank regulators in Montserrat.

11

(b)    In early 1990, Stanford moved Guardian's banking operations to Antigua under the name Stanford International Bank, Ltd. (SIBL), of which he was the sole shareholder and for which **DAVIS** continued to serve as Controller through approximately 1992, when **DAVIS** became Chief Financial Officer of Stanford Financial Group (SFG). SFG was the parent company of SIBL and a web of other affiliated financial services entities, including Stanford Group Company (SGC) and Stanford Capital Management (SCM).

(c)    SIBL's primary investment product was referred to as a Certificate of Deposit (CD) which SIBL would solicit to potential investors in the United States and elsewhere through SFG broker-dealers, sometimes referred to as "Financial Advisors" (FAs). By 2008, SIBL had sold CDs resulting in liabilities totaling over $7 billion to investors in the United States and elsewhere. Stanford, **DAVIS**, and their conspirators promoted SIBL's investments as being well-managed, safe and secure, claimed that SIBL's investment strategy was to minimize risk and achieve liquidity, and falsely touted in SIBL's Annual Reports beginning in at least 1999 an almost year-by-year percentage and dollar increase in the purported value of SIBL's earnings, revenue and assets.

(d)    Prior to purchasing SIBL CDs, potential investors were required to provide their basic biographical and financial information in the form of a Subscription Agreement. Subscription Agreements regarding the investors were routinely sent from Stanford Group Company in Houston, Texas to SIBL in Antigua. CDs and account statements regarding the CDs were also routinely sent by mail to investors, including an account statement driven by the false investment and revenue values for an investor (identified as "Investor TA" in Count 2 of the Information) which on November 30, 2008 was sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas.

(e)    Stanford, **DAVIS** and their conspirators further promoted the sale of SIBL's CDs by representing to investors that SIBL's operations and financial condition were being scrutinized by Antigua's bank regulator, the Financial Services Regulatory Commission (FSRC), and that SIBL's financial statements were subject to annual examination and inspections by the FSRC and audits by an independent outside auditor.

12

(f)     Stanford, **DAVIS**, Chief Investment Officer Laura Pendergest-Holt (Holt) and other conspirators created and perpetuated the false impression to investors, potential investors, and the majority of SFG employees that Holt was responsible for overseeing and monitoring SIBL's entire portfolio of non-cash assets and that she managed all of those assets through a global network of money managers. In order to continue to effectuate the scheme, on December 7, 2005, Stanford and others, appointed Holt to the SIBL "Investment Committee." The purpose of this appointment was to continue to dupe the CD investors into falsely believing that Holt understood and "managed" SIBL's entire investment portfolio.

(g)     Unknown to investors, Stanford, **DAVIS**, Holt and other conspirators internally segregated SIBL's investment portfolio into three investment tiers: (a) cash and cash equivalents ("Tier I"); (b) investments with "outside money managers," sometimes also referred to as "outside portfolio managers" ("Tier II"); and (c) other assets ("Tier III"). In actuality, Holt's management of SIBL's assets was confined to those assets contained in Tier II which, by 2008 made up only 10% of SIBL's entire portfolio. In fact, by 2008, approximately 80% of SIBL's investment portfolio was made up of illiquid investments, including grossly overvalued real and personal property that SIBL had acquired from Stanford-controlled entities at falsely inflated prices. At least $2 billion dollars of undisclosed, unsecured personal loans from SIBL to Stanford were concealed and disguised in SIBL's financial statements as "investments."

(h)     At Stanford's direction and assisted by SFG's Chief Accounting Officer, Gilberto Lopez (Lopez), and the Global Controller for an affiliate of SFG, Mark Kuhrt (Kuhrt), **DAVIS** regularly created false books and records in which the value of the investment portfolio was further fraudulently adjusted by percentage increases to produce false investment and revenue values. As a result, SIBL's values for revenue and investments were falsified on a routine basis.

(i)     From at least 2002, **DAVIS**, at the request of Stanford, would prepare with the assistance of Lopez and Kuhrt, fictitious SIBL investment reports, which were provided to the Antiguan FSRC on a quarterly basis, again falsely inflating the value of SIBL's investments. These false forms continued to be provided to the FSRC on a quarterly basis until at least September 2008. Kuhrt would send the false documents to SIBL in Antigua. SIBL Executive A would then execute the documents and provide them to the FSRC.

(j)     Stanford was insistent that SIBL appear to show a profit each year. Stanford and **DAVIS** would collaborate to select a false revenue number. **DAVIS** would then send the collaborative false revenue numbers to Lopez and Kuhrt.

(k)     To create the falsely inflated values for SIBL's assets, **DAVIS** would extrapolate from the values attributed to a portion of SIBL's investment portfolio which was monitored by Holt and managed by money managers. **DAVIS**, at Stanford's urging, would multiply those actual values by artificial percentage factors necessary to equal the value for depositor liabilities. By email or personal delivery, **DAVIS** would send the false investment valuation report to Kuhrt, who then sent it to SIBL.

(l)     Initially, **DAVIS** did the calculations manually, but later a computer spreadsheet was created which was useful in generating the bogus revenue numbers. Every year, SIBL would prepare a budget projecting growth. Stanford, **DAVIS**, Lopez, Kuhrt and other conspirators would then use the "budgeted" numbers to develop falsely inflated revenue numbers which would be claimed as the "actual" revenue numbers to generate the desired Return on Investment (ROI). At Kuhrt's direction, subordinate employees in SFG's accounting group would be given a secret instruction sheet informing them as to how to make the changes to generate the false adjusted revenue figures, including the steps necessary to obtain approval by Lopez and **DAVIS**. After "backing into" or "reverse engineering" the numbers to match the "budgeted" numbers, Kuhrt would then transmit the inflated revenue numbers from Houston initially, and later from St. Croix when Kuhrt's accounting group moved to St. Croix, to Lopez in Houston, Texas and to **DAVIS** in Mississippi for **DAVIS'** approval. **DAVIS** often would further adjust the already bogus numbers to reach a desired ROI and would transmit to Kuhrt and Lopez the changes to be made.

(m)     Kuhrt and Kuhrt's employees in the accounting group would prepare the false financial statements published in SIBL's annual reports, which Stanford, Lopez and **DAVIS** would review prior to publishing and sending out to investors.

(n)     This continued routine false reporting by Stanford, **DAVIS**, Lopez, Kuhrt and their conspirators, upon which CD investors routinely relied in making their investment decisions, in effect, created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds. Stanford, **DAVIS**, Lopez, Kuhrt and their conspirators fraudulently claimed in SIBL's Annual Reports an increase in assets from approximately $1.2

14

billion in 2001 to approximately $8.5 billion reported in SIBL's Monthly Report for December 2008. By the end of 2008, Stanford, **DAVIS** and their conspirators falsely represented in SIBL's December monthly report that it held over $7 billion in assets, when in truth and in fact, SIBL actually held less than $2 billion in assets.

(o)     By at least 2002, Stanford had introduced **DAVIS** to Leroy King, a bank auditor for the FSRC, a former Ambassador to the United States from Antigua and a former executive at Bank of America in New York. King became Administrator and the Chief Executive Officer (CEO) of the FSRC in approximately 2003.

(p)     Sometime in 2003, Stanford performed a "blood oath" brotherhood ceremony with King and another employee of the FSRC, each of whom participated in the FSRC's regulatory oversight of SIBL. This brotherhood oath was undertaken in order to extract an agreement from both King and the other FSRC employee that they, in exchange for regular cash bribe payments by Stanford to King and the other FSRC employee, would ensure that the Antiguan bank regulators would not "kill the business" of SIBL. During the course of the fraud scheme King routinely referred to Stanford as "Brother" or "Big Brother." In the regular preparation of the false SIBL investment reports for submission to the FSRC, Stanford, **DAVIS**, and other conspirators relied upon the assurances that King and the other FSRC employee, because of the bribes, would ensure that the FSRC would not actually examine the validity of the investments of SIBL as set forth in those investment reports.

(q)     When Stanford needed cash to make these bribe payments, he generally would instruct **DAVIS** to debit funds from a secret numbered Swiss bank account at Society General Bank (SocGen account #108731) and to wire those funds to an SFG account at Bank of Antigua, from which the cash in United States dollars would be withdrawn. This secret SocGen account #108731 was funded by CD investor funds and was also used to make regular bribe payments, via wire transfer, to SIBL's outside auditor in Antigua, C.A.S. Hewlett & Co. Ltd. The cash bribe payments by Stanford to King ultimately exceeded $200,000.

(r)     Sometime in approximately 2003, Stanford and SIBL Executive A complained to King that two FSRC examiners were becoming aggressive and suspicious in their examination of SIBL's financial statements. Stanford reassured **DAVIS** and SIBL Executive A that, because of their brotherhood oath and the bribe payments, King would assist in removing the two FSRC employees from the regulatory oversight function of SIBL. Both FSRC employees soon thereafter were reassigned or replaced.

15

(s)   In January 2004, Stanford also continued his bribery scheme with Leroy King by paying $8000 for tickets to the Super Bowl game in Houston and by corruptly giving those tickets to King and his girlfriend to attend the game.

(t)   In June of 2005, King provided to Stanford a confidential letter that King had received from the United States Securities and Exchange Commission (SEC) in his capacity as Administrator and CEO of the FSRC wherein the SEC sought information and records regarding SIBL's CD investment portfolio. In the confidential letter, the SEC maintained that it was investigating SIBL's sales practices with respect to its CD program and sought from the FSRC details and records of SIBL's investments because the SEC stated that it had evidence to suggest that SIBL was engaged in a "possible Ponzi scheme." Stanford and SIBL Executive A then assisted King in drafting a false and misleading response by the FSRC to this confidential SEC letter.

(u)   By August of 2005, Stanford had retained an outside counsel to represent the interests of SIBL in the SEC inquiry of SIBL's sales practices (hereafter Outside Attorney A). During that month, Outside Attorney A traveled to the SIBL facility in Antigua where he met with Stanford, **DAVIS**, SIBL Executive A, Leroy King and others to familiarize himself with the operations and finances of SIBL. Outside Attorney A further reviewed SIBL's disclosures to investors in its CD program.

(v)   On July 30, 2006, Leroy King transmitted to SFG Attorney A in Houston, Texas, a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB") to the FSRC in Antigua concerning, inter alia, the affiliate relationship of SIBL to the Bank of Antigua. Similarly, on August 1, 2006, King again faxed to SFG Attorney A in Houston, Texas, a proposed response to the ECCB letter which sought the input of SFG Attorney A in crafting a response by the FSRC calculated to mislead the ECCB as to the financial bona fides of SIBL to prevent legitimate scrutiny of SIBL by the Eastern Carribean bank regulator. Recognizing that he had already been paid through cash bribe payments from Stanford, King concluded the August 1, 2006 facsimile transmission with the following handwritten words: "Please do not bill me (laugh),  Thanks a million, Lee."

(w)   On September 25, 2006, King provided to Stanford, SFG Attorney A, and SIBL Executive A another confidential letter he had received from the SEC wherein the SEC again sought records and information regarding SIBL's CD investment

portfolio. Stanford, **DAVIS**, SIBL Executive A, and SFG Attorney A would then propose various responses designed to mislead the SEC that King would be requested to insert into the FSRC's response to the SEC's confidential letter.

(x)     In late September of 2006, Outside Attorney A contacted the SEC and represented that he had "heard through the grapevine" that the FSRC had not been provided with an appropriate request from the SEC for documents; that the SEC should "go to Antigua" to review the SIBL examination reports; that the SEC had "no basis" to request documents regarding SIBL's investment portfolio from SIBL; that he (Outside Attorney A) had spent 15 years investigating fraud for the SEC and was "well-equipped" to recognize the "hallmarks of fraud"; that he (Outside Attorney A) found SIBL to be credible in all their business dealings; and that, based upon his review of the situation and personal visit to SIBL, Outside Attorney A found SIBL to be an "incredible institution."

(y)     In late 2008, Outside Attorney A was informed that SIBL's CD investment portfolio included a previously undisclosed third tier of investments (Tier III) that was not "managed" by Holt. Subsequently, in early January 2009, Outside Attorney A was informed that this third tier included real estate investments and private equity. Outside Attorney A, through his prior review of SIBL's disclosures knew and understood that this third tier of investments, including the real estate investments, had not been disclosed to investors. In early January of 2009 Outside Attorney A further learned that this undisclosed third tier of investments constituted approximately 80% of SIBL's investment portfolio or approximately $6 billion.

(z)     During the course of the fraud conspiracy, Holt supervised a group of research analysts at SFG's offices in Memphis, Tennessee, who were primarily responsible for researching and trading investments in the Tier II segment of SIBL's portfolio. These research analysts were aware that Tier II represented a small segment of SIBL's entire portfolio and that the vast majority of SIBL's purported assets were in Tier III of SIBL's portfolio. Occasionally, Holt's research analysts would question her regarding Holt's knowledge of SIBL's Tier III assets. Holt would often dismiss such inquiries and would explain that she knew the details of the assets in Tier III and the research analysts "did not need to concern themselves" with Tier III.

(aa)   From 2005 through at least February of 2009, Stanford, **DAVIS**, Holt, SIBL Executive A and others would attend investor conferences and other meetings with FAs called "Top Producer Club" or "TPC" meetings where they would falsely tout the assets and earnings of SIBL's investments, falsely tout SIBL's investment

17

strategy and deceive both the investors and FAs as to the role Holt played in the "management" of SIBL's investment portfolio.

(bb) In December 2008, Holt's research analysts began to make further inquiry of Holt regarding the quantity and the quality of the assets that made up SIBL's Tier III. During that same month, Holt led several meetings with her research analysts wherein she would purport to inform the analysts as to some of the content of SIBL's Tier III. Specifically, Holt explained the evolution of Tier III from a segment of SIBL's portfolio in the 1990s that contained mostly futures, options and currencies, to its current content which was purportedly geared toward larger holdings of real estate and private equity. Holt explained that Tier III was composed of 30-40% private equity and real estate and 10-12% cash. She further explained that SIBL had conducted private equity and real estate deals that had been "very profitable." In fact, she cited one transaction involving "two islands and one club" that Stanford had acquired and "got a very good deal." Because of this, Holt explained, Tier III was "up 7% mid-year." Holt told her research analysts that "we are restructuring Tier III and that will happen as early as January 2009."

(c) In mid-2008, Stanford, **DAVIS** and other conspirators were desperately seeking a fraudulent mechanism whereby they could artificially inflate SIBL's assets and thereby further conceal the fact that, undisclosed to investors, Stanford had made approximately $2 billion in loans to himself; that many if not all of private equity investments in Tier III were either insolvent or losing money badly, and that the touted returns on investment had been fictitious. As such, Stanford, **DAVIS**, Lopez, Kuhrt and other conspirators designed a real estate transaction wherein they would falsely inflate and convert an approximate $65 million dollar real estate transaction in Antigua into a purported $3.2 billion dollar asset of SIBL merely through a series of related party property flips through business entities controlled by Stanford. From approximately May 2008 through November 2008, Stanford, **DAVIS**, Lopez, Kuhrt, SIBL Executive A, SFG Attorney A and other conspirators participated in documenting elements of this bogus real estate in the books and records of SIBL designed to fraudulently add billions of dollars in value to SIBL's financial statements.

(dd) On January 14, 2009, the SEC served, through Outside Attorney A, investigatory subpoenas to **DAVIS** and Holt seeking testimony and documents related to SIBL's investment portfolio. Stanford also was served an SEC subpoena through Outside Attorney A. Outside Attorney A understood that the SEC inquiry would require the subpoenaed individuals to make a complete and transparent presentation to the SEC regarding all of the assets related to SIBL's CD program.

(ee)   On January 21, 2009, Outside Attorney A met at the SIBL airplane hangar in Miami, Florida, to discuss the SEC investigation with Stanford, **DAVIS**, Holt, SIBL Executive A, SFG Attorney A and others to discuss who could make the presentation to the SEC.  At that meeting, despite the knowledge that Stanford and **DAVIS** were in the best position to disclose the assets in the Tier III portfolio, Stanford, **DAVIS**, Holt, Outside Attorney A, SIBL Executive A and SFG Attorney A all agreed that Outside Attorney A would seek to convince the SEC that Holt and SIBL Executive A were the best individuals to present testimony and evidence to the SEC as to SIBL's entire investment portfolio.  The participants also agreed to participate in a series of meetings in Miami, Florida during the week of February 2, 2009, to bring Holt and SIBL Executive A "up to speed on Tier 3" before the SEC presentation.

(ff)    On January 22, 2008, Outside Attorney A met in Houston, Texas with several SEC attorneys in Houston, Texas to discuss issues related to the SEC investigation.  The SEC attorneys reiterated that their investigation was seeking to determine where and how the entire portfolio of SIBL assets were invested and managed.  Outside Attorney A falsely maintained that Stanford and **DAVIS** did not "micro-manage" the portfolio but that Holt and SIBL Executive A were the "better people to explain the details" about SIBL's entire portfolio.  As a result of Outside Attorney A's misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and **DAVIS** and to take the testimony of SIBL Executive A and Holt on February 9-10, 2009, respectively.  Outside Attorney A also falsely informed the SEC attorneys at this meeting that  SIBL was "not a criminal enterprise."

(gg)   In the last week of January 2009, **DAVIS** met with King in Antigua.  By that time, SIBL was facing increasing regulatory scrutiny from the SEC, and Stanford, Holt and **DAVIS**, had received subpoenas from the SEC.  King appeared very stressed.  King related that he had again been contacted by the SEC.  King asked **DAVIS** if "we were going to make it?" which meant whether the fraud they had been engaged in was going to be exposed.  **DAVIS** informed King that he thought they were going to be ok.

(hh)   On January 27, 2009, Outside Attorney A contacted **DAVIS**, Holt and SIBL Executive A and informed them when Holt and SIBL Executive A responded to the SEC inquiry they would be required to present "positive proof" regarding all of the assets of SIBL including the three tiers, that they needed to "rise to the occasion," and that "our livelihood depends on it."

(ii)    On February 3, 4, 5 and 6, 2009, **DAVIS** met with Holt, SFG Attorney A, SIBL Executive A, Outside Attorney A, and ultimately, Stanford on February 5,

and others, at SFG's office in Miami, Florida to discuss the testimony that Holt and SIBL Executive A would provide to the SEC during the week of February 9, 2009. During these meetings Holt disclosed that the value of the assets she actually managed in Tier II totaled approximately $350 million, down from $850 million in June of 2008. At these meetings **DAVIS** further revealed that the purported value of Tier III of SIBL's investment portfolio was made up of: real estate valued at in excess of $3 billion which allegedly had been acquired earlier that year by SIBL for less than $90 million; $1.6 billion in "loans" to Stanford; and various other private equity investments. Several of the Miami meeting participants acknowledged that if this disclosure was accurate, then the bank was insolvent. During the February 5, 2009 session, Stanford falsely informed the participants that despite what they had just been told, SIBL had "at least $850 million more in assets than liabilities."

(jj)   Later in the day of February 5, 2009, Stanford, **DAVIS** and Outside Attorney A attended a separate meeting where Stanford acknowledged that SIBL's assets and financial health had been misrepresented to investors, and were overstated in SIBL's financials.

(kk)   On the morning of February 10, 2009, prior to Holt's testimony before the SEC in Fort Worth, Texas, in an effort to continue to obstruct the SEC investigation, **DAVIS** spoke with Holt by telephone and told her to only disclose to SEC investigators her knowledge of Tier II investments.

(ll)   During her testimony to the SEC on February 10, 2009, in addition to failing to disclose the Miami meetings and participants which had occurred the prior week, Holt falsely stated in her SEC testimony that she was unaware of the assets and allocations of assets in Tier III of SIBL's portfolio.

## Breach of Plea Agreement

18.   If the defendant fails in any way to fulfill completely all of his obligations under this Agreement, the United States will be released from its obligations hereunder, and the defendant's plea and sentence will stand. If at any time the defendant retains, conceals, or disposes of assets in violation of this Agreement, or if the defendant knowingly withholds evidence or is otherwise not completely truthful

with the United States, then the United States may ask the Court to set aside his guilty plea and reinstate prosecution. Any information and documents that have been disclosed by the defendant, whether prior to or subsequent to execution of this Agreement, and all leads derived therefrom, will be used against the defendant in any prosecution.

### Forfeiture

19.     Defendant agrees to forfeit all property which constitutes or is derived from proceeds traceable to the violations charged in Counts One and Two of the information. Defendant stipulates and agrees that the factual basis for his guilty plea supports the forfeiture of at least $1,000,000,000 (one billion dollars). Defendant agrees to a personal money judgment for $1,000,000,000 (one billion dollars) against him and in favor of the United States of America. Defendant represents that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant stipulates and admits that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists. Defendant agrees to forfeit any of Defendant's property, or Defendant's interest in any property, up to the value of any unpaid portion of the money judgment, until the money judgment is fully satisfied. Defendant agrees to take all steps necessary to pass clear title to forfeitable and substitute assets to the United States, including but not limited to surrendering title, signing a consent decree, stipulating facts regarding the

transfer of title and basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.

20.    Defendant agrees to the entry of a preliminary order of forfeiture and consents to the preliminary order of forfeiture becoming final as to the Defendant immediately following this guilty plea pursuant to Fed.R.Crim.P. 32.2(b)(3). Defendant waives the right to challenge the forfeiture of property in any manner, including by direct appeal or in a collateral proceeding.

### Complete Agreement

21.    This Agreement, consisting of 23 pages, together with the attached letter agreement dated April 21, 2009, constitutes the complete plea agreement between the United States, the defendant, and his counsel. No promises or representations have been made by the United States except as set forth in writing in this Agreement. The defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

22.    Any modification of this Agreement must be in writing and signed by all parties.

Filed at Houston, Texas, on August 27, 2009.

_____
James M. Davis
Defendant

Subscribed and sworn to before me on August 27, 2009.

By:   _____
Deputy United States District Clerk

APPROVED:

Tim Johnson
United States Attorney

By:   _____
Gregg Costa
Assistant U.S. Attorney

_____
David Finn
Attorney for Defendant

Steven A. Tyrrell
Chief
Fraud Section, Criminal Division
Department of Justice

BY: _____
Paul E. Pelletier
Principal Deputy Chief
Jack B. Patrick
Senior Litigation Counsel
Matthew Klecka
Trial Attorney

23



**Information Systems.**
My GPA was a 3.88. After 17 years working in the
High-Tech industry I went to medical school. AUA!
This was by far the worst choice I've ever made in
my life. I want to ensure you don't do the same! I am
an honor graduate of the US Army and honorably
discharged. I've volunteered for my local Fire
Dept./Ski Patrol/Skiing for the handicapt.

**Country:** United States

## Recent Activity

aaustudentrights uploaded a new
video (3 days ago)
AUA Lied, Diploma
Worthless,
AUA Lied, Student Robbed,
Dreams Destroyed,
Devastated, AUA Lied, AUA Pr... more

aaustudentrights commented on
Obama Birth Certificate Fak...
(1 week ago)
"I would think the White
House would want to hire
someone like you to exp..."
more

aaustudentrights uploaded a new
video (4 months ago)
Grading Fraud - Dead AUA
St...
Discovery for lawsuit,
Medical student suicide
articles, AUA falsifying ... more

aaustudentrights commented on I'm
On A Boatt (5 months ago)
"Wow, Awesome Guys too
funny!"

## Channel Comments (7)

**kaari1** (11 months ago)
Thx for your sweet words on inourwee:) Join us on facebook. THX!!!!

**mahatma28100** (1 year ago)
"I have honor degrees in Robotics Technology, Engineering and a Master of Science in Computer
Information Systems.
My GPA was a 3.88"
Wow- you have definitely worked hard and have a highly respectable GPA. Don't think you would apply
to AUA with such a decorated CV/ resume? please dont take offense. just trying to write what I feel is
right just as you post what you feel is right.

**mahatma28100** (1 year ago)
Oh, and the corneal reflex controversy is so lame dude. USMLE doesn't dish out easy questions like is
it the corneal reflex or scleral reflex(which I know is incorrect). I am currently foiling a doctor at
EMORY SOM and he has made minute errors in terminology as well. But that doesn't make him a bad
doctor. Please re evaluate what you're posting. I hope you dont take any of my comments as an insult.
just trying to have a healthy debate and back up a great school. Sure it has flaws, just like any
school. even EMORY!!!

**mahatma28100** (1 year ago)
I think this is such a waste of time. spend more time studying than posting rubbish. AUA is a great
school. And afghani, I highly doubt a prof. would say that. you may be mad coz ure grades and efforts
didnt reflect. don't hate. work hard and anything is possible. trust me I went through the program just
fine, with hard work and dedication.

**afghanilphatty** (1 year ago)
I was forced to leave because the pre-med dean, Dr. Moreno, clearly stated to me "I do not like you
and am failing you on purpose"

**Sidium** (1 year ago)
AH!!! I'm AT AUA. doing clinical rotations. SCARED NOW!! :(

**DuckandDeerGrinder** (1 year ago)
thank you for sharing this....I was really considering AUA

Add Comment

**EXHIBIT 90**



**EXHIBIT 91**