

EXHIBIT 92




EXHIBIT 93



her !!! heheheh next time i will pay her :) just calm down you fucking little monkey !!
Terrywarrior 4 months ago

@Terrywarrior Your sick, may God have mercy on your soul!
Charbel4God 4 months ago

Guys all you know is swearing, it is all what is in your head.

Now, zehlewe are you really from Zahleh? Are you proud of geagea forces? You are proud of what Zahle became? or you do not care since for geagea froces, Zahleh is outside the canton and it is only needed that zahalneh be moved to the canton?

Thousands of Sunnis that Saad Hariri moved to Zahleh to impose its views on Christians to win parliamentary majority.

Let us know your reaction about this and your pride of geagea forces.
m33able 1 year ago

TerryWarrior,

Airy by it immak ya ibn sharmouta.

Go fuck yourself you lousy useless shit
DuckandDeerGrinder 1 year ago

hehehehe you wanna suck my dick???? tell the truth?? hahahahaha

you people are good in sucking dicks !! :)

you are one of Lebanese Forces, aren't you??? then come and suck it hehehehe
Terrywarrior 1 year ago

the only thing that Lebanese Forces can do is to suck my dick :P
Terrywarrior 1 year ago

i understand that you are angry, maybe you were born because one of our soldier fuck your mom so deeply that she got pregnant ;) ahahaha
Abolunett 1 year ago

hehehehe you wanna suck my dick???? tell the truth?? hahahahaha
you people are good in sucking dicks !! :)
Terrywarrior 1 year ago

no believe me , even in these they're not good
bew0909 1 year ago

ask your mom about sucking dicks idiot !
eliazourosqw 1 year ago



EXHIBIT 84




EXHIBIT

Site Navigation
Sponsor Ad

Linda Ann Bennett
October 25, 2010

LINDA ANN BENNETT
NOTARY PUBLIC, STATE OF MI
COUNTY OF GENESEE
MY COMMISSION EXPIRES Apr 30, 2013
ACTING IN COUNTY OF



**dwoodward**
School Official

Posts: 120
Downloads: 0
Uploads: 0

You know, I'm not sure what we accomplish by bringing this up again. We are all aware of it; it sucks! ☹
But from what I have heard that other than the 4 caribs with Title IV loans, it is only AUA, MUA, SABA, and with very, very high qualifying parameters UMHS that have loan programs; St. Matthews has just lost theirs!
There is an acknowledged gap from the loans funds and the total coast of attendance, the administration on numerous times has admitted this! This is even posted on our website for prospective students; we are being as up front as possible. We have set up MBA partnership programs to try to assist with that deficit. We are still looking at other programs (MPH) for our students, and we are certainly ALWAYS diligent in our searches for additional loan opportunities. Scaring everyone with yet another post accomplishes what?

I have attached below the original post from iwanabmd back in July. We are continuing to improve communications with our students, and we have NO intention of doing anything that can be prevented which would negatively effect the ability of our students to get loans.

07-23-2009, 03:13 AM
iwanabmd
Member

**Meeting with the CFO and COO**

ok so the loan situation is bad... real bad. And I have been promoting all the sneaky footwork I think AUA is pulling. I just spent 5 hours sitting and listening to what is going on. I personally asked several questions that I thought AUA wouldnt have an answer for, but to my surprise... they did, and well it was tough to swallow that they are doing all they could with such a crap loan. I also spent all morning reading other non-title IV funded caribbean schools postings. At the end of the day here is the cold harsh truth- Loan money is pretty much non-existent. If you don't go to the BIG 4 or AUA you will get ZERO dollars for a loan. (if anyone knows of a non-title IV recieving full tuition and spend money, let me know ASAP as I have been talking with FA consistently about lenders to look into) I have been on many loan company websites, and many have postings stating that certain loan programs know longer exist... period end of story (dont care if your at harvard) Next, AUA has set up this program so that we have something instead of nothing... THEY KNOW IT **SUCKS**, they admit it **sucks**, and their honest opinion when it comes down to it is... you really shouldn't take it, but we wanted to offer you atleast something. Now, as far as AUA controlling the lender with Ed-Invest vs BOLM... in a nut shell, Ed-Invest works semester to semester and BOLM works every 2 semesters. So as far as having an underwriter, BOLM is better. The financer's for the school are AUA, Kasturba, and a 3rd party (soon to hopefully be IFC) Now if IFC comes officially on board for say a semester or two, things MAY improve. My new found faith in AUA has come strictly from meeting with the CFO and head of FA, these two people are very intelligent and know what they are doing (not like every other AUA staff member I have ever encountered) Mr. G is not that bad of a guy either... I duno what it is about him that makes me feel like he is untrustworthy, maybe its because he is the guy who always has to present reality to us(and unfortunately for him it seems like he never gets to give any good news) I presented the head of FA with questions about possible loans that I was SURE she would answer with "OK, I'll look into it" but instead came back with "Heard of it, tried it, and here is why I can't get it" . Also some questions thrown at the CFO who I was SURE would beat it around the bush and feed us garbage, surprised me when instead he came back with very concise and blunt answers even if it made the situation at AUA look bad. When I tell you I was sitting and waiting for a question for him to beat around the bush (because then I know where to focus, because obviously thats where the hidden info is that explains the situation) I was examing every "um" and "well" that came out of his mouth, and to my disbelief he had an imediate answer to almost everything, and it was only at this point that I began thinking to myself... just maybe AUA really does have nothing to hide and just maybe they really did do the best they could. Now don't get me wrong AUA is of course making significant profit, and they admit to that, but they also admit that they have sacrificed a decent amount of that profit in order for students to continue their education. Questions?

"Epithelial cells brought you into this world, and epithelial cells will take you out." - Dr. S.

"Naked people come and go, but gastric glands will be there forever."

Richard Woodward, MBA
Vice President for Enrollment Management
American University of Antigua (AUA)
College of Medicine; College of Veterinary Medicine; School of Nursing; American International College of Arts and Sciences


EXHIBIT 96

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE,

    Plaintiff,

v.

                                                  Case No. 10-10978
                                                  Honorable Patrick J. Duggan

STEVEN L. WOODWARD,

    Defendant.
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION FOR SANCTIONS AND TO DISMISS

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 16, 2010.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

On March 11, 2010, Plaintiff American University of Antigua College of Medicine ("AUA") filed this lawsuit against Defendant Steven L. Woodward ("Woodward"), seeking to shut down Woodward's internet website with the domain name www.aua-med.com. Presently before the Court are the following motions: (1) AUA's Renewed Motion for a Preliminary Injunction, filed November 1, 2010 (Doc. 45); and (2) Woodward's Motion for Sanctions and Motion for Dismissal, filed November 8, 2010 (Doc. 51). Responses have been filed to both motions and, on December 13, 2010, this Court informed the parties that it is dispensing with oral argument with respect to the



EXHIBIT 97

motions pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons that follow, the Court denies the motions.

### Factual and Procedural Background

AUA is a medical school located in Antigua which caters, in part, to students from the United States. AUA maintains a website with the domain name: www.auamed.org. Woodward is a former student of the medical school who was discharged without completion of his degree. Woodward filed a lawsuit against AUA and others regarding his discharge, but was unsuccessful. He started the aua-med.com website apparently to express his dissatisfaction with AUA and his belief that AUA engages in various forms of wrongful conduct and misrepresents the safety of the island on which it is located and its students' passage rates on the United States Medical Licensing Examination.

Contending that Woodward's website threatens injury to its reputation, AUA filed the instant lawsuit on March 11, 2010, alleging that Woodward's maintenance of the website and statements contained on the website violate federal and state law. Specifically, AUA alleges: (I) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1); (II) infringement under the Anticybersquatting Consumer Protection Act of 1999 ("ACPA"),15 U.S.C. § 1125(d); (III) a violation of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g; and (IV) defamation in violation of Michigan law.

On April 15, 2010, AUA filed a motion for preliminary injunction. Woodward previously informed the Court that he would be departing the country on April 20, 2010,

2

due to an employment opportunity. Therefore, the Court scheduled a hearing on AUA's motion before Woodward left. Woodward and counsel for AUA appeared at the preliminary injunction motion hearing on April 19, 2010.

At the motion hearing, the Court began by discussing with AUA's counsel the merits of AUA's claims against Woodward, expressing some doubt as to the likelihood of AUA's success at least with respect to its claims under the Lanham Act, ACPA, and Family Educations Rights and Privacy Act of 1974. (Doc. 19 at 1-22.) The Court then engaged in a discussion with AUA's counsel and Woodward concerning the alleged defamatory statements on Woodward's website. Discerning that it would be impossible in the time allowed to analyze the truth or falsehood of the various statements on the site, the Court suggested to Woodward the possibility of taking down his website until he returned to the country and could litigate this case.

Eventually, an agreement on the record was reached where Woodward agreed to modify his website to reflect on the main page that it is "under maintenance" or "under construction" and to rename the index file to prevent anyone from automatically going into the directory and bringing up its contents. (*Id.* at 51-56, 59.) Woodward also agreed to mark videos he posted on YouTube as "private" so they would not be accessible to anyone but himself. (*Id.* at 59.) Based on Woodward's representations of what he would do, the Court found it unnecessary to enter a preliminary injunction. (*Id.* at 60.)

According to AUA, in mid-July 2010, after returning to the country, Woodward

3

republished the contents of his website without first seeking and obtaining leave of the Court. AUA therefore filed the renewed motion for preliminary injunction that currently is pending. Contending that it is likely to succeed on the merits of its defamation claim, AUA asks the Court to enjoin Woodward from the following: (1) "[f]rom all further publication under the internet domain name 'www.aua-med.com'"; (2) "[f]rom the unlicensed publication, in any manner, of AUA student academic records (other than his own)"; and (3) "[f]rom publication of all other contents presently disseminated through his websites www.aua-med.com and www.aua-vet.com including associated YouTube videos by any other means or medium." (Doc. 45 at 3.)

In his motion for sanctions and dismissal, Woodward claims that AUA has removed content from its website and appears to be arguing that this inhibits his ability to defend against AUA's claims. Specifically, Woodward asserts that AUA removed information that he would have shown to be false. Woodward asks the Court to impose sanctions against AUA for this conduct, including dismissing its action against him.

### Discussion

A court must balance four factors to determine whether to issue a preliminary injunction: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Hamilton Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citation omitted). As suggested

previously, AUA relies on the success of its defamation claim to support its present request for a preliminary injunction. Even assuming that AUA could demonstrate a likelihood of success with respect to this claim and that other factors favor AUA, the issuance of an injunction– at least prior to a full adjudication of the merits– is a wholly inappropriate form of relief.

A fundamental principle emerging from the Supreme Court's decisions interpreting the First Amendment is that governmental units and courts may not impose a prior restraint on speech. *See Near v. Minnesota ex rel Olson*, 283 U.S. 697, 713-14, 51 S. Ct. 625 (1931) ("... prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560, 96 S. Ct. 2791, 2803 (1976); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418-19, 91 S. Ct. 1575, 1577-78 (1971) ("[C]ourts do not concern themselves with the truth or validity of the publication. Under *Near* ... the injunction, so far as it imposes prior restraint on speech and publication constitutes an impermissible restraint on First Amendment rights.") "Temporary restraining orders and permanent injunctions– *i.e.*, court orders that actually forbid speech activities– are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993) (citation omitted). In *Near*, the Court invalidated a court order that perpetually enjoined the named party, who had published a newspaper containing articles found to violate a state nuisance statute, from producing any future "malicious, scandalous or defamatory" publication. 283 U.S. at 706, 51 S. Ct. at 627.

In addition to the First Amendment's "heavy presumption" against prior restraints, *see New York Times Co. v. Sullivan*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971), "courts have long held that equity will not enjoin a libel." *Metro. Opera Ass'n v. Local 100, Hotel Employees and Rest. Emp. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citing cases); *see also Kramer v. Thompson*, 947 F.2d 666, 677-78 (3d Cir. 1991) (following "nearly two centuries of widespread acceptance at common law" to conclude that equity will not enjoin a defamation). "'The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'" *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir. 1990) (Guy, J., majority opinion, controlling except as to injunctive relief for defamatory speech) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir.1987)).

The Court acknowledges that some courts have permitted an exception to this long-standing, traditional rule. In fact, a majority of the court in *Lothschuetz* granted "a narrow and limited injunction" as an exception to this rule, prohibiting the defendant "from continuing and reiterating the same libelous and defamatory charges" found to be false and libelous. 898 F.2d at 1208-09 (Wellford, J., for the court, concurring in part, dissenting in part.) The court made it clear, however, that such an injunction only should be permitted for statements found by the trier of fact to be false and libelous. *Id.* at 1209. Where this "modern rule" has been followed, there has been a full adjudication of the merits before an injunction has issued and the judge or jury has made a final determination that the statements to be enjoined are false and libelous. *See, e.g., Lassiter*

6

*v. Lassiter*, 456 F. Supp. 2d 876, 884 (E.D. Ky. 2006); *Kramer*, 947 F.2d at 676-77 (summarizing cases applying the modern rule but concluding that the Pennsylvania Supreme Court would adhere to the traditional rule).

At this stage of the proceedings, there has been no final determination that any statements on Woodward's website are false and defamatory. Precedent therefore instructs that it would be inappropriate to grant AUA's request for an injunction restraining Woodward's speech and website publications. Moreover, the Court notes that even if an injunction ultimately is entered in this case, it must "be clearly and narrowly drawn so as not to prohibit protected expression."[1] *See Lassiter*, 456 F. Supp. 2d at 884. The injunctive relief AUA requests in its motion reaches far beyond the statements on Woodward's website alleged to be false and defamatory and seeks to suppress *in toto* Woodward's lawful exercise of his First Amendment rights via the internet.

With respect to Woodward's motion for sanctions and motion to dismiss, the same constitutional concerns that foreclose the Court's restraint on Woodward's speech on his website apply to Woodward's request for sanctions based on AUA's modification of the contents of its website. Moreover, Woodward fails to identify a basis for finding AUA's conduct sanctionable. Furthermore, it is unclear what relevance the alleged false

---

[1] This is not to suggest that this Court would follow the modern rule and grant AUA an injunction following a final adjudication of its defamation claim. Notably, the Sixth Circuit was applying District of Columbia and not Michigan law in *Lothscheutz* in granting injunctive relief. Furthermore, the Court finds a number of strong arguments for *not* following the modern rule. *See, e.g.,* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157 (2007).

statements *on AUA's website* have to the issues in this case. Finally, to the extent they are relevant, Woodward is aware of what those statements were, appears to possess evidence showing what statements AUA previously made, and therefore can inform the Court and/or trier of fact of the same.

Accordingly,

**IT IS ORDERED**, that Plaintiff's Renewed Motion for a Preliminary Injunction (Doc. 45) is **DENIED**;

**IT IS FURTHER ORDERED**, that Defendant's Motion for Sanctions and to Dismiss (Doc. 51) is **DENIED**.

s/PATRICK J. DUGGAN<br>UNITED STATES DISTRICT JUDGE

Copies to:
Eric A. Buikema, Esq.

Steven Woodward
7211 Brittwood Lane
Flint, MI  48507

**From:** John Hayden (jhayden@auamed.net)
**To:** steve_l_woodward@yahoo.com;
**Date:** Fri, June 15, 2007 9:48:47 AM
**Cc:**
**Subject:** RE: Hey There!

Hey Steve,

Thanks for the note. Really appreciate your passing the word about the sailing. Am celebrating a birthday this weekend and my wife has already arranged a scuba trip & dinner – so unfortunately, I can't make that gig, which sounds awesome! If you get word of any future sailings, please pass it along. You gave me Sandy's name before and I have her phone #.

Also, appreciate the info about 5th semester. As of yet I am unaware of any attempts to coordinate what goes on there with what's happening here. Obviously, we should be and hopefully, that will change on a go forward basis. Being the new guy on the block, I'm not at liberty to rock the boat until I'm sure I have my feet on solid ground. However, I understand what you are saying and your input as well as your student colleagues is helpful and constructive. Change will come thanks to your efforts. Unfortunately, as a trail blazer, you yourself won't benefit from the path you are creating. But that's usually the case for leaders and forward thinkers.

Bill

---

**From:** Steve Woodward [mailto:steve_l_woodward@yahoo.com]
**Sent:** Thursday, June 14, 2007 8:21 PM
**To:** jhayden@auamed.net
**Subject:** Hey There!

Dr Hayden,

Couple things

This weekend will be a great time to go sailing!

Two yatch clubs are going to Green Island for a weekend party, one of the biggest of the year!
I've always wanted to go but AUA always got in my way.

They just tried to recruit me, I guess a several boats need crew.

I recommend you get on a boat called Streaker, you'll have a blast, the Captain, Sandy is a lot of fun and a great sailor this is a guarenteed fun time!!

PS.
We had a speaker today, Dr Victor rehorovich, I guess he's in charge of 5th semester.
According to him these are some of the things we need to learn in 5th semester, I thought it would interest you and Dr Manju.
It really upset me!
How to dress
Shoes to wear
How to take a history
Following a doctor around and listen to report.

I asked him "Isn't that what we're suppose to learn in ICM/DPS and if you coordinate with each other?"
He told me that they're working on coordinating that with your team. It's been four years and he's working on it?
That's $750,000/year we're spending on redundancy and lack of basic coordination.
Anyway I better stop here before I get into trouble, I recorded the conversation if you're interested.

EXHIBIT 98

Steve

----- Original Message ----
From: John Hayden < jhayden@auamed.net >
To: Steve Woodward <steve_l_woodward@yahoo.com>
Sent: Friday, June 8, 2007 10:06:17 AM
Subject: RE: Hospital

Steve,

Thanks for the pictures and your help with this. All great suggestions. I'll visit the hospital again to get the feel of the layout and will draw a rough sketch.

Bill

---

**From:** Steve Woodward [mailto:steve_l_woodward@yahoo.com]
**Sent:** Thursday, June 07, 2007 6:42 PM
**To:** jhayden@auamed.net
**Subject:** Hospital

Dr Hayden,

Per our conversation about the hospital.

Please let me prepare something you and AUA can use, let me get you something Tuesday.
I need to study for my Pharm exam this weekend.

Thanks

Steve

**From:** Steve Woodward (steve_l_woodward@yahoo.com)
**To:** pbell@auamed.net;
**Date:** Sat, July 21, 2007 3:10:32 PM
**Cc:**
**Subject:** Thoughts

Dr. Bell

Here's a couple ideas you might like:

Tickets to students that don't follow rules.
e.g: If a student brings food into a classroom and a guard catches them they get written up for a $10.00 ticket.
If they talk back to a guard or staff, $50.00 ticket. You could also make the points work toward dismissal.

I saw some students cheating on a quiz last week. I wanted to use my video camera on my laptop to catch them, but unfortunately
the policy to record lectures is forbidden per the student handbook and Path. syllabus.

Unfortunately, one instructor can't monitor all the students and multiple people required to monitor an exam also requires staffing headcount and cost money to the school. The school could install some tinted globes, like the ones that you see in the casino.
You wouldn't even need cameras, just catch one person cheating and the rumor would spread that there is a chance someone could be watching might be enough to prevent it. This would limit the number of people required to monitor exams and quizzes.
The globes might also help reduce the need for staff to monitor the library, classrooms and study hall in the evening..
Every once in a while catch someone doing something wrong might be enough to prevent other problems. A camera and a laptop are cheap.

Just some thoughts.

Steve

EXHIBIT 99

**From:** Deneen Nicks (NICKSD@trinity-health.org)
**To:** steve_1_woodward@yahoo.com;
**Date:** Tue, September 18, 2007 8:54:34 AM
**Cc:**
**Subject:** Re: Anesthesia Clinic

Good Morning,

I spoke with Dr. Zonia (Director of Medical Education) and she said you will need to provide St. Joseph with proof of attending this function and she will approve this day.

Also, FYI... She is not approving anyone else to attend this Anesthesia Clinic.

If you have any additional questions and/or concerns, feel free to contact me.

Sincerely,
Deneen Nicks
Coordinator, Student Services
St. Joseph Mercy Oakland Hospital
Pontiac, Michigan

>>> "Steve Woodward" <steve_1_woodward@yahoo.com> 9/12/2007 7:18 PM >>>
Deneen,

I would like permission to attend an anesthesia clinic on November 21.
This is the Airway Clinic of U of M, Master of Science, Anesthesia program.
I would like to request that this be an excused absents since I will have the opportunity to learn and teach a station at the clinic.
I will provide the course outline as soon as I receive it.

I was also told that I can invite 4 other students.
I have already talked to students that are interested in this class, if it is an excused absence I will tell them to make a similar leave request.

Thank you for your time,

Steve

EXHIBIT 100

 # Anesthesia Program



Lynn Lebeck, CRNA, DNSc
Clinical Assistant Professor
Program Director

November 21, 2007

Steven Woodward

Dear Mr. Woodward,

We want to express our sincere appreciation to you for the creation and donation of the Fiberoptic Training Device. Although our students do get opportunities to use training devices in the simulation laboratory at William Beaumont Hospital, that experience is only available several times per year. The opportunities to practice manipulation of the fiberscope at any time will increase the proficiency, self confidence, and likelihood of students successfully using fiberoptic scopes in the clinical area. Our students will be better prepared to use fiberoptic scopes in the delivery of anesthesia care. Your creativity in creating a usable practice device out of ordinary materials is remarkable and we look forward to future creations.

Sincerely,

Lynn L. Lebeck, PhD

One Hurley Plaza     Flint, MI 48503-5993
http:www.hurleymc.com/education/anesthes/index.htm
*Clinical Excellence. Service to People.*

EXHIBIT 101