

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

SUSAN ZONIA,

    Plaintiff,

              CASE NO. 11-116369-CD
v.             HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

    Defendant.

| DEBORAH L. GORDON, PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg ((24235) |
| Carol Laughbaum (P41711) | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | |

## AFFIDAVIT

    I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

Sign: *Debra K. Reid*

Print Name: *Debra K. Reid*

Date: **8/15/11**

Subscribed and sworn to before me this

**15th** day of **August**, 2011

*Adara L. Mission*

Notary Public, State of Michigan

County of **Oakland**

My commission expires: **02-10-2014**

Acting in the County of: **Oakland**

2⁶

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

1    Deb Reid    9/30/10    9:12 AM    Arie McNeil

Seen an improvement in Zonia's behavior
since Susie onboarded.
    - doesn't work as close to Zonia as others
- profanity used in office (f word, bastard physician
    full wyd
    used                 called
- Donna went to her & told her some horve
issue w/ profanity. Would say fuck like a
regular word.
- In the past felt uncomfortable going to S2
    - didn't want to hear what you had
    to say, hand up
    - gruff
    - asked Donna - 'does she not like me'

Didn't feel she was targeting her specifically
but thought it was not a match (behavior)

- Issue was Evaluations
    - S2 had input in evals
    - Donna would tell Deb that she
    had tweak eval b/c S2 was
    negative.
    - felt eval process was a joke
    because of Donna's comment
    reg S2.
    - Th

DR.

29

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

2

This yrs eval had a comment regarding Gallup — 'not engaged in survey & bad thing to say'

A few yrs ago SZ said 'you need to find a best friend at work' excuse me I thought Gallup was confidential. I don't call everyone a bfriend at work.

- felt it was inappropriate & inapp to call it out on eval.
        - placed comment at the end of eval
- 3 positive sentences & 1 negative
- not a bad eval. told it was best in department. Didn't leave her feeling real good.

Doesn't know why she has seen an improvement in 2 mia.
        - coming in saying GMorning & GBye
        - kinda nice

Not easily intimidated, not respected & well received — Susan Z
        Donna & Susie — open door policy
Susie not trusting right now but she's trying.

DR.

30

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

3

- Group holiday luncheon — feeling last night
was — not having to sit with her feeling
as though she wanted to be there (S2)

- Susie — tough spot, having to align with
Zonia being right.

- Journey & GB a someone who doesn't
believe a live there. Why are they
here.

Others have told Deb
— putting down religion
+ sex discussions

felt Zonia was cautious w/ her because
of her (Deb's) beliefs.

feels comfortable a supported by Susie
— building trust

Attributing change in Swin to Susie
holding her accountable.

31

 

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

SUSAN ZONIA,

        Plaintiff,

                               **CASE NO. 11-116369-CD**

v.                                **HON. JAMES M. ALEXANDER**

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

        Defendant.

| | |
|---|---|
| **DEBORAH L. GORDON. PLC** | **LAW OFFICE OF DAVID B. GUNSBERG, P.C.** |
| **Deborah L. Gordon (P27058)** | **David B. Gunsberg ({24235)** |
| **Carol Laughbaum (P41711)** | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | |

**AFFIDAVIT**

      I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

                         Sign: *Deneen McCall*

Date: **8-15-2011**        Print Name: *Deneen McCall*

Subscribed and sworn to before me this

**15th** day of **August** , 2011

*Adara L. Masson*

Notary Public, State of Michigan

County of **Oakland**

My commission expires: **02-10-2014**

Acting in the County of: **Oakland**

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Ann & Don

Deneen McCall                              9/30/10  9:45am
                                                   10:42am

SZ - dismissive  hand-up
        calls RJ a bitch
             Diaciok idiot
        mentions who she doesn't like

- walks in while doing her nails
        - door majority of the time closed
- desk chair ready we're maj. oh you would come in here when I am getting nails
- left on business time to meet men for dates
        - she told Deneen
        - Oct/Nov 09

When SS first came (Pat wasn't here)
what can I do to help you. Deneen didn't
say anything - in fear
        - went into Zonia's office told
          her everything  Feb
          Since then It's been bad

2009 Gone for 2½ hrs left early home to get ready
      hrs for night date
- Pat Davis harassed by them both
- Susia become friends w/ Zonia (text after
  hrs)

- Malloy & Kahn - doesn't like them & would
  do what she can to get rid of them

33

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

-if she likes you she tells you everything
Shared personal info. - too much **
- one perm too old
- divorces
- 17 dates in 17 days
- rich man but too old he's
a bastard

heard her tell Susie at GME mtg
- told Susie to reschedule mtg
w/ PJ availability first time
she
-faculty complains to many students - they can't run mtg
from the dept
-I don't care whos on service I just
want the money. Doesn't care about
students as long as they are paying big bucks.
- Dr Yanez & Deneen went to 52
6months ago
-female student harassed
by physician (Grewal)
-what was your mother
cathy. other comments

2mths ago - another incident (Dr G) makes them feel
stupid, changed services - Dr. Kahn talked to Dr G I'll talk to
Dr. 2
- AVA student lawsuit - 52 part play
mad b/c she wouldn't answer the
question the way she wanted.
-DR. Yanez found out

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

2

Was student good rep of the AUA prg.

- Denise Cannot untan

Dr Yang was told by Zoria   he said
Denise wouldn't know.

Would stop students from applying — would give
bad reference.
Shared with Donnan the details

• Zoria 'she'll be okay acts like the
sky is fally'

Favoritism towards Mariel
    - Susie          (Fielded by Susan a
    - Susan          sometimes Susie)
    - becareful who you talk too

— Susie playing each against one another
                  unsisifull word
52  Same attitude, F word, dismisses you,
texting on phone, in meeting

- Not a sensitive person.
- J1 - stupid sessions, cunhaye
    - in other ntp (leadership ntps, orginel mtg

35

3

- feels Susie was trying to impress Susan

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

SZ told - Only reason why she (Susie's) has the job is
Deneen   b/c Susie keeps protecting her v. cally
her.

- Was not in favor of the group session

- 9/30/10 asked Susie why did you take
  these issues to Zunica - felt like
  she/they were sold out.

  - everything confidential - would probe
    Deneen (she wouldn't talk)

- what if I told you someone told me
  you were looking to leave. (felt like she
  was trying to probe.

- Susie something will be changing (notice
  Donna would do were passed to Deneen)
  -

36

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

8

Dr Silverglad — program director of surgery
            2007
        - would talk to him in a demanding
        way
        - she will do what she can to get
        him out - she wanted his
        office

Nursing
Prayers (overhead) — do we all have
        to listen to this.

I have friends in every dept. all men
& I know this
            - Afraid to come to work b/c
            of Zonia's comments
- feels Susie & Susan pin ppl against each
other. Divide & conquer.

- Good relationship w/ peers.

You need to speak up, now is the time.
Everything I did came from Dr Zonia.
        Diane - felt she was back peddling

- Deb Reid told her she _____ w/ Gwe
let me go to talk to Anne.
        felt Susie was putting together a group
mtg- She said when your ready will Anne I can be

37

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

intake.

Feels like Susie is trying to cover herself

— I fought hard for you all (when MNa
DB came) ↑

— Doesn't feel Susie supports her.

— Doesn't feel she can trust Susie b/c
of previous behavior.

— Susie continues to ask Deann to talk
to her — conversation confidential
Deann would tell her, no.
Susie (May/June 10)
Change to orientation for new residents
— no one was opposing it just
talking about previous orientation
sessions
— then went to Znic
— Later came back & said "I feel
you all were unfair to me & attacked
It wasn't only her another ec
came to her & Znic
— Mariel said "not me".

Deann — very stressed. Grinds teeth, looking for another job.

36

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**From:**      Valerie Payne-Jackson, D.O.
**To:**        Zonia, Susan
**CC:**        Abdelrahman, Anan;  Bignotti, Donald;  Jewell MD, William;  Kazzi, George;
               Mattison, Anissa;  Shaman, Peter
**Date:**      09/27/2010 11:33 AM
**Subject:**   Re: OB/GYN residents

Susan,

There is nothing insulting, unprofessional or demeaning in anything that I have said.  For the residents to be told that *"Any issues or concerns that you have, need to be addressed with Dr. Zonia...In Dr. Zonia's absence please contact me."* and by-pass my GME specialist is simply wrong and inefficient.  I was not rude in my comments or insulting.  It does not state anywhere that I think you incapable of helping the program.

As for your statement to Susie Swanson,
*"Susan Zonia"* <zonias@trinity-health.org> 09/26/10 9:19 PM >>>
*Can she be MORE insulting? Ignore her (cold shoulder will bother her)*

This is unprofessional, does not reflect the Mission Statement, and most of all, tells me that I am not supported.  In fact, it insults me that you have such a poor opinion of me and disregard for me as a fellow professional.  Is this a Med Ed Department, or a click.

Valerie

Valerie Payne-Jackson, D.O., F.A.C.O.O.G., F.A.C.O.G.
Director, Obstetrics and Gynecology Residency Program
Michigan State University/St. Joseph Mercy Oakland

>>> "Susan Zonia" <zonias@trinity-health.org> 09/27/2010 8:01 AM >>>
I sent it from an airplane last night to Susie but it was what I felt at the time. I am sorry that you do not feel I am capable of stepping in to help with the program in your absence.

[Message delivered by NotifyLink]

----------Original Message----------

From: "Valerie Payne-Jackson, D.O." <paynejav@trinity-health.org>
Sent: Sun, September 26, 2010 11:58 PM
To: "Susan Zonia" <ZONIAS@trinity-health.org>
Subject: Re: OB/GYN residents


Am I the intended recipient?

Valerie

>>> "Susan Zonia" <zonias@trinity-health.org> 09/26/10 9:19 PM >>>
Can she be MORE insulting? Ignore her (cold shoulder will bother her)

[Message delivered by NotifyLink]

----------Original Message----------

From: "Valerie Payne-Jackson, D.O." <paynejav@trinity-health.org>
Sent: Sun, September 26, 2010 8:05 PM
To: "Susie Swanson" <swanssl@trinity-health.org>
Cc: anissamattison@aol.com, pshaman@comcast.net, wjewelljr1@comcast.net, "Donald Bignotti" <BIGNOTTD@trinity-health.org>, "Gail Molitor" <MOLITORG@trinity-health.org>, "George Kazzi" <KAZZIG@trinity-health.org>, "Susan Zonia" <ZONIAS@trinity-health.org>, "Anan Abdelrahman" <ABDELRAA@trinity-health.org>, wjewelljr1@yahoo.com
Subject: Re: OB/GYN residents

**EXHIBIT** 

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Susie,

I copied the E-mail I sent to you, to Dr. Zonia, as well.

Dr. Payne-Jackson

Valerie Payne-Jackson, D.O., F.A.C.O.O.G., F.A.C.O.G.
Director, Obstetrics and Gynecology Residency Program
Michigan State University/St. Joseph Mercy Oakland
>>> "Susie Swanson" <swanssi@trinity-health.org> 09/26/10 7:58 PM >>>
This direction came from Dr Susan Zonia.  I will relay your message to her.
Regards,
Susie


-- Sent from my Palm Pre
On Sep 26, 2010 6:54 PM, Valerie Payne-Jackson, D.O. <paynejav@trinity-health.org> wrote:


Susie,


Your E-mail to the OB/GYN residents on Friday the 24th, was forwarded to me, as they were very concerned and confused.
I appreciate your attempt to assist my residents.  Unfortunately, that was not the outcome achieved.


I had drafted a letter to the residents, to inform and reassure them, at the same time.  Due to a personal commitment
Friday morning, I did not have an opportunity to send it to Gail for group distribution, until late morning.  I then became
aware that they had already received your E-mail.


I fully believe that the plan that I have outlined, i.e. all patient related issues go to Dr. Rahman; all administrative questions
to Gail, who will then forward to Dr. Zonia as appropriate, is the best.  As the GME specialist for the total existence of the
program, Gail knows more about the daily operations than anyone.  She has been the closest thing to an Associate Program
Director, that I have had for 14 years.  Therefore, it makes more sense for the residents to first go to Gail, rather than be
directed to take "any issues or concerns to Susan, and in her absence, to contact you".


Sincerely,

Dr. Payne-Jackson


>>> Susie Swanson 09/24/2010 8:15 AM >>>

Any issues or concerns that you have need to be addressed with Dr Zonia in Dr Payne Jackson's absence.  Please let her
know if she can assist you in any way.  In Dr Zonia's absence please contact me.


Thank you,

Susie

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Susie L. Swanson, BBA

Manager, Graduate Medical Education

St Joseph Mercy Hospital, Oakland

Phone:  248-858-3235

Fax:  248-858-3244

swanssl@trinity-health.org


Valerie Payne-Jackson, D.O., F.A.C.O.O.G., F.A.C.O.G.

Director, Obstetrics and Gynecology Residency Program

Michigan State University/St. Joseph Mercy Oakland

Susan Zonia
7/15/2011

12 (Pages 42 to 45)

Page 42

1 Q. Was he dismissed?
2 A. No, he was not.
3 Q. That was in 2008?
4 A. Correct.
5 Q. Did you recommend that Steven Woodward be dismissed
6 from -- he wasn't a resident. He was a fifth year
7 medical student.
8 A. No, I did not.
9 Q. Did you recommend that Pat Davis be dismissed?
10 A. No, I did not.
11 Q. How about Gail Molitor?
12 A. No, I did not.
13 Q. Were you involved in a matter involving a resident
14 called Atif?
15 A. Marginally, yes.
16 Q. Was there an investigation of Dr. Atif?
17 A. Yes, there was.
18 Q. Did you recommend that Atif be dismissed or not
19 graduated?
20 A. I believe I did.
21 Q. When was that? What time frame are we talking about?
22 A. That would have been 2007, I believe he graduated.
23 There was a very large investigation regarding him and I
24 was relatively new and sat on the committee. It was the
25 first time I had encountered something like that.

Page 43

1 Q. Did Dr. Atif ask that an outside investigator or someone
2 other than Dr. Bignotti investigate his claims of --
3 A. My goodness, I think it was short of the supreme court
4 wanted to look at it. I don't recall. But I do recall
5 a lot of noise and accusations of counter suits and
6 things.
7 Q. And did St. Joe bring in somebody from the outside to
8 handle the investigation?
9 A. I can't recall that.
10 Q. Any other investigations?
11 A. I believe, Mr. Gunsberg, you might have been involved in
12 the Atif case but I'm not certain.
13 Q. So any other investigations that you recall or at least
14 that you were involved in?
15 A. There were many that I was involved in. There were many
16 disagreements of residents saying things were unfair or
17 inappropriate. And I would do an initial look to see if
18 there was a systemic problem or was this a he said she
19 said. But those are the big ticket items that I have
20 immediate recall of.
21 Q. Do you have any plans to move out of town?
22 A. Yes.
23 Q. Where are you going?
24 A. University of Chicago.
25 Q. When?

Page 44

1 A. August 1st.
2 Q. Is that a new job?
3 A. Yes, it is.
4 Q. What is the job?
5 A. I will be the -- I will be in University Research
6 Administration. They have four institutional review
7 boards. And I will be the Director of Research
8 Integrity for the university.
9 Q. Do you have a contract with the University of Chicago?
10 A. Yes, I do.
11 Q. And when did you sign that?
12 A. Well, it's a Letter of Intent to show up on August 1st.
13 I signed that end of June.
14 Q. Is the University of Chicago, are you with a hospital or
15 with a medical school or --
16 A. I'm with the university. It's a university appointment.
17 Q. Does the University of Chicago have a medical school?
18 A. Yes, it does.
19 Q. And it has a hospital?
20 A. Yes, it does.
21 Q. So will you be handling research for all of the
22 University of Chicago entities?
23 A. Yes, I will.
24 Q. Okay. So it's a big job?
25 A. Huge. It scares me.

Page 45

1 Q. University of Chicago is a very prestigious place, is it
2 not?
3 A. Yes, it is.
4 Q. I wanted to go there for law school and I got in and my
5 father wouldn't pay the bill. He told me to go get a
6 job for a few years and maybe he'd kick in a few bucks.
7 But at the time it was a hot bed of socialism and
8 communist activity according to Congress.
9 Anyway, so it's a very highly respected place,
10 correct?
11 A. Yes, it is.
12 Q. I assume that being the Director of Research Integrity
13 for the University of Chicago is a very highly respected
14 position?
15 A. I respect it. I'm excited.
16 Q. Are you? Good. But I'm asking from a different
17 standpoint. I assume my knowledge is that the
18 University of Chicago is a very highly respected place
19 as far as its research component is concerned?
20 A. I believe so. They have evidently over 7,000 active
21 research projects.
22 Q. How big a research budget do they have; do you know?
23 A. A bazillion. I don't know I don't know.
24 Q. It's huge?
25 A. I'm thinking.

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31





EXHIBIT 9

## Victor Hrehorovich

| | |
|---|---|
| From: | Victor Hrehorovich |
| Sent: | Tuesday, October 23, 2007 4:17 PM |
| To: | 'Susan Zonia' |
| Cc: | 'nssimon@auamed.org'; 'JECMPARK@aol.com' |
| Subject: | RE: Exammaster Error |

Dear Susan:  I apologize for Steve, but, am inclined to give him one more week to see if you find an improvement in his performance. I promise that we will screen very carefully the next group of Vth Semester students.  It may even be possible that you may be able to meet he final candidates during our meeting in Antigua next month.  Best regards, Victor

Victor R. Hrehorovich, M.D., FACP, FCCP
Vice Chancellor and Executive Dean
American University of Antigua, College of Medicine c/o Greater Caribbean Learning Resources
888 282-8633, FAX: 212 661-8864
-----Original Message-----
From: Susan Zonia [mailto:ZONIAS@trinity-health.org]
Sent: Tuesday, October 23, 2007 3:35 PM
To: Victor Hrehorovich
Subject: RE: Exammaster Error

Victor:  I am appalled at the exchange.  I would terminate him at this point.  As a hospital training site, are held to the standard of teaching the core competencies of communication and professionalism.  This individual has failed to see the merit in either core value.  He will not represent the college, our hospital, or the profession, well.

Susan

>>> "Victor Hrehorovich" <vhrehorovich@AUAMED.ORG> 10/23/2007 3:26 PM
>>>
Dear Steve:  I leave the last word to you. Best regards,


Victor R. Hrehorovich, M.D., FACP, FCCP

Vice Chancellor and Executive Dean

American University of Antigua, College of Medicine

c/o Greater Caribbean Learning Resources

888 282-8633, FAX: 212 661-8864


From: Steve Woodward [mailto:steve_l_woodward@yahoo.com]
Sent: Tuesday, October 23, 2007 3:24 PM
To: Victor Hrehorovich
Subject: Re: Exammaster Error


Dear Dr Hrehorovich,


I'm trying to succede by trying to schedule and concentrate on my studies.

i.e.  Seeing what I was told was a requirement for patients visits; so I could focus on passing the Step review and finishing this semester's requirements.

**EXHIBIT**  10

A student may withdraw before the second week of a semester without academic consequences.

In exceptional circumstances, determined on a case-by-case basis, the Promotions Committee reserves the right to allow a student to continue at the University while on probation, even if the student has not met all of the above requirements. **In such circumstances, however, the student may be ineligible for financial aid.**

# GRIEVANCES and DISCIPLINARY ACTION

The University's policies regarding disciplinary action apply to non-academic matters. Disciplinary actions may include, but are not limited to, verbal reprimand, written reprimand, required restitution, and suspension or expulsion from the University.

AUA/KMC students are encouraged to address any academic or non-academic concerns with their Professors, Faculty Advisors or Deans.

The Grievance and Disciplinary Committee is composed of faculty and student representatives. It is the investigative and judicial arm of the Dean's Office. The Grievance and Disciplinary Committee has authority over all matters referred by the Dean, the Dean of Student Affairs, the Student Government Association, students, and faculty. The Dean reviews the decisions and issues a final determination to the Grievance and Disciplinary Committee that is forwarded to the President.

A student may appeal any recommendation of suspension or dismissal authorized by the Grievance and Disciplinary Committee and executed by the Dean. The student must give written notice of intent to appeal the Committee's decision to the President's Office within ten days of receiving a decision.

The student has the right to counsel and to present witnesses and documentary evidence. The President and at least one other non-involved member of the administration will hear the appeal.

The three part appeal process is as follows:

- The written appeal must be received by the President's office no later than 14 days after receipt of the notice to appeal.

- The appeal must be heard within 2 weeks after receipt of the written appeal.

- The decision on the appeal will be communicated to the student in writing within one week after the final decision has been made by the President.

# PROFESSIONAL CONDUCT and ETHICAL BEHAVIOR

It is incumbent upon each student at the University to maintain the highest level of ethics and morals, and to conduct himself in a manner befitting a physician.



**EXHIBIT**

**Subject:**   Notice of Grievance Committe hearing

**From:**   William Cain (billcain@comcast.net)

**To:**   steve_l_woodward@yahoo.com;

**Cc:**   sbarrie@auamed.org; jecmpark@aol.com; metellug@bellsouth.net; yanezj@trinity-health.org; nikhielrau@gmail.com; pbell@auamed.net; vhrehorovich@AUAMED.ORG;

**Date:**   Wednesday, December 19, 2007 11:47 AM

Steve Woodward, Med Student V:

An American University of Antigua Faculty Grievance and Disciplinary Committee has been examining the subject introduced to you by Dr. Zonia (memo from Dr. Zonia to Dr. Calderon , December 17, 2007 , RE: V Semester).

According to Dr. Zonia 's memo and evidence available to the Committee, you may again be in violation of articles contained in the American University of Antigua Student Handbook (AUA-KMC_2007 Student Handbook_v71807, pp. 12-14). More specifically, the committee has received evidence suggesting that your demeanor has continued to be inappropriate in that you have rudely and unprofessionally vented anger toward the AUA curriculum, failed to answer hospital pages, selected an unseemly username in ExamMaster and defended the epithet when challenged.

A hearing with regard to your conduct will be held by conference call at 10:00 AM , Friday 21Dec07. Please speak to Zonia for access to a private room and telephone connection. Rules of the hearing will be as you experienced in Antigua (*i.e.*, no recording device, no legal council, written and/or verbal responses to committee questions, availability of evidence and witnesses, right to cross examine, *etc.*) During the hearing, you will be questioned by Committee members. Please respond directly to the questions asked, and please keep your responses brief and succinct. If you wish to make an opening statement, you will have five minutes for that purpose. If you have more to say than you can express within five minutes, please type it up and distribute it to the committee prior to the hearing.

After the meeting, the Committee will report to the appropriate dean(s). You will not receive a copy of the Committee's recommendation from the Committee. The dean(s) will further dispose of this matter. Under some conditions (stated in the Student Handbook, p13) you have the right to appeal the Deans' action to the President of the University in which case you may be represented by legal council.

**EXHIBIT**  12

If you have any questions, please address them directly to me.  You may reach me by email reply or call me at (410) 299-5550 .


Thank you.


William A. Cain , Ph.D.

AUA Faculty Grievance Committee Chair

**Sevrine Barrie**

| | |
|---|---|
| From: | William Cain [billcain@comcast.net] |
| Sent: | Monday, December 17, 2007 9:38 AM |
| To: | 'Susan Zonia'; JECMPARK@aol.com |
| Cc: | 'Deneen McCall'; 'Jeffrey Yanez'; Sevrine Barrie |
| Subject: | RE: Planning the grievance hearing |

Dear Dr. Zonia and Dr. Calderon;

Your memo, Dr. Zonia's, to Dr. Calderon dated Dec. 17, 2007 is what we needed to continue the committee's work.

Later today, I will meet with Dr. Calderon and Sevrine Barrie to plan distribution of the grievance documents and to arrange a time and places for the hearing.  Hopefully, the hearing will get done on Wednesday of this week (Dec. 19).

We will need your help, Dr. Zonia, with hearing arrangements.  When I talk to Steve Woodward, I need to tell him when and where he should appear to respond to the grievance and to answer questions from the committee.  Please expect a call from me and/or Sevrine this afternoon.

Thank you.

Regards,

Bill Cain

-----Original Message-----
From: Susan Zonia [mailto:ZONIAS@trinity-health.org]
Sent: Monday, December 17, 2007 9:08 AM
To: JECMPARK@aol.com; billcain@comcast.net
Cc: Deneen McCall; Jeffrey Yanez
Subject: RE: Planning the grievance hearing

Here is the memo you requested.  Please let me know if you need anything else.


Susan C. Zonia, Ph.D.
Director of Medical Education
St. Joseph Mercy-Oakland
44405 Woodward
Pontiac, Michigan 48341
(248)858.6796
zonias@trinity-health.org

>>> "William Cain" <billcain@comcast.net> 12/15/2007 7:02 AM >>>
Dear Dr. Zonia,

To me, the documents I have received are evidence of absurd behavior.  To proceed, we need is a grievance statement (or request for grievance committee hearing).  I will distribute your statement to Steve Woodward and to the faculty committee.  Then, during the hearing, I will ask Steve Woodward to respond.


A letter or memo from you that states or summarizes the complaint(s) will suffice.

**EXHIBIT** 13

Please feel free to call [(410)-299-5550] or email me at any time.


Thank you.


Bill Cain


William A. Cain, Ph.D.

AUA School of Medicine

Professor and Assistant Dean

Allied Health Professions


————

From: JECMPARK@aol.com [mailto:JECMPARK@aol.com]
Sent: Saturday, December 15, 2007 3:58 AM
To: ZONIA@trinity-health.org; ZONIAS@trinity-health.org
Cc: billcain@comcast.net
Subject: Fwd: Planning the grievance hearing


ear Susan:


Please read this note from Dr. Cain.  You need to write a request to start a
Grievance procedure.   If you would like, you could say that "according to
instructions from VH and myself......"  That way you would not have this person in your
Office complaining.


J. Ernesto


————

See AOL's top
<http://food.aol.com/top-rated-recipes?NCID=aoltop00030000000004>  rated recipes and easy
<http://body.aol.com/fitness/winter-exercise?NCID=aoltop00030000000003>
ways to stay in shape for winter.


**ST. JOSEPH**
**MERCY**OAKLAND

44405 Woodward Avenue
Pontiac, Michigan 48341-5023
248-858-3000

TO:       Ernesto Calderon, M.D.
FROM:     Susan Zonia, Ph.D.
RE:       V Semester
DATE:     December 17, 2007

We have been reviewing our experiences with offering the V Semester for the first time. As with any new program, it was not without its hitches and student adjustment issues. However, we found the attitude and demeanor of Steven Woodward to be completely inappropriate and detrimental to the program. Mr. Woodward appeared to have resented every assignment we gave him. But, instead of constructive criticism, he vented his anger in a professional unacceptable manner. For example: he completed his 100 patient log in two weeks and wanted to stop attending the program; he requested a transfer to the Miami program saying that the V Semester was a waste of time and his time would be better spent in a Kaplan course; sabotaging exams by giving the same response to all questions to simply get it over with; requesting early release on virtually a daily basis from his clinical rotation so that he could study for boards, etc. We believe that if he perceived the AUA V Semester curriculum as inappropriate, the professional response would have been to engage in a reasoned dialogue with representatives of the school, not argue with faculty at St. Joseph Mercy Oakland, or openly demonstrate his contempt for the curriculum, and those charged with delivering it.

Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern. We do not feel that he will be a good ambassador for AUA, our hospital, or the profession he is about to enter. We encourage the faculty at AUA to review his entire record, to determine if he does meet the qualifications to sit for the boards, and begin clinical rotations.

**EXHIBIT 14**

A MEMBER OF  TRINITY HEALTH


OUR MISSION: We serve together in Trinity Health in the spirit of the Gospel to heal the body, mind and spirit,
to improve the health of our communities and to steward the resources entrusted to us.

**Subject:**    Request for Telephone Conference

**From:**     Susan Zonia (ZONIAS@trinity-health.org)

**To:**       steve_l_woodward@yahoo.com;

**Cc:**       billcain@comcast.net;

**Date:**     Monday, December 17, 2007 3:07 PM


Student Doctor Woodward:

Attached is a letter that was sent to AUA today.  The faculty would like to speak with you about it at
2:30 on Wednesday, the 19th.  If you would like to receive the call at the hospital, I can arrange that but
you will need to let me know.  If you wish to take the call from home, please let Dr. Cain (at the e-mail
address above) know what number to call.



Susan C. Zonia, Ph.D.
Director of Medical Education
St. Joseph Mercy-Oakland
44405 Woodward
Pontiac, Michigan 48341
(248)858.6796
zonias@trinity-health.org

WOODWARD v. TRINITY HEALTH-MICH., ET AL

DEPOSITION OF SUSAN ZONIA, PH.D.

### Page 58

1  A   I know that he engaged in a dialogue.  I have evidence of
2  his dialogue with the school about curriculum.  Now, whether
3  there were other communications out there I don't have all
4  of Mr. Woodward's communications.
5  Q   So why would you have accused him of not doing it if you
6  didn't think you had all of the communications?
7  A   This is my opinion of Mr. Woodward's summary of my exposure
8  to Mr. Woodward.  I have not been exposed to all aspects of
9  Mr. Woodward or every communication he has ever written.
10  Based on what I have been exposed to these are my
11  conclusions and my opinion.
12  Q   And what faculty at St. Joe did he argue with?
13  A   Dr. Yanez.
14  Q   Anybody else?
15  A   Not that I am aware of.
16  Q   Do you know if Dr. Yanez wrote a good evaluation for Steven
17  Woodward?
18  A   No, I do not.
19  Q   If I told you that he gave him two 100 percents, would that
20  surprise you?
21         MR. GUNSBERG:  I'm going to object.
22  I don't know what the context of it is.
23         MR. GUNSBERG:  Object that it misstates and it's
24  not on the record.
25  Q   Regarding the fifth semester, would that surprise you?

### Page 59

1  A   No.  Students get phenomenal grades regardless of how they
2  do.
3         (Deposition Exhibit 3 marked)
4  Q   I'm going to show you what I have marked as Exhibit Number
5  3.
6  What do we got here?
7         (Witness reviews exhibit)
8  A   Oh, case presentation.  Yeah, not at all surprised at that.
9  I am not a physician.  I could get 100 percent on this.
10  Q   Why don't you tell me what it was I just showed you.  What
11  is Exhibit 3?
12  A   Exhibit 3, and, again, I am not as well versed in the
13  details of the fifth semester curriculum as Dr. Yanez, but
14  one of the components is that the student had to bring
15  forward a case that they felt that they had had substantive
16  contact with and summarize the case in three minutes.
17         MR. GUNSBERG:  Well, that's a exhibit you marked
18  in the dep so let's leave it in the dep.  I think you were
19  going to put it back in your book.
20         MR. NICOLETTI:  Yeah.  I was going to, but I
21  didn't.
22         MR. GUNSBERG:  That's not an evaluation.  By the
23  way, I'm going to renew my objection to the form of your
24  question characterizes that document as something that it's
25  not now that you have just shown the document to the witness

### Page 60

1  and the witness has identified that it's not an evaluation
2  in the sense that you have characterized it on this record.
3  Please note my objection.
4  Q   Any other faculty that Mr. Woodward argued with other than
5  Dr. Yanez?
6  A   No.  I believe I stated previously that I am not aware of
7  those conversations?
8  Q   Now, you state that "He openly demonstrated his contempt for
9  the curriculum and those charged with delivering it."  What
10  did you mean by that?
11  A   If I could have my October 10th memo.
12  Q   Exhibit 2.
13         (Counsel hands exhibit to witness)
14  A   When I met with him I have summarized here he stated that
15  his time would be better spent not in our program, that he
16  would learn much more if he was in a Kaplan course, that he
17  did not like being in the fifth semester program and that he
18  resented having to be there.  He didn't think it was a good
19  use of his time.
20  Q   So when you say "demonstrate his contempt for the
21  curriculum," you mean the fifth semester program?
22  A   Correct.
23  Q   You don't mean the general AUA program?
24  A   He had voiced dissatisfaction with his training on the
25  island, but I am not in a position to judge whether that was

### Page 61

1  a valid criticism or not.  I don't know.  He said that it
2  was a crappy school, that it was a waste of his time, that
3  they are just about the money.  I mean those are things that
4  I recall him saying about the school.  Whether it's true or
5  not I have no idea.  All I know is what we're supposed to do
6  in 12 weeks.
7  Q   Were there any other students that complained similarly
8  about the same things that Steven Woodward complained about?
9  A   No, there weren't.  Did they have those concerns?  They may
10  well, but they didn't voice them to me.
11  Q   Your memo also indicates "Mr. Woodward's lack of
12  professionalism and poor communication skills are a source
13  of great concern."  I don't want to beat this horse to
14  death, but have we already talked about what his lack of
15  professionalism was?
16  A   (Nodding head in affirmative).
17  Q   For the record you're shaking your head.
18  A   I'm sorry.  His lack of professionalism, yes, I had concerns
19  with that.  I have indicated his communication skills to me.
20  His ability to present a reasoned argument as opposed to
21  some of the words that he uses to use in a professional
22  context.  I had concerns about how he would represent
23  himself if he had a disagreement with an attending about
24  patient care or about patients.  I was concerned about how
25  he would present himself to a patient population.



EXHIBIT 15

Case 2:10-cv-10978-PJD-MJH   ECF No. 180-1, PageID.2894   Filed 11/14/11   Page 25 of 50

WOODWARD VS TRINITY HEALTH-MICH., ET AL          DEPOSITION OF JEFFREY YANEZ, M.D.

Page 34

1  Q   What about the transfer to Miami, what do you know about
2      that?
3  A   He asked me one time again either before class -- you know,
4      sometimes stepped aside and said, "I would like to transfer
5      to Miami because I want to take a Kaplan course." I said,
6      "Steve, it's not my decision. Take it up with AUA. It's
7      their decision." Subsequent I understood -- I don't know
8      where I heard it, but AUA declined his transfer.
9  Q   Did you have anything to do with whether or not he actually
10     achieved his transfer or not?
11 A   No.
12 Q   Did you care one way or another?
13 A   It didn't make a big difference to myself.
14 Q   All right. What about sabotaging exams, did he sabotage
15     exams?
16 A   That was information related to us from AUA. They had their
17     Exam Master that you're familiar with online questions that
18     the university scheduled and it was relayed to us from the
19     university that he was basically answering "B" to all
20     questions just to get them done. The score on the exam
21     didn't matter. They had to complete so many questions in
22     the semester to get credit and rather than actually do the
23     questions he just marked "B" down for all them and, you
24     know, did the three-hour exam in ten minutes.
25 Q   Dr. Zonia testified that the sabotaging exams manifested

Page 35

1      itself in throwing off the class curve. So it doesn't sound
2      like that was the case with what you just indicated?
3  A   The Exam Master had a requirement for the number of
4      questions answered. It was a learning tool the university
5      put in place. It didn't affect their final score at all
6      other than they had to do the questions.
7  Q   So how was that sabotaging?
8  A   It did not sabotage the class curve. I'm not sure what she
9      is referring to, but it did not sabotage the class curve.
10 Q   Did it sabotage the exam?
11 A   Which exam?
12 Q   Whichever exam she mentions in her --
13 A   It didn't have any affect on the quizzes that AUA offered.
14     They call them quizzes on this exhibit. So here exam,
15     quizzes, tests, all the same thing. Exam Master was a
16     completely separate entity.
17 Q   You're referring to Exhibit 11?
18 A   Yeah. In Dr. Zonia's defense I'm not sure if she understood
19     the difference between Exam Master and the quizzes. I'm not
20     sure she understood the difference between those two.
21 Q   Are you aware as to whether or not Kaplan teaches as an exam
22     strategy answering the same response to each question if you
23     don't know the answer?
24 A   I am unfamiliar with that.
25 Q   Do you know whether or not Steve Woodward ever voiced his

Page 36

1      complaints or concerns to AUA?
2  A   Only indirectly. During our conference calls that we had
3      all of these slight areas we would always say what's going
4      on and I would mention the issues that his name came up and
5      comments from other individuals were, "Oh, we knew Steve
6      from the islands." You know, "He complains about
7      everything." I heard that from other individuals on
8      conference calls, but once again I just kind of went with
9      the flow.
10 Q   And who was it that says he complains about everything?
11 A   The conference calls consisted of myself, the Baltimore, the
12     Miami, the New York office and somebody in Antigua. There
13     were ten people on the phone. I'm not sure.
14 Q   And do you recall who said that he complains about
15     everything?
16 A   I don't remember. There are so many people. This was a
17     year and a half ago.
18 Q   And who did he argue with at St. Joe?
19 A   Arguing is a term. When I talk about my episodes with him
20     he was in a classroom setting. It was a group. And he
21     would voice his frustration or anger, he was voicing it
22     towards AUA, towards the curriculum, towards the
23     administration. So it was, like, an open issues and I was
24     able to reel him in. It just recurred over and over again.
25     So his arguments were over the changes that his university

Page 37

1      were implementing. It wasn't with St. Joe's per se.
2  Q   So it sounds to me like you would disagree with the word
3      "arguing" that he was just expressing his concerns in what
4      you deemed to be an inappropriate manner?
5  A   Yes.
6  Q   Did he ever -- did you consider him to lack professionalism?
7  A   For example, when he came to his attending physician
8      requesting to not come in anymore that was about as
9      unprofessional as it gets in the field. That's horrific.
10     Okay. His out-raids and tirades were bad but the other
11     example is very, very inappropriate. You know, asking to
12     transfer to Miami is, you know, not a big deal, but
13     expecting to be relieved from your normal responsibilities
14     because you fulfilled a paper with a list of names is very
15     unprofessional and I don't think anybody that I know would
16     disagree with that.
17 Q   Except for maybe me.
18 A   I don't think any physician would disagree with it.
19         MR. GUNSBERG: You might disagree, but you don't
20     have any qualifications to disagree because you're not a
21     doctor.
22         MR. NICOLETTI: I'm a doctor, so are you.
23         MR. GUNSBERG: Yeah, but not this kind.
24         MR. NICOLETTI: Not this kind.
25 A   I don't think a physician would disagree with that.



**Subject:** Attention All Fifth Semester Students !!!!!!!!!!!!!

**From:** Shatara Hayden (shayden@AUAMED.ORG)

**To:**

shileola_11@yahoo.com; siddross22@yahoo.com; sameerwahmed@gmail.com; zahmed0571@hotmail.com; deji_2000@yahoo.com; sameerah219@aol.com; falkazir@yahoo.com; ammara_a@hotmail.com; vashbey@yahoo.com; skbanergt@yahoo.com; mfberthold@comcast.net; elizabethbulat@comcast.net; desidreemer@hotmail.com; mbuzz20@hotmail.com; lilrichie04@hotmail.com; ecashjr@hotmail.com; equadolce@yahoo.com; chahalparas@yahoo.com; eurowillo@hotmail.com; vishal.doctor@gmail.com; chowdhuryp1985@yahoo.com; sourav322@hotmail.com; bheeshamd@aol.com; gdhaliwa@gmail.com; aechev@gmail.com; lakedra_evans@hotmail.com; keithtgeorge@hotmail.com; keithtgeorge@hotmail.com; jagrew@gmail.com; cyrgriffin@hotmail.com; nehaliji@yahoo.com; m.hamed01@gmail.com; jakeiknight@yahoo.com; n_hampel@hotmail.com; bhelmer68@hotmail.com; jenellejanet@yahoo.com; hankhoang@gmail.com; marciahd@hotmail.com; bughart2000@yahoo.com; okey@exite.com; raza8@hotmail.com; merlynnj@gmail.com; vmjayara@gmail.com; wallyj52@yahoo.com; jknjny@aol.com;

**Cc:**

simkapur@hotmail.com; kushi3004@mac.com; jkim246@aol.com; miknom79@yahoo.com; nicokristen@yahoo.com; oliverloeffler@hotmail.com; zoh16@msn.com; silkjavelin@hotmail.com; juliesgmayo@aol.com; markmckool@hotmail.com; mobus.1@hotmail.com; davincis_girl@hotmail.com; cybtiggr14@yahoo.com; anirbann@hotmail.com; rasmansolo@yahoo.com; mo52276@hotmail.com; jknguyen831@yahoo.com; tom_ngwen@comcast.net; ifyboy_us@yahoo.com; scokorie@aol.com; ozuomba@hotmail.com; nila_p_2001@yahoo.com; karinapatel911@hotmail.com; kujo_15@hotmail.com; vipps911@gmail.com; greeningwsu@yahoo.com; myroup2002@yahoo.com; jen1doctor@hotmail.com; huniebear23@yahoo.com; ahalya2@hotmail.com; behman@mail.usf.edu; tammalarice@netscape.net; jrcandy@hotmail.com; funjolt@yahoo.com; meeta.shah@gmail.com; parthyshah@gmail.com; ninashojayi@gmail.com; jaya18_221@yahoo.com; dsinha1@gmail.com; SoniaSivakumar@hotmail.com; mysriram@aol.com; subhashtummala@yahoo.com; priya.umapathi@yahoo.com; awijitvarma@gmail.com; rolmar_df@yahoo.com; alvin_922@yahoo.com; steve_l_woodward@yahoo.com; shannonzipf@gmail.com;

**Date:** Tuesday, September 25, 2007 3:51 PM

**Dear Student,**

**We here in the New Financial Aid Office know that you have recently started your fifth semester in Miami , Baltimore , or Michigan . Your USLME and Kaplan review time is fast approaching. We want you to have a peace of mind while you prepare for your exam. In order for this to be accomplished, we need for all 5th semester students to create a budget. In this budget please include the following:**

1. **The cost of USLME and/or Kaplan review**

2. **and living expenses for that time period**

**EXHIBIT 17**

**If you have any questions feel free to contact the New York Financial Aid Office at 1(877) 666-9485 from in the U.S. or 1(212) 661-8899 from outside the U.S.**

**Subject:**   RE: Financial Aid Award Letter

**From:**   Shatara Hayden (shayden@AUAMED.ORG)

**To:**   steve_l_woodward@yahoo.com;

**Date:**   Wednesday, December 5, 2007 12:03 PM


Hi Steven,


You will have a disbursement coming 12/26/07 of $15,000.


----------------------------------------------------------------

**Shatara Hayden**

*Financial Aid Officer*

American University of Antigua/ Kasturba Medical College

Two Wall Street, 5th Floor, New York , NY 10005

Tel. (877) 666-9485, Ext. 153   Fax. (646) 417-6220

shayden@auamed.org

www.auamed.org


**From:** Steve Woodward [mailto:steve_l_woodward@yahoo.com]
**Sent:** Wednesday, December 05, 2007 11:09 AM
**To:** Shatara Hayden
**Subject:** Re: Financial Aid Award Letter


Shatara,

As soon as I'm finished with 5th semester requirements.


Steve

----- Original Message ----
From: Shatara Hayden <shayden@AUAMED.ORG>

**EXHIBIT 15**

Thanks


Steve

----- Original Message ----
From: Steve Woodward <steve_1_woodward@yahoo.com>
To: Shatara Hayden <shayden@AUAMED.ORG>
Sent: Monday, November 26, 2007 5:57:13 PM
Subject: Re: Financial Aid Award Letter

Shatara,


I totally forgot about replying for my student loan!  Sorry!

I would like to apply for $15,000.00, this is the loan amount you said in your last email that I qualified for.


Budget:

Kaplan, $5,000.00

Step I: $750.00 (Application fee + AUA fee)

Food: $200/week 800

Gas: $100/week 400

Housing:$1,500/month

Utilities: $200/month

Auto insurance: $200/month

Health Insurance $300/Semester(AUA)?

Travel Expences: $1,000.00


Hope you had a Happy Thanksgivings!


Steve

----- Original Message ----
From: Shatara Hayden <shayden@AUAMED.ORG>

| Subject: | Transfer |
|---|---|
| From: | Steve Woodward (steve_l_woodward@yahoo.com) |
| To: | zonias@trintiy-health.org; |
| Date: | Friday, October 5, 2007 6:48 PM |

Dear Dr. Zonia,

I am trying to transfer to the Miami 5th semester program.
There is room in the October 15th Kaplan program and I believe attending this review will be good for my career.

Thank you for all your time and help.

Steve

**EXHIBIT 19**

| **Subject:** | Re: 5th Semester |
|---|---|
| **From:** | Vasanth Jayaraman (vmjayara@gmail.com) |
| **To:** | steve_l_woodward@yahoo.com; |
| **Date:** | Saturday, October 27, 2007 8:41 PM |

Hey Steve,

School has been a waste of time i feel like. Goin to hospital has been fun some weeks and pointless other weeks. Kaplan is comin along. It has been pretty crazy learning biochem in about a week and now we are doin anatomy and will be starting physio on thursday. Well i dont know what you mean if the hospital has been helpful but when we get sent home after like an hour everyday cuz there is nothin to do in that department then i guess it is beneficial. Yeah we did sign a petition to stop the whole standardizing of programs and now dr. metellus has told calderon that he aint gonna follow their orders and will do his own thing so yeah we dont have those quizzes anymore. But it was more than just the quizzes cuz the school wanted to implement a whole new program like two weeks ago. I mean how on earth does someone try to do that. So in that sense it was unfair and fortunately the Hospital and Metellus both agreed and had no problems tellin the NY office to fuck off. Ok about the last thing you said i dont know who you are talkin to but thats total bullshit. I wanna crack up after i read that. All i know is if they got rid of miami then AUA would be fuckin themselves over with the next semester comin along. I mean their class is twice the size of ours and the michigan and maryland programs cant hold all those students. I guess the only problem we have been causing down here is with the exam master questions. Most of us are just pickin one answer and stickin with it and doin them in under 5 mins each.

On 10/27/07, **Steve Woodward** <steve_l_woodward@yahoo.com> wrote:
> VJ,
>
> Hey, What's up?  How's the semester and Kaplan treating you?
> Is the hospital helping out with your schedule, so you can spend more time with Kaplan?
>
>
> I heard there was a petition passed around to stop the Friday quizzes.
> Is that true?
>
> I heard Dr Hro. is going to try to get rid of the Miami program, because the students aren't doing what they are told...
> I heard he's going to make examples of a people.
> Have you heard this?
>
>
> Steve

--
VJ Jayaraman
6331 Chickering Woods Drive

**EXHIBIT**    2ᴑ

Nashville, TN 37215
315-372-1000

**Subject:** 5th Semester

**From:** Steve Woodward (steve_l_woodward@yahoo.com)

**To:** VHREHOROVICH@auamed.org;

**Date:** Sunday, October 28, 2007 3:45 PM

Dear Dr. Hrehorovich,

You've called me unprofessional.   You've hindered my education when I'm just trying to do what I was told was a requirement.   I've even tried to give you constructive critisism on this program!

This is what other students, and doctors feel about this program:

School has been a waste of time i feel like. Goin to hospital has been fun some weeks and pointless other weeks. Kaplan is comin along. It has been pretty crazy learning biochem in about a week and now we are doin anatomy and will be starting physio on thursday. Well i dont know what you mean if the hospital has been helpful but when we get sent home after like an hour everyday cuz there is nothin to do in that department then i guess it is beneficial. Yeah we did sign a petition to stop the whole standardizing of programs and now dr. metellus has told calderon that he aint gonna follow their orders and will do his own thing so yeah we dont have those quizzes anymore. But it was more than just the quizzes cuz the school wanted to implement a whole new program like two weeks ago. I mean how on earth does someone try to do that. So in that sense it was unfair and fortunately the Hospital and Metellus both agreed and had no problems tellin the NY office to fuck off. Ok about the last thing you said i dont know who you are talkin to but thats total bullshit. I wanna crack up after i read that. All i know is if they got rid of miami then AUA would be fuckin themselves over with the next semester comin along. I mean their class is twice the size of ours and the michigan and maryland programs cant hold all those students. I guess the only problem we have been causing down here is with the exam master questions. Most of us are just pickin one answer and stickin with it and doin them in under 5 mins each.

Maybe it's not the students?

Steve

**EXHIBIT**    21



# Circuit Court
## County of Oakland

SHALINA KUMAR
CIRCUIT JUDGE

1200 N TELEGRAPH RD DEPT 404
PONTIAC MI 48341-0404

SIXTH JUDICIAL CIRCUIT
OF MICHIGAN
(248) 858-5280
FAX 248-975-9784
kumars@oakgov.com



BY: -------------------

April 29, 2009

Paul J. Nicoletti, Esq.
Nicoletti & Associates
39520 Woodward Ave., Ste. 200
Bloomfield Hills, MI  48304

David B. Gunsberg, Esq.
Law Office of David Gunsberg
322 North Old Woodward Ave.
Birmingham, MI  48009

RE:   **Steven Woodward v Trinity Health-Michigan, et al**
       **Circuit Court Case No.  2007-646-9090**

Dear Counsel:

Enclosed please find the Opinion and Order that was issued by the Honorable
Shalina Kumar with regard to the above referenced matter.

Very truly yours,

*Jenice R. McGruder*

Jenice R. McGruder
Judicial Assistant to the
HONORABLE SHALINA D. KUMAR

**EXHIBIT**     **22**

from AUA who had three years of experience prior to his 5th semester at AUA. Plaintiff was cited for unprofessional conduct and used the word "AUSUCKS" as his master program password.   Plaintiff also used the "F word" in letters and emails to school officials.   In addition, school officials have stated that Plaintiff would "grandstand" and was disruptive during class.   During a review exam, Plaintiff used the answer "B" to all questions in order to complete the exam in 10 minutes.   Previously, on November 2, 2006, Mr. Woodward was placed on non-academic probation for engaging in inappropriate behavior against one of his professors, Dr. Somaraju of AUA.  **(See Exh. 3 - Defendant's Motion for Summary Disposition**).  Mr. Woodward was encouraged to seek counseling for anger management at that time.

Despite the evidence of unprofessional behavior, Plaintiff claims that he was defamed when Defendant, Susan Zonia, PHD, wrote to Dr. Ernesto Calderon of AUA wherein she stated:

> "Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern.   We do not feel that he will be a good ambassador for AUA, our hospital, or the profession he is to enter.  We encourage the faculty at AUA to review his entire record, to determine if he does not meet the qualifications to sit for the boards, and begin clinical rotations."  (Exh. 1 Defendant's motion for summary disposition).

Plaintiff claims that he was dismissed from the AUA medical school program due to this letter and, therefore, this lawsuit followed.

Plaintiff alleges in his complaint that Defendants communicated false statements to AUA about Plaintiff's unprofessional behavior.   Plaintiff also alleges that Defendants, Trinity and Dr. Zonia interfered with his contractual

2




UNIVERSITY
OF ANTIGUA
COLLEGE OF
MEDICINE

*CRLs Greater Caribbean Learning Resources*

NAME OF
MEDICAL
COLLEGE

DEPOSITION
EXHIBIT
8
McCall

SEMESTER V: PRELIMINARY CLINICAL TRAINING
SITE __Pontiac, Michigan__ - FALL 2007
**STUDENT EVALUATION - OUTPATIENT ROTATIO**

| Student's Name: Steven Woodward | Preceptor's Name: Dr. Breitenbach | Dates: From: 10/29/07 — To: 11/30/07 |
|---|---|---|

## 1) PLEASE, RATE THE STUDENT FROM A TO F:

**1.0**
**Attendance: Attended scheduled sessions at your Office**

| **F** | **C** | **B** | **A** |
|---|---|---|---|
| (Missed 3 or more sessions in 6 weeks) | (Missed 2 sessions in 6 weeks) | (Missed 1 session in 6 weeks) | (Attended all scheduled sessions) |

**RATE**
A

## 2) PLEASE, GIVE THE STUDENT A PERCENTAGE SCORE AS FOLLOWS:

| | |
|---|---|
| < 60% | Substandard |
| 60 - <70% | Borderline adequate |
| 70 - <80% | Competent |
| 80 - <90% | Superior |
| 90 - 100% | Outstanding |

**2.1**
**Medical Knowledge:** Demonstrated appropriate **knowledge of basic sciences** and was able to apply it to the clinical situations he/she encountered.

**SCORE** 79

**2.2**
**Attitude:** Displayed initiative and positive disposition to learn, **cooperative and constructive** attitude toward the members of team or Group that he/she was assigned to (As opposite to being negative and conflictive)

**SCORE** 95

**2.3**
**Learning Skills:** Gradually started to **master proper skills** concerning elaboration of clinical history and examination of the different body systems, analyses of the results, and formulation of working diagnosis.

**SCORE** 95

**2.4**
**Communication Skills:** Demonstrates listening skills, interchange medically related information with other members of the team, shows progress in **concisely and effectively** presenting clinical cases both in written and verbal form.

**SCORE** 95

**2.5**
**Professionalism:** a) Demonstrated commitment to professional development and solid ethical principles and sensitivity to patients/family and peer diversity; b) showed compassion, respect and honesty; c) Accepted responsibility for his/her acts.

**SCORE** 95

**EXHIBIT** 23

STUDENT EVALUATION - OUTPATIENT ROTATION

3. - General observations on the student's performance and suggestions for improvement:

*VERY COMPUTER LITERATE*

*EXCELLENT STUDENT.*

4. - Please, fill the following portion for the students rotating at your Office from March 1 through March 29, 2007.

The student has mastered the following skills:

| | |
|---|---|
| < 60% | Substandard |
| 60 - <70% | Borderline adequate |
| 70 - <80% | Competent |
| 80 - <90% | Superior |
| 90 - 100% | Outstanding |

| Skills | Score | Pointed Suggestions for improvement |
|---|---|---|
| A) Elaboration of solid comprehensive clinical history | 80 | |
| B) Elaboration of focused Clinical History | 80 | |
| a) General examination of the eyes | 80 | |
| b) Examination of HENT and Neck | 80 | |
| c) Examination of Chest and Lungs | 80 | |
| d) Examination of Heart and CV System | 80 | |
| e) Examination of Abdomen | 80 | |
| f) Examination of Breast | 80 | NOT DONE THIS OFFICE |
| g) Examination of Female GU System | | |
| h) Examination of Male GU System | 80 | |
| i) Examination of Nervous System | 80 | |
| j) Gross examination of Mental Condition | 80 | |
| k) Examination of Musculoskeletal System | 80 | |
| l) Examination of Skin | 80 | |
| C) Overall skill to perform comprehensive physical examination | 80 | |
| D) Overall Skill to perform focused Physical examination | 80 | |

4. - Evaluation discussed with student:

Preceptor's Signature    11/29/07    Date

Student's Signature    11/29/07    Date

Form DOCS- EVALUATION 05 - 09/01/07 JEC

2

 

AMERICAN
UNIVERSITY
OF ANTIGUA
COLLEGE OF
MEDICINE

KASTURBA
MEDICAL
COLLEGE

*C/O Greater Caribbean Learning Resources*

DEPOSITION
EXHIBIT
9
*McCall*

SEMESTER V: PRELIMINARY CLINICAL TRAINING

## St. Joseph Mercy Oakland Hospital, Pontiac Michigan – Fall 2007

### IN-PATIENT STUDENT EVALUATION - TEAM _____

| Student's Name: **Steven Woodward** | Preceptor's Name: **D. Malloy, M.D.** |
|---|---|

## 1) PLEASE, RATE THE STUDENT FROM A TO F:

| 1.0 **Attendance: Attended academic sessions:** including: a) morning rounds, b) morning case presentations, c) questions/discussion, d) ward rounds, e) morning lectures, f) grand rounds | RATE |
|---|---|
| **F** (Missed 3 or more sessions in 2 weeks)   **C** (Missed 2 sessions in 2 weeks)   **B** (Missed 1 session in 2 weeks)   **A** (Attended all scheduled sessions) | A |

## 2) PLEASE, GIVE THE STUDENT A PERCENTAGE SCORE AS FOLLOWS:

| < 60% | Substandard |
|---|---|
| 60 - <70% | Borderline adequate |
| 70 - <80% | Competent |
| 80 - <90% | Superior |
| 90 - 100% | Outstanding |

| 2.1 **Medical Knowledge:** Demonstrated appropriate **knowledge of basic sciences** and was able to apply it to the clinical situations he/she encountered.. | SCORE 80 |
|---|---|

| 2.2 **Attittude:** Displayed initiative and positive disposition to learn, **cooperative and constructive** attitude toward the members of team or Group that he/she was assigned to (As opposite to being negative and conflictive) | SCORE 90 |
|---|---|

| 2.3 **Learning Skills:** Gradually started to **master proper skills** concerning elaboration of clinical history and examination of the different body systems, analyses of the results, and formulation of working diagnosis. | SCORE 90 |
|---|---|

| 2.4 **Communication Skills:** Demonstrates listening skills, interchange medically related information with other members of the team, shows progress in **concisely and effectively** presenting clinical cases both in written and verbal form. | SCORE 90 |
|---|---|

| 2.5 **Professionalism:** a) Demonstrated commitment to professional development and solid ethical principles and sensitivity to patients/family and peer diversity; b) showed compassion, respect and honesty; c) Accepted responsibility for his/her acts. | SCORE 90 |
|---|---|

FORM DOCS-EVALUATION 015

**EXHIBIT** 24

**2.6**

**Suggestions for Improvement**

Evaluation reviewed with the student:

_____  12/5/01          _____  12/5/07
Preceptor                    Date           Student                     Date

FORM DOCS - EVALUATION.01S

## Page 54

1  transfer request or are you talking about different request?

2  A  **No, that is the transfer request.**

3  Q  You indicate, "He completed his hundred patient log in two

4  weeks and wanted to stop attending the program."  Is it fair

5  for me to assume that that was based on information from one

6  of the course instructors?

7  A  **Correct.  Most students were hard pressed to log a hundred**

8  **cases in 12 weeks.**

9  Q  Did he ever see more than 100 patients?

10  A  **No.  It's not just see a patient.  Like, "Oh, look.  There**

11  **is one.  There is one.  There is one."  He was supposed to**

12  **have substantive contact and know the case and the diagnosis**

13  **and be able to discuss it.  And for someone who has just**

14  **completed two years of basic science to be able to do 100**

15  **cases in two weeks I'm hard pressed having a resident that**

16  **can do 100 cases in two weeks and these are people that are**

17  **already licensed.**

18  Q  Did you ever verify that that was, in fact, true that he

19  completed 100 patient log in two weeks?

20  A  **He walked down a corridor and saw 100 patients.  That's not**

21  **what the intent of that assignment was.**

22  Q  How do you know that, because the instructor told you that?

23  A  **I know it's physically impossible for a student at that**

24  **level to interview 100 patients in two weeks.**

25  Q  Okay.  I think you're not hearing my question.  My question

## Page 55

1  is, did you ever verify that he completed his hundred

2  patient log in two weeks?  I'm not asking you if it is

3  possible.  I'm asking you if you ever verified it.

4  A  **He turned in to Dr. Yanez his log with 100 patients and**

5  **asked if he could now be excused from the course.**

6  Q  In two weeks?

7  A  **In two weeks.**

8  Q  And that's what Dr. Yanez told you?

9  A  **Correct.**

10  Q  But did you ever verify that that was true?

11  A  **I looked at the logs and knew it wasn't possible.**

12  Q  So your answer is, "yes," you did verify it?

13  A  **Yes.**

14  Q  Your memo says "Sabotaging exams by giving the same response

15  to all questions to simply get it over with."  Is that your

16  comment or is that based on something that you were told by

17  one of the instructors?

18  A  **It's what I was told by one of the instructors.  It's what**

19  **the school told me, and it's what Mr. Woodward told me he**

20  **did was because he thinks the exams are a waste of time.**

21  Q  And you specifically used the word "sabotaging."  How was

22  that sabotaging?

23  A  **Because the exams were weighted and so he would change -- by**

24  **not doing well it would change the distribution and so the**

25  **scores he could lower the grades for everybody.**

## Page 56

1  Q  So you're saying by his giving the same response he would

2  receive a lower score than he should, therefore, --

3  A  **Well, it would change the curve and so you could just play**

4  **probabilities and hope that you came out with a high enough**

5  **score.**

6  Q  So it wasn't sabotaging the exam.  It was sabotaging the

7  grades from the exam?

8       MR. GUNSBERG:  Objection; argumentative.

9  Q  Is that right?

10  A  **It's also sabotaging the intent of the exam.  The intent is**

11  **to have a measure the acquisition of information that**

12  **students have been gleaning from their experiences and if**

13  **you don't take it seriously it defeats the purpose of having**

14  **the exam.**

15  Q  Was that a course strategy that was taught by Kaplan as far

16  as if you don't know the answer answer the same question for

17  every question?

18  A  **I really have no knowledge of how Kaplan instructs.**

19  Q  If Kaplan instructs that way would that make a difference?

20  A  **Not to me.**

21  Q  Your memo says "Requesting early release on virtually a

22  daily basis from his clinical rotations so that he could

23  study for the boards, et cetera."  What does the "et cetera"

24  mean?

25  A  **I just got tired of listing what his concerns were.**

## Page 57

1  Q  How do you know that he requested early release on virtually

2  a daily basis?

3  A  **That is some amount of hyperbole, but when you interview,**

4  **when you speak with Dr. Yanez and Deneen McCall it felt like**

5  **it was every day he was asking, "Can I go home now?  Are we**

6  **done?"**

7  Q  So did you just take the liberty to add "virtually a daily

8  basis"?

9  A  **It is hyperbole.**

10  Q  Which means what, in your opinion?

11  A  **It happened very frequently.  It felt like every day.**

12  Q  So none of the course instructors told you that it was on a

13  daily basis?

14  A  **No, they did not.**

15  Q  "We believe that if perceived" —

16  A  **"That if he perceived."**

17  Q  -- "if he perceived the AUA fifth semester curriculum

18  as inappropriate the professional response would have

19  been to engage in a reasoned dialogue with

20  representatives of the school, not argue with the

21  faculty at St. Joe Mercy Oakland or openly demonstrate

22  his contempt for the curriculum and those charged with

23  delivering it."

24  Do you know if he ever tried to engage in a reasoned

25  dialogue with anybody from the school?

EXHIBIT 25

WOODWARD VS TRINITY HEALTH-MICH., ET AL                              DEPOSITION OF JEFFREY YANEZ, M.D.

| Page 34 | Page 36 |
|---|---|

**Page 34**

1  Q     What about the transfer to Miami, what do you know about
2        that?
3  A     He asked me one time again either before class -- you know,
4        sometimes stepped aside and said, "I would like to transfer
5        to Miami because I want to take a Kaplan course." I said,
6        "Steve, it's not my decision. Take it up with AUA. It's
7        their decision." Subsequent I understood -- I don't know
8        where I heard it, but AUA declined his transfer.
9  Q     Did you have anything to do with whether or not he actually
10       achieved his transfer or not?
11 A     No.
12 Q     Did you care one way or another?
13 A     It didn't make a big difference to myself.
14 Q     All right. What about sabotaging exams, did he sabotage
15       exams?
16 A     That was information related to us from AUA. They had their
17       Exam Master that you're familiar with online questions that
18       the university scheduled and it was relayed to us from the
19       university that he was basically answering "B" to all
20       questions just to get them done. The score on the exam
21       didn't matter. They had to complete so many questions in
22       the semester to get credit and rather than actually do the
23       questions he just marked "B" down for all them and, you
24       know, did the three-hour exam in ten minutes.
25 Q     Dr. Zonia testified that the sabotaging exams manifested

**Page 35**

1        itself in throwing off the class curve. So it doesn't sound
2        like that was the case with what you just indicated?
3  A     The Exam Master had a requirement for the number of
4        questions answered. It was a learning tool the university
5        put in place. It didn't affect their final score at all
6        other than they had to do the questions.
7  Q     So how was that sabotaging?
8  A     It did not sabotage the class curve. I'm not sure what she
9        is referring to, but it did not sabotage the class curve.
10 Q     Did it sabotage the exam?
11 A     Which exam?
12 Q     Whichever exam she mentions in her --
13 A     It didn't have any affect on the quizzes that AUA offered.
14       They call them quizzes on this exhibit. So here exam,
15       quizzes, tests, all the same thing. Exam Master was a
16       completely separate entity.
17 Q     You're referring to Exhibit 11?
18 A     Yeah. In Dr. Zonia's defense I'm not sure if she understood
19       the difference between Exam Master and the quizzes. I'm not
20       sure she understood the difference between those two.
21 Q     Are you aware as to whether or not Kaplan teaches as an exam
22       strategy answering the same response to each question if you
23       don't know the answer?
24 A     I am unfamiliar with that.
25 Q     Do you know whether or not Steve Woodward ever voiced his

**Page 36**

1        complaints or concerns to AUA?
2  A     Only indirectly. During our conference calls that we had
3        all of these slight areas we would always say what's going
4        on and I would mention the issues that his name came up and
5        comments from other individuals were, "Oh, we knew Steve
6        from the islands." You know, "He complains about
7        everything." I heard that from other individuals on
8        conference calls, but once again I just kind of went with
9        the flow.
10 Q     And who was it that says he complains about everything?
11 A     The conference calls consisted of myself, the Baltimore, the
12       Miami, the New York office and somebody in Antigua. There
13       were ten people on the phone. I'm not sure.
14 Q     And do you recall who said that he complains about
15       everything?
16 A     I don't remember. There are so many people. This was a
17       year and a half ago.
18 Q     And who did he argue with at St. Joe?
19 A     Arguing is a term. When I talk about my episodes with him
20       he was in a classroom setting. It was a group. And he
21       would voice his frustration or anger, he was voicing it
22       towards AUA, towards the curriculum, towards the
23       administration. So it was, like, an open issues and I was
24       able to reel him in. It just recurred over and over again.
25       So his arguments were over the changes that his university

**Page 37**

1        were implementing. It wasn't with St. Joe's per se.
2  Q     So it sounds to me like you would disagree with the word
3        "arguing" that he was just expressing his concerns in what
4        you deemed to be an inappropriate manner?
5  A     Yes.
6  Q     Did he ever -- did you consider him to lack professionalism?
7  A     For example, when he came to his attending physician
8        requesting to not come in anymore that was about as
9        unprofessional as it gets in the field. It's horrific.
10       Okay. His out-raids and tirades were bad but the other
11       example is very, very inappropriate. You know, asking to
12       transfer to Miami is, you know, not a big deal, but
13       expecting to be relieved from your normal responsibilities
14       because you fulfilled a paper with a list of names is very
15       unprofessional and I don't think anybody that I know would
16       disagree with that.
17 Q     Except for maybe me.
18 A     I don't think any physician would disagree with it.
19           MR. GUNSBERG: You might disagree, but you don't
20       have any qualifications to disagree because you're not a
21       doctor.
22           MR. NICOLETTI: I'm a doctor, so are you.
23           MR. GUNSBERG: Yeah, but not this kind.
24           MR. NICOLETTI: Not this kind.
25 A     I don't think a physician would disagree with that.

# STATE OF MICHIGAN

# COURT OF APPEALS

STEVEN WOODWARD,

        Plaintiff-Appellant,

v

TRINITY HEALTH-MICHIGAN, SUSAN
CATHERINE ZONIA and AMERICAN
UNIVERSITY OF ANTIGUA COLLEGE OF
MEDICINE,

        Defendants-Appellees.

UNPUBLISHED
January 13, 2011

No.  292172
Oakland Circuit Court
LC No.  2007-088103-CZ

Before:  Gleicher, P.J., and Zahra and K.F. Kelly, JJ.

Per Curiam.

Steven Woodward appeals as of right the trial court's grant of summary disposition to Trinity Health-Michigan, Susan Catherine Zonia, and the American University of Antigua College of Medicine (AUA).  We affirm.

Woodward was a medical student in his fifth semester of study at AUA.  As part of the medical school program, AUA placed Woodward in a clinical experience rotation at St. Joseph Mercy Oakland Hospital (SJMO), which is owned and operated by Trinity Health-Michigan (Trinity).  Zonia served as the director of medical education at SJMO, and as a dean for AUA's program at that site.  Zonia's duties included oversight of AUA's fifth semester program at SJMO, and the evaluation of student performance.  This lawsuit arises from a memorandum authored by Zonia and forwarded to Dr. Ernesto Calderon, an AUA administrator, at Calderon's request.   The memorandum described concerns regarding Woodward's demeanor and unprofessional conduct while at SJMO, stating in pertinent part:

> Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern.  We do not feel that he will be a good ambassador for AUA, our hospital, or the profession he is to enter.  We encourage the faculty at AUA to review his entire record, to determine if he does not meet the qualifications to sit for the boards, and begin clinical rotations.

The record documents numerous specific examples of Woodward's inappropriate conduct while at SJMO, including his demonstrated resentment of assignments, his completion of 100 patient logs in a mere two-week period accompanied by an indication that he did not wish

-1-

**EXHIBIT   27**

to participate further in the program, statements that the program constituted a waste of time and that he wished to transfer, "sabotaging exams," use of inappropriate language and passwords in communications with AUA, and general lack of respect and disruptive behavior while in classroom settings. Before participating in the SJMO program, Woodward had been placed on non-academic probation at AUA for unprofessional conduct. Woodward's academic performance was also tenuous, as he maintained only a 1.5 grade-point average. Ultimately, AUA initiated proceedings before its grievance and disciplinary committee, and Woodward was dismissed from the medical school. Despite receiving notice of the hearing and having an option to appeal the grievance and disciplinary committee's dismissal recommendation, Woodward elected to not attend the hearing or to pursue any administrative remedies.

Woodward filed a complaint against AUA, setting forth claims for breach of contract and an unspecified invasion of privacy. Additionally, Woodward's complaint asserted claims against Trinity and Zonia for libel per se, intentional infliction of emotional distress based on the alleged libel, and tortious interference with a contractual relationship. AUA filed a motion for summary disposition pursuant to MCR 2.116(C)(8), contending that Woodward had failed to state a claim on which relief could be granted. The trial court granted AUA's subrule (C)(8) motion, rejecting Woodward's contract claim. The trial court also dismissed Woodward's invasion of privacy claim against AUA, finding that Zonia's memorandum had not been publically published. Although the trial court afforded Woodward an opportunity to amend his complaint, he failed to timely submit an amended complaint to the court, or to serve it.

Following discovery, Zonia and Trinity sought summary disposition in accordance with MCR 2.116(C)(10), contending that no genuine issue of material fact existed concerning any of Woodward's remaining claims. The trial court granted defendants' motion, and Woodward now appeals.

This Court reviews de novo the grant or denial of summary disposition. *Ligon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). A motion brought in accordance with MCR 2.116(C)(8) tests the legal sufficiency of the pleadings, which are considered alone and without any additional evidence. *Johnson-McIntosh v Detroit*, 266 Mich App 318, 322; 701 NW2d 179 (2005); MCR 2.116(G)(5). In contrast, a motion brought in accordance with MCR 2.116(C)(10) tests the factual support for a claim and is to be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *The Healing Place at North Oakland Med Ctr v Allstate Ins Co*, 277 Mich App 51, 56; 744 NW2d 174 (2007). "A genuine issue of material fact exists when the record, after drawing all reasonable inferences in favor of the nonmoving party, leaves open an issue on which reasonable minds could differ." *Id.*

Woodward first contends that because defendants failed to plead affirmative defenses, the trial court erred by granting summary disposition in their favor. We find this argument utterly without merit. Fundamentally, Woodward misapprehends the procedural distinction between motions for summary disposition and the pleading of affirmative defenses. Contrary to his allegations on appeal, the trial court granted summary disposition based on Woodward's failure to state a viable claim against AUA, and the absence of a genuine issue of material fact with regard to the claims pertaining to Trinity and Zonia. The failure of these defendants to plead various affirmative defenses did not shift the burden of proof, and lacked any relevance to the disposition of Woodward's claims. This Court has explained:

Case 2:10-cv-10978-PJD-MJH ECF No. 180-1, PageID.2913 Filed 11/14/11 Page 44 of 50

WOODWARD v. TRINITY HEALTH-MICH., ET AL     DEPOSITION OF SUSAN ZONIA, FH.D.

**Page 42**

1   statement. What was your understanding of that? I mean
2   were you going to write a nice story about Steven Woodward
3   or were you going to write a grievance statement?
4 A   I did neither. I didn't preface it by saying, "I have been
5   requested to do this." I didn't ask for a grievance
6   procedure to be instituted. This memo that I wrote on
7   December 17th is my personal summary of our interactions
8   with Mr. Woodward. The school could do whatever they wanted
9   with it.
10 Q   And did you have anything nice that you thought about Steven
11   Woodward? I mean did he do anything right?
12 A   He didn't hurt children or small animals, to the best of my
13   knowledge, so I have no complaints with regards to that. My
14   personal opinion is that his attitude in the medical
15   education office and in the classroom was not something that
16   I felt particularly comfortable with.
17 Q   Well, but my question was, do you have anything nice to say
18   about your observation of his time in the fifth semester? I
19   mean did he do anything right? Is there anything positive
20   that you have to say?
21 A   No, I don't.
22 Q   So as far as you're concerned he did everything wrong?
23 A   No, that's not what I said at all. I said I'm aware of
24   negative things that he did. I am not aware of positive
25   things that he did. I'm not saying that there weren't any.

**Page 43**

1   I'm not aware of them.
2 Q   Well, did you perform any investigation to determine if
3   there were any positive things that you should have included
4   in your memo?
5   MR. GUNSBERG: Object to the form of the question.
6 Q   You can go ahead and answer.
7 A   No, I didn't.
8 Q   And why didn't you?
9 A   I talked to Deneen. I talked to Jeff. They never had
10   anything positive to say that they brought to light about
11   him. All I heard about Mr. Woodward were negative things.
12 Q   But did you ever ask -- strike that. Is it fair for me to
13   assume that you never asked Deneen or Dr. Yanez if there was
14   anything positive about Mr. Woodward?
15 A   I did not use those words, no.
16 Q   All right. You didn't use those words, but you didn't use
17   that general frame of mind either?
18   MR. GUNSBERG: Is that a question?
19 Q   Is that correct? In other words, you --
20 A   I was looking for something good about Mr. Woodward which is
21   why we waited over a month before I talked -- or a month
22   before I talked to him. I was hoping he would settle down
23   and find a way that he could cope with this 12-week course
24   so that he could move on with his life. That was my
25   sincerest wish. I don't like it when they had problems. I

**Page 44**

1   don't like it. It makes my life more difficult. And I
2   wanted him to find a way to cope with it. He never showed
3   me or my direct reports that he had found a way to just get
4   through this so the only feedback, my only interactions,
5   were negative. I did not go the extra 300 yards to find a
6   positive, that is correct.
7 Q   Now, in terms of the grievance committee meeting that is
8   referenced in Exhibit Number 1, did you participate in the
9   grievance committee meetings?
10 A   No, I did not.
11 Q   But you understood that your memo would be used in that
12   meeting, didn't you?
13   MR. GUNSBERG: Objection to form.
14 A   After the fact, yes, I did, when I went back and read the
15   communications from Dr. Cain and Dr. Calderon.
16 Q   In fact the December 15th email it says that they want
17   a grievance statement or a request for grievance committee
18   hearing so you knew that there was going to be a hearing
19   because it's referenced in the email on December 17th -- or
20   December 15th; is that correct?
21   MR. GUNSBERG: I'll object as it misstates the
22   document.
23 A   There is mention of a grievance proceedings, but I didn't
24   know that it would actually come to fruition. I couldn't
25   possibly know what other documents they had and I did not

**Page 45**

1   request a grievance hearing. I have here my summary of my
2   interactions. It says nothing about requesting grievance or
3   disciplinary action against Mr. Woodward.
4   MR. GUNSBERG: You're referring to the memo of
5   December 17th.
6   THE WITNESS: December 17th.
7 Q   All right. Let's go back to the December 17th memo then.
8   All right. So we have talked about the first sentence,
9   "We have been reviewing our experiences with offering
10   fifth semester for the first time. As with any new
11   program it is not without its hitches and student
12   adjustment issues."
13   What were the hitches and what were the student adjustment
14   issues that you were referencing?
15 A   Some of the student adjustment issues had to do with
16   weather, being on Antigua and then coming to Michigan and
17   dealing with cold. The hours are very different for student
18   rotations. There is a huge difference between taking
19   classes at a university and the physical demands of being on
20   clinical rotations. It starts at 6:30 or 7:00 in the
21   morning and it goes 'til 6:00 o'clock at night. And I don't
22   care if you're tired or if you don't like this patient, they
23   get to be seen. So there was some of that time management
24   issues. Students have a -- many of them -- have a
25   significant challenge with time management. Without its

**EXHIBIT**

28

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

        Plaintiff,

                                 CASE NO.  2011-116369CD

-vs-

                                 HON. JAMES M. ALEXANDER

TRINITY HEALTH MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC, *a domestic
corporation.*

        Defendant.

---

| DEBORAH L. GORDON, PLC | LAW OFFICE OF DAVID B. GUNSBERG |
|---|---|
| **Deborah L. Gordon (P27058)** | **David B. Gunsberg (P24235)** |
| **Carol Laughbaum (P41711)** | Attorney for Defendant |
| Attorneys for Plaintiff | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Suite 275 | Birmingham, Michigan 48009 |
| Bloomfield Hills, Michigan 48304 | Telephone 248 646-9090 |
| Telephone 248 258 2500 | |

---

**BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY DISPOSITION**

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

EXHIBIT  29

1

cursed at work. Not only did no one ever complain about this in any formal way (until solicited by Bignotti and HR), there is no evidence that anyone at the hospital has been disciplined, let alone fired, for an occasional curse or isolated raunchy remark. Nor is anyone fired for expressing their opinions about others. *See* Bignotti 41 (confirming that "*a lot of people*" at the hospital "*make [negative] comments all the time about doctors and administrators,*" people voice their opinions, and no one is fired for that; at most, they may receive a non-disciplinary counseling.)

**F.      Plaintiff is Fired Without Ever Being Questioned About the Allegations Against Her**

Zonia was called into a meeting with Bignotti and HR and summarily fired on Friday, October 1, 2010. Zonia was told the decision was final and not appealable. While HR admits it generally likes to get both sides of the story when conducting an investigation (McNeil 31) this practice was ignored with respect to Plaintiff. **In fact, Zonia was told not to speak at the meeting, and that nothing she could say would change the decision to terminate her.[19] (Zonia, 118)**

While Defendant now asserts that Plaintiff was fired for "violation of policy," her termination paperwork is silent as to which policy she allegedly violated.[20] Defendant's Motion, Exhibit 6.  But Bignotti could not identify any violation of policy in the notes of the investigation of Plaintiff. (Bignotti, 128)[21]  And, while Defendant now apparently claims Plaintiff engaged in a "major infraction" for which immediate termination was appropriate, they are unable to articulate in any credible way what that was. (Bignotti, 127-128)

---

[19]One comment Zonia did manage to get out was. "I guess I confused work relationships with friendships." Zonia was referring to Bignotti and HR (Murphy) who she had considered friends. (Zonia, 117)

[20]Bignotti gave Plaintiff the termination paperwork at their meeting although he doesn't know who wrote it. (Bignotti, 85)

[21]Nor could Bignotti identify a single thing that was the basis for the decision to terminate Plaintiff, from the meeting with McNeil and Murphy in which its alleged that the decision to terminate Plaintiff was made. (Bignotti, 127)

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

American University of A...gua College of Medicine
V Semester - Preliminary Clinical Training
Pontiac Michigan - St Joseph Mercy Oakland

## Final Grades by Component - Fall 2007

| Code | | Attendance 10% | | Prac Session 5% | | Outpatient E 5% | | Verbal Presr 5% | | Portfolio 10% | | Quizzes 35% | | Written Ex 20% | | | Practical Ex 10% | | Final | Final Grade Adjusted | Final |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Score | PT | Score | PT | Score | PT | Score | PT | Score | PT | Scol | PT | Score | Curv | PT | Score | PT | | | |
| 1 | Hampel, Nicola | 92 | 9.2 | 92 | 4.6 | 100 | 5.0 | 100 | 5.0 | 100 | 10.0 | 54 | 18.9 | 77 | 16.2 | 81 | 95 | 9.5 | 78 | C | |
| 2 | Jayadeep, Simbia | 100 | 10.0 | 100 | 5.0 | 80 | 4.0 | 100 | 5.0 | 100 | 10.0 | 57 | 20.1 | 80 | 16.8 | 84 | 95 | 9.5 | 79 | C | (1) |
| 3 | Ozuomba, Michael | 100 | 10.0 | 100 | 5.0 | 83 | 4.2 | 100 | 5.0 | 100 | 10.0 | 56 | 19.6 | 70 | 14.8 | 74 | 80 | 8.0 | 77 | F | (3) |
| 4 | Chheda, Vishal | 75 | 7.5 | 75 | 3.8 | 86 | 4.3 | 100 | 5.0 | 100 | 10.0 | 62 | 21.7 | 86 | 18.0 | 90 | 75 | 7.5 | 76 | C | |
| 5 | Bulat, Elizabeth | 100 | 10.0 | 100 | 5.0 | 96 | 4.8 | 100 | 5.0 | 100 | 10.0 | 70 | 24.4 | 84 | 17.6 | 88 | 85 | 8.5 | 83 | B | |
| 6 | Evans, Lekedra | 100 | 10.0 | 100 | 5.0 | 96 | 4.8 | 100 | 5.0 | 100 | 10.0 | 65 | 22.6 | 73 | 15.4 | 77 | 85 | 8.5 | 83 | C(-) | (1) |
| 7 | Woodward, Steve | 100 | 10.0 | 100 | 5.0 | 95 | 4.8 | 100 | 5.0 | 100 | 10.0 | 62 | 21.6 | 71 | 15.0 | 75 | 80 | 8.0 | 80 | F | (3) |
| 8 | Paras, Chahal | 100 | 10.0 | 100 | 5.0 | 92 | 4.6 | 100 | 5.0 | 100 | 10.0 | 58 | 20.4 | 79 | 16.6 | 83 | 80 | 8.0 | 81 | B | |
| 9 | Hamed, Mousa | 100 | 10.0 | 100 | 5.0 | 100 | 0.0 | 100 | 5.0 | 100 | 10.0 | 70 | 24.4 | 87 | 18.4 | 92 | 93 | 9.3 | 82 | B | (4) |
| 10 | Kristen, Nico | 100 | 10.0 | 100 | 5.0 | 100 | 0.0 | 100 | 5.0 | 100 | 10.0 | 68 | 23.9 | 78 | 16.4 | 82 | 80 | 8.0 | 83 | B | (4) |

(1)   Failed Final Exam. Remedial score 78.  Final Grade: C(-)
       Failed Final Exam. Has not taken remedial
(3)   Failed Final Exam. Did take remedial and failed
       Did not have OP rotation. Toal score / 95
(4)   Did not take OP rotation. Total Score / 95

**EXHIBIT 30**

**Subject:**   test

**From:**   Jeffrey Yanez (YANEZJ@trinity-health.org)

**To:**   steve_l_woodward@yahoo.com;

**Cc:**   MCCALLDY@trinity-health.org; ZONIAS@trinity-health.org;

**Date:**   Monday, December 10, 2007 7:05 AM

Steve,

Due to testing irregularities. AUA will allow you a retake on the Vocabulary section on Tuesday between 3 and 4 PM. Please see Deneen for further details and arrangements. Please note that the test may look different and have new/different content?

You will need a total score of 560 out of 800 questions. 80% (640 questions) less the 10% curve = 560 questions

**EXHIBIT**   31

Scholar360

Home | Profile | Blog | Contacts | Messages
RSS Reader | Calendar
My Classes | All Classes
My Communities | All Communities
My Grades | My Files | Digital Dropbox
Search | Help | Logout

## My Grades

| Item | Date | Available Points | Grade |
|---|---|---|---|
| **AUA Online**<br>Final Grade: 71 | | | |
| Test - Final Exam - Block 4 (Dermatology, Imaging, Gyn, Psychiatry) | 2007-12-06 | 200 | 142 |
| Test - Final Exam - Block 2B (Opthalmology) | 2007-12-06 | 50 | 43 |
| Test - Final Exam - Block 2A (History and Physical Exam) | 2007-12-06 | 50 | 37 |
| Test - Final Exam - Block 2C (Vocabulary) | 2007-12-06 | 100 | 88 |
| Test - Final Exam - Block 3B (Hemopoietic/Lymphopoietic System) | 2007-12-05 | 50 | 21 |
| Test - Final Exam - Block 3A (Cardiovascular) | 2007-12-05 | 100 | 47 |
| Test - Final Exam - Block 3C (GI System) | 2007-12-05 | 50 | 37 |
| Test - Final Exam - Block 1B (ENT) | 2007-12-03 | 100 | 71 |
| Test - Final Exam - Block 1A (Respiratory) | 2007-12-03 | 100 | 82 |

**Total Points Possible: 800**
**Total Points Earned: 568**
**Current Average: 71**

Terms of Service | Help | Support



EXHIBIT   32

COPY

DANIEL M. HORRIGAN

2009 MAR -3  PM 1: 14

SUMMIT COUNTY
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO

INDICTMENT TYPE: SECRET

CASE NO. 2009-02-0562A,B,C,D,E

INDICTMENT FOR:  A,B) KIDNAPPING (1) 2905.01(B)(1) F-1;

A,B,C,D) CONSPIRACY TO COMMIT KIDNAPPING (1) 2905.01(B)(1)/2923.01 F-2;

A,B,C,D,E) ABDUCTION (1) 2905.02(A)(1) F-3; AGGRAVATED RIOT (1) 2917.02(A)(1)
F-5; RIOT (1) 2917.03(B) M-1;

A,B) UNLAWFUL RESTRAINT (1) 2905.03 M-3;

C) NEGLIGENT ASSAULT (1) 2903.14 M-3

In the Common Pleas Court of Summit County, Ohio, of the term of JANUARY in the year
of our Lord, Two Thousand and Nine.

The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County
aforesaid, being duly impaneled and sworn and charged to inquire of and present all
offenses whatever committed within the limits of said County, on their oaths, IN THE
NAME AND BY THE AUTHORITY OF THE STATE OF OHIO,

### COUNT ONE

DO FIND AND PRESENT That **A) SHARON ROTHSTEIN-STEINBERG and B) DAVID
STEINBERG** on or about the 24th day of February, 2008, in the County of Summit and
State of Ohio, aforesaid, did commit the crime of **KIDNAPPING** in that they did, by any
means, remove Lawrence Rothstein, a person mentally incompetent, from the place where
found under circumstances that created a substantial risk of serious physical harm to
Lawrence Rothstein, in violation of Section 2905.01(B)(1) of the Ohio Revised Code, A
FELONY OF THE FIRST DEGREE, contrary to the form of the statute in such case made
and provided and against the peace and dignity of the State of Ohio.

**EXHIBIT**     **33**