UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE,

        Plaintiff,

v.                                                                         Case No. 10-10978
                                                                           Honorable Patrick J. Duggan

STEVEN L. WOODWARD,

        Defendant.

_____/

## OPINION

On March 11, 2010, Plaintiff American University of Antigua College of Medicine

("AUA") filed this lawsuit against Defendant Steven L. Woodward ("Woodward"),

seeking to quiet his complaints about AUA and shut down his internet website with the

domain name www.aua-med.com where many of his complaints are being published.

AUA alleges the following claims against Woodward in its Complaint: (I) trademark

infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (II) infringement under

the Anticybersquatting Consumer Protection Act of 1999 ("ACPA"), 15 U.S.C.

§ 1125(d); (III) violation of the Family Educational Rights and Privacy Act of 1974, 20

U.S.C. § 1232g; and (IV) defamation in violation of Michigan law.  AUA seeks a

permanent injunction prohibiting Woodward from publishing, on his website or by any

other means or medium, defamatory content or AUA proprietary information (including

student academic records other than his own).  AUA also asks the Court to order

Woodward to forfeit the domain names he has registered using "AUA" and to award

damages.

Presently before the Court is AUA's motion for summary judgment with respect to Counts I, II, and IV of its Complaint, filed pursuant to Federal Rule of Civil Procedure 56 on April 29, 2011.[1]  The motion has been fully briefed and the Court held a motion hearing on September 20, 2011.

### Factual and Procedural Background

AUA is a medical school located in Antigua which caters, in part, to students from the United States.  AUA maintains a website with the domain name: www.auamed.org. Woodward is a former student of the medical school who was discharged without completion of his degree.  Woodward filed a lawsuit against AUA and others regarding his discharge in Michigan state court, but was unsuccessful.  *See Woodward v. Trinity Health Michigan, et al.*, No. 292172, 2011 WL 118812 (Mich. Ct. App. Jan. 13, 2011) (unpublished opinion) (Pl.'s Mot. Ex. A). He started the aua-med.com website apparently to express his dissatisfaction with AUA and his belief that AUA engages in various forms of wrongful conduct and misrepresents the safety of the island on which it is located and its students' passage rates on the United States Medical Licensing Examination

---

[1]AUA does not seek summary judgment based on Count III of its Complaint, alleging a violation of the Family Educational Rights & Privacy Act of 1974.  As this Court indicated to AUA's counsel at the hearing on AUA's first preliminary injunction motion, the Court does not believe that the statute creates a private cause of action.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 287, 122 S. Ct. 2268 (2002). The Court therefore is entering summary judgment for Woodward pursuant to Federal Rule of Civil Procedure 56(f) with respect to this claim.

2

("USMLE").

Contending that Woodward's website threatens injury to its reputation, AUA filed the instant lawsuit along with a motion for preliminary injunction. That motion was resolved by agreement at a hearing on April 19, 2010, in light of Woodward's impending departure from the country due to an employment opportunity. This agreement required Woodward to *inter alia* modify his website to reflect on the main page that it is "under maintenance" or "under construction" and to rename the index file to prevent anyone from automatically going into the directory and bringing up its contents. Woodward also agreed to mark videos about AUA that he posted on YouTube "private" so they would not be accessible to anyone but himself.

According to AUA, in mid-July 2010, after Woodward returned to the country, he republished the contents of his website without first seeking and obtaining leave of the Court. AUA therefore filed a renewed motion for preliminary injunction on November 1, 2010. AUA sought injunctive relief based on its defamation claim, only. In an opinion and order issued December 16, 2010, this Court denied AUA's motion.

The Court did not make a finding with regard to AUA's likelihood of success on its defamation claim, but denied injunctive relief based on that claim due to "the First Amendment's 'heavy presumption' against prior restraints" and "'nearly two centuries of widespread acceptance at common law . . . that equity will not enjoin a defamation.'" (Doc. 72 at 6 (citing *Kramer v. Thompson*, 947 F.2d 666, 677-78 (3d Cir. 1991)); *see also Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir. 1990) (quoting *Cmty. for*

3

*Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987) ("'The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'")) Although recognizing an exception prohibiting a defendant "'from continuing and reiterating the same libelous and defamatory charges' found to be false and libelous," the Court concluded that the exception is inapplicable where there has been no final determination that the statements to be enjoined are false and libelous. (Doc. 72 at 6.)

On November 8, 2010, shortly after filing its renewed motion for preliminary injunction, AUA sent Woodward requests for admissions. (Pl.'s Mot. Ex. D.) Pursuant to Federal Rule of Civil Procedure 36(a)(3), Woodward was required to answer the admissions within thirty (30) days or by December 8, 2010, or the matters would be deemed admitted. Woodward did not timely answer; however, he apparently served late responses to AUA's requests "at his reconvened deposition" which the Court gleans to have been in March 2011. (*See id*. at 3 and n.2.) Neither party has provided the Court with a copy of Woodward's responses.

On December 27, 2010, Woodward filed a motion seeking the appointment of a pro bono attorney to assist him in defending against AUA's lawsuit. This Court referred the motion to Magistrate Judge Michael Hluchaniuk. On January 5, 2011, Magistrate Judge Hluchaniuk conditionally granted the motion based on the ability to obtain counsel willing to represent Woodward within ninety days.

While that search ensued, AUA filed its pending motion for summary judgment,

4

relying in large part on Woodward's failure to timely answer its request for admissions. Woodward filed a response to the motion on May 19, 2011; AUA filed a reply brief on June 3, 2011. This Court delayed addressing AUA's motion for summary judgment, however, while the search for an attorney to represent Woodward was pending. The Court eventually identified and appointed counsel to represent Woodward on July 14, 2011; however, for reasons not relevant to the pending motion, Woodward asked the Court to withdraw the assignment. Woodward therefore is proceeding pro se in this matter.

### Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine

issue for trial.'"  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine

issue, the nonmoving party must present sufficient evidence upon which a jury could

reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*,

477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's

evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255,

106 S. Ct. at 2513.

The Sixth Circuit has indicated that special or preferential treatment should not be

granted to pro se parties, including when reviewing their responses to summary judgment

motions.  *West v. Adecco Employment Agency*, 124 Fed. App'x 991, 992 (6th Cir. 2005)

(citing *Brock v. Hendershott*, 840 F.2d 339, 343 (6th Cir.1988)).  Nevertheless, the Sixth

Circuit recognized in *West* that courts have utilized a less stringent standard in construing

the pleadings of a pro se litigant and indicated that "[t]his approach is consistent with

[Federal Rule of Civil Procedure] 8(f), which provides that '[a]ll pleadings shall be so

construed as to do substantial justice.'"  *Id*. at 992-93.

## Applicable Law and Analysis

Plaintiff seeks summary judgment based on its defamation, Lanham Act, and Anti-Cybersquatting Consumer Protection Act claims.

### Lanham Act

The Lanham Act imposes liability for infringement of trademarks on:

(1) Any person who shall, without the consent of the registrant–

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, . . .

15 U.S.C. § 1114.  As the plain reading of the statute indicates, the Lanham Act only regulates the use of an infringing mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services."  *Id*.  Without this limitation on the breadth of activity covered, the statute would be unconstitutional.  *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003).

As the Sixth Circuit stated in *Taubman*: "The Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment."  *Id*. (citing *Central Hudson Gas & Elec. Corp. v. Public*

7

*Serv. Comm'n of New York*, 447 U.S. 557, 563, 100 S. Ct. 2343 (1980)).  The Tenth,

First, and Ninth Circuits have commented that ". . . trademark rights cannot be used 'to

quash an unauthorized use of the mark by another who is communicating ideas or

expressing points of view.'"  *Utah Lighthouse Ministry v. Found. for Apologetic Info. and*

*Research*, 527 F.3d 1045, 1052-53 (10th Cir. 2008) (quoting *Bosley Med. Inst. v. Kremer*,

403 F.3d 672, 675 (9th Cir. 2005) and *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d

26, 29 (1st Cir. 1987)).  Thus the threshold question in evaluating AUA's trademark

infringement claim is whether Woodward's use of its mark is commercial.  This is a

question that AUA has not satisfactorily addressed.

AUA states in its brief in support of its motion for summary judgment:

> Here Plaintiff is indisputably involved in commerce by virtue of its
> providing medical education services.  As such, the trademark statute
> applies since Defendant's actions are "in connection with . . . services" in
> that he seeks to curtail the services that Plaintiff provides.

(Pl.'s Br. in Supp. of Mot. at 9.)  *Taubman* instructs, however, that Woodward's use does

not fall under the Lanham Act's jurisdiction unless *his* use is commercial.  Woodward is

not selling, distributing, or advertising any goods or services on his website and the

website does not contain links to any commercial sites.[2]  The Lanham Act therefore

---

[2]Moreover, the Lanham Act is violated only if Woodward's use of AUA's mark also creates a likelihood of confusion.  *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) ("Generally speaking, the key question in cases where a plaintiff alleges trademark infringement . . . is whether the defendant's action creates a likelihood of confusion as to the origin of the parties' goods or services."))  The homepage of

(continued...)

8

cannot be properly invoked in this case.

AUA accordingly is not entitled to summary judgment based on its Lanham Act claim (Count I). Furthermore, the Court concludes that summary judgment for Woodward pursuant to Federal Rule of Civil Procedure 56(f) is appropriate with respect to this claim.

## AntiCybersquatting Consumer Protection Act ("ACPA")

The ACPA provides, in pertinent part:

A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person

(i) has a bad faith *intent to profit from* that mark . . . and

(ii) registers, traffics in, or uses a domain name that–

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d) (emphasis added). "Congress enacted [the ACPA] . . . to address 'a

---

[2](...continued)
Woodward's website includes a disclaimer that it is not the official website of AUA. Further, the website is unmistakably a forum for Woodward to criticize AUA. Under these circumstances, there could be no confusion. *See Taubman*, 319 F.3d at 776-78; *see also Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619 (6th Cir. 1996) (finding the existence of a disclaimer informative when finding no likelihood of confusion).

9

new form of piracy on the Internet caused by acts of 'cybersquatting,' which refers to the

deliberate, bad-faith, and abusive registration of Internet domain names in violation of the

rights of trademark owners.'" *Utah Lighthouse Ministry*, 527 F.2d at 1057 (quoting

S.Rep. No. 106-140, at 4 (1999)).  As courts have further described, "'cybersquatting'

occurs when a person other than the trademark holder registers the domain name of a well

known trademark and then attempts to profit from this by either ransoming the domain

name back to the trademark holder or by using the domain name to divert business from

the trademark holder to the domain name holder." *DaimlerChrysler v. The Net Inc.*, 388

F.3d 201, 204 (6th Cir. 2004) (citing *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,

202 F.3d 489 493 (2d Cir. 2000)).

> To prevail on a claim under the ACPA, a plaintiff must demonstrate the following:

> (1) it has a valid trademark entitled to protection; (2) its mark is distinctive
> or famous; (3) the defendant's domain name is identical or confusingly
> similar to, or in the case of famous marks, dilutive of, the owner's mark;
> and (4) the defendant used, registered, or trafficked in the domain name (5)
> with a bad faith intent to profit.

*Id*. (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003)).  The last

element does not simply require a finding of bad faith, as AUA postures in its pending

motion, but "a bad faith *intent to profit*."

> The ACPA identifies nine factors a court may consider in determining whether the

defendant has a bad faith intent to profit:

> (I) the trademark or other intellectual property rights of the person, if any,
> in the domain name;

10

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B).  "These factors are not considered exclusive or mandatory."

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 369 (D.N.J. 2004) (citing

11

*Morrison & Foerster LLP v. Wick*, 94 F. Supp. 2d 1125, 1131 (D. Colo. 2000) and

*Sporty's Farm LLC*, 202 F.3d at 498).  Moreover, as the Sixth Circuit warned in *Lucas*

*Nursery and Landscaping, Inc. v. Grosse*, a reviewing court must evaluate the relevance

of these factors in light of the statute's intended purpose:

> The role of the reviewing court is not simply to add factors and place them
> in particular categories, without making some sense of what motivates the
> conduct at issue. The factors are given to courts as a guide, not as a
> substitute for careful thinking about whether the conduct at issue is
> motivated by a bad faith intent to profit.

359 F.3d 806, 811 (6th Cir. 2004).

Similar to the present case, the defendant in *Lucas Nursery* registered the domain

name "lucasnursery.com" to complain about the plaintiff's company, which the defendant

believed provided her unsatisfactory services.  Despite the fact that several factors

weighed against the defendant, the Sixth Circuit held that the ACPA is not violated when

a defendant creates a website, using the plaintiff's trademark as the domain name, solely

to critique the plaintiff's goods or services.  *Lucas Nursery*, 359 F.3d at 809-11.  The

court reasoned that "[t]he paradigmatic harm that the ACPA was enacted to eradicate– the

practice of cybersquatters registering several hundred domain names in an effort to sell

them to the legitimate owners of the mark– [was] simply not present in any of [the

defendant's] actions."  *Id*. at 810.  The court continued:

>  Perhaps most important to our conclusion are, [the defendant's] actions,
> which seem to have been undertaken in the spirit of informing fellow
> consumers about the practices of a landscaping company that she believed
> had performed inferior work on her yard. One of the ACPA's main
> objectives is the protection of consumers from slick internet peddlers who

12

> trade on the names and reputations of established brands. The practice of
> informing fellow consumers of one's experience with a particular service
> provider is surely not inconsistent with this ideal.

*Id*. at 811. Other courts have reached the identical conclusion: that registering a website

with a domain name identical to or confusingly similar to the plaintiff's for the sole

purpose of "cyber-griping" is not the type of activity made illegal by the ACPA. *See*

*Mayflower Transit*, 314 F. Supp. 2d at 369 (cases cited therein); *Utah Lighthouse*

*Ministry*, 527 F.3d at 1058 (cases cited therein).

In the present matter, Woodward, according to AUA, is a disgruntled former

medical student seeking revenge for his discharge from AUA's medical program.  There

is no evidence that he is seeking to profit from his use of the aua-med.com website,

specifically that he ever attempted to sell the domain name to AUA or anyone else or that

his website advertises or provides links to any goods or services. Instead, the evidence

indicates that Woodward created the website exclusively as a means of expressing his

anger and dissatisfaction with AUA and its medical program.  Therefore, there is no

evidence supporting a finding that Woodward's conduct violates the ACPA.

AUA accordingly is not entitled to summary judgment based on its ACPA claim

(Count II).  Furthermore, the Court concludes that summary judgment for Woodward

pursuant to Federal Rule of Civil Procedure 56(f) is appropriate with respect to this claim.

**Defamation**

**Establishing Defamation**

To establish a claim for defamation under Michigan law, a plaintiff must show the

13

following: "(1) a false and defamatory statement concerning [the] plaintiff; (2) an

unprivileged publication to a third party; (3) fault amounting at least to negligence on the

part of the publisher; and (4) either actionability of the statement irrespective of special

harm (defamation per se) or the existence of special harm caused by the publication

(defamation per quod)." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 217 (6th Cir. 1994)

(quoting *New Franklin Enters. v. Sabo*, 192 Mich. App. 219, 221, 480 N.W.2d 326, 328

(1991)).  Under Michigan law, "[a] communication is defamatory if, considering all the

circumstances, it tends to so harm the reputation of an individual as to lower that

individual's reputation in the community or deter third persons from association or

dealing with that individual."  *Kevorkian v. Am. Medical Ass'n*, 237 Mich. App. 1, 5, 602

N.W.2d 233, 236 (1999) (citing *Ireland v. Edwards*, 230 Mich. App. 607, 614, 584

N.W.2d 632, 636 (1998)).

     The burden of proving falsity varies depending on the status of the plaintiff and the

subject-matter of the statement.  "Where the alleged defamation concerns both a private

figure and a matter of private concern, the burden of proving that the statement was *not*

false rests with the defendant.  However, where the statements are of public concern, the

private-figure plaintiff bears the burden of proving falsity."[3] *J & J Constr. Co. v.*

---

     [3]As to when speech involves a matter of public concern, the Supreme Court
recently provided:

          Although the boundaries of what constitutes speech on matters of public
          concern are not well defined, this Court has said that speech is of public

                                                                    (continued...)

14

*Bricklayers & Allied Craftsmen, Local 1*, 468 Mich. 722, 732 n.11, 664 N.W.2d 728, 734

n.11 (2003) (citing *Rouch v. Enquirer & News of Battle Creek*, 427 Mich. 157, 181, 398

N.W.2d 245 (1986), citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.

Ct. 1558 (1986)).  The plaintiff's status has some implication with respect to the element

of fault, as well.  A private party plaintiff, regardless of whether the statement is one of

public or private concern, need only show negligence and is "not required to show malice

on the part of the defendant."  *Rouch*, 427 Mich. at 202-03, 398 N.W.2d at 265.  Whereas

for public figures[4], the plaintiff must prove that the defendant acted with "actual malice,"

which requires knowledge or reckless disregard for the falsity of the statement.  *New York

Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726 (1964).

### Protection of Free Expression

The Supreme Court has provided an overview of the development of defamation

---

[3](...continued)
concern when it can be fairly considered as relating to any matter of
political, social, or other concern to the community, . . . or when it is a
subject of general interest and of value and concern to the public . . .. A
statement's arguably inappropriate or controversial character . . . is
irrelevant to the question whether it deals with a matter of public concern.

*Snyder v. Phelps*, – U.S. – , 131 S. Ct. 1207, 1211 (2011) (internal quotation marks and
citations omitted).


[4]Pursuant to Supreme Court precedent, public figures include "[t]hose who, by
reason of the notoriety of their achievements or the vigor and success with which they
seek the public's attention, are properly classed as public figures and those who hold
governmental office." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997,
3008 (1974).

15

law from a strict liability offense to one with certain exceptions due to First Amendment

concerns:

> As the common law developed in this country, apart from the issue of
> damages, one usually needed only allege an unprivileged publication of
> false and defamatory matter to state a cause of action for defamation . . .
> However, due to concerns that unduly burdensome defamation laws could
> stifle valuable public debate, the privilege of "fair comment" was
> incorporated into the common law as an affirmative defense to an action for
> defamation. The principle of "fair comment" afforded legal immunity for
> the honest expression of opinion on matters of legitimate public interest
> when based upon a true or privileged statement of fact. . . . [C]omment was
> generally privileged when it concerned a matter of public concern, was
> upon true or privileged facts, represented the actual opinion of the speaker,
> and was not made solely for the purpose of causing harm.

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12-14, 110 S. Ct. 2695, 2702-2703 (1990)

(citations and quotation marks omitted). Over the years, protection of free expression has

led the Court to expand on the categories of speech not actionable under state defamation

law. *Id.* at 14, 110 S. Ct. at 2703 (citation omitted).

In *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, the Court held

that, under the circumstances, a newspaper's reporting that some people had characterized

a developer's negotiating position with the city as "blackmail" was not slander or libel.[5]

398 U.S. 6, 90 S. Ct. 1537 (1970). The Court reasoned that "even the most careless

reader must have perceived that the word was no more than rhetorical hyperbole, a

---

[5]In *Bresler*, a real estate developer engaged in negotiations with a local city council for a
zoning variance on certain of his land, while simultaneously negotiating with the city on other
land the city wished to purchase from him. A local newspaper published articles stating that
some people had characterized the developer's negotiating position as "blackmail," and the
developer sued for libel.

vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id*. at 13-14, 90 S. Ct. at 1541-42. The Michigan Court of Appeals subsequently described such non-actionable statements, "certain statements, although factual on their face, and provable as false, could not be interpreted by a reasonable listener or reader as stating actual facts about the plaintiff." *Ireland*, 230 Mich. App. at 617, 584 N.W.2d at 638. The Michigan court has noted further that "exaggerated language used to express opinion, such as 'blackmailer, 'traitor' or 'crook,' does not become actionable merely because it could be taken out of context as accusing someone of a crime." *Kevorkian*, 237 Mich. App. at 8, 602 N.W.2d at 237 (citing *Hodgins v. Times Herald Co.*, 169 Mich. App. 245, 254, 425 N.W.2d 522 (1988)).

Based on this same reasoning, the Supreme Court has found parodies, political cartoons, and satires generally entitled to First Amendment protection and non-actionable. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S. Ct. 876 (1988). And in *Ireland*, the Michigan Court of Appeals concluded that the statement that Ireland "never" spent time with her child, although patently false, was an obvious expression of disapproval of the amount of time she did spend with the child. 230 Mich. App. at 618-19, 584 N.W.2d at 638. The *Ireland* court provided another example of a non-actionable statement:

> There is no dispute that Maranda [Ireland's child] suffered a fractured arm or wrist while under [Ireland's] supervision at the playground. Thus, the falsity of the statement that "Maranda suffered a fractured arm because of Ireland's neglect" is disputed only with regard to whether the fall was due to neglect. However this question, like the question of whether someone is

17

a fit mother, or whether someone is abysmally ignorant, can only be
answered subjectively.  We conclude that this portion of the statement is not
provable as false and, thus, that it is protected opinion.

*Id*. at 620, 584 N.W.2d at 639.

The Supreme Court, however, has rejected "a wholesale defamation exemption for
anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18, 110 S. Ct. at 2705.
Instead, the Court advised, the determination of whether a statement is actionable rests
upon whether it is "provable as false." *Id*. at 18-19, 110 S. Ct. at 2705-06.  "By way of
example, the Court suggested that the statement 'In my opinion Mayor Jones is a liar"
would be potentially actionable, while the statement "In my opinion Mayor Jones shows
his abysmal ignorance by accepting the teachings of Marx and Lenin" would not be
actionable." *Ireland*, 230 Mich. App. at 616, 584 N.W.2d at 637 (citing *Milkovich*, 497
U.S. at 20, 110 S. Ct. at 2706).  "[T]hese examples illustrate the difference between an
objectively verifiable event, such as lying, and a subjective assertion, like "shows his
abysmal ignorance . . ." *Id*. (citing *Milkovich*, 497 U.S. at 21-22, 110 S. Ct. at 2707).

Finally, the Michigan courts have held that "[l]anguage that accuses or strongly
implies that someone is involved in illegal conduct crosses the line dividing strongly
worded opinion from accusation of a crime," and such an accusation is "defamatory per
se, meaning that special harm need not be proved." *Kevorkian*, 237 Mich. App. at 8, 602
N.W.2d at 237 (citations omitted).  Under the circumstances in *Kevorkian*, however, the
court indicated that "[a] statement that [the] plaintiff is a murderer" falls into the category
of statements that may be necessarily subjective and also objectively verifiable and

18

therefore not actionable.  *Id*. at 6, 602 N.W.2d at 236.  Thus the Michigan court

"decline[d] . . . to hold as a matter of law that all accusations of criminal activity are

automatically defamatory . . ."  *Id*. at 13, 602 N.W.2d at 239.

The Court now will analyze Woodward's purported defamatory statements based

on the above precedent.  The Court first will analyze whether the statements are

actionable.  Only as to any actionable statement will the Court determine whether AUA

establishes the necessary elements of its defamation claim.

**Analyzing the Statements at Issue**

AUA provides the following examples of Woodward's alleged defamatory

statements on his website, and relies on these statements in its pending motion to prove its

defamation claim:[6]

14.　　AUA routinely commits fraud upon its students;
15.　　AUA falsifies its students' grades;
16.　　AUA breaches contracts;
17.　　AUA disregards student civil rights;
18.　　AUA conspires against its students;
19.　　AUA engages in unethical practices;
20.　　AUA has "malicious intensions" [sic];
21.　　AUA administration and academic advisors are of a "heinous nature";
22.　　AUA students are sexually assaulted;
23.　　AUA professors teach students wrong information;
24.　　AUA conspires to commit fraud and violations of civil rights;
25.　　AUA commits criminal activities reportable to the FBI;
28.　　AUA's student pass rate for USMLE medical board exams is only

---

[6]The Court is numbering the statements to correspond with the numbers in AUA's request for admissions, where Woodward is asked to admit that he published the statements.  (*See* Pl.'s Mot. Ex. D.)

|  | 22.9%; |
| 29. | AUA contrives false evidence in student disciplinary proceedings; |
| 30. | AUA colluded with St. Joseph Hospital to maliciously end [Woodward's] career; |
| 31. | AUA's agents and employees engaged in a conspiracy; |
| 32. | AUA abused its power; |
| 33. | AUA committed perjury; |
| 34. | AUA is otherwise immoral and unethical; |
| 35. | AUA's agents are liars; and |
| 36. | Antigua is full of "rape, murder, fraud, and government corruption" and that therefore AUA is an unsafe place. |

(Pl.'s Mot. Ex. D [Requests for Admission].)

In the request for admissions that AUA directed to Woodward on November 8, 2010, AUA asked Woodward to admit that (1) he published the above statements; (2) they are intended to be factual; (3) they are false; and, (4) he knew they were false when they were published.  (*Id.*)  Because Woodward failed to timely answer AUA's request for admissions, AUA contends that the requests are deemed admitted and it, therefore has satisfied the corresponding elements of its defamation claim. To the extent any statement requires a showing of damages, AUA further provides an affidavit from its president stating: "AUA has suffered damages stemming from the Defendant's publication of his website www.aua-med.com."  (Pl.'s Mot. Ex. H; Doc. 171 ¶ 10.)

As briefly mentioned earlier, under the Federal Rules of Civil Procedure, a request for admissions that is not responded to within the applicable time period "is conclusively established unless the court on motion permits withdrawal or amendment of the admission."  Fed. R. Civ. P. 36(b).  Woodward has not filed a motion asking the Court to withdraw his admissions.  Pursuant to Rule 36(b), "the court may permit withdrawal or

amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." *Id.* Although Woodward has not filed a motion asking the Court to withdraw or amend his admissions, he has attempted to demonstrate in his pleadings and at hearings before the Court that his alleged defamatory statements are not false. Moreover, at hearings before the Court, he also has argued that the matters should not be deemed admitted because he eventually did respond to the request for admissions.[7] The Sixth Circuit Court of Appeals has upheld a district court's determination that "statements made by defense counsel at oral argument were equivalent to a motion to withdraw or amend." *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 154 (6th Cir. 1997). The court expressed a "reluctan[ce] to assign talismanic significance to the attorney's failure to use the phrase 'I move.'" *Id.*

"A 'district court has considerable discretion over whether to permit withdrawal or amendment of admissions.'" *Id.* at 154 (quoting *Am. Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke, P.C.*, 930 F.2d 1117, 1119 (5th Cir. 1991)). In exercising its discretion, however, the Court must follow Rule 36(b)'s instruction that withdrawal or amendment if proper only if (1) "it would promote the presentation of the merits of the action" and (2) it would not cause prejudice to the party who requested the admissions "in maintaining or

---

[7]To the Court's recollection, AUA has never argued that Woodward's untimely responses were inadequate. As the Court has never been presented with a copy of his responses, it cannot say that they were insufficient.

defending the action on the merits." Fed. R. Civ. P. 36(b). "Prejudice under Rule 36(b) . . . 'relates to special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission.'" *Kerry Steel*, 106 F.3d at 154 (quoting *AAA Legal Clinic of Jefferson Crooke*, 930 F.2d at 1120).

This Court believes that allowing Woodward to withdraw his admissions would not promote the presentation of the merits of the action and would prejudice AUA. As indicated below, many of the statements that AUA seeks to enjoin are not actionable. As to those statements that are actionable, Woodward is barred by the doctrine of collateral estoppel or res judicata from challenging whether they are false and/or his evidence fails to demonstrate that the statements are true.

The Court finds that the following alleged defamatory statements constitute subjective assertions that, under the circumstances, could not reasonably be interpreted as stating actual facts about AUA:

17.    AUA disregards student civil rights.
18.    AUA conspires against its students.
19.    AUA engages in unethical practices.
20.    AUA has "malicious intensions [sic]."
21.    AUA administration and academic advisors are of a "heinous nature."
23.    AUA professors teach students wrong information.[8]
29.    AUA contrives false evidence in student disciplinary proceedings.

---

[8]This statement on one hand is verifiable because the word "wrong" implies that the information that should be taught could be determined. The term, however, also is used to express disapproval or inappropriateness of the information taught, which is an expression of personal opinion that is not capable of objective verification.

22

31.    AUA's agents and employees engaged in a conspiracy.[9]
32.    AUA abused its power.
34.    AUA is otherwise immoral or unethical.
35.    AUA's agents are liars.[10]

Woodward no longer states on his website that "AUA student<u>s</u> are sexually assaulted" (*see* Request for Admissions No. 22 (emphasis added)); instead, he asserts: "AUA student sexually assaulted."  *See* http://aua-med.com.  Woodward presents evidence to show that this is a true statement.  Similarly, Woodward no longer states that "AUA's student pass rate for USMLE medical board exams is only 22.9%." (Request for Admissions No. 28.)  Instead Woodward states that "*Antigua* only has a 22.9% USMLE Pass Rate!"  *See id*. (emphasis added).  "A preliminary injunction is proper only to prevent an on-going violation."[11]  *Taubman Co.*, 319 F.3d at 775 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30, 64 S. Ct. 587 (1944)).

Woodward's statement that "Antigua is full of 'rape, murder, fraud, and government corruption' and that therefore AUA is an unsafe place" (Request for Admission No. 36), constitutes an objectively verifiable (the first clause) and subjective (the second clause) assertion.[12]  Woodward's statement about the level of crime on

---

[9]As the statement is vague as to what AUA conspired to achieve, it is not objectively verifiable.

[10]Unlike the example in *Milkovich*, Woodward's statement does not refer to any specific AUA agent and thus the Court does not find the statement objectively verifiable.

[11]Moreover, neither statement as now published is "concerning the plaintiff."

[12]The Court believes, however, that the inclusion of "full of" may convert the first
(continued...)

23

Antigua, however, is not "concerning the plaintiff."  Moreover, Woodward presents

evidence indicating that there *is* significant rape, murder, fraud, and government

corruption on Antigua.[13]

This leaves the following alleged defamatory statements:

14.    AUA routinely commits fraud upon its students.
15.    AUA falsifies its students' grades.
16.    AUA breaches contracts.
24.    AUA conspires to commit fraud and violations of civil rights.
25.    AUA commits criminal activities reportable to the FBI.
30.    AUA colluded with St. Joseph Hospital to maliciously end
       [Woodward's] career.
33.    AUA committed perjury.

These statements concern AUA.  It matters not whether these statements relate to matters

of "public concern," as AUA demonstrates that they are false based upon Woodward's

admissions and/or the Michigan Court of Appeals' decision in the case Woodward filed

in state court.  (*See* Pl.'s Mot. Ex. D.)  As a further result of Woodward's admissions,

AUA demonstrates that Woodward made an unprivileged publication of the statements.

(*See id.*; *see also* Pl.'s Mot. Ex. A.)  AUA, however, still must show "actionability of the

statement[s] irrespective of special harm . . . or the existence of special harm caused by

---

[12](...continued)
portion of the statement also to a subjective assertion.

[13]The Michigan courts have held that substantial truth is an absolute defense to a defamation claim.  *Collins v. Detroit Free Press, Inc.*, 245 Mich. App. 27, 33, 627 N.W.2d 5 (2001).  "To avoid liability, it is not necessary for '[the] defendants to prove that publication is literally and absolutely accurate in every minute detail."  *Id.* (quoting *Rouch*, 440 Mich. at 258).

the publication . . ."  *Kevorkian*, *supra*.

The statements numbered 24, 25, and 33  constitute accusations of criminal activity and, as such, are "defamatory per se, meaning that special harm need not be proved."  *See Kevorkian, supra*.  AUA, therefore, must demonstrate the existence of special harm caused by the remaining statements.  AUA satisfies its burden through the affidavit of its president, Neil Simon.  (*See* Doc. 171 ¶ 10.)

As such, the Court concludes that AUA demonstrates that it is entitled to summary judgment with respect to its defamation claim concerning the following statements:

14.    AUA routinely commits fraud upon its students.
15.    AUA falsifies its students' grades.
16.    AUA breaches contracts.
24.    AUA conspires to commit fraud and violations of civil rights.
25.    AUA commits criminal activities reportable to the FBI.
30.    AUA colluded with St. Joseph Hospital to maliciously end [Woodward's] career.
33.    AUA committed perjury.

Otherwise, AUA fails to demonstrate that Woodward engaged in defamation.

### Relief Requested

AUA seeks an injunction preventing Woodward from publishing any defamatory content, whether on his website or by any other means.  The Supreme Court repeatedly has recognized that an "injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights."  *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418-19, 91 S. Ct. 1575, 1577-78 (1971) (citing *Near v. Minnesota ex rel Olsen*, 283 U.S. 697, 51 S. Ct. 625 (1931)).  "'The usual rule is

that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'" *Lothschuetz*, 898 F.2d at 1206 (quoting *Cmty. for Creative Non-Violence*, 814 F.2d at 672).

In *Lothschuetz*, however, the Sixth Circuit recognized that "First Amendment rights are not absolute . . . [and] injunctive relief is appropriate if there is no adequate remedy at law." *Id*. at 1208-09 (Wellford, J., for the court, concurring in part, dissenting in part). The court granted "a narrow and limited injunction" as an exception to this rule, prohibiting the defendant "from continuing and reiterating the same libelous and defamatory charges" found to be false and libelous." *Id*. The injunction must "be clearly and narrowly drawn so as not to prohibit protected expression." *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 884 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008).

At this stage of the proceedings, AUA's only proof with respect to damages is its president's statement that "AUA has suffered damages stemming from the Defendant's publication of his website . . ." (Doc. 171 ¶ 10.) Considering the sophistication (or lack thereof) of Woodward's website and the content of the website, this Court cannot conclude based on President Simon's affidavit, alone, that any damages could be significant. Any individual who views Woodward's website is immediately alerted to the fact that it is not the official website of AUA and would quickly discern that it is the website of a disgruntled and somewhat irrational former student. Nevertheless, in its motion for summary judgment, AUA asks the Court for the opportunity (if the Court grants its motion) to present proof of damages.

26

**Conclusion**

For the reasons set forth above, the Court concludes that AUA fails to demonstrate

that it is entitled to summary judgment with respect to the claims alleged in its Complaint,

except its claim that Woodward engaged in defamation.  AUA's claims under the Lanham

Act, Anticybersquatting Consumer Protection Act, and Family Educational Rights and

Privacy Act of 1974 (Counts I-III, respectively) fail as a matter of law.  Thus the Court is

granting summary judgment to Woodward with respect to those claims pursuant to

Federal Rule of Civil Procedure 56(f).[14]

While the Court concludes that AUA is entitled to summary judgment with respect

to its defamation claim (Count IV), the Court concludes that AUA prevails with respect to

the following statements by Woodward, only:

- AUA routinely commits fraud upon its students.
- AUA falsifies its students' grades.
- AUA breaches contracts.
- AUA conspires to commit fraud and violations of civil rights.
- AUA commits criminal activities reportable to the FBI.
- AUA colluded with St. Joseph Hospital to maliciously end [Woodward's] career.
- AUA committed perjury.

The Court therefore is entering a permanent injunction, enjoining Woodward from

_____

[14]Rule 56(f) allows a court to grant summary judgment for a nonmovant "[a]fter giving notice and a reasonable time to respond . . ."  On prior occasions in this litigation, the Court has shared with the parties its reasons for concluding that AUA's claims under the Lanham Act, ACPA, and Family Educational Rights and Privacy Act of 1974 fail to state a claim for relief as a matter of law.  AUA has failed to respond in a reasonable time with arguments suggesting that the Court's analysis is incorrect.

continuing to publish these seven statements.  The Court is scheduling a hearing on the

issue of damages.

An Order consistent with this Opinion will issue.


DATE: December 5, 2011            s/PATRICK J. DUGGAN
                                  UNITED STATES DISTRICT JUDGE


Copies to:
Eric A. Buikema, Esq.

Steven Woodward
7211 Brittwood Lane
Flint, MI   48507