Case 2:10-cv-10978-PJD-MJH



FILED 348

2012 APR 24 P 3:58

U.S. DIST. COURT CLERK
EAST DIST. MICH
FLINT

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA,
COLLEGE OF MEDICINE, a foreign corporation,

Plaintiff,

V                                    CASE No.: 2:10-cv-10978-PJD-MJH
                                     Judge Patrick J. Duggan

STEVEN WOODWARD,

Defendant,

**Defendant's Response to Docket 206**

*Several Pages Are*
POOR QUALITY
ORIGINAL

1

## Defendant's Response to Docket 206

This case is an obvious SLAPP, Strategic Lawsuit Against Public Participation. The Plaintiff filed a verified lawsuit including a sworn affidavit by the President (and general counsel) Neal Simon stating "**I have personal knowledge of the facts set forth in this complaint and, having read the same, I hereby attest that each and every allegation contained herein is true to the best of my knowledge, information and belief.**" The fact that Mr. Woodward is innocent of approx. 90% of these allegations as of April 19, 2010 is evidence of Perjury (Claims I, II, and I and majority of Claim IV). Judge Duggan refused Hearings on six(6) of the Defendant's Motions for Perjury. On April 19, 2010 Judge Duggan himself made evident Neal Simon was committing perjury making false statements, that Mr. Woodward's statements were actually TRUE. Judge Duggan's own statements regarding the Plaintiff's claims included ridiculous and without merit. Judge Duggan allowed blatant violations of FRCP 11 to happen to Mr. Woodward for over two years. Judge Duggan protects the Plaintiff by trickery and violations of Federal Law by ruling on a Summary Judgment against Mr. Woodward, preventing him from being able to defend himself against claims he previously admitted in prior Motions. The Plaintiff refused to produce any Documentation per FRCP 34 and even admitted to refusing requested discovery from Mr. Woodward; the Plaintiff could not defend themselves by Law. Judge Duggan has allowed the Plaintiff to violate FRCP 26, 34, 36 and 37. Judge Duggan has allowed the Plaintiff to deny Mr. Woodward his own Student Records. Mr. Woodward's Motions for Contempt (filed prior to the Plaintiff's motion for Summary Judgment) were allowed no Hearing and considered moot, while the Court held a hearing against Mr. Woodward for contempt. The Plaintiff did file a Rule 7.1 disclosure

statement the most simple and required disclosure. Docket 206 is evidence of blatant violations of Mr. Woodward's Civil Rights.

**A)** Mr. Woodward filed a Notice of Appeal, including allegations of Court misconduct, U.S. Court of Appeals for the Sixth Circuit Case No. 12-1128. Mr. Woodward's ability to demonstrate bias by Judge Patrick J. Duggan including Fraud on the Court, violations of Civil Rights Due Process and First Amendment Rights, Oath of Office, Code of Judicial Conduct; therefore Treason to the Constitution, failing of self Disqualification and writing Order Docket 206 (Bulloch v. United States, and U.S v. Sciuto).

Evidence to support these claims includes, but is not limited to, the Court appointing an attorney to Mr. Woodward, Motion for Pro Bono Attorney, Docket 85, dated 12/27/2010 **"If the Court can not aid with an attorney for the entire case the Defendant requests an attorney for Discovery purposes, specifically the deposition phase of Discovery"**. The Court Granted Docket 85 in Docket 89, dated **1/05/11 "Court will endeavor to obtain pro bono counsel for plaintiff within the next 90 days"** discovery closed **4/11/11**. Mr. Woodward was burdened and harassed by the Plaintiff with attending three(3) depositions, one on 1/04/11, of which the Plaintiff did not attend, cancelling that morning; 2/01/11, of which the Plaintiff walked out, and 3/24/11. On 7/14/11 Judge Duggan appoints attorney, Leigh C. Taggart of Radar, Fishman & Grauer, approx. three(3) months after the closing of Discovery and seven(7) months after the request. **Exhibit 2, "Our firm represents Trinity in trademark matters, and we cannot and will not do anything adverse to their legal interests."** The Court purposefully put Mr. Woodward in a room with an attorney that represents the Business Partner of the Plaintiff, St Joseph Mercy Oakland Hospital, to question Mr. Woodward violating FRCP

30(d)(1), **Exhibit 2** and put such an attorney in control of Mr. Woodward's case.  Mr.

Woodward filed Motion, Docket 162, release of the attorney for obvious conflict of

interest, resulting in a hearing 8/11/2011, of which Judge Duggan bullied and threatened

Mr. Woodward into accepting the attorney.

**(Note: Judge Duggan does not hold hearings for the Defendant's six(6) Motions**

**concerning obvious Perjury Claims, and two(2) obvious Contempt Claims)**

Judge Duggan went so far as demand Mr. Woodward obtain an attorney in 45 days in

Order, Docket 164, knowing Mr. Woodward's inability to afford an attorney.

All of Judge Duggan's Orders, Docket 185, permanent injunctions against Mr.

Woodward directly involves, is tied to, relates to, and includes St Joseph Mercy Oakland

Hospital and American University of Antigua.  This is evidence of the bias, violations of

Mr. Woodward's Civil Rights of Due Process, and Fraud committed by the Court.

**B) Contempt and Mr. Woodward's Web Site**

Judge Duggan's Docket 206 statement **"Shut Down his Website completely"** is False

the agreement Mr. Woodward, made under duress, trauma, and complete violations of

Due Process, were rejected by the Plaintiff and must be considered Null and VIOD.

The Plaintiff and Judge Duggan's intentions were simple; to completely violate Mr.

Woodward's Civil Rights.   The email written by Mr. Buikema is evidence to this fact,

**Exhibit 11**.  The Plaintiff agreed Mr. Woodward stood by his agreement, but the Plaintiff

refused.  Mr. Woodward does not agree to the Plaintiff's demands to completely violate

Mr. Woodward's CIVIL RIGHTS to Appeal or Future Publication of the FACTS.  On

January 18, 2012 Judge Patrick J. Duggan was exposed for his bias, being bias, he

handcuffed, shackled, and jailed, Mr. Woodward traumatizing him for exposing this fact.

Judge Duggan's sole purpose of the January 18, 2012 Hearing was wrongfully without cause and defense imprison Mr. Woodward for Contempt.

**NOTE: The Court has either denied, would not hear, or made moot every Motion Mr. Woodward has filed against the Plaintiff for Contempt and Perjury (Defense Motions: Dockets 16, perjury, Docket 27, perjury, Docket 51, perjury, Docket 193, claim 8 perjury, Docket 182, evidence of perjury, Docket 198, perjury, Docket 136, contempt, Docket 178, contempt)**

Judge Duggan states on January 18, 2012 page 41, line 23 "**Or statements that relate to them**" this is another FALSE statement.  Court Order 185, page 1, clearly states "**It is further ordered, that Defendant is Permanently Enjoined from publishing on the Internet or by any other means or medium the following statements:**

**-AUA routinely commits fraud upon its students,**

**-AUA falsifies its students' grades,**

**-AUA breaches contracts,**

**-AUA conspires to commit fraud and violations of civil rights,**

**-AUA commits criminal activities reportable to the FBI,**

**-AUA colluded with St. Joseph Mercy Hospital to maliciously end [Woodward's], career, -AUA committed perjury"**

Mr. Woodward filed Motions (Docket 189 and Docket 190) concerning complying with Court Order 185.  Mr. Woodward stated in Docket 189, page 2,  line 11 "**Mr. Woodward is more than willing to cooperate with the Court, but Mr. Woodward has finished searching the files and audio files on both www.youtube.com and www.aua-med.com and www.auasucks.com and can not find any of the statements**

above that would qualify those listed in Court Order 185. **I can not delete what doesn't exist.**" and "**I am more than willing to cooperate with the Court in these matters.**" and "**I am waiting for the Courts decision.**"

Mr. Woodward stated in Docket 190, page 2, "**Mr. Woodward is more than willing to cooperate with the Court and has demonstrated by Exhibit 1, pages 1-3 made an effort to do so.**"   Judge Duggan ruled in favor of Mr. Woodward's statement of "**AUA student sexually assaulted**" vs the Plaintiff's statement "**AUA students are sexually assaulted**" over the letter "**S**" plurality, Docket 8, Exhibit C, vs Docket 8, page 2, letter "h.".   Likewise with the nine (9) of sixteen(16) (a – p) alleged Defamation Claims, Docket 1, page 9, based on Subjectivity.   Judge Duggan refused to hear Mr. Woodward's defenses to the actual statements that were made or to Judge fairly, his intentions are clear to shut down Mr. Woodward's Web Site.  Judge Duggan lead Mr. Woodward into an obvious trap with Order 185 and the January 18, 2012 of which Mr. Woodward asked for clarification in both Docket 189 and 190, but the Court did not reply to these Motions. Judge Duggan refused to let Mr. Woodward defend himself of this burden Judge Duggan asked questions page 10, line 5 "**Did you ever put anything equal to that**" and page 19, line 19 "**Everything relating to falsifying grades.**" which would include Mr. Woodward's information concerning AUA's Docket 1, page 9, CLAIM III Willful Violation of FERPA, of which Mr. Woodward is innocent by Law.  **Mr. Woodward is innocent by Law for publishing Student Records, disclosed by the Plaintiff, but Judge Duggan held Mr. Woodward in Contempt for doing so, page 12, line 9.**

The seven statements Judge Duggan chose were to condemn Mr. Woodward purposefully putting Mr. Woodward in a catch 22 situation.

Judge Duggan then tactfully leading Mr. Woodward into a paradoxical situation of which he could not escape. Mr. Woodward tried to defend this situation but Judge Duggan refused to listen to his defense with statements such as Docket 199, page 31, line 24 **"No, we're going to do it my way"**. Mr. Woodward tries to explain the situation, Docket 199, page 25, line 11, **"I can't answer that without condemning myself. I can't answer that. You've asked me to ask two different things"**

**Examples include:**

**1)** Mr. Woodward is innocent by law of Plaintiff's Claims I-III and the majority of Claim IV Defamation (90% of the Claims). Neal Simon's Docket 1 Complaint is a verified Complaint including a sworn affidavit affirming everything in the Complaint is true, being an Attorney himself. Docket 1 Claim IV, letter "o.", page 10, **"AUA agents are liars"**. Judge Duggan's Ruling would condemn Mr. Woodward to Contempt of any of his statements that were TRUE or innocent by Law concerning Claims I-IV since it could infer **"AUA agents are liars"** thereby confirm(infer) Neal Simon commits Perjury of which Mr. Woodward could be found in Contempt by Judge Duggan's form of questioning **"Everything relating to"**.

Judge Duggan's Rulings contradict themselves, condemning Mr. Woodward to Contempt for statements that are TRUE, or of which Mr. Woodward is innocent by Law.

**2)** Mr. Woodward is innocent of Plaintiff's claims "Count III – Willful Violation of FERPA". FACT, AUA disclosed student record. Those records include 5th Semester Student Grades. **Mr. Woodward was found to be in Contempt by Judge Duggan for posting those Student Grades, Docket 199, page 12, line 9**. Docket 27 Exhibits, **Exhibit 1** (doc 27 page 14 of 21). Judge Duggan's statement **"Everything relating to"**

condemned Mr. Woodward.  Calculating Kristen, Nico, (Student 10) would reveal he only earned a "**78.3**" but was given a "**83**" and "**B**", while Evens Lekedra earned a "**81.3**" was given a "**83**" but was assigned a "**C-**".  Per the Course Syllabus, **Exhibit 1**(Doc 27 page 43 of 50) Students 4 did not meet the Course requirements for "**Attendance**", "**Prac Session**", and "**Practical Ex**".  Students 1, 2, 3 and 8 did not meet the Course requirements for "**Quizzes**".   Students 9 and 10 did not meet the Course requirements for "**Outpatient Eval**.".  Students 1, 3, 6, 7, 8, and 10 would have failed the final exam without a CURVE.  AUA promised a 10% Curve, **Exhibit 1**, (Doc 27 page 4 of 21) but lied and only assigned a 4% Curve (except for Student 9 who received a 5% curve). AUA posted Note(3) "**Failed Final Exam.  Did take remedial and failed**", this a FALSE statement per, **Exhibit 1**, (Doc 27 page 4 of 21) "**Due to testing irregularities**", "**Vocabulary section**", "**You will need a total score of 560 out of 800 questions**" which Mr. Woodward's Final Exam scores, **Exhibit 1**, (Doc 27 page 5 of 21) shows Mr. Woodward earned 88 out of 100 **(or 88%)** for the "**Vocabulary section**" and "**Total Points Earned: 568**" equating to "**Current Average: 71**"which is recorded on **Exhibit 1** (Doc 27 page 14 of 21) for Mr. Woodwar.  AUA writes an email on **12/20/2007**, **Exhibit 1** (Doc 27 page 7 of 21) "**Exclude from it the vocabulary portion**" in reference to the Final Exam, (Neal Simon is cc'd (nssimon@auamed.org)).  If this was TRUE Mr. Woodward's Final Exam grades would have been 68% not the recorded 71%. **Note: Mr. Woodward's attorney notified AUA of his Civil Action against them, prior to AUA's 12/20/2007 email, (Neal Simon is cc'd (nssimon@auamed.org).**

Mr. Woodward publishing alone, of which he is innocent by LAW, **Exhibit 1**, AUA documentation would condemn Mr. Woodward to Contempt by implying ALL SEVEN STATEMENTS per the Docket 185 Permanent Injunctions.

This is just a couple examples of how Judge Duggan stacked the deck, giving all the "ACES" to the Plaintiff; while throwing Mr. Woodward under a train, condemning him to fines and jail, violating his Civil Rights of Due Process and of the First Amendment.

**3)** Judge Duggan violated Mr. Woodward's Civil Rights to Due Process, not allowing Mr. Woodward to defend himself. Mr. Woodward was wrongfully handcuffed, shackled, and jailed, upon return surrounded by U.S. Marshalls; Judge Duggan states to the Plaintiff, January 18, 2012 Hearing, page 21, line 16 **"When we continue the hearing, I want you to be prepared quickly to articulate, on this website, where these things he says he can't find are."**

By the close of Discovery, **April/11/2011**, Docket 94, the Plaintiff refused to produce any documentation per FRCP 34. **Exhibit 12** is the Plaintiff's responses to Mr. Woodward's FRCP 34 Requests, dated **November 11, 2011**. Mr. Woodward's FRCP 34 Request for Documentation was served to the Plaintiff **November 22, 2010**. The Court and the Plaintiff has been violating Mr. Woodward's Rights to FRCP 26, 34, and 37 for nearly a year.

**Note: Judge Duggan and Judge Hluchaniuk refuse to demand the Plaintiff produce Mr. Woodward's own Student Records, violating Federal and State Laws as well as the Plaintiff's own Student Handbook.**

Judge Duggan allowed the Plaintiff to gather and produce documentation violating FRCP 37(c)(1) If a party fails to provide information or identify a witness as required by Rule

9

26(a) or (e), **the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing".** Mr. Woodward brought this violation to Judge Duggan's attention on January 18, 2012, page 26, line 2 "**If a party is requested o produce documentation to support their claim and they've been requested to produce that documentation to support their claim and they refuse to produce the documentation to support their claim, can they use that claim in a hearing?**" Judge Duggan's reply: "**Probably, I don't know, every case is different. Maybe they have an explanation, I don't know. The rule says what it says**"

Judge Duggan told the Plaintiff to produce documentation as evidence that violated FRCP 37(c)(1) and did not allow Mr. Woodward adequate time to review to defend himself against documents, which by law, should not have been produced in a hearing. This is evidence that Judge Duggan has violated Code of Conduct for United States Judges (A)(1) "**maintain professional competence in the law**" and violation Mr. Woodward's Civil Rights of Due Process.

Mr. Woodward was harassed, bullied, imprisoned, traumatized, handcuffed, shackled, jailed, intimidated being threatened with imprisonment, by the Court, over seven quoted statements that he could not find and requested clarification to that point. Mr. Woodward requested in motions clarification of Order 185 in Dockets 189 and 190, the Court did not respond to these motions. The Court fully intended on imprisoning Mr. Woodward for implied statements outside the scope of Order 185. The Plaintiff was barred from producing evidence to support there Claims, per FRCP 37(c)(1) but Judge Duggan allowed the Plaintiff to produce documentation of unknown amounts and content to Mr. Woodward who had no time to defend himself against who knows what.

Prior to January 18, 2012 Mr. Woodward could not delete random statements for which would imply guilt, of which Mr. Woodward is innocent.

The Court forced Mr. Woodward into the decision he made.

Mr. Woodward stated on January 18, 2012, page 42, line 7 "**I'll delete everything on them tonight.  They'll be blank, empty vessels**"

Mr. Buikema verified Mr. Woodward's actions in his email dated January 24, 2012, **Exhibit 11**.  My offer did not satisfy the Plaintiff as the email states "**So long as you do not choose to exercise an appeal (which is your right) or choose to republish (portions of which may also be your right)**"

The email verifies AUA's intention to violate both Mr. Woodward's Civil Right to access to the Court of Appeals and Freedom of Speech, and that Mr. Woodward's offer was refused.  Mr. Woodward did not agree to removing his Website Domain, which is implied in Docket 206, Mr. Buikema verified.  Mr. Woodward fully intends on publishing the truth as well as this appeal.  The Plaintiff has made any agreement Mr. Woodward offered NULL and Void by not agreeing to the original commitment and Mr. Woodward does not agree to AUA's blatant attempt to violate his Civil Rights.  Mr. Woodward Requests any charges of Contempt be completely overturned and stricken from the record and Mr. Woodward be relieved of any obligation made with AUA.

**C) Counterclaims**

The Court's statement "**Woodward has not sought leave to file his untimely counterclaims**", Docket 206, page 4 is FALSE!  Mr. Woodward filed Docket 146, dated 5/03/11, "**The Defense requests Leave under Rule 15 to file Counter Claims.**"  The

Court's statement "**he seeks to litigate issues already decided in his state law case against AUA and others.**" is FALSE, Mr. Woodward's Claims are separate and distinct. The "and others" obviously being St Joseph Mercy Oakland Hospital, SJMO and Susan Zonia, who was fired by St Joseph Mercy Oakland Hospital in 2010 for, including but not limited to, creating a hostile work environment and admitted to saying such statements as FUCK, Blowjob, and "yank his dick" at work, including making obvious and further false statements in her Court case **Exhibit3**. Comparing Depositions of Susan Zonia, **Exhibit 4**, Jeffrey Yanez, **Exhibit 5**, Deneen McCall, **Exhibit 6**, Mr. Woodward's patient logs, **Exhibit 7**, to Court Orders **Exhibit 8** and **Exhibit 9** blatant Perjury has been committed. This Courts assertion of collateral estoppel or res judicata hinges on no wrongdoing by the Plaintiff and their business partners in these proceedings, the major element of collateral estoppel(re judicata) being"fair" Due Process. The Courts Clearly violated Mr. Woodward's Civil Rights of Freedom of Speech, and violations of 20 U.S.C 1011a. Mr. Woodward's Counterclaims are not barred by collateral estoppel or res judicata since Mr. Wooward's Claims are based on the Plaintiff's separate and distinct actions. An Example being CLAIM 8 PERJURY; Woodward did not read in either, Circuit Court County of Oakland, Case No. 07-088103 **Exhibit 8**, or, State of Michigan Court of Appeals No. 292172 **Exhibit 9**, the words perjury or fraud for that matter. Res judicata- though former jeopardy by trial for the substantive crimes is not available as a defense against this perjury indictment.(Sealfon v. United States, 332 U.S. 575 578 and United States v. Williams 341 U.S. 58) and "It has long been recognized that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. (Pinkerton v. United States 328 U.S. 640, 643). Mr. Woodward's

Docket 193 Counterclaims are clearly separate, distinct, and different. The Plaintiff, under the penalty of perjury filed Docket 13, 7/15/10, which was Ruled Against, Set Aside, Docket 37, 10/06/10. The Plaintiff was GRANTED two(2) Adjournments by the Court for Discovery due to the Plaintiff's own act of Perjury by the Court, but only the Plaintiff has benefitted by Discovery being the Court completely has allowed the Plaintiff not to produce virtually any Discovery. By Judge Duggan's own ruling, 90% of the Plaintiff's Claims in their verified complaint (including attached affidavit) is evidence of Perjury; and the Court refuses to allow Mr. Woodward to Defend himself against the Seven Statements. Mr. Woodward acknowledges that Judge Duggan's: delay in Ruling on the Plaintiff's blatant perjury by filing for Default, Docket 13; GRANTING Plaintiff's Adjournments, not Hearing Mr. Woodward's Motions for Dismissal for Perjury, and Not Ruling on Claims of which 90% are proven to be Lies, and without merit, April 19, 2010 would have had a significant impact on the outcome of Mr. Woodward's Appeal, **Exhibit 9**. This suggests a Conspiracy to Commit Fraud and violations of Mr. Woodward's Civil Rights to cover-up blatant Civil Right's violations by the Court's themselves i.e. Judge Kumar's Order **Exhibit 8** and **Exhibit 9**. The Court's Denial of Mr. Woodward's Counterclaims, Docket 193, filed 12/20/11, is an example of obvious bias by the Court. Mr. Woodward's requests his Counterclaims be GRANTED and be Heard by the Court of Appeals.

**D) Reconsideration**

Mr. Woodward's Motion for Reconsideration was originally scheduled to be heard on 1/18/12. The Hearing for Show Cause was scheduled for 1/19/12 as proven by an email from Marilyn Orem on December 23, 2011, **Exhibit 10**. Docket 192 should have been

stricken. Mr. Woodward's Motion for Reconsideration was denied because it showed FALSE statements made by Judge Duggan himself as evidence to cover-up perjury, blatant contradictions in his own ruling, and violations of Due Process against Mr. Woodward. The Statement made by Judge Duggan in Docket 206, page 3, line 8 "**he has presented evidence to show that the enjoined statements are not false**" is FALSE. On the Contrary Mr. Woodward stated on January 18, 2012, Hearing, page 14, line 11, "**I want fairness. I want unbias fairness and due process out of this and you have not given me that.**". page 15, line 22 "**The issue is you've violated my rights of due process, sir.**", page 16, line 12 "**your own opinions contradict each other. Your own opinions, sir.**", page 16, line 18 "**You made statements on April 19th that the statements I'm making are true. How did you ever let this go this far?**" page 18, line 9 "**You won't let me prove it because you're violating my right of even – I mean, you've even lied in there about them refusing to take documentation, sir.**" Judge Duggan writes in Docket 206, page 3, "**merely presents the same issues already ruled upon by the Court**" concerning "palpable defect" E.D. Mich. LR 7.1(h)(3) is FALSE. **Examples include**: Docket 188, page 16, (f) Mr. Woodward demonstrates **ABSOLUTE CONCENT** by LAW, 20 U.S.C 1011a, the Plaintiff's own Student Handbook, and other AUA documentation. Mr. Woodward demonstrates in Docket 188 blatant FALSE statements and contradictions in Order and Opinion, Docket 184, made by Judge Duggan himself. Mr. Woodward requests Docket 192 be stricken and Mr. Woodward's Motion of Reconsideration be Heard by the Court of Appeals.

**E) Motions for Dismissal**
Judge Duggan's ruling on denying Docket 198 is outrageous and is more evidence of his blatant bias and victimization of Mr. Woodward by the Courts as well as the Plaintiff in

these matters.  The Courts own ruling that Mr. Woodward is innocent of 90% of the Plaintiff's Claims, not conducting a Hearing on these outright lies, refusing Mr. Woodward the Right defend himself against seven statements, is appalling and heinous. Critical Statements from Judge Patrick J. Duggan concerning Plaintiffs Docket 1 verified complaint, which included as evidence a sworn affidavit signed by AUA's general counsel and University president, Neal Simon "**I hereby attest that each and every allegation contained herein is true to the best of my knowledge, information and belief.**" On April 19, 2010, Transcript, Docket 19, page 7, line 6  Concerning Docket 1 Claim I "**it doesn't seem to me your Lanham Act has any merit at all**".  Concerning Count II, Anticybersquatting Consumer Protection Act, ACPA, page 11, line 2 "**That isn't happening here, is it?**". Concerning Plaintiff's claim FERPA Count III page 14, line 24 "**It's just ridiculous.  I don't know why you're arguing that**",  concerning all the Plaintiff's claims page 15, line 8 "**Wow, he's just throwing everything in there so if they're weak, all his claims must be equally weak**", page 15, line 13 "**I don't think there's any merit to this claim at all**", page 15, line 24 "**It's not tortuous interference**".  Count IV Defamation page 19, line 19 "**That's the spin you put on it. But the statement itself is true, "AUA students are sexually assaulted", have they?**" In Judge Patrick J. Duggan's own Opinion, Docket 184, page 27, "**AUA's claims under Lanham Act, Anticybersquatting Consumer Protection Act, and Family Educational Rights and Privacy Act of 1974 (Counts I-III, respectfully) fail as a matter of law**".  In Docket 184 Judge Duggan states "**Woodward no longer states on his website that "AUA students are sexually assaulted" (see Request for Admissions no. 22 (emphasis added)); instead, he asserts: "AUA student sexually assaulted".**

**See http:aua-med.com.”** Mr. Woodward NEVER said "**students**". This is a False Statement made by Judge Duggan to protect AUA and Neal Simon from perjury and their Defamation Claims. In Docket 184 Judge Duggan writes "**Woodward no longer states that "AUA's student pass rate for USMLE medical board exams is only 22.9%." (Request for Admissions No. 28.) Instead Woodward states that "Antigua only has a 22.9% USMLE Pass Rate!”**. Mr. Woodward NEVER said "**AUA's student pass rate for USMLE medical board exams is only 22.9%.**", this is another False statement made by Judge Duggan to protect AUA and Neal Simon from perjury and their Defamation Claims. The Plaintiff's own Docket 1, Defamation Claim IV(o.) "**AUA agents are liars**" condemns all Plaintiff Defamation Claims, for Neal Simon is a LIAR and has committed perjury by signing such a ridiculous meritless and outright false verified complaint and affidavit under oath stating otherwise; making blatant false statements and Claims. The FACT that AUA publishes in their Student Handbook, **Exhibit 13**, page 25, "**The University adheres to the mandates of the United States Family Educational Rights and Privacy Act(FERPA)**" but disclosed approx. 150 private student records (blaming Mr. Woodward), and page 25 "**The student has the right to inspect and review his educational record within 45 days of the University's receiving a written request to access.**" but denies Mr. Woodward access to his student records for over a year, page 12 "**The Student has the write to counsel**" but denied Mr. Woodward counsel, page 12 "**AUA/KMC students are encouraged to address any academic or non-academic concerns with their Professors, Faculty Advisors or Deans.**" but conspires with St Joseph Mercy to fabricate a Committee Meeting against him for doing so is irrefutable facts that "**AUA agents are liars**" therefore commit

perjury.  Judge Duggan being bias even rejects verbal statements made by other students and Neal Simon himself that AUA agents are liars from a Fox News report.  The Plaintiff's own Docket 8, Exhibit C and April 19 Hearing Arguments proves that the Plaintiff's Defamation Claims are FALSE and that Mr. Woodward's statements were TRUE.  Judge Duggan makes FALSE statement concerning Mr. Woodward TRUTH in Docket 184.  Per Federal Case Law "D. Brian Radecki v. Glaxosmithkline" No 09-3901-cv "dismiss with prejudice as a sanction for perjury" This case should have been dismissed April 19, 2010.  Mr. Woodward has been handcuffed, shackled, jailed, displaced from his home, risked his life relocating his home, harassed, burdened, impoverished, over blatant, false statements, lies, frivolous Claims, described in the first hearing by Judge Patrick J. Duggan as "ridiculous" and having no merit wasting Two(2) years of Mr. Woodward's life.  The Plaintiff and the Court wasted four(4) months of Mr. Woodward's, more evidence of Perjury and FRCP 11 violations by the Plaintiff.  The Court then Granted the Plaintiff's motions for Adjournment, Dockets 38 and 59 for Discovery.  The Court has allowed the Plaintiff to get away without performing nearly any Discovery, and actually refused to participate in Discovery, lie to a Federal Court Judge about Discovery; while completely burdening and being one sided with Mr. Woodward, including FRCP 34 Request for Admissions the premises of the Plaintiff's Summary Judgment.  The Court has wrongfully rule in favor of the Plaintiff over Summary Judgment since the Plaintiff has refused to participate in Discovery; in a Just and Fair Court Governed by FRCP 37, 26, 34 and 36 the Plaintiff would have to forfeit all Claims.  Being bias the Court has summarily mooted or ruled against Mr. Woodward's Motions to Compel and Claims of Contempt and Sanctions for failing to

perform Discovery.   In a fair Court with an unbias Judge Mr. Woodward's Motions to

Dismiss for perjury would have been heard.   Mr. Woodward requests a hearing on

Motions for Dismissal for Perjury and Contempt, which were filed prior to the Plaintiff's

Motions for Summary Judgment, before the Court of Appeals.

**F)Summary Judgment**

Judge Patrick J. Duggan states on September 20, 2011 Hearing, Docket 204, page 19, line

11: "**I don't care about your understanding, okay, the rule says what the rule says.**"

concerning rules for answering FRCP 36 Requests for Admissions, the core for the

Plaintiff's Motion for Summary Judgment, Docket 143.   On January 18, 2012 Hearing,

Concerning the FRCP 36, Docket 199, page 37, line 6: "**You're rehashing issues that**

**had been decided, right or wrong, they've been decided.**"

Page 24, line 7 "**The situation is, follow the ruling, right or wrong, there is a record.**

**And if some Appellate Court thinks the record was wrong, it will be dealt with at**

**that time.**"   Under FRCP 36 (b) "on motion" for Protective Order U.S. D. C. Western

District of Washington at Seattle MDL No. 1407 Support of Motion for Protective Order

[Requests for Admissions] "or, as defendant did here, move for a protective order."

Mr. Woodward did file a Motion for Protective Order, Docket 56, which was heard by

Magistrate Judge Michael Hluchaniuk on December 22, 2010, Docket 205, page 1, line

10, "**Court: the defendant's motion for protective order**"

The Motion, Docket 56, was ruled and Order written, Docket 88.

FRCP 11 (b)(1) states "it is not being presented for any improper, such as to harass, cause

unnecessary delay, or needlessly increase the cost of litigation"

Mr. Woodward not only previously answered each of (or nearly exact) the statements he

is permanently enjoined from publishing prior to the Plaintiff's serving of the Request for

Admissions November 8, 2010 e.g.: Docket 10, dated 4/15/2010, Docket 11, dated

4/16/2010, Docket 16, dated 7/19/2010, Docket 27, dated 8/06/2010, Docket 40, dated

10/15/2010, and Docket 51, date 11/08/2010.  Mr. Buikema admitted to refusing personal

service of Mr. Woodward's answers to the Plaintiff's FRCP 36 Request for Admissions,

and FRCP 34 documentation, December 22, 2010 before Magistrate Judge Michael

Hluchaniuk, lying to a Federal Court Judge.  Rulings concerning the violation of the Fist

Amendment of the Constitution of the United States, "Right or Wrong", Judge Duggan

has to adhere to the "Rules" as he stated; it's not an option concerning violations to the

Constitution of the United States, the Oath of Office of a Federal Judge, and Judicial

conduct.  Mr. Woodward requests the Summary Judgment be overturned and Mr.

Woodward be allowed to defend himself against the Seven Statements, before the Court

of Appeals.

<div align="center">
Steven Woodward<br>
7211 Brittwood Ln<br>
Flint, MI 48507<br>
(810)235-7267
</div>

**List of Authority:**
Title: 28 U.S.C. 455
United States Constitution, Due Process and Access to the Courts
Listed in Brief

**List of Exhibits:**
Exhibit 1: Docket 27 Exhibits.
Exhibit 2: Email form Pro Bono Attorney, Leigh Taggart.
Exhibit 3: S. Zonia v Trinity Health
Exhibit 4: Deposition of Susan Zonia
Exhibit 5: Deposition of Jeffrey Yanez
Exhibit 6: Deposition of Deneen McCall
Exhibit 7: Mr. Woodward's Patient Logs
Exhibit 8: Court Order Judge Kumar
Exhibit 9: Court Order Michigan Court of Appeals
Exhibit 10: Email Marilyn Orem
Exhibit 11: Email Eric Buikema
Exhibit 12: Email Kathryn Zalewski
Exhibit 13: American University of Antigua Student Handbook

United States District Court
Eastern District Of Michigan
Southern Division

American University Of Antigua College
Of Medicine, a foreign corporation,

Plaintiff,

United States District Court
Judge Patrick J. Duggan, presiding
Case No.: 2:10-cv-10978

V

Steven Woodward,

Defendant.

| | |
|---|---|
| Eric A. Buikema (P58379) | Steven L. Woodward |
| Cardelli, Lanfear & Buikema, P.C. | In Pro Per |
| Attorneys for Plaintiff | c/o 7211 Brittwood Lane |
| 322 W. Lincoln | Flint, MI 48507 |
| Royal Oak, MI 48067 | steve_L_woodward@yahoo.com |
| (248) 544-1100 | |
| ebuikema@cardellilaw.com | |

### Certificate of Service

The undersigned certifies that the foregoing **Defendant's Response to Docket 206** and this **Certificate of Service** were served upon Plaintiff U.S. mail to American University of Antigua, via council, Eric A. Buikema (P58379), 322 West Lincoln Ave, Royal Oak, Michigan 48067

Steven Woodward
7211 Brittwood Ln
Flint, Michigan 48507



Scholar360

Page 1 of 1

Home | Profile | Blog | Contacts . Messages
RSS Reader | Calendar
My Classes | All Classes
My Communities | All Communities
My Grades | My Files | Digital Dropbox
Search | Help | Logout

## My Grades

| Item | Date | Available Points | Grade |
|---|---|---|---|
| AUA Online | | "CC" | "DD" |
| Final Grade: 71 | | | |
| Test - Final Exam - Block 4 (Dermatology, Imaging, Gyn, Psychiatry) | 2007-12-06 | 200 | 142 |
| Test - Final Exam - Block 2B (Opthalmology) | 2007-12-06 | 50 | 43 |
| Test - Final Exam - Block 2A (History and Physical Exam) | 2007-12-06 | 50 | 37 |
| Test - Final Exam - Block 2C (Vocabulary) | 2007-12-06 | 100 | 88 |
| Test - Final Exam - Block 3B (Hemopoietic/Lymphopoietic System) | 2007-12-05 | 50 | 21 |
| Test - Final Exam - Block 3A (Cardiovascular) | 2007-12-05 | 100 | 47 |
| Test - Final Exam - Block 3C (GI System) | 2007-12-05 | 50 | 37 |
| Test - Final Exam - Block 1B (ENT) | 2007-12-03 | 100 | 71 |
| Test - Final Exam - Block 1A (Respiratory) | 2007-12-03 | 100 | 82 |
| | | 800 | 568 |

**Total Points Possible: 800**
**Total Points Earned: 568**
**Current Average: 71**

With Vocabulary

| | |
|---|---|
| 200 | 142 |
| 50 | 43 |
| 50 | 37 |
| 100 | 88 |
| 50 | 21 |
| 100 | 47 |
| 50 | 37 |
| 100 | 71 |
| 100 | 82 |
| 800 | 568 |

Without Vocabulary

| | |
|---|---|
| 200 | 142 |
| 50 | 43 |
| 50 | 37 |
| 100 | 21 |
| 50 | 47 |
| 100 | 37 |
| 100 | 71 |
| 700 | 480 |

$568/800 = 0.71$
$71\%$

$480/700 = 0.68$
$68\%$

Terms of Service | Help | Support



DEPOSITION EXHIBIT

2

Print       2:10-cv-10978-PJD-MJH   Doc # 27-1   Filed 08/06/10   Pg 4 of 21   Pg ID 502
http://usmg1.mail.yahoo.com/dc/launch?freeacct=1...g

**From:** Jeffrey Yanez (YANEZJ@trinity-health.org)
**To:** steve_l_woodward@yahoo.com;
**Date:** Mon, December 10, 2007 8:05:42 AM
**Cc:** MCCALLDY@trinity-health.org; ZONIAS@trinity-health.org;
**Subject:** test

Steve,

Due to testing irregularities, AUA will allow you a retake on the Vocabulary section on Tuesday between 3 and 4 PM. Please see Deneen for further details and arrangements. Please note that the test may look different and have new/different content?

You will need a total score of 560 out of 800 questions.   80% (640 questions) less the 10% curve = 560 questions



3

8/1/2010 9:56 AM

| | |
|---|---|
| **From:** | <jecmpark@aol.com> |
| **To:** | <shileola_11@yahoo.com>; <nisha.abraham@gmail.com>; <skbanergt@yahoo.com>; <mbuzz20@yahoo.com>; <eurowillo@hotmail.com>; <jagrew@gmail.com>; <jakeiknight@yahoo.com>; <bhelmer68@hotmail.com>; <jenellejanet@yahoo.com>; <okey@excite.com>; <merlynnj@gmail.com>; <shamz1000@hotmail.com>; <simkapur@hotmail.com>; <Jkim246@aol.com>; <miknom79@yahoo.com>; <anirbann@hotmail.com>; <rasmansolo@yahoo.com>; <ifyboy_us@yahoo.com>; <greeningwsu@yahoo.com>; <tammalarice@netscape.net>; <funjolt@yahoo.com>; <ninashojayi@gmail.com>; <dsinha1@gmail.com>; <priya.umapathi@yahoo.com> |
| **Cc:** | <yanezi@trinity-health.org>; <vhrehorovich@auamed.org>; <nssimon@auamed.org> |
| **Sent:** | Thursday, December 20, 2007 8:51 PM |
| **Subject:** | Scholar360 |

Hi class !:

I hope that now you are resting and getting ready for your clinical rotations:

For those of you who took the Final exam using Scholar360, I need you to e-mail me your evaluation of that Program.  Exclude from it the vocabulary portion that was not good because we did not have the time to correct it.

Include in your evaluation how did you like the format, grade of difficulty to understand and answer questions, the format and clarity of screens, including images and graphics, the speed with which you received the scores and any other aspect that you like to talk about.  Finally, your suggestions about possible improvements.

JEC

More new features than ever. Check out the new AOL Mail!

Exhibit 17

4

4. The form *Clinical Cases Discussed, Observed, and Examined During Fall 2007* which includes the list of all new patients that the student saw during clinical rotations as well as previous patients who presented with new clinical problems.

5. The form *Academic Activities Attended* listing all academic sessions that the students actually attended in and outside the Hospital.

6. The form *Correlation Course Tests Taken* including the number of questions answered and the individual scores.

7. A general student evaluation of the Course and of individual lectures, practical sessions and rotations.

The booklet "Fifth Semester Guidelines" provides detailed suggestions on how to prepare the Portfolio.

### g. Quizzes and Exams

Quizzes and exams will be important tools in the evaluation and grading of students. The Course also uses them as important learning tools. To that end the teaching staff will routinely discuss with students the quizzes and exam questions as part of the core curriculum of the course. The Course provides ample opportunities to reinforce concepts and facts.

Students will take approximately fourteen (14) quizzes and tests related to the Course lectures and practical sessions. The final written exam will include the same material covered by the quizzes. The practical exam will consist on the interview and examination of a patient at the Preceptors' office.

## II. ACADEMIC POLICIES

### A. Mandatory Attendance and Punctual Arrival at Sites

AUA/KMC students must <u>attend at least 85% of lectures and practical sessions.</u> The university permits three (3) absences of clinical sessions per student during



the entire semester. Only the Course Director or the Dean of Clinical Sciences can authorize any deviation from this policy.

To request an absence from a clinical assignment, students must submit to the Course Director a written request one week prior the requested absence.

**Failure to comply with attendance policy may result in the lowering of the final grade, failing the rotation, or dismissal.**

### B. Conduct

The AUA expects students to exhibit the highest level of professional standards, behavior, and integrity. Professional appearance and attitude are essential to a quality doctor-patient relationship.

### C) Mandatory Attire

**The attire for males is a dress shirt, tie and trousers and for females, a dress, skirt or slacks with blouses. Students must wear white coats and AUA/KMC identification tags when at the Hospital or on its grounds and when seeing patients at any location. Teachers and preceptors will not allow violators to participate in the academic or practical sessions**

### D) Disaster Precautions

A Disaster Preparation Booklet includes a safety plan for students attending the Hospital and is available upon request at the Hospital.

## III. EVALUATION AND GRADING

### A)   Passing Grade Minimal requirements

- ❖ Minimal total course grade                           75%
- ❖ Minimal lectures attendance                         85%  (18 lectures)
- ❖ Minimal practical sessions attendance         85%
- ❖ Minimal Hospital lectures and other
  Academic sessions attendance                        50%*

 

❖ Minimal Out-patient sessions attendance    90%
❖ Minimal Correlation Course questions    80% (1,600)
❖ Minimal total quizzes score    60%
❖ Minimal final written exam score    80%
❖ Minimal final practical exam Score    80%

*During Hospital rotations*

**B)**   **Components included in Grade Calculation**

❖ Attendance to Course lectures    10 %
❖ Practical session reports    5%
❖ Outpatient Preceptor evaluation    5%
❖ Verbal 2-minutes presentation of clinical cases    5%
❖ Portfolio    1    10%
❖ Quizzes    35%
❖ Final written Exam    20%
❖ Final Practical Exam    10%

**C)**   **Student Evaluation of Academic Activities**

Students will submit an evaluation of every lecture and academic activity in which they have been involved, making suggestions for improvement. The *Fifth Semester Guidelines* booklet includes the respective forms and instructions.

## IV. BOOKS, LIBRARIES AND ON-LINE RESOURCES

1. **Mosby's Guide to the Physical Exam**, 6th Edition, Mosby, 2006 and accompanying CD which is the required textbook.

2. **MKSAP for Students 3** Developed by the American College of Physicians - Clerkship Directors n Internal medicine, 2005 and accompanying CD

3. **Harrison's Principles of Internal Medicine**, 16th Edition, McGraw-Hill, 2005 printing


12

rrini                                                              http://us.mg1.mail.yahoo.com/dc/launch?freeacct=1...

**From:** Paul J. Nicoletti (paul@nicoletti-associates.com)
**To:** billcain@comcast.net; steve_l_woodward@yahoo.com; yanezj@trinity-health.org;
nssimon@auamed.org; vhrehorovich@auamed.org; zonias@trinity-health.org;
**Date:** Thu, December 20, 2007 6:22:22 PM
**Cc:**
**Subject:** Steven Woodward v. Trinity Health-Michigan

Enclosed please find a copy of the civil action that was filed this afternoon. I would hope that this matter could be resolved without the need for costly and protracted litigation.

NICOLETTI & ASSOCIATES, P.C.
Paul J. Nicoletti
39520 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
(248) 203-7800
Fax (248) 203-7801

\* \* \* \* \* \* \* \* \* \*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another person any transaction or matter addressed in this communication.

\* \* \* \* \* \* \* \* \* \*

The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney-client communication, and as such would be privileged and confidential. If the reader of this message is not the intended recipient or any agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy the original message. Thank you.

No virus found in this outgoing message.
Checked by AVG.
Version: 7.5.503 / Virus Database: 269.17.4/1189 - Release Date: 12/18/2007 9:40 PM

Exhibit 16

8



<u>Print</u> - <u>Close Window</u>

Subject: RE: Antigua College vs. Woodward, Deposition Exhibits March 24
From:    Leigh C. Taggart (lct@raderfishman.com)
To:      steve_l_woodward@yahoo.com;
Cc:      dlj@raderfishman.com; mjw@raderfishman.com; on@raderfishman.com; lct@raderfishman.com;
Date:    Tue, 19 Jul 2011 17:37:45


Dear Steve:

Thanks for the e-mails and attachments.  Thank you as well for your time today in meeting with us.  We
look forward to working with you to identify and accomplish the legitimate objectives of your defense of
this suit.

I also want to confirm something that we told you in our meeting today.  You previously had litigation
against St. Joe's and Trinity Health Care in Oakland County Circuit Court and in the Michigan Court of
Appeals.  (Our firm represents Trinity in trademark matters, and we cannot and will not do anything
adverse to their legal interests.) Having said that, we do not think that the  present lawsuit by American
University of Antigua pending against you in the Eastern District of Michigan will require us to do
anything adverse to Trinity's legal interests.  If that changes however, we will obviously have to have a
discussion with you about any such issues and resolve them at that time.

Thanks again for your cooperation and attention to these matters.


Very best regards,
Leigh


**RADER,**
**FISHMAN**
**& GRAUER** PLLC

**Leigh C. Taggart, Esq.**
Rader, Fishman & Grauer PLLC
39533 Woodward Ave., Suite 140
Bloomfield Hills , Michigan 48304
+1-248-593-3315 direct
+1-248-594-0610 facsimile
lct@raderfishman.com

**CONFIDENTIAL AND PRIVILEGED INFORMATION IMPORTANT:** The enclosed message and any attachments are intended
for the addressee only and are privileged and confidential. If you are not the addressee, then please DO NOT read, copy or
distribute the message or any attachment.  Please reply to the sender that you received the message in error and delete it.
Thank you.

---

**From:** Steve Woodward [mailto:steve_l_woodward@yahoo.com]
**Sent:** Tuesday, July 19, 2011 4:27 PM
**To:** Jennifer Wunsche; Leigh C. Taggart
**Subject:** Antigua College vs. Woodward, Deposition Exhibits March 24

Dear Leigh and Jennifer,

Attached is the Exhibits from the March 24 Deposition.

Thanks again,

Steven Woodward

**EXHIBIT 2**

1

**RADER,**

**FISHMAN**

**& GRAUER**
PLLC

*39533 Woodward Ave., Ste. 140*
*Bloomfield Hills, Michigan 48304*
*Tel: (248) 594-0600*
*Fax: (248) 594-0610*

**LEIGH C. TAGGART**
**(248) 593-3315**
**lct@raderfishman.com**

July 19, 2011

Mr. Steven Woodward
7211 Brittwood Lane
Flint, MI 48507

      Re:    *American University of Antigua v. Steven Woodward*
             U.S.D.C., Eastern District of Michigan
             Case No. 10-cv-10978-PJD-mh

Dear Mr. Woodward:

      I have been appointed by the U.S. District Court to represent you in the above referenced lawsuit. There are certain details about our relationship that we must clearly establish so that we can represent your legal interests to the best of our ability. Please review the terms and conditions set forth below and sign where indicated, if you agree to this firm's representation of you in this matter.

**Terms of Representation**

      Under the court-sponsored program, I have agreed to represent you in this case on a pro bono basis, which means that I will not charge any fees for my work. We will represent your interests to the best of our ability, including giving you our best advice regarding any settlement negotiations that might occur.

      Under the court-sponsored pro bono program, my law firm is permitted to seek reimbursement from a fund established by the Court for up to $2,000 in costs actually incurred in representing you in this lawsuit. Costs include such things as deposition transcript expenses, legal research fees, preparation of exhibits for trial, expedited delivery of documents, and other similar expenses. You agree that we may seek reimbursement of expenses actually incurred on your behalf, and that any amount paid by the Court from its fund shall go solely to the law firm and not to you.

      Our agreement to represent you is in connection with the case shown above and not in any other legal matters.

*Worldwide Intellectual Property Matters • Patents • Trademarks • Litigation • Copyrights • U.S. and Foreign Portfolio Management*
*Computer and Internet Law • Trade Secrets • Unfair Competition*

**Bloomfield Hills      Washington, D.C.      Salt Lake City    Tokyo**

**2**

**RADER,**

**FISHMAN**

**& GRAUER**
PLLC

Mr. Steven Woodward
July 19, 2011
Page 2

We are coming into this case at a fairly late stage of the process. It is absolutely critical that you provide us with full information about the facts of the case that you claim are important to your defenses as soon as possible. We would prefer to meet with you in person to discuss these facts and to review any documents that you have gathered and that you believe are relevant to the case, either because they support your position, or because they support AUA's position. We also need you to immediately identify any witnesses who could or would testify to the facts that you allege, even if you do not consider them to be friendly to your claims.

The Court has scheduled a hearing on plaintiff AUA's motion for summary judgment on August 18, 2011. We need to determine as soon as possible whether we need to gather additional evidence before we can respond to this motion. We will have to file an opposition to this motion very quickly if the motion hearing goes forward as scheduled.

I will be assisted in this case by my associate Darcey Jacobs, and by my paralegal, Mary Jennifer Wunsche. It is just as important that you cooperate fully with both of them as it is that you cooperate fully with me in defending you in this lawsuit.

If you refuse to follow our advice in this matter, or refuse to cooperate in preparing your case (including failing to communicate with us about the case when we request information or decisions), you agree that we shall have the right to terminate our representation. We also retain the right to terminate our representation under the circumstances and in accordance with the procedures provided by the Michigan Rules of Professional Conduct applicable to all lawyers.

Other than routine communications about administrative details, we will not schedule or conduct depositions or meetings with opposing counsel or the adverse party without your knowledge and/or attendance to same. We will file no Motions or other documents with the Court on your behalf without your express knowledge and authorization. We reserve the right to file a motion to withdraw as your counsel of record without your approval if you stop responding to our communications or if the attorney-client relationship breaks down to the extent that we can no longer perform our legal duties as required by the Michigan Rules of Professional Conduct.

3

**RADER,**

**FISHMAN**

**& GRAUER**
PLLC

<div align="right">

Mr. Steven Woodward
July 19, 2011
Page 3

</div>

Please indicate your agreement that Rader, Fishman & Grauer PLLC represent you under the terms and conditions stated above.  Please do this by signing the copy of the letter enclosed, and sending it back to me in the enclosed self-addressed stamped envelope.

Very truly yours,

RADER, FISHMAN & GRAUER PLLC

Leigh C. Taggart

LCT/mjw

-----------------------------------------------------------------------------------------------------------

I have read this letter and agree that Rader, Fishman & Grauer PLLC should represent me in the above referenced lawsuit.  I further agree to the terms and conditions set forth in this letter.

**ACCEPTED AND AGREED**

_____          _____
**(Signature)**                                      **(Printed Name)**

**Date:** _____

4

BD

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

                  Plaintiff,

vs.

CASE NO. 11-116369-CD
HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC, a domestic Corporation,

                  Defendant.

_____/

| DEBORAH L. GORDON. PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| **Deborah L. Gordon (P27058)** | **David B. Gunsberg (P24235)** |
| **Carol Laughbaum (P41711)** | Attorney for Defendant |
| Attorneys for Plaintiff | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | davidgunsberg@hotmail.com |

_____/

## NOTICE OF HEARING

      PLEASE TAKE NOTICE that Defendants' Motion for Summary Judgment will be brought on for hearing before the Circuit Court for the County of Oakland, the Honorable James M. Alexander presiding, on <u>Wednesday, October 12, 2011 at 8:30 a.m.</u> or as soon thereafter as counsel may be heard.

                             LAW OFFICES OF DAVID B. GUNSBERG, P.C.

                             By:   /s/ David B. Gunsberg_____
                                 David B. Gunsberg (P24235)
                                 Attorney for Defendant
                                 322 North Old Woodward Ave.
<u>Date: September 15, 2011</u>            Birmingham, MI 48009

**EXHIBIT 3**

1

<div style="writing-mode: vertical">Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31</div>

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

                 Plaintiff,

vs.
                                               CASE NO. 11-116369-CD
                                               HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC, a domestic Corporation,

                 Defendant.
                                                                          /

| DEBORAH L. GORDON. PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg (P24235) |
| Carol Laughbaum (P41711) | Attorney for Defendant |
| Attorneys for Plaintiff | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | davidgunsberg@hotmail.com |

                                                                                                 /

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

     NOW COMES Defendant through counsel, David B. Gunsberg, and motions this Court

for an order of summary judgment based on MCL 2.116(C)(8) and (10) for reasons stated in

the brief attached.

                               LAW OFFICES OF DAVID B. GUNSBERG, P.C.


                               By:   /s/ David B. Gunsberg
                                  David B. Gunsberg (P24235)
                                  Attorney for Defendant
                                  322 North Old Woodward Ave.
Date: September 15, 2011            Birmingham, MI 48009

2

FEE

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

               Plaintiff,

vs.                                         CASE NO. 11-116369-CD
                                         HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC, a domestic Corporation,

               Defendant.

_____/

| DEBORAH L. GORDON. PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg ((24235) |
| Carol Laughbaum (P41711) | Attorney for Defendant |
| Attorneys for Plaintiff | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone:  248.646.9090 |
| Telephone:  248.258.2500 | |

_____/

## DEFENDANT'S  BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

    NOW COMES Defendant through counsel David B. Gunsberg, and for its Brief in

Support of its Motion for Summary Judgment states as follows:

    Plaintiff Susan Zonia ("Zonia") filed a one count Complaint against Trinity Health-

Michigan d/b/a St. Joseph Mercy Oakland Hospital ("SJMO") alleging she was terminated in

violation of public policy (**Exhibit 1, Complaint**).  Her Complaint alleges she was an "at will"

employee terminated for her complaints about violation of law and policy occurring in the

hospital (**Exhibit 1**, Complaint, par 17) and, in part, for her failure and refusal to violate or

"acquiesce in" violations of law (**Exhibit 1**, par 21).  Zonia's complaint specifically refers to 3

incidents which she claims support her claim – a complaint about a doctor carrying a knife, a

complaint about residents with J-1 Visas who were "moonlighting" and denying a staff doctor's request to have a person "shadow" him in the hospital (Exhibit. 1).

Plaintiff's complaint fails to state a claim MCR 2.116 (c) 8. Furthermore, based on the undisputed facts, Defendant is entitled to summary disposition as a matter of law (MCR 2.116 (c)(10)).

## FACTS

Zonia was employed as Director of Graduate Medical Education (GME) at SJMO from 2005 until Oct. 1, 2010. She was in charge of all educational programs including administrative (i.e. non-medical) oversight of the residency program. Zonia reported to Dr. Don Bignotti (who hired her). Zonia supervised the 5 physician's responsible medical aspects of SJMO's 5 residency programs and the GME office staff.[1]

In her Complaint Zonia alleged she complained about or refused to participate in 3 incidents which she alleges were violations of law and/or hospital policy (Exhibit 1, par 12-16).

The first "incident" involved an objection to a staff physician, Dr. Denier, carrying a "switchblade" knife on hospital property (**Exhibit. 1**, par 12). Zonia's complaint does not identify the law or public policy violated by Denier carrying a "switchblade" knife. In her deposition Zonia described the incident (Zonia, dep. pg 90-94). Per Zonia, in 2008 a resident complained that Dr. Denier was seen giving another resident a "switchblade" knife (Zonia Dep. 90). Zonia reported this to Dr. Bignotti, her supervisor (Zonia Dep. 91), that Bignotti told her to "contact the resident to find out if it was true" (Dep. 92), that she assumes Bignotti had a meeting with Dr. Denier and told him to get rid of the knife (Zonia Dep. 94), that there was no further conversation about it other than "joking" (Dep. 94) and Zonia has no information than the

---

[1] Zonia has a PHD in social work and although she refers to herself as Dr. Zonia, is not a medical doctor. The residency programs are Internal Medicine, surgery, OB-GYN, radiology and "transitional year" (Zonia dep P. 68, 87) Deposition references are to Zonia deposition Ex 7A, Bignotti dep Ex 7B, Murphy dep Ex 7C, and McNeil dep Ex 7D.

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

knife incident was in any way considered in the decision to terminate her (Zonia Dep 94-95). Bignotti testified Zonia reported the knife and he told Denier "it was not acceptable and I never wanted to hear about it again" (Bignotti Dep pp 116-117).

The second "incident" referred to in Zonia's complaint alleges that in or about July 2010, Zonia "objected to violation of federal immigration laws by residents who were moonlighting" Exhibit 1, par 13 and that based on her objection "the practice ceased" (Exhibit 1, par 13 & 14). This "incident" is described in Zonia's deposition at pages 107-114. In July 2010, an internal medical resident complained about being pressured to "moonlight" i.e. cover internal medicine call for extra pay. Zonia discovered that residents with J-1 Visas (non-work, education only) were scheduled to "moonlight" by the Internal Medicine Chief Resident (whom Zonia supervised) and notified Dr. Diaczok, the Internal Medicine Program Director (who reported to Zonia) that J-1 Visa residents should not moonlight.

Diaczok agreed ("he said he'd get right on it" and "I believe he did", Zonia dep. 110). Zonia testified Diaczok instructed the Chief Resident[2] to stop the practice and it did (Zonia dep. 113-114). There was no more conversation about the issue after that (Zonia dep. 113-114).

Dr. Bignotti testified that he agreed with Zonia regarding the J-1 Visa issue and told her to get it stopped (Bignotti dep. pp 237).

Zonia testified she has no information the J-1 Visa issue was involved in any way in the decision to terminate her (Zonia dep. p 114).

The third "incident" listed in Zonia's Complaint involved a request by a staff physician, Dr. Jewell, to allow a non-resident to "shadow" him, i.e. accompany him on rounds in the hospital. Zonia alleges that she objected because SJMO had a "direct policy" prohibiting such

---

[2] The "Chief Resident " of a residency program changes by year because typically a chief resident is in his/her last year of residency.

5

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

conduct and it "threatened" to violate federal and state privacy laws including Health Insurance Portability and Accountability Act (HIPPA) (**Exhibit 1** par 15-16).

Zonia testified that Dr. Jewell made the request to Susan Shultz, Director of the research area, to allow a "shadow", that Zonia told Shultz "we can't even consider it" because it violates hospital policy, that Shultz told Dr. Jewell she (Shultz) couldn't approve Jewell's request, that Jewell, per Shultz, was "very annoyed", that Zonia has no idea what Jewell did with the information, and that Zonia talked to Dr. Bignotti about it later. (Zonia's dep pp 95-107). Bignotti responded "maybe we should rewrite the policy" and "no, he (Bignotti) didn't tell me I need to allow it" (Zonia dep. 106).[3]

Zonia testified she has no information the shadow issue was in any way involved in the decision to terminate her (Zonia dep. pp 106-107).

Zonia testified no one ever told her that as part of her job she had to violate the law or instructed her to violate the law (Zonia dep. pp 114).

### Zonia's Termination

On September 26, 2010, Zonia sent an email to her direct report, Susan Swanson, regarding Dr. Payne Jackson (PJ), the director of OB-GYN Residency Program, in response to an email PJ has sent regarding communication with PJ's residents while PJ was on leave. In her email Zonia told Swanson, in a response to a communication from Dr. Payne Jackson, to "Ignore her (cold shoulder will bother her)" (**Exhibit 2**, 9/26/10 email) (Zonia dep. pg 83-84). Zonia also accidentally sent the email to PJ and others. PJ was "highly offended" and complained to Dr. Bignotti, Zonia's supervisor. (Murphy dep, p 42) Dr. Bignotti talked to Swanson. During the Bignotti-Swanson conversation, Swanson voiced numerous complaints about Zonia including

---

[3] Zonia testified that there is no law against "shadowing", that SJMO allows non-employee nursing students to "shadow", that "privacy" or "HIPAA" rights belong to the patient and no patient ever assigned their privacy rights to Zonia (Zonia dep pp 100-101).

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

complaints Zonia talked about her (Zonia's) sex life, made comments about Swanson's sex life, was nasty and created an atmosphere of fear in the GME office, told GME staff that Zonia, "couldn't be touched" because she was friends with management, cursed (especially constant use of the f _ _ _ word), criticized management and doctors and belittled/demeaned the GME staff. (see Affidavits, Summary of Statements, **Exhibit 5**). Dr. Bignotti consulted with VP of Human Resources Martha Murphy.

This was not the first time Zonia had been accused of "belittling" the staff. Swanson's predecessor, Donna Hamilton, had quit. During an exit interview Hamilton complained to Bignotti about Zonia's "belittling" behavior. Zonia denied it (Zonia dep. pp 26-29). Bignotti told Zonia such behavior was not acceptable. (Bignotti dep. pp. 174-176).

Bignotti and VP of HR, Martha Murphy, decided to suspend Zonia and investigate (Murphy dep. Exhibit 7(c) p 47, 51, 53-56). Bignotti and Murphy met with GME staff and arranged for GME staff to meet with HR Director, Ane McNeil. On Sept. 30, McNeil met with Swanson and five (5) other GME staff who confirmed Swanson's complaints. McNeil concluded that Zonia has created "hostile environment" and violated SJMO's Mission Statement (McNeil dep, **Exhibit 7(D)** p 113-114) (see **Exhibit 3**, Disciplinary Policy, **Exhibit 4** Mission Statement and **Exhibit 5**, Affidavits and Summary of Statements) which holds directors/leaders like Zonia to a "higher standard", and requires respect and appropriate treatment of subordinates. <u>McNeil met with Murphy and recommended Zonia's termination</u> (McNeil dep p 94-101, 111.).[4] McNeil testified she did not interview Zonia but did not feel it necessary to interview Zonia because the allegations were repeatedly corroborated (McNeil dep p 101). Murphy reviewed

---

[4] <u>McNeil testified she had no information about any of the incidents Zonia allegedly complained about, ie the knife and Dr. Denier, Dr. Jewell and shadowing or the J-1Visa issue. (McNeil dep p 112-113).</u> Similarly, Murphy was not involved in any of Zonia's "Complaints".

7

**7**

McNeil's notes and concurred in the termination decision. (See **Exhibit 5**, Affidavits with Statements/Summary of Statements, Murphy dep p 88-90).

Murphy and McNeil met with Bignotti. Bignotti concurred with the recommendation (Murphy dep. p 88-90) (Bignotti dep. p 153-176). [5] On October 1, 2010 Murphy and Bignotti terminated Zonia (See **Exhibit 6**, Termination Notice). [6] When Murphy asked Zonia if she had anything to say, Zonia said she "confused friendship with work". Murphy took that to mean Zonia admitted she "messed up" (Murphy dep p 112).

Murphy testified she did not consider actions less than termination because of the "damage" to the work group and she wouldn't put Zonia back into a supervisory position over the GME staff who were "fearful". (Murphy dep p 87-88, 91-93, 114).

<u>Argument</u>

Defendant moves for dismissal under MCR 2.116 C(8) and C(10).

Zonia's claim fails on its face under MCR 2.116 (C)(8). Wrongful discharge in violation of public policy is a common law cause of action created by the Michigan Courts in 3 limited circumstances. The Michigan Supreme Court has recognized three situations where an at-will employee may challenge termination on public policy grounds. Suchodolski v Michigan Consolidated Gas, 412 Mich 692 (1980). The three public policy exceptions apply when 1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; 2) the employee is discharged for refusal or failure to violate its law in the course of employment; or 3) the employee is

---

[5] McNeil testified she had recommended termination on another prior occasion without interviewing the terminated employee (McNeil dep. p 31, 32). Murphy also testified to 2 occurrences prior to Zonia, she was aware of where director level employees have been terminated without interviewing the directors (see Murphy dep p 65, 66) or without prior disciplinary actions (Murphy dep pp 17-18, 58-59, 66-67).

[6] Murphy and Zonia were good friends who socialized outside of work Murphy testified some of the sexual comments Zonia made to staff were also comments Zonia had made to Murphy outside of work and staff would not have known about statements unless they came from Zonia (Murphy dep p 90).

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

discharged for exercising a right conferred by a well established legislative enactment. Id. Complaints about a refusal to follow/violate an employer's policy does not support a public policy violation. Id.

There is no Michigan case or statute which supports a public policy exception for "refusing to acquiesce in violation of law". "Acquiescence", i.e. that plaintiff was required to "put up with" some one else's violation of the law, is not a one of the three circumstances or "prongs" recognized by Suchodolski.

The public policy exception to at-will does not extend to "discharges in retaliation for reporting violation of law to superiors". Cushman –Lagerstrom v Citizens Insurance Co. of America, 2003 US app Lexis 55635, 16-20 (CA6 2003) (unpublished) (See Exhibit 8-A). It is well established that there is no common law cause of action in Michigan for discharge of an employee for reporting an employee's violation of the law. Covell v Spengler 141 Mich App 76 (1986); Shuttleworth v Riverside Osteopathic Hospital, 191 Mich App 25 (1991). To the extent Zonia claims "protected activity" to support a wrongful discharge such public policy claim, there is no such common law cause of action. See also, Lewandowski v Nuclear Management Company, 272 Mich App 120 (2006) (recognizing employee's no common law right to avoid termination if report violation of law). That no common law cause of action exits for reporting violations of law to a supervisor. has been repeatedly recognized by Federal Courts interpreting Michigan Law. In addition to Cushman-Lagerstrom, see Scott v Total Renal Care 194 Fed App 292 (CA6 2006) (unpublished) (see Exhibit 8-D) (Michigan law does not protect Plaintiff's right to make complaints of violation of law to her employer); Goldfadden v Wyeth Labs, Inc. 2010 US Dist Lexis 49219 (Ed Mich, Roberts J) (The WPA (Whistle Blower's Protection Act) is the exclusive remedy for employees terminated for reporting violation of law. There is no common law cause of action in Michigan for discharge in retaliation for underlined internal reporting of violations of

9

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

law). Korte v Ford Motor Co., 2011 US Dist Lexis 2886 (Ed Mich, Borman, J) (unpublished) (see Exhibit 8-E) (It appears to be well established that Michigan courts do not recognize a cause of action for a discharge in retaliation for reporting violations of law to superiors), Robins v Radison of VA, 624 F Supp2d 617 (Ed Mich 2008, Cox, J.) (a public policy claim cannot be based on internally reporting alleged unlawful conduct; rejecting plaintiff's argument reporting unlawful conduct to a supervisor qualifies is a "refusal to violate the law").

A statute that does not directly confer rights on the Plaintiff does not satisfy the public policy exception to at will Edelberg v Leco, 236 Mich App 177 (1999). In other words, Plaintiff cannot succeed in a public policy claim by complaining about the violations of rights of a third party. Id.

Zonia's Complaint asserting that a doctor carried a switchblade knife on hospital property, does not identify a specific legislative statement prohibiting discharge of an employee who acts in accordance with a statutory right or duty. Nor does Zonia's objection, on its face, amount to Zonia's refusal to violate the law, or constitute Zonia's exercising a right confirmed by a well established legislative enactment. Even if carrying a switchblade knife is a violation of law, Zonia does not allege any one required her to violate the law. Cushman-Lagerstrom, supra. Zonia's complaint to Bignotti, her supervisor, is not protected. (see cases cited, supra).

And if carrying a knife violated hospital policy, such violation is not actionable as a "violation of public policy". Suchodolski, supra.

Similarly, objection to a physician having a "shadow" does not meet any privacy right of Zonia's. Suchodolski, supra. Zonia does not assert that "shadowing" is illegal. While shadowing, to the extent it may potentially/possibly involve a patient privacy issue, or could "potentially" violate HIPAA, none of the "rights" implicated belong to Zonia; they belong to the patient(s). Again, as to shadowing, Zonia has not identified any explicit legislative statement

10

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

prohibiting discharge of an employee who acts in accordance with a statutory right. There is simply no "public policy" about "shadowing" of a physician by a non-physician. There is no claim plead by Zonia that Zonia was instructed to or refused to violate "the law", or that she exercised her rights conferred by a well established legislative enactment.

Again, complaining about a "possible" or "potential" violation of hospital policy is not a public policy violation. Id.

Similarly, Zonia's objection to J-1 Visa residents moonlighting meets none of the 3 prongs of Suchodolski. As to immigration law, Zonia has identified no explicit legislative statement prohibiting discharge of an employee who acts in accordance with a statutory duty. Zonia does not allege she was required to violate the law by allowing J-1 Visa residents to "moonlight"; nor was Zonia exercising right(s) conferred by a well established legislative enactment, and none is identified. Again, if Zonia complained about J-1 Visa residents moonlighting as a violation of hospital policy, such complaint is not actionable. Id. And again, Zonia's internal complaint to her supervisor is not actionable or protected. (see cases re: complaint to supervisors, supra)

Because Zonia's "complaints" do not meet the 3 prongs of Suchodolski. Zonia fails to state a claim. MCR 2.116 (C) (8).

<u>Argument</u>

Zonia fails to state a claim under MCR 2.116 (c)(10). Zonia fails to state a prima facia case.

A motion under MCR 2.116(c)(10) tests the factual sufficiency of this Plaintiff's complaint measuring the admissible evidence submitted in the light most favorable to the non moving party Maiden v Rozwood, 461 Mich 109 (1999). Summary judgment should be granted where there is no genuine dispute of material facts and Defendant is entitled to judgment as a matter of law, id.

11

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Public policy wrongful discharge cases may be viewed/analyzed as a retaliation claim. Plaintiff must show that she engaged in protected activity 2) was discharged, 3) there was a causal nexus between the protected activity and the discharge. See West v General Motors Corp, 469 Mich 177 (2003), (in the context of a Whistleblower Protection Act (WPA) case, Something more than a temporal relationship between the protected conduct and termination is required to show causation where an employee with 30 year "nearly perfect" record terminated after reporting incident to police). Causation requires that the protected activity be a "significant factor" in the adverse employment action, Barrett v Kirtland Community College, 245 Mich App 306, 315 (2001).

Here, Zonia's complaint alleges she was terminated on October 1, 2010 for complaining about J-1 Visa resident moonlighting in July 2010, denying Dr. Jewell a "shadow" in summer, 2010, and complaining about Dr. Denier carrying a knife in 2008.

Again, even if that is true, the "complaints" fails to establish Zonia engaged in protected activity, Suchodolski, supra, for the reasons previously stated.[7]

Zonia testified she has no information any of these issues were considered in the decision to terminate her. Zonia explicitly testified she was not instructed to violate the law. To the contrary, Zonia testified that with respect to the "knife" incident, she assumed the issue was immediately taken care of by Dr. Bignotti. With respect to the J-1 Visa Residents (over which Zonia had direct supervisory control and could have stopped the moonlighting on her own), again, the issue was immediately taken care of (i.e. stopped). With respect to the "shadowing" incident, there is no evidence that Zonia was even involved in the denial of the request. Per

---

[7] To the extent Zonia's complaint plead she was required to "acquiesce in violations of law", her testimony contradicts her complaint. Zonia testified that with respect to any complaint she was not required to "live with" any violation of the law – to the contrary, the response was that the matters complained of were immediately stopped (eq, the "knife" was removed, the J1 VISA residents were not allowed to moonlight and Dr. Jewell not allowed to shadow). Zonia herself was never required to "violate the law", and Zonia's internal complaints do not amount to a "refusal to violate the law", Cushman-Lagerstrom. Supra.

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Zonia, the request was denied by Sue Shultz, an employee in Zonia's department, who is still employed by SJMO.  And there is no evidence Zonia was told she had to allow "live with" a knife on hospital grounds, or J-1 Residents moonlighting or "shadowing".  In short, Zonia can't identify factually any violation of a right she had or violation of law she was forced to engage in. In the end, her complaints resulted in the immediate response she requested – the knife was removed, the J-1 Visa residents stopped moonlighting and there was no shadow of Dr. Jewell.

Moreover there is no evidence of a causal nexus between her complaints and her termination.  The precipitating event which caused Zonia to be investigated was Zonia's email to Swanson about Dr. Payne Jackson on September 26, 2010, which precipitated a complaint from Dr. PJ and led to an investigation which disclosed that Zonia's department was working in a hostile environment based on Zonia's actions.  These claims were corroborated in whole or in part by six (6) GME staff members. (See Exhibit 5, affidavits).

The principal investigator, Ane McNeil, testified she had no information at all about Zonia's complaint about the knife, J-1 Visa or shadowing. (McNeil dep p 111-113).  After McNeil conducted her investigation/interview of 6 GME staff, McNeil concluded that Zonia should be terminated and recommended termination (McNeil dep p 101, 113-114).  Martha Murphy, McNeil's boss, reviewed the investigative notes and also concluded that Zonia should be terminated. (Murphy dep p 87-89).  There is no evidence the HR persons involved in the investigation/recommendation for termination were involved in any way in the issues Zonia complained of.

Again, Zonia admits having no evidence her complaints had anything to do with her termination and cannot show that the person(s) who recommended her termination considered her complaints in making their recommendation.  Zonia can't establish a causal nexus between any complaint and her termination.

13

13

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Moreover, Defendant has proffered a non pretextual reason for Zonia's termination: Zonia's creation of a hostile environment and inappropriate behavior as a "leader". There is no dispute that such actions violate the disciplinary policy and Mission Statement of SJMO and are terminable, i.e. "major" offenses. McNeil and Murphy testified as to examples of others who similarly violated such policy/Mission Statement and were terminated. Zonia, in her deposition, denied some of the actions, but also she admitted to other actions or tried to explain them away.

For example Zonia admitted to telling staff she would have to give her boyfriend more "blow jobs" for his helping her move (Zonia's dep p 136). Zonia admitted to having conversations with Susie Swanson that Swanson should have sex with more than one man (i.e. not limit herself to sex with her husband) but claimed Swanson brought up the topic. Zonia testified she cut down on using the F_ _ _ word but said "WTF" instead. (as in "what the F_ _ _") (Zonia 125, 127).   In the end, McNeil/Murphy were faced with not believing six (6) staff and believing Zonia. They chose to believe the staff.

It is anticipated Zonia will attack the credibility of Susie Swanson and other staff and claim the investigation was unfair because she was not interviewed. Again, McNeil and Murphy explained it was not uncommon not to interview an accused employee, and both felt that even if Zonia denied everything, they felt the six statements corroborated the information. Their conclusion was that the relationship in GME was between Zonia and her staff was broken and could not be fixed. This opinion is pure business judgment.[8] The Court should not sit as a super personnel department to second guess SJMO management's business judgment.   Town v Michigan Bell, 455 Mich 688, 704-705 (1997) (the plaintiff cannot simply show that the employer's decision was wrong or mistaken. The issue is whether the employer was motivated

---

[8] It is anticipated that Zonia will claim she wasn't "warned" although Bignotti testified he told her that "belittling" behavior toward her subordinates was "unacceptable" when he discussed Hamilton's complaints about Zonia's "belittling" behavior with Zonia.

14

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

by discriminatory animus, not whether the employer's decision is wise, shrewd, prudent or competent).

Defendant anticipates Zonia will claim that Defendants' actions were "pretextual" or "suspicious" because; 1) Plaintiff was not interviewed during the investigation of the complaints about her; 2) the investigation process took only a few days; 3) Plaintiff was not previously "disciplined"; 4) Plaintiff was not given an "improvement" plan, and Zonia has previously had "good evaluations". A Plaintiff may show pretext by showing that the Defendants proffered reason is false, was not the actual reason for its action, or that the reason does not warrant the adverse action. Lytle v Malady, 458 Mich 152, 174 (1998).

But Zonia was not treated differently than others. Murphy testified that there had been 3 other occasions where "director" level employees had not been interviewed (Murphy dep, p 59, 66-73, a Chief Nursing Officer, a CFO, and a Chief of Security) before being terminated. McNeil could recall one (1) other occasion where the accused was not interviewed (McNeil dep p 31). Both testified that the six (6) GME staff corroborated the allegations and they were satisfied with the credibility of the GME staff. (Murphy dep p 87-93, 101-102, McNeil dep p 89-103, 111, 122-123).

The investigation was "a few days" because the email from Zonia to Dr. PJ occurred on 9/26, the investigation was completed quickly because Zonia was suspended and the process completed to the point where McNeil/Murphy were satisfied and could reach a conclusion on termination. There was no plan to "speed up" the investigatory process. (McNeil dep p 111).

Both McNeil and Murphy testified that other managers had been fired without prior discipline. (McNeil dep p 71, Murphy dep p 16-19). And both felt Zonia had damaged the relationship with her department and could not be placed on an improvement plan, similar to

15

15

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

other managers who had not been placed on improvement plans (Murphy dep p 17-18, 67-69, 89-90, 92, 114, 122-123, McNeil dep p 48).

That Zonia had "a good performance record" up to the point where she lodged her complaint(s), does not establish that the complaint(s) were a "significant factor" in Defendant's decision to terminate her for her violations of disciplinary policy and SJMO's mission statement. Wolfgang v Dixie Cut Stone and Marble, 2010 Mich. App. Lexis 130 (unpublished opinion) (see Exhibit 8-B).[9] (Plaintiff's reference to her "good performance record" up to time of lodging complaints does not establish that her complaints were a "significant factor" in her termination for violation of employer's policy).

And Zonia's "denial" that she engaged in most of the conduct she was accused of by the six (6) GME staff, doesn't establish pretext, i.e. does not show the Defendant's reasons for her termination were not the "real" reason for her termination, see for example Arold v Michigan Bell Telephone Co., 1998 Mich. App. Lexis 2192 (unpublished opinion) (see Exhibit 8-C) (where plaintiff denied the she had "accessibility problems" and argued that Defendants' reliance on her short comings were misplaced, Plaintiff merely asks the court to second guess Defendants' business judgment and does not suggest that Defendants' reasons were unworthy of belief).

There is no evidence Zonia was treated differently than other managers. Plaintiff is merely arguing about management's business judgment, which the court should not second guess. Town, supra.

---

[9] SJMO does not dispute that prior to her inappropriate email to Dr. Payne-Jackson and the complaints voiced about her by her entire support staff, Zonia had good evaluations. Clearly, Zonia presented one face to Bignotti and an entirely different face to her staff. It is hardly surprising, given Zonia's repeatedly telling her staff she "couldn't be touched" and was "in with" upper management, that GME staff were reluctant to complain about her. It was exactly Zonia's attempt to create the impression among her staff that she was "untouchable" that concerned management.

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

In the end, the investigation disclosed a breakdown in the GME department.  As Martha Murphy testified, in such circumstance the company can fire the leader or fire the staff (Murphy dep p 92).  SJMO chose to fire the leader.   Zonia may disagree with the way the investigation was conducted or argue that she should have been given a disciplinary plan.  But such arguments are merely a disagreement on SJMO's business judgment. Town, supra.  They do not constitute a genuine dispute of material fact sufficient to prevent summary judgment.

Summary Disposition should be granted.

LAW OFFICES OF DAVID B. GUNSBERG, P.C.

By:   /s/ David B. Gunsberg
      David B. Gunsberg (P24235)
      Attorney for Defendant
      322 North Old Woodward Ave.
Date:   September 15, 2011      Birmingham, MI 48009

### CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2011, I electronically filed the Defendant's Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment with Exhibits 1 – 8 attached, with the Clerk of the Court using the WIZNET system which will send notification of such filing to counsel of record.

        /s/ Luann Meitz
        Legal Assistant, Law Office of David B. Gunsberg