

**ST. JOSEPH**
**MERCY** OAKLAND
A MEMBER OF TRINITY HEALTH

**SJMO Hospital**
**Policy & Procedure**

**POLICY CODE:** 125-HPP-Y-4

**SUBJECT:**
Employee Discipline

*Exhibit*

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**PURPOSE:**

To ensure that disciplinary action is administered on a fair, equitable and consistent basis according to the SJMO-MO commitment to promoting quality improvement and safety in all processes, systems, and actions.

**POLICY:**

The St. Joseph Mercy Oakland-Member Organization (SJMO-MO) is committed to providing a learning environment in all aspects of our work. This learning environment promotes quality improvement and safety in all processes, systems, and actions. The key to enhancing quality and safety is building trusting and respectful relationships with patients, employees, Medical Staff, and volunteers that is reflective of the Trinity Health values.

**PROCEDURE:**

Discipline is issued when an employee: (1) deliberately disregards established rules, regulations, policies, procedures, processes or systems; or (2) is involved in criminal activity; or (3) provides false information in the course of performing their job responsibilities.

The specific level of discipline issued is dependent upon the seriousness of the infraction. SJMO-MO recognizes **Section A - Minor Infractions** and **Section B - Major Infractions**. Infractions that relate to the making or reporting of errors/injuries or "near misses" (potential conditions for error or injury), hazardous conditions or aberrant behavior will be addressed separately in Policy 125 AAA

A.   **MINOR INFRACTIONS**
     Minor infractions will result in an employee being issued discipline in a progressive manner based upon the seriousness of the infraction. Normally, the progression will be as follows:

     1st Infraction   -   Written Warning
     2nd Infraction   -   Written Reprimand
     3rd Infraction   -   Suspension Without Pay
     4th Infraction   -   Final Warning
     5th Infraction   -   Discharge From Employment

---



| | |
|---|---|
| **ST. JOSEPH**<br>**MERCY** OAKLAND<br>A MEMBER OF 🟢 TRINITY HEALTH<br>**SJMO Hospital**<br>**Policy & Procedure** | **POLICY CODE** 125-HPP-Y-4<br>**SUBJECT:**<br>Employee Discipline |

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**Minor** infractions include but are not limited to:

1. unacceptable job performance
2. failure to adhere to departmental or SJMO-MO standards with respect to personal hygiene, grooming, clothing, and uniforms
3. rudeness to patients, employees, physicians, volunteers, vendors, or visitors
4. failure to promptly report an on-the-job injury within 24 hours to supervision
5. violation of minor security, fire, traffic, smoking, or parking regulations
6. unauthorized solicitation on the premises
7. failure to record/punch shift starting and/or shift ending time
8. failure to follow reasonable departmental call-in procedural guidelines
9. unauthorized absence from work area
10. presence in unauthorized area

**B.      MAJOR INFRACTIONS**

Major infractions will result in an employee being issued either a Final Warning or Suspension Without Pay or Discharge based upon the seriousness of the infraction. **Major** infractions include but are not limited to:

1. theft, removal or unauthorized possession, tampering, or use of property belonging to another employee, patient, visitor or SJMO-MO.
2. unlawful or unauthorized use, manufacture, possession, sale or transfer of illegal or controlled substances on or off SJMO-MO premises. Possession, abuse or unauthorized use of alcohol on SJMO-MO premises. Evidence of use or reporting to work under the influence of alcohol, illegal or controlled substances is based on reasonable cause to believe that an employee is not in a condition to perform her or his duties due to chemical impairment which may be evidenced by:
3. inability to perform assigned job
4. undesirable influence (such as breath, behavior, uncooperativeness toward patients, staff, visitors and/or other employees).
5. refusing to submit to medical evaluation including testing when reasonably suspected of being under the influence of alcohol or drugs
6. immoral conduct or indecency on the SJMO-MO premises
7. punching another employee's timecard or having another employee punch your time card
8. falsification of payroll or other SJMO-MO records
9. falsification of identifying self or business purpose or actions with patient, another employee or the public
10. fraudulently reporting unavailability for work
11. assault
12. sabotage
13. using obscene, abusive or threatening language
14. mistreatment of patients, employees, physicians, volunteers, vendors, or visitors
15. possessing firearms, knives or other unauthorized dangerous materials on the SJMO-MO premises
16. willful destruction of SJMO-MO property
17. insubordination (willful disobedience of an order given by the supervisor which does not pose a safety problem for the employee).

19



| | POLICY CODE: | 125-HPP-Y-4 |

**ST. JOSEPH MERCY OAKLAND**
A MEMBER OF TRINITY HEALTH

**SJMO Hospital Policy & Procedure**

**POLICY CODE:** 125-HPP-Y-4

**SUBJECT:**

Employee Discipline

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

18. sleeping or assuming the posture of sleep while on duty
19. unauthorized ordering, access, possession, use, copying or revealing information about SJMO-MO business and activities or about employees'/patients' conditions, business, or activities
20. lack of compliance with the Trinity Health Organizational Integrity Program or the
21. Organizational Integrity Program's Standards of Conduct or other laws and regulations relating to Trinity Health business activities.
22. performance that causes grave harm/potential grave harm to the patient or SJMO-MO
23. gambling on SJMO-MO property
24. improper or negligent acts that cause damage to, waste of, or loss of material, supplies,
25. equipment, facilities, or other property of SJMO-MO, or of a patient, an employee, or a visitor
26. failure to assist a patient if such service is within the scope of the employee's duties or is required by reason of an emergency relating to the patient
27. behavior which creates a hostile work environment such as threatened or actual physical violence, sexual harassment, racial harassment, or verbal abuse of a patient, visitor, staff, or another employee
28. walking off the job (abandonment of position)
29. conviction of a felony which has an adverse impact on the business condition of SJMO-MO

The employee's Director must consult with and receive the approval of both their respective Vice President and the Vice President for Human Resources prior to assessing such discipline. A complete review of the incident will occur and a determination made of its' seriousness and effect on patient care or employee morale. Also, the employee's past record will be reviewed by the Vice President for Human Resources who will recommend the appropriate level of disciplinary action consistent with action taken within SJMO-MO.

**GENERAL:**

SJMO-MO management reserves the right to exercise discretion to assess lesser or greater discipline based on the employee's record and extenuating or mitigating circumstances.

Active discipline for the purpose of issuing successive steps in the disciplinary action process cannot extend beyond two years from the date of the initial incident except in the case of discipline issued for Major infractions.

Completed Disciplinary Action forms containing all required information and signatures must be forwarded to Human Resources promptly for processing and filing. The employee copy should be given to the employee during the disciplinary conference.

The Human Resources Department is responsible for the interpretation and administration of this policy.

20

ANE J. McNEIL                                    August 10, 2011

29

1    this employee; is that correct?
2    A.   No.
3    Q.   Well, there were prior issues such that he or she was
4         issued a final written warning; correct?
5    A.   Correct.
6    Q.   And presumably a final written warning implies that
7         there were issues prior to that; correct?
8    A.   Not necessarily, no.
9    Q.   Do you know in this case whether the final written
10        warning was literally the first disciplinary action this
11        person had received or not?
12   A.   Outside of this person receiving discipline for
13        attendance, which is a separate disciplinary tract, I
14        believe it was.
15   Q.   So, they had an issue two, plus, years back, and then
16        they had another issue in 2011; correct?
17   A.   Correct.
18   Q.   What, if any, action was taken after this individual was
19        issued a final written warning to ensure that those
20        behaviors didn't repeat; if you know?
21   A.   I don't know.
22   Q.   Was that employee counseled?
23   A.   Yes.
24   Q.   By whom?
25   A.   Would have been counseled by her management.

30

1    Q.   Was there some specific plan, like action plan or
2         corrective plan, put in place that was reviewed
3         periodically with the employee to see if he or she was
4         complying?
5    A.   I'm not aware of that was.
6    Q.   Is that something that the hospital sometimes utilizes
7         or not? An actual plan?
8    A.   Yes.
9    Q.   And you don't know the specifics of the prior issue that
10        resulted in this person being put on a final written
11        warning?
12   A.   I don't recall specifically, and I don't want to guess.
13   Q.   Okay. But it would have had to have been a major
14        infraction, presumably, to have been issued a final
15        written right off the bat?
16   A.   Yes.
17   Q.   And how long did you say that investigation took?
18   A.   It may have taken anywhere from three to five days.
19   Q.   Okay. And was the individual who was accused of the
20        inappropriate behavior interviewed as part of that
21        investigation?
22   A.   Yes, she was.
23   Q.   And with respect to the other investigation you
24        mentioned in 2011 having to do with Dietary Department,
25        nonmanagement employees, who was interviewed as part of

31

1    that investigation; if you know?
2    A.   I believe both parties were interviewed, and there may
3         have been other interviews as well. Witnesses or --
4         management was interviewed as far as awareness.
5    Q.   Am I correct that generally HR wants to get both sides
6         of the story in conducting an interview?
7         Scratch that.
8         In an investigation?
9    A.   Generally.
10        There are times that we may not.
11   Q.   Why would the hospital in some scenarios not want to
12        speak with a party that was alleged to have done
13        something improper?
14   A.   There may be times that that party may have -- the
15        actions may have been so severe that what they may have
16        said -- I mean if they said they didn't do it and
17        everybody else was not speaking the truth, the hospital
18        has -- I, HR, has a responsibility to make a judgment
19        call based on the information that I'm receiving.
20   Q.   How many times have you been aware that the accused, so
21        to speak, was not interviewed as part of the
22        investigation?
23   A.   That I'm recalling right now?
24   Q.   Yeah.
25   A.   I would say one time that I'm aware of.

32

1    Q.   And that was Susan Zonia or --
2    A.   No.
3    Q.   -- someone else?
4    A.   That was someone else.
5    Q.   Was Susan Zonia interviewed as part of the
6         investigation?
7    A.   I did not speak with Susan.
8    Q.   Do you know if she was interviewed or not?
9    A.   She was spoken to by Martha and Don.
10   Q.   When she was fired; right?
11   A.   Correct.
12   Q.   Is that considered an investigative interview? When
13        you're spoken to at the time you're fired?
14   A.   She had an opportunity to ask for additional
15        information. She also had an opportunity to utilize our
16        problem-solving procedure process.
17   Q.   Okay. That wasn't my question.
18        MS. LAUGHBAUM:   Could you read the question back?
19        THE REPORTER:   (Reading.)
20        "Question:   Is that considered an
21        investigative interview?   When you're spoken
22        to at the time you're fired?"
23   A.   No.
24   BY MS. LAUGHBAUM:
25   Q.   Who's the other person that you're thinking of that was



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

21

ANE J. McNEIL                                    August 10, 2011

41

1    Q.   Okay. So, before the break we were discussing how you
2         were going to give me certain information regarding the
3         other management level or above people that you've been
4         involved in investigating in the last few years, and I
5         think preliminarily, at least, we've agreed to talk
6         about the departments and the job titles; is that right?
7             MR. GUNSBERG:  No.  Just the departments, and they
8         were management individuals.
9             MS. LAUGHBAUM:  Okay.  All right.
10   BY MS. LAUGHBAUM:
11   Q.   What were the --
12            MR. GUNSBERG:  The question had to do with
13        terminations she was involved with.
14            MS. LAUGHBAUM:  That's correct.
15            MR. GUNSBERG:  Okay.
16            MS. LAUGHBAUM:  Okay.  So, we're on the same page.
17   BY MS. LAUGHBAUM:
18   Q.   So, there were two individuals besides Susan Zonia?
19   A.   Correct.
20   Q.   And what were the departments of each of those
21        individuals?
22   A.   One department was Radiology the second department was
23        Urgent Care.
24   Q.   Okay. So, these are employees that ended up being fired
25        following an investigation; correct?

42

1    A.   Yes.
2    Q.   And what was your role with respect to the investigation
3         of the Radiology person?
4    A.   The -- I wasn't the first HR person involved.  The
5         associate that filed the complaint was also a member of
6         management and had been speaking to one of my
7         subordinates at the time.
8             At the point where I got involved, he wasn't
9         available to speak with her.  So, the nature of it was
10        inappropriate -- allegations of inappropriate remarks,
11        comments; feelings of intimidation.
12   Q.   What was the gender of the Radiology -- what was the
13        gender of the person fired?
14   A.   Female.
15   Q.   What was the gender of the management associate who
16        filed the complaint?
17   A.   Female.
18   Q.   And what were the inappropriate remarks?
19   A.   Remarks such as -- you know, basically threatening their
20        jobs.  So, "If you don't," kind of, "do it my way,
21        Woodward is right there."
22   Q.   Was the person that was fired a physician?
23   A.   No.
24   Q.   And how long was that investigation; if you know?
25   A.   Well, the investigation -- I wouldn't -- the

43

1         investigation that led to the termination was a very
2         short period of -- there wasn't an investigation that
3         actually led to the termination.  There were allegations
4         being made by the associate, the supervisor, against the
5         other member of management, and then another person who
6         ultimately was terminated was also making allegations
7         against that person.
8             So, there were various sessions and meetings held
9         by both myself, the VP of that work area.
10            So, I wouldn't necessarily call it an investigation
11        that led to the termination.
12   Q.   All right.  Well, how long was the whole process?
13   A.   About ten months.
14   Q.   And that was from the allegations surfacing to this
15        female manager in Radiology being terminated; correct?
16   A.   There was -- not necessarily.
17   Q.   Okay.
18   A.   The allegations that both parties were making were not
19        fully substantiated, and the decision to terminate was
20        based on the inappropriate or lack of leadership that
21        the other manager was providing to the department.
22            MR. GUNSBERG:  The higher level manager?  Is that
23        who you're talking about?
24   A.   The higher level manager, yes.
25   BY MS. LAUGHBAUM:

44

1    Q.   What was the ten months?  What was the process that took
2         ten months?
3    A.   Employee A coming to HR saying, you know, "Here's my
4         complaint."
5             The other -- the other higher level manager
6         saying -- you know, approaching HR, not necessarily
7         being called by HR, coming to HR and saying, "Well, I
8         have this issue."
9             So, it was just an ongoing kind of back and forth
10        situation between the two that both parties were talked
11        to together and also individually regarding their
12        actions.
13   Q.   Did you conduct interviews in that matter, personally?
14   A.   I spoke to both of them, yes.
15   Q.   Do you know who else would have conducted interviews?
16   A.   I wouldn't necessarily call them interviews.  The VP of
17        that work area also spoke to them individually.
18   Q.   Okay.  Let's move to the Urgent Care situation.
19            Strike that.
20            The Radiology termination was what year?
21   A.   2011.
22   Q.   And how about the Urgent Care termination?
23   A.   2010.
24   Q.   What month in 2010; if you know?
25   A.   You know, I don't recall.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

22

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

ANE J. McNEIL                                                     August 10, 2011

57

1  Q. And what were they?
2  A. Performance concerns.
3  Q. Like?
4  A. Not -- what I recalled is at that time they were going
5     through a medical chart audit, making sure that the
6     associates that are working in the back office or that
7     are medical assistants are following the procedure of
8     intake for a patient. So, making sure that they have
9     documented the weight, the height and the reason why the
10    patient is being seen.
11 Q. And according to the -- was it the operations manager
12    that said this wasn't happening? He or she had concerns
13    that this person was not doing that properly?
14 A. Not the operations manager. The Urgent Care manager.
15 Q. Okay. But the e-mail came from the manager over the
16    person that was fired?
17 A. Yes.
18 Q. Okay. And so there were irregularities or omissions in
19    the -- did you say the intake process?
20 A. From the perspective of the manager, yes.
21 Q. Okay. So, what's the next thing that happened with
22    respect to this whole investigation?
23 A. The next thing that happened is, I started receiving
24    phone calls from several employees from that location.
25 Q. Okay. And they raised concerns about this person you

58

1     were investigating?
2  A. Yes.
3  Q. Do you know how they were prompted to call you?
4     MR. GUNSBERG: Object to the form of the question.
5     "Prompted."
6     You mean why they called? What precipitated that
7     call?
8     BY MS. LAUGHBAUM:
9  Q. Do you know what led them to call you?
10 A. My understanding at the time is they were having similar
11    issues that were raised in -- that were raised in the
12    letter, and they called me.
13 Q. Going back to the e-mail, you told me about one sort of
14    specific performance concern that was in the e-mail.
15    Were there any other specifics in the e-mail? Any
16    more new information or specifics with respect to what
17    this person was doing improperly?
18 A. One other item that I recall was surrounding her
19    disagreement with a performance evaluation that she had
20    received. I can't recall the specifics around it.
21 Q. All right. How many phone calls did you get from other
22    employees?
23 A. Well, the very next day was a Saturday. So, I had
24    received four calls.
25 Q. Were these from people that reported to the Urgent Care

59

1     manager?
2  A. Yes.
3  Q. And what did they complain of?
4  A. Intimidating work environment, non-trusting environment,
5     not knowing if they had a job to go to the next day,
6     fear of retaliation, there were favorites in the
7     department.
8     So, they were afraid of saying anything or speaking
9     up, because they didn't want to -- they didn't want to
10    be subject to more of the same type of inappropriate
11    behavior.
12 Q. Okay. So, you listened to them.
13    Did you take notes?
14 A. Yes.
15 Q. And what was the next step in the investigation?
16    Was it at that point that you talked to the
17    manager?
18 A. No. It was at -- the manager had requested to speak
19    with myself and her operations manager.
20    My next step was to contact the operations manager
21    and also Martha, as my boss, to notify them of the calls
22    that I had received and the allegations that were being
23    made.
24 Q. How long did this whole process take?
25    MR. GUNSBERG: What whole process?

60

1     You mean from the complaint to --
2     BY MS. LAUGHBAUM:
3  Q. From the complaint to termination.
4  A. About three weeks.
5  Q. Okay. Is it then that you have the meeting with the
6     manager and also the operations manager?
7  A. Correct.
8  Q. And what was the result of that meeting?
9  A. All the allegations against her were false. She did
10    nothing wrong.
11    She did admit to having or engaging in
12    inappropriate text messages with her staff in which she
13    called out her cell phone and read me the text messages
14    back and forth.
15 Q. What was inappropriate about them?
16    MR. GUNSBERG: Excuse me. Are you describing what
17    the Urgent Care manager said?
18 A. Yes.
19    MR. GUNSBERG: Is that what you're saying?
20 A. Yes.
21    MR. GUNSBERG: Okay.
22    BY MS. LAUGHBAUM:
23 Q. So, you saw the text messages or she read you the text
24    messages?
25 A. She read me the text messages.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

23

ANE J. McNEIL                                                August 10, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**85**

1  tell an employee that HR directed you do this.  As a
2  manager, you have the authority to make sure that
3  policies and procedures are being followed. So, if
4  indeed she did violate a policy, they have the right to
5  speak to her instead of using HR as a method of
6  communicating, if you will.
7  Q. So, did Susie Swanson or Susan Zonia tell you that they
8  had told Pat what Pat alleged?
9  A. Yes.
10  Q. And were either of them disciplined in any way for
11  whatever it is they said to Pat Davis?
12  A. No.
13  Q. Now, Pat Davis reported directly to Susie Swanson;
14  correct?
15  A. Correct.
16  Q. And indirectly to Susan Zonia?
17  A. Yes.
18  Q. Are you aware that Pat Davis – do you know how many
19  times Susan Zonia had disciplined Pat Davis?
20  A. I'm not aware.
21  Q. Have you read Dr. Bignotti's deposition in this case?
22  A. No.
23  Q. Are you aware that the hospital takes the position that
24  Ms. Davis should have been disciplined?
25       MR. GUNSBERG: Object to the form.

**86**

1  BY MS. LAUGHBAUM:
2  Q. Did you ever learn that?
3  A. No.
4  Q. Did you understand that she had performance issues?
5  A. I understood that from that conversation when I had
6  contacted Susan and Zonia – excuse me – Zonia and
7  Swanson. They had shared with me the nature of that
8  discipline and then also mentioned a performance
9  concern.
10  Q. Were there also issues with Ms. Davis wearing something
11  that violated the dress code?
12  A. That was the nature of this conversation.
13  Q. And the allegation was that she was showing cleavage or
14  something to that effect?
15  A. Yes.
16  Q. Is that what she got upset about?
17  A. Yes.
18  Q. Is that the only issue that she – is that the only
19  disciplinary issue that she was discussing with you?
20  A. Yes. At that time.
21  Q. Did you ever become aware that Ms. Davis had sent out
22  several e-mails calling Susan Zonia some nasty names?
23  A. I was – Susan and – Susan Zonia and Susie Swanson
24  shared with me during that call that Swanson – that –
25  yes, I was aware of that.

**87**

1  Q. And did you also learn that Pat Davis had included in
2  those e-mails words to the effect that she was going to
3  set Susan Zonia up to fail?
4  A. No.
5       MR. GUNSBERG:  Object to the form.
6  BY MS. LAUGHBAUM:
7  Q. You did not become aware of that?
8  A. No.
9  Q. Have you ever learned of that since?
10  A. No.
11  Q. Any other complaints or concerns brought forward to you?
12     I believe you told me there was just the one.
13  A. Correct.
14  Q. Had you ever received positive feedback in your capacity
15  in HR with respect to Susan Zonia and the job she was
16  doing?
17  A. No.
18  Q. So, what is the first thing – I think it's uncontested
19  that Dr. Zonia was fired on October 1st of 2010.
20     When is the – what's the first thing you would
21  have become involved in with respect to any events
22  leading up to her termination?
23  A. I received a call from Martha on, I believe, September
24  29th advising me that she was placed on administrative
25  suspension.

**88**

1  Q. Why?
2  A. Regarding an e-mail exchange between her and another
3  physician.
4  Q. Okay.  Did you get any specifics at that time?
5  A. I was given specifics regarding the nature of that
6  e-mail exchange.
7  Q. Did she send you the actual e-mail?
8  A. No.
9  Q. And who had placed Susan on suspension?
10  A. My understanding, Don Bignotti.
11  Q. And what was Martha asking you to do; if anything?
12  A. She was making me aware that her and Don had spoken
13  to – they were requested to go up to the Medical
14  Education Department.  The staff wanted to speak with
15  them.  And they had requested a member of HR to talk
16  with them regarding their concerns.  So, she was making
17  me aware that one of our associate relations specialists
18  was going to be investigating.
19  Q. Someone that reported to you was going to be
20  investigating?
21  A. Yes.
22  Q. Who is that?
23  A. His name is Ryan Hernandez.
24  Q. Did he ever end up doing that?
25  A. No.

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

241

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

ANE J. McNEIL                                            August 10, 2011

93

1      They had requested to speak to HR regarding their
2   concerns.
3   Q. Did you say this was precipitated by an e-mail exchange
4   with Susan Zonia and another physician?
5   A. Yes.
6   Q. Who was the other physician?
7   A. Dr. Payne-Jackson.
8   Q. And was Dr. Payne-Jackson interviewed as part of this
9   process?
10  A. I believe so.
11  Q. Not by you?
12  A. Not by me.
13  Q. By whom?
14  A. It's an assumption.
15     By Don.
16  Q. How, as you understood it, did this issue with
17  Dr. Payne-Jackson flow into, if it did, these five or
18  six people wanting to talk to HR?
19  A. It's my understanding that there was an e-mail that
20  Payne-Jackson had sent out.  Susan had responded to the
21  e-mail intending it to go to Susan Swanson stating
22  something about – I don't recall specifically, but
23  giving her the cold shoulder will make her mad.
24     Susie Swanson became aware of it.  Payne-Jackson
25  contacted or forwarded the e-mail to Don Bignotti,

94

1   making him aware of the situation.  Susan Swanson met
2   with Don and shared with him her concerns and her
3   involvement with that e-mail, and based on that
4   discussion is when HR was asked to step in, if you will.
5   Q. Okay.  Do you know if Dr. Zonia had a discussion with
6   Dr. Bignotti about this e-mail?
7   A. I believe so.
8   Q. Do you know what was discussed?
9   A. Not specifically, no.
10  Q. Do you know whether Dr. Bignotti took the position that
11  this was a minor issue, a non-issue or some serious
12  concern?
13  A. My understanding is a serious concern.
14  Q. And that's based on what?
15  A. His communication to me.
16  Q. But you weren't privy to what he and Dr. Zonia actually
17  discussed; correct?
18  A. No.
19  Q. So, you sat down with these people, and these are – are
20  they medical coordinators?  Is that their job title?
21  A. Medical education specialists.
22  Q. Okay.  And they are administrative people; correct?
23  A. Not necessarily, no.
24  Q. Well, what type of role do they play?
25  A. They support program directors with the medical

95

1   residency program.
2   Q. Aren't they classified as administrative; if you know?
3   A. No.
4   Q. You don't know or they're not?
5   A. I'm sorry.
6      They are not.
7   Q. What are they classified as?
8   A. They're exempt staff.
9   Q. What is the pay range of a medical education specialist?
10  A. I don't recall.
11  Q. Do you need a college degree for that position?
12  A. I believe the job description states bachelor's degree
13  or equivalent work experience.
14  Q. Do they all have a bachelor's degree; if you know?
15  A. I don't know.
16  Q. And these individuals did not report directly to Susan
17  Zonia, with the exception of Ms. Swanson; correct?
18  A. Correct.
19  Q. So, did you just meet with them and say, "Tell me
20  whatever you want to tell me about Susan, and I'll write
21  it down?"  Or what was the format you followed?  What
22  were you trying to accomplish?
23  A. What I said to each of them was, "I understand that you
24  wanted to speak with me regarding concerns you have.
25  Please understand that what you share with me will be

96

1   discussed on a need to know basis, and that you should
2   not –" I discussed with them the no retaliation policy
3   to put them at ease that they can speak freely to me.
4   Q. Was Don Bignotti present as well?
5   A. He was present for either two or three of the
6   interviews.
7   Q. Did he meet with anyone when you were not present?  Do
8   you know?
9   A. No, I don't know.
10  Q. Now, some of the individuals that you interviewed had
11  been disciplined by Susan Zonia; correct?
12  A. Pat Davis.
13  Q. Any others?
14  A. Not that I'm aware of, no.
15  Q. Are you aware that Dr. Zonia had counseled Susie Swanson
16  about coming in late on multiple occasions?
17  A. No.
18  Q. Did you ever learn that Susie Swanson was upset about
19  that?
20  A. No.
21  Q. Did you ever learn that Susan had spoken to Susie
22  Swanson, that is, Susan Zonia had talked to Susie
23  Swanson about Susie appearing to be overly medicated on
24  the job?
25  A. No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

25

ANE J. McNEIL                                                         August 10, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

97

1  Q. Did you learn that Susie was open about the fact that
2     she was under treatment for some mental health issues?
3  A. No.
4  Q. Have you ever learned that Ms. Swanson has mental health
5     issues?
6  A. Yes.
7  Q. In the course of this litigation or previously?
8  A. No.
9  Q. I don't understand your answer.
10 A. Not during the course of this investigation.
11 Q. Okay. And how did you become aware of these issues with
12    Ms. Swanson?
13 A. Indirectly, I have -- I work with -- I shouldn't say
14    "indirectly," but I have kind of a dotted line with our
15    Employee Health Department.
16 Q. Did you ever learn that Ms. Swanson on the job was
17    fairly vocal about the mental health issues she was
18    having and the fact that she was on medications for
19    those issues?
20    MR. GUNSBERG: Object to form.
21 A. Can you repeat that?
22    MS. LAUGHBAUM: Would you read that back?
23    THE REPORTER: (Reading.)
24    "Question: Did you ever learn that
25    Ms. Swanson on the job was fairly vocal about

98

1     the mental health issues she was having and
2     the fact that she was on medications for
3     those issues?"
4  A. No.
5  BY MS. LAUGHBAUM:
6  Q. Did Susie Swanson appear to be credible to you?
7  A. Yes.
8  Q. Have you subsequently learned that after Susan Zonia was
9     gone, that the same people that gave statements about
10    Susan Zonia have said that Susie Swanson has created a
11    hostile work environment?
12 A. No.
13 Q. Was Susie Swanson investigated at any time by Human
14    Resources; if you know?
15 A. During my meeting with those associates, I asked them an
16    open-ended question.
17 Q. Which was what?
18 A. "I understand you want to share concerns with me.
19    Please feel free to do so," and shared the
20    non-retaliation policy.
21    Some shared with me concerns they had with Susie.
22 Q. But this was in the context of an investigation into
23    Susan Zonia's behavior; correct?
24 A. Yes.
25 Q. Susie Swanson was not the subject of the investigation

99

1     at that time?
2  A. No. But if concerns were raised regarding her, we would
3     have looked into those.
4  Q. Have you seen any paperwork generated as a result of
5     this investigation other than your own handwritten
6     statements?
7  A. I don't know if I can answer that question.
8     What type of paperwork?
9  Q. Any paperwork.
10 A. I've seen --
11 Q. You know there's a one-page document? A termination
12    document; correct?
13 A. Yes.
14 Q. And there's your handwritten notes of the people that
15    you interviewed on September 30th, 2010?
16 A. Yes.
17 Q. Have you seen anything else with respect to the
18    investigation? Anything else in writing at all?
19 A. I saw the e-mail.
20    I don't recall. I don't believe I've seen anything
21    else.
22 Q. Was there any summary put together of witnesses'
23    testimony?
24 A. No.
25 Q. Or any recommendations put in writing that you saw?

100

1  A. No.
2  Q. What did you do after you had compiled these notes?
3  A. I met with Don and Martha.
4  Q. On the 30th or the following day?
5  A. On the 30th.
6  Q. So, do you remember who you interviewed last on the
7     30th?
8  A. No.
9  Q. I have Pat Davis at 3:00 p.m. I don't know if you had
10    one subsequent to that.
11    Do you know?
12 A. I don't recall. I time and date my documents. So, if
13    it says 3:00, that may have been my last meeting.
14 Q. Do you remember when you met with Ms. Isfrate?
15 A. I recall it being somewhat -- sometime in the morning or
16    afternoon.
17 Q. Okay. And did you meet with Dr. Bignotti and Martha
18    Murphy on September 30th?
19 A. Yes.
20 Q. And what was discussed?
21 A. Discussed the nature of the meetings and shared with
22    them that based on what I had -- the remarks that were
23    made to me by the associates, and based on my review of
24    our standards of conduct policy and employee discipline
25    policy, that the behavior that is described is not



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

26

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

ANE J. McNEIL                                        August 10, 2011

113

1   Q.  You know there is a policy?

2   A.  I believe there is one.

3   Q.  Do you know what the job shadow policy essentially says?

4   A.  No.

5   Q.  Do you know whether or not that proposed shadowing of

6       his girlfriend's daughter, who's a nonmedical student,

7       could raise HIPAA concerns?

8       MR. GUNSBERG:  Objection.  Form of the question.

9   A.  I don't know.

10  BY MS. LAUGHBAUM:

11  Q.  Did Ms. Zonia's termination fall within any of the

12      categories on the employee discipline policy, Exhibit 1?

13  A.  Yes.

14  Q.  Which ones?

15  A.  Thirteen, 21, 27, and again I would say number 3.

16  Q.  All right.  With respect to 27, hostile work

17      environment, you're not claiming that Dr. Zonia singled

18      out people based on some protected category, such as

19      age, gender, religion, race or the like, are you?

20  A.  No.

21  Q.  What was the hostile environment based on?

22  A.  The fact that associates had concerns and were afraid to

23      bring them forward because comments that Ms. Zonia made,

24      such as, "I make a lot of money for this hospital.  So,

25      Jack Weiner would not get rid of me."  Or, "I have

114

1       friends down the admin coordinator, and I'm

2       untouchable."

3   Q.  Have you read Dr. Zonia's deposition transcript?

4   A.  I read half of it, yes.

5   Q.  Do you know that she vehemently disputes many of the

6       allegations that have been made against her?

7   A.  Yes.

8   Q.  And you have worked with her in the past; correct?

9   A.  Yes.

10  Q.  You got along with her fine?

11  A.  Yes.

12  Q.  You found her to be credible at the time?

13  A.  At the time of what?

14  Q.  At the time you worked with her investigating residents.

15  A.  For the most part, yes.

16  Q.  And you didn't have any reason to question her on her

17      honesty or integrity at that time; correct?

18  A.  No, you are not correct.

19  Q.  Why?

20  A.  There were times that during an investigation she may

21      have -- she used inappropriate language in my presence,

22      and I would comment -- I kind of said to her, "Susan,"

23      you know.  And she kind of laughed it off, if you will.

24  Q.  Okay.  So, you didn't appreciate some of the language

25      she would use, but how does that relate to whether or

115

1       not you had any reason to question her honesty or

2       integrity?

3       I think that was my question.

4   A.  There was another situation when we were conducting an

5       investigation, and she was -- she was interjecting her

6       own personal life experience onto this person, and when

7       I spoke to her later that evening, I asked her if she

8       could allow me to proceed with the investigation with

9       her present, because she had set up a dynamic that was

10      not appropriate.

11  Q.  Okay.

12  A.  And she relayed that as well.

13  Q.  How did that reflect on her honesty or integrity?

14      You had a difference of opinion on how to conduct

15      an investigation; correct?

16  A.  (Nods head.)

17      THE REPORTER:  I'm sorry.  Is that --

18  BY MS. LAUGHBAUM:

19  Q.  That's a "yes"?

20  A.  I didn't hear the question.

21  Q.  You had a difference of opinion with respect to how this

22      investigation should be conducted; correct?

23  A.  Yes.

24  Q.  How did that -- my question had to do with Dr. Zonia's

25      honesty or integrity.

116

1       How did that translate in your mind to raising some

2       issue about honesty or integrity because you disagreed

3       with how she wanted to do an investigation?

4   A.  The way it translated to me was not questioning her

5       honesty, but her integrity when it came down to her

6       presence during the investigations.  Her

7       professionalism.

8   Q.  What was the integrity issue?

9       Well, I already asked you about professionalism,

10      and I think you testified however you testified.  I

11      believe you said you generally found her to be

12      professional; correct?

13  A.  "For the most part," I responded.

14  Q.  So, what's the integrity issue?

15      I don't understand your testimony.

16  A.  So, can you ask me the question again, please?

17  Q.  Yeah.

18      I asked you if in your dealings with Dr. Zonia you

19      had any reason to question her honesty or integrity.

20      I'm trying to figure out what you're talking about.

21  A.  Okay.  My response after discussing it with you is no.

22  Q.  Thank you.

23      I'm going to show you what has been marked as

24      Bignotti Deposition Exhibit Number 2.  It's the

25      disciplinary action which I think you reviewed prior to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com



Exhibit _____

**SUMMARY OF GME STAFF COMPLAINTS ABOUT SUSAN ZONIA**

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

<u>Susan Swanson (Monzur).</u>

- Dr. Zonia says F word a lot asked her to stop; Zonia says she has "freedom of speech";
- Tell staff she is "untouchable" because she is friend of higher management;
- Belittles staff;
- Tells Susan Swanson to give people "cold shoulder". eg Dr. Payne Jackson, Dr. Cotant;
- Has inappropriate conversations about Zonia's sex life. eg. comments about a doctor who stutters and makes me want to "pull his dick" to make him stop;
- Talks about her sex life with her boyfriend;
- Tells Swanson she shouldn't limit her sex life to her husband; talks about "cheating" on her boyfriend, had to give her boyfriend more blow jobs for helping her move;
- Refers to Swanson as her secretary and treats her as such;
- Calls management and doctors names like Dr. PJ is a "bitch", doctor at awards dinner an "ass";
- Makes negative comments about CEO of hospital;
- Makes negative comments about hospital training programs;
- Says she like to create atmosphere of fear;
- Said to throw away all the crucifixes;
- Says people who believe in God are stupid;
- Leaves early to meet with her boyfriend;
- She makes too much money for hospital so they won't fire her;
- Says Deb Reid, a staff employee, "needs to get laid".

<u>Patricia Davis</u>

- Told to throw away crucifix;
- Refers to Drs and other as "bastards";
- Intimidated, bullied and harassed for past 6 months, write ups given as harassment;
- Leaves early;
- Told her that her job is in jeopardy.

<u>Muriel Iafrate</u>

- Tells her training programs are stupid;
- Uses F word;
- Refers to meetings as "waste of time";
- Always closes her door;
- Always does her nails;
- Smells like alcohol in the morning;
- Demeans us by always referring to herself as "the one with the PhD";
- Openly talks about her sex life
- Leaves work for dates;
- Referred to Reverend Moore as a "f_ _ _ing indiot"
- Disclosed Dr. PJ's surgery;
- Rude to staff.

**EXHIBIT** 

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**Gail Molitor**

- Tells staff that she's not happy with any of us;
- Refers to Kanzi as "lazy bastard";
- Strongly encourage us not to meet with Dr. Bignotti;
- Told "get with the program or bail";
- Belittles staff;
- Talks about people openly and makes remarks about others;
- Refers to hospital training programs and missions as "bunch of rumbaya"
- She has sarcastic and demeaning behavior.

**Deb Reid**

- Uses profanity in office, F word, called physician "bastard";
- Can't go to her, puts her hand up and dismisses me;
- Puts down religion;
- Sex discussions.

**Deneen McCall**

- SL is "dismissive"
- Refers to Dr. Payne Jackson as a "bitch";
- Refers to Dr. Dioczok as an "idiot";
- Door always closed, spends time doing her nails;
- Leaves early for dates;
- Talks about doctors she doesn't like;
- Talks about her sex life, dates, guys she goes out with;
- Talks about not caring about students so long as she get the money in;
- Constantly uses the F word;
- Dismissive of the staff;
- Refers to training programs as "stupid";
- Probes us for confidential information;
- Tell us she has friends in management and HR; and we are afraid to go to HR because Susan Zonia has friends in HR who protect her;
- I am very stressed; looking for another job.

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

## **AFFIDAVITS**

1. Gail P. Molitor

2. Susan L. Swanson

3. Patricia A. Davis

4. Mariel Iafrate

5. Debra K. Reid

6. Deneen McCall

30

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

        Plaintiff,

                                     CASE NO. 11-116369-CD
v.                                    HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

        Defendant.

| DEBORAH L. GORDON, PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg ({24235) |
| Carol Laughbaum (P41711) | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | |

## AFFIDAVIT

    I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

Sign: *Gail P. Molitor*

Date: 8-16-2011    Print Name: Gail P. Molitor

Subscribed and sworn to before me this

16th day of August , 2011

*Adora L. Missom*

Notary Public, State of Michigan

County of OaKland

My commission expires: 02-10-2014

Acting in the County of: OaKland

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

31

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Gail Molitor                                    9/30/10 2pm

Susie mid morning called Gail; wanted
to check to see if she scheduled mtg w/
Ow

later called Gail told her that bet you
done. — pulled evaluation gave to Don

52 — Not happy with any of us.

Mtg. Thursday (Pat JJ) one staff member
crying 'what did I get myself into'
—Feb take this to Dr.B.
     Discussed w/ all of them she told
     Dr. Z.

—Susan Z.
     Kazzi — lazy bastard (b/c she had to do
          paperwork
     · Student that applied + went w/ another
          — bastard
     —Shared w/ everyone what type of surgery
     PJ had — donna's going away pty

9/30/10 Susan
w/us We strongly encouraged not to go to DO mtg
          you work for us not the

52

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

2

- told Jwell, Don talked to Jewell (were taken care of.

last 2 months staff mtg. SS called S2 in for clarification. no longer print evals. Made comment on that is ging to be difficult not to go to paper

S.2 - 'Get with the program - bail'

9/29 - In group told staff she printed off text messages

- Read this one 'Why do we pay RT big money when Gail can do it with it a high school degree.

15 min before Susie shared w/ Gail M.

PJ no input on evals, evals were done between Donna & Zonia. Donna would smooth them out.
3.45 language was inappropriate - where did it come from - Zonia (Donna would tell her).

33

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

-Don't want to ask questions b/c of how
she was made to feel.

-PJ sent letter to Donna & Dr. ___
          -from now on when you feel
          over whelmed just say 'your whelmed'

Avoid med-ed when Susan is there
          -luncheon she asked did you get
          that dress

Uncomfortable, talks about ppl, remarks

Susie Swanson

Monday - reaching out to her
          bet you & me conversation

Doesn't trust her - new innovations (Gail snapped
                    at Pat b/c she interrupted) you know
yesterday. I know. Don't call Lucy she was
in tears. Talked to one another - SS
Pitting each other.

May - orientation mtg.
          HR not prepared, resisting me
went to Zinia's office. later Bret
disrespected her. Why? You slammed books

34

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

dows). One of the fire also came to me
- Marc (not me)

lack of integrity — proxy to calendar.

Pat gave proxy to her email to
Susie.

Pat disclosed this to group

At staff mtg said w/ everyone present
(I know you don't like JT (Jimmy Indecisive)

@ Graduation wanted to know why
she was sitting w/ PJ

9/30 — do you know how much
Dr. 2 makes.

Thinks it's both (Susie & Susan)
5ppl (4 looking; Gail wants to retire)

— a lot of changes too fast, not good mgr.
skills

— heard about other being picked.
(She treated → Residents to

— Not exciting anymore. ) Sarcastic, demeaning
behavior.
SM
8/16/11

35

 

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

SUSAN ZONIA,

        Plaintiff,

v.                            **CASE NO. 11-116369-CD**
                                            **HON. JAMES M. ALEXANDER**

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

        Defendant.
                                                     /

| DEBORAH L. GORDON. PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg ((24235) |
| Carol Laughbaum (P41711) | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | |

                                                                           /

**AFFIDAVIT**

      I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

                                    *[signature]* Sign:

Date: 8/17/2011            Print Name: Susan L Swanson

Subscribed and sworn to before me this

*17th* day of *August*, 2011

*[signature]*

Notary Public, State of Michigan

County of *Macomb*

My commission expires: *12-16-2013*

Acting in the County of: *Oakland*

LUANN STRAIGHT-HERTZ
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Dec 16, 2016
ACTING IN COUNTY OF

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

36

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

*1*

Susie Swanson & Bu                                    9/30/10
                                                      11:20 pm

Day 1  Lit with everybg

Dr. Zmie she is abo i me. I thru any
other dept & that's why Jack gives
her whatever she wants & will never
fire her.

Smelling like alcohol in the morning
        - Anyl Sept (looking at calendar for pre
        - saw she had to work at the day
          golf outing & hard to present at
          golf. - in late next day
        - always lying about where ____ is
            going

Jack is nothing but an uneducated Rep.
Weiner  -almost at every MJR mtg says this

        -Jack running for rep. party
        -Martha ____ ____ & trying to
          shut them down.

        -Imlay, Pres of Oakland Society   told him
She ____ out          Dint w/ Kathy & Barb (St. Georges)
K & B                       that's what she told Susie.
                                              (buzzed)
Bmb boy          Showed up - can of ____ tipsy. Cantin
                 to drink.. I need to see you Susie.~

39

2

Dr RJ is on an indefinite leave. Good I can't stand that bitch. You email the OB team & team to contact Zuria.

*magic field she is*  Always looking like the bad guy.

Tries to back-up staff but hard to do.

Fired this girl Alicia (old IUB person - got in the way) Doesn't like P. Stein  to fire her so she quit).

- If Susie doesn't do security she's afraid she would get fired. (Suzie felt intimidated by Zuria)

- Aggressive & mean
    PhD always throwing that in there faces
    - takes credit for things that Susie

- Dr. Cotand makes too much $$ a host to be friendly to him.

Both standing at Mariel's desk when she smelled like alcohol.
        - goes into office & closes door
        - told Mariel & Susie that she drinks a bottle of wine a night. She's very cultural & only

38

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

3

in america is It looked down at.

- hosp needs her b/c she is on the
AOA committee

- Susie walks into office (52)

- on hotmail, lands ends, talbots
magizine every day.

- red computer all personal
- left meeting had into to go
print boarding pass.

- meeting rol'ing eyes, meaningless
- hated it

- nails 3x a week

At Imlay's party

- buzzed said that Man is
republican. I hate him
(louder than normal)

You need to stop going after every little
thing.

39

4

- Susan had input on the evals SW compt

Susan wanted to fire Gail a 2:1
(hasn't received it)

She calls Susie her secretary
- have Susie schedule she is
my secretary.
- tells residents talk to my
- secretary

Gone out w/ Pete (DA) "tell ppl I'm at a
mtg at corporate."
learn Dixon.
- doesn't work 40 hrs a wk,
on avg 25-30 hrs. do it from
phone replying to email.
in Phys longer talking to K Coburn

When she bought new phone had Susie
set-it up all day calling reviews & teaching
her how to use it.

Doesn't want to work w/ her. If phone
comes back find a another job for SiS
feels this is big punished.

190

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

5

Susie _____ y Ann McNeil                    9/30/10

Sept 8 & 9th

- function was one of those nights
- told her how much she drinks
  3 bottles of wine.
      - door closed
      - cut 7s
      - leaving my headache
      - hungover -

52 +05W  Asked Personal questions about her husband?

- She has been w/ multiple partners
  been w/ one my husband — we'll see
  how long that will last. Stupid dean.
- She has to hide her faith from Tina
  because she thinks those that believe
  in God are stupid. doesn't want 52 to think
  she is stupid.
- Made 55 feel like she was untouchable
- I think my role is more important than
  parts they wouldn't touch me.
- Ex husband was carrying up a heavy piece
  of furniture to her bedroom you'll have
  to give him more than one blowjob
  tonight  (Shared this w/ 55)
- belittles Susie — secretary, I don't fax
  Longs Susie will have to fax it.

41

6

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

—then would say good things to her.
— got SS to do dirty work. Susie
   to send email out for him.

'Deb needs to get Laid'

Hasn't heard from her today no
contact.

      —Discussed with SS the
         importance of keeping info
         quite not to suck out staff

Afraid of susan, real mean to her
and others. Can't work for her
anymore.

      <shaky, crying>

493

 STATE OF MICHIGAN 

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

SUSAN ZONIA,

        Plaintiff,

                           **CASE NO. 11-116369-CD**

v.                            **HON. JAMES M. ALEXANDER**

**TRINITY HEALTH-MICHIGAN**
**d/b/a ST. JOSEPH MERCY**
**HOSPITAL, PONTIAC,**
A domestic Corporation,

        Defendant.
                                          /

| | |
|---|---|
| **DEBORAH L. GORDON. PLC** | **LAW OFFICE OF DAVID B. GUNSBERG, P.C.** |
| **Deborah L. Gordon (P27058)** | **David B. Gunsberg ({24235)** |
| **Carol Laughbaum (P41711)** | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | |

                                                    /

### AFFIDAVIT

    I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

Sign: *Patricia A. Davis*

Print Name: PATRICIA A. DAVIS

Date: 8/15/11

Subscribed and sworn to before me this

15th day of August , 2011

*Adora L. Misson*

Notary Public, State of Michigan

County of Oakland

My commission expires: 02-10-2014

Acting in the County of: Oakland

43 b

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Received
3pm 9/30/10
from P Davis
[initials]

**General Comments**
- Wanted to throw away crucifix.
- Slams office door closed when overhead prayer comes on.
- Witnessed talking to Dr. Stein disrespectfully (sent memo to Dr. Bignotti a few years ago).
- Puts hand up to be dismissed when she wants to end conversation.
- Can hear swearing from other end of hall. ("Bastard" when hanging up phone.)
- Told Susie that Donna and I were friends and that I was given special treatment. Donna and I were friends before Donna became manager.
- Dr. Zonia is a vindictive person and this has been witnessed by all of us and experienced by me. Dr. Zonia cannot be taken at her word.

When Susie joined us, she asked for proxy to my calendar. When I did the proxy, I did not realize that I sent her my e-mails along with the calendar. At the time, Susie said I did it correctly. Susie opened and read my e-mails addressed to Donna. She passed this information on to Dr. Zonia. I did make some comments, (Susie was bland) and (her office looked like a shrine). I said Dr. Zonia was leaving early "again". I was brought in with Gary Rice and Susie to discuss. After discussion, I was told by Susie that I should have been fired for using the computer inappropriately and that I tried to sabotage her, which I did not. I apologized to Susie, wrote an apology letter to Susie and Dr. Zonia. It was agreed at the table that Susie and I would make a fresh start. It was suggested that I go to Team, which I did, and I had 4 coaching sessions with Susie.

For the last 6 months a fresh start did not happen. I have a 1st warning for my behavior about the e-mails. I received a 2nd warning for performance improvement. I was verbally given a warning for wearing an inappropriate blouse, and received a 3rd warning for insubordination, rudeness and negativity. I have been told by Susie that I am rude to my co-workers, faculty, residents, and outside vendors. I met with Ane McNeil 2x during this time period. It was at my insistence that you sign the disciplinary actions because I wanted you to know what was going on. I believe they were hiding it from you.

I have been told not to talk to anyone because I am on "thin ice". When I have been reprimanded by Susie or Dr. Zonia and have disagreed with them, they have said to me, "Are you calling me a liar"? I have been told numerous times in the last six months, by Susie and Dr. Zonia that Martha Murphy said "to just let her go". Dr. Zonia also told me that Dr. Bignotti said to "just let her go".

I have been intimidated, bullied, and harassed for the past 6 months. I have worked under a microscope daily afraid to being viewed as deficient. My health took a decline during this period of time. I was at the point where I was either going to take a medical leave, find another position, or hire an attorney.

I believe these write-ups by Susie were driven by Dr. Zonia, however, Susie played a big part in them as well.

My recent evaluation reflected the events of the last 6 months. I received a total of 2.4 for overall with a -0- in the section of Mission and Values. I have been employed for 33 years and never received a disciplinary action or bad evaluation. It's amazing to me that in 6 months time I have had three disciplinary write ups and one verbal disciplinary.

More detailed notes of the last six months are housed in the HR department.

447

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Pat Davis, Ave & Don                                        9/30/10 3pm

When she first arrived wanted to throw
cross away                    DUMB
- closes door when prayer came on
- bastard Unproved in that area

- told SS that P. was friends w/ Donna
- Szania can't be trusted.

Proxy - to calendar did I do it right,
yes.
   - Office looks like a shrine
   - Blend Susie
   - told by Susie she should have
     been fired & it was sabotaged.

   - Szania - leaving early

- Not to talk to any of the other
girls or friends in any other dept
- are you calling me a liar
- Several time MARTHA & DON let her
         go. (Would tell Pat Martha & Don said
            to let you go).
- We saved your job (Susan & Susan Z.)
   & Dr. B said to let you go.
      (Bignotti)

52.

P.D.

45 18

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

- health issues
- believe wright ups were driven by Susan2

- eval 2.4          D for minor extras

8/13 met w/ Ann
that Monday met w/ her positive
improvement improvement

70% Zinia issue
30% Susie issue
           Could work w/ Susie if
        she needed to.

        Mgm't style — micro manger
           insults intelligence.
                        coming from

Went to Susie w/ frustration
    w/ Diacrok keeping him focused @ SS
went to Zinia.

Thinks Susie is afraid of her job
— back peddling
              feeling as though she is
                 regretely her action.

Susie  We really don't want to fire you pat.
       Pat seems like she's really cool and believe
       you haven't gone out for drinks before.

46 R

3

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Will give ppl the benefit of the doubt.

*If anyone asks how it went — call us.

Dr. Cotant, very concerned about Pat.

47



# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

        Plaintiff,

                                         **CASE NO. 11-116369-CD**

v.                                        **HON. JAMES M. ALEXANDER**

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

        Defendant.

_____/

| | |
|---|---|
| **DEBORAH L. GORDON. PLC**<br>**Deborah L. Gordon (P27058)**<br>**Carol Laughbaum (P41711)**<br>*Attorneys for Plaintiff*<br>33 Bloomfield Hills Parkway, Ste. 275<br>Bloomfield Hills, MI 48034<br>Telephone: 248.258.2500 | **LAW OFFICE OF DAVID B. GUNSBERG, P.C.**<br>**David B. Gunsberg (24235)**<br>*Attorney for Defendant*<br>322 North Old Woodward Avenue<br>Birmingham, MI 48009<br>Telephone: 248.646.9090 |

_____/

## AFFIDAVIT

       I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

Sign: *Mariel Iafrate*

MARIEL IAFRATE

Print Name:

Date: August 15, 2011

Subscribed and sworn to before me this

15th day of August , 2011

*Adora L. Mission*

Notary Public, State of Michigan

County of OaKland

My commission expires: 02-10-2014

Acting in the County of: OaKland

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

21

49

Mariel - Ann McNeil                           9/30/10   1045,
Intrate

Doesn't like talking, negative about ptl Very upset
about Susan Lu in's behavior.

Opposite by TH Valriu

JT   3 day      - I'l your gonna hate it, it's
     Truancy       like cum bye. Open about her
                   feelings.

                - Negative attitude
                - every god stars calling again
                      (yelling)
- using F+ word loud
- I don't want to deal w/08 spray true
  he's annoying me.

- lean only last wk - what a waste of
                       time feeling like I'm
                       in elem. school

- nerty in back huffing & puffing
- dering, Research RN at Mariel's dad
     to    - you react (what do you mean
            - you react like smoke
            - re-riel or you, voice ?
            - felt embarassed by Susans
              Actions

49   2

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Intimidated by her knock on door
'yells yes' like your bothering her
- Filing nails
- polishing nails
- reading magazines, no work on
desk.

Will you call BWG about the toilet,
I have a PHd & I am messing
with this - makes you feel like
a nobody b/c she new phd

Holiday week - all wanting to go
- 'Ah-lets get this over
with'
- feeling like they are not - worth it

- Smelled alcohol in breath - in the
morning (looks like she hung over)
- hair a mess
- tells ppl she parties all night
- twice smelly like alcohol
- comes in late 930 - 10c -
- not feeling good.
- couple months ago.

IRB - refuses projects on purpose think
they are fun. Residents 1st time
looking for help. St. says I don't know the
answers. But she is reading magazines. (m

23
50

3

No involved w/ IKB
    —maint cmter packet
      doesn't feel like she cares
      about it
    — she refuses to meet w/ reside
    — asks maintd to talk w/ them
    — says its a joke

Last xmas '09
    Battle's body (c/c found her (S.2)
    Gail hadn't gotten it
      + b/f dollar store, it's a d Gail knew
      what the driver had received.

(emails in ppwrk etc)
Donna—emailed w/ her a question from
    the director of the + required
      forward the message to all in ____

Open about:
    — I want to shot George Bush (email joke
    — Sex; going on trip + immed.) it was t
      fling
    In ah dates (17 guys in 17 days)
      only work long blind dates

51

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

calling Rev. moore an Fucking Idiot

- Andians's
told everyone about PJ's surgery
at _____ party. Oh she looks good
breast reduction. (No one knew)

Patty School, Program directors, all
heard her

- at ____ party ____ ____ _____ Deb is
arranging a dance if ____ ____ ____
her to do.

- Pride

After Susie got here she put me
on OC for a ___ ___

- _____ (Maura) ____ ____ ____ ____
comments.

2 -- Never ever mean or unkind to Mara
comment - she has been ____ & ____
in general    - I have a PhD (makes you
feel ___ your ___ ___)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

5

frustrated w/c w/ lily b/c say to office
she doc't as angry in impact

— function better w/o here she
is very negative.

felt supported by Susie Swanson
— writes policies

Dr Z. did't know anything trod Dan
aid
— When no manger worked - She days
door closed, no support when they
needed her

Susie came in and met w/ team.
felt She had to address the concerns
w/ Brian

— did't feel that Susie was
interested w/ packaging it up front
& sharing with Brian

— Thinks Susie is doing a good job.
hears Brian snap at Susie. On a 9 z
office call my 'assistant'.

53

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:81

6

Has Susie answer her calls &
Schedule appoints. like a secretary

Relationship positive w/ peers. Team wr
ings - getting.

Haven't shared specifics with Susan

_____ - _____ physical good
looking - always _____ the
for them he bring her along

off residents come in & she
doesn't have time to meet up them

54²



# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

        Plaintiff,

                                          CASE NO. 11-116369-CD

v.                                    HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

        Defendant.

| DEBORAH L. GORDON, PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg ({24235) |
| Carol Laughbaum (P41711) | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone: 248.646.9090 |
| Telephone: 248.258.2500 | |

## AFFIDAVIT

       I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

                             Sign: *Debra K. Reid*

Date: _8/15/11_               Print Name: *Debra K. Reid*

Subscribed and sworn to before me this

_15th_ day of _August_, 2011

*Adara L. Mixon*

Notary Public, State of Michigan

County of _Oakland_

My commission expires: _02-10-2014_

Acting in the County of: _Oakland_

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

55

1    Deb Deid        9/30/10    9:12 AM              Arie McNeil

Seen an improvement in Zonia's behavior
since Susie onboarded.
   -doesn't work as close to Zonia as others
-profanity used in office (F-word, bastard - called physician
-Donna went to her & told her some have
issue w/ profanity would say fuck like a
regular word.
-In the past felt uncomfortable going to 52
   -didn't want to hear what you had
     to say, head up
   -gruff
   -asked Donna - 'does she not like me'

Didn't feel she was targeting her specifically
but thought it was not a match (behavior)


-Issue was Evaluations
   -52 had input in evals
     -Donna would tell Deb that she
     had tweak eval b/c 52 was
     negative.
     -felt eval process was a joke
     because of Donna's comm
     rel 52.
    -T

DR.

56

2

This yrs eval had a comment regarding Gallup — 'not enjoyed in survey & bad thing to say'

A few yrs ago S2 said 'you need to find a best friend at work' excuse me I thought Gallup was confidential. I don't call everyone bfriend at work.

— felt it was inappropriate & inapp to call it out on eval.
— placed comment at the end of eval

eval previous — 3 positive sentences & 1 negative
— not a bad eval: told it was best in department. Didn't leave her feeling real good.

Doesn't know why she has seen an improvement in 2mia.
— coming in saying GMorning & GBye
— kinda nice

Not easily intimidated, not respected & well received — Susan Z
Donna & Susie — open door policy
Susie not trusting right now but she's trying.

DR.

57  3

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

3

- Group holiday luncheon — feeling last night
was — not having to sit with her family
as though she wanted to be there (?)

- Susie — tough spot, having to align with
Zonia being right.

- Johnny & GB & someone who doesn't
believe & live them? Why are they
here.

Others have told Deb
— putting down religion
+ sex discussions

felt Zonia was cautious w/ her because
of her (Deb's) beliefs.

feels comfortable & supported by Susie.
— building trust

Attributing change in Sara to Susie
holding her accountable.

DR.

58



# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

        Plaintiff,

                                       CASE NO. 11-116369-CD
                                       HON. JAMES M. ALEXANDER

v.

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

        Defendant.

| | |
|---|---|
| **DEBORAH L. GORDON. PLC**<br>**Deborah L. Gordon (P27058)**<br>**Carol Laughbaum (P41711)**<br>*Attorneys for Plaintiff*<br>33 Bloomfield Hills Parkway, Ste. 275<br>Bloomfield Hills, MI 48034<br>Telephone: 248.258.2500 | **LAW OFFICE OF DAVID B. GUNSBERG, P.C.**<br>**David B. Gunsberg ((24235)**<br>*Attorney for Defendant*<br>322 North Old Woodward Avenue<br>Birmingham, MI 48009<br>Telephone: 248.646.9090 |

## AFFIDAVIT

       I have reviewed the attached notes taken which accurately reflect what I told Ane McNeil during the investigation of Susan Zonia. I adopt the attached notes as my true and accurate testimony regarding Susan Zonia.

Sign: _Deneen McCall_

Print Name: _Deneen McCall_

Date: _8-15-2011_

Subscribed and sworn to before me this

_15th_ day of _August_ , 2011

_Adara L. Mission_

Notary Public, State of Michigan

County of _Oakland_

My commission expires: _02-10-2014_

Acting in the County of: _Oakland_

59

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Ane & Don

Deneen McCall                                    9/30/10   9⁴⁵ am
                                                          10⁴²

SZ —   dismissive  hand-up
       calls PJ a bitch
       Dinciok Idiot
       mentions who she doesn't like

- walks in while doing her nails
        - door majority of the time closed
- desk clear ready you're maj- oh you would come in here when I am fixing.
- left on business time to meet men for dates
        - she told Deneen
        - Oct/Nov 09

When SS first came (Pat wasn't here)
What can I do to help you. Deneen didn't
say anything - in fear
        - went into zonia's office told
        her everything  Feb
        Since then It's been bad

2009 Gone for 2½ hrs left early home to get ready
my date.
- Pat Davis harassed by the both
- Susia became friends w/ Zonia  (text after
hrs)

- Malloy & Kahn - doesn't like them & would
do what she can to get rid of them

3

10

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

-if she likes you she tells you everything

Shared personal info - too much **
              - one person too old
      - divorces
      - 17 dates in 17 days
      - rich man but too old he's
        a bastard

heard her tell Susie at OME mtg
    - told Susie to reschedule mtg
     w/ PJ availability first time
     she

- faculty complains to many students - they can't make Trin the dept **
- I don't come whis on service I don't
  want the money. Doesn't care about
 students as long as they are paying big bucks.
- Dr Yanez & Deneen went to S2
6 months ago
    - female student harassed
  by physician (Grewal)
    - what was your mother
  catty. other comments

2 months ago - another incident (Dr G) makes them feel to Dr G
stupid, changed services - Dr Kahn talked Dr. 2 I'll tell him
   - AVA student lawsuit - S2 got play NCI
 mad b/c she wouldn't answer the
 question the way she wanted.
  -DR. Yanez found out

61

3'

Was student food rep of the AVA pay

- Denise I am not certain

Dr Vang was told by Zonia he said
Denise wouldn't know —

Would stop students from applying — would give
bad reference.
Shared with Donovan the details

• Zonia 'she'll be okay acts like the
sky is falling'

Favoritism towards Mariel
- Susie      (fielded by Susan a
- Susan        sometimes Susie)
- be careful who you talk too

— Susie playing each against one another
— unsuccessful hires

52  Sour attitude, F word, dismissive gen,
texting on phone, in meeting

— Not a sensitive person.
—J1 — stupid sessions, curbaya
— in other mtgs (leadership mtgs, april mtg

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

62

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

3

feels Susie was trying to impress
Susan

SZ told - Only reason why she (supies) has the job is
Deneen    b/c Susie keeps protecting her & calling
her.

- Was not in favor of the group session

- 9/30/10 asked Susie why did you take
   these issues to Zurica - felt like
   she/they were sold out.

   - everything confidential - would probe
      Deneen (she wouldn't talk)

- what if I told you someone told me
   you were looking to leave. (felt like she
   was trying to probe.

- Susie some things will be changing (duties
   Donna would do were passed to Deneen)

63
3

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

8

Dr Silverglad — program director of surgery
        2007
    - world talk to him in a demanding
    way
    - she will do what she can to get
    him out — she wanted his
    office

~~Nursing~~
Prayers (overhead) — do we all have
        to listen to this.

I have friends in every dept. all men
& I know things
        - Afraid to come to HR b/c
        of Zonia's comments
- feels Susie & Susan pin ppl against each
other. Divide & conquer.

- Good relationship w/ peers.

You need to speak up, now is the time.
Everything I did came from Dr Zonia.
        Dana — felt she was back peddling

- Deb Reid told her she ~~was~~ really unforgiving
let me go to talk to Anne.
        felt Susie was pushing to have a group
mtg- she said when your ready and Anne I will be

64 ³

in there.

feels like Susie is trying to cover herself

— I fought hard for you all (When MNA
DB corp ↑)

— Doesn't feel Susie supports her.

— Doesn't feel she can trust Susie b/c
of previous behavior.

Susie continues to ask Dena to talk
to her — conversation confidential
Dena would tell her, no.

Susie (May/June '10)
Change to orientation for new residents
— no one was opposing it just
talking about previous orientation
sessions
— then went to Zinie
— Later came back & said 'I feel
you all were unfair to me & attacked
It wasn't only her emotion ___
came to her & Zinie's
— Muriel said 'not true'.

Seemed | very stressed. Grindy teeth, looking for another job.

*Exhibit 7*

**Susan Zonia**
**7/15/2011**

2 (Pages 2 to 5)

Page 2

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

1  APPEARANCES:
2  CAROL LAUGHBAUM P41711
3  Deborah L. Gordon, PLC
4  33 Bloomfield Hills Parkway
5  Suite 275
6  Bloomfield Hills, Michigan 48934
7  (248) 258-2500
8      Appearing on behalf of the Plaintiff.
9
10  DAVID B. GUNSBERG P24235
11  Law Office of David R. Gunsberg
12  322 North Old Woodward Avenue
13  Birmingham, Michigan 48009
14  (248) 646-9090
15      Appearing on behalf of the Defendant.
16
17  ALSO PRESENT:
18      Martha Murphy
19          *     *     *

Page 3

1          TABLE OF CONTENTS
2  Witness                        Page
3  SUSAN ZONIA
4  EXAMINATION BY MR. GUNSBERG        4
5
6
7          INDEX TO EXHIBITS
8          (No exhibits)
9
10  Exhibit                        Page
11

Page 4

1  Birmingham, Michigan
2  Friday, July 15, 2011
3  10:36 a.m.
4          SUSAN ZONIA
5  having first been duly sworn, was examined and testified
6  on her oath as follows:
7      MR. GUNSBERG: Good morning.  Would you give
8  the court reporter your full name, please?
9      THE WITNESS:  My full name is Susan Catherine
10  Zonia, Z O N I A.
11      MR. GUNSBERG:  This is the deposition of the
12  plaintiff, Susan Zonia, in the captioned matter taken
13  pursuant to notice for this time and place.
14  EXAMINATION BY MR. GUNSBERG:
15  Q.  Ms. Zonia, have you had your deposition taken
16      previously?
17  A.  Not in this case, but yes.
18  Q.  How many times before?
19  A.  Once before.
20  Q.  And what was that matter that you were deposed in?
21  A.  That was a matter concerning a student that rotated at
22      St. Joseph Mercy Oakland Hospital in which Mr. Gunsberg
23      represented me and the hospital in the complaint that
24      the student filed.
25  Q.  Do you know what years that lawsuit was active?

Page 5

1  A.  I'm going to guess.  I believe it was 2007, perhaps
2      2008.
3  Q.  And the lawsuit was -- eventually it was dismissed by
4      the court?
5  A.  Correct.
6  Q.  And did Mr. Woodward appeal; if you know?
7  A.  To the best of my knowledge, he has appealed.
8  Q.  Do you know the outcome of the appeal?
9  A.  I believe it was also dismissed.
10  Q.  The appeal was dismissed?
11  A.  I believe it was but I'm not certain.
12  Q.  Did you do anything to prepare for the deposition today,
13      review any documents, review any notes or records, talk
14      to anybody?
15  A.  When the depositions -- the transcripts from Becky
16      Herner and Bill Jewell were first sent out, I glanced at
17      them because I had never looked at a deposition before,
18      probably spent about ten minutes on it since I had been
19      present when the depositions were given.
20          I also met with my counsel, Ms. Laughbaum,
21      earlier this week.  And she simply reminded me of the
22      form and content of giving a deposition.
23  Q.  Okay.  You understand that I'm asking you questions and
24      that you should try to let me finish my question before
25      you answer.



HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313-567-8100

66



Susan Zonia
7/15/2011

3 (Pages 6 to 9)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 6

1   A.  Correct.
2   Q.  And I'll try to let you finish your answer before I ask
3       another question.
4   A.  Correct. I understand.
5   Q.  If you think I've interrupted you, you'll let me know so
6       I can let you finish the answer. Okay?
7   A.  Thank you, yes.
8   Q.  If you don't understand a question I ask you or you
9       disagree with the question or the form of the question,
10      would you let me know that so I can try to ask the
11      question in a different way?
12  A.  Yes, I will do that.
13  Q.  Please try to say yes or no or I don't know or answer
14      verbally otherwise -- as opposed to um-hmm
15      (affirmatively) or uh-huh (negatively) or nods of the
16      head because the court reporter can't take that down.
17      Okay?
18  A.  Yes, I understand.
19  Q.  And sometimes I talk in a sort of lurching way so you
20      can't tell when I'm finished. And so give me a chance
21      to try and finish the question so we don't step on each
22      other with your jumping in to answer before I finish.
23      Okay?
24  A.  Yes. I understand.
25  Q.  Did you review any of the documents that were produced

Page 7

1       in this case by the defendant?
2   A.  Yes, I did many -- several weeks ago. I couldn't give
3       you an exact date but when they came to my counsel, I
4       was asked to come in and review them.
5   Q.  Did those documents include notes of witness interviews
6       that had been done during an investigation that was
7       conducted in the September, 2010, time frame?
8   A.  Yes.
9   Q.  Did you review any other notes or documents, for
10      instance, notes that you kept yourself while you were
11      employed at St. Joe?
12  A.  Yes.
13  Q.  Have you produced all of those documents to us in this
14      case?
15  A.  Yes.
16  Q.  Did you keep any kind of a calendar or diary while you
17      worked at St. Joe where you wrote down either meetings
18      or significant events or things that people said, things
19      like that?
20  A.  Yes.
21  Q.  Do you have such a diary or calendar?
22  A.  I don't because it was -- those notes were made on my
23      office computer.
24  Q.  Did you keep a copy of those elsewhere?
25  A.  No, I did not.

Page 8

1   Q.  Did you have a personal computer, that is a computer in
2       addition to your office computer, where you maintained
3       notes or diaries or calendar entries, that type of
4       thing?
5          MS. LAUGHBAUM:  Let me clarify, you're asking
6       other than what she might have prepared for counsel, I
7       presume.
8   BY MR. GUNSBERG:
9   Q.  Well, while you were employed at St. Joe, did you
10      prepare any documents for counsel?
11  A.  While I was employed at St. Joe's did I prepare any
12      documents for counsel?
13          MS. LAUGHBAUM:  Or in --
14          MR. GUNSBERG:  For a lawyer.
15          MS. LAUGHBAUM:  Or in anticipation, I think is
16      fair.
17          THE WITNESS:  Oh, I didn't anticipate
18      litigation, so no.
19  BY MR. GUNSBERG:
20  Q.  So while you were employed at St. Joe, did you keep any
21      notes or records like on a diary or calendar, on a
22      personal computer, notes or records related to your job?
23  A.  The only thing that I had on a personal computer were
24      particularly nice notes from support staff that I sent
25      to my own E-mail account, hot mail. And I have produced

Page 9

1       those for counsel since they were in my possession. The
2       other notes are not in my possession.
3   Q.  So your testimony is that you took the nice notes and
4       you sent those over to your personal computer but any
5       other notes or records you did not?
6   A.  No, I did not.
7   Q.  Where do you live?
8   A.  I live at 1372 Devon Lane in Troy.
9   Q.  How long have you lived there?
10  A.  Almost two years.
11  Q.  Is that a house or a condo?
12  A.  It's a condo.
13  Q.  Do you own the house or the condo?
14  A.  Yes.
15  Q.  Is it paid off? In other words, did you pay cash for
16      it?
17  A.  I have a mortgage.
18  Q.  Has anybody ever foreclosed or threatened foreclosure on
19      the mortgage?
20  A.  No.
21  Q.  The mortgage is up-to-date?
22  A.  Correct.
23  Q.  And where did you live before that?
24  A.  I lived in Novi, 25854 Lochmoor Lane, Novi.
25  Q.  And why did you move?

