

Susan Zonia
7/15/2011

4 (Pages 10 to 13)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

### Page 10

1   A. I got divorced.
2   Q. When were you divorced?
3   A. Two years ago.
4   Q. Do you have a date that the judgment was entered?
5   A. July 7th.
6   Q. About two years ago. And how long was the divorce case
7     pending before the judgment was entered?
8   A. I believe it was around eight months -- eight, nine
9     months.
10   Q. Did the Complaint, was that filed by you against your
11     ex-husband or by your ex-husband against you?
12   A. By me.
13   Q. So did the divorce come about because your husband
14     wanted a divorce or did the divorce come about because
15     you wanted the divorce?
16        MS. LAUGHBAUM: Objection on the basis
17   relevance. You can answer.
18        THE WITNESS: He requested the divorce.
19   BY MR. GUNSBERG:
20   Q. Did that come as a surprise to you?
21   A. Yes.
22        MS. LAUGHBAUM: Objection -- continuing
23   objection on the basis of relevance.
24        MR. GUNSBERG: Sure.
25        THE WITNESS: Yes.

### Page 11

1   BY MR. GUNSBERG:
2   Q. You had no suspicion or indication that your husband
3     wanted a divorce prior to this being sprung on you, so
4     to speak?
5   A. No, I did not.
6   Q. And did this divorce request out of the blue, did that
7     cause you emotional distress?
8   A. Yes, it did, Mr. Gunsberg.
9   Q. And did you seek any treatment or counseling for that
10     emotional distress caused by the divorce?
11   A. Yes. I availed myself of TEAM which is a benefit that
12     the hospital offers. TEAM is -- I'm not going to be
13     able to recall what the letters stand for, but it is an
14     organization that the hospital provides access to
15     that -- for counseling. Any personal problems or issues
16     that you wish to discuss, you can do it confidentially
17     with TEAM.
18   Q. And when did you start counseling with TEAM or a TEAM
19     representative?
20   A. I believe it would have been in December, two years ago.
21     So December 2007, 2008.
22   Q. Well, your divorce was finalized in July, 2009.
23   A. So 2007.
24   Q. Let me see if we can get the chronology. So the lawsuit
25     was pending about eight, nine months. So the lawsuit

### Page 12

1     must have been filed the end of 2008; does that sound
2     right?
3   A. Yes.
4   Q. And so you started counseling for the emotional distress
5     in December of 2008; does that sound right?
6   A. That sounds about right, yes.
7   Q. And who did you counsel with?
8   A. If I recall correctly her name is Theresa Magnum, M A G
9     N U M, not entirely sure of the last name.
10   Q. And is she a psychiatrist, psychologist, social worker?
11   A. I believe she is a psychologist.
12   Q. Did you see or counsel with anyone else other than
13     Theresa Magnum?
14   A. For -- professionally, no.
15   Q. Did you counsel with someone else who was not a
16     professional?
17   A. My friends.
18   Q. Did you counsel with Martha Murphy or did you talk about
19     your divorce with Martha Murphy?
20   A. I believe I did on several occasions.
21   Q. Did you consider Martha Murphy one of your friends?
22   A. Yes, I did.
23   Q. Do you still?
24   A. Yes.
25   Q. Did you socialize together, you and Martha?

### Page 13

1   A. On several occasions, yes.
2   Q. Did you discuss your divorce with any other friends who
3     were also employees of St. Joe?
4   A. Yes, I'm sure I did.
5   Q. Can you tell me who those folks are?
6   A. Dr. Verardi, V E R A R D I.
7   Q. Is that a man or woman?
8   A. It's a woman. Cathy Coburn. I believe on one occasion
9     or two -- a couple of occasions, I won't put a number on
10     it, Barb Hertzler, the COO of the organization. And I
11     believe Donna Hambleton, H A M B L E T O N, who at that
12     time was my assistant.
13   Q. Donna Hambleton was a Manager in the Graduate --
14   A. Graduate Medical Education, yes.
15   Q. You call her your assistant. Actually her title was
16     manager not assistant.
17   A. She assisted me in many things. She managed the office.
18   Q. Were -- you were the number one person in charge of the
19     Graduate Medical Education office?
20   A. Correct.
21   Q. And was Donna Hambleton, was she the number two person
22     in charge of the office?
23   A. She would fill in when I was not available, yes.
24   Q. In terms of the management hierarchy of the Graduate
25     Medical Education Department, you were at the top. If I



60

 

**Susan Zonia**
**7/15/2011**

7 (Pages 22 to 25)

Page 22

1  Q.  Do you two still socialize together?
2  A.  Yes, we do.
3  Q.  Is Cathy Coburn still employed at St. Joe?
4  A.  No, she is not.
5  Q.  Do you know when she left?
6  A.  I'm not sure. I believe it was March or April of 2011.
7  Q.  Do you know why she is no longer employed at St. Joe?
8      Let me ask it this way, do you have any firsthand
9      knowledge other than -- do you have any firsthand
10     knowledge of why she is no longer there?
11 A.  No, I do not.
12 Q.  Did she quit or was she fired; if you know?
13 A.  I believe she was encouraged to resign.
14 Q.  Do you know who encouraged her to resign?
15 A.  I go not have firsthand knowledge.
16 Q.  Has Cathy Coburn told you she was encouraged to resign?
17 A.  She told me that she was asked to resign.
18 Q.  Who asked her to resign according to Cathy Coburn?
19     MS. LAUGHBAUM: I'm going to object on the
20     grounds of relevance and foundation. If you know.
21 BY MR. GUNSBERG:
22 Q.  I'm only asking what Cathy Coburn told you, if she told
23     you anything at all.
24 A.  I don't know if my recollection is 100 percent accurate
25     on this. I believe Barb Hertzler had something to do

Page 23

1      with it. She reported to Barb so I'm thinking Barb
2      Hertzler had something to do with it. And I believe
3      that there was somebody from Trinity's home office as
4      well, but I'm not certain.
5  Q.  Did Cathy Coburn tell you what it was that was the basis
6      for or why it was that whoever encouraged her to resign
7      from St. Joe was encouraging her to resign?
8      MS. LAUGHBAUM: Objection, form and relevance.
9      If you can answer, go ahead.
10 BY MR. GUNSBERG:
11 Q.  In other words, they want me to resign because they say
12     I did blah, blah, blah?
13 A.  She did not go into great detail. She did mention, as I
14     recall, something about being told people don't like
15     her.
16 Q.  Do you have any information about whether people liked
17     Cathy Coburn? And I assume when you say people don't
18     like her that meant people at St. Joe don't like her.
19     So my question is do you have any information about
20     whether people liked Cathy Coburn or not?
21     MS. LAUGHBAUM: Can I have a continuing
22     objection about Cathy Coburn?
23     MR. GUNSBERG: Of course. You can have a
24     continuing objection about everything.
25     MS. LAUGHBAUM: It may come to that.

Page 24

1      MR. GUNSBERG: That's okay. It's fine.
2      THE WITNESS: Can I answer that? I know many
3      people that like Cathy Coburn that work at St. Joe's.
4  BY MR. GUNSBERG:
5  Q.  Do you know any people that didn't like her?
6  A.  I never heard anyone complain to me about Cathy Coburn.
7  Q.  Cathy Coburn and you did not have any kind of reporting
8      relationship? In other words, you didn't report to her
9      and she didn't report to you?
10 A.  No.
11 Q.  And you didn't supervise the same area or same people as
12     Cathy Coburn?
13 A.  That is correct.
14 Q.  And who did Cathy Coburn report to?
15 A.  I believe she reported to Barb Hertzler, H E R T Z L E
16     R.
17 Q.  Is Dr. Verardi still at St. Joe?
18 A.  Yes, she is.
19 Q.  What does she do?
20 A.  She is a physician. She is an internist. And she
21     teaches in the Internal Medicine Residency Program.
22 Q.  Are you and Dr. Verardi still social friends?
23 A.  Yes, we are.
24 Q.  Did you go out together?
25 A.  Occasionally.

Page 25

1  Q.  Did you go to her home?
2  A.  I've never been to her home.
3  Q.  Does she come to yours?
4  A.  She has been.
5  Q.  Does Cathy Coburn come to your home?
6  A.  Yes.
7  Q.  And you go to hers?
8  A.  Yes, I do.
9  Q.  Do you still socialize with Barb Hertzler?
10 A.  No.
11 Q.  Is Barb Hertzler still with St. Joe?
12 A.  To the best of my knowledge.
13 Q.  And Donna Hambleton, did you socialize with her out of
14     work?
15 A.  We had lunch several times while she was employed.
16 Q.  Did she come to your house or you go to hers?
17 A.  No.
18 Q.  Do you know why Donna Hambleton left St. Joe?
19 A.  Her husband had had his work hours reduced working for
20     the City of Pontiac and she wanted a salary increase. I
21     had gotten her one, but I couldn't get her another one.
22 Q.  Do you have a recollection of Donna Hambleton
23     complaining about the way you treated her as part of her
24     exist interview or as part of her process of leaving the
25     hospital?

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

69

 

**Susan Zonia**
**7/15/2011**

8 (Pages 26 to 29)

### Page 26

1   A.   That was news to me.
2   Q.   Who gave you that news that Donna Hambleton complained
3        about the way you treated her?  Was it Don Bignotti?
4   A.   It came to my attention when I saw a series of
5        inappropriate E-mails between Pat Davis and Donna
6        Hambleton.
7   Q.   Let me interrupt you.  The question was who told you
8        that Donna Hambleton complained about the way you
9        treated her as part of her exiting process from the
10       hospital?  Can you give me a name?
11  A.   I saw it in writing.  And then I went and addressed Don
12       about what I saw in writing.
13  Q.   So was it Don Bignotti who told you that Donna Hambleton
14       complained about the way you treated her?
15  A.   After I saw it in writing, yes.
16  Q.   When did Donna Hambleton leave St. Joe?
17  A.   December of 2009.
18  Q.   When was it that Don Bignotti told you about the
19       complaints that Donna Hambleton had about -- the
20       complaints about the way she was treated by you?  How
21       long after she left?
22  A.   Several months.
23  Q.   And was that in a one-on-one meeting in Don Vignotti's
24       office?
25  A.   Correct.

### Page 27

1   Q.   Did you make any notes or record of that meeting?
2   A.   No, I did not.
3   Q.   Did Don Bignotti identify any treatment of Donna
4        Hambleton that he discussed with you as behavior that
5        shouldn't be recurring?  In other words, should stop or
6        don't act this way or anything like that?
7   A.   No, he did not.
8   Q.   Do you recall what it was that Donna Hambleton
9        complained about as far as your mistreatment of her?
10  A.   That I treated her like a secretary.
11  Q.   Anything else that you recall Don Bignotti talking to
12       you about at this meeting regarding Donna Hambleton's
13       complaints about you?
14  A.   I specifically asked him was there a problem.  And his
15       response was have I been treating you any differently.
16       So that indicated to me that there was not an issue.
17  Q.   Did you respond to this accusation that you had been
18       treating Donna like a secretary?  Did you say, yeah,
19       maybe I was a little bit demeaning or no, it never
20       happened or it's all in her mind or any kind of
21       response?
22  A.   My thought at the time --
23  Q.   Listen to my question.  I didn't ask what you thought
24       was.  My question was what was your response.  Did you
25       say anything to Don Bignotti about it?

### Page 28

1   A.   Perfect recollection of the conversation?  I don't have.
2        I believe I indicated to him that given the salary
3        increase and the position increase that we were able to
4        get Donna, I felt that she never performed up to that
5        level but continued to perform in more of a supportive
6        office manager role rather than an Administrative
7        Director of Medical Education.
8   Q.   So did you treat Donna like a secretary?
9   A.   I treated her like the office manager.
10  Q.   Did you deny that you -- to Don Bignotti did you deny
11       that you treated Donna in any demeaning or deprecating
12       way?
13  A.   I don't believe I treated Donna in a demeaning or
14       deprecating way.
15  Q.   My question is, is that what you told Don Bignotti?
16  A.   I told Don I don't believe I treated her in a demeaning
17       or deprecating way.
18  Q.   So you denied Donna's accusation?
19  A.   It's matter of perspective.
20  Q.   You denied or disagreed with her perspective?
21  A.   I disagreed with her perspective.
22  Q.   So essentially if Donna said Susan Zonia treated me
23       badly.  She treated me like a secretary or demeaning,
24       whatever the import of that accusation was, your answer
25       was that's not so?

### Page 29

1   A.   I don't believe I did.
2   Q.   And that's what you told Don Bignotti?
3   A.   Correct.
4   Q.   Did you get along with Don Bignotti?
5   A.   Yes, I did.
6   Q.   Did you consider him a friend?
7   A.   No.
8   Q.   Did you socialize with him outside of work?
9   A.   No.
10  Q.   Did you socialize with him at work events?
11  A.   Graduation, yes.
12  Q.   Do you have any complaints about the way he treated you?
13  A.   Um, yes.
14  Q.   Okay.  Well, he was involved in your termination and you
15       complained about that.  Other than that, do you have any
16       complaint about the way he treated you?
17  A.   There was information that often wasn't shared with me
18       that was key to my job that put me in difficult
19       situations.
20  Q.   Any other complaints that you have about Don Bignotti?
21  A.   Other than the access to information, no.
22  Q.   How long did you work for Don Bignotti?
23  A.   Almost five years.  Just shy of five years.
24  Q.   Did Don hire you?
25  A.   Yes, he did.



Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

70



Susan Zonia
7/15/2011

10 (Pages 34 to 37)

Page 34

1  Q. Your office located at St. Joe was located where?
2  A. It was on the fourth floor of -- gosh, I'm forgetting
3     which wing it's referred to. I don't know what wing
4     it's referred to now in the hospital. It's on the
5     fourth floor.
6  Q. And Don Vignotti's office was in the Executive area on
7     the first floor?
8  A. Correct.
9  Q. And Martha Murphy's office was also in the Executive
10    Office?
11 A. Correct.
12 Q. Are Don's office and Martha's office next to each other?
13 A. At one point they were not. Offices moved in that
14    corridor. Don's never did. Don's stayed in the same
15    place. But I believe Martha Murphy and Cathy Coburn
16    flipped offices at some point during my employment
17    there. So I believe when I left Martha's office was
18    adjacent to Don's, I believe.
19 Q. In 2010, how often did you see Don?
20 A. Oh, gosh. Initially we had one on one meetings at least
21    once a month. They were scheduled every two weeks but
22    often they got cancelled because he had things come up.
23    But at least once a month we had a one hour meeting.
24 Q. And did that frequency diminish? Did it become less and
25    less frequent?

Page 35

1  A. Yes, it did.
2  Q. Do you know why?
3  A. I was much more comfortable in my job and I believe Don
4     had his support person, Becky, cancel those meetings and
5     the frequency of them because he did not feel compelled
6     to have frequent meetings with me. I E-mailed him a lot
7     to apprise him of what was going on and he could read
8     those E-mails at a time that was more convenient for him
9     than setting aside time for a meeting.
10 Q. Did you ever have any meetings with Martha Murphy?
11 A. I believe we had several.
12 Q. What would those have been about?
13 A. First of all, she did an orientation for me when I first
14    came on board. I believe we had a meeting regarding
15    bringing in someone from Trinity's home office to take a
16    look at some of the allegations that were being made
17    against Ben Diaczok, D I A C Z O K.
18 Q. Was that something that Dr. Diaczok had requested?
19 A. Dr. Diaczok had requested it.
20 Q. You sat through Dr. Diaczok's deposition the other day,
21    correct?
22 A. Correct.
23 Q. And Dr. Diaczok said that he had been accused by some
24    anonymous resident of various things and had hired a
25    lawyer and requested that an outside investigator

Page 36

1     investigate?
2  A. Correct.
3  Q. Is that true as far as your memory is concerned?
4  A. It was several residents, not one.
5  Q. And that there was, at his request, then an outside
6     investigator?
7  A. Correct.
8  Q. Was that a request that you took to Martha Murphy? In
9     other words, did Diaczok ask you to have an outside
10    investigator and then you went to Martha or how exactly
11    did that happen?
12 A. That would have been something -- the complaints that I
13    was getting about Dr. Diaczok I shared immediately with
14    Don, my Director. Don, I believe, spoke with Martha.
15    And then the three of us discussed what was the best way
16    to go forward with this, how to handle the complaints.
17    Something like that is not I need a direction, they need
18    to set the tone for that. First I shared it with Don.
19    Don consulted with Martha, a plan was developed for
20    addressing the concerns.
21 Q. And apparently in response to that plan then Dr. Diaczok
22    then requested an outside investigator, correct? That's
23    what he said?
24 A. I don't recall that he specifically requested an outside
25    investigator. I know he felt that the allegations

Page 37

1     needed to be looked at. Now whether it was Don, Martha
2     or Ben that suggested someone from corp -- the
3     corporation come in, I don't recall of that who
4     suggested that.
5  Q. Okay. Have you ever been involved in the investigation
6     of any other St. Joe employee other than Dr. Diaczok?
7  A. Yes.
8  Q. Who else have you been involved in an investigation of?
9  A. A number of residents.
10 Q. Okay. Anybody else?
11 A. Several physicians for inappropriate behavior.
12 Q. Who?
13 A. Dr. Patel.
14 Q. Patel?
15 A. P A T E L.
16 Q. Okay.
17 A. First name K I R I T.
18 Q. Anyone else?
19 A. Dr. Denier and Pat Davis who was employed in medical
20    education and Gail Molitor who was also in medical
21    education.
22 Q. Anyone else that covered those investigations you've
23    been involved in?
24 A. I believe it does at this time.
25 Q. Can you identify the residents you were involved with



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

71



Susan Zonia
7/15/2011

11 (Pages 38 to 41)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 38

1   involving investigation?
2   A.  Gosh, the name was right here.  Hold on.  A surgery
3       resident, Larry Gaines.  I knew it was a surgery
4       resident for inappropriately touching a nurse.
5   Q.  Okay.  Anyone else?
6   A.  Dr. Beemooth for prescribing large dosages of oxycodone
7       to non-patients of St. Joe's.
8   Q.  Okay.  Anyone else?
9   A.  Dr. Zamlut, Z A M L U T, a resident -- Chief Resident
10      for hitting on, dating students under his supervision.
11      Others regarded more internal medical education
12      performance, academic issues.
13  Q.  Steven Woodward?
14  A.  Steven Woodward.  Thank you.  There were many of those.
15      Christine Stoica, S T O I C A.  There was one right
16      before I left, Dr. Mansour, M A N S O U R.
17  Q.  These are all residents?
18  A.  These are all residents for being inappropriate in his
19      interactions with nurses on the floor and refusing to
20      take direction.
21  Q.  Were these investigations that you've -- that you were
22      involved in, were these all based on matters that were
23      raised by you?
24  A.  No.  They were matters that were brought to me.
25  Q.  But once the matters were brought to you, did you then

Page 39

1   raise them with someone else like Dr. Bignotti or Martha
2   Murphy or --
3   A.  Oh, yes.  So for example, the one with Dr. Gaines, the
4       inappropriate touching of a resident nurse, I
5       immediately brought in HR and alerted his program
6       director to the allegation.
7   Q.  In any of these investigations did any of the
8       individuals other than Diaczok, and I'm not saying
9       Diaczok actually did this, did any of the individuals
10      involved request an outside investigator be appointed or
11      be involved?
12  A.  Not to the best of my knowledge.
13  Q.  When was the complaint about Dr. Patel brought by you to
14      Dr. Bignotti; do you recall what year that was?
15  A.  2007.
16  Q.  And how about the complaint involving Dr. Denier?
17  A.  I'm going to say 2008, to the best of my recollection.
18  Q.  And how about complaints that you brought about Pat
19      Davis?
20  A.  That would have been in 2010.
21  Q.  How about Gail Molitor?
22  A.  2009.  It was before Pat.
23  Q.  And the complaint about Diaczok that was brought, when
24      was that?
25  A.  That would have been either very late in 2006 or early

Page 40

1   2007.
2   Q.  The complaint about Patel, what was that?
3   A.  For many people he was loud and abrasive and verbally
4       abusive.
5   Q.  Diaczok, that involves some complaints from two
6       residents about sex harassment?
7   A.  There were several.  I wouldn't say two but there were
8       several female residents that came to me to complain
9       about statements that he made and the way that they were
10      treated by him.
11  Q.  And the complaints that were raised about the residents,
12      when did those come up?  How about, let's see,
13      Dr. Mansour?
14  A.  Oh, the Dr. Mansour issue came up in spring of 2010.  He
15      was a resident and that had to do with unpleasant
16      interactions between the nursing staff and Dr. Mansour's
17      responsiveness.
18  Q.  How about Dr. Gaines, when did that?
19  A.  Dr. Gaines would have been -- also been in the spring of
20      2011 -- 2010, sorry.
21  Q.  How about Dr. Bee -- I can't read my writing.  I
22      apologize.
23  A.  Beemooth?
24  Q.  Yes.
25  A.  Beemooth would have been 2008 maybe.

Page 41

1   Q.  And that involved prescription --
2   A.  Drugs.
3   Q.  Improperly prescribing prescription drugs?
4   A.  Correct.
5   Q.  And did Dr. Beemooth, was he dismissed from the program?
6   A.  Yes, he was.
7   Q.  And was that a decision that was made by Dr. Bignotti?
8       Would he have the final decision on that?
9   A.  After it moved through several levels, yes.
10  Q.  Dr. Zamlut, hitting on students, when did that happen?
11  A.  It happened in '08.
12  Q.  Doctor -- was Dr. Zamlut dismissed from the residency?
13  A.  No, he was not.
14  Q.  Hitting on students, that's a form of sex harassment?
15  A.  Yes, it is.
16  Q.  Were any of these residents other than Dr. Beemooth
17      dismissed from the residency program?
18  A.  No, they were not.
19  Q.  Did you recommend that any of these doctors be dismissed
20      from the residency program that you've named Mansour,
21      Gaines, Beemooth, Zamlut?
22  A.  Yes.
23  Q.  Which ones did you recommend be dismissed?
24  A.  I thought Dr. Zamlut should be disciplined, if not
25      dismissed.



Susan Zonia
7/15/2011

12 (Pages 42 to 45)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

### Page 42

1  Q.  Was be dismissed?
2  A.  No, he was not.
3  Q.  That was in 2008?
4  A.  Correct.
5  Q.  Did you recommend that Steven Woodward be dismissed
6      from -- he wasn't a resident.  He was a fifth year
7      medical student.
8  A.  No, I did not.
9  Q.  Did you recommend that Pat Davis be dismissed?
10 A.  No, I did not.
11 Q.  How about Gail Molitor?
12 A.  No, I did not.
13 Q.  Were you involved in a matter involving a resident
14     called Atif?
15 A.  Marginally, yes.
16 Q.  Was there an investigation of Dr. Atif?
17 A.  Yes, there was.
18 Q.  Did you recommend that Atif be dismissed or not
19     graduated?
20 A.  I believe I did.
21 Q.  When was that?  What time frame are we talking about?
22 A.  That would have been 2007, I believe he graduated.
23     There was a very large investigation regarding him and I
24     was relatively new and sat on the committee.  It was the
25     first time I had encountered something like that.

### Page 43

1  Q.  Did Dr. Atif ask that an outside investigator or someone
2      other than Dr. Bignotti investigate his claims of --
3  A.  My goodness, I think it was short of the supreme court
4      wanted to look at it.  I don't recall.  But I do recall
5      a lot of noise and accusations of counter suits and
6      things.
7  Q.  And did St. Joe bring in somebody from the outside to
8      handle the investigation?
9  A.  I can't recall that.
10 Q.  Any other investigations?
11 A.  I believe, Mr. Gunsberg, you might have been involved in
12     the Atif case but I'm not certain.
13 Q.  So any other investigations that you recall or at least
14     that you were involved in?
15 A.  There were many that I was involved in.  There were many
16     disagreements of residents saying things were unfair or
17     inappropriate.  And I would do an initial look to see if
18     there was a systemic problem or was this a he said she
19     said.  But those are the big ticket items that I have
20     immediate recall of.
21 Q.  Do you have any plans to move out of town?
22 A.  Yes.
23 Q.  Where are you going?
24 A.  University of Chicago.
25 Q.  When?

### Page 44

1  A.  August 1st.
2  Q.  Is that a new job?
3  A.  Yes, it is.
4  Q.  What is the job?
5  A.  I will be the -- I will be in University Research
6      Administration.  They have four institutional review
7      boards.  And I will be the Director of Research
8      Integrity for the university.
9  Q.  Do you have a contract with the University of Chicago?
10 A.  Yes, I do.
11 Q.  And when did you sign that?
12 A.  Well, it's a Letter of Intent to show up on August 1st.
13     I signed that end of June.
14 Q.  Is the University of Chicago, are you with a hospital or
15     with a medical school or --
16 A.  I'm with the university.  It's a university appointment.
17 Q.  Does the University of Chicago have a medical school?
18 A.  Yes, it does.
19 Q.  And it has a hospital?
20 A.  Yes, it does.
21 Q.  So will you be handling research for all of the
22     University of Chicago entities?
23 A.  Yes, I will.
24 Q.  Okay.  So it's a big job?
25 A.  Huge.  It scares me.

### Page 45

1  Q.  University of Chicago is a very prestigious place, is it
2      not?
3  A.  Yes, it is.
4  Q.  I wanted to go there for law school and I got in and my
5      father wouldn't pay the bill.  He told me to go get a
6      job for a few years and maybe he'd kick in a few bucks.
7      But at the time it was a hot bed of socialism and
8      communist activity according to Congress.
9          Anyway, so it's a very highly respected place,
10     correct?
11 A.  Yes, it is.
12 Q.  I assume that being the Director of Research Integrity
13     for the University of Chicago is a very highly respected
14     position?
15 A.  I respect it.  I'm excited.
16 Q.  Are you?  Good.  But I'm asking from a different
17     standpoint.  I assume my knowledge is that the
18     University of Chicago is a very highly respected place
19     as far as its research component is concerned?
20 A.  I believe so.  They have evidently over 7,000 active
21     research projects.
22 Q.  How big a research budget do they have; do you know?
23 A.  A bazillion.  I don't know I don't know.
24 Q.  It's huge?
25 A.  I'm thinking.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

73

 

Susan Zonia
7/15/2011

13 (Pages 46 to 49)

**Page 46**

1  Q. And you're going to be overseeing the proper -- that
2     they follow the rules?
3  A. Correct.
4  Q. That's what you do?
5  A. Correct.
6  Q. And how much are you getting paid on this job?
7  A. $130,000.
8  Q. Do you have a bonus opportunity?
9  A. No, I do not.
10 Q. Do you have fringe benefits?
11 A. Yes.
12 Q. Like health insurance --
13 A. Yes.
14 Q. -- life insurance, pension, that type of thing?
15 A. Correct.
16 Q. Are those comparable to the benefits that you had at St.
17    Joe?
18 A. In terms of dollar amount, I couldn't say yes or no.
19    But the overall benefit package in terms of access to a
20    401-K and a pension, yes. I haven't drilled down to --
21 Q. Is there a -- do you know who held the job at University
22    of Chicago before you?
23 A. No, I don't know.
24 Q. Do you know how much the person was paid in the job?
25 A. No, I don't know.

**Page 47**

1  Q. Do have an opportunity for growth -- opportunity to make
2     more money, that sort of thing?
3  A. I'm hopeful.
4  Q. Who do you report to?
5  A. Carol Zuiches, Z U I C H E S.
6  Q. What position is that?
7  A. She's the Vice President for Research.
8  Q. Do you know how much she makes?
9  A. No, I do not.
10 Q. Do you believe there will be opportunities for promotion
11    within the University of Chicago from this position if
12    you're doing a good job there?
13 A. I would like to assume, yes.
14 Q. When you're doing this job, can you do consulting work
15    on the side?
16 A. Probably not.
17 Q. Do you know?
18 A. I have a huge learning curve with this job so my initial
19    plans are to not consult because I want do this one
20    well.
21 Q. Sure. But you've set up a consulting company -- well,
22    let me ask you this; when did you set up your consulting
23    company?
24 A. I believe I became an LLC in January of 2011.
25 Q. Did you do outside consulting, that is consulting with

**Page 48**

1     any entity on any matters, while you were employed by
2     Trinity or St. Joe?
3  A. Not for pay.
4  Q. Did you do consulting without being paid?
5  A. I was President of a Director of Medical Education
6     organization. And I would be consulted, asked my
7     opinion by the American Osteopathic Association on some
8     educational guidelines. Colleagues would call and ask
9     what would I do in X situation and I would give them my
10    opinion.
11       So consulting in that sense, in a collegial
12    sense, yes, I did consult but not for pay.
13 Q. Was the Director of the Association for the American
14    Osteopathic Association, was the directorship position
15    that you had -- you said president actually?
16 A. President.
17 Q. Was that a paid position?
18 A. No, it was not.
19 Q. How long did you hold that for?
20 A. Two years.
21 Q. Did your term expire?
22 A. Yes. It expired in April of 2011.
23 Q. Can you run for another term?
24 A. Oh, dear God, no.
25 Q. Say that again?

**Page 49**

1  A. No.
2  Q. No, you could not or no, you would not?
3  A. Both.
4  Q. You had enough of that?
5  A. Yes.
6  Q. So did you serve out your term?
7  A. Yes.
8  Q. Did colleagues continue to call you up until the end of
9     your term to ask you the same kinds of questions they'd
10    asked you before, like what would you do about this or,
11    what do you think about that?
12 A. Yes, they did.
13 Q. Did you get paid for consulting as a result of any of
14    those contacts after October, 2011?
15 A. After October, 2011, and I set up my consulting company.
16    MS. LAUGHBAUM: You mean October, 2010.
17    MR. GUNSBERG: Thank you. Bad question. Good
18    catch. Thank you.
19    THE WITNESS: October, 2010, after I set up my
20    consulting company, if it was a quick E-mail or a phone
21    conversation that could be handled in a couple of
22    minutes, there was no charge.
23       When I was asked to take on projects, I
24    developed a fee structure. And yes, I got paid for
25    long-term involvement. Long-term being more than

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

74

 

Susan Zonia
7/15/2011

14 (Pages 50 to 53)

**Page 50**

1 several hours.
2 BY MR. GUNSBERG:
3 Q. You have a web site?
4 A. Yes, I do.
5 Q. And the web site was set up when?
6 A. The web site was set up, I believe, December, 2010.
7 Q. That's a very nice picture of you.
8 A. Thank you. That's a Trinity photo, my employment photo.
9 Q. So you were smiling in the picture. And let's see, it
10 lists you as President. This is the web site now. As
11 consultant in medical education and hospital
12 administration October, 2010, to the present, ten
13 months, correct?
14 A. Correct.
15 Q. And then the web site lists -- it lists a number of
16 entities which you provided consultation.
17 A. Over my life, my professional life. Not all in the last
18 ten months.
19 Q. So I'm going to -- you're familiar with your web site?
20 A. Yes, I am.
21 Q. I'm going to show you a piece of your web site that
22 refers to consultation provided to and there's a list of
23 about 20 places or so.
24 And I just wondered if you could tell me if
25 any of those consultations occurred while you were

**Page 51**

1 working for Trinity or St. Joe's Mercy Oakland?
2 A. No, not a one.
3 Q. Did any of them occur after October, 2010?
4 A. Yes.
5 Q. Which ones?
6 A. Pacific Northwest University and Health Services, TUMEC,
7 T U M E C, Emanuel Medical Center, American College of
8 Osteopathic Anesthesiology, and St. Mary Mercy Hospital
9 in Livonia, also St. Joseph Mercy Health System in Ann
10 Arbor -- hospital system -- Health System in Ann Arbor.
11 Q. Okay. How about AUA?
12 A. AUA, correct. Thank you.
13 Q. Any others? This is after October 1 of 2010.
14 A. They're not on here but Heart of Lancaster Hospital in
15 Lancaster, Pennsylvania.
16 Q. Okay.
17 A. And that's it.
18 Q. There is eight consulting arrangements that you had
19 beginning after October 1, 2010, correct?
20 A. Correct.
21 Q. Are any of them ongoing?
22 A. Two.
23 Q. Which?
24 A. The one at Pacific Northwest Hospital, the first one.
25 Q. Pacific Northwest University?

**Page 52**

1 A. Out in Yakima, Washington. And Touro, the one in --
2 Emanuel Medical Center. I am -- I'm sorry, Emanuel
3 Medical Center which is in Turlock, California.
4 Q. Do you have a contract with Pacific Northwest and
5 Emanuel Medical Center?
6 A. Yes, I do.
7 Q. How long do those go for?
8 A. The one for Emanuel ends July 31st.
9 Q. What do you do for Emanuel?
10 A. I'm helping them establish an entirely new Graduate
11 Education Medical Program. They've never been involved
12 in Graduate Medical Education.
13 Q. How much do you get paid a month under that contract?
14 A. 10,000.
15 Q. When did you start?
16 A. I started that one, February, 2011.
17 Q. So through July, six months at $10,000 a month?
18 A. Correct.
19 Q. Is that contract renewable? In other words, have you
20 finished setting up the Graduate Medical Residency
21 Program?
22 A. I've written all residency applications.
23 Q. My question is a little different. Let me ask it this
24 way, but for you're taking the job at the University of
25 Chicago, would that contract continue?

**Page 53**

1 A. If I had the time. If I wasn't doing a full-time job,
2 yes, it could continue, I believe.
3 Q. Is there a way that you could do your job at the
4 University of Chicago and still continue some or all of
5 the Emanuel Medical Center work that you're doing?
6 Doing it at night, do it on the weekends, something like
7 that?
8 A. No. I was contracted to write the residency
9 applications and give them directions on how to set up a
10 department. My work for that will be completed with
11 Emanuel on July 31st.
12 The medical school out in California has
13 several other hospitals they would like to bring on
14 board but I do not have the time nor can I fly out there
15 for frequent meetings in order to set up new hospitals.
16 Q. That's the Emanuel Medical Center has other work you
17 had -- they'd like you to do but you don't think you'll
18 have time?
19 A. The medical school identified Emanuel. The medical
20 school is TUMEC and Touro. And they have identified
21 potential training sites. Emanuel was one of them. I'm
22 completing that work. They have some other sites they
23 would like to develop but I don't have the availability
24 of time to go out and make site visits and help develop
25 the faculty.

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



75

 

Susan Zonia
7/15/2011

15 (Pages 54 to 57)

Page 54

1   Q. Okay. The Pacific Northwest University, University of
2       Health Services in Yakima, Washington, when did that
3       start?
4   A. That started in March, perhaps April of 2011.
5   Q. And how much do you get paid a month under that program?
6   A. I don't get paid monthly under that program. I have two
7       deliverables. One I get paid 25,000 for and one I get
8       paid 15,000 for.
9   Q. When are the deliverables due?
10  A. At the latest December.
11  Q. You will be delivering those deliverables?
12  A. July 31st.
13  Q. And you will collect your $15,000 and $25,000 when you
14      make those deliveries July 31st?
15  A. Correct. That's what I'm hoping, that they are
16      satisfied with the product.
17  Q. Assuming you did it right and they liked it and you met
18      all the other criteria?
19  A. Yeah.
20  Q. You'll get deliverables accepted and paid for?
21  A. Correct.
22  Q. And does Pacific Northwest have other projects that they
23      would like you to take on?
24  A. They wanted me to come out and be Associate Dean of the
25      Medical School.

Page 55

1   Q. Oh. In Yakima, Washington?
2   A. Correct.
3   Q. That's a nice place, don't you think?
4   A. Seattle is better.
5   Q. Yakima is pretty good. And you turned that down?
6   A. Correct.
7   Q. How much did they offer you for that job?
8   A. 130.
9   Q. Did you have -- putting that aside for a minute, did
10      they have other projects that they want you to work on,
11      what you call these deliverable projects?
12  A. They had talked about there being a potential but we
13      never explored what that might be.
14  Q. I assume that you're in good standing with Pacific
15      Northwest and if they like your products when you
16      deliver them the end of this month, and that you get
17      comfortable and maybe have some time and learn the job
18      at the University of Chicago, it's possible to go back
19      and do some more deliverables for them?
20  A. Anything is possible somewhere down the road.
21  Q. Okay. What about TUMEC? What is TUMEC?
22  A. TUMEC -- oh, goodness. We're going to get into the
23      finer grain of osteopathic education. And TUMEC is in
24      Las Vegas, Nevada. It's called an OPTI, O P T I,
25      Osteopathic Postdoctoral Training Institution. And

Page 56

1       TUMEC is the OPTI associated with Touro University
2       Medical School. Touro has campuses in New York, Viejo,
3       California and Las Vegas. And the OTPI, the
4       coordinating entity is located in Las Vegas. And that's
5       actually where my pay came from for the consulting to
6       set up Emanuel.
7   Q. So that's a separate job from Emanuel?
8   A. No.
9   Q. So covered under the same 10,000 a month?
10  A. Yes.
11  Q. How about you listed American College of Osteopathy
12      Anesthesiology?
13  A. Yes. That was a very small project I did for them.
14  Q. How much was that?
15  A. I think $350, $375, very small. A couple of hours worth
16      of work.
17  Q. Did they have other work for you to do that you could
18      find time to do?
19  A. Not that I'm aware of.
20  Q. How about -- well, in any event, are you in good
21      standing with them?
22  A. Oh, yes.
23  Q. They like you?
24  A. Yes.
25  Q. Did they offer you any other jobs?

Page 57

1   A. No. They haven't offered me any other jobs.
2   Q. How about TUMEC, did they offer you a job come out here
3       and run the program or things like that?
4   A. No.
5   Q. You're in good standing with them, with TUMEC?
6   A. Yes.
7   Q. St. Mary Mercy, now I'm familiar with St. Mary Mercy.
8       They're in Livonia?
9   A. Yes, they are there a Trinity Hospital.
10  Q. So did you do some work for St. Mary Mercy?
11  A. Yes, I did.
12  Q. And how much did St. Mary pay you?
13  A. On the first contract 20,000, that was from November
14      until about January.
15  Q. Did you have another one that --
16  A. Yes, another contract for double the amount to run
17      through December of this year.
18  Q. So how much did you get paid under that contract?
19  A. I believe I've only collected -- I've only done billable
20      hours for about -- less than 5,000 is my recollection.
21  Q. That contract is still in place?
22  A. It is but they don't have any other work for me right
23      now. They've had some staffing changes in Ann Arbor
24      that have slowed things down.
25  Q. Well, this was St. Mary's in Livonia?



Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

76



Susan Zonia
7/15/2011

16 (Pages 58 to 61)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 58

1  A.  But their Graduate Medical Education office is under the
2      direction of Ann Arbor.
3  Q.  For St. Joseph Mercy Health, that's St. Joe Ann Arbor?
4  A.  Yes, it is.
5  Q.  That's also a Trinity Hospital?
6  A.  Correct. I wrote one fellowship application for them, a
7      Mohs Fellowship.
8  Q.  How much did they pay you for that?
9  A.  Well, that was paid out of St. Mary's contract but since
10     they're part of the same management structure I was
11     directed to write that Mohs Fellowship application and
12     bill St. Mary's for that.
13 Q.  So if they -- if St. Mary's or St. Joe in Ann Arbor
14     calls you and says we got some more work for you under
15     the second contract that's got 40,000 in terms of work
16     that you signed for between now and the end of the year,
17     are you available to do that?
18 A.  Not after August 1, no, I'm not.
19 Q.  How about AUA, did you have a faculty position with
20     them?
21 A.  I always had a faculty position with them and that
22     faculty position continues. I was asked to help find a
23     training site for their students and put on a $1,000 a
24     month retainer. I believe that contract also started
25     end of January, beginning of February, 2011. I have

Page 59

1      subsequently notified AUA that I'm not available to
2      continue that work as of July 31st.
3  Q.  Okay.
4  A.  So I terminated that contract.
5  Q.  So you collected five, 6,000 from AUA?
6  A.  Correct.
7  Q.  How about Heart of Lancaster Hospital, what was that?
8  A.  That was a very short-term project that I did last week.
9      Was it last week? The Fourth of July weekend. The
10     fifth and sixth of July I was in Lancaster doing an
11     evaluation needs assessment of their program. I spent a
12     total of four days, $6,000 plus expenses.
13 Q.  What was your base pay at St. Joe as of October 1, 2010?
14 A.  My base pay was 170 with a 25,000 incentive.
15 Q.  Did you collect some of the incentive?
16 A.  Yes, I finally did.
17 Q.  How much of the 25?
18 A.  I believe -- this is before or after taxes? I believe I
19     met the objectives for around 20, 22,000 of the 25.
20 Q.  In your consulting practice before you took the job at
21     University of Chicago, did you have some time to fill?
22 A.  Oh, yes.
23 Q.  So what -- were you working 50 percent of your available
24     time? Maybe can you give me a ballpark?
25     MS. LAUGHBAUM: What time period are we

Page 60

1      talking about?
2      MR. GUNSBERG: From the time you set up the
3  consulting company until you took the job.
4      THE WITNESS: From the time I set up the
5  consulting company until now, say 75 to 80 percent
6  always looking for other contracts but that filled up a
7  lot of time.
8  BY MR. GUNSBERG:
9  Q.  So you were working 75 to 80 percent of your capacity, a
10     fair estimate?
11 A.  Well, capacity, I could deny myself sleep, I suppose.
12     I'm not sure what capacity is.
13 Q.  Well, I guess it would depend on how hard you want to
14     work. But you said 75 percent.
15 A.  I was working. It's difficult to answer that question
16     because with many of these projects I'm traveling across
17     country. So while I'm sitting on planes does that count
18     as part of my capacity? Or is it actually writing is
19     capacity?
20 Q.  I work on a plane. Do you work on planes or snooze?
21 A.  I sometimes work. I sometimes snooze.
22 Q.  Did you have an hourly rate as a consultant?
23 A.  I started off with an hourly rate but then was advised
24     by several individuals that do a lot of consulting that
25     for longer term projects, it's better to come up with a

Page 61

1      day rate rather than hourly. My St. Mary's contract,
2      which was my first contract that I landed within a few
3      weeks of being terminated, states an hourly rate.
4  Q.  How much was that?
5  A.  I believe I started out at $100 an hour.
6  Q.  Was that the hourly rate that you used consistently when
7      you used an hourly rate or did you raise it or lower it
8      or --
9  A.  Well, now I charge by the day.
10 Q.  Okay. So how much do you charge a day?
11 A.  $1,500.
12 Q.  $1,500 a day. So that's more like $200 an hour?
13 A.  Correct.
14 Q.  You're getting to be like a lawyer now.
15 A.  I am a doctor.
16 Q.  So now you get 1,500 a day?
17 A.  Correct.
18 Q.  And a day is how many hours?
19 A.  Ten, 12 hours.
20 Q.  Did you -- after October 1, 2010, did you elect to take
21     COBRA?
22 A.  No. It was too expensive.
23 Q.  So what did you do for health care?
24 A.  I bought a health care plan. I'm sorry. It was so
25     useless. I believe it's HAP or maybe Blue Cross Blue



 

Susan Zonia
7/15/2011

18 (Pages 66 to 69)

Page 66

1  Q.  And did they give you a pay range?
2  A.  The previous pay range when they had offered me the job
3      several years before was around 130.
4  Q.  With a bonus or incentives?
5  A.  We didn't talk about that.
6  Q.  And you elected not to take that.
7  A.  The consulting was going well and I did not feel where I
8      was in a place yet where I could move across country. I
9      was concerned about selling my house in the middle of
10     winter and the loss I would take on it.
11 Q.  And have you sold your house now?
12 A.  Yes, I have.
13 Q.  How much did you buy the house for?
14 A.  I bought the house for 170, 175.
15 Q.  What did you sell it for?
16 A.  160.
17 Q.  Okay. Are there any other perks that go with this
18     University of Chicago like a car or --
19 A.  They're going to offset some of my moving expenses.
20 Q.  Okay. Anything else?
21 A.  Not that I've found yet.
22 Q.  So as of this point in time you intend to move to
23     Chicago, start working at the University of Chicago
24     August 1?
25 A.  Correct.

Page 67

1  Q.  You're not looking for work at this point in time?
2  A.  I'm turning it down, correct.
3  Q.  And you decided to abandon the consulting practice, at
4      least at this point?
5  A.  Correct.
6      MR. GUNSBERG: Can we take five?
7      MS. LAUGHBAUM: Sure.
8      (A short recess was taken)
9  BY MR. GUNSBERG:
10 Q.  How did you come to work at St. Joe?
11 A.  The Director of Medical Education at Pontiac Osteopathic
12     Hospital Gary Willyerd, W I L L Y E R D, had an
13     association with St. Joseph Mercy Oakland. And the
14     position of DME was open. And Gary Willyerd suggested
15     that I apply for the position. So I sent my resume to
16     Don Bignotti who reviewed it and then brought me in for
17     a series of interviews.
18 Q.  Who was your predecessor?
19 A.  A gentleman by the name of -- last name is Bustamante.
20 Q.  Do you know what happened to him?
21 A.  He went back to Oakwood Hospital. He had been at
22     Oakwood, went to St. Joe's and then went back to
23     Oakwood.
24 Q.  Was he terminated or did he quit; do you know?
25 A.  I believe he quit.

Page 68

1  Q.  Did he quit based on somebody suggesting he ought to
2      quit?
3  A.  I have no idea, no knowledge of that.
4  Q.  And the job you took was Director of Graduate Medical
5      Education?
6  A.  Correct.
7  Q.  And that entailed what? What was Graduate Medical
8      Education?
9  A.  At that time I believe they had five residency programs.
10     And they wanted to improve the quality of programs and
11     they wanted to add programs and they wanted, as I was
12     told, greater financial responsibility and fiscal
13     oversight to be sure all the reimbursements were being
14     captured.
15 Q.  And so this was in 2005 and the five residency programs
16     were?
17 A.  2006, January 2006. The residency programs were the
18     transitional year, internal medicine, general surgery,
19     radiology, and osteopathic OB.
20 Q.  The transitional year, what is that?
21 A.  That's for residents that either haven't secured a
22     residency program or the residency program that they are
23     going into requires one year of general medical
24     training. So some residency programs, like radiology,
25     require that you do a transitional year before you start

Page 69

1      the residency programs.
2  Q.  How many transitional residents were there?
3  A.  I believe there were six.
4  Q.  Did the number of residents stay the same all the time
5      you were there?
6  A.  No, they did not.
7  Q.  When you started how many were there?
8  A.  I believe that there were around 75.
9  Q.  Would that go up then?
10 A.  104 when I left.
11 Q.  And were about half of those in internal medicine?
12 A.  May I correct something?
13 Q.  Sure.
14 A.  In terms of the 75 or so residents that were there when
15     I came, that was 75 residents under contract to
16     St. Joe's. Hospitals are capped in terms of the number
17     of people that they'll receive reimbursement for
18     training. The cap has always stayed the same, which is
19     around 102, 103.
20         St. Joe's was highly dependent on having
21     people from other hospitals rotate in to bump up the
22     number every month so that we'd get the full
23     reimbursement for 104. While I was there, perhaps
24     despite my effort, the programs became more attractive.
25     And we were relying less on outside people coming in and

HANSON RENAISSANCE   hansonreporting.com
Court Reporters & Video   313-567-8100

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

7B

 

Susan Zonia
7/15/2011

19 (Pages 70 to 73)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 70

1    we had more under contract that were in-house all the
2    time.
3    Q.  So you had 75 under contract plus these residents that
4    would rotate in to bring you up to 102?
5    A.  Yes.
6    Q.  That's when you started.  And then when you left there
7    were 104.  And fewer of those 104 were rotating?
8    A.  Correct.
9    Q.  Were they all under contract at the time, the 104?
10   A.  Virtually all of them were under contract.
11   Q.  So the rotating had stopped?
12   A.  The rotating had stopped.
13   Q.  And did you have any other folks that you oversaw or
14   programs that you oversaw besides residents?
15   A.  Yes, the Institutional Review Board, the IRB.
16   Q.  What is the IRB?
17   A.  There was some research going on in the hospital.  And I
18   chaired the review committee to approve, review the
19   applications to conduct human subjects research in the
20   hospital.
21   Q.  And did that amount of research stay the same over the
22   four or five year period you were there?
23   A.  Pretty much.  It was fairly constant.
24   Q.  Okay.  And do you know what the -- was there a budget or
25   was there a revenue generated by the residency program?

Page 71

1    A.  Oh, I'm sorry.  Yes, there is.
2    Q.  How much is that?
3    A.  To the best of my recollection they get about 220,000
4    per resident.  So I think it came to some 19 million a
5    year.
6    Q.  And did that stay constant?
7    A.  No.  It got much better over time as we were more
8    diligent about tracking who was in-house and being sure
9    that finance filled out the right forms to get CMS,
10   Center for Medicaid Services, to reimburse the hospital
11   for the training.
12   Q.  When you say it got better, you mean that the amount
13   that the hospital collected?
14   A.  We became more efficient and accurate in claiming what
15   we were doing.
16   Q.  So when you started how much was the hospital collecting
17   in residency fees a year?
18   A.  It wasn't very clear.
19   Q.  How much was it on an annual basis when you left?
20   A.  Well, we were claiming 104 residents at about 220,000
21   per year.
22   Q.  By the way, when you -- if people ask you why you were
23   terminated, what do you tell them?
24   A.  It depends on who is asking.
25   Q.  Okay.  So you tell different people different reasons?

Page 72

1    A.  Yes, I do.
2    Q.  So let's say it's one of -- one of your friends.  Have
3    you told any of your friends why you were terminated?
4    A.  Yes, I have.
5    Q.  So have you told Cathy Coburn why you were terminated?
6    A.  Yes.
7    Q.  What did you tell her?
8    A.  I told her that there were allegations that I had
9    created a hostile work environment and that I drank on
10   the job.
11   Q.  Okay.  And did you tell her that yes, I did; no, I
12   didn't; some of it was true, some of it wasn't, I
13   disagree with what they say, we have a difference of
14   opinion about that?
15   A.  Cathy knows me and knows I never drank on the job and am
16   unlikely to have created a hostile work environment.
17   Q.  What do you tell people who are not your friends?
18   A.  I said there was some differences of opinion and the
19   hospital desired different leadership.
20   Q.  So are those basically the two variations of what you
21   tell people?
22   A.  Yeah.  My mom heard it in much greater depth.  Many more
23   details.
24   Q.  And when you talk about differences of opinion, is that
25   what you would tell prospective employers or prospective

Page 73

1    consulting prospects?
2    A.  Not prospective consulting prospects.  They never asked.
3    Many -- most of those -- virtually all of those
4    positions that I secured came through my professional
5    contacts.  They've known me over time.  They've worked
6    with me.  And why I wasn't with St. Joe's really didn't
7    make any difference to them.
8    Q.  Did you ever -- are you aware of anybody contacting St.
9    Joe for a reference?
10   A.  No, I am not aware of it.
11   Q.  Did you list St. Joe as a reference?
12   A.  No, I did not.
13   Q.  So with prospective employers you told them we had a
14   difference of opinion and they wanted new leadership or
15   words to that effect?
16   A.  Correct.
17   Q.  And that satisfied them, as far as you know, in terms of
18   contacting St. Joe or checking out the reason?
19   A.  Well --
20   Q.  If you know?
21   A.  I don't know.  I know I didn't get those jobs.
22   Q.  How many jobs did you actually apply for as a Medical
23   Education Director?
24   A.  As a Medical Education Director?
25   Q.  Yes.  Like what you were doing at St. Joe.



79

 

Susan Zonia
7/15/2011

20 (Pages 74 to 77)

Page 74

1   A. I was literally not aware of any openings. I did send
2       my CV to a hospital in Jackson that is getting ready to
3       start some programs, but I have not heard back from
4       them. I sent that off in March, April.
5   Q. What hospital is that?
6   A. I'm sorry?
7   Q. Jackson, Michigan?
8   A. Yes, Jackson, Michigan. I was aware that there was a
9       DME position somewhere in rural West Virginia, had
10      sufficient consulting work that -- that stimulated me
11      and was paying the bills that, that was not a high
12      priority position to apply for.
13  Q. So in terms of your -- back up a minute.
14          So you're director of GME at St. Joe and
15      you're responsible for overseeing the IRB, correct?
16  A. Yes, correct.
17  Q. Does that cover all your jobs?
18  A. I guess I'd stick with recruiting, I helped write
19      curriculum. I did some teaching, counseled residents,
20      counseled program directors.
21  Q. And each of the residency programs had a medical
22      director?
23  A. Had a program director, yes, that was a physician
24      specializing in that area.
25  Q. And for the transitional year residents, who was in

Page 75

1       charge of that?
2   A. Jeffrey Yanez, Y A N E Z.
3   Q. Is this, the transitional year, was that the same as AUA
4       fifth year?
5   A. No.
6   Q. There was an AUA fifth year program as well for a while?
7   A. Correct.
8   Q. Was that discontinued or was that still going on when
9       you left St. Joe?
10  A. It was still going on when I left St. Joe. I don't
11      believe it's going on now.
12  Q. And how many of those AUA fifth year students were
13      there?
14  A. I think around the time that I left the number was 18.
15  Q. And then in each of the areas that there was a program
16      director there was Yanez and he's not with the hospital
17      anymore?
18  A. No, he is not.
19  Q. Did he quit or was he terminated?
20  A. He quit.
21  Q. The Program Director in Internal Medicine was always
22      Diaczok?
23  A. While I was there, yes.
24  Q. Did you hire him?
25  A. No. He was hired around the same time I was.

Page 76

1   Q. He reported to you?
2   A. For medical education.
3   Q. He was an employed physician?
4   A. Correct.
5   Q. Employed by St. Joe?
6   A. Correct.
7   Q. And you, on the chart -- organization chart would be
8       listed as his immediate supervisor?
9   A. For medical education, correct.
10  Q. So medical education had to do with the Residency
11      Program for Internal Medicine, correct?
12  A. Correct.
13  Q. And did you and he get along okay?
14  A. We?
15  Q. You and Diaczok.
16  A. Dr. Diaczok and I had a rough start. And I thought we
17      worked very well together over the last few years.
18  Q. If there was a disagreement on how a residency program
19      in internal medicine should be administered, not the
20      training that is what they learn, but all the other
21      stuff that went with it --
22  A. Um-hmm (affirmatively), correct.
23  Q. -- did you have the last word? In other words, if you
24      and Diaczok had a disagreement, you could say this is
25      the way we're going to do it?

Page 77

1   A. I suppose I could take that approach but instead I would
2       show him the regulation and explain why I thought this
3       is how we would comply with it and try to get the
4       program director to see that whatever the issue was
5       could get us into trouble.
6   Q. But in the end if he said, look, I don't care what that
7       is, I'm going to do it a different way, you would be the
8       person who would say, look, this is how we're going to
9       do it and we're going to comply with the regulation,
10      correct? That would be your job?
11  A. It would be my job and I would check with Don Bignotti
12      usually to be sure that he had my back.
13  Q. Okay. And did you and Diaczok ever have a disagreement
14      about any administrative aspect of the Internal Medicine
15      Residency Program?
16  A. There were differences of opinion with all the program
17      directors.
18  Q. My question was with Diaczok.
19  A. Yes.
20  Q. Can you identify anything that you and Diaczok had a
21      disagreement about?
22  A. We had a disagreement when I looked at the call schedule
23      for the number of times women would be on for holidays
24      and weekends versus men. So we had a disagreement over
25      Dr. Diaczok thinking that he could grant an FMLA leave



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313-567-8100

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

80




Susan Zonia
7/15/2011

20 (Pages 74 to 77)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 74

1   A.  I was literally not aware of any openings. I did send
2       my CV to a hospital in Jackson that is getting ready to
3       start some programs, but I have not heard back from
4       them. I sent that off in March, April.
5   Q.  What hospital is that?
6   A.  I'm sorry?
7   Q.  Jackson, Michigan?
8   A.  Yes, Jackson, Michigan. I was aware that there was a
9       DME position somewhere in rural West Virginia, had
10      sufficient consulting work that -- that stimulated me
11      and was paying the bills that, that was not a high
12      priority position to apply for.
13  Q.  So in terms of your -- back up a minute.
14          So you're director of GME at St. Joe and
15      you're responsible for overseeing the IRB, correct?
16  A.  Yes, correct.
17  Q.  Does that cover all your jobs?
18  A.  I guess I'd stick with recruiting, I helped write
19      curriculum. I did some teaching, counseled residents,
20      counseled program directors.
21  Q.  And each of the residency programs had a medical
22      director?
23  A.  Had a program director, yes, that was a physician
24      specializing in that area.
25  Q.  And for the transitional year residents, who was in

Page 75

1       charge of that?
2   A.  Jeffrey Yanez, Y A N E Z.
3   Q.  Is this, the transitional year, was that the same as AUA
4       fifth year?
5   A.  No.
6   Q.  There was an AUA fifth year program as well for a while?
7   A.  Correct.
8   Q.  Was that discontinued or was that still going on when
9       you left St. Joe?
10  A.  It was still going on when I left St. Joe. I don't
11      believe it's going on now.
12  Q.  And how many of those AUA fifth year students were
13      there?
14  A.  I think around the time that I left the number was 18.
15  Q.  And then in each of the areas that there was a program
16      director there was Yanez and he's not with the hospital
17      anymore?
18  A.  No, he is not.
19  Q.  Did he quit or was he terminated?
20  A.  He quit.
21  Q.  The Program Director in Internal Medicine was always
22      Diaczok?
23  A.  While I was there, yes.
24  Q.  Did you hire him?
25  A.  No. He was hired around the same time I was.

Page 76

1   Q.  He reported to you?
2   A.  For medical education.
3   Q.  He was an employed physician?
4   A.  Correct.
5   Q.  Employed by St. Joe?
6   A.  Correct.
7   Q.  And you, on the chart -- organization chart would be
8       listed as his immediate supervisor?
9   A.  For medical education, correct.
10  Q.  So medical education had to do with the Residency
11      Program for Internal Medicine, correct?
12  A.  Correct.
13  Q.  And did you and he get along okay?
14  A.  We?
15  Q.  You and Diaczok.
16  A.  Dr. Diaczok and I had a rough start. And I thought we
17      worked very well together over the last few years.
18  Q.  If there was a disagreement about how a residency program
19      in internal medicine would be administered, not the
20      training that is what they learn, but all the other
21      stuff that went with it --
22  A.  Um-hmm (affirmatively), correct.
23  Q.  -- did you have the last word? In other words, if you
24      and Diaczok had a disagreement, you could say this is
25      the way we're going to do it?

Page 77

1   A.  I suppose I could take that approach but instead I would
2       show him the regulation and explain why I thought this
3       is how we would comply with it and try to get the
4       program director to see that whatever the issue was
5       could get us into trouble.
6   Q.  But in the end if he said, look, I don't care what that
7       is, I'm going to do it a different way, you would be the
8       person who would say, look, this is how we're going to
9       do it and we're going to comply with the regulation,
10      correct? That would be your job?
11  A.  It would be my job and I would check with Don Bignotti
12      usually to be sure that he had my back.
13  Q.  Okay. And did you and Diaczok ever have a disagreement
14      about any administrative aspect of the Internal Medicine
15      Residency Program?
16  A.  There were differences of opinion with all the program
17      directors.
18  Q.  My question was with Diaczok.
19  A.  Yes.
20  Q.  Can you identify anything that you and Diaczok had a
21      disagreement about?
22  A.  We had a disagreement when I looked at the call schedule
23      for the number of times women would be on for holidays
24      and weekends versus men. So we had a disagreement over
25      Dr. Diaczok thinking that he could grant an FMLA leave





**Susan Zonia**
**7/15/2011**

21 (Pages 78 to 81)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

### Page 78

1    to a resident as opposed to going through HR. We had a
2    disagreement over using J-1 residents moonlighting, a
3    disagreement about some of his communications, the way
4    that he chose to communicate some things.
5    Q.  Are those the biggies?  The big disagreements?
6    A.  Yeah, I think so.
7    Q.  And with respect to the call schedule, what was the
8        problem?
9    A.  Well, as some residents came to point out to me, that
10       there were -- women tended to be scheduled on holidays
11       for coverage, holiday coverage, and men were not
12       scheduled for holiday coverage; that there was a period
13       of time where it seemed like there were more of the
14       women were pulling the call than men were.
15           Dr. Diaczok is a wonderful person but not
16       particularly good at detail.  And if a resident came to
17       him and said, oh, I really need a day off for a personal
18       reason, then tended to grant that.  It seemed as though
19       he tended to agree to that more for male residents than
20       female residents.
21           And so as the head of the department it's
22       imperative with all those residents running around that
23       nobody gets extra vacation days regardless of how well
24       meaning you are.
25    Q.  What time period are we talking about?  Was this in the

### Page 79

1    beginning, like 2006?
2    A.  This was continuous.  It became less frequent over time.
3        But Dr. Diaczok, that's what we did, was every once in a
4        while these would happen and we would remind Dr. Diaczok
5        and we would help him with these details, which he
6        wasn't particularly good at.
7    Q.  Who is we?
8    A.  Myself, Pat Davis, chief residents.
9    Q.  And when you and these other folks pointed out that the
10       call schedule looks like it's heavier on the women on
11       the weekends and holidays then did he, Diaczok, get
12       better?
13    A.  The call schedule for internal medicine was made by the
14       chief resident or it was up until the time I left.  Ben
15       was responsible for oversight of that detail.  And
16       sometimes his oversight was better than others.  And
17       when it wasn't very good then we would point out
18       patterns to him and then he would communicate to the
19       chief residents and it would get better for a while.
20           But I do believe that that was not unique to
21       St. Joe's, that that is a problem of trying to manage 50
22       people and get coverage 24/7.  So I --
23    Q.  Okay.  So if you told Diaczok look, this needs to get
24       done in a different way, did he listen to you?
25    A.  I believe he did.  I had every reason to believe he did.

### Page 80

1    Q.  Did you ever have to write him up over any issue that he
2        wouldn't respond to?
3    A.  I did write him up on two issues.  Twice I did.
4    Q.  When did you write him up and what for?
5    A.  The first time that I wrote him up in a message to Don,
6        a written message to Don, was during the whole time when
7        Ben -- we were receiving complaints about Ben prior to
8        the outside investigation taking place.
9    Q.  That would have been back in -- early on in '06, I think
10       you said?
11    A.  No.  Late '06.
12    Q.  Late '06.  Okay.
13    A.  Because I believe he started around April of '06.  So
14       this would have been winter months.  He was very angry,
15       very distressed by it.  And I was in an elevator one
16       morning and he was verbally abusive in the elevator with
17       patient family present.
18    Q.  So you wrote him up about that?
19    A.  Yes, I did.  And --
20    Q.  Is that a formal disciplinary action?
21    A.  I believe it was the proverbial straw that broke
22       the camel's back and prompted Don and HR to look at how
23       do we evaluate this.
24    Q.  And did Don Bignotti agree with what you had done?
25    A.  Don asked me to put it in writing.

### Page 81

1    Q.  So he agreed with what you had done?
2    A.  Yes.
3    Q.  Did HR agree with what you had done?
4    A.  I can only assume that they did because they brought in
5        somebody from corporate to take a look at it.
6    Q.  What was the other time you wrote up Diaczok?
7    A.  Dr. Diaczok had a tendency to forget where he was when
8        he was saying things.  And there was an occasion when we
9        had daily huddles in Don's office and I would go in case
10       there was an issue that compromised patient care that
11       came up that involved the residents that I needed to go
12       back, follow-up on this.
13           There was a situation where, if I recall
14       correctly, there were allegations that a resident had
15       mis-ordered methadone and mis-ordered an amount of
16       methadone.
17    Q.  When was this?
18    A.  This would have been in -- sometime -- it's in 2010.
19       And I'm thinking late spring.
20    Q.  Okay.
21    A.  The patient unfortunately died.  And so there was
22       a question whether the resident did anything
23       questionable.  So I went back to Ben and asked him to
24       immediately look into it.  It's a clinical issue.  I
25       don't make those calls.



HANSON RENAISSANCE    hansonreporting.com
COURT REPORTERS & VIDEO    313-567-8100

82

 

Susan Zonia
7/15/2011

22 (Pages 82 to 85)

Page 82

1       I was walking down the hallway from a meeting,
2 went into the stairwell to go up to my office. It was
3 by the ICU waiting area. Ben came the other direction,
4 opened the door and I'm halfway up a flight of steps and
5 in a loud voice said I looked into that record, the
6 resident didn't kill the patient.
7       It was not appropriate place to be making that
8 kind of a statement with a waiting area right there. So
9 I wrote him up for that.
10 Q. And did you go to Don Bignotti about this write-up, tell
11    Don I'm going to write Diaczok up, this is what
12    happened?
13 A. Right.
14 Q. And Don agreed?
15 A. Right. Because Don had indicated to me several times
16    when he heard Ben having inappropriate hallway
17    conversations.
18 Q. Does that cover the times you wrote up Ben Diaczok?
19 A. Yes, it does.
20 Q. Do you have any information that Ben Diaczok had any
21    input or participated in any way in the decision to
22    terminate you?
23 A. I have no knowledge of that.
24 Q. Who was the Program Director for OB/GYN?
25 A. Valerie Payne-Jackson. P A Y N E hyphenated.

Page 83

1 Q. Did they call her PJ?
2 A. Yes, they did.
3 Q. How did you and PJ get along?
4 A. It was a professional relationship.
5 Q. You're aware that PJ complained about an E-mail that got
6    sent out in September, 2010?
7 A. Yes.
8 Q. And you're familiar with the E-mail. You know what
9    E-mail I'm talking about?
10 A. Yes.
11 Q. The one to Susie Swanson that said ignore her, that will
12    frost her, or words to that effect?
13 A. I object to that interpretation.
14 Q. What does it say?
15 A. It doesn't say it will frost her. It says you need to
16    ignore this, cold shoulder it.
17 Q. Cold shoulder will bother her?
18 A. May bother her. I thought it said may bother. This was
19    September on a Blackberry.
20 Q. I'll quote it to you. This is an E-mail that you sent
21    to Susan Swanson. It says, ignore her (cold shoulder
22    will bother her.
23 A. Right, I will acknowledge that.
24 Q. And that was an E-mail that by mistake it got sent out
25    for a general publication, correct?

Page 84

1 A. It got sent out to more than Susie Swanson, yes.
2 Q. It got sent out to other department heads?
3 A. It went out to some other faculty but I can't tell you
4    which faculty.
5 Q. And it went out to PJ?
6 A. It went out to PJ.
7 Q. And PJ was upset?
8 A. I believe she was.
9 Q. And PJ complained to Dr. Bignotti?
10 A. Well, probably.
11 Q. Do you know?
12 A. No, I don't know for a fact. I don't know.
13 Q. Dr. Bignotti testified that PJ complained to him and he
14    started an investigation. You're aware of that. You
15    were there when he testified?
16 A. Yes, but he also said that the investigation had been
17    going on for some time so I'm not clear when the
18    investigation started.
19 Q. He said whatever he said. I respectfully disagree with
20    that. But in any event, do you know whether PJ actually
21    complained to Bignotti or not?
22 A. I wasn't there so I wouldn't know.
23 Q. Did you ever discuss the matter with PJ?
24 A. I wasn't given an opportunity to.
25 Q. So the answer is no, you didn't?

Page 85

1 A. Correct.
2 Q. Did you ever -- did you think there was anything
3    inappropriate about your E-mail that says ignore her?
4 A. I believe that was something Susie should ignore. She
5    should not be caught up in the series of exchanges with
6    Valerie that were taking place.
7 Q. When you instructed Susie Swanson to ignore her, cold
8    shoulder will bother her, do you think there was
9    anything inappropriate about that instruction?
10 A. Taken out of context, yes.
11 Q. Well, cold shoulder will bother her, those were your
12    words, correct?
13 A. According to what you're reading, yes.
14 Q. That's what it says.
15 A. Um-hmm (affirmatively).
16 Q. Yes?
17 A. Yes.
18 Q. Did you have any other disputes with PJ?
19 A. I wouldn't say dispute. We had conversations about the
20    quality of resident research. We had conversations
21    about some documentation that Michigan State University
22    needed. I wouldn't classify it as a dispute.
23 Q. Did you dislike PJ in any way?
24 A. Not particularly. I invited her to my house several
25    times. I signed her up for Zumba classes that we did

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

83

 

Susan Zonia
7/15/2011

23 (Pages 86 to 89)

Page 86

1 together. So I didn't dislike her.
2 Q. Did you think PJ was pushy or difficult?
3 A. PJ could be challenging.
4 Q. Challenging meaning difficult to get along with?
5 A. No. Challenging.
6 Q. Well, what does that mean?
7 A. She really liked for things to be done her way and not
8 be questioned. She is a very strong person. I'm a
9 strong person. I can appreciate that. While I may not
10 have agreed with her, it had nothing to do with her
11 worth as a human being.
12 Q. Who were the other program directors?
13 A. Surgery was Robert Robinson.
14 Q. How many OB residents were there?
15 A. 16, I believe.
16 Q. So there were about 50 residents in internal medicine?
17 A. When I first started there were 54. Four individuals
18 were kept on for an additional year, inappropriately,
19 and called a chief.
20 Q. So 16 residents in OB?
21 A. Um-hmm (affirmatively), correct.
22 Q. How many in surgery?
23 A. Surgery -- I'm always murky on this. I believe that
24 there were what's called 12 categorical and four
25 preliminary.

Page 87

1 Q. 16?
2 A. Yeah.
3 Q. So who was the head of -- the Program Director for
4 Surgery?
5 A. Bob Robinson.
6 Q. And how did you and Bob Robinson get along?
7 A. I thought great.
8 Q. And then we had transitional year, internal medicine,
9 surgery, OB and then there was --
10 A. Radiology.
11 Q. Radiology. And how many residents in radiology?
12 A. Five year program, 15 -- 14 or 15.
13 Q. And who was the director?
14 A. When I first got there, I'm going to blank on his name.
15 He was with a group that was terminated. The group was
16 called AROC, A R O C. I don't remember the program
17 director's name. We only overlapped for about four or
18 five months. Then another group was brought in
19 Eastpointe Radiology and Jim Denier was named the
20 program director.
21 Q. And was Denier the program director until October of
22 2010?
23 A. Yes.
24 Q. How did you and Denier get along?
25 A. Initially, very well.

Page 88

1 Q. Did Denier, to your knowledge, have any participation in
2 or involvement in the decision to terminate you?
3 A. He tried to have me terminated once before.
4 Q. But my question is a little different. My question is
5 did he have any input or participate in the decision to
6 terminate you in October of 2010?
7 A. I would have no knowledge of that.
8 Q. When did Denier try to have you terminated before?
9 A. When residents were coming to me alleging that he was a
10 bully, that he was rude and inappropriate, that he had
11 it in for one of the residents, Mike Sonnenberg, S O N N
12 E N B E R G. And the residents were uncomfortable with
13 how badly Denier was treating Sonnenberg. His placing
14 service over education and what was perceived by some of
15 the residents as threatening behavior.
16 Q. What does that mean threatening behavior?
17 A. Threatening that if you complain or if you go up and see
18 Zonia, that you know your life is going to be tough.
19 Q. When? What time frame are we talking about?
20 A. This went on for over a year. I'm thinking like 2008.
21 I'm thinking.
22 Q. And when you say he tried to get you terminated, what is
23 it you understand he did?
24 A. According to what Don reported to me, Jim Denier and Ray
25 Rahi, R A H --

Page 89

1 Q. Who is Rahi?
2 A. The head of Eastpointe Radiology.
3 Q. That would be Denier's partner?
4 A. Yes, they were. They were less than pleased that I was
5 listening to the residents and I was, with Don's
6 permission, giving the residents a monthly forum to meet
7 and discuss problems in the program.
8 Q. Okay. So what did they do, go to Don and say get rid of
9 Zonia?
10 A. In a nutshell that's what Don reported to me was that
11 they wanted me gone.
12 Q. And this was, you think, in 2008?
13 A. I'm hazy on that. I'm going to say 2008.
14 Q. And Don said not going to happen?
15 A. According to Don both he and Jack Weiner, the CEO, said
16 it's not going to happen.
17 Q. Did you ever talk to Jack Weiner about Denier and Rahi
18 wanting you gone in 2008?
19 A. No, I did not.
20 Q. Did you ever discuss Denier and Rahi wanting you gone
21 with Denier and/or Rahi?
22 A. No, I did not. I perceived that that was almost like
23 privileged information that Don was confiding in me just
24 to make me aware of their feelings so I could take that
25 into consideration when I did interact with them.





 

**Susan Zonia**
**7/15/2011**

24 (Pages 90 to 93)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**Page 90**

1   Q. Okay. And in your Complaint there is a reference to
2      some incident involving a knife with Denier.
3   A. Correct.
4   Q. Did that incident occur before they went to Don or at
5      the same time they went to Don?
6   A. Slightly after.
7   Q. How long after?
8   A. Within a few months.
9   Q. Tell me about –
10   A. It could have been closer in time. I wasn't exactly
11      sure on the first event. So it's in that time frame.
12      It's within the window.
13   Q. Fair enough. And it's -- you would say it's within --
14      the knife incident was within the window of time during
15      which Denier and Rahi were trying to get you fired?
16   A. I believe so.
17   Q. And the knife incident, how did that start? Did
18      somebody complain to you or mention to you or what
19      happened exactly?
20   A. One of the radiology residents, Steve Zifka, Z I F K A,
21      came to my office to tell me that Dr. Denier was seen
22      giving Dr. Vakhariya, V I C A R I A, first name Seetha,
23      a switchblade to defend herself if needed when she was
24      on a rotation in Washington, D.C. Evidently Dr. Denier
25      and as he expressed to me, was that all of Washington,

**Page 91**

1      D.C. was a very dangerous area.
2   Q. That's what was reported to you by Dr. Zifka?
3   A. Zifka.
4   Q. And did you ever see this knife?
5   A. Yes, I did. I held it in my hand.
6   Q. Oh, how did you happen to see the knife?
7   A. Seetha – Dr. Vakhariya was on the out rotation in
8      Washington, D.C. I sent her an E-mail that said I
9      wanted to speak with her her first day back. She came
10      to my office. She had the knife in her pocket.
11   Q. Okay. And describe the knife.
12   A. It wasn't a penknife. When I held it in my hand it was
13      bigger than my hand.
14   Q. Was it a pocket knife like a Victoria Knox Knife?
15   A. I'm not a weapons expert. I don't know. It was large.
16      It was heavy. The few knives that I have seen that are
17      like pocket knives or penknives, you need both hands to
18      open them. This had a button and a blade came out. To
19      the best of my knowledge that's called a switchblade but
20      I may be wrong.
21   Q. Well, had you reported this to anyone prior to having it
22      shown to you by Dr. Vakhariya?
23   A. Yes.
24   Q. Who did you report that to?
25   A. Don Bignotti.

**Page 92**

1   Q. Okay. And what did you say to Don Bignotti about the
2      knife?
3   A. I told him, as I recall, that the complaints about
4      Dr. Denier were escalating and that it was reported to
5      me that he gave a resident a knife for self defense.
6      And that the residents had also reported that Dr. Denier
7      told them he kept a gun in his car in the glove
8      compartment and that he was licensed to carry a
9      concealed weapon.
10   Q. Was this a verbal report?
11   A. I don't recall. It probably was verbal -- probably was
12      verbal.
13   Q. And what did -- was that the end of the conversation or
14      what happened after that? Did you say anything more?
15   A. Don said to continue following up on it.
16   Q. What does that mean, continue following up on it?
17   A. As I interpreted it, it was to contact Dr. Vakhariya to
18      find out if this was true.
19   Q. And did you do that?
20   A. Yes, I did.
21   Q. And she showed you this knife?
22   A. Yes.
23   Q. And then what did you do next?
24   A. I told her I wanted to take it down to Dr. Bignotti.
25      She begged me not to because it would compromise her

**Page 93**

1      position with Dr. Denier. And she felt it would
2      jeopardize her ability to get a fellowship program
3      because she would need a letter of recommendation from
4      him.
5   Q. So what did you do?
6   A. I told her I had never been confronted with a situation
7      like that and she could get into big trouble walking
8      around the hospital with such a device, that she needed
9      to either give it to security or give it back to
10      Dr. Denier but she needed to rid herself of that
11      immediately.
12   Q. Did Dr. Vakhariya agree to do that?
13   A. She did.
14   Q. And so what happened to the knife; do you know?
15   A. I believe she gave it back to Dr. Denier.
16   Q. Did you discuss this matter any further with Denier or
17      anybody else?
18   A. I didn't discuss it with Dr. Denier.
19   Q. Did you discuss it further with anybody else?
20   A. Dr. Bignotti.
21   Q. Okay. What did you do?
22   A. I told Dr. Bignotti that I had in fact held the knife in
23      my hand, described what it looked like. And he assured
24      me that he would follow-up with Dr. Denier and Dr. Rahi
25      about this.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

45




Susan Zonia
7/15/2011

25 (Pages 94 to 97)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

### Page 94

1  Q.  And did he; if you know?  Do you know what happened
2      after that?
3  A.  No, I do not.  I believe he said he had a meeting with
4      them.
5  Q.  You believe Bignotti said that he, Bignotti, had a
6      meeting with Denier and Rahi?
7  A.  Correct.
8  Q.  And that was the end of the knife?
9  A.  That was the last discussion of the knife incident.
10  Q.  Did you ever have any discussion about the knife
11      incident with Dr. Bignotti again or was that the end of
12      it?
13  A.  Not a meaningful discussion.  We had some jokes about in
14      private about knives.  I'm sure it came up in a sidebar
15      conversation but not in terms of taking any corrective
16      action.
17  Q.  As far as you know Bignotti talked to Denier, told him
18      to get rid of the knife and that's what happened,
19      correct?
20  A.  That's all I can assume.
21  Q.  Do you have any information of any kind that this
22      incident with the knife and Dr. Denier and any
23      conversation you had with Dr. Bignotti about the knife
24      was in any way considered in the decision to terminate
25      you?

### Page 95

1  A.  I have no knowledge of that.
2  Q.  You've alleged in your Complaint that there was an issue
3      about shadowing involving Dr. Jewell?
4  A.  Correct.
5  Q.  When did that issue come up?
6  A.  That issue came up August or September, I want to say,
7      of 2010.
8  Q.  Let me stop you there.  So did Dr. Jewell have anything
9      to do with your Graduate Medical Education Program?
10  A.  No, nothing.
11  Q.  Did you know Dr. Jewell?
12  A.  Yes.
13  Q.  How?
14  A.  We were on a number of committees together.  He knew
15      that I was the Director of Medical Education.  When I
16      first started for several years he was supposed to be
17      coming to the Graduate Medical Education monthly
18      meetings and didn't.  So I saw him around the hospital,
19      said hello.
20  Q.  You two friendly, amiable, hello, hello?
21  A.  Cordial.
22  Q.  Cordial.  Good word.  Thank you.  You were cordial?
23  A.  Yes.
24  Q.  Did Dr. Jewell, was he a covered by any of the policies
25      that covered Graduate Medical Education?

### Page 96

1  A.  Yes.
2  Q.  How?
3  A.  Well, the issue of bringing someone in to shadow him
4      would be a medical education policy.  So that would
5      affect him.
6  Q.  Let me back up a minute.  I guess my question is was he
7      part of the Medical Education Department in any way?
8  A.  Well, I believe, as I stated, for many years he was, as
9      Chair of the Department, supposed to be coming to the
10      Graduate Medical Education Committee Meetings.  I
11      also – where policies and procedures, among other
12      things, were discussed and approved.  He was also on the
13      Medical Executive Committee where all of our policies
14      and procedures would then go for final approval.
15  Q.  Was Dr. Jewell a member of the Department of Medical
16      Education?
17  A.  He was a member of the Medical Education Committee but
18      not a faculty member paid out of my department budget.
19  Q.  Was he a member of the Department of Medical Education?
20  A.  No.  Only the five program directors are.
21  Q.  So the shadowing incident that took place, what do you
22      know about it?
23  A.  What I know about it is that Dr. Jewell contacted Susan
24      Schultz, S C H U L T Z, who is a nurse who set up
25      opportunities for nurses to shadow.  When nurses shadow,

### Page 97

1      they're typically in the hospital for a day.  And they
2      move them through a number of different departments.
3          Dr. Jewell wanted to get an ID badge for his
4      girlfriend's daughter who was in high school to come and
5      spend some time with him.
6  Q.  Let me stop you.  The nurses that shadow, are these
7      employees of the hospital?
8  A.  They are in nursing school.
9  Q.  So they're not employees of the hospital?
10  A.  No, they are not.
11  Q.  They're not in a residency program?
12  A.  Correct.
13  Q.  They're not in any educational program through St. Joe?
14  A.  They're in the educational program but not through St.
15      Joe's Health Care Educational Programs.
16  Q.  And they're not members of the Department of Medical
17      Education --
18  A.  Correct.
19  Q.  -- at St. Joe?
20  A.  Correct.  So these nurses, when they come in and shadow,
21      they follow another nurse around.  They will be
22      assigned -- they're currently enrolled in nursing
23      school.  It would almost be like the AUA fifth semester
24      but it's for one day.  They'll spend a little bit of
25      time in the emergency department and they might go to



86

 

Susan Zonia
7/15/2011

26 (Pages 98 to 101)

Page 98

1  oncology for a little while. So they're moved around
2  during the day. So they're not involved in patient care
3  or have direct patient contact. They're working with
4  the nurses outside of patient care.
5  Q. But they might have access to patient records?
6  A. Correct.
7  Q. Do they sign some sort of -- is there a consent that's
8  signed or some sort of shadowing agreement that's
9  signed?
10  A. They receive training -- it's my understanding, because
11  I'm not in charge of nursing education, that they
12  undergo HIPAA training as part of their nursing
13  education. And they sign a HIPAA disclosure form that
14  they agree, they understand HIPAA. And it's reviewed
15  before they go out on the floors. And they sign that
16  they agree to adhere to the HIPAA policy.
17  Q. Does St. Joe have a shadowing form that a patient can
18  sign that says I agree to what this person -- let this
19  person shadow with my doctor or talk to my doctor or be
20  part of the shadowing program or something like that?
21  A. Not in medical education we don't.
22  Q. Does St. Joe have a form of such signed outside of
23  medical education?
24  A. On the admission form there is a statement that I can't
25  quote but there is a statement to the effect that this

Page 99

1  is a teaching hospital and that there will be -- there
2  may be learners, residents and nurses involved that are
3  observing, that are in training.
4  Q. I guess I'm asking are you aware of whether there is a
5  form of some kind that a patient can sign as a consent
6  to shadow?
7  A. I believe the OR has one for pharmaceutical reps and
8  device manufacturers. I haven't seen it personally.
9  Q. Do you know whether a patient can verbally consent to a
10  shadow?
11  A. In a physician's office, certainly.
12  Q. How about in a hospital?
13  A. We have a policy that was supported by Don Bignotti and
14  Jack Weiner that the only people allowed to shadow on
15  the services in the hospital were people that were in
16  good standing in medical school, that we had a contract
17  with the medical school to train their residents, that
18  we could be sure that their immunizations were
19  up-to-date and filled out an application form in
20  advance.
21  Then if there was capacity on a service, there
22  weren't already 20 people on it, then we would take
23  them.
24  Q. But my question is a little different. To your
25  knowledge can a patient verbally agree that to allow a

Page 100

1  shadow, for instance, to come into the patient's room or
2  observe a procedure or look at their records? Do you
3  know if that's legally doable or not?
4  A. It would be a violation of hospital policy.
5  Q. But I guess I'm asking under the law, can a patient
6  verbally consent to a shadow, as far as you know; if you
7  know?
8  A. I believe there would be contradictions to hospital
9  policy and that hospital policy would trump, I believe.
10  Q. So do you know whether, for instance, HIPAA rights can
11  be waived?
12  A. A patient can sign a release for a particular individual
13  to have access to their medical records.
14  Q. So HIPAA rights are waivable?
15  A. You can assign them to someone else, yes.
16  Q. HIPAA rights and privacy rights, to the extent that
17  patients have privacy rights, belong to the patient,
18  correct?
19  A. I'm going to say I agree with you.
20  Q. I'm asking you as Director of Medical Education, do you
21  have any information about whose rights, privacy and
22  HIPAA rights, belong to? In other words, do the rights
23  belong to the patient, as you understand it?
24  A. The rights belong to the patient. The patient chooses
25  to assign them to someone else.

Page 101

1  Q. Have some patients ever assigned, as far as you know,
2  their HIPAA rights to you?
3  A. Never.
4  Q. Has a patient ever assigned their privacy rights to you?
5  A. They've assigned them to the hospital --
6  Q. Okay.
7  A. -- to protect their privacy.
8  Q. Have you as a patient ever assigned to you the right to
9  be -- strike that.
10  Do you review patient records?
11  A. No, I do not.
12  Q. Do you go on the floors and see patients?
13  A. As I'm walking down the corridor have I seen a patient,
14  yes. But I don't see them in terms of consulting with
15  them.
16  Q. Do you have any information that shadowing in and of
17  itself violates any law?
18  A. Shadowing in and of itself?
19  Q. Yes.
20  A. I'm going to say I have no knowledge. I'm not in a
21  position to judge the laws.
22  Q. Your understanding or belief is that shadowing violates
23  a policy at the hospital, correct?
24  A. Shadowing in and of itself doesn't violate the policy.
25  We determined that there were certain individuals that


Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Susan Zonia
7/15/2011

27 (Pages 102 to 105)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 102

1  we believed would be eligible to shadow and others that
2  are not.
3  Q. As a function of policy?
4  A. As a function of hospital policy. That it wasn't a
5  place for the medically curious.
6  Q. So as a matter of hospital policy, you understood or
7  believed that certain people, as you call them the
8  medically curious, shouldn't be shadowing; is that a
9  fair statement, a correct statement?
10 A. The Medical Education Committee voted on that policy
11 annually and endorsed that there was a set of
12 individuals that were eligible and others that were not.
13 It was my job as the DME to follow the policies of the
14 Medical Education Committee that were also approved by
15 the hospital board.
16 Q. So Dr. Jewell wanted his girlfriend's daughter to shadow
17 with him?
18 A. Correct.
19 Q. How did you -- strike that.
20        And that you understand that Dr. Jewell went
21 to Susan Schultz and asked that that girlfriend's
22 daughter be allowed to shadow with him or somebody?
23 A. Susan Schultz called me and said that Dr. Jewell wanted
24 to bring somebody in to shadow. It wasn't a nursing
25 student so she said she had told him to contact me, that

Page 103

1  this was outside of something she could do.
2  Q. Susie Schultz said that she had told Dr. Jewell to
3  contact you --
4  A. As I recall.
5  Q. -- or contact medical education?
6  A. Well, if I recall correctly because she called me on it
7  right away, it was my understanding that she told him
8  that he needed to work through me or Deneen McCall.
9  Deneen is the person that handles student rotations.
10 Q. So Susan Schultz called you and said Dr. Jewell wanted
11 somebody to shadow and you said?
12 A. We have a policy that unless they're in medical school
13 we can't even consider it.
14 Q. That's what you told Susie Schultz?
15 A. Yes.
16 Q. Anything else in that conversation?
17 A. No, that's pretty much it.
18 Q. And then what happened after that?
19 A. She had indicated that he was very annoyed in the
20 conversation because he wanted to bring someone in.
21 Q. Let me back up. Susie Schultz then apparently talked to
22 Dr. Jewell and said no, you can't do that?
23 A. She said she couldn't do it.
24 Q. So Susan Schultz talked to Dr. Jewell and said that she,
25 Susie Schultz, could not approve his request?

Page 104

1  A. Correct.
2  Q. That's what you understood from Susan Schultz?
3  A. Correct.
4  Q. And what did Dr. Jewell do with that information?
5  A. I have no idea what he did with it.
6  Q. Did you have any more discussion with anybody about the
7  shadowing incident --
8  A. Yes, I did.
9  Q. -- or shadowing request? Did you ever talk to
10 Dr. Jewell about the shadowing request?
11 A. Yes, I did.
12 Q. When did you do that?
13 A. I saw him several days later in the doctors' dining room
14 in the morning. And I wanted him to understand the
15 process. And I went up to him. And as he was on his
16 way out the door, grabbing a piece of fruit or whatever,
17 and said Susan Schultz had contacted me and that unless
18 the person he wanted to bring on board was in medical
19 school, we couldn't allow it.
20 Q. What did he say?
21 A. Bullshit. I'm going to talk to Don about it.
22 Q. Did he talk to Don about it; if you know?
23 A. I have no knowledge of that.
24 Q. Well, you were in his deposition, Dr. Jewell's
25 deposition?

Page 105

1  A. Correct.
2  Q. And Dr. Jewell said that he was annoyed because he had
3  been run back and forth between medical education and
4  volunteers, I think is what he said. Do you know
5  whether that's true or not true?
6  A. I talked to the individuals in volunteer services to be
7  sure that they understood as well what the medical
8  education policy was about shadowing physicians on the
9  floor. Anyone who is not in medical school, who is in
10 high school or looking for career day, they go through
11 volunteer services and they -- I believe they tend to
12 put them in the emergency department or have -- have
13 them do what we older folks used to euphemistically
14 refer to as candy striper activity, but not don a white
15 coat and go into patient's rooms with a physician as
16 though they were part of the health care team.
17 Q. You remember Dr. Jewell testified he talked to Bignotti
18 and Bignotti said he can't do it and that was the end of
19 it. Do you recall that?
20 A. As I recall Dr. Jewell said he asked Dr. Bignotti and
21 Dr. Bignotti said he didn't know if it was possible or
22 not, to check with medical education.
23 Q. And he checked with medical education and he was told no
24 and that was the end of it?
25 A. Dr. Bignotti knew what the policy was.



  

**Susan Zonia**
**7/15/2011**

28 (Pages 106 to 109)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 106

1 Q. Well, in any event once Dr. Jewell was told he couldn't
2     have a shadow, assuming that you told him, do you have
3     any further information that there – anything else
4     occurred with regard to the shadow matter?
5 A. Nothing came directly to the Medical Education
6     Department. Now I'm not out on the floors 24/7
7     shadowing people myself. So whether he brought somebody
8     in or not, I would have no knowledge of.
9 Q. Did anybody ever tell you that you had to allow
10     Dr. Jewell to bring a shadow?
11 A. No. Oh, correction, there was a sidebar conversation
12     when these issues came up about shadowing. I typically
13     would alert Don or Jack, if Jack was making the request,
14     that someone was annoyed that we were using this policy
15     and said no.
16     Don had always supported me in the past. I
17     mentioned to him that Dr. Jewell was annoyed that we
18     weren't letting him bring somebody in. And Don's
19     response was maybe we should revisit the policy. So no,
20     he didn't tell me that I needed to allow it but it was
21     the first time he said we need to revisit the policy.
22 Q. Do you know if the policy was ever revisited?
23 A. I was gone shortly thereafter so I don't know if it's
24     ever been revisited.
25 Q. Do you have any information that Dr. Jewell requesting a

Page 107

1     shadow and being denied a shadow was in any way involved
2     in the decision to terminate you?
3 A. I would have no knowledge of that.
4 Q. You mentioned that you had a disagreement with
5     Dr. Diaczok about J-1 Visa residents moonlighting. Did
6     I get that right?
7 A. Correct.
8 Q. When did that occur?
9 A. The first time that occurred would have been around
10     2008. At a 2007 – I believe 2007, the department made
11     a conscious decision to no longer take H-1 residents.
12     It was approved by Medical Education Committee. And
13     there was discussion about what would be allowed and not
14     allowed by J-1s. And sometimes J-1s would show up on
15     the moonlighting schedule. And that would be the kind
16     of detail we would bring to Dr. Diaczok's attention that
17     it can't happen.
18 Q. So when you brought it to his attention would he take
19     them off the schedule?
20 A. He would direct the chief residents to take them off the
21     schedule.
22 Q. And this was in 2007, 2008?
23 A. Correct. And again in 2009/10.
24 Q. So in 2009 – let me ask it this way, how would it come
25     to your attention that a resident, a J-1 resident, was

Page 108

1     on the moonlighting schedule?
2 A. They would come and complain that they felt pressured to
3     moonlight.
4 Q. And can you identify anyone who came to you and
5     complained?
6 A. If I stop thinking it will. Dr. Challa, C H A L L A.
7 Q. Is that man or woman?
8 A. It's a woman.
9 Q. And when did she talk to you about feeling pressured to
10     moonlight?
11 A. Around April, May, 2010.
12 Q. Was she a J-1 Visa?
13 A. Yes, she was.
14 Q. And so you're saying up to that point in time, if
15     Dr. Diaczok had put J-1 – well, strike that.
16     You said that in 2007 there were some
17     schedules that had J-1 residents working moonlighting.
18     And you brought that to Diaczok's attention and he took
19     them off?
20 A. Correct.
21 Q. And you said when you brought these issues to Diaczok's
22     attention he took them off?
23 A. He would look into it. And if they were on, he would
24     instruct the people that make the schedule to take
25     greater care to not schedule people that shouldn't

Page 109

1     moonlight to moonlight.
2 Q. Okay. And then in April of 2010, Dr. Challa came to you
3     and said what?
4 A. There was another resident. And again, it will come
5     came to me, to say that since the previous November
6     there had been evening scheduling difficulties because
7     the purple team which was managed by Kathleen Peroni
8     (phonetic) with NPs and PAs were short-staffed. And
9     that because they weren't able to hire people they were
10     asked to fill in the openings.
11 Q. Let me back up a minute. When you say fill in the
12     openings is that time beyond the normal time they would
13     be acting as residents?
14 A. Correct. And they would make additional money for that
15     time.
16 Q. Who was together that – who was asking them to fill in?
17 A. Kathleen Peroni and Ben Diaczok were asking them to
18     cover as many shifts as they could.
19 Q. Okay. And so what did you do with that information when
20     Dr. Challa and this other resident told you that?
21 A. I took a look at the call schedules where they were
22     signing up to moonlight and I took a look at the
23     payments that had been made over the last few months to
24     residents for moonlighting and saw that there were many
25     J-1s that had been moonlighting for a prolonged period




 

Case 2:10-cv-10978-PJD-MJH   ECF No. 211-2, PageID.3789   Filed 04/24/12   Page 23 of 50

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



Page 110

1   of time.
2   Q.  Then what did you do?
3   A.  I asked Dr. Diaczok to stop by my office.  I explained
4        it to him.  His response was oh, that's very bad.  He
5        had lost track of how long it had been going on.  He
6        thought it had only taken place for a short period of
7        time.  And he asked me what he should do.  My response
8        was you need to make it stop.
9   Q.  What did he say?
10  A.  He said he'd get right on it.
11  Q.  Did he?
12  A.  I believe he did.
13  Q.  Okay.  And was that the end of it?
14  A.  No.
15  Q.  Did he fix the problem?
16  A.  Well, from a legal perspective he did.
17  Q.  When did you have this conversation with Diaczok about
18       -- this is going on and he said it's bad and you said
19       get it stopped and he said that he would?  When did that
20       go on?
21  A.  I believe that that was May or June of 2010.
22  Q.  Did you hear about this issue again?
23  A.  I wrote it up and sent an E-mail to Don.
24  Q.  What did the E-mail say?
25  A.  That it turns out the residents had been moonlighting

Page 111

1   for a prolonged period of time trying to help out cover
2   at night, but the residents are complaining because
3   they -- either they don't want to work those hours, some
4   of them did for the additional money, but many did not.
5   Regardless, the Visa didn't allow it.  I brought that to
6   Don's attention.  And his response, as I recall several
7   days later, I thought I would get an immediate
8   response -- several days later was, why the sudden
9   decision.
10  Q.  Did he send an E-mail back why this sudden decision?
11  A.  Correct.
12  Q.  And was this something you had talked with him -- about
13       with him before?
14  A.  We had talked about moonlighting off and on for years.
15  Q.  My question is you're referring to the J-1 Visa
16       moonlighting.
17  A.  Correct.
18  Q.  Had you talked to Don about this before?
19  A.  Yes.  And it was a topic of conversation in the Medical
20       Education Committee Meetings as well which he
21       participated in.
22  Q.  And what was the conversation?
23  A.  Which conversation?
24  Q.  Was the conversation starting in 2007 that J-1 Visa
25       residents shouldn't be moonlighting?

Page 112

1   A.  That they're not allowed to moonlight, yes.
2   Q.  And when it came to your attention that Diaczok and the
3        chief residents were doing this, you talked to Diaczok
4        and told him to stop it and apparently it stopped for a
5        while and it started up again, correct?
6   A.  Yes.
7   Q.  And then you got this report from Dr. Challa and this
8        other doctor -- and this other resident and talked to
9        Diaczok and he said it's bad.  And you sent an E-mail to
10       Don.  And Don sent you a response saying why the sudden
11       decision?
12  A.  Correct.
13  Q.  Anything else that was in that response?
14  A.  Not that's the essence of what I remember.
15  Q.  Was there any further communication with Don Bignotti
16       about this issue?
17  A.  No.  Kathleen Peroni contacted me to explain the
18       difficult situation that she was in trying to provide
19       coverage at night because of staffing issues.
20           Ben and I met with her and Ben stressed that
21       he would really like to help but he couldn't and that he
22       had lost track of how long it had gone on.
23  Q.  And did Kathleen Peroni have a reaction to that?  Did
24       she say anything?
25  A.  She was frustrated.  She was annoyed because she had

Page 113

1   slots to fill.  And so we told her that we would work
2   with her and get as many non-J1s to sign up to cover at
3   night as we could.
4   Q.  And when did this conversation with Diaczok and Peroni
5        and you take place?
6   A.  I'm going to hazard a guess, end of June, beginning of
7        July 2010, roughly.
8   Q.  All right.  And did you then work with Diaczok to get
9        these slots filled by non-J-1 Visa residents?
10  A.  He instructed the chief residents to not -- that
11       schedule is posted in the resident call room and they
12       get to sign up.  The chief residents were asked to go
13       through and be sure that anyone that signed up was, in
14       fact, eligible to do it.
15  Q.  That's what Diaczok did?
16  A.  Diaczok instructed the chief residents to do that.
17  Q.  How do you know that?
18  A.  Because he told me.
19  Q.  And did the chief residents then follow his instruction?
20  A.  I stopped getting complaints about it.  And I assumed
21       that the residents -- I spoke with the chief residents
22       about it.  They said they were on it.  I didn't get any
23       more complaints, so I had every reason to believe that
24       it had been addressed.
25  Q.  Was that the -- did you have any more conversation with



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100



**Susan Zonia**
**7/15/2011**

30 (Pages 114 to 117)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 114

1    anybody else about the issue after that?
2    A.   No.
3    Q.   Do you have any information that this issue about J-]
4         Visa residents was involved in any way in the decision
5         to terminate you?
6    A.   Do I have direct evidence?
7    Q.   Any evidence.
8    A.   No.
9    Q.   Did anybody ever tell you that you were required to
10        violate the law?
11   A.   That I was required?
12   Q.   Yes, ma'am. As part of your job that you had to violate
13        the law.
14   A.   No, they did not.
15   Q.   Did anybody ever instruct you to violate the law in any
16        way?
17   A.   Direct instruction, no.
18   Q.   When you were terminated, who was present?
19   A.   Martha Murphy and Don Bignotti.
20   Q.   And where did that meeting take place?
21   A.   In Martha's office.
22   Q.   And how did you -- you at the time had been suspended,
23        correct?
24   A.   For three days, yes.
25   Q.   And you were told that there was an investigation going

Page 115

1    on, correct?
2    A.   Yes. I received an E-mail that there was an
3         investigation going on.
4    Q.   During the time that you were suspended, did you have
5         any contact with any of the Medical Education Department
6         staff, either the program directors or any of the staff
7         people that worked in the department?
8    A.   I had contact with Susie Swanson. Limited.
9    Q.   When was that?
10   A.   I was suspended on a Tuesday. I believe Tuesday
11        afternoon.
12   Q.   Did you call her? Did you call Susie Swanson?
13   A.   She called me. She frequently called me -- very
14        frequently called me.
15   Q.   What was said in that conversation?
16   A.   She asked what was going on. And I told her that, you
17        know, as a result of the E-mail that got misdirected
18        that she had been involved in, that there was an
19        investigation taking place.
20             And she said that she was going to --
21        something along the lines of send out an E-mail that I
22        was on a leave. I forget what it was. But I told her
23        to just send out an E-mail that I wasn't going to be
24        available for several days.
25             I don't remember the particulars. There was

Page 116

1    something about what she was going to say versus what I
2    would have preferred she would have said in terms of my
3    availability.
4    Q.   Was that the end of the conversation with Susie Swanson?
5    A.   She was very worried about her position. And I can't
6         recall other specifics from the conversation at this
7         time.
8    Q.   Did you have conversation with anyone else at St. Joe
9         during the time you were suspended?
10   A.   Dr. Verardi called me to ask what was going on. Cathy
11        Coburn was -- I walked past her office and she saw that
12        I was upset and came out and gave me a hug. Several
13        residents called and that was about it.
14   Q.   What happened at the termination meeting? Who said
15        what?
16   A.   Virtually all the talking was done by Dr. Bignotti.
17        Martha explained to me my COBRA rights and went over the
18        paperwork. Don said they had conducted an investigation
19        and that I was alleged to have created a hostile work
20        environment and been a poor leader. And I believe that
21        those are the exact words that are reflected in the
22        termination paper. And said -- I wasn't given specific
23        allegations. It was just a poor leader and/or poor
24        leadership and a hostile work environment. But I wasn't
25        told what was hostile about the environment. And that

Page 117

1    there was no point in me saying anything because the
2    decision had been made.
3             So I was not told the specifics nor was I
4    given an opportunity to defend myself against some of
5    the allegations that I have later seen in writing.
6    Q.   Anything else that you can recall that was said?
7    A.   It was a very brief meeting.
8    Q.   Do you recall responding? Do you recall responding by
9         saying I guess I confused the difference between work
10        relationships and friendships?
11   A.   I was talking about Martha and Don. Yes, I did say
12        that.
13   Q.   Well, did you say it with respect to Martha and Don, I
14        guess I confused the difference? Or did you say
15        generally I guess I confused the difference between work
16        relationships and friendships?
17   A.   I was referring to the people in the room when I made
18        that statement.
19   Q.   My question is did you refer to them by name or did you
20        just make the statement? I'm not asking what was in
21        your head. I'm just asking what it was you said.
22   A.   I made the statement to Martha and Don. They were the
23        people in the room.
24   Q.   The statement was I guess I confused the difference
25        between work relationships and friendships?



Case 2:10-cv-10978-PJD-MJH   ECF No. 211-2, PageID.3791   Filed 04/24/12   Page 25 of 50



Susan Zonia
7/15/2011

30 (Pages 114 to 117)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

### Page 114

1    anybody else about the issue after that?
2    A.  No.
3    Q.  Do you have any information that this issue about J-1
4        Visa residents was involved in any way in the decision
5        to terminate you?
6    A.  Do I have direct evidence?
7    Q.  Any evidence.
8    A.  No.
9    Q.  Did anybody ever tell you that you were required to
10       violate the law?
11   A.  That I was required?
12   Q.  Yes, ma'am.  As part of your job that you had to violate
13       the law.
14   A.  No, they did not.
15   Q.  Did anybody ever instruct you to violate the law in any
16       way?
17   A.  Direct instruction, no.
18   Q.  When you were terminated, who was present?
19   A.  Martha Murphy and Don Bignotti.
20   Q.  And where did that meeting take place?
21   A.  In Martha's office.
22   Q.  And how did you -- you at the time had been suspended,
23       correct?
24   A.  For three days, yes.
25   Q.  And you were told that there was an investigation going

### Page 115

1    on, correct?
2    A.  Yes.  I received an E-mail that there was an
3        investigation going on.
4    Q.  During the time that you were suspended, did you have
5        any contact with any of the Medical Education Department
6        staff, either the program directors or any of the staff
7        people that worked in the department?
8    A.  I had contact with Susie Swanson.  Limited.
9    Q.  When was that?
10   A.  I was suspended on a Tuesday.  I believe Tuesday
11       afternoon.
12   Q.  Did you call her?  Did you call Susie Swanson?
13   A.  She called me.  She frequently called me -- very
14       frequently called me.
15   Q.  What was said in that conversation?
16   A.  She asked what was going on.  And I told her that, you
17       know, as a result of the E-mail that got misdirected
18       that she had been involved in, that there was an
19       investigation taking place.
20           And she said that she was going to --
21       something along the lines of send out an E-mail that I
22       was on a leave.  I forget what it was.  But I told her
23       to just send out an E-mail that I wasn't going to be
24       available for several days.
25           I don't remember the particulars.  There was

### Page 116

1    something about what she was going to say versus what I
2    would have preferred she would have said in terms of my
3    availability.
4    Q.  Was that the end of the conversation with Susie Swanson?
5    A.  She was very worried about her position.  And I can't
6        recall other specifics from the conversation at this
7        time.
8    Q.  Did you have conversation with anyone else at St. Joe
9        during the time you were suspended?
10   A.  Dr. Verardi called me to ask what was going on.  Cathy
11       Coburn was -- I walked past her office and she saw that
12       I was upset and came out and gave me a hug.  Several
13       residents called and that was about it.
14   Q.  What happened at the termination meeting?  Who said
15       what?
16   A.  Virtually all the talking was done by Dr. Bignotti.
17       Martha explained to me my COBRA rights and went over the
18       paperwork.  Don said they had conducted an investigation
19       and that I was alleged to have created a hostile work
20       environment and been a poor leader.  And I believe that
21       those are the exact words that are reflected in the
22       termination paper.  And said -- I wasn't given specific
23       allegations.  It was just a poor leader and/or poor
24       leadership and a hostile work environment.  But I wasn't
25       told what was hostile about the environment.  And that

### Page 117

1    there was no point in me saying anything because the
2    decision had been made.
3        So I was not told the specifics nor was I
4    given an opportunity to defend myself against some of
5    the allegations that I have later seen in writing.
6    Q.  Anything else that you can recall that was said?
7    A.  It was a very brief meeting.
8    Q.  Do you recall responding?  Do you recall responding by
9        saying I guess I confused the difference between work
10       relationships and friendships?
11   A.  I was talking about Martha and Don.  Yes, I did say
12       that.
13   Q.  Well, did you say it with respect to Martha and Don, I
14       guess I confused the difference?  Or did you say
15       generally I guess I confused the difference between work
16       relationships and friendships?
17   A.  I was referring to the people in the room when I made
18       that statement.
19   Q.  My question is did you refer to them by name or did you
20       just make the statement?  I'm not asking what was in
21       your head.  I'm just asking what it was you said.
22   A.  I made the statement to Martha and Don.  They were the
23       people in the room.
24   Q.  The statement was I guess I confused the difference
25       between work relationships and friendships?



92



**Susan Zonia**
**7/15/2011**

32 (Pages 122 to 125)

Page 122

1   number one, two, three four. Just I read through it and
2   said I agreed or disagreed.
3           MS. LAUGHBAUM: As a suggestion, maybe you
4   could ask her what she recalls what's false?
5           MR. GUNSBERG: I just wanted to know when.
6   BY MR. GUNSBERG:
7   Q.  When did you go through it?
8   A.  I really couldn't give you a date. Counsel notified me.
9       I was out of town when it came in on a consulting trip.
10      It's all a blur now. Sometime between -- I don't know,
11      maybe April. Best guess, March of this year. I really
12      couldn't tell you.
13  Q.  Did you review the notes that you made on the -- about
14      the interviews to prepare for the deposition today?
15  A.  No, I didn't.
16  Q.  Did you do anything to refresh your memory about what in
17      the investigation notes were true or untrue to prepare
18      for today?
19  A.  No, I didn't.
20          MR. GUNSBERG: Can we go off the record for a
21  second?
22          (A short recess was taken)
23          MR. GUNSBERG: Back on the record.
24  BY MR. GUNSBERG:
25  Q.  Do you know who William Allen is?

Page 123

1   A.  I believe Bill Allen, he was administrator before my
2       time.
3   Q.  Do you know if he was fired?
4   A.  I wasn't here, so I would have no knowledge of that.
5   Q.  How about someone called Vandenbrook (phonetic)?
6   A.  Deb Vandenbrook, I believe we overlapped by a few
7       months. She stepped in for finance, I believe. I think
8       it was finance.
9   Q.  Do you know if she was fired?
10  A.  I would have no knowledge of.
11  Q.  Did you fire anyone who worked for you?
12  Q.  Did I personally fire anyone?
13  Q.  Yes.
14  A.  No, I did not.
15  Q.  Did you have the understanding that HR had the final say
16      or have to sign-off on any termination decisions?
17  A.  That was my understanding.
18  Q.  Okay. Do you have any information about whether or not
19      Martha Murphy was involved in the decision to terminate
20      you?
21  A.  I can only assume, since I believe that HR signs off,
22      that Martha had some say in it.
23  Q.  Okay. Did you believe that you and Susie Swanson were
24      friends?
25  A.  I thought we had a collegial relationship, yes.

Page 124

1   Q.  Does that mean that you thought you and she were
2       friends?
3   A.  Not in the sense that she wanted to be friends.
4   Q.  What does that mean?
5   A.  For example, she wanted to double date, her and her
6       husband to go out with me and the person that I was
7       dating. She sent me, almost every night, photographs of
8       her and her kids playing, birthday cakes, when she went
9       to a wedding, wedding photos of places that she was at.
10      So I didn't consider myself that kind of friend.
11  Q.  Did you have any conversation with Susie Swanson or any
12      of the staff people in the department involving your
13      personal life? For instance, your dating relationships,
14      your sexual life, your boyfriend or guys you dated,
15      anything like that?
16  A.  On Fridays frequently what are you doing this weekend,
17      those kind of conversations. Yes, we had those kind of
18      conversations.
19  Q.  Did you use the F-word in the office?
20  A.  I did once or twice when I first started working there.
21      Yes, I did.
22  Q.  Did you use the F-word when Susie Swanson came on in
23      February 2010?
24  A.  I can't remember every single word I had said but I had
25      disciplined myself to, I believe, not say that word.

Page 125

1   Q.  The F-word meaning fuck. That's the F-word?
2   A.  Correct.
3   Q.  So if Susie Swanson reported that you used the F-word a
4       lot, you would disagree with that?
5   A.  I absolutely disagree with that.
6   Q.  So Susie Swanson is lying about that?
7   A.  Susie Swanson confided to me many, many --
8   Q.  Listen to my question. Is Susie Swanson lying about
9       that?
10  A.  She is inaccurate in reporting that. If you want to
11      call it a lie, it's inaccurate.
12  Q.  Did Susie Swanson ever ask you to stop using the F-word?
13  A.  No, because I wasn't using it in the first place.
14  Q.  Would you agree that it would be inappropriate for you,
15      as the director of the department, to use the F-word a
16      lot in the office?
17  A.  To use the F-word a lot in the office would be
18      inappropriate.
19  Q.  And do you recall telling Susie Swanson that using the
20      F-word was part your freedom of speech?
21  A.  Not the F-word, no.
22  Q.  So if Susie Swanson reported that she asked you to stop
23      using the F-word and that you referred to the F-word as
24      your freedom of speech, she's lying?
25  A.  I believe that what she is reporting is not accurate.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313-567-8100

93

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



Susan Zonia
7/15/2011

33 (Pages 126 to 129)

Page 126

1    Q.   Well -- so if you were asked about that in an
2         investigation, your answer would be that she's not
3         telling the truth and you are?  I mean how would you
4         respond to that?
5    A.   I would ask for a situation in which she recalled my
6         saying.
7    Q.   Well, if she reported that it was constant, that you
8         regularly used the F-word and she says you used it all
9         the time in all kind of situations, would you
10        effectively be in a position to say somebody had to
11        either believe you or believe her?
12             MS. LAUGHBAUM:  Objection, form.  I don't
13        understand the question.
14   BY MR. GUNSBERG:
15   Q.   In terms of responding to an investigation, assuming
16        somebody said to you in this investigation Susie Swanson
17        says you used the F-word a lot and she asked you to
18        stop --
19   A.   Susie Swanson used the F-word.
20   Q.   So it's your testimony that it was Susie Swanson using
21        the F-word, not you using the F-word?
22   A.   On occasion Susie used the F-word.  She never asked
23        me -- as I recall, she never had a conversation with me
24        about it because I didn't use the F-word.
25   Q.   So if people in the department during this

Page 127

1         investigation, the staff members, reported that you used
2         the F-word a lot --
3    A.   What is a lot?  I mean I used the F-word several
4         times -- a number of times when I first started working
5         there.  It was pointed out to me that several of the
6         staff members had very strong religious and other
7         beliefs that they took great umbrage at that term.  I
8         switch to saying WTF.
9    Q.   What does that mean, WTF?
10   A.   For example, what the fuck.  It could be interpreted
11        that way.  I, however, when I was challenged on it when
12        I'm nervous, I eat.  WTF can also be where's the food.
13        So you can read into it what you want.
14   Q.   So was it common for you to respond to things or to use
15        the phrase WTF?
16   A.   Not common.
17   Q.   And if you used the phrase WTF, people were supposed to
18        know that that meant where's the food?
19   A.   I even said where's the food.  WTF, where is the food.
20   Q.   I see.  Did you -- did you ever make a statement about a
21        person who stutters, that the guy stutters a lot and
22        makes me want to go yank his dick to help him get the
23        words out?
24   A.   I repeated the conversation from another DME.  Yes, I
25        repeated that conversation.

Page 128

1    Q.   Who was the guy who was stuttering?
2    A.   It was a faculty member at Michigan State.
3    Q.   And why were you and who did you repeat that to, say
4         that to, the guy stutters a lot and it makes me want to
5         go yank his dick so he can get the words out?
6    A.   Not that I want to do that.  It was an individual that
7         was likely to -- I believe it was Deneen McCall.  It was
8         somebody that we were thinking about bringing in to do
9         some teaching for the osteopathic residents.  Dr. Joann
10        Mitchell is the DME at Pontiac and that was her
11        statement.  And Deneen had reported how difficult he was
12        to speak with and I shared that story from Dr. Mitchell.
13   Q.   Did you tell Susie Swanson or any member of the staff
14        that you were dating someone named Pete?
15   A.   I have had his picture in my office and they asked who
16        it was.
17   Q.   So the answer is?
18   A.   Yes.
19   Q.   And did you tell Susie Swanson or other members of the
20        staff you were cheating on Pete?
21   A.   No.
22   Q.   So if Susie Swanson reported this, she's a liar?
23   A.   Yes.
24   Q.   That would be your position that that's a lie?
25   A.   Yes.

Page 129

1    Q.   And how would someone who is doing an investigation know
2         who is telling the truth in this you said, they said
3         situation?
4    A.   I was never asked to comment on any of it.  So only one
5         side of a story was ever heard.
6    Q.   My question is a little different.  Assuming that this
7         comment was reported, that you said that you were dating
8         someone named Pete and you were cheating on him, how
9         would the -- and you denied it, by the way, how would
10        somebody know who to believe?
11   A.   You know, I guess they could call in Pete and ask if I'm
12        where I say I'm going to be.  I have no idea.
13   Q.   How would Pete know whether you're cheating on him?  I
14        assume if you were cheating on him, wouldn't you hide
15        that from Pete?
16             MS. LAUGHBAUM:  I'm going to object to this
17        whole line of the questioning, what investigators might
18        or might not have learned when it's obvious that
19        Ms. Zonia was never asked.  So this is just kind of
20        silly.
21             MR. GUNSBERG:  Thank you.  I appreciate your
22        comment.
23   BY MR. GUNSBERG:
24   Q.   The question I have is how would an investigator know
25        whether to believe you or to believe what the people in



HANSON RENAISSANCE    hansonreporting.com
COURT REPORTERS & VIDEO      313-567-8100

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

94

Susan Zonia
7/15/2011

35 (Pages 134 to 137)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 134

1   A. Journey is a philosophical approach that the hospital is
2      asking all — and training that asked all support staff
3      to go through because it was going to set the tone for
4      operations at the hospital.
5   Q. Where did the directive to go through Journey come from?
6   A. It came from the top levels. Could have been at
7      Trinity, it could have been within the corporation, but
8      certainly within St. Joe's.
9   Q. Did you make a statement to any of the staff that you
10     hate Journey and that it was the hokiest thing ever? Or
11     words to that effect?
12  A. No. I liked Journey compared to the other programs we
13     went through.
14  Q. Did you make a statement that Journey was nothing but a
15     bunch of Kumbayas or words to that effect?
16  A. Journey was not Kumbaya.
17  Q. Do you know what something called JI refers to?
18  A. JI? JI? Journey Intensive.
19  Q. Is that the same thing as Journey?
20  A. I think it's the same thing as Journey Intensive.
21  Q. Did you refer to Journey Intensive as Kumbaya?
22  A. As I said before, I actually enjoyed the Journey
23     experience. The hospital had previously put on some
24     other experiences which I did not enjoy.
25  Q. Do you agree that it would be inappropriate for you to

Page 135

1      make statements that Journey is hokey or that it's a
2      bunch of Kumbaya and that you hated those type of
3      things?
4   A. If I had done it, it would have been inappropriate.
5   Q. So once again, if during an investigation staff members
6      said you made these statements, someone would have to
7      weigh your denial, you're saying no, I didn't versus
8      those folks saying yes, she did?  You agree with that?
9   A. Yes, I do agree with that.
10  Q. Do you have any reason why you believe that your denial
11     should be believed versus the assertions made by your
12     staff that you said or did the kind of things I've been
13     talking about for the last half hour?
14  A. Yes.
15  Q. Why should they believe you versus the staff?
16  A. I believe that the annual evaluations that Dr. Bignotti
17     did in which he states I'm a very good communicator,
18     that I'm a team builder and that I've done a good job of
19     pulling the department together, I would believe that
20     his statements would count for something.
21  Q. Any other reason why you should be believed versus the
22     staff being believed?
23  A. I can only point to my excellent evaluations and record.
24  Q. Did you ever have the staff take the crosses down in the
25     Medical Ed Department?

Page 136

1   A. I did not.
2   Q. Would you agree that would be inappropriate?
3   A. To order the staff to take down the crosses? Yes,
4      absolutely inappropriate.
5   Q. Did you make comments to the fact that people who are
6      religious or believe in God are stupid or naive or
7      simple, words to that effect?
8   A. No.
9   Q. Did you ever make any comments about religion of any
10     kind in the office?
11  A. I said that I didn't — I believe when asked what
12     denomination or what my religious conviction was, I said
13     I had none.
14  Q. So again, if there was a report that you made the staff
15     take the crosses down and you made statements to the
16     effect that people who believe in religion are foolish
17     or simple or naive, that would be your word against the
18     staff, correct?
19  A. That would be correct.
20  Q. Do you recall telling Susie Swanson that — or
21     reiterating a conversation that a friend told you that
22     you would have to give your boyfriend a blow job for
23     helping you move?
24  A. I do recall saying that. It was — you're taking it out
25     of context but I remember some of those words.

Page 137

1   Q. Did you refer to Dr. Kazzi (phonetic) as a lazy bastard?
2   A. No.
3   Q. Would that be inappropriate for you to do that?
4   A. Yes.
5   Q. Did you refer to a student who had accepted an intern
6      position and then declined as a bastard?
7   A. I have no knowledge of what you're — which students,
8      what you're talking about.
9   Q. Did you ever refer to anyone as a bastard?
10  A. In my life? Yes.
11  Q. Bad question. How about in the office? Did you ever
12     use that term, referring to people as a bastard?
13  A. You know, I can't remember a day or time or situation.
14  Q. Are you saying you — yes, yes, you might have but you don't
15     recall it or no, you never did or which?
16  A. I don't recall.
17  Q. Did you ever make any kind of disrespectful remarks
18     about Dr. Richter?
19  A. I made remarks that — well, it sounds like everything I
20     said was perceived as disrespectful. I made remarks
21     about the difficulty in working with Dr. Richter.
22  Q. Did you ever give people the finger behind their back,
23     make an obscene gesture as people walked away from you?
24  A. Yes (indicating).
25  Q. You made a motion with your hands.



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313-567-8100

95

  

Susan Zonia
7/15/2011

36 (Pages 138 to 141)

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Page 138

1  A. Made a motion with my hands. It was not the finger.
2     I've put my hands up as people walked away that I found
3     frustrating. I have done that on occasion.
4  Q. Would it be inappropriate for you to give the people the
5     finger as they walked away from you?
6  A. Depends on the situation. If I'm out on the street? If
7     I'm at home? It depends.
8  Q. I haven't been asking you any questions about on the
9     street or at home. My questions have to do with what
10    was reported to be your behavior in the office. So
11    that's what my questions have to do with.
12         So would it be inappropriate for you to give
13    people the finger as they walked away in the office?
14 A. It would.
15 Q. And again, if this was reported you would be responding
16    by saying I didn't do that. So someone investigating
17    would have to either believe you or believe the people
18    who reported it, correct?
19 A. Yes.
20 Q. Do you have any information why staff -- Medical
21    Education Department staff would report that you're a
22    vindictive person and that you intimidate people?
23 A. Vindictive, there is absolutely no evidence of. There
24    were people that should have been fired that were
25    retained and given second chances. I don't think that's

Page 139

1     vindictive.
2         What was the other piece? That I was
3     vindictive and intimidating?
4  Q. Yes.
5  A. I'm a strong person. And that is intimidating for some
6     people.
7  Q. Was it your practice to dismiss people by putting your
8     hands up, signalling they should stop or go away. In
9     other words, to dismiss people by putting your hands up?
10 A. I know the exact situation that you're referring to.
11    And it's taken out of context.
12 Q. Did you refer to PJ as a bitch?
13 A. Not that I recall.
14 Q. Do you have any --
15 A. I said she was challenging to work with, that she could
16    be very difficult.
17 Q. Would it be improper for you to refer to PJ as a bitch
18    in the office, refer to her in front of staff, would
19    that be improper?
20 A. Yes.
21 Q. Did you ever leave on business time to meet men to go on
22    dates?
23 A. Did I have lunch with friends at times?
24 Q. Did you tell Deneen McCall that you left -- that you
25    left the office to meet men to go for dates?

Page 140

1  A. I met people at lunchtime on occasion.
2  Q. Did you tell Deneen McCall that you were going on a
3     date?
4  A. One day I did, yes. But I had a lunch date and she had
5     my pager and cell phone and could contact me if anything
6     came up.
7  Q. Who was Malloy?
8  A. There was a physician by the name of Dennis Malloy that
9     worked for the organization when I first came.
10 Q. Did you tell Deneen McCall that you didn't like Malloy
11    being here and you would do whatever you could to get
12    rid of him?
13 A. Absolutely not.
14 Q. Do you know a person named Khan?
15 A. Yes.
16 Q. Is that a doctor?
17 A. Yes, Dr. Muhammad Khan.
18 Q. Did you tell Deneen McCall that you didn't like Dr. Khan
19    and you would do whatever you could to get rid of
20    Dr. Khan?
21 A. I did not.
22 Q. So once again, if these reports were made someone would
23    have to decide that Deneen was telling the truth or you
24    were telling the truth, would you agree?
25 A. That's correct.

Page 141

1  Q. Did you talk to Deneen about the men you dated?
2  A. This was about the time she was getting married. And
3     she asked some questions about what single life was like
4     now that she was about to get married. And yes, I
5     mentioned that I was dating.
6  Q. Did you tell her that you had 17 dates in 17 days?
7  A. We talked about speed dating and that phenomenon.
8  Q. Did you tell her that you had slept with so many
9     different men during a period of time that sometimes you
10    couldn't remember the name of the guy you were in bed
11    with?
12 A. Oh, dear God, no.
13 Q. So if she reported that, either she's lying or you're
14    lying?
15 A. That would be correct.
16 Q. And someone would have to make a choice whether to
17    believe her or to believe you?
18 A. That's absolutely correct.
19 Q. Did you make a comment to Susan Swanson that you
20    couldn't understand how she could only sleep with one
21    man and that you thought that that was the wrong way to
22    behave, either in words or in substance, told her that?
23 A. No. Susie Swanson volunteered all kinds of information
24    about her sex life and her husband's anatomy. No, I did
25    not make any comments about what she should or should



96

**Susan Zonia**
**7/15/2011**

37 (Pages 142 to 145)

Page 142

1  not be doing.
2  Q.  Did you tell people in the department that you were
3     friends with or good buddies with Martha Murphy?
4  A.  Not that I recall but they saw that we had a collegial
5     relationship, a social relationship, that we on a couple
6     of occasions had lunch. Martha would sometimes in her
7     department be subject to criticism. And she's a friend
8     and I would speak up on her department's behalf.
9  Q.  Did you get along with someone called Deb Reed?
10 A.  Deb is a very nice person, yes.
11 Q.  Is she an honest person as far as you know?
12 A.  I'm not going to pass judgement on everything she does
13    in the office. I don't know.
14 Q.  Do you know why Donna Reed (sic) would report that you
15    used profanity in the office a lot, including the
16    F-word, used the word bastard and called physicians or
17    referred to physicians as bastards and would say fuck
18    like a regular word?
19 A.  No, I don't know why she would say that.
20 Q.  Is that true that you did that?
21 A.  I believe to Deb's ear when I first started working
22    there, she heard the word and took great umbrage with
23    it. I believe that same document says that I became
24    much friendlier and nicer and appropriate as time went
25    on.

Page 143

1  Q.  Did you make a comment about Deb Reed when she's in a
2     good mood it looks like she had sex during lunch?
3  A.  No. That would be Susie Swanson's statement. Susie
4     said that Deb came back with her hair all messed up and
5     she seems like she's in a good mood. She probably got
6     laid during lunch. Susie said that.
7  Q.  Did you do anything about Susie Swanson making such a
8     statement? Did you think that such a statement would be
9     inappropriate to make in an office?
10 A.  She came in my office and said that behind closed doors
11    and I said we can't speculate about that and let it go.
12 Q.  So your version of the story is Susie Swanson said it
13    and Susie Swanson's version of the story is you said it?
14 A.  That's correct.
15 Q.  So somebody would have to make a judgement about whose
16    got credibility, correct?
17 A.  Correct.
18 Q.  Did you say to Susie Swanson that -- referring to Dr. PJ
19    that it was good that she was on indefinite leave
20    because I can't stand that bitch?
21 A.  No, that is not true.
22 Q.  Did you ever make a statement to the effect that Jack
23    Weiner, the CEO of the hospital, would give you whatever
24    you wanted and would never fire you?
25 A.  No, not true. I wish that were true.

Page 144

1  Q.  Would you agree that such a statement to your staff
2     would be inappropriate?
3  A.  Yes.
4  Q.  Did you ever make any kind of a comment about Deb Reed
5     needing to get laid?
6  A.  Susie Swanson made that statement.
7  Q.  Did you ever make a reference to Jack Weiner as being
8     stupid or uneducated or words to that effect?
9  A.  I have the utmost respect for Jack. I did not make that
10    statement.
11 Q.  Did you ever say anything negative about Jack, refer to
12    Jack Weiner in the office or anywhere else for that
13    matter?
14 A.  I did not always agree with Jack. There were some
15    policy directives that I respectfully disagreed with.
16    It has nothing to do with trashing him as a human being,
17    saying he's stupid or uneducated.
18 Q.  What is the ADA committee? Is there such a thing ADA?
19    How about AOA?
20 A.  Oh, American Osteopathic Association.
21 Q.  Did you ever make a statement that the hospital needed
22    you because you were on the AOA Committee?
23 A.  I made statements that it's very helpful that I'm on the
24    AOA committee, that I'm on several AOA committees
25    because it deals with accreditation. And one of the

Page 145

1  things I'm responsible for is accreditation at the
2  hospital.
3  Q.  Did you ever tell Susie Swanson you were going on a date
4     with Pete, your boyfriend, and to tell people that you
5     were at a meeting at corporate?
6  A.  Goodness, no.
7  Q.  Would that be an inappropriate thing for you to do?
8  A.  Absolutely.
9  Q.  All the things that I -- I've been asking you about
10    whether you did them or not, would you agree you told me
11    these are things that if believed or if true would be
12    inappropriate for you to do on the job, correct?
13 A.  You've taken out of context that some of them were done,
14    yes.
15 Q.  Would you agree that if believed that these would be
16    things that would create an inappropriate or hostile
17    environment in your office?
18 A.  It could.
19 Q.  Did you ever refer -- do you know who Reverend Moore is?
20 A.  Yes, Fredrick Moore. Beautiful speaking voice.
21 Q.  What is his relationship to the hospital?
22 A.  I'm a little fuzzy on that. He provides ministerial
23    services to the hospital. And he also was our community
24    representative on the IRB. The IRB has to have two
25    non-scientific members that are part of the committee


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100



 

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

### Page 146

1   and he represented the IRB, the community on the IRB.
2   Q.  Did you call or refer to Reverend Moore as a fucking
3       idiot?
4   A.  Goodness, no.
5   Q.  Would that be inappropriate?
6   A.  If it happened, yes, it would.
7   Q.  Do you have any information about why Muriel Iafrate
8       would report that you called Reverend Moore a fucking
9       idiot?
10  A.  I have no idea why.  We had difficulty with Reverend
11      Moore attending meetings because without a community
12      rep, we couldn't do it.  We couldn't have the meeting.
13      So I voiced complaints about his lack of showing but I
14      didn't call him a F-ing idiot.
15  Q.  Did you ever make negative comments about Christians or
16      their -- or Christian beliefs in the office?
17  A.  No, I did not.
18  Q.  Would you agree that it would be inappropriate?
19  A.  Yes, I do.  If it took place.
20  Q.  Did you make a comment or tell Susie Swanson that your
21      boyfriend would say that Jesus loves you and your
22      reaction would be to say that there's no Jesus?
23  A.  My boyfriend didn't believe in Jesus so I don't -- I
24      have no idea.  I don't know where that comes from.
25  Q.  Did you ever refer to Jack Weiner as an asshole?

### Page 147

1   A.  No.
2   Q.  That would be inappropriate?
3   A.  If it happened, it would be inappropriate.
4   Q.  Do you recall telling Susan Swanson in August of 2010
5       that you and your boyfriend, Peter, had gotten into a
6       fight and you had gotten another guy to go to Chicago
7       with you and slept with him in Chicago and had great
8       sex?
9   A.  No, I did not.
10  Q.  Did that occur, that you actually had gotten in a fight
11      with your boyfriend, Peter, and had gone to Chicago with
12      some other guy?
13  A.  No, it did not.
14  Q.  Did you tell Susie Swanson that you were going to stop
15      having sleep overs with Pete because you were staying up
16      late at night having sex and that interfered with your
17      work or words to that effect?
18  A.  No, I did not.  I said that I only dated on weekends.  I
19      refer to the week as school nights.  And I see my
20      friend, Peter, on weekends.  You can't be with someone
21      on a school night, work late, getting up early.  Nothing
22      to do with great sex.
23  Q.  Do you know someone called Sherwin Imlay?
24  A.  Yes, I do.  Dr. Imlay, I M L A Y.
25  Q.  Did you -- do you recall attending a meeting or a dinner

### Page 148

1   where Dr. Imlay was the speaker?
2   A.  He wasn't a speaker.  He was receiving an award.  I
3       believe he was being installed as President, Oakland
4       County Medical Society, I think it was.
5   Q.  Do you remember who the speaker was?
6   A.  Don Pevin (phonetic).  He's on the medical staff and he
7       is a pathologist, I think.  Don -- I'm sorry.  He was
8       passing the torch.  So I don't know if he'd really say
9       he was the speaker.  He introduced and gave the award to
10      Dr. Imlay.
11  Q.  Do you recall making a statement at the award dinner the
12      speaker, this Dr. Pevin, was what you referred to as an
13      asshole?
14  A.  Goodness, no.  Susie Swanson was there as were several
15      residents.  And no, I didn't make that statement.
16  Q.  Did you make a statement to Susie Swanson that
17      Dr. Bignotti was an asshole or an ass or words to that
18      effect?
19  A.  Goodness.  Never and never.  I had the ultimate respect
20      and liked Dr. Bignotti.  I still like Dr. Bignotti.
21      Disagree with is different than trashing someone.
22  Q.  Did you refer to Jim Denier as a, quote, fat bastard,
23      close quote?
24  A.  No, not that I recall.
25  Q.  Would you agree that that would be inappropriate for you

### Page 149

1   to do that in the office?
2   A.  If it occurred.
3   Q.  Would you agree that referring to Dr. Bignotti as being
4       a real ass to Susie Swanson, that that would be
5       inappropriate?
6   A.  If it happened.  But it didn't.
7   Q.  So have you done any calculation of your damages that
8       you're claiming in this case?
9   A.  I've thought about some of the losses and expenses that
10      I've incurred but I haven't come up with a dollar
11      amount.  No, I haven't.
12  Q.  Do you know if there's an expert who has been hired by
13      you to calculate your damages in this case?
14  A.  I haven't hired anyone and to the best of my knowledge,
15      my counsel hasn't either, so --
16  Q.  So can you give me any idea, as you sit here today, what
17      your damages are in this case?
18  A.  I know that --
19          MS. LAUGHBAUM:  Let me place an objection.
20      The categories of damages are set forth in our
21      Complaint.  You can answer to the extent you are able.
22          THE WITNESS:  All right.  I know that I -- I
23      don't have the benefits that I used to have and have had
24      to pay for that out of pocket.  I know that there were
25      two months when I had no income at all coming in.  I



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

9B

MARTHA MURPHY                                                                August 10, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

41

1  Q.  And how did you gain that understanding; if you
2      remember?
3  A.  I knew he was happy with her performance, and there was
4      a time when we had processed a special increase for her.
5      I think I knew about her high performance scores when we
6      did that.
7  Q.  Would you have been aware of her pay raises over the
8      years?
9  A.  Yes.
10 Q.  And am I correct that she was given significant pay
11     rises, in the ball park of 30 to 40 percent?  Does that
12     comport with your recollection?
13     MR. GUNSBERG:  I'm sorry.  Say that again, please?
14     MS. LAUGHBAUM:  Can you repeat that?
15     THE REPORTER:  (Reading.)
16         "Question:  And am I correct that she
17         was given significant pay rises, in the ball
18         park of 30 to 40 percent?  Does that comport
19         with your recollection?"
20 A.  I recall one significant pay raise in particular.
21 BY MS. LAUGHBAUM:
22 Q.  And presumably that was an indication that her bosses
23     thought she was doing a good job; correct?
24 A.  It was because she had another job opportunity, and we
25     want to retain her.

42

1  Q.  And her bosses did feel she was doing a good job; is
2      that correct?
3  A.  Yes.
4  Q.  So, aside from the Ben Diaczok concern raised about
5      Susan that you've mentioned, what's the next thing you
6      heard with regard to any, you know, alleged misconduct
7      or inappropriate conduct on the part of Susan Zonia?
8  A.  Don showed me the e-mail exchange between she and
9      Dr. Payne-Jackson.
10 Q.  And do you know how this was brought to Don's attention?
11 A.  Dr. Payne-Jackson.
12 Q.  Okay.  What was the time frame on this?
13 A.  Must have been late September 2010.
14 Q.  And what did he tell you at that time about this e-mail?
15 A.  He showed it to me.  And he had spoken to
16     Dr. Payne-Jackson, who told him she was highly offended
17     by it and it was typically -- I believe, my
18     recollection, is she felt it was typical of her
19     relationship with Susan and that it needed to be
20     addressed.
21     I also believe that at that point he had spoken to
22     Susan about it, and her response had been that she
23     didn't see anything wrong with the response she had
24     given Dr. Payne-Jackson, even though she had not
25     intended for Dr. Payne-Jackson to see it.

43

1  Q.  And you don't know specifically what Dr. Bignotti said
2      to Susan about this misdirected e-mail, do you?
3  A.  I don't know specifically, no.
4  Q.  And this was not the first time in your knowledge that
5      someone at the hospital had misdirected an e-mail
6      accidentally; correct?
7  A.  Correct.
8  Q.  And in fact, didn't Gail Molitor accidentally copy in
9      Susan Zonia on an e-mail to her boss calling Susan a
10     "bitch"?
11 A.  Apparently so, through these proceedings.
12     MR. GUNSBERG:  I'm sorry.  You said through these
13     proceedings, you learned that?
14 A.  I believe that's when I learned it.
15     MR. GUNSBERG:  You mean through this lawsuit?
16 A.  Yes.
17 BY MS. LAUGHBAUM:
18 Q.  So, there are people prematurely hitting the "Send"
19     button?  Not just Dr. Zonia; correct?
20 A.  One other instance.
21 Q.  Do you know of any others?
22 A.  I've done it.
23 Q.  Are you aware of Dr. Bignotti making a comment to Dr.
24     Zonia to the effect that, "If we disciplined everybody
25     that misdirected an e-mail, we wouldn't have anyone

44

1      left"?
2  A.  No.
3  Q.  What, if anything, was the game plan with respect to how
4      you were going to address this e-mail issue and
5      Dr. Payne-Jackson's concern?
6  A.  I believe two things unfolded in one day.
7  Q.  What was the first thing?
8  A.  The e-mail from Payne-Jackson, and Don's call,
9      discussion, with Payne-Jackson and with Susan.  I
10     believe he asked for HR help, because he was going to
11     ask Susie Swanson about her involvement in the e-mail.
12 Q.  All right.  So, he wanted to discuss this with Susie
13     Swanson?  That's your understanding?
14 A.  Right.
15     Because the e-mail had been directed, you know,
16     "Susie, give her the cold shoulder.  That
17     will irritate her or make her mad."
18     So, I believe Don and Ryan Hernandez on my team met
19     with Susie to ask her about the e-mail.
20 Q.  When did they meet?  Do you know?
21 A.  I don't know.
22 Q.  How did you find out that Don had met with Susie to ask
23     about the e-mail?
24 A.  Partly in my reviewing of the notes to prepare for
25     today, I recalled that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

99

MARTHA MURPHY                                   August 10, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

45

1   Q.  Okay. And Hernandez is somebody in your department?
2   A.  Yes.
3   Q.  And all three of them met regarding this e-mail as far
4       as you know?
5   A.  His notes lead me to believe that, yes.
6   Q.  And what are the notes that you're referring to?
7   A.  There are notes that he took from meeting with Don and
8       Susie where they started out talking about the e-mail,
9       and then Susie began talking about the working
10      conditions in GME and concerns about working with Susan
11      Zonia.
12  Q.  And whose handwriting are those notes in?
13  A.  Ryan Hernandez.
14  Q.  Are these the notes you're referring to?
15  A.  No.
16  Q.  You said "No"?
17  A.  No.
18      MS. LAUGHBAUM:  Have these handwritten notes been
19      produced?
20      MR. GUNSBERG:  I believe so.
21      MS. LAUGHBAUM:  I'm not aware of any.
22  A.  I think so.
23      MR. GUNSBERG:  I think so. They're whatever notes
24      we had.
25  BY MS. LAUGHBAUM:

46

1   Q.  How many pages are they?
2   A.  Maybe two.
3   Q.  And these are handwritten notes that Mr. Hernandez took
4       in meeting with Susie Swanson and Don Bignotti; correct?
5   A.  Yes.
6   Q.  And what else did you review to prepare for today?
7       MR. GUNSBERG:  Well --
8   A.  The handwritten --
9       MR. GUNSBERG:  -- I'm also going to object. It
10      hasn't been established that those notes were reviewed.
11      But go ahead.
12  A.  The handwritten notes that Ane McNeil took in her
13      interviews.
14  BY MS. LAUGHBAUM:
15  Q.  Anything else?
16  A.  I looked at the disciplinary termination write-up.
17  Q.  Anything else?
18  A.  I looked at the discipline policy and I looked at the,
19      "Trinity Health Organizational Integrity
20      Program/Standards of Conduct."
21  Q.  What did the Hernandez -- and you did say you reviewed
22      the Hernandez's notes as well; correct?
23  A.  Yes.
24  Q.  What did those notes say?
25  A.  They talked about that things like the e-mail to

47

1       Payne-Jackson were not unique; that she was frequently
2       asked to do things with other physicians that -- or
3       people in the office; that Susan was intimidating. I
4       don't remember the specifics, but today I put together
5       that that is what triggered the bigger investigation out
6       there.
7   Q.  What do you mean you put it together today?
8   A.  That the Payne-Jackson piece and then the meeting with
9       Susie all occurred on the same day, and as a result, we
10      decided to initiate an investigation.
11  Q.  Okay. So, your testimony is that Dr. Bignotti asked for
12      HR to get involved because he was going to talk to Susan
13      Swanson regarding this e-mail; correct?
14  A.  Correct.
15  Q.  And following the meeting with Swanson, Bignotti and
16      Hernandez, what happened? Or what was concluded as a
17      result of that meeting; if anything?
18  A.  We concluded we might have a bigger problem than just a
19      one-off e-mail between Zonia and Payne-Jackson.
20  Q.  Have you subsequently formed the opinion that Susie
21      Swanson had some significant credibility problems?
22      MR. GUNSBERG:  Subsequent to what?
23      MS. LAUGHBAUM:  Subsequent to that day.
24  A.  I wouldn't characterize it as "significant credibility
25      problems."

48

1   BY MS. LAUGHBAUM:
2   Q.  Okay. How would you characterize any concerns you had
3       about Susie Swanson or her truthfulness?
4   A.  In a different scenario all together, someone has
5       reported to me that they weren't 100 percent positive
6       about her truthfulness.
7       Or her integrity. It was more of an integrity
8       thing.
9   Q.  When did these issues come to your attention?
10  A.  Probably about two months ago.
11      It might have been longer.
12  Q.  Did that give you any pause with respect to the
13      incidents surrounding Susan Zonia's termination?
14  A.  No.
15  Q.  Even though the key -- one of the key complainants
16      against Ms. Zonia turned out to have questionable
17      integrity or reputation for telling the truth?
18      MR. GUNSBERG:  I'll object to that. There's no
19      foundation that this -- that Susan Swanson has
20      questionable integrity or telling the truth issues.
21      That's not what the witness testified.
22      MS. LAUGHBAUM:  Would you read back the question?
23      THE REPORTER:  (Reading.)
24      "Question: Even though the key -- one of
25      the key complaints(sic) --"



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com



100

MARTHA MURPHY                                                    August 10, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

53

1  Q.  How do you know that what she said was truthful or not
2      truthful?
3  A.  Because it was corroborated by six other people.
4  Q.  And what was corroborated, specifically.
5  A.  Various aspects, such as intimidating behavior, implying
6      to the staff that she was untouchable, and so if they
7      didn't like something, they shouldn't bring it forward,
8      because she was friends with myself, she was friends
9      with other people in administration, she made too much
10     money for the hospital.  Jack Weiner would never let her
11     go.
12 Q.  Okay.  And you're here -- and this is all based on what?
13     This is all based on the statements that were taken on
14     September 30th; correct?
15 A.  Yes.
16 Q.  What did you hear at the time from Don or Hernandez or
17     Susie with respect to what Susie sat at that meeting?
18 A.  Similar types of things.
19 Q.  Okay.  And it's all set forth in these handwritten
20     notes; correct?
21 A.  Correct.
22 Q.  And it's a two-page document?
23 A.  Yes.
24 Q.  All right.  So, what was decided after this meeting?
25     That there was going to be further discussion with

54

1      people in Medical Education; is that right?
2  A.  Yes.
3      And that we would suspend Susan during that time.
4  Q.  Okay.  So, whatever the date was of that meeting with
5      Susie and Bignotti and Hernandez, the suspension
6      decision was made; correct?
7  A.  Yes.
8  Q.  Based on whatever Susie -- based on the e-mail and
9      whatever Susie Swanson said; correct?
10 A.  Yes.
11 Q.  And would that have occurred without Susie Swanson's
12     statement with regard to additional issues beyond the
13     e-mail?
14 A.  Probably not.
15 Q.  Susie Swanson was about a six-month employee; is that
16     correct?
17 A.  At that time, I believe so.
18 Q.  Susan Zonia had been with Trinity four or five years?
19 A.  Yes.
20 Q.  And Susie Swanson reported to Susan Zonia?
21 A.  Yes.
22 Q.  Did Mr. Hernandez report to you what had transpired at
23     this meeting, or how did you find out about it?  Did he
24     just hand you his notes?
25 A.  I don't remember.

55

1  Q.  Did you weigh in on the suspension decision?
2  A.  Yes.
3  Q.  Was that actually your recommendation?
4  A.  I can't remember if it was mine independently.
5      In general when we have those kind of complaints
6      about a leader, we try to suspend, to remove the leader
7      from the work environment so that the employees feel
8      more comfortable speaking during the investigation and
9      not worried about daily retaliation if they're all
10     working together.
11 Q.  So, you believed Susie Swanson that she -- that
12     Dr. Zonia was implying that she was untouchable,
13     apparently throwing around your name in the context of
14     her being untouchable, and you presumed that Susie
15     Swanson was being truthful about that?
16 A.  And I didn't -- I presumed that we needed to get more
17     information if the things -- to verify whether the
18     things Susie was saying was accurate.
19 Q.  Okay.  Well, Dr. Zonia wasn't asked for her input before
20     she was suspended; correct?
21 A.  Correct.
22 Q.  And it's possible that Susie Swanson is completely
23     mentally unbalanced or untruthful or was just making
24     something up; correct?
25 A.  I'd like to modify.

56

1      Dr. Zonia was asked about her exchange in the
2      errant e-mail to Dr. Payne-Jackson.
3  Q.  Okay.  That wasn't my question.
4      My question was, at the time you put Dr. Zonia on
5      suspension, nobody had bothered to ask Susan Zonia if
6      what Susie Swanson had said was accurate, or to respond
7      or rebut or even be made aware of these allegations; is
8      that right?
9      MR. GUNSBERG:  That's a multiple question.
10     But if you can answer, you can.
11 A.  I didn't make Dr. Zonia aware of those, no.
12 BY MS. LAUGHBAUM:
13 Q.  Okay.  So, whatever Susie Swanson said was essentially
14     taken at face value, and, boom, Susan Zonia suspended;
15     right?
16 A.  Susan Zonia was suspended, yes.
17 Q.  And then subsequently -- by the way, was that September
18     29th that she was suspended?  Or was it the 28th?  Do
19     you know?
20 A.  I don't remember between those two dates.
21 Q.  But it was literally, at most, maybe a two and a half
22     day process from the time any issues surfaced and her
23     termination; correct?
24 A.  I think the documents have confirmed that, yes.
25 Q.  All right.  So, who decided let's talk to these



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

101

MARTHA MURPHY                                                  August 10, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

57

1  coordinators in the Medical Education Department?
2  A.  I don't know whether it was me or Don together or
3     independent, but they are the people that are employed
4     up there, and we determined that we would interview the
5     people that were employed up there.
6  Q.  All right.  Well, you sat through Dr. Bignotti's
7     deposition; correct?
8  A.  Yes.
9  Q.  And you heard him testify that he had nothing to do with
10    who was interviewed; correct?
11 A.  I did hear him testify to that.
12 Q.  And were you taken sort of aback by that testimony?
13 A.  Not really taken aback.  I assumed he either was not
14    involved with that specific decision or doesn't recall.
15 Q.  Well, he wasn't being truthful, was he?
16 A.  I would not characterize it that way.
17 Q.  Did you get the sense he was throwing HR under the bus?
18 A.  No, I did not.
19 Q.  Were you surprised by his testimony when he said he had
20    absolutely nothing to do with who got interviewed?
21 A.  No.
22 Q.  So, who did?  If it wasn't him, then it was you;
23    correct?
24 A.  It may have been Ryan, actually, and/or Ane, because
25    that was when Ryan then became ill and Ane ended up

58

1     doing the interviews.
2  Q.  Okay.
3  A.  It is normal with that kind of complaint to begin a
4     process of interviewing people in the work team.
5  Q.  Okay.
6  A.  And so I'm assuming we followed that process, and Don,
7     very likely, didn't dictate to us.  We likely said, "We
8     need to interview all the employees up there."
9  Q.  Okay.  Well, a minute ago I asked you who decided that
10    we're going to haul in these HR -- strike that.
11    MR. GUNSBERG:  "Haul in"?
12 BY MS. LAUGHBAUM:
13 Q.  Haul in these Medical Education staff members, and you
14    told me, "It was me or Don."
15    Now you're saying, well, it also could have been a
16    couple other people in HR; correct?  Either Ane or
17    Mr. Hernandez?  Is that your testimony?
18 A.  So, the reality is, I do not remember.
19 Q.  All right.  Well, you need to tell me if you don't
20    remember --
21 A.  All right.
22 Q.  -- instead of giving me an answer that you're going to
23    retract.
24    And you just said something about it's normal to
25    interview people when some sort of issue arises in a

59

1     department; correct?
2  A.  Correct.
3  Q.  And it's highly abnormal to not interview the accused?
4     Isn't that also correct?
5  A.  No.
6  Q.  What other situations have you been involved in which
7     resulted in an employee termination where the person
8     accused of misconduct is not interviewed or asked for
9     his or her side of the story?
10 A.  There's a recent one sticking in my mind.  I can't think
11    of every scenario right now unless I take a moment.
12 Q.  Is the recent one one that has occurred since Dr. Zonia
13    was fired?
14 A.  Yes.
15 Q.  In the last few months or --
16 A.  Yes.
17 Q.  How about prior to the time Dr. Zonia was fired?  Any
18    other instances you can recall sitting here today where
19    the accused, who ended up being terminated, was never
20    asked for his or her side of the story?
21 A.  I can't think of a specific instance at this time.
22 Q.  Okay.  Did you read Becky Hoerner's deposition?
23 A.  Yes.
24 Q.  And she testified under oath that Dr. Bignotti asked her
25    to schedule an interview of all the girls in Graduate

60

1     Medical Education; correct?
2  A.  That's what her deposition said, yes.
3  Q.  And is that accurate as to what happened as far as you
4     know?  Do you have any reason to dispute that?
5  A.  No.
6  Q.  Do you know why Dr. Bignotti would deny choosing who got
7     interviewed?
8  A.  No.
9  Q.  You didn't sit in on any of the interviews; correct?
10 A.  Correct.
11 Q.  Did you ever learn that some of the women Don wanted to
12    interview didn't want to meet with Don alone?
13 A.  No.
14 Q.  Did you read Becky Hoerner's testimony to that effect?
15 A.  I read her testimony.
16    I don't recall that piece in it.
17 Q.  Do you recall her saying -- testifying to the effect
18    that Don was -- she was setting up meetings for Don to
19    meet with these Medical Education people, and some of
20    them raised the issue of wanting to get HR involved and
21    not meet with Don one on one.
22    Do you recall her testimony to that effect?
23 A.  I don't.
24 Q.  Do you know if that's the way it played out or not?
25 A.  My only recollection is that when we were setting up the

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

102



Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**MARTHA MURPHY**                                           August 10, 2011

81

1    all peers?
2    A.   I don't have any recollection of that.
3    Q.   Could have happened?  You just don't recall?
4    A.   I suppose it could have happened.  I think I would have
5         remembered that.
6    Q.   And if her recollection is she asked you for advice on
7         that very issue, would you have any reason to dispute
8         that?
9    A.   I have no recollection of that conversation.
10   Q.   Okay.  So, you did come to understand that at least
11        three of the people that had given statements about or
12        said negative comments about Susan Zonia had been
13        previously counseled or disciplined by her; correct?
14   A.   I came to understand two.  I knew that Pat Davis and
15        Gail Molitor.
16   Q.   Okay.  And weren't you aware that she had also counseled
17        Susie Swanson about attendance and other issues?
18   A.   I heard that through these proceedings, but didn't have
19        an independent recollection of that.
20   Q.   Okay.  So, there was a decision made, and it was made by
21        Don Bignotti and/or HR that they were going to call in
22        these Medical Education specialists and ask them about
23        Susan; correct?
24   A.   Correct.
25   Q.   And that happened within, you know, roughly a day;

82

1         correct? .
2    A.   Yes.
3    Q.   And your involvement in that was what?  Did you
4         designate Ms. McNeil to handle that or --
5    A.   Originally, Ryan Fernandez, and then he became ill.  And
6         so Ms. McNeil was designated, yes.
7    Q.   Did you give her any direction as to how you wanted her
8         to conduct those interviews?
9    A.   Nothing specific.
10   Q.   Okay.  Was there any time frame in mind?  Was it, you
11        know, let's get this wrapped up in a day or two, or
12        could she have taken a month if she wanted to?  Was
13        there any talk of how long the process would take?
14   A.   We didn't specifically talk about it.  We always try to
15        be as quick as possible, and with this work team, we
16        were able to schedule all the interviews in one day.
17   Q.   Was there any talk -- was there any contact with
18        Dr. Zonia's successor at that point?  The person that
19        ultimately filled that job?
20   A.   Not by me, no.
21   Q.   Do you know if Dr. Bignotti had already been in contact
22        with that person?
23   A.   I don't believe so.  I do not know specifically.
24   Q.   But he stepped into the job literally a week later?
25   A.   Yes.

83

1    Q.   So, it was very quickly?
2    A.   I do know that -- I do know that Don approached him
3         after we conducted the termination.
4    Q.   Based on what Don testified to?
5    A.   No.  Based on events at the time.  As the HR person,
6         when we have a termination, and then we ended up with a
7         vacant position that was critical, I asked Don, "Do you
8         want me to begin the recruitment process?  What are you
9         going to do about filling the role in GME?"  And he
10        indicated he was going to have a conversation with
11        Dr. Dorfman about potentially stepping in on an interim
12        basis.
13   Q.   And do you know how it came about that Dorfman was put
14        in place so quickly other than what you've told me?
15   A.   Because he was already working for us on a part-time
16        contract.  So, Don approached him to see if he had the
17        interest and/or the availability to give us some time to
18        step in on an interim basis and do some leadership in
19        GME.
20   Q.   Okay.
21   A.   And he said he did.
22   Q.   So, Ane McNeil conducted these interviews on September
23        30th; correct?
24   A.   Yes.
25   Q.   And did she report back to you throughout the day as she

84

1         was doing these interviews, or what's the first thing
2         you heard about what was revealed in these interviews?
3              (Outside interruption.)
4    A.   I believe it was at the end of the day, after they had
5         all been conducted, that she met with Don and I, and
6         went over --
7              MR. GUNSBERG:  Excuse me just a minute.  I have to
8         take this call.
9              (Discussion held off the record.)
10             THE REPORTER:  (Reading.)
11             "Question:  And did she report back to
12        you throughout the day as she was doing these
13        interviews, or what's the first thing you
14        heard about what was revealed in these
15        interviews?
16             "Answer:  I believe it was at the end of
17        the day, after they had all been conducted,
18        that she met with Don and I, and went over --"
19   A.   Right.
20        There was a point, and I don't remember if it was
21        before Ane conducted the interviews -- I think it was
22        the evening before that Don and I went up to the GME
23        Department, I believe it was the day we suspended Susan,
24        to let the team know up there that Susan would be out of
25        the office for a few days and that we were going to have



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

103

 

**97**

1    a national organization of Medical Education directors,
2    and the hospital flew out a bunch of VPs to Seattle to
3    attend the installation?
4    A.   Yes.
5    Q.   And they threw a big reception for her?
6    A.   Yes.
7    Q.   And this was approximately a year or so prior to her
8    termination; correct?
9    A.   Yes.
10   Q.   Do you have a crucifix in your office?
11   A.   I don't.
12   Q.   Is it a problem to not have a crucifix in your office at
13   St. Joe's?
14   A.   Crucifixes are placed various places.
15        MR. GUNSBERG:  The question is, is it a problem not
16   to have a crucifix in your office.
17   A.   Is it a problem?
18        No.  No.
19   BY MS. LAUGHBAUM:
20   Q.   Was there one in your office at one time?
21   A.   I don't think so.
22   Q.   How many days did you collect information or did the
23   hospital collect information on Susan?
24        Is it one day?
25   A.   I believe from the record we've said there was the

**98**

1    e-mail, then there was one day of interviews and then
2    there was a decision.  So --
3    Q.   Two days?
4    A.   Two days.
5        MR. GUNSBERG:  Whatever it was.
6    BY MS. LAUGHBAUM:
7    Q.   Did you ever have any reason to believe that Susan Zonia
8    had -- was impaired on the job?
9    A.   No.
10   Q.   Or that she smelled of alcohol?
11   A.   No.
12   Q.   Did those allegations strike you as being, you know, out
13   of line based on what you knew --
14        MR. GUNSBERG:  "Out of line"?
15   BY MS. LAUGHBAUM:
16   Q.   -- about Susan?
17        MR. GUNSBERG:  You mean wrong?
18        Object to the form of the question.
19        I don't know what "out of line" means.
20        MS. LAUGHBAUM:  Everyone knows what "out of line"
21   means.
22        MR. GUNSBERG:  No, they don't.
23        MS. LAUGHBAUM:  It's sad.
24        MR. GUNSBERG:  Maybe it is sad, but I'm objecting
25   to the form of the question and the term "out of line."

**99**

1    BY MS. LAUGHBAUM:
2    Q.   Can you answer the question?
3    A.   No.  I'm sorry.
4        Can you ask the question again?
5        MS. LAUGHBAUM:  Can you read it back?
6        THE REPORTER:  One second, please.
7        "Question:  Did those allegations strike
8        you as being, you know, out of line based on
9        what you knew --"
10   the objection --
11        "Question:  -- about Susan?"
12        MR. GUNSBERG:  That's an interesting proposition.
13   A.   I didn't judge those allegations one particular way or
14   another.
15        I knew that socially --
16   BY MS. LAUGHBAUM:
17   Q.   Well, I'm not talking about socially.  I'm talking about
18   what you observed on the job.
19        MR. GUNSBERG:  Whoa, whoa, whoa.  You asked her a
20   question about whether it's out of line, and now when
21   the witness is trying to answer what's out of line as
22   she understands Susan's behavior, whatever the context,
23   you want to interrupt her and cut her off.
24        MS. LAUGHBAUM:  No.
25        MR. GUNSBERG:  You can't have it both ways.

**100**

1        MS. LAUGHBAUM:  No.
2    BY MS. LAUGHBAUM:
3    Q.   I want to know about your interactions with Susan on the
4    job, and whether it was surprising to you that there was
5    an allegation that she smelled of alcohol on the job?
6    A.   That's a different question.
7        MR. GUNSBERG:  That's a different question.
8    BY MS. LAUGHBAUM:
9    Q.   Well, answer that one.
10   A.   That one --
11   Q.   I don't want to know if you're aware Susan Zonia had a
12   glass of wine some night.  I mean that's irrelevant to
13   me.  I'm asking about on the job, and these allegations
14   that she was either impaired or had an odor of alcohol.
15        MR. GUNSBERG:  I'm just going to object to your
16   methodology of asking the witness a question with an
17   undefined term, and the witness begins to answer giving
18   you an answer you don't like, and you cut her off and
19   then change the question.
20        MS. LAUGHBAUM:  All right.
21        MR. GUNSBERG:  So, that being the case, answer
22   whatever question is on the table.
23   BY MS. LAUGHBAUM:
24   Q.   Ms. Murphy, answer however you want to answer any of the
25   questions I just asked.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company



MARTHA MURPHY                                                    August 10, 2011

109

1   Q.   Did someone tell her to write it; if you know?
2   A.   I think we -- I may have asked her for a summary like
3        this, yeah.
4            She may have --
5   Q.   Post?
6   A.   She may have done it on her own.  It was in preparation
7        for the meeting we were going to hold with Susan.
8   Q.   Okay.  Well, this is an after-the-fact recounting of
9        what happened at the termination meeting; correct?
10  A.   I see that it says October 1, and I can't remember the
11       date of the termination meeting, but it was given to me
12       before the termination meeting as kind of prep --
13  Q.   Okay.
14  A.   -- for what we were going to share with Susan.
15  Q.   Okay.  Ane McNeil was not at the termination meeting?
16  A.   No, she was not.
17  Q.   Did you ask her to provide you some verbiage that you
18       could use at the meeting?
19  A.   I either asked her, or often she is proactive.  I can't
20       remember which way it was, but she provided this, yes.
21  Q.   Did any of this get conveyed to Susan Zonia?
22  A.   We covered -- probably not word for word, but we used
23       this as a guide to talk about that we had investigated
24       and found these items laid out here.
25  Q.   Am I correct that none of these allegations referenced

110

1        in paragraph two were ever discussed with Susan Zonia at
2        the meeting?
3            MR. GUNSBERG:  You mean before the meeting?
4            MS. LAUGHBAUM:  At the meeting.
5   BY MS. LAUGHBAUM:
6   Q.   When she was terminated.
7   A.   My recollection of the meeting is that we communicated
8        to Susan that our investigation had found that she had
9        created an intimidating work environment, which is
10       stated in the second paragraph, and that therefore she
11       was being terminated.
12  Q.   No one mentioned word-one about inappropriate sexual
13       remarks on October 1st, did they?
14  A.   I do not believe that we called that out specifically in
15       that meeting.
16  Q.   And no one mentioned anything about sharing and asking
17       of personal matters with subordinates, did they?
18  A.   We talked about inappropriate leadership behavior, but
19       we were probably not specific to those items.
20  Q.   And no one mentioned discussing personal issues
21       occurring with physicians; correct?
22  A.   Where do you see that?
23  Q.   Line three, second paragraph.
24  A.   Correct.
25  Q.   In fact, Ms. Zonia didn't really know what the

111

1        allegations were against her at that point, did she?
2   A.   She was told -- I don't know what she knew, but she was
3        told that after meeting with her team, we had found that
4        she had created a work environment that we found to be
5        inappropriate.
6   Q.   And the statements were not shared with her; correct?
7   A.   Individual statements were not shared with her.
8   Q.   And nothing substantively in those statements was shared
9        with her, was it?
10  A.   No.
11  Q.   And in fact, she said she would like an opportunity to
12       respond to whatever the claims against her were, didn't
13       she, at the termination meeting?
14  A.   I don't recall her saying that, specifically.
15           I recall Dr. Bignotti saying, "There's not anything
16       you can say that is going to change this."
17           I did ask her in that meeting if she had something
18       to say, and that is when she said, and she was tearful
19       when she said it, "I guess I confused friendships with
20       work relationships," or something to that defect.
21  Q.   And you heard her testify that she was referring to what
22       she presumed was a friendship with you and Don Bignotti;
23       correct?
24  A.   I did hear her testify to that.
25  Q.   And do you recall -- did she or didn't she ask at the

112

1        termination meeting for an opportunity to respond?  Do
2        you recall if she did or not?
3   A.   I do not recall her asking for an opportunity to
4        respond.
5   Q.   And she was told the decision was not appealable;
6        correct?
7   A.   She was not told that the decision was not appealable.
8        She was told that there wasn't anything that she would
9        be able to say at that moment that would change the
10       decision.
11  Q.   Okay.  So, no one said, "Susan, let's get your take on
12       any of this"?  She was essentially foreclosed from any
13       ability to say anything, really, wasn't she?
14  A.   We asked her what she had to say.  When she said, and
15       got quiet and tearful, that she had confused
16       relationships, I took that to mean she understood the
17       issues we were raising and she had messed up.
18  Q.   And you may have just completely misconstrued what her
19       point was, in that her position is she was just saying I
20       thought you two were my friends, essentially?
21  A.   I took it one way.  She's testified to having meant
22       something differently, yes.
23  Q.   And was there any thought or discussion about attempting
24       to get Susan to change whatever these allegedly
25       problematic behaviors were?



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com



105

Donald D. Bignotti, M.D.                                    June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**45**

1    right?

2    A.   That is correct.

3    Q.   Okay.  And --

4         MR. GUNSBERG:  I've got to make a 2:00 phone call.

5    So, if this is a good place to take a break?

6         MS. GORDON:  All right.

7         MR. GUNSBERG:  Let's take a few.

8    About 10.

9         (Short recess at 2:00 p.m.)

10                  * * *

11        (Record resumed at 2:17 p.m.)

12   BY MS. GORDON:

13   Q.   What is your educational background, Doctor?

14   A.   I have a bachelor's of science in microbiology and a

15        medical degree from Wayne State University.

16   Q.   Both are from Wayne?

17   A.   No.  The bachelor of science is from Michigan State.

18   Q.   Okay.  And the medical degree you obtained when?

19   A.   In 1981.

20   Q.   And do you have any specialty?

21   A.   I am Board-certified in family medicine.

22   Q.   Any other Board certifications?

23   A.   I held a Certificate of Added Qualifications in

24        geriatric medicine.  That expired in 2008.

25   Q.   Okay.  How long have you been employed at St. Joseph

**46**

1         Mercy?

2    A.   Since March of 2005.

3    Q.   What were you doing before that?

4    A.   I was the Vice President for Medical Affairs and Chief

5         Medical Officer at Bon Secours Cottage Health Services.

6    Q.   In Grosse Pointe?

7    A.   Yes.

8    Q.   How long were you there?

9    A.   I started there in the position when it was just Bon

10        Secours Hospital in January of 1996.

11   Q.   So, you were there from '96 until when?

12   A.   Until 2005.

13   Q.   Okay.  And why did you leave Bon Secours?

14   A.   To take the position at St. Joe's.

15   Q.   Were you recruited?

16   A.   Yes.

17   Q.   Did you know somebody?  How did it come to be?

18   A.   I was contacted by a recruiter and had worked with Jack.

19   Q.   Jack who?

20   A.   Jack Weiner, our CEO, when he was also part of the Henry

21        Ford system, as was Bon Secours Cottage Health Services.

22   Q.   Okay.  Where were you before Bon Secours?

23   A.   I was in private practice full-time.

24   Q.   Where?

25   A.   In St. Clair Shores.

**47**

1         I'm sorry.

2         Roseville.

3    Q.   Were you in a practice group?

4    A.   I was.

5    Q.   Was there a name?

6    A.   East Area Family Physicians.

7    Q.   How many physicians were there?

8    A.   It varied from time-to-time.  As few as three and as

9         many as six.

10   Q.   And how long were in that private practice?

11   A.   From 1984 until I made the transition to the Vice

12        President for Medical Affairs position.

13   Q.   Okay.  Prior to private practice, were you employed as a

14        physician in any manner?

15   A.   I was an employee of the group, yes.

16   Q.   Okay.

17   A.   And a partner.

18   Q.   But prior to the group, were you employed anywhere?

19   A.   Oh, I was a resident in family medicine at Bon Secours.

20   Q.   Okay.  What is your current title at St. Joe's?

21   A.   I'm the Vice President of Medical Affairs and Chief

22        Medical Officer.

23   Q.   Okay.  And how long have you held that title?

24   A.   Since March of 2005.

25   Q.   The entire time you've been there?

**48**

1    A.   Yes, ma'am.

2    Q.   Do you have a written job description?

3    A.   Currently, I do not.

4    Q.   Who do you report to?

5    A.   Jack Weiner, the CEO.

6    Q.   Who reports to you directly?

7    A.   The Director of Medical Education, the Manager of the

8         Medical Staff Office, the Director of --

9    Q.   I'm sorry.  Medical Staff Office?

10   A.   Correct.

11   Q.   What is the Medical Staff Office?

12   A.   It is the area responsible for credentialing of

13        physicians and medical staff.

14   Q.   Okay.  All right.  Who else?

15   A.   The Director of Risk Management, the Director of

16        Outcomes Management and the Chief Medical Informatics

17        Officer.

18   Q.   What's that?

19   A.   The Chief Medical Informatics Officer is the physician

20        who is a specialist in informatics.

21   Q.   What is informatics?

22   A.   That is the application of technology, particularly

23        electronic medical records, to medical practice.

24   Q.   Okay.  Who else reports to you directly, or is that it?

25   A.   Can you read those back so I can make sure I have those.



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

106



Donald D. Bignotti, M.D.                                        June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**49**

1  Q.  Yes.
2      Medical Education Director, Manager Medical Staff
3      Office, Director of –
4      MR. GUNSBERG:  Risk.
5  BY MS. GORDON:
6  Q. – risk Management and Chief Medical Informatics Office.
7      MR. GUNSBERG:  And Director of Outcomes and –
8      MS. GORDON:  That's right.  I'm sorry.
9  A.  And then my – I'm responsible for doing the evaluation
10     also for my administrative assistant, although those are
11     managed by the Chief Human Resource officers.
12  BY MS. GORDON:
13  Q.  Whose your administrative assistant as of today's date?
14  A.  As of today's date?  Her name is Zea Lebate,
15     L-a-b-e-t-e.
16  Q.  How long has she been with you?
17  A.  For approximately two months.
18  Q.  And who was there previously?
19  A.  Rebecca Hoemer, H-o-e-r-n-e-r.
20  Q.  What happened to her?
21      I mean where is she today?
22  A.  She today works as, I think, an executive assist at
23     Trinity Health Corporate Office.
24  Q.  As far as you're aware, why did she leave you?
25  A.  She left to take a position that was considered a

**50**

1      promotion with an increased salary, literally 2 miles
2      from her home, and she took it so she could be closer to
3      her little girls.
4  Q.  Who is the current Vice President of Medical Affairs?
5      MR. GUNSBERG:  I'm sorry?  Vice President –
6  BY MS. GORDON:
7  Q.  I apologize.  Let me retract that.
8      Who's the current Director of Medical Education?
9  A.  Stan Dorfman, D-o-r-f-m-a-n.
10  Q.  When did he take that position?
11  A.  He took the position approximately one week after
12     Susan's termination.
13  Q.  Who was he?  Where did he come from?
14  A.  He is a past Chief of Staff and had been in private
15     practice in OB/GYN.
16  Q.  Where was he in private practice?
17  A.  His office was actually in Pontiac at the time he
18     retired.
19  Q.  I'm sorry.
20      At the time he retired from his practice?
21  A.  Uh-huh.
22      THE REPORTER:  I'm sorry.  Is that –
23  BY MS. GORDON:
24  Q.  That's a "yes"?
25  A.  Yes, ma'am.

**51**

1  Q.  Is he a friend of yours?
2  A.  Is he a friend of mine?
3  Q.  Yeah.
4  A.  As in do we see each other on a regular basis socially,
5      versus being more business acquaintances?
6  Q.  I don't know.  Either one.
7  A.  I think we've only had one social occasion that we had
8      spent together.
9  Q.  When did you first meet him?
10  A.  On my first day of being interviewed for the position.
11     He was, at that time, the chief of staff-elect.
12  Q.  Okay.  And how long did he remain chief of staff?
13  A.  Two years.
14  Q.  And then what happen?
15  A.  He retired.
16  Q.  And then he left the hospital management altogether?
17  A.  No.  He – after he was chief of staff and he retired
18     from practice, he remained as a chief of staff – the
19     past chief of staff, which is to function more as a
20     consulting role to the chief of staff, and he took a
21     position with the organization after about six months
22     following his retirement to be the physician advisor for
23     The Care Experience.
24  Q.  What's that?
25  A.  That's a position where we sit together with a group of

**52**

1      physicians to review how we can improve the satisfaction
2      of the physicians with the facility and of our patients
3      with our medical staff.
4  Q.  Okay.  And how long – was there a time when he ended
5      that role, or did he continue to have that role?
6  A.  He continues to have that role.
7  Q.  Okay.  But for how long had he been back in private
8      practice when he came back on board as Director of
9      Medical Education?
10  A.  I'm sorry?
11  Q.  Yeah.
12      When he – when you made him Director of Medical
13      Education –
14  A.  Yes.
15  Q.  – he was back in private practice?
16  A.  No, he was not.
17  Q.  Okay.  What was he doing?
18  A.  He was retired.  He was functioning – at that time, he
19      had – he was the chief of staff; the immediate past
20      chief of staff.  So, he was no longer in practice at the
21      time that he was the physician advisor for The Care
22      Experience.
23  Q.  How much time did that take from him?
24  A.  It varied.  I'd say probably on the average, maybe about
25      10 hours per week.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

107



Donald D. Bignotti, M.D.                                June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**61**

BY MS. GORDON:

1  Q.  Okay.  Well, what was the problem with the medical
3      coordinators?
4          Strike that.
5          How much does a medical coordinator make a year?
6  A.  I do not know.
7  Q.  What did — were they making more or less than Rebecca
8      Hoerner?
9  A.  I have no idea.
10 Q.  You literally have no idea?
11 A.  I do not.
12 Q.  Okay.  Who wasn't getting along with each other?
13 A.  The staff.
14 Q.  Of the program —
15 A.  The staff were not getting along with the program —
16     with the DME and —
17 Q.  Well, she was gone.  So, what is — so, that problem is
18     gone.
19         I thought you said they weren't getting along with
20     each other?
21 A.  I said that they were not working as a team.  And they
22     were not.
23 Q.  Why not?
24 A.  The why, I can't necessarily answer.  That they weren't,
25     I can.

**62**

1  Q.  Okay.  Who else have you ever fired from the hospital?
2  A.  As in a direct employee?
3  Q.  As compared to what?
4  A.  As there are people that I am sometimes referred to as
5      "firing" in quotes, who are really members of the
6      medical staff and independent for whom their privileges
7      are terminated as a result of an investigation.
8  Q.  Yeah.  I'm not talking about that.  I'm talking about
9      employees.
10 A.  Employees reporting directly to me, terminated for
11     cause, I believe I have not done before, personally.
12 Q.  And you don't recall investigating anybody either?
13     I think you already said that.
14 A.  I don't think you asked that.
15 Q.  Have you ever been involved in directing an
16     investigation or asking for an investigation into any
17     employee of the hospital?
18 A.  Yes.
19 Q.  Who?
20 A.  Ben Diaczok, D-i-a-c-z-o-k.
21 Q.  What was that for?
22 A.  There were allegations of his behavior with residents.
23 Q.  Such as what?
24 A.  Being insensitive and rude.
25 Q.  What happened to him?

**63**

1  A.  He was counseled.
2  Q.  And what happened after he was counseled?  Did it help
3      him?
4  A.  Yes.
5  Q.  And he stayed on board?
6  A.  Yes.
7  Q.  And how many residents complained about him?
8  A.  I do not recall off the top of my head.
9  Q.  Okay.  Do you recall what his rude behavior was?
10 A.  I do not recall off the top of my head.
11 Q.  Was he a doctor?
12 A.  Yes.
13 Q.  Who else have you been involved in investigating?
14 A.  As employees?
15 Q.  Yeah.
16 A.  I do not recall actually having an investigation done on
17     any other of my other employees while at either
18     St. Joe's or at Bon Secours.
19 Q.  Okay.  Anybody else that you've had to counsel or work
20     with or warn?
21     MR. GUNSBERG:  Object to the form.  You've got a
22     bunch of parts in that one.
23     MS. GORDON:  No.  It's any of the above.
24 BY MS. GORDON:
25 Q.  You tell me.  Any of the above.

**64**

1      MR. GUNSBERG:  Still have a bunch of parts in it.
2  BY MS. GORDON:
3  Q.  Go ahead.
4      MR. GUNSBERG:  You can answer.
5  A.  On a regular basis, we have times where we have to tell
6      people that their interactions are improvable,
7      remediable, and we take them aside and we say, "Here's
8      what you did, and here's how it would have been handled
9      better."
10     As far as others that had to escalate beyond that,
11     no.  Most of it was education one-on-one informally.
12 BY MS. GORDON:
13 Q.  And that worked?
14 A.  Yes.
15 Q.  The hospital has a policy on performance improvement; is
16     that correct?
17 A.  I believe so.
18 Q.  Okay.  What do you understand that to be?
19 A.  We have multiple on process improvement.
20     In which area are you speaking?
21     MR. GUNSBERG:  I'm sorry.  Can you read the
22     question back, please?
23     MS. GORDON:  I said, "You have a policy on
24     performance improvement, don't you?"
25     MR. GUNSBERG:  Thank you.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

108

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Donald D. Bignotti, M.D.                                         June 22, 2011



**73**

1    meetings with her on a daily basis.
2        If that's not the question, I would be happy to
3    answer the question, if you would rephrase it.
4    Q.  Okay.  I asked you earlier how often you saw her, and I
5    said, "Was it every day?"
6        And you said, "No.  It was once a week."
7        MR. GUNSBERG:  Actually, he said once a week,
8    actually more – "I saw her weekly, more or less," is
9    what he said.
10       MS. GORDON:  Okay.
11       MR. GUNSBERG:  So, object to the form.
12   BY MS. GORDON:
13   Q.  I took it to be once a week.
14       Are you retracting that statement?
15   A.  No.  I think I'm staying with what I said before.
16   Q.  Once a week?
17   A.  No.  I said, more or less, I would see her at least once
18   a week.
19   Q.  Okay.  So, now you've added "at least."
20       So, what's the most you would see her in any given
21   week?
22   A.  And some weeks I might see her five days.
23   Q.  Okay.  You gave her assignments?
24   A.  Yes.
25   Q.  You set her goals?

**74**

1    A.  Yes.
2    Q.  Okay.  You got along with her?
3    A.  Yes.
4    Q.  Okay.  She was professional around you?
5    A.  Yes.
6    Q.  Okay.  You assigned her budget – things to do with
7    regard to the budget; correct? .
8    A.  Yes.
9    Q.  Okay.  Writing applications; correct?
10   A.  For?
11   Q.  Various – whatever.  Fill in the blank.
12   A.  Yes.  Part of her job would be to do an application or
13   things related to program accreditation.
14   Q.  And she always got those done on time; correct?
15   A.  Yes.
16   Q.  You authorized two salary increases for her; is that
17   correct?
18   A.  Yes.
19   Q.  You thought she was the best Director of Medical
20   Education you had ever worked with; is that correct?
21   A.  That is.
22   Q.  And you also thought she was an effective contributor to
23   work teams; is that correct?
24   A.  I did.
25   Q.  And you thought she had effective problem-solving

**75**

1    skills; is that correct?
2    A.  I did.
3    Q.  That's from were – you formed those opinions based on
4    seeing her in action, I assume, at these times you were
5    with her during the week?
6    A.  Yes.
7    Q.  You thought she demonstrated integrity?
8    A.  Yes.
9    Q.  You thought she was a good mentor of program directors;
10   is that correct?
11   A.  Yes.
12   Q.  And you thought she was continuing to emerge as an
13   effective leader and was respected for her abilities and
14   knowledge; is that correct?
15   A.  Yes.
16   Q.  Did you know whether or not she was being recruited by
17   other organizations during the time she worked at
18   St. Joe's?
19   A.  I recall at least one other opportunity that she had
20   that she told me about.
21   Q.  Okay.  And what was that?
22   A.  As I recall, it was as an associate dean.  I don't
23   know – I don't recall where.
24   Q.  And she turned that down?
25   A.  Yes.

**76**

1    Q.  Did you discuss that with her?
2    A.  I did.
3    Q.  Tell me what that discussion involved.
4    A.  My recollection was that she said that she had an
5    opportunity, and one of the things that was attractive
6    about the opportunity for her was that it was paying
7    more than what we were.  And that was, as I recall, one
8    of the reasons that she also received a salary increase.
9    Q.  You wanted her to stay; is that correct?
10   A.  I did.
11   Q.  So, as far as you were aware, Susan Zonia appeared to be
12   doing her job quite well?
13   A.  Yes.
14       (Deposition Exhibit 1 marked
15       for identification.)
16   BY MS. GORDON:
17   Q.  I'll hand you Exhibit 1.
18       Is that your review of Ms. Zonia at the end of '09?
19   A.  It is.
20   Q.  That's your signature?
21   A.  It is.
22   Q.  Who had input into this other than you; if anybody?
23       MR. GUNSBERG:  Into the evaluation, you're
24   referring?
25       MS. GORDON:  Right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

109



Donald D. Bignotti, M.D.                                        June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

81

1    included it in your evaluation or something.
2  A.  I do not recall that any resident came to me to complain
3    about Dr. Zonia and her treatment of them, with the
4    exception of a resident by the name of Greg Yanish, who
5    complained while we were doing an investigation of some
6    of his behavior, and he was reacting to comments that
7    Susan made during an interview that we had with him.
8  Q.  Okay. And what did you do about that?
9  A.  After the meeting with Dr. Yanish, I told Susan that the
10    way she had approached it was not optimal and that she
11    had to be aware of how she was portrayed to other
12    people.
13  Q.  And what did she say?
14  A.  She said, "Thank you. I will keep that in mind."
15  Q.  And when was that?
16  A.  That would have been probably in the first year that
17    Susan was with us, and I don't recall exactly the time.
18  Q.  Okay. And you never had any other negative statements
19    by residents.
20    Am I correct on that?
21    About Dr. Zonia?
22  A.  Not that I recall.
23  Q.  Okay. Did you ever have any negative statements from
24    doctors about her?
25  A.  Yes.

82

1  Q.  And who would that be?
2  A.  I had some negative statements made about her by
3    Dr. Cotant.
4    MR. GUNSBERG: I'm sorry. Who is that?
5  A.  John Cotant.
6    MR. GUNSBERG: Thank you.
7  BY MS. GORDON:
8  Q.  And who else?
9  A.  From time-to-time, by Dr. Dieczok.
10  Q.  And who else?
11  A.  Drs. Denier and Rahi, and the Eastpointe Radiology
12    Group. The group of --
13  Q.  Dr. Jewell's group?
14  A.  No. These are the radiologists that do the work in our
15    hospital and supervise the Radiology Residency Program.
16  Q.  Okay. Who else?
17    Anybody else?
18  A.  No one else who comes to mind off the top of my head.
19  Q.  Dr. Jewell?
20  A.  I don't recall that Dr. Jewell ever came to me to
21    complain about Susan.
22  Q.  Well, he came to you to complain to you about an issue
23    Susan was involved with; correct?
24  A.  He came to me to ask about some issues with shadowing.
25  Q.  Right.

83

1  A.  Yes.
2  Q.  Okay. And he was unhappy about the situation; correct?
3  A.  He was unhappy that he felt he was getting a runaround
4    between Graduate Medical Education and Volunteer
5    Services.
6  Q.  He wanted to have somebody shadowing?
7  A.  He wanted to have somebody shadow at the hospital.
8  Q.  Did he ask you your permission for that?
9  A.  He asked me what the policy was.
10  Q.  What did you say?
11  A.  That's why we sent him to Human Resources.
12  Q.  You didn't know what the policy was?
13  A.  Off the top of my head, I did not.
14  Q.  Do you know who he wanted to have shadow him?
15  A.  I do not.
16  Q.  Do you know sitting here today who it was?
17  A.  I do not.
18  Q.  And when did these other doctors whose names you've
19    mentioned complain to you about Susan Zonia?
20  A.  I don't recall the exact date and time.
21  Q.  Okay. You never included that in any review you ever
22    gave her, did you?
23  A.  No.
24  Q.  In fact, in every review, you gave her very high marks
25    on management of others, didn't you?

84

1  A.  I had.
2  Q.  And you also gave her very high marks on leadership,
3    didn't you?
4  A.  I had.
5  Q.  And you always felt she was respected for her abilities
6    and knowledge in the area of medical education, didn't
7    you?
8  A.  I had.
9  Q.  And you knew she was going to always have a problem with
10    people being resistant to change; isn't that correct?
11    MR. GUNSBERG: Object to the form.
12  A.  Please repeat your question.
13  BY MS. GORDON:
14  Q.  Yeah.
15    You knew that part of her job was going to involve
16    her trying to figure out how to work with people who
17    were resistant to change?
18  A.  Yes.
19  Q.  Because when you brought her on board, the two of you
20    had ideas and goals for improving things; correct?
21  A.  Correct.
22  Q.  And that would involve change; correct?
23  A.  Correct.
24  Q.  Which, as we all know, to -- some people don't do as
25    well with that than others; correct?



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com





Donald D. Bignotti, M.D.                                          June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



85

1   A.  That is correct.
2          (Deposition Exhibit 2 marked
3          for identification.)
4   BY MS. GORDON:
5   Q.  So, here's Exhibit 2.
6          What is this?
7   A.  This is a "Disciplinary Action."
8   Q.  Who signed it?
9   A.  I did.
10  Q.  Uh-huh.
11         And it says, "Susan Zonia?"
12  A.  Yes.
13  Q.  Okay.  And whose handwriting is on it?
14  A.  The handwriting -- the printing above the --
15  Q.  Well, everything on it other than the signatures.
16  A.  Other than the signatures, I do not know who exactly
17      wrote this.
18  Q.  Not you?
19  A.  It was not me.
20  Q.  Okay.  Read to me what that says about the reason for
21      termination so we'll have that in the record, in that
22      it's handwriting.
23  A.         "The hospital investigated the allegations
24      of inappropriate conduct, behavior and
25      harassment based on its internal standards

86

1      for leadership, associate standards of conduct,
2      and determined that your actions are in
3      violation of hospital policies and standards
4      of conduct.  Based on the substantiated
5      allegations, you failed to display professional
6      leadership and judgment, and effective, October 1,
7      2010, we are exercising our right -- your
8      right --"
9   no --
10         "-- our right as an at-will employee(sic) to
11      discharge you from SJM- --"
12  I'm assuming there's an "O" that didn't come through.
13  BY MS. GORDON:
14  Q.  Okay.  May I have that back?
15  MR. GUNSBERG:  It actually is, "at-will employer."
16  A.  Is that "employer"?
17         Okay.
18         "-- at will employer --"
19  BY MS. GORDON:
20  Q.  May I have that back?
21  A.  (Producing document.)
22  Q.  During what time frame did Susan Zonia violate hospital
23      policies and standards of conduct?
24  A.  During the investigation that HR did and their
25      interviews with the staff, what they presented to Martha

87

1      and I indicated to us a very deliberately set pattern of
2      treatment of the individuals, particularly in Graduate
3      Medical Education, in a manner that was not consistent
4      with the standards that we would expect of a leader and
5      created a hostile work environment.
6          We believe that while she could maintain a very
7      charming, professional, outward appearance --
8   Q.  Excuse me for interrupting.  You're not answering my
9      question, sir, at all.
10  A.  I'm attempting to answer the question.
11  Q.  Do you know what my question was?
12         Repeat what my question was.
13  A.  I took your question to be so what was the reason for
14      the termination.
15  Q.  Really?  That's what you thought my question was?
16         MS. GORDON:  Would you read back the question,
17      John?
18  BY MS. GORDON:
19  Q.  Just listen very carefully, Doctor.
20         THE REPORTER:  (Reading.)
21         "Question:  May I have that back?
22         "During what time frame did Susan Zonia
23      violate hospital policies and standards of
24      conduct?"
25  BY MS. GORDON:

88

1   Q.  You got it?
2   A.  Yes, ma'am.
3   Q.  Okay.  Good.
4          Give me the month, the day, the year.
5   A.  Up to the weeks before this incident with
6      Dr. Payne-Jackson, there was a pattern of behaviors that
7      was unknown to us.
8   Q.  Who is "us"?
9   A.  The medical staff -- the leadership of the hospital.
10         And the actual date of its beginning, I could not
11      tell you.
12  Q.  Well, what dates did she violate the policy?
13  A.  I cannot give you exact dates except to tell you that
14      the investigation determined that we had a hostile work
15      environment and it was the result of Susan's behavior.
16  Q.  Look, you fired somebody.  I'm just -- and it's a really
17      straightforward question.  I just want to know the
18      dates, if you know them, that my client violated some
19      policy.
20         If you don't know a date, tell me.
21  A.  I don't know the exact dates of the pattern.
22  Q.  Do you know any date, sir?  Any date?
23  A.  I cannot give you --
24  Q.  Can you give me a date?
25  A.  I cannot give you a date.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company



Donald D. Bignotti, M.D.                                June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

**89**

1  Q.  Thank you.
2      Can you -- you say here she was in violation of
3  hospital policies and standards of conduct.
4      Why don't you list a policy number?  Why not?
5  A.  Because my understanding is, we don't have to.
6  Q.  Okay.  Well, you don't have to fire her either.
7      MR. GUNSBERG:  Objection to the form.
8  Argumentative.
9  BY MS. GORDON:
10 Q.  So, why -- if you think she violated a policy, why would
11 you not set forth what the policy was?
12     MR. GUNSBERG:  Asked and answered.
13 A.  Because we are not required to.
14 BY MS. GORDON:
15 Q.  Okay.  Well, what policy did she violate?  Do you know
16 sitting here today?
17 A.  I cannot quote you the number of the policy.
18 Q.  Well, what's the name of the policy?
19 A.  I cannot quote you the name of the policy.
20 Q.  What's the content of the policy?
21 A.  The content of the policy is to establish an environment
22 of professionalism and to treat people in a manner that
23 is professional at all times.
24 Q.  Okay.  And you think that's a written policy in the
25 hospital?

**90**

1  A.  You asked me, I believe, to summarize the policy and
2  what I understood of it.
3  Q.  No.  I said, "What's the content of the policy?"
4      I didn't ask you -- I never used the word
5  "summarize."
6  A.  Okay.  That is what I believe is the content of the
7  policy.
8  Q.  Okay.  You think there's a policy that says:
9      "Treat people with respect at all
10     times"?
11 A.  I believe so.
12 Q.  Okay.  And you think -- and you know, sir, that that
13 policy is not upheld every day by every employee, is it?
14     MR. GUNSBERG:  Object to the form.
15 BY MS. GORDON:
16 Q.  It's violated -- if there is such a policy, and the
17 policy speaks for itself, that policy is violated all
18 the time, isn't it?
19 A.  I'm not sure I would say "violated all the time."
20     Is the policy violated?
21     At times, I'm sure.  That's why Human Resources is
22 busy.
23 Q.  Well, they weren't busy with Susan Zonia, were they --
24     MR. GUNSBERG:  Object to the form.
25 BY MS. GORDON:

**91**

1  Q.  -- until three days before she was fired?
2      Nobody ever went to HR about Susan Zonia, did they?
3  A.  Not to my knowledge.
4  Q.  Okay.  But people do go to HR all the time.  In fact,
5  your HR is set up to deal with employee complaints and
6  concerns, isn't it?
7  A.  Yes, it is.
8  Q.  And there's a policy at HR where, if an employee does
9  have a complaint, HR will take it seriously and
10 investigate it, won't they?
11 A.  Yes.
12 Q.  And they will tell the employee they're not going to be
13 retaliated against, don't they?
14 A.  Yes.
15 Q.  And did you yourself interview anybody with regard to
16 the so-called investigation of Susan Zonia?
17     MR. GUNSBERG:  Object to the form.
18 A.  I believe I was present for at least one of the
19 interviews with the staff.
20 BY MS. GORDON:
21 Q.  Okay.  And whose in the views were you present for?
22 A.  To my recollection, I was present with Deneen Nicks, I
23 think.
24 Q.  Okay.  Why were you there?
25 A.  At her request.

**92**

1  Q.  Why did she request you?
2      MR. GUNSBERG:  Object to the form.  Foundation.
3  A.  I had offered all the staff that if they wanted me
4  present during the time of the HR interviews, that I
5  would make the time.
6      Deneen requested it.
7  BY MS. GORDON:
8  Q.  Okay.  And who else was there?
9  A.  One of the HR staff.
10 Q.  Who?
11 A.  I don't recall who was actually present for that
12 interview.
13 Q.  Where was the meeting?
14 A.  I don't recall exactly where the meeting was.
15 Q.  Who took notes of these sessions?
16 A.  The HR representative.
17 Q.  Were they recorded?
18 A.  As in taped?
19 Q.  Yes.
20 A.  I don't recall that they were.
21 Q.  Did you discuss Ane McNeil, you said, was -- is it Ane?
22 A.  Ane.
23 Q.  Ane McNeil was involved with this investigation, you've
24 already said?
25 A.  That was my recollection, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

112



Donald D. Bignotti, M.D.                                      June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

101

1   Q. What was Dr. Diaczok's title at that time?
2   A. The was the Program Director for the Internal Medicine
3       Residency.
4   Q. Okay. Did you get complaints or hear that he was a
5       bully? Or could be?
6   A. Could be, yes.
7   Q. Okay. And some of the residents felt he was a bully to
8       them?
9   A. Yes.
10  Q. Okay. And some of the complaints were about his
11      drinking?
12  A. I never heard a complaint about Dr. Diaczok drinking.
13  Q. Okay. In any event, you were concerned about the things
14      the residents were saying directly to you about
15      Dr. Diaczok; right?
16  A. Correct.
17  Q. And this went on for over a period of time; right? It
18      wasn't just one or two things, but you had been hearing
19      things for a while and you eventually decided to look
20      further.
21      Do I have that right?
22  A. I don't know that I would characterize that -- I
23      wouldn't characterize it as constant stream of
24      complaints. There would be an occasional issue that
25      would come up, and we would follow it up.

102

1   Q. Okay. So, did you ever look into his behavior?
2   A. I asked Dr. Zonia in the past to look into his behavior.
3   Q. Did she do so?
4   A. Yes, she did.
5   Q. Did she report back to you?
6   A. Yes, she did.
7   Q. What did she advise you?
8   A. We sat down and had a counseling session with
9       Dr. Diaczok.
10  Q. The three of you?
11  A. Yes.
12  Q. Okay. And what did you raise with him at that time?
13  A. The need to be professional in the work environment at
14      all times; to realize that as a leader, he cast a shadow
15      and needed to essentially treat the workplace as an
16      on-stage area at all times. He needed to look, be, feel
17      the part of a Program Director for Internal Medicine
18      Residency Program.
19  Q. What was his reaction?
20  A. Well, his reaction was, I would say, one of being
21      disappointed in himself, but he committed to work with
22      us to try and improve his image with other people and
23      collaborate.
24  Q. And did Dr. Zonia work with him, then?
25  A. Yes.

103

1   Q. And how did that go?
2   A. We noted improvement in his behavior.
3   Q. Okay. Did you ever have to meet with him again or have
4       more discipline?
5       MR. GUNSBERG: Object to the form of the question --
6   BY MS. GORDON:
7   Q. Go ahead.
8       MR. GUNSBERG: -- as to the aspect of "more
9   discipline."
10  BY MS. GORDON:
11  Q. Well, strike that.
12      Any discipline?
13  A. There was no disciplinary action.
14  Q. Okay. Were there any subsequent meetings or anything
15      like that --
16  A. We --
17  Q. -- with him?
18  A. I'm sorry.
19  Q. Go ahead.
20      Were there any subsequent meetings with him?
21  A. Yes.
22  Q. And what were those about?
23  A. About the running of the residency program and to
24      provide him ongoing feedback on performance.
25  Q. And that was you and Dr. Zonia?

104

1   A. Yes.
2   Q. And the two of you would get together and let him know
3       what your observations were and the feedback you were
4       getting?
5   A. Yes.
6   Q. Okay. And how did that work? Was that a positive?
7   A. I would say, yes.
8   Q. And for how long did you continue to meet with him?
9   A. I continued to meet with Dr. Diaczok through last week.
10  Q. Is he having additional problems?
11  A. No. The issues are to continue to mentor somebody in
12      their progress to being a more effective leader of a
13      program to provide the support that we are required
14      under the ACGME rules to provide for a residency
15      teaching program.
16      So, these ongoing meetings aren't specifically
17      about behavior. We meet on a regular basis to discuss
18      the same kind of issues that I would discuss with any of
19      the people that work in my division that can use
20      assistance.
21  Q. Okay. But you've continued to keep an eye on him with
22      regard to the complaints you received at least to be
23      mindful of what's happening and to help mentor him about
24      it?
25  A. I would say it would be accurate to say that I am



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

113



Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

Donald D. Bignotti, M.D.                                June 22, 2011

113

1       Do you recall that?
2   A.  That, I recall.
3   Q.  What do you recall about the string of e-mails?
4   A.  With Pat Davis?
5   Q.  Yeah.
6   A.  My recollection was that Pat had a string of e-mails
7       going back and forth with Donna Hamilton.
8   Q.  Who's that?
9   A.  Who was the previous person in the position before Susie
10      Swanson as the manager of the area, and that she and
11      Donna had a continuing string of e-mails in which Pat
12      was very critical of Susan.
13  Q.  Okay. Did you ever see the e-mails?
14  A.  I did not.
15  Q.  Did you hear about them, though?
16      I guess you did.
17  A.  I did.
18  Q.  Okay. So, why wasn't she fired for that? Being
19      critical in an e-mail and sending this e-mail back and
20      forth?
21  A.  Her disciplinary action was handled consistent with the
22      policy of the organization.
23  Q.  And what's that?
24      That if you bad mouth people, what happens to you?
25  A.  No. It's handled with the stepped disciplinary --

114

1   Q.  Progressive discipline?
2   A.  Progressive discipline.
3   Q.  Okay. And that's the appropriate way to handle it when
4       somebody puts ugly things in writing about somebody that
5       they work with?
6       MR. GUNSBERG: Object to the form.
7   A.  That was the recommendation from Susan and HR.
8   BY MS. GORDON:
9   Q.  Okay. And with regard to Gail, what was her discipline?
10  A.  I don't recall what her discipline was off the top of my
11      head.
12  Q.  Did you ever hear allegations Susan Zonia had an odor of
13      alcohol on her?
14  A.  Yes.
15  Q.  When did you first hear that?
16  A.  Donna Hamilton told me that when she had her exit time
17      with me.
18  Q.  I don't know what "her exit time" means.
19  A.  When she left the organization on her last day.
20  Q.  When was that?
21  A.  I don't recall.
22  Q.  Give me a year.
23  A.  I don't recall when she was --
24  Q.  Well, let's wind back; okay?
25      Dr. Zonia was terminated in 2010.

115

1       Do you recall that?
2   A.  Yes.
3   Q.  Okay. Susie had been there for about seven months. So,
4       that would take us back to the beginning of the year.
5       Is that when Hamilton left? In late '09 or early
6       '10?
7   A.  That sounds like it could be about right.
8   Q.  Okay. So, what did she tell you?
9   A.  She told me that Susan was difficult to deal with; that
10      she continued to swear; continued to be disrespectful of
11      other individuals, including the physicians; that she
12      would periodically flip people the finger behind their
13      back after meetings; and that she occasionally smelled
14      of alcohol.
15  Q.  Okay. So, what did you do about this? Did you look
16      into it? About any of those things you just said?
17  A.  I made a point of going upstairs from time to time just
18      to make sure that I had a presence and could observe if
19      this was true.
20      I did take that as some of the, let's call it,
21      turbulence around trying to make change. So --
22  Q.  Okay.
23  A.  I supported Susan in not jumping to the conclusion
24      that these were either valid and took it upon myself to
25      spend more time walking through the unit where their

116

1       offices were to see if I noticed any of the behavior
2       that could support the comments of a person leaving the
3       organization for a better opportunity, who might be
4       bad-mouthing somebody who is trying to make the change.
5   Q.  Okay. And when you walked through there, you didn't see
6       any evidence of any issues, did you?
7   A.  I did not.
8       MS. GORDON: Okay. I apologize. I meant to tell
9       my secretary something. Just one minute.
10      (Short recess at 3:52 p.m.)
11          • • •
12      (Record resumed at 3:55 p.m.)
13
14  BY MS. GORDON:
15  Q.  And you never smelled any alcohol?
16  A.  I personally did not.
17  Q.  Okay.
18  A.  On Susan, I'm assuming you mean.
19  Q.  Yeah.
20      Nor did you ever get the impression she had been
21      drinking?
22  A.  I did not.
23  Q.  Were you aware that Dr. Denier from Radiology brought a
24      switchblade into the hospital?
25  A.  I recall there was an issue with Dr. Denier and a knife.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

114



Donald D. Bignotti, M.D.                                    June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

117

1         I do not recall that it was a switchblade.
2    Q.  What was it?
3    A.  To the best of my recollection, it was a pen knife.
4    Q.  Did you see it?
5    A.  I did not.
6    Q.  Well, who would care if he had a pen knife?
7         Don't people carry pen knives around the hospital,
8    or not? You're not supposed to?
9    A.  When the issue was brought to me, I went to Dr. Denier
10   and basically said, "Please don't do this."
11   Q.  All right. Who brought it to you?
12   A.  I think it was Susan.
13   Q.  Okay. And what did she say?
14   A.  That the residents had reported that he had a knife and
15   was -- and I can't remember the specifics. Something
16   about the resident going someplace that was potentially
17   dangerous and basically showed her the knife.
18   Q.  Okay. Why did he bring it in?
19   A.  I did not ask why.
20   Q.  Why not?
21   A.  I simply told him it was not acceptable and I never
22   wanted to hear about it happening again.
23   Q.  What did he say?
24   A.  He apologized and agreed that it would never happen
25   again.

118

1    Q.  He was the Radiology Program Director; correct?
2    A.  At that time, yes.
3    Q.  And this was kind of a big incident amongst the
4    residents; is that correct? There was a lot of talk
5    about it?
6         MR. GUNSBERG: Object to the form of the question.
7    BY MS. GORDON:
8    Q.  Is that correct?
9    A.  Amongst the residents?
10        I don't know. They did not discuss it with me.
11   Q.  Okay. Well, amongst who, then? Who did you hear about
12   it from?
13   A.  From Dr. Zonia.
14   Q.  Anybody else?
15   A.  That I heard from?
16   Q.  Yeah.
17   A.  Not that I recall.
18   Q.  And you also heard, I think we've touch on this, that
19   you heard that he was a bully?
20   A.  Yes.
21   Q.  Okay. Dr. Patel, have you heard some complaints from
22   some of the nurses or other staffers that he is a bully?
23   A.  We have multiple Dr. Patels. Which Dr. Patel are you
24   referring to?
25   Q.  Kirit.

119

1    A.  Yes.
2    Q.  What have you heard in that regard?
3    A.  I've heard that Dr. Patel occasionally is less than
4    cordial and at times inappropriate in his behavior.
5    Q.  And by "inappropriate," do you mean from a sexual point
6    of view --
7    A.  No.
8    Q.  -- with regard to women?
9    A.  No.
10   Q.  Some of his -- the language he uses, I mean?
11   A.  No.
12        Inappropriate from the standpoint of decibel
13   level, and, at times, has been accused of being condescending
14   in nature.
15   Q.  Okay. Was there an investigation on him?
16   A.  It was handled through the medical staff policy, which
17   for that level, would rise to conversations with that
18   individual and the chief of staff or the department
19   chair.
20   Q.  Okay. So, what ended up happening with him and his bad
21   behavior?
22   A.  We had a meeting to discuss the issue.
23   Q.  You were there?
24   A.  Yes.
25   Q.  Okay. Go ahead.

120

1    A.  And he was advised of what the policy was and instructed
2    to be in compliance with the policy.
3    Q.  What was the policy that you advised him of?
4    A.  The policy is the medical staff policy on conduct.
5    Q.  Okay. And what does that say, in general?
6    A.  In general, that professional behavior is expected at
7    all times and in all circumstances.
8    Q.  Did you give him a chance to explain what had happened
9    with his behavior?
10   A.  I don't recall that he attempted to explain his
11   behavior.
12   Q.  Okay.
13   A.  The meeting was to establish an expectation.
14   Q.  Was there a nurse named Colleen that was working under
15   him that had particular problems with him?
16   A.  I don't recall.
17   Q.  Did you ever hear comments about Dr. Steven Rapp being a
18   bully in the OR?
19   A.  Yes.
20   Q.  And you heard that on several occasions.
21        Am I correct on that?
22   A.  Yes.
23   Q.  And that he could be very verbally abusive to people?
24   A.  That's what people have alleged.
25   Q.  Okay. And that he had threatened to have nurses fired?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

115



Donald D. Bignotti, M.D.                                      June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

125

1    A.   I have read all of the notes that HR has provided me
2         with.
3              I am assuming that they have given me everything.
4    Q.   All right.  When did you read the notes?
5    A.   At the time of the investigation.
6    Q.   Prior to the termination or after the termination?
7    A.   Prior to the termination.
8    Q.   How long did it take you to read them all?
9    A.   I do not recall.
10   Q.   Okay.  Hang on one second.
11              (Deposition Exhibit 3 marked
12              for identification.)
13   BY MS. GORDON:
14   Q.   All right.  Let me hand you Exhibit 3.
15              What's that?
16              You don't know what that is?
17   A.   It looks like they are notes.  They are not signed.
18   Q.   Do you know whose handwriting that is?
19   A.   Well, it looks familiar.  I'm not sure I can say exactly
20        to whom it belongs.
21   Q.   Well, what are the possibilities?
22              You know, I mean you were at this meeting,
23        apparently; right?
24   A.   Yes.
25   Q.   So, who was there with you?

126

1    A.   The date of the meeting, I would say that most likely it
2         would have been with Ane, myself and possibly Martha.
3    Q.   Well, okay.  Were there -- what does it say on the top,
4         sir?
5    A.   It says:
6              "Pat Davis, Ane and Don."
7    Q.   Okay.  So, you think the three of you were there?  Does
8         that refresh your recollection on that?
9    A.   No.
10   Q.   You just don't recall?
11   A.   I do not recall.
12   Q.   And you don't know whose handwriting this is?
13   A.   I do not.
14   Q.   But do you remember being at the meeting?
15   A.   I do not remember specifically being at the meeting.
16   Q.   Okay.  And the date of this meeting is 9-30-2010?  Does
17        that sound right?
18   A.   That's what the date is given at the top.
19   Q.   And have you seen these notes before?
20              Have you seen these before?
21   A.   Oh, these notes before?
22   Q.   Yes.  Yes.  Yes.
23   A.   I believe -- I believe I have.
24   Q.   When?
25   A.   Probably at the time of the investigation.

127

1    Q.   What are these notes, as far as you understand it from
2         having just sat here and reviewed them?
3    A.   These appear to be the notes that were taken of the
4         conversation at this meeting at 3:00 p.m. on 9-30-10.
5    Q.   Okay.  So, you tell me from these notes.  This -- was
6         there more than one conversation with Pat, by the way?
7    A.   I couldn't tell you if there's more than one
8         conversation with Pat.
9    Q.   Okay.  Was anything said at this meeting that you
10        believe is a basis for a reason to terminate Dr. Zonia?
11   A.   Can you read the question back again, please?
12              MS. GORDON:  John, you want to read it back?
13              THE REPORTER:  (Reading.)
14              "Question:  Okay.  Was anything said at
15        this meeting that you believe is a basis for
16        a reason to terminate Dr. Zonia?"
17   A.   I would say that I cannot point to one specific thing in
18        this conversation alone that I would say was the basis
19        by itself for the decision to terminate Dr. Zonia.
20   BY MS. GORDON:
21   Q.   Okay.  I don't think that was my question.
22              I didn't --
23              MR. GUNSBERG:  Then try it again.
24   BY MS. GORDON:
25   Q.   Is there anything in here that you relied upon in your

128

1         decision to terminate Dr. Zonia?
2              MR. GUNSBERG:  It's a different question.
3              (Discussion held off the record.)
4    BY MS. GORDON:
5    Q.   Go ahead.
6    A.   Please ask your question once more.  I've read it again.
7    Q.   Is there anything in here that you relied upon in your
8         decision to terminate Susan Zonia?
9    A.   I would say that everything in here as part
10        of the decision to terminate Susan Zonia.
11   Q.   Okay.  Well, specifically what?
12              I don't know what you mean by "everything."
13   A.   All the things that are written here were used as part
14        of the decision to evaluate --
15   Q.   Okay.
16   A.   -- Susan Zonia.
17   Q.   What here is a violation of a policy?
18   A.   One thing would be Susan's leaving early.
19   Q.   Okay.  What policy is that a violation of?
20   A.   I couldn't quote you the exact policy.
21   Q.   What date did she leave early?
22   A.   I couldn't quote you the exact date that she left early.
23   Q.   Well, how early did she leave?  What time?
24   A.   That is not something I can tell you from this note.
25   Q.   Well, is there anything else that you can use to tell me



ESQUIRE
an Alexander Gallo Company

Toll Free:  800.866.5560
Facsimile:  248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

116



Donald D. Bignotti, M.D.                                      June 22, 2011

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

133

1   Q.  She's being disciplined by Susan Zonia; right?

2   A.  Yes.

3   Q.  We already know she doesn't like Susan Zonia; right?

4       That's already been made very clear; correct?

5   A.  Correct.

6   Q.  Because we know about a nasty string of e-mails that she

7       sent; right?

8   A.  Correct.

9   Q.  And you're in a meeting with Pat, and Pat says, "She

10      left early."

11      And you, sir, go, "Oh, okay.  Check.  Let's fire

12      her"?

13      That's -- this was a --

14      MR. GUNSBERG:  Object to form of the question.

15      MS. GORDON:  Strike that.

16      MR. GUNSBERG:  I also object to the tone, by the

17      way.

18      MS. GORDON:  That's fine.

19      MR. GUNSBERG:  Yeah.  We don't need the nasty,

20      sarcastic, nasty tone.

21      MS. GORDON:  Okay.

22      MR. GUNSBERG:  Okay?  Can we try to it in a less

23      sarcastic --

24      MS. GORDON:  It's really difficult, but I will try.

25      MR. GUNSBERG:  I'm sure you can control yourself.

134

1       You're really good at this.  You've been doing this a

2       long time.

3       MS. GORDON:  What does that have to do with

4       anything?

5       MR. GUNSBERG:  What it has to do with, I don't

6       think it's respectful of the witness and I don't think

7       it's appropriate for you to --

8       MS. GORDON:  Well, I don't think it's respectful --

9       THE REPORTER:  I'm sorry.  One at a time.

10      MS. GORDON:  -- of my client to sit here and lie

11      about her either.

12      MR. GUNSBERG:  He's not lying about her.

13      MS. GORDON:  Oh, really?

14      MR. GUNSBERG:  Yeah.  Really.

15      MS. GORDON:  Okay.

16      MR. GUNSBERG:  And if you want to ask a question,

17      he'll give an answer.

18      MS. GORDON:  Maybe he's got one.

19      MR. GUNSBERG:  If you want to have a nasty, nasty,

20      sarcastic tone, we'll play the tape back, and I can --

21      MS. GORDON:  Okay.  Yeah.

22      MR. GUNSBERG:  It's on the tape.  So, I was asking

23      you not to do it.

24      MS. GORDON:  Maybe he's not lying.  Maybe he really

25      runs his business where you take a disgruntled employee

135

1       and somebody says "She's late," and he just goes,

2       "Okay."  Maybe that's really true.  But that's what I'm

3       going to follow-up on.

4       BY MS. GORDON:

5   Q.  So, Doctor, let me ask you this --

6       MR. GUNSBERG:  I'm just asking you not to do it in

7       a nasty, sarcastic way.  That's all.

8       MS. GORDON:  Okay.  All right.

9       BY MS. GORDON:

10  Q.  So, are you sitting here today saying you accepted on

11      face value Pat Davis's statement that my client was

12      late?  You accepted that as true, and you accepted that

13      as wrongdoing on the part of Dr. Zonia?  Is that your

14      testimony here today?

15  A.  No, it is not.

16  Q.  Okay.  You had no idea if Dr. Zonia was appropriately

17      leaving early or not leaving early or anything else;

18      right?  On the date that Pat is talking about?

19  A.  On the date that Pat is talking about, we are listening

20      to Pat and her story only.

21  Q.  Okay.

22  A.  And these notes reflect her story only.

23  Q.  Okay.  And you didn't know whether what she was telling

24      you was, in fact, true or not true?

25  A.  Correct.

136

1   Q.  And you didn't know whether Dr. Zonia had left early

2       inappropriately or not on the date Pat referred to;

3       true?

4   A.  True.

5   Q.  Okay.  And you didn't ask Pat what she based her

6       statement on; true?

7   A.  I did not follow-up with that.  Human Resources did.

8   Q.  They follow-up with what?

9   A.  With the other parts of the investigation that were to

10      corroborate or refute any of the individual positions

11      presented by any of the staff.

12  Q.  Okay.  So, what did they do to corroborate or refute the

13      statement that "S. Zonia - leaving early"?

14      What did they do to follow-up on that?

15  A.  I could not tell you the specifics of exactly what they

16      did in HR conducting the investigation.

17  Q.  Well, give me the general.  Since you're decider to fire

18      her, what's your -- what's your general understanding of

19      what they did?

20      MR. GUNSBERG:  Object to form of the question.

21      BY MS. GORDON:

22  Q.  Not what they would do, sir, what they actually did; if

23      anything.

24  A.  I can't recall the specifics of what they said they did

25      in this particular case.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

117