Exhibit 4

*Received @ her orientation*

St. Joseph Mercy Oakland

# ORGANIZATIONAL
# INTEGRITY PROGRAM

STANDARDS OF CONDUCT • SUPPORTING RIGHT RELATIONSHIPS



*But as for me,
I will walk in my integrity.*

PSALM 26:11

Received 2011 SEP 16 AM 10:31 Filing Oakland County Clerk

118



*Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31*

# Table of Contents

Introduction ................................................ 2
- Why the Standards of Conduct are Important ...................... 2
- Our Responsibilities .......................................... 2
- Responsibilities of Leaders .................................... 2

Standards of Conduct:  Supporting Right Relationships ........... 4
- My Relationships With Patients, Their Families and Others We Serve ..... 4
- My Relationships With My Co-Workers and Others Who Serve With Me ............... 6
- My Relationships With Vendors, Other Business Partners, and Competitors ......... 8
- My Relationships With the Government and Other Payers ......... 10
- My Relationships With My Organization and the Communities We Serve ........ 13

Where to Find Help ........................................ 15
- Resources ............................................. 15
- Non-Retaliation Policy ................................. 16

Acknowledgement and Certification .................... 17

Trinity Health

*Mission*

We serve together in Trinity Health,
in the spirit of the Gospel,
to heal body, mind and spirit,
to improve the health of our communities
and to steward the resources entrusted to us.

*Core Values*

- Respect
- Social Justice
- Compassion
- Care of the Poor and Underserved
- Excellence

*Performance Criteria Characteristics*

- Mission-Centered
- Customer-Focused
- Interdependent
- Open Communications
- Socially Responsible

119

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31



# A MESSAGE
## *From Our Leadership*

St. Joseph Mercy Oakland and Trinity Health were established on a foundation of faith-based principles: Respect, Social Justice, Compassion, Care of the Poor and Underserved, and Excellence. These principles and the Mission serve as a compass to guide our ongoing health care ministry.

We understand that working in the health care industry is extremely challenging, and sometimes the right course of action can be unclear. The Standards of Conduct are intended to help you respond to common questions and issues you may encounter in your daily work. The Standards are designed to help support "Right Relationships" – relationships with patients and others in our care, relationships with our co-workers and business partners, relationships with the government and others who pay for the health care services we provide, and relationships with our organization and communities.

The Standards describe the behaviors and conduct expected of all St. Joseph Mercy Oakland and Trinity Health associates, volunteers, medical staff and board members. To further apply the Standards to common situations encountered in the workplace, we have included actual questions posed by associates, physicians and others, along with answers.

Please review and become familiar with the Standards of Conduct, particularly those areas that apply to your everyday work activities. When faced with a difficult decision or uncertainty, you should ask questions and seek advice from your supervisor or other appropriate resource. Most important, you're responsible for speaking up about behaviors or actions that may be inconsistent with the Standards of Conduct. If you have a question or concern that is not specifically addressed by the Standards, please consult one of the many resources listed herein for assistance.

Our health care ministry began more than 150 years ago through the work of our founding religious congregations – the Sisters of Mercy of the Americas, Regional Community of Detroit and the Congregation of the Sisters of the Holy Cross. Our sponsor today, Catholic Health Ministries, calls us to continue the ministry based on our Mission and Core Values. Acting with integrity and making decisions based on the highest standards of ethical behavior are critical to maintaining the long-established and well-deserved reputation we've achieved in our communities and within the health care industry.

Thank you for joining us in our shared commitment to be leaders in the delivery of high-quality, safe and effective health care services in our communities, and in transforming the delivery of health care in the United States.


Joseph R. Swedish
President and CEO
Trinity Health

Jack Weiner
President and CEO
St Joseph Mercy Oakland


120

Received for Filing Oakland County Clerk 2011 SEP 16 AM 10:31

# WHY THE STANDARDS OF CONDUCT ARE IMPORTANT

St. Joseph Mercy Oakland and each of us individually are held accountable for our behaviors and actions. In addition to supporting our Mission and Values, the Standards of Conduct also assist in ensuring that our actions and behaviors are consistent with the numerous legal, ethical and professional obligations that apply to our health system ministry. Actions and behaviors that are inconsistent with the Standards of Conduct can significantly harm relationships with patients, communities, business partners and others we rely upon to assist us in the delivery of health care services.

Individuals will be held accountable for actions and behaviors inconsistent with the Standards of Conduct. Violations could result in disciplinary action, up to and including termination of employment, suspension of medical staff privileges, or termination of business relationships, as applicable, in accordance with St. Joseph Mercy Oakland's and Trinity Health's policies.

## Our Responsibilities

The Standards of Conduct apply to all associates, contract workers, volunteers, medical staff members, and board members of St. Joseph Mercy Oakland.

You have a responsibility to:

- Review and follow the Standards of Conduct, paying particular attention to those areas that apply to your every day work activities

- Ask questions when you're uncertain what to do. See page 15 "Where to Find Help" for a listing of resources available to answer questions

- Speak up when you're concerned about behavior that is inconsistent with the Standards of Conduct. See page 15 for a list of resources that can also be used to address your concerns

## Responsibilities of Leaders

Leaders in St. Joseph Mercy Oakland and Trinity Health, including managers, supervisors, medical staff leaders, program directors, senior executives, and board members, are held to a higher standard of responsibility. As a leader, you serve a key role in receiving and responding to questions and concerns

raised by associates and others you lead. How you respond to questions and concerns posed to you is key to others having the trust and confidence to bring important matters to your attention.

As a leader at St. Joseph Mercy Oakland, you have a responsibility to:

- Serve as a role model for our Mission and Values by carrying-out your responsibilities with the highest degree of personal integrity

- Clearly communicate to others your expectations for the highest standards of ethical behavior

- Promote a culture of trust, open communication and respect

- Hold those you lead accountable for behavior inconsistent with our Mission and Core Values, and the Standards of Conduct

- Encourage others to raise issues and concerns so they can appropriately be addressed

- Respond timely and appropriately to issues and concerns when they are brought to your attention

- Support and reinforce our Values through the use of the **Mission Discernment Process and Trinity Health Values-Based Decision Making Process**

- Support and promote our policy of non-retaliation against anyone who raises issues and concerns in good faith

- Learn and follow applicable laws and regulations that affect business activities with physicians or other organizations who refer patients to our facilities. See page 10 for further information

- Ask for assistance when you're unsure how to respond to an issue or concern. See page 15, "Where to Find Help," for a list of resources

St. Joseph Mercy Oakland, Trinity Health and our founding health systems have served the health care needs of communities for nearly 150 years. Your actions as a leader are critical to upholding the long-established reputation of our organization.

121

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

        Plaintiff,

  -vs-

TRINITY HEALTH MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC, *a domestic
corporation.*

        Defendant.

CASE NO.  2011-116369CD

HON. JAMES M. ALEXANDER

---

**DEBORAH L. GORDON, PLC**
**Deborah L. Gordon (P27058)**
**Carol Laughbaum (P41711)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills, Michigan 48304
Telephone 248 258 2500

**LAW OFFICE OF DAVID B. GUNSBERG**
**David B. Gunsberg (P24235)**
Attorney for Defendant
322 North Old Woodward Avenue
Birmingham, Michigan48009
Telephone 248 646-9090

---

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY DISPOSITION

122

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

## I.    INTRODUCTION

It is uncontested that Susan Zonia was the best Director of Graduate Medical Education (a high-level position responsible for overseeing 100 plus residents in five residency programs) ever employed by St. Joseph Mercy Oakland. Unfortunately, in her role, Zonia refused to violate the law on more than one occasion, and had to pro-actively end illegal activity going on at Defendant's hospital. As a result of her failure and refusal to violate the law, Plaintiff was terminated. Defendant counters that Plaintiff was fired as a result of a string of interviews conducted as part of an investigation of Plaintiff. As discussed more fully below, **the documentary evidence makes crystal clear that the damaging interviews on which Defendant seeks to rely actually took place after the decision to terminate Plaintiff was already made.** Compare Plaintiff's **Exhibit 4** (dated 9/29/10) with Defendant's Exhibit 5 (dated 9/30/10). Also particularly telling is the fact that Plaintiff was never told of complaints, provided a copy of the complaints, or questioned as part of the investigation. The decision was made without any opportunity for her to respond.

## II.    FACTS

It is undisputed that Susan Zonia is highly credentialed and experienced in the field of medical education. In January 2006, Dr. Zonia was hired by Defendant as its Director of Medical Education. In that position, Dr. Zonia managed the hospital's five residency programs. (Zonia, 70)  Each of the residency programs was headed up by a program director (a physician) who reported directly to Dr. Zonia with regard to medical education. (Zonia, 74)  The hospital's residents all reported to Zonia as well. The number of residents increased from 75 to 104 during her time there. (Zonia, 69)

As Director of Medical Education, Zonia constantly (and successfully) strove to improve the quality of St. Joes' residency programs. Her job duties included establishing and improving relationships with medical schools to enhance the resident candidate pools, recruiting, writing curriculum, teaching, and mentoring and

123

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

counseling the program directors and residents. (Zonia, 68, 74)  Zonia also headed up the Institutional Review board (IRB), a research review committee.  (Zonia, 74)  Dr. Zonia was the first woman and non-physician to be elected President of the National Organization of Directors of Medical Education (2009), and was also bestowed with a 2010 Leadership Award by that organization. (Murphy, 97)

Plaintiff reported directly to VPMA and Chief Medical Officer Don Bignotti, M.D., who has confirmed repeatedly and in writing that Zonia's performance was exceptional. (Bignotti, 48, 74-75)  In her five years at St. Joes, Defendant increased her salary by over 30%. (Bignotti, 74)  Bignotti always gave Zonia very high marks on leadership and management of others. (Bignotti 83-84)  **Exhibit 1,** Performance Reviews.[1]

Defendant's agents observed that Dr. Zonia was pleasant, professional competent, knowledgeable, easy to get along with, honest, and had integrity. (Hoerner 19) (Bignotti 74-75) (McNeil 116)  Dr. Zonia admits she is a strong person, which people might find intimidating.  (Zonia, 86)  Bignotti also confirms that in her role as DME, Plaintiff was often attempting to effectuate change with individuals that were resistant to change, which made her job difficult at times. (Bignotti 84-85)

On at least three occasions preceding the abrupt and unprecedented decision to terminate her employment, the Plaintiff failed and refused to go along with violations of law by refusing to permit an illegal weapon (a knife) in the workplace, refusing to violate federal immigration law by unlawfully utilizing residents on J1 visas (education only), and refusing to violate the privacy rights of countless patients.  As DME, Zonia also gave her residents a monthly forum to discuss concerns and complaints they had  regarding their residency program and/or their program directors.  (Zonia, 89)  Several residents complained to her that Dr. Denier (program director, radiology) engaged in abusive, threatening and rude behavior, bragged about his

---

[1]The performance reviews were based on a scale of 0-4, with a "3" indicating full accomplishment, and a "4" indicating extraordinary accomplishment/"expert."  Zonia received mostly "expert" ratings in all categories. **Exhibit 1.**

124

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

extensive gun collection and that he carried a gun in his car, and warned residents that they had better not complain about him to Zonia, or they would be sorry. (Zonia, 88, 92)  Denier also brought a knife to work (discussed below), which a concerned resident brought to Zonia's attention (see below). (Zonia, 90)  Bignotti told Zonia that Denier and his partner were angry that Zonia was giving the residents a forum to raise their concerns, and **wanted Zonia gone.** (Zonia, 89)

Zonia also fielded numerous complaints against Dr. Diaczok (program director, internal medicine). Several female residents accused Diaczok of gender discrimination, and he was  repeatedly accused of coming to work drunk.[2] (Zonia, 40) (Murphy, 25-26)  Defendant's agents also admit Diaczok had significant problems dealing with others at the hospital, was known to be insensitive, rude, loud,  tough to work for; various residents and nurses complained about his abusive language and general bad behavior.[3] (Hoerner 46-47)(Bignotti 62,178-180)  Zonia had to write Diaczok up twice for his erratic behavior and poor judgment - once for becoming loud, angry and abusive to Zonia in a hospital elevator, with a patient's family present.  In late spring 2010 (just months before Plaintiff was fired), Plaintiff wrote Diaczok up again, this time for yelling out to Zonia, near an ICU waiting area, that a certain resident "didn't kill that patient."[4] (Diaczok, 82)

Both Denier and Diaczok remain employed by Defendant despite these serious transgressions.

A.    **Plaintiff Complains about Dr. Denier Bringing A Switchblade Onto Hospital Property**

In approximately March 2009, not long after Bignotti admitted to Plaintiff that Dr. Denier wanted her

---

[2]Diaczok takes the position that none of these claims (sex discrimination, being drunk at work) were true, that the residents complaining about him were just "disgruntled" and that "I  made them work, I disciplined them, and they didn't like it." (Diaczok 95-96)

[3]For his behavior, Diaczok received a verbal counseling.  (Bignotti, 102)

[4]Diaczok, at Zonia's  direction, had been looking into whether a patient's death had been the result of one of his residents mis-ordering methadone.

125

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

gone, Zonia fielded another complaint from a resident about Denier - that he had given a female resident a switchblade (on hospital property) to "defend herself." (Zonia, 90)  Zonia approached the female resident, who showed her the knife, which opened with a button.  (Zonia, 91)  The possession of such a knife is unlawful under Michigan's penal code.  **Exhibit 7**, Pocketknife statute.  Zonia went to Bignotti, who admitted he admonished Denier over the incident and never wanted to hear about it happening again. (Bignotti, 117)

**B.    Plaintiff Complains about Residents Illegally Moonlighting (Dr. Diaczok)**

Plaintiff also had to put a halt to illegal moonlighting by foreign residents, which was a recurrent problem at St. Joes.  In 2008, Plaintiff approached Dr. Diaczok and told him the use of J1 visas for moonlighting (working additional shifts outside their education requirements) was prohibited and had to stop. (Diaczok, 30) (Zonia, 107)  As Plaintiff was the person responsible for writing letters when questions were raised about a resident's visa, it was particularly important for her to make sure no violations occurred. **Exhibit 2**, Zonia affidavit.  Using residents to moonlight frees up the attending physicians from having to come into the hospital and the doctors pushed hard to make sure the schedule was completely covered by residents to avoid the necessity of them coming in to see their own patients in the middle of the night and during other inconvenient times.  (Diaczok, 39, 49 Since at least 50% of the residents, if not more, are J1 visas, eliminating them from the schedule meant the extra burden on physicians was substantial from Plaintiff's refusal to permit them to moonlight unlawfully.  (Diaczok, 59)

A J-1 visa is an educational visa (as opposed to an H-1 work visa) and Defendant's agents admit that a resident on a J-1 visa cannot be paid beyond his or her resident salary, and thus is not lawfully permitted to moonlight.[5] (Diaczok, 55) (Bignotti, 226-27)  Defendant admits that it has previously (and illegally) allowed J-1 visas to moonlight. (Diaczok, 72) (Bignotti, 226-27)

_____

[5] Roughly 50-60% of the hospital's residents were on J-1 visas.

126

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

When Zonia discovered this illegal practice, she met with Diaczok and instructed him that residents on J1 visas were "not allowed to moonlight" because it was not worth risking licenses and that the "residents may be deported." (Diaczok, 30) (Zonia, 107)  However, in July 2010, just months before Plaintiff was terminated, Zonia learned that J-1s in internal medicine were, once again, illegally moonlighting.[6] (Zonia, 110) (Bignotti, 226)  Plaintiff investigated and confirmed **that many J-1s had been illegally moonlighting for a prolonged period of time** (going back to November 2009). (Zonia, 109)

Dr. Zonia again met with Dr. Diaczok, and the team leader who was involved, and insisted this illegal practice be stopped. (Zonia, 110)  The team leader was annoyed and frustrated, complaining that she did not know how she was going to cover all the shifts. (Zonia, 112-13)  Diaczok admitted that he did not like the fact that Dr. Zonia " liked to keep on top of me" and he "really didn't like that" because he wanted to "run my own department." (Diaczok 75)  Plaintiff also notified Bignotti who replied, "why the sudden decision?" (Zonia, 111) **Bignotti admits that the physicians complained, and that he (Bignotti) "picked up some of the fall-out" from that.** (Bignotti, 227)  Diaczok confirmed that as a result of Zonia's actions refusing the unlawful use of residents with J1 visas, which was the majority of Defendant's residents, Bignotti "had a problem" with the physicians. (Diaczok, 74)[7]

C.    **Plaintiff Objects to HIPAA Violations  (Dr. Jewell)**

The final straw for Plaintiff was apparently a September 2010 incident (she was fired October 1) in which her refusal to violate the law irritated a St. Joes employed Ob-Gyn, Dr. Jewell. (Zonia, 95)  Jewell wanted his girlfriend's daughter (a high school student) to "shadow" him in the hospital, including in the Labor

---

[6] The issue came to Plaintiff's attention when two residents on J-1 visas approached Plaintiff and complained that they were  feeling pressure to moonlight.  (Zonia, 108)

[7] This incident was also raised at the Department of Medicine meeting.  (Zonia, 111)

127

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

and Delivery Department.[8] (Jewell, 22)  Dr. Zonia denied his request, both because doing so would have violated patient privacy and confidentiality laws (HIPAA)[9], and because the hospital had a policy directly prohibiting such conduct. (Zonia, 99-100)[10]

Dr. Jewell apparently attempted to circumvent Zonia/Medical Education by going through another department, but was later informed by another staff person that Zonia had refused his request. (Zonia, 103)  Jewell was apparently "very annoyed" at being denied. (Zonia, 103)  Several days later, when Zonia approached Jewell in the doctors' dining room to explain why she had denied his request, Jewell told her it was "**bullshit**" and that he was "going to talk to Don [Bignotti]." (Zonia, 104)

And talk to Bignotti he did.  Jewell continued to express his "frustration" to Bignotti. (Jewell, 23-24)  Bignotti also expressed irritation with Plaintiff and for the first time, opined that he thought they should "revisit" the hospital policy against shadowing. (Zonia, 106)

**D.   Plaintiff Misdirects an Email and is "Suspended Pending Investigation"**

On September 26, 2010, not long after the incident with Dr. Jewell, as Zonia was sitting on a plane ready to take off, she saw a flurry of emails pass between her  assistant (Susie Swanson) and a residency

---

[8] Jewell also wanted the  hospital to issue his girlfriend's daughter an official  identification badge to wear as she shadowed him. (Zonia, 97)

[9] In recognition of the HIPPA issues, the hospital had another policy, Graduate Medical Education Policy Code 117, which stated "Only those individuals under St. Joseph Mercy Oakland's resident contract, or on official hospital rotations from an affiliated residencies or medical schools, are allowed on the hospital wards/clinics. Under no condition is contact with patients or their records to be made by individuals other than those listed above." (Bignotti, 218)

[10] See, Bignotti, 217, admitting the hospital did not have the "mechanism in place" to obtain the necessary HIPPA authorizations that would be required to permit such shadowing.

-6-

128

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

program director, Dr. Payne-Jackson, who also reported to Zonia.[11] (Zonia, 83-84) Zonia thought the email exchange should stop and that Swanson and Jackson should not get caught up in it. (Zonia, 85) To this end, Zonia hurriedly typed off a reply that Swanson should "ignore her (cold shoulder will bother her)." (Zonia, 83) Defendant's Motion, Exhibit 2. Unfortunately, the reply was also sent in error to Jackson, who was irritated by it, and copied in the entire department. (Zonia, 84)

Zonia let Bignotti know what had happened and he asked her to come in and see him on September 28th.[12] **Exhibit 3**, Bignotti Email, 9/27/10. At the time of their conversation, Bignotti downplayed the incident saying, in effect, "if we acted on everyone that accidentally sent the wrong e-mail, we'd be down a lot of employees."[13] Exhibit 2, Zonia affidavit. Nonetheless, Plaintiff was placed on administrative leave on September 28th, allegedly so an investigation could occur. (McNeil, 87)

### E. Defendant Makes the Decision to Terminate Plaintiff, Replace Her, and Then Conduct a Sham Investigation to Justify the Termination.

The truth is that by September 29, 2010, before any investigation had occurred, Defendant replaced Plaintiff with Stan Dorfman. **Exhibit 4**, "Graduate Medical Education Leadership Change" Memo. **Although Plaintiff had not been terminated as of September 29th, and was actually only on administrative leave, the memo indicated Zonia has "left" and identified Dorfman as the interim replacement**. Bignotti admits Dorfman replaced Plaintiff almost immediately, but falsely testified it was "one week after Susan's termination." (Bignotti, 50) Murphy also falsely testified that after Plaintiff's termination, she discussed hiring a replacement with Bignotti and he indicted he had someone in mind. (Murphy, 83) In truth, Bignotti had prepared his

---

[11] Payne-Jackson was "challenging" to work with, liked things done her way, and did not like to be questioned. (Zonia, 86)

[12] Plaintiff was not in the office on September 27, 2010.

[13] Murphy, the Director of Human Resources, herself admits to misdirecting email. (Murphy, 43)

129

September 29th memo, announcing Plaintiff's replacement, and sent it out to the hospital on the evening of October 1st , **the same day Plaintiff was terminated not a week later**. **Exhibit 5**, Bignotti Email, 10/1/10.

Defendant alleges that they only decided to conduct an investigation into Plaintiff based on an alleged meeting between Bignotti and Susie Swanson. (Murphy, 54) Swanson, a six month employee and direct report of Plaintiff's, had been disciplined by Plaintiff for repeated tardiness and appearing overly medicated. (Murphy, 54) Defendant admits that without this alleged meeting with Swanson, no investigation would have proceeded.

At this point, the stories of Defendant's agents cease to make any coherent sense and begin to hopelessly conflict with one another, clearly showing that the reason articulated for the termination is pretextual. Murphy testified that Bignotti met with Susie Swanson the same day the Payne-Jackson email occurred, but it is uncontested that the email was sent on a Sunday. (Murphy, 44 and 47) Defendant's Motion, Exhibit 2. Murphy alleges there are notes from the Swanson meeting, but Defendant has been unable to produce them. (Murphy, 45-46)

The notes produced by and relied on by Defendant in its motion, are all dated September 30.[14] Defendant's motion, Exhibit 5. **The documentation of the alleged interview into Susan Zonia, which Defendant's agents all allege resulted in Plaintiff's termination, are all dated after the decision to terminate Plaintiff and a replacement had been named**. Compare, Defendant's Motion, Exhibit 5 to Plaintiff's Exhibit 4. It is clear the "investigation" was a sham and Defendant's reason is pretextual.

This point is only further driven home by looking at the contradictory testimony of Defendant's agents regarding who determined how the investigation would be conducted and who actually conducted it:

- Bignotti testified that it was HR that determined who would be interviewed and conducted the investigation. (Bignotti, 150-151) Martha Murphy the Director of HR testified that she and Bignotti

---

[14]There was another set of notes produced by Defendant with a date of October 3, 2010, the author of which was unknown. (Murphy, 45)

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

130

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

determined who would be interviewed. (Murphy, 57) Bignotti's former administrative assistant testified that Bignotti **directed her to schedule meetings** with "all the girls up in the Graduate Medical Education Department." (Hoerner 37-38)

- Murphy testified that Ane McNeil, the Manager of HR, did "all the interviews." (Murphy, 58 and 83) Bignotti testified that he **may** have attended one interview. (Bignotti, 91) McNeil testified that she did all the interviews and Bignotti sat in on two or three. (McNeil, 96) Hoerner testified that **all the interviews were conducted by Bignotti alone** and HR was not involved. (Hoerner, 39 and 41)

From the interview notes, it's clear the staff in graduate medical education were interviewed in back to back meetings on September 30. Defendant's Motion, Exhibit 5. It is also clear that the "investigation" was a free-for-all, in which employees who were not at Plaintiff's level, and with one exception did not even report to Plaintiff, were allowed, and in fact encouraged, to raise every conceivable gripe or issue they had with Plaintiff, no matter how incredible.[15] (McNeil, 98) Defendant's agents conducted a fishing expedition intended to justify the decision they'd already made to terminate her. At least three of the alleged complainants had been disciplined by Plaintiff.

- **Swanson had been counseled by Zonia for not showing up to work on time** (Swanson was arriving at work at 9:30 or 10:00, while her reports got in at 7:30) **and appearing overly medicated on the job.** Swanson openly discussed her mental health problems and the fact that she was on medication for depression and anxiety. Defendant's agents admit that Swanson (who recently resigned) **is dishonest, manipulative, cannot be trusted, was a source of friction and divisiveness in the Department and created a hostile work environment.** (Bignotti 193, 199-200) And, even though some of the interviewees revealed that Swanson played staff off each other and then blamed Zonia, and attribute much of the turmoil in the department to Swanson, Defendant never saw fit to investigate Swanson.

- Davis was **under discipline by Plaintiff** and had received **two written warnings** for, among other things, sending inappropriate emails critical of Plaintiff stating she wanted to get Plaintiff fired. Bignotti admits Davis' emails made it very clear she did not like Zonia. (Bignotti 133) He also does not know if Davis' claims (e.g., accusations that Zonia left work "early") were even true; yet her statements were relied upon, in part, in firing Zonia. (Bignotti 135) Defendant's agents admit that Davis has trouble getting along with others, and can be disrespectful and rude. (Diaczok 86)

---

[15]For example, the staff alleged alleged Plaintiff was drunk or impaired on the job, but witnesses testified they never saw Plaintiff drunk on the job or had any reason to suspect or believe she was drunk. (Bignotti, 116; Murphy, 98; Hoerner, 50)

131

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

- Defendant also solicited a statement about Zonia from Gail Molitor, who was disciplined (counseled) for sending an email to a program director (and accidentally copying Plaintiff) in which Molitor referred to Plaintiff as a "bitch."

Defendant's agents allege they dutifully compiled notes of these serious complaints (which were never shown to Plaintiff until this litigation), and then immediately met and determined that she would be fired without ever getting her side of the story or giving her a chance to respond. (McNeil, 100)  **In truth, the decision had been made the previous day.** Exhibit 4.  McNeil, a Manager in Defendant's HR department for over five years, could not remember **anyone at Plaintiff's level being terminated after a one or two day investigation.**[16] (Murphy, 110) Murphy could only remember one instance of someone at her level being terminated without being given a chance to respond to the allegations. (McNeil, 31)

Zonia vehemently denies nearly all the allegations, including drinking on the job, making derogatory comments about her superiors, making any lewd gestures, discussing her personal relationships in any type of graphic way, or bragging about being highly paid[17], indispensable, or untouchable.[18] At deposition, Zonia responded to many of the allegations with "never," "absolutely not" or "goodness, no." (Zonia 143-145)

Plaintiff admits to putting her hand up to stop certain conversations. Zonia also admits that early on in her employment (before she knew that certain women in the office frowned upon swearing), she occasionally

---

[16]McNeil testified that the two investigations and terminations of individuals at Plaintiff's level took ten months and three months. (McNeil, 43 and 60)

[17]It was Swanson who discussed Zonia's pay. Swanson had access to the department financials, and several times told Zonia she couldn't believe how much money Zonia made.

[18]Many of the statements Swanson attributes to Zonia were actually made by Swanson (e.g., that a co-worker who came back from lunch with messed up hair "must have gotten laid at lunch"). Swanson spent considerable time attempting to ingratiate herself with Plaintiff and/or concocting a personal friendship with her (she was constantly sending Zonia photos of her family or of herself out drinking with girlfriends, and asked Zonia to "double date". In addition, Swanson had no problem saying "fuck" at work, and regularly made comments about her sex life and her husband's anatomy. (Zonia 124-26)

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01



cursed at work. Not only did no one ever complain about this in any formal way (until solicited by Bignotti and HR), there is no evidence that anyone at the hospital has been disciplined, let alone fired, for an occasional curse or isolated raunchy remark. Nor is anyone fired for expressing their opinions about others. *See* Bignotti 41 (confirming that "*a lot of people*" at the hospital "*make [negative] comments all the time about doctors and administrators*," people voice their opinions, and no one is fired for that; at most, they may receive a non-disciplinary counseling.)

### F.   Plaintiff is Fired Without Ever Being Questioned About the Allegations Against Her

Zonia was called into a meeting with Bignotti and HR and summarily fired on Friday, October 1, 2010. Zonia was told the decision was final and not appealable. While HR admits it generally likes to get both sides of the story when conducting an investigation (McNeil 31) this practice was ignored with respect to Plaintiff. **In fact, Zonia was told not to speak at the meeting, and that nothing she could say would change the decision to terminate her.**[19] (Zonia, 118)

While Defendant now asserts that Plaintiff was fired for "violation of policy," her termination paperwork is silent as to which policy she allegedly violated.[20] Defendant's Motion, Exhibit 6. But Bignotti could not identify any violation of policy in the notes of the investigation of Plaintiff. (Bignotti, 128)[21] And, while Defendant now apparently claims Plaintiff engaged in a "major infraction" for which immediate termination was appropriate, they are unable to articulate in any credible way what that was. (Bignotti, 127-128)

---

[19]One comment Zonia did manage to get out was. "I guess I confused work relationships with friendships." Zonia was referring to Bignotti and HR (Murphy) who she had considered friends. (Zonia, 117)

[20]Bignotti gave Plaintiff the termination paperwork at their meeting although he doesn't know who wrote it. (Bignotti, 85)

[21]Nor could Bignotti identify a single thing that was the basis for the decision to terminate Plaintiff, from the meeting with McNeil and Murphy in which its alleged that the decision to terminate Plaintiff was made. (Bignotti, 127)

13

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

| | |
|---|---|
| **From:** | Donald Bignotti |
| **To:** | Zonia, Susan |
| **Date:** | 09/27/2010 1:09:45 PM |
| **Subject:** | Fwd: Re: OB/GYN residents |

We need to talk when you are back tomorrow.

Thanks

Don

>>> Valerie Payne-Jackson, D.O. 09/27/2010 11:33 AM >>>
Susan,

There is nothing insulting, unprofessional or demeaning in anything that I have said.   For the residents to be told that "Any issues or concerns that you have, need to be addressed with Dr. Zonia...In Dr. Zonia's absence please contact me."   and by-pass my GME specialist is simply wrong and inefficient.   I was not rude in my comments or insulting.   It does not state anywhere that I think you incapable of helping the program.

As for your statement to Susie Swanson ,
   "Susan Zonia" < zonias@trinity-health.org > 09/26/10 9:19 PM >>>
Can she be MORE insulting? Ignore her (cold shoulder will bother her)

This is unprofessional, does not reflect the Mission Statement, and most of all, tells me that I am not supported.   In fact, it insults me that you have such a poor opinion of me and disregard for me as a fellow professional.   Is this a Med Ed Department, or a click.

Valerie

Valerie Payne-Jackson, D.O., F.A.C.O.O.G., F.A.C.O.G.
Director, Obstetrics and Gynecology Residency Program
Michigan State University/St. Joseph Mercy Oakland

>>> "Susan Zonia" < zonias@trinity-health.org > 09/27/2010 8:01 AM >>>
I sent it from an airplane last night to Susie but it was what I felt at the time. I am sorry that you do not feel I am capable of stepping in to help with the program in your absence.

[Message delivered by NotifyLink]

----------Original Message----------

From: "Valerie Payne-Jackson, D.O." < paynejav@trinity-health.org >
Sent: Sun, September 26, 2010 11:58 PM
To: "Susan Zonia" < ZONIAS@trinity-health.org >
Subject: Re: OB/GYN residents

Am I the intended recipient?

Valerie

>>> "Susan Zonia" < zonias@trinity-health.org > 09/26/10 9:19 PM >>>
Can she be MORE insulting? Ignore her (cold shoulder will bother her)

[Message delivered by NotifyLink]

----------Original Message----------

From: "Valerie Payne-Jackson, D.O." < paynejav@trinity-health.org >
Sent: Sun, September 26, 2010 8:05 PM
To: "Susie Swanson" < swanssl@trinity-health.org >
Cc:  anissamattison@aol.com ,  pshaman@comcast.net ,  wjewelljr1@comcast.net , "Donald Bignotti" <

13

Exhibit 4

 ST. JOSEPH MERCY OAKLAND
SAINT JOSEPH MERCY HEALTH SYSTEM

# Memo

To:     All SJMO Associates and Medical Staff

From:   Don Bignotti, MD, VPMA and CMO

Date:   September 29, 2010

Re:     Graduate Medical Education Leadership Change

---

I wish to inform you of a change in the leadership structure for Graduate Medical Education at SJMO. Dr. Susan Zonia has left our organization and therefore I have asked Dr. Stan Dorfman to fill in the position of Director of Graduate Medical Education on an interim basis. Dr. Dorfman will continue to report to me as did Dr. Zonia.

We will begin immediately to start a search for a permanent Director of Medical Education. A search committee comprised of the program directors, sponsoring department and division chiefs, medical staff leadership and management team members will be responsible for reviewing and recommending candidates.

We want to make certain that everyone knows that we remain strongly committed to graduate medical education, and continuing to grow the programs that have served our hospital and community so well.

Received for Filing Oakland County Clerk 2011 OCT 05 PM 01:01

135

TII.01/20/11.15:57:36.45443



11-116369-CD

JUDGE JAMES M. ALEXANDER
ZONIA,SUSAN V TRINITY HEALT

OAKLAND COUNTY

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

SUSAN ZONIA,

        Plaintiff,

                              **CASE NO. 2010        CD**

-vs-

                              **HON.**

**TRINITY HEALTH MICHIGAN**
**d/b/a ST. JOSEPH MERCY**
**HOSPITAL, PONTIAC**
*a domestic corporation.*
        Defendant.

---

**DEBORAH L. GORDON, PLC**
**Deborah L. Gordon (P27058)**
**Carol Laughbaum (P41711)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500

BY:
DEPUTY COUNTY CLERK

2011 JAN 20 PM 2: 19

RECEIVED FOR FILING
OAKLAND COUNTY CLERK

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

    There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed after having been assigned to a judge, nor do I know of any other civil action, not between these parties, arising out of the same occurrence as alleged in this complaint that is either pending or was previously filed and dismissed, transferred, or otherwise disposed of after having been assigned to a judge in this court.

    Plaintiff **Susan Zonia** by her attorneys **Deborah L. Gordon PLC**, complains against

Defendant as follows:

136

TII.01/20/11.15:57:36.45444

## Jurisdiction and Parties

1.      This is an action for wrongful discharge in violation of Michigan public policy ("public policy tort") arising out of Plaintiff's employment with Defendant.

2.      Plaintiff **Susan Zonia** (hereafter Plaintiff) is a resident of Oakland County, Michigan.

3.      Defendant **Trinity Health - Michigan d/b/a St. Joseph Mercy Hospital, Pontiac** (hereafter Defendant **St. Joseph)** is a domestic corporation located in Oakland County, Michigan.

4.      The events giving rise to this cause of action occurred in Oakland County, Michigan.

5.      The amount in controversy exceeds $25,000.00, exclusive of interest, costs, and attorney fees and the matter is otherwise within the jurisdiction of this Court.

## Background Facts

6.      On or about January 2006 Plaintiff was hired by Defendant as the Director of Medical Education.

7.      Plaintiff's performance was, at all times, satisfactory or better.

8.      Over the four years Plaintiff was employed by Defendant, her salary was increased more than 30 percent.

9.      Plaintiff was elected President of the National Organization of Directors of Medical Education in 2009. She was the first woman and first nonphysician to be elected to this position.

10.     Plaintiff was also awarded the Leadership Award in April 2010 by the same organization.

11.     During Plaintiff's employment she objected to and refused to acquiesce in the violation of numerous laws.

137

12.     As an example, in or about March 2009 Plaintiff objected to an attending physician's unlawful possession of a switchblade on hospital property.

13.     In or about July 2010, Plaintiff objected to violations of federal immigration law by residents who were moonlighting in the Internal Medicine Department.

14.     As a result of Plaintiff's objections, the practice ceased and attending physicians in Internal Medicine were required to handle on call matters at all hours.

15.     In or about September 2010, a doctor requested to have a student shadow him in the hospital, including the Labor and Delivery Department.

16.     Plaintiff objected to the request, because the Defendant had a policy directly prohibiting such conduct and because it threatened to violate both patient privacy and confidentiality laws, including but not limited to the Health Insurance Portability and Accountability Act (HIPAA).

17.     On or about October 1, 2010, Plaintiff was terminated in retaliation for her complaints about violations of law and policy occurring in the hospital.

## COUNT ONE
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

18.     Plaintiff repeats and realleges paragraphs 1 through 17 as though set forth in full herein.

19.     During her employment with Defendant, Plaintiff refused to violate or acquiesce in violation or suspected violations of laws including, but not limited to:  federal immigration law and laws protecting patient privacy and confidentiality, including the Health Insurance Portability and Accountability Act (HIPAA).

-3-

20.    Plaintiff's termination was carried out, in part, in retaliation for her failure and refusal to violate laws or acquiesce in violations of law.

21.    Plaintiff's termination violated clearly established public policy of the State of Michigan that an employer may not discharge an employee where the alleged reason for the discharge of the employee is the failure or refusal to violate a law in the course of employment.

22.    The actions of Defendant, their agents, representatives and employees were intentional and willful, and were in deliberate disregard of and made with reckless indifference to the rights and sensibilities of Plaintiff.

23.    As a direct and proximate result of those actions, the terms, conditions and privileges of Plaintiff's employment were adversely affected, and Plaintiff was unlawfully terminated.

24.    As a further direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages including but not limited to: loss of earnings and earning capacity; loss of career opportunities; loss of fringe and pension benefits; mental anguish; anxiety about her future; physical and emotional distress; humiliation and embarrassment; loss of professional reputation; damage to her good name and reputation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of her choice.

**<u>Relief Requested</u>**

Plaintiff demands judgment against Defendant as follows:

A.    Legal Relief:

        1.    Compensatory damages in whatever amount above Twenty Five Thousand Dollars ($25,000.00) Plaintiff is found to be entitled;

        2.    Exemplary damages in whatever amount above Twenty Five Thousand Dollars ($25,000.00) Plaintiff is found to be entitled; and

-4-

139

3.      An award of interest, costs, reasonable attorney fees, and expert witness fees.

B.    Equitable Relief:

1.      An order from this Court placing Plaintiff in the position she would have been in had there been no wrongdoing by Defendant;

2.      An injunction out of this Court prohibiting any further acts of wrongdoing;

3.      An award of interest, costs and reasonable attorney fees; and,

4.      Whatever other equitable relief appears appropriate at the time of final judgment.

**DEBORAH L. GORDON, PLC**

Deborah L. Gordon (P27058)
Carol A. Laughbaum (P41711)
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500

Dated: January 19, 2010


## JURY DEMAND

Plaintiff **Susan Zonia,** by her attorneys Deborah L. Gordon, PLC, demands a trial by jury of all the issues in this cause.

**DEBORAH L. GORDON, PLC**

Deborah L. Gordon (P27058)
Carol A. Laughbaum (P41711)
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500

Dated: January 19, 2010

-5-

140

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

SUSAN ZONIA,

                Plaintiff,

v.

                                    CASE NO. 11-116369-CD
                                    HON. JAMES M. ALEXANDER

TRINITY HEALTH-MICHIGAN
d/b/a ST. JOSEPH MERCY
HOSPITAL, PONTIAC,
A domestic Corporation,

                Defendant.

_____/

| DEBORAH L. GORDON. PLC | LAW OFFICE OF DAVID B. GUNSBERG, P.C. |
|---|---|
| Deborah L. Gordon (P27058) | David B. Gunsberg ({24235) |
| Carol Laughbaum (P41711) | *Attorney for Defendant* |
| *Attorneys for Plaintiff* | 322 North Old Woodward Avenue |
| 33 Bloomfield Hills Parkway, Ste. 275 | Birmingham, MI 48009 |
| Bloomfield Hills, MI 48034 | Telephone:  248.646.9090 |
| Telephone: 248.258.2500 | |

_____/

**DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT AND JURY DEMAND**
**AND**
**AFFIRMATIVE DEFENSES**     pd/dm

    **NOW COMES** Defendant TRINITY HEALTH-MICHIGAN d/b/a ST. JOSEPH

MERCY HOSPITAL, PONTIAC, by and through its undersigned counsel, and for its Answer to

Plaintiff's Complaint and Jury Demand state as follows:

1. Paragraph 1 of Plaintiff's Complaint does not require a response.

2. Defendant neither admits nor denies the allegations contained in Paragraph 2 of the

    Complaint for the reason that it lack sufficient knowledge upon which to form a belief

    and therefore leaves Plaintiff to her proofs.

3. Admitted

Received for Filing Oakland County Clerk 2011 MAR 14 PM 03:47

141

Received for Filing Oakland County Clerk 2011 MAR 14 PM 03:47

4. Defendant neither admits nor denies the allegations contained in Paragraph 4 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

5. Defendant neither admits nor denies the allegations contained in Paragraph 5 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

6. Admitted.

7. The allegations contained in Paragraph 7 of the Complaint are denied as untrue.

8. Defendant neither admits nor denies the allegations contained in Paragraph 8 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

9. Defendant neither admits nor denies the allegations contained in Paragraph 9 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

10. Defendant neither admits nor denies the allegations contained in Paragraph 10 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

11. The allegations contained in Paragraph 11 are denied as untrue.

12. Defendant neither admits nor denies the allegations contained in Paragraph 12 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

142

Received for Filing Oakland County Clerk 2011 MAR 14 PM 03:47

13. Defendant neither admits nor denies the allegations contained in Paragraph 13 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

14. Defendant neither admits nor denies the allegations contained in Paragraph 14 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

15. Defendant neither admits nor denies the allegations contained in Paragraph 15 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

16. Defendant neither admits nor denies the allegations contained in Paragraph 16 of the Complaint for the reason that it lack sufficient knowledge upon which to form a belief and therefore leaves Plaintiff to her proofs.

17. The allegations contained in Paragraph 17 of the Complaint are denied as untrue.

## COUNT ONE
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

18. Defendant hereby reincorporate by reference Paragraphs 1-17 as though set forth fully herein.

19. The allegations contained in Paragraph 19 of the Complaint are denied as untrue.

20. The allegations contained in Paragraph 20 of the Complaint are denied as untrue.

21. The allegations contained in Paragraph 21 of the Complaint are denied as untrue.

22. The allegations contained in Paragraph 22 of the Complaint are denied as untrue.

23. The allegations contained in Paragraph 23 of the Complaint are denied as untrue.

24. The allegations contained in Paragraph 24 of the Complaint are denied as untrue.

143

Received for Filing Oakland County Clerk 2011 MAR 14 PM 03:47

**WHEREFORE** Defendant TRINITY HEALTH-MICHIGAN d/b/a ST. JOSEPH

MERCY HOSPITAL, PONTIAC prays this Honorable Court dismiss Plaintiff's Complaint

in its entirety and award Defendants TRINITY HEALTH-MICHIGAN d/b/a ST. JOSEPH

MERCY HOSPITAL, PONTIAC costs, interest and attorney fees so unjustly incurred.

Respectfully submitted,

LAW OFFICE OF DAVID B. GUNSBERG, P.C.

By:   _/s/ David B. Gunsberg_
      David B. Gunsberg (P24235)
      Attorney for Defendants Trinity Health-
      Michigan d/b/a St. Joseph Mercy Hospital,
      Pontiac

Dated: March 14, 2011

### AFFIRMATIVE DEFENSES

NOW COMES Defendant TRINITY HEALTH-MICHIGAN d/b/a ST. JOSEPH MERCY

HOSPITAL, PONTIAC, by and through its undersigned counsel, and raise the following

Affirmative Defenses to Plaintiff.  Defendant does not hereby assume any burden of proof that

would otherwise rest on Plaintiff.

1. Plaintiff has failed to state a claim for which relief may be granted.

2. Plaintiff has failed to mitigate damages.

3. Plaintiff has failed to join all claims/parties.

4. Plaintiff is not entitled to exemplary damages/attorney fees.

5. Plaintiff's claims are pre-empted by the Whistle Blower Protection Act.

6. Plaintiff's are time-barred/barred by the applicable statutes of limitations.

144

7. Defendant Trinity Health-Michigan d/b/a St. Joseph Mercy Hospital, Pontiac reserves

the right to amend these Affirmative Defenses to include any additional Affirmative

Defenses as may become known in the future.

Respectfully submitted;

LAW OFFICES OF DAVID B. GUNSBERG, P.C.

By: ___/s/David B. Gunsberg_____
DAVID B. GUNSBERG (P-24235)
Attorney for Defendant
322 N. Old Woodward Avenue
Birmingham, Michigan  48009
☎ 248.646.9090

Dated:     March 14, 2011

### Proof of Service

The undersigned certifies that on the *14th* day of March, 2011, she served a copy of this document upon the attorneys of record at their addresses as disclosed in the foregoing caption by mailing same to said addresses with first class postage fully prepaid.

Signature: _____*/s/Carol E. Webber*_____
Carol E. Webber, Legal Assistant/Paralegal
322 North Old Woodward Avenue
Birmingham, MI 48009
248.646.9090
cewebber36@hotmail.com

Received for Filing Oakland County Clerk 2011 MAR 14 PM 03:47

145