EXHIBIT 4

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

STEVEN WOODWARD,

Plaintiff,

v

File No. 07-088103-CZ

HON. SHALINA KUMAR

TRINITY HEALTH-MICHIGAN,
a Michigan Nonprofit corporation,
SUSAN CATHERINE ZONIA, an individual,
AMERICAN UNIVERSITY OF ANTIGUA
A Foreign corporation,

Defendants.
_______________________________/

DEPOSITION OF SUSAN ZONIA, PH.D.

Taken by the Plaintiff on the 3rd day of February, 2009, at 322 North Old Woodward Avenue, Birmingham, Michigan, at 8:30 a.m.

APPEARANCES:

For the Plaintiff: MR. PAUL J. NICOLETTI (P44419)
Nicoletti & Associates, PC
39520 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
(248) 203-7800

For the Defendant: MR. DAVID B. GUNSBERG (P24235)
Law Office of David B. Gunsberg
322 North Old Woodward Avenue
Birmingham, Michigan 48009
(248) 646-9090

Also Present: Alex Pathenos

RECORDED BY: Sheila H. Raymond, CER 6932
Certified Electronic Recorder
Network Reporting Corporation
1-800-632-2720

NetworkReporting
1-800-632-2720

TABLE OF CONTENTS

PAGE

Examination by Mr. Nicoletti. . . . . . . . . . . . . . . .5

EXHIBIT INDEX

PAGE

Deposition Exhibit 1 marked. . . . . . . . . . . . . . . .26
(Three-Page Email 12-17-2007)
Deposition Exhibit 2 marked. . . . . . . . . . . . . . . .47
(10-10-2007 Memo to File)
Deposition Exhibit 3 marked. . . . . . . . . . . . . . . .58
(Case Presentations)
Deposition Exhibit 4 marked. . . . . . . . . . . . . . . .68
(12-8-2007 Final Exam Curve Email)
Deposition Exhibit 5 marked. . . . . . . . . . . . . . . .71
(Scholar 360 Printout)
Deposition Exhibit 6 marked. . . . . . . . . . . . . . . .73
(12-17-2007 Memo to Ernesto Calderon)
Deposition Exhibit 7 marked. . . . . . . . . . . . . . . .73
(Zonia File)

Birmingham, Michigan
Tuesday, February 3, 2009 - 8:43 a.m.

MR. NICOLETTI: Dr. Zonia, let the record reflect that this is the time and date for your deposition. My name is Paul Nicoletti and I represent Steven Woodward. And I'm going to take your deposition. I'm going to ask you a series of questions.

DR. ZONIA: Uh-huh (affirmative).

MS. NICOLETTI: Have you ever had your deposition taken before?

DR. ZONIA: Yes, I have.

MR. NICOLETTI: Okay. Now, one thing that you just showed me, you can't say "uh-huh" --

DR. ZONIA: Oh, I'm sorry.

MR. NICOLETTI: -- when I ask you questions because the court reporter can't take that down so you need to try to say "yes" or "no" or a verbal response so she can take it down.

DR. ZONIA: Certainly.

MR. NICOLETTI: You indicate that have you had deposition taken before?

DR. ZONIA: Yes, I have.

MR. NICOLETTI: And when was that and why was that?

DR. ZONIA: It was taken probably around four

years ago. That's an approximate and it was because I had to remove a physician from the faculty teaching service at a previous hospital that I was associated with.

MR. NICOLETTI: And who was the physician that you had to remove?

DR. ZONIA: I don't know why that's relevant.

MR. GUNSBERG: I'm going to object. I think that that physician terminations may be a privileged or confidential and totally irrelevant to this case.

MR. NICOLETTI: Are you --

MR. GUNSBERG: It's a different hospital and I don't think the witness should be disclosing that kind of information.

MR. NICOLETTI: Are you instructing her not to answer?

MR. GUNSBERG: I am, yes.

REPORTER: Raise your right hand. Do you solemnly swear or affirm that the testimony you're about to give will be the whole truth?

DR. ZONIA: Yes, I do.

REPORTER: Thank you.

SUSAN ZONIA, PH.D.
having been called by the Plaintiff and sworn:

EXAMINATION

BY MR. NICOLETTI:

Q What was the previous hospital that you were at?
A **I have been at several previous hospitals.**
Q Okay. And what was the hospital before Trinity Health?
A **Oakwood.**
Q And how long were you at Oakwood?
A **Four years.**
Q And when did you start there and when did you leave there?
A **Well, I've been at Trinity for three years so --**
Q So in terms of --
A **-- 2006. I left Oakwood, so I would have been there from 2002 to about 2006. And then from approximately 2000 to 2006 I was at Botsford Hospital, all in similar positions to what I hold now.**
Q And what is the position that you hold now?
A **Director of medical education.**
Q And what is your educational background? Why don't you start with college and then tell me what you have -- where did you go to college and what you have done after college?
A **I went to the University of Missouri, St. Louis for a bachelors and a masters degree in sociology. I went to Michigan State University and received a Ph.D. in sociology.**

Page 6

Q And when was that?
A **It's like deja vu. 1987 I got my Ph.D.**
Q And you haven't always been living in Michigan because you were at the University of Missouri?
A **Uh-huh (affirmative); correct.**
Q How long have you been in Michigan?
A **I've been in Michigan 30 years.**
Q So you are not a medical doctor, you're a Ph.D.; is that correct?
A **I am a doctor. I'm not a physician.**
Q Okay. And you started at -- you started at Trinity in 2006; is that correct?
A **Correct.**
Q And when you started at Trinity in 2006 what was your position at that time?
A **Because they had to change the medical staff bylaws I was called the chief academic officer.**
Q And what were your responsibilities as chief academic officer?
A **My responsibilities are not unlike being the principal of a very large high school. I oversee all of the academic programs, the physician faculty report to me. Ultimately I am responsible for the quality of the programs, for all of the reporting to the federal government, to CMS, and to the accrediting agencies and for the recruitment and selection**

Page 7

**of residents.**
Q Now, Trinity is a hospital; is it not?
A **Trinity is a health care system.**
Q Okay. And I'm not asking this question to try to trick you, but it's out of my sheer ignorance. Why does a health care system have an academic officer?
A **Because we have academic programs. Not all hospital are teaching hospitals?**
Q And Beaumont is a teaching hospital?
A **Beaumont is a teaching hospital. John Musich is their chief academic officer.**
Q Okay. So is it fair for me to assume that any hospital that is a teaching hospital has an academic type of an officer?
A **Yes, they do.**
Q Okay.
MR. GUNSBERG: Wait a minute. Let him finish his question before you answer it. You're stepping on the question.
THE WITNESS: Okay.
Q Now, so in 2006 you were the chief academic officer. When did that responsibility change, if it did?
A **The responsibilities didn't change. They chose to call me the director of medical education/chief academic officer.**
Q Responsibilities were the same?
A **Responsibilities were identical.**

Page 8

Q Now, when did you become affiliated or when did you becc associated with American University of Antigua?
A **The best of my recollection would be about two year go, so I was there for almost a year before we developed th relationship.**
Q So that would have been in 2007?
A **Approximately, yes.**
Q And do you know how that relationship developed?
A **Excuse me. I do recall, and it would have been the f of 2006.**
Q Okay. And how is it that you recall it was the fall of 2006?
A **Because the CEO and I ended up going down to Anti together and it was in September or October.**
Q And who is the CEO?
A **Jack Weiner.**
Q W-e-i-n-e-r?
A **Correct.**
Q And he is the CEO of Trinity?
A **He is the CEO of St. Mercy Oakland.**
Q What is the relationship between Trinity and St. Joseph Mercy Oakland?
A **Trinity is a health care system. They have hospitals m coast to coast, so that is the parent corporation. I'm t quite sure how to categorize it. Not unlike St. John's**

Page 9

**Health System which has St. John's and Providence a Providence Park. It's the parent company. St. Josep lercy Oakland is one of the hospitals under the Trinity Heal Care System.**
Q And what other hospitals, if any, are part of the same umbrella?
A **In the greater Detroit area it would be St. Mary's, St Joseph-Ann Arbor, Saline, Port Huron, Muskegon -- M kegon is the other side of the state. I think there is one in Monroe.**
Q So when I was asking you who you worked for do you worl r Trinity or do you work for St. Joes?
A **I report directly to the leadership at St. Joseph Merc Oakland and ultimately we all roll up to the parent corporation.**
Q When you get a paycheck does it say St. Joseph?
A **St. Joseph Mercy Oakland.**
Q Okay. So is it fair for me to assume that you don't work for the parent company you work for the individual hospital called St. Joseph Mercy Oakland; is that correct? I don't want to put words in your mouth so --
A **No. I understand.**
Q -- I'm just trying to understand.
A **In terms of my hiring and firing that's up to St. Jose Mercy Oakland, so I would say, yes, I work for them.**

Page 10

Q And so when you say that you went down to Antigua with the CEO, Jack Weiner, Jack Weiner does work for Trinity though, the parent company?
A **Correct.**
Q And you went down to Antigua in the fall of 2006 and what was the purpose of traveling down there?
A **The purpose was to see the medical school and they wanted to -- the leadership down there wanted to speak with us about developing a relationship so that their students could do third and fourth year rotations and also to begin discussions about what was then called the fifth semester program.**
Q And were there other schools that you went to visit other than the American University in Antigua?
MR. GUNSBERG: You mean when she went to Antigua?
Q Well, not when you went to Antigua, but I presume that you were looking for a school to be associated with?
A **I visit medical schools every year, not just Antigua. There are other schools in the continental US that I visit to look at the curriculum, to talk to the faculty, to discuss how their students do -- or perform in our program. So that's an annual -- it's a routine event for a DME, for a director of medical education.**
Q So I guess what I am asking you is in the fall of 2006 you didn't have any students from Antigua?

Page 11

A **Not yet, correct.**
Q Okay. So you were looking to establish a relationship to get students from Antigua?
A **We wanted to see if Antigua was a school we wanted to be associated with?**
Q Okay. All right. So you were pretty much marketing to see if Antigua would be a candidate?
A **They were marketing to us.**
Q Okay. All right. And what did you find? What did you decide?
A **We spoke with the faculty. We got a tour of the facilities and saw the planned construction and felt that this was a program that we would be interested in developing to see if it would work out in the long run so we agreed to take a few students.**
Q And who did you meet with when you went there?
A **Peter Bell, Neil Simon, Reza Sanii. There were a number of faculty that I met with. I don't recall all their names at this time.**
Q Could you spell the Reza Sanii?
A **R-e-z-i S-a-n-i (phonetic). He is an associate dean.**
Q And what did you find out about the American University of Antigua? What did you learn about the school in terms of who owns it? Where the headquarters are and what kind of program it was?

P e 12

A **Well, I didn't learn much about who owns it. I alrea had looked into that so I was aware that it was part of Ku rba Medical College of India which is a highly regarded international program. We have many faculty that ha graduated from Kusturba. And AUA is the Caribbean nch of that school. I met with the faculty and felt that the faculty credentials were quite good and felt that give those qualifications and the people that I met with I some, some confidence in the quality of the product t they would be training.**
Q And when did AUA first sent students to your hospital?
A **I'm going to say it would probably would have been ut January.**
Q Of 2007?
A **Uh-huh (affirmative).**
Q And you said it was a few students. Is that three students?
A **I really couldn't tell you. We had to develop a contra before those students could come in terms of, you kn determining what immunizations were going to be, w was going to pay malpractice so I'm sure it took several n ths before that would have been signed by both parties, ny best guess is it's going to be January or February bef the students came and it would be a handful, four or , would be my best guess.**
Q So who was in charge of developing the contract with AUA?

P e 13

A **It would have been a pass-off, if you will. AUA w l have sent me something. I would have given it to our le counsel for them to review.**
Q And who was your legal counsel?
A **Cathy Radner.**
Q Is it K or a C?
A **C.**
Q R-a --
A **R-a-d-n-e-r.**
Q And where does she work? Does she work at the hospit
A **Yes, she does.**
Q And who signed off on that contract with AUA?
A **Jack Weiner.**
Q So you weren't required to sign that?
A **No.**
Q So it was between Jack Weiner and who signed on beha f AUA? Was it Peter Bell?
A **No, Neil Simon.**
Q And what did the contract with AUA provide, if you know
MR. GUNSBERG: I'm going to object to the forn the question. You can answer the question.
A **To the best of my knowledge it will have its stand what are the requirements of the school, what are the requirements of hospital in terms of provision of e ation and supervision and if they're going to pay us anyt g. I**

Page 14

mean this are just standard university to hospital contracts, but I couldn't give you the specifics.
Q Who is in possession of the AUA contract? Is it Cathy Radner?
A **Cathy has a copy. I have a copy. We need them for accreditation purposes to be able to show them immediately to an inspector so I have a copy.**
Q Did you bring any documents with you today?
A **Not a one.**
Q Did your attorney ask you to bring any documents?
A **No, he did not.**
MR. GUNSBERG: Actually Dr. Zonia gave me her file so I have her file which is what you asked for, I think, although I think the -- actually -- the document request attached to the subpoena is improper.
Q So you did bring your file with you?
A **I did not bring my file with me.**
Q You had previously given a copy to your attorney?
A **It's not a copy. He has all my originals. I no longer have any documents. The AUA contract is not going to be in there.**
MR. NICOLETTI: And I would just going to ask, will I be provided an opportunity to look through the file that she brought?
MR. GUNSBERG: Yeah, despite the fact that I think

Page 15

your request is improper I'm giving you the file that I have redacted and taken out the documents that are privileged.
(Counsel hands file to counsel)
Q So Dr. Zonia, I'm not going to go through each page of this file right now, but can you just give me just a brief overview of what's in this file that I have in my hand right now?
A **Certainly. Because the hospital has limits on email size and they start deleting things I printed off all of the emails that I had that were communications between AUA, Mr. Woodward that I was copied on so that they wouldn't be deleted when they were deleted from the computer because there is a time expiration. The system is so big they just delete things. I printed those off so that there would be a copy. And, of course, a copy of the notification that you and Mr. Woodward sent me about the lawsuit is in there.**
Q Okay. I'm just going to put your file in the middle for right now, but I would like to take time to look through it when we take a break. Okay. All right. Let's get to the important subjects here. Steven Woodward. Do you know who Steven Woodward is?
A **Yes, I do.**
Q When did you first learn who Steven Woodward was?
A **I first learned who Steven Woodward was when I met all the students the first day that they came for their first class.**

Page 16

Q Did you recall when that was?
A **No.**
Q Was that --
A **Sometime in September of 2007.**
Q And why was it that you met all those students?
A **As the director of medical education I make it a point [...]ien my schedule permits to meet and greet cohorts of stu[...]ts to introduce myself, to tell them that I am a point person [...] they run into any problems, if they need any advice or assistance, if they have positive or negative comment[...]me and see me, but that they wouldn't see me much exce[...]or that. So it's a standard procedure that I have.**
Q All right. Now, prior to meeting Steven Woodward in September of 2007, I presume, that you met him at the hospital, at St. Joe's?
A **Correct.**
Q And prior to meeting him at the hospital did you know anything about him or were you told anything about him or were you given anything pertaining to him?
MR. GUNSBERG: Object to the form of the question It's multiple.
Q And I can ask them individually, but if you can --
A **I had no previous knowledge of any of the students t[...] came from AUA. I was not provided with any background information except to say that they were all eligible to**

Page 17

**participate in that course.**
Q And this was the fifth semester program?
A **Correct.**
Q And what is the fifth semester program? What does it basically consist of?
A **The fifth semester program is designed -- its intent is [...] better prepare the students so that they can pass step [...] of their boards. Because many of these students will b[...] international students it's a way to familiarize them wi[...] how American hospitals work which is something that s[...]lents who have been trained in the continental US are going [...] have greater familiarity with. So if you get a student fr[...] Kusturba Medical College that finishes up at Antigua th[...]e not going to be familiar with how a US hospital works s[...] they have all the students go through the fifth semeste[...] familiarize themselves with American hospitals and als[...] because many of the students have a weaker academic [...]ord and this is a way to provide them with some additional exposure so that they're better prepared to pass step o[...]**
Q Is it fair for me to assume that this is the first time, essentially, that the medical student is allowed into a hospital or have they previously been in hospitals, if you know?
A **Some students in some places of the US may have had [...] opportunity to shadow in a hospital, maybe they were [...]**

Page 18

**candy-striper. I really couldn't say.**

Q Now, in terms of the fifth semester program are all the students at the same point in their medical education when they start the fifth semester program; in other words, are they juniors, are they seniors or are they not classified in that way?

A **I don't believe they're classified in that way in AUA. What I will tell you is that they all -- I have been told -- that they have all completed their first two years of the medical school curriculum and that is typically -- whether it's in Antigua or the US -- it's typically then when the students go to begin doing rotations at a hospital. So there is two years on campus and then two years rotating through various services and then they graduate -- they matriculate and hopefully get a residency program.**

Q And so the fifth semester program is really the start of the two-year rotation program; is that correct?

MR. GUNSBERG: Object to the form.

A **The fifth semester program is sort of a remediation program for AUA students to be sure that they can compete as good clinical students. Most US medical schools do not have a fifth semester. They finish two years on campus and they go directly into rotations. AUA students have a fifth semester where it's a combination of academics and observing to better prepare them.**

Page 19

Q All right. So the fifth semester program then was only for AUA students. They were no other medical students involved with that program at the hospital?

A **Absolutely correct.**

Q Okay. All right. So after you met Steven Woodward, what was your contact history like with Steven Woodward? How many times had you seen him in 2007 or did you teach him or did you associate with him in any way?

A **I certainly didn't associate with him or any of the other students. I did minimal instruction in that course in terms of talking about doctor-patient relations. I made some presentation to them about that. I can't tell you the exact date. How many times did I see him? I passed him in the hallway. I really couldn't tell you exactly how many times I saw him.**

Q Did you ever form an opinion about Steven Woodward as far as what type of medical student he was?

A **Well, I believe from the documents it's clear that I did.**

Q Okay. And the document that you're referring to is it the December 17th, 2007, memo that you wrote?

A **If that's the date of the memo of the date that I wrote to Dr. Hrehorovich then that would be a summary of my impressions.**

Q Okay. The December 17th memo that I am looking at is a memo that you wrote --

Page 20

A **Calderon.**

Q -- to Calderon.

A **Okay.**

Q Was there another one that you wrote to Hrehorovich?

A **No. Hrehorovich is the one that sent me the series of emails of his discussions with Student Dr. Woodward. T Calderon -- Calderon and Hrehorovich are the two peop interacted with the most relative to fifth semester. I misspoke if I said Hrehorovich that I wrote the Decemb 17th memo to. It was Calderon.**

Q How many memos did you write regarding Steven Woodward'

A **To whom?**

Q Well, I am asking you. Were there more than just the December 17th memo that you wrote to anyone about Steven Woodward?

A **No. The December 17th memo is my summary statem to the school.**

Q Now, do you recall what the December 17th memo says?

A **I couldn't quote it chapter and verse, but I know the sentiments that I expressed in it.**

Q Now, prior to coming here today did you prepare, in any way, for today's deposition?

A **I met with Mr. Gunsberg last week who reminded me a ut the format of giving a deposition and gave me an idea of so of the questions I might be asked, but --**

Page 21

MR. GUNSBERG: I'm going to object to object tc any questions of this witness about her communication wi me.

MR. NICOLETTI: I didn't ask her any questions about it.

MR. GUNSBERG: I'm just putting my objection c the record.

Q Besides Mr. Gunsberg have you talked to anybody else a t this deposition?

A **I talked to Deneen McCall who you're going to be aking with later to arrange her transportation back to the hospital.**

Q But just regarding transportation?

A **Yeah.**

Q As far as documents what documents did you look at pri o this deposition?

MR. GUNSBERG: You mean outside of the meet with me?

Q Outside of the meeting with -- well, even in the meeting with Mr. Gunsberg.

MR. NICOLETTI: I don't think documents are privileged.

MR. GUNSBERG: Well, I think the documents ar part of my communication with my client so to the extent there are documents that I reviewed with the client and



Page 22

discussed I identified those documents and reviewed them with her and I think they're privileged.
MR. NICOLETTI: Well, objection is noted for the record, but --
MR. GUNSBERG: Well, my objection is that's my objection is it's privileged.
MR. NICOLETTI: Right. That the documents are privileged?
MR. GUNSBERG: That the identification of documents that I communicated with my client are privileged.
Q In terms of any documents that weren't associated with your meeting with Mr. Gunsberg were there any other documents that you reviewed?
A **I don't know what they could have possibly been. I didn't review any documents.**
Q All right. Well, let me ask you some questions about your December 17th, 2007, memo. Now, in your memo you indicate that "We have been reviewing our experiences with offering the five semester for the first time."
MR. GUNSBERG: I'm just going to -- excuse me. I don't mean to interrupt you. If you're going to refer to the document I'd like the witness to be shown a copy of the document that you're referring to, please.
MR. NICOLETTI: Does she have a copy in her file? I didn't make a copy of the document.

Page 23

(Witness reviews file)
MR. NICOLETTI: Actually I have one right here.
(Counsel hands document to witness)
Q I just read the first sentence of that memo.
A **Uh-huh (affirmative).**
Q Actually before I ask you a question, what prompted the writing of this memo?
A **The memo was written at the request of either Dr. Calderon or Dr. Hrehorovich. There is an email communication. And I'm sorry. I did not review these documents to sort of memorize chain of events. There is an email in which I am specifically asked to summarize my experiences to the school I am under contract to the school. They requested information from me. I wrote this message.**
Q Now, did the contract with AUA, did it require a summarization for each student?
A **It required that I be accountable to the school for the progress of their students.**
Q And so the memo -- was it a email or was it a memo that you were sent?
A **I wrote this memo --**
Q No, not this memo. I'm saying the memo that prompted this letter, was it an email or was it an email that had asked for it?
A **It was an email message to me requesting this.**

Page 24

Q Okay. And did the email message specifically mention Steven Woodward or did it mention other students as well?
A **As I recall it specifically mentioned Steven Woodward.**
Q So is it fair for me to assume that you only wrote a memo concerning Steven Woodward and no other students?
A **That is correct because I was not asked for anything else.**
Q And you indicated that the email came from either Calderon or Hrehorovich?
A **Correct.**
Q And I know the court reporter is going to ask you for the spelling of Hrehorovich?
A **I believe it's H-r-e-v -- I don't know.**
MR. GUNSBERG: I think I've got it.
Q Actually it's --
MR. GUNSBERG: I think it's H-r-e-h-o-r-o-v-i-c-
Q And his first name is Victor?
A **Victor.**
THE WITNESS: Thank you.
MR. GUNSBERG: Sure.
Q And I think she'll also ask you for the spelling for Kusturbia?
A **Kusturba, K-u-s-t-u-r-b-a.**
Q Now, when was the last time that you saw the email that had requested the writeup on Steven Woodward?
A **Four of five months ago, I believe.**

Page 25

Q And how was it that you saw the email four or five months ago? Where was the email?
A **The email was in my possession and it would have been discussed in that --**
MR. GUNSBERG: If it had anything to do with conversations with me don't go into it.
THE WITNESS: Okay.
Q Okay. I'm not worried about whether it was discussed with Mr. Gunsberg or not. So the email was you saw it four or five months ago. Was it on your computer? I mean the email has to be on a computer? Was it printed?
A **It would have been printed.**
Q And did you provide it to your attorney?
MR. GUNSBERG: You can answer that.
A **Yeah. It's in the file.**
Q Is it in the file that I have here?
A **Well, I don't know if Mr. Gunsberg has put it in that packet or if it's over there (indicating).**
Q I actually don't have --
A **It's not in my possession.**
Q I actually don't have any of your documents here. Can you look at your file and tell me if it's in there? I don't want you to spend a lot of time looking for it right now unless you can find it right away.
(Witness reviews file)

Page 26

A **Here is the contract for AUA.**
MR. GUNSBERG: Well, we don't need that right now.
A **Yes, it's in here.**
Q Okay. Could you show it to me, please?
A **It's highlighted in green.**
MR. NICOLETTI: Could we mark this as -- are you doing letters or numbers?
REPORTER: Numbers.
MR. NICOLETTI: Okay. Exhibit Number 1.
(Deposition Exhibit 1 marked)
Q Okay. We have marked as Exhibit Number 1, it's a three-page email and I don't know if this email reads in the reverse like most emails, but it looks like on the first page -- well, you know, instead of me describing it why don't you tell me -- describe it for me, the three pages, how they come together?
A **On Saturday December 15th Dr. Ernesto Calderon sent me an email asking if I would write a memo that said according to instructions Dr. Hrehorovich and myself and then write a summary of our impressions of Mr. Woodward. And then later that day a gentleman by the name of Dr. Cain sent me a message again about Mr. Woodward and requesting a letter or a memo from me that states or summarizes our experiences.**
Q So you got two emails from people at AUA asking you to summarize Steven Woodward?

Page 27

A **Correct.**
Q And they were both on the same day?
A **One was December -- this man, Ernesto Calderon, never sleeps. This request came Saturday, December 15th, at 3:58 a.m.**
Q Is there a time change or is it the same time?
A **No. He is in Baltimore.**
Q Okay.
A **And the other one came from Bill Cain at 7:02 a.m. that day and then my memo, I wrote that day, but thought about the wording and didn't send it off until December 17th, two days later.**
Q Okay. Can I see Exhibit Number 1 then.
MR. NICOLETTI: And I guess for the court reporter -- Sheila, I want to mark this whole exhibit so do you need to mark each page? I don't want it just this page. I want the whole exhibit.
REPORTER: Right. We can just title that it's three pages.
MR. NICOLETTI: All right. So Exhibit 1 is the three-page email.
Q Now, up until December 15th -- or I'm sorry. Up until December -- no, I guess it was up until December 15th, had you ever received emails from Dr. Calderon asking you to summarize a student?

Pa e 28

A **No.**
Q Had you ever received a request from Mr. Cain asking you t summarize the performance of a student?
A **No.**
Q Did you think it was unusual that you received the requests from these two gentlemen?
MR. GUNSBERG: Object to form of the question. Object to the relevancy as to your thought process. You car answer if you can.
A **Not at all.**
Q And why weren't you -- why didn't you think it was unusual
A **Because schools frequently contact me to ask how p icular students are doing.**
Q So you have had this experience before where the school h sent a request pertaining to just one student?
A **Correct.**
Q Now, that was on December 15th early in the morning and n you indicated that you wrote a rough draft. Is that what you said?
A **Correct.**
Q And did you handwrite it or did you write it on the computer? How did you write it?
A **I wrote it on the computer.**
Q And when did you write the rough draft?
A **It would have been sometime Saturday December 1 .**

P e 29

Q Do you still have a copy of the rough draft?
A **No.**
Q What happened to the rough draft?
A **The rough draft became the final copy.**
Q Did you overwrite the rough draft or did you start a ne file?
A **Oh, no, I would overwrite a rough draft.**
Q Did you ever print the rough draft and save a copy of
A **Yes, I did. It was put in my file when I wanted t e sure that the email was not lost, the communication.**
Q All right. So you have the rough draft with you?
A **I don't have a rough draft.**
Q All right. Well, I don't --
MR. GUNSBERG: Maybe she is not understan g what you're saying.
A **I don't have a rough draft. I would have overwr en the rough draft to turn it into the final copy.**
MR. GUNSBERG: The rough draft became thi (indicating)?
A **The rough draft became this (indicating).**
Q Okay. But my question was, did you ever print a copy the rough draft, not the final?
A **No.**
Q All right. So you don't have any record of the rough c t?
A **No, I would not.**

Page 30

Q Do you recall if the rough draft was any different in substance than the final draft?

A **No, it would not have been substantially different. I would have wordsmithed it to be sure that the grammar was correct, the spelling is correct, the commas and semicolons are used appropriate, but that's pretty much about it.**

Q Okay. All right. So turning to Exhibit Number 1 here, it looks like the first email on December 15th at 3:58 -- that is the first email? Am I reading this right?

A **Correct.**

Q It says,

"Dear Susan, please read this note from Dr. Cain. You need to write a request to start a grievance procedure. If you would like you could say that according to instructions from VH and myself that way you would not have this person in your office complaining."

What note from Dr. Cain is -- it says, "Please read this note from Dr. Cain," what note is he referencing or don't you know?

A **I don't recall. I really don't recall.**

Q Was there another email with a note from Dr. Cain?

A **At this point I'm thinking there may have been, but I don't have it in my possession right now, so I don't know. It could have been part of that long chain of emails attached to the Hrehorovich emails. I really don't recall. I don't**

Page 31

**recall.**

Q And the email on December 15th it indicates that there was a -- it mentions a grievance procedure. Is this the first time that you had heard anything about a grievance procedure in Steven Woodward?

A **Yes, it is.**

Q And did you wonder why there was a grievance procedure?

A **No.**

Q And did you ask any questions about what the grievance procedure was regarding?

A **I don't believe I needed to ask why there was a grievance procedure started. There had been a number of phone conversations. The school was not pleased with her performance and that was their decision. I did not request grievance procedures be started.**

Q You say "The school was not pleased with his performance." Why do you say that?

A **I believe you have a series of emails in which his communication was questioned by the school as to its appropriateness and professional tone.**

Q And what communications are you referring to?

A **The ones between Mr. Woodward and Dr. Hrehorovich, the dean.**

Q And were you ever provided with those communications?

A **Yes, I was.**

Q And were you provided with those communications before this

Page 32

email came to you on December 15th?

A **Yes, I was.**

Q And how were you provided with those communications? ow were they provided to you?

A **Email.**

Q And are those emails in your folder there?

(Witness reviews file)

A **Yes, they are.**

Q And what are the date of those emails that you're lookin at?

A **Well, there seems to be quite a few of them. Just a moment.**

**(Witness reviews document)**

A **Let's see. We've got Tuesday, October 23rd -- I ar ust looking to see. There is quite a few of them here tl were sent to me -- 23rd, 26, October 22nd. It looks like y're not in order in here, but it looks like it starts aroun October 22nd and runs through October 28th. A se s of communications between Mr. Woodward and vario representatives of AUA.**

Q Now, were you copied on those emails or were they just forwarded to you somehow?

A **They were forwarded to me.**

Q So they were forwarded via email to you; in other words your email address was on the email when it was sent an o

Page 33

it was forwarded to you via the email process?

A **Yes.**

Q And --

(Counsel and witness confer)

MR. GUNSBERG: I assume "CC" means a copy.

A **I am copied on some of them.**

Q Now, that was back in October, so did you read those in October of 2007?

A **I would have read them the date that they were s to me, on or about the date.**

Q Now, prior to October of 2007 there is, obviously, a strin of emails that had been forwarded to you. Did you have reason to form an opinion regarding Steven Woodward pi to October of 2007?

A **Because of my position faculty come to me when t y encounter problems. That is my job to try to help t m troubleshoot. Dr. Yanez whose office is right next or to mine would frequently -- I cannot quantify but -- v ld frequently come in to talk about Mr. Woodward's b avior in class during his lectures so I was privy to that info ation from one of the people that I supervise.**

Q Who besides Dr. Yanez discussed Steven Woodward's be vior?

A **Deneen McCall.**

Q Anybody else?

A **No. The three of us were the ones that had the gi test**

Page 34

**contact, with the students with Yanez and McCall being 99 percent of the contact with the students.**

Q What was it that Dr. Yanez was complaining about relating to Steven Woodward?

A **His demeanor in the classroom and his disruptive behavior.**

Q Did he give you any examples?

A **Yes. I would classify it as body language that indicated that he really didn't want to be there, challenging why this is important or relevant. Making noises, sighing, rolling his eyes.**

Q Anything else?

A **No.**

Q What complaints did Deneen McCall have about Steven Woodward?

A **That Mr. Woodward come and ask if he could leave early, did he have to come in at all, complaining about the curriculum which we were under contract to deliver, saying that this was not a good use of his time, participating in this course was not a good use of his time.**

Q Now, did you ever speak to Mr. Woodward about the complaints from Dr. Yanez or Deneen McCall?

A **Yes, I did.**

Q And when did you speak to him about them?

A **I believe that that was on October the -- it was on October the 9th I had a formal meeting with him.**

Page 35

Q We seem to be talking about October a lot. Is there anything before October regarding complaints about Mr. Woodward's performance or his --

A **The complaints started almost the first day that he came into the program. We gave him a month to try to settle down.**

Q And the program started when?

A **Around the first or second week of September.**

Q Okay. And you say you gave him a month or so to settle down. What do you mean by "settle down"?

A **To get into the habit or routine of the program and to try to find some value or way to cope with it because it's what one needed to get through according to the school's guidelines.**

Q Now, going back to the email message, the email message on December 15th says "If you would like you could say that according to instructions from VH and myself that way you would not have this person in your office complaining," what did y understand that to mean?

A **Well, I believe Mr. Woodward had demonstrated to us an ability to voice his dissatisfaction and opinions about the program and about his training. We had a history of him complaining. And I understood that to mean that they wanted me to preface it, which was appropriate. I would not have written that email unless the school had specifically**

Page 36

**requested it from me. I would not have written it, : I am under contract to them. They made a request.**

Q Now, did you say in your memo that according to instruc is from VH and myself, meaning from Mr. Ernesto -- you dor have to in your memo though?

A **No, I don't.**

Q So you chose not to take that suggestion when it was --

A **I didn't particular think it was necessary. These ai ny opinions.**

MR. GUNSBERG: "These," meaning referring to December 17th, '07 memo?

THE WITNESS: Correct.

A **And so I gave them my opinions. They requested i**

Q Now, you indicated that Mr. Woodward had a number of complaints about the school in the fifth semester program is that correct?

A **Correct.**

Q Were any of his complaints about the school or the fifth semester program valid complaints?

A **Well, I certainly couldn't say about the -- I don't k w his opinions. I mean I'm not quite sure what you're as ig. For me to second guess whether he is right in his ci :ism of the school I have not been a student at that tim › I don't know.**

Q Well, but you testified that he -- and maybe I am putting

Page 37

words in your mouth, but my impression is that you testified that he complained a lot?

A **Correct.**

Q Were any of his complaints valid complaints?

A **I'm hard pressed to say "yes" or "no" on that.**

Q Well, usually when a person complains the person that is being complained to makes some sort of a search or investigation as to whether or not the person's complaints are valid.

MR. GUNSBERG: Objection to form of the questior It assumes facts not in evidence nor any requirement in this case based on the claims that have been filed against this party. You can answer.

A **He certainly is entitled to an opinion and if he doesn like the curriculum, I believe, as I have indicated in n communications the correct thing to do would be to I ıg it up with the school. We are not empowered to chang ıeir curriculum.**

Q So is it fair for me to assume that although you thought Mr Woodward complained a lot you never tried to determine whether or not any of his complaints were valid?

A **In my opinion, my own opinion, I felt many of his co laints were not warranted.**

Q Okay. In order for you to feel that many of his complaints were not warranted that means that you would have had to

Page 38

perform some investigation as to all of them to weed out the ones that you thought were not warranted; am I correct?
A **Many of the complaints that he had about the way the education is run at the hospital is run the same way for all medical schools. It's a fact. It's just the way it is. You show up early in the morning and you stay until a certain time. You don't come and go. And that was something he had issues with, and that's just a part of being a student, being a physician. A patient may cancel. You can't blow off the rest of the day. You got to hang around. He didn't like that. So I think that there was a bit of a disconnect between what his expectations were, for example, in control of his time and the reality of learning to be or becoming a physician.**
Q But in terms of his attendance at the hospital and being there all of the time were there any other complaints that he made that you thought were invalid?
A **He believed that he would be better served not participating in the course at all and simply taking a Kaplan course. I don't know, for a fact, that that wasn't in his best interest. I don't know that because he wasn't able to drop the course and only do Kaplan and we can then tell his board scores what they would have been one way or the other. I'm not in a position to judge that.**
Q Were there any other complaints that you can recall that you

Page 39

thought were invalid?
A **He didn't like the content of the course. He didn't like the structure of the course. He didn't think that his experiences were valuable.**
Q At the hospital or in the school program all together?
A **I think it's a combination of both, as I recall.**
Q Did you ever perform any investigation as to whether or not complaints that he would have had against AUA or valid or invalid?
A **I looked at the curriculum for the fifth semester. I believe it is a valid program. I don't have any substantive complaints with the structure of the program. As to his preclinical training on the island, no, I didn't go into any investigation as to course content down there and some of his complaints about the training he received on the island. I didn't look at that. There is nothing I can do about that.**
Q Do you know anything about the Exam Master Program?
A **Yes, I do.**
Q And what do you know about that?
A **Well, I know the students were frequently tested to check their mastery of the material and that there were a bank of questions and that they had routine examinations from Exam Master and there were a fixed number of questions, self-study questions, that they had to also go through.**

Page 40

Q And where was Exam Master administered from? Was it administered from locally here or was it from Antigua?
A **I believe it was administered from Baltimore or New York, George Kroon, K-r-o-o-n, was the individual that was and that would have been New York created and maintai[illegible] the Exam Master file.**
Q Are you aware of any problems with the Exam Master Progr[illegible]?
A **Yes.**
Q Were there complaints from students about Exam Master?
A **I recall a few, yes.**
Q Were the complaints from students about Exam Master vali[illegible] complaints?
MR. GUNSBERG: If you know.
A **I really couldn't say. Yes, the system did crash at le[illegible] once, but I can't tell you anything more than that.**
Q All right. So aside from the system crashing once you don't have any personal knowledge as to whether or not Exam Ma[illegible]r performed the way it was supposed to?
A **No. Dr. Yanez would be the one locally that would h[illegible] that information.**
Q Bill Cain on December 17th says in his email, "Dear Dr. Zonia, to me the documents I have received are evidence of absurd behavior. To proceed we need his agrievance statement" -- and I'm reading it just the way it says --

Page 41

A **Yes.**
Q -- "to proceed his agrievance statement (or a request for a grievance committee hearing). I will distribute your statement to Steve Woodward and the faculty committee. Then during the hearing I will ask Steve Woodward to respond. A letter or memo from you th[illegible] states or summarize the complaints will suffice." You recall reading that from Bill Cain?
A **Yes, I do.**
Q Do you know what documents he received that are evide[illegible] of absurd behavior?
A **Well, I couldn't state definitively what he received his computer. I am assuming it is a series of emails be[illegible]en Hrehorovich and Woodward, but that's an assumpti[illegible]on my part.**
Q But your understanding was that they were -- that Bill Cai[illegible] was asking for a negative summarization of Steven Woodv[illegible]'s performance. Obviously, he was asking you for a grievanc[illegible] committee hearing report; --
MR. GUNSBERG: Object --
Q -- is that correct?
MR. GUNSBERG: Object to the form of the quest[illegible] and you're asking this witness to speculate as to the state of mind of Dr. Cain.
Q Well, the email says, "To proceed we need his agrievance

statement. What was your understanding of that? I mean were you going to write a nice story about Steven Woodward or were you going to write a grievance statement?

A **I did neither. I didn't preface it by saying, "I have been requested to do this." I didn't ask for a grievance procedure to be instituted. This memo that I wrote on December 17th is my personal summary of our interactions with Mr. Woodward. The school could do whatever they wanted with it.**

Q And did you have anything nice that you thought about Steven Woodward? I mean did he do anything right?

A **He didn't hurt children or small animals, to the best of my knowledge, so I have no complaints with regards to that. My personal opinion is that his attitude in the medical education office and in the classroom was not something that I felt particularly comfortable with.**

Q Well, but my question was, do you have anything nice to say about your observation of his time in the fifth semester? I mean did he do anything right? Is there anything positive that you have to say?

A **No, I don't.**

Q So as far as you're concerned he did everything wrong?

A **No, that's not what I said at all. I said I'm aware of negative things that he did. I am not aware of positive things that he did. I'm not saying that there weren't any.**

**I'm not aware of them.**

Q Well, did you perform any investigation to determine if there were any positive things that you should have included in your memo?

MR. GUNSBERG: Object to the form of the question.

Q You can go ahead and answer.

A **No, I didn't.**

Q And why didn't you?

A **I talked to Deneen. I talked to Jeff. They never had anything positive to say that they brought to light about him. All I heard about Mr. Woodward were negative things.**

Q But did you ever ask -- strike that. Is it fair for me to assume that you never asked Deneen or Dr. Yanez if there was anything positive about Mr. Woodward?

A **I did not use those words, no.**

Q All right. You didn't use those words, but you didn't use that general frame of mind either?

MR. GUNSBERG: Is that a question?

Q Is that correct? In other words, you --

A **I was looking for something good about Mr. Woodward which is why we waited over a month before I talked -- or a month before I talked to him. I was hoping he would settle down and find a way that he could cope with this 12-week course so that he could move on with his life. That was my sincerest wish. I don't like it when they had problems. I**

**don't like it. It makes my life more difficult. And I wanted him to find a way to cope with it. He never owed me or my direct reports that he had found a way to t get through this so the only feedback, my only interacti s, were negative. I did not go the extra 300 yards to f l a positive, that is correct.**

Q Now, in terms of the grievance committee meeting that is referenced in Exhibit Number 1, did you participate in the grievance committee meetings?

A **No, I did not.**

Q But you understood that your memo would be used in tha meeting, didn't you?

MR. GUNSBERG: Objection to form.

A **After the fact, yes, I did, when I went back and rea he communications from Dr. Cain and Dr. Calderon.**

Q In fact the December 15th email it says that they want agreivance statement or a request for grievance committe hearing so you knew that there was going to be a hearing because it's referenced in the email on December 17th -- ( December 15th; is that correct?

MR. GUNSBERG: I'll object as it misstates the document.

A **There is mention of a grievance proceedings, but I ln't know that it would actually come to fruition. I coul 't possibly know what other documents they had and id not**

**request a grievance hearing. I have here my summar f my interactions. It says nothing about requesting grieva : or disciplinary action against Mr. Woodward.**

MR. GUNSBERG: You're referring to the memo of December 17th.

THE WITNESS: December 17th.

Q All right. Let's go back to the December 17th memo then. All right. So we have talked about the first sentence,

"We have been reviewing our experiences with offering fifth semester for the first time. As with any new program it is not without its hitches and student adjustment issues."

What were the hitches and what were the student adjustme issues that you were referencing?

A **Some of the student adjustment issues had to do wi weather, being on Antigua and then coming to Michi and dealing with cold. The hours are very different for st nt rotations. There is a huge difference between taking classes at a university and the physical demands of b g on clinical rotations. It starts at 6:30 or 7:00 in the morning and it goes 'til 6:00 o'clock at night. And I d 't care if you're tired or if you don't like this patient, th get to be seen. So there was some of that time mana ment issues. Students have a -- many of them -- have a significant challenge with time management. Withoi ts**

Page 46

**hitches getting people to show up when they were supposed to, being sure that our rooms were scheduled appropriately for the lectures and that we had the mannequins and everything else that the school was requiring us to use. So those were the hitches and the student adjustment issues. I mean I think it was a normal roll-out of a new program. It was nothing significant.**

Q So the hitches in student adjustment issues those didn't really pertain just to Steven Woodward. That was for all the students?

A **Yes, and the program itself. Correct.**

Q Now, when you say "the program itself," are we talking about the fifth semester program? Is that the program we're talking about?

A **Correct.**

Q Okay. The next sentence says, "However, we found the attitude and demeanor of Steven Woodward to be completely inappropriate and detrimental to the program." What do you mean when you say that his attitude and demeanor were inappropriate and detrimental to the program?

A **As I had previously stated, his behavior in the classroom when lectures were being given, a lot of sighing, a lot of, you know, draping himself all over the chair, a lot of saying that, "This is irrelevant, I don't need to know this," voicing that to the instructor of the course.**

Page 47

Q Now, this is information that you gained from the instructor?

A **And from other fifth semester students who attempted to have Mr. Woodward represent them appropriately.**

Q Okay. Did you ever personally observe Mr. Woodward exhibiting an attitude or demeanor that was inappropriate and detrimental to the program? A very specific question. Did you ever personally make that observation?

A **In his conversation with me on October the 2nd his vocabulary, the way that he was criticizing AUA and the fifth semester program I did not think was appropriate.**

Q And you say how he was criticizing AUA in the fifth semester program. Were the criticisms valid criticisms?

A **Not from my perspective, no.**

Q And which criticisms are you specifically referring to?

A **The general comment that "This is a waste of my time."**

Q Now, you reference the October 2nd.

A **It's my memo to the file.**

MR. NICOLETTI: And I don't know if I have seen that so why don't we mark this as Exhibit Number 2.

MR. GUNSBERG: That's our original so -- oh, go ahead.

MR. NICOLETTI: It comes off.

MR. GUNSBERG: We'll make a copy of that.

(Deposition Exhibit 2 marked)

Pa[ge] 48

MR. GUNSBERG: You'll get it back. It's part of the file.

Q I'm going to hand you what we have marked as Deposition Exhibit Number 2. That's the memo from the file that you referenced?

A **Correct.**

Q And what prompted that memo to the file?

A **I wrote that memo to the file because I met with Mr. Woodward on October 9th at 4:45. Mr. Woodward wa[s g]reatly dissatisfied with being in our program and felt he wou[ld] be better served by being in the program run out of Mian[i]. He contacted someone in Miami, I cannot tell you who th[at] was, to find out if he could transfer to the Miami program. Miami said yes and he announced he was leaving St. J[oseph']s. Dr. Yanez cautioned him that he needed to contact th[e s]chool before he did that. When he contacted the school he [wa]s told he could not transfer.**

Q And who told him that?

MR. GUNSBERG: If you know.

A **I don't know who it was that told him that he could n[ot] transfer.**

Q Okay.

A **So I met with him on October the 9th and said that I [wa]s willing to let bygones be bygones, that we would not terminate him from the program, that he could stay in [th]e**

Pa[ge] 49

**program, but I expected to see a more positive attitu[de] from him, that I can appreciate he may not like what the s[ch]ool does or how they do it, I am under contract. We're providing the curriculum. And that was my memo to [th]e file to document that we had that conversation.**

Q And who was that memo provided to?

A **No one. It was part of -- whenever I meet with stud[en]t, intern or resident to discuss a sensitive issue or their progress I make a memo to my file.**

Q And was that memo provided to anybody at AUA?

A **No.**

Q And was that memo provided -- was a copy provided to Ste[ve]n Woodward?

A **No. It's my note to myself.**

Q So it didn't go in his file. It went in your file?

A **It went in my AUA file.**

Q Did you keep a file for Steven Woodward?

A **Only after I got served.**

Q But prior to that time?

A **No.**

Q How does St. Joseph keep a record of student progress?

A **The school has an evaluation form that varies from s[ch]ool to school that preceptors will fill out. The director of medical education is frequently contacted and asked [if t]here was anything extremely positive or negative you wa[nt t]o**

Page 50

**communicate to us about our students. Most students I have nothing particularly glowing or negative. They're right in the middle, a nice normal curve, they're right there, and so I have no need to communicate.**
Q So where are these evaluation forms kept?
A **They're kept in Deneen McCall's office. She has a formal file on every student that rotates with us. I think we keep five years in her office.**
Q So Deneen McCall has a file for Steve Woodward?
A **Yes. It would have his transcripts, photograph, pager number, just everything that we have on him.**
Q Does that memo that we have marked as Exhibit 2 does it indicate anything else besides the issue of wanting to transfer to Miami?
A **Yes, it does. And I am quoting from this, "I told him that he could continue with our program, but that I expected him to behave more professionally."**
Q And what did you mean by that?
A **Continuing his constant criticism of AUA and St. Joseph Mercy Oakland is not appreciated or helpful. Frequent comments that "AUA sucks" or "This program sucks," I don't know where to fix that. Can you give me something specific?**
Q Well, I'm not sure if you're reading from the memo or if you're just commenting.
A **I'm commenting at that point.**

Page 51

Q Can I see Exhibit 2?
(Witness hands exhibit to counsel)
Q All right. So the memo doesn't say anything about "AUA sucks," you're just added that?
A **Yes, from emails that I had from Dr. Hrehorovich quoting -- well, that were forwarded to me that Mr. Woodward wrote.**
Q All right. To your knowledge were there ever any criticisms of AUA or of St. Joseph Mercy Oakland that were appreciated or helpful?
A **None that I can recall.**
Q You indicate that you expected him to behave more professionally so, in other words, what you meant was quit criticizing and the hospital. Was that your idea of --
A **No. I welcome constructive criticism. Tell me how we can make it better, don't just say, "I don't want to do this."**
Q So is it your testimony that he never offered any constructive criticism that you're aware of?
A **He never offered any criticism that I found constructive that I could use to improve the program.**
Q Do you know if he ever offered any criticism that anyone else ever found constructive?
A **You would have to ask the other people he interacted with.**
Q All right. You don't know?
A **No, I don't.**
Q Okay. In fact your December 17th memo it indicates "Mr.

P e 52

Woodward appeared to have resented every assignment that gave him." Is that based upon what one of the instructors told you or is that based on your own personal knowledge?
A **Again, I am the principal for the program and I am summarizing what my faculty had communicated to m aculty that I had been working for some time and hold in higl regard.**
Q And who was it that told you that Mr. Woodward appeared t have resented every assignment that we gave him?
A **It would have been largely Dr. Yanez who was the ke culty member of the course.**
Q And not so largely Deneen McCall?
A **Less. She certainly communicated to me, but Dr. Yan s a faculty member and so it would be largely his input th would have taken for this statement. Deneen is suppo staff and so, I think, Dr. Yanez is better qualified to judge that than Deneen is.**
Q The next sentence says "For example," -- or I'm sorry. I skipped a sentence. "But instead of constructive criticism he vented his anger in unprofessional" -- or I'm sorry -- "in a professional unacceptable manner."
A **Oh, it should have been "professionally unacceptable manner."**
Q And how did you consider it to be professional unacceptable?
A **I did see his body language in the classroom. I did wi ss**

P e 53

**the sighing, the rolling of the eyes and the language th he used in October when he met with me and in comm cations to the school that I do not think it's professional. It's my opinion that it's not professional.**
Q All right. The language that he used in October you're referring to "AUA sucks"?
A **And using the F word in emails to the dean of the scho I don't find that particularly helpful.**
Q And so somebody showed you emails where he used the F w ?
A **Uh-huh (affirmative).**
Q And when was that?
A **Well, it's in the series of communications, I believe as said, sometime between October 22nd and the 26th or 28th, something like that.**
Q So those were provided to you by AUA?
A **Yes.**
Q You indicate, for example, "He completed his hundred patien log in two weeks and wanted to stop attending the program"?
A **Correct.**
Q "He requested a transfer to the Miami program saying that the fifth semester was a waste of time and would be better spend in a Kaplan course"?
A **Correct.**
Q Is that what we had already talked about regarding your October 10k memo? Does your October 10th memo summari he

Page 54

transfer request or are you talking about different request?
A **No, that is the transfer request.**
Q You indicate, "He completed his hundred patient log in two weeks and wanted to stop attending the program." Is it fair for me to assume that that was based on information from one of the course instructors?
A **Correct. Most students were hard pressed to log a hundred cases in 12 weeks.**
Q Did he ever see more than 100 patients?
A **No. It's not just see a patient. Like, "Oh, look. There is one. There is one. There is one." He was supposed to have substantive contact and know the case and the diagnosis and be able to discuss it. And for someone who has just completed two years of basic science to be able to do 100 cases in two weeks I'm hard pressed having a resident that can do 100 cases in two weeks and these are people that are already licensed.**
Q Did you ever verify that that was, in fact, true that he completed 100 patient log in two weeks?
A **He walked down a corridor and saw 100 patients. That's not what the intent of that assignment was.**
Q How do you know that, because the instructor told you that?
A **I know it's physically impossible for a student at that level to interview 100 patients in two weeks.**
Q Okay. I think you're not hearing my question. My question

Page 55

is, did you ever verify that he completed his hundred patient log in two weeks? I'm not asking you if it is possible. I'm asking you if you ever verified it.
A **He turned in to Dr. Yanez his log with 100 patients and asked if he could now be excused from the course.**
Q In two weeks?
A **In two weeks.**
Q And that's what Dr. Yanez told you?
A **Correct.**
Q But did you ever verify that that was true?
A **I looked at the logs and knew it wasn't possible.**
Q So your answer is, "yes," you did verify it?
A **Yes.**
Q Your memo says "Sabotaging exams by giving the same response to all questions to simply get it over with." Is that your comment or is that based on something that you were told by one of the instructors?
A **It's what I was told by one of the instructors. It's what the school told me, and it's what Mr. Woodward told me he did was because he thinks the exams are a waste of time.**
Q And you specifically used the word "sabotaging." How was that sabotaging?
A **Because the exams were weighted and so he would change -- by not doing well it would change the distribution and so the scores he could lower the grades for everybody.**

Page 56

Q So you're saying by his giving the same response he wou[ld] receive a lower score than he should, therefore, --
A **Well, it would change the curve and so you could j[ust] play probabilities and hope that you came out with a hig[h e]nough score.**
Q So it wasn't sabotaging the exam. It was sabotaging the grades from the exam?
MR. GUNSBERG: Objection; argumentative.
Q Is that right?
A **It's also sabotaging the intent of the exam. The in[ten]t is to have a measure the acquisition of information th[e] students have been gleaning from their experience[s a]nd if you don't take it seriously it defeats the purpose of [ha]ving the exam.**
Q Was that a course strategy that was taught by Kaplan as as if you don't know the answer answer the same questio[n fo]r every question?
A **I really have no knowledge of how Kaplan instruct[s].**
Q If Kaplan instructs that way would that make a difference
A **Not to me.**
Q Your memo says "Requesting early release on virtually a daily basis from his clinical rotations so that he could study for the boards, et cetera." What does the "et cetera" mean?
A **I just got tired of listing what his concerns were.**

Page 57

Q How do you know that he requested early release on virtua[lly] a daily basis?
A **That is some amount of hyperbole, but when you int[erv]iew, when you speak with Dr. Yanez and Deneen McCall it [fel]t like it was every day he was asking, "Can I go home now? [A]re we done?"**
Q So did you just take the liberty to add "virtually a daily basis"?
A **It is hyperbole.**
Q Which means what, in your opinion?
A **It happened very frequently. It felt like every day.**
Q So none of the course instructors told you that it was on a daily basis?
A **No, they did not.**
Q "We believe that if perceived" --
A **"That if he perceived."**
Q -- "if he perceived the AUA fifth semester curriculum as inappropriate the professional response would have been to engage in a reasoned dialogue with representatives of the school, not argue with the faculty at St. Joe Mercy Oakland or openly demonstrate his contempt for the curriculum and those charged with delivering it."
Do you know if he ever tried to engage in a reasoned dialogue with anybody from the school?

A **I know that he engaged in a dialogue. I have evidence of his dialogue with the school about curriculum. Now, whether there were other communications out there I don't have all of Mr. Woodward's communications.**

Q So why would you have accused him of not doing it if you didn't think you had all of the communications?

A **This is my opinion of Mr. Woodward's summary of my exposure to Mr. Woodward. I have not been exposed to all aspects of Mr. Woodward or every communication he has ever written. Based on what I have been exposed to these are my conclusions and my opinion.**

Q And what faculty at St. Joe did he argue with?

A **Dr. Yanez.**

Q Anybody else?

A **Not that I am aware of.**

Q Do you know if Dr. Yanez wrote a good evaluation for Steven Woodward?

A **No, I do not.**

Q If I told you that he gave him two 100 percents, would that surprise you?

MR. GUNSBERG: I'm going to object.

A **I don't know what the context of it is.**

MR. GUNSBERG: Object that it misstates and it's not on the record.

Q Regarding the fifth semester, would that surprise you?

A **No. Students get phenomenal grades regardless of how they do.**

**(Deposition Exhibit 3 marked)**

Q I'm going to show you what I have marked as Exhibit Number 3.

A **What do we got here?**

**(Witness reviews exhibit)**

A **Oh, case presentation. Yeah, not at all surprised at that. I am not a physician. I could get 100 percent on this.**

Q Why don't you tell me what it was I just showed you. What is Exhibit 3?

A **Exhibit 3, and, again, I am not as well versed in the details of the fifth semester curriculum as Dr. Yanez, but one of the components is that the student had to bring forward a case that they felt that they had had substantive contact with and summarize the case in three minutes.**

MR. GUNSBERG: Well, that's a exhibit you marked in the dep so let's leave it in the dep. I think you were going to put it back in your book.

MR. NICOLETTI: Yeah. I was going to, but I didn't.

MR. GUNSBERG: That's not an evaluation. By the way, I'm going to renew my objection to the form of your question characterizes that document as something that it's not now that you have just shown the document to the witness

and the witness has identified that it's not an evaluation in the sense that you have characterized it on this record. Please note my objection.

Q Any other faculty that Mr. Woodward argued with other tha Dr. Yanez?

A **No. I believe I stated previously that I am not awar f those conversations?**

Q Now, you state that "He openly demonstrated his contempt the curriculum and those charged with delivering it." What did you mean by that?

A **If I could have my October 10th memo.**

Q Exhibit 2.

(Counsel hands exhibit to witness)

A **When I met with him I have summarized here he st d that his time would be better spent not in our program, th he would learn much more if he was in a Kaplan course, it he did not like being in the fifth semester program and t he resented having to be there. He didn't think it was a od use of his time.**

Q So when you say "demonstrate his contempt for the curriculum," you mean the fifth semester program?

A **Correct.**

Q You don't mean the general AUA program?

A **He had voiced dissatisfaction with his training on th island, but I am not in a position to judge whether th was**

**a valid criticism or not. I don't know. He said that it was a crappy school, that it was a waste of his time, t they are just about the money. I mean those are thi that I recall him saying about the school. Whether it's tr r not I have no idea. All I know is what we're suppose do in 12 weeks.**

Q Were there any other students that complained similarly about the same things that Steven Woodward complained a it?

A **No, there weren't. Did they have those concerns? I may well, but they didn't voice them to me.**

Q Your memo also indicates "Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern." I don't want to beat this horse to death, but have we already talked about what his lack of professionalism was?

A **(Nodding head in affirmative).**

Q For the record you're shaking your head.

A **I'm sorry. His lack of professionalism, yes, I had co rns with that. I have indicated his communication skills me. His ability to present a reasoned argument as oppose o some of the words that he uses to use in a professior context. I had concerns about how he would repres himself if he had a disagreement with an attending a ut patient care or about patients. I was concerned abo ow he would present himself to a patient population.**

Page 62

Q Did he ever get that opportunity to present himself to a patient population?
A **Extremely limitedly.**
Q And what was your observation of that extremely limited situation?
A **Neutral. He didn't behave, to the best of my knowledge, exceptionally or poorly.**
Q So he didn't demonstrate the lack of professionalism or poor communications skills when he interacted with the patients?
A **To the best of my knowledge, no.**
Q You say, "We do not feel that he will be a good ambassador for AUA." Who is "we"?
A **"We," myself, Dr. Yanez and Ms. McCall.**
Q And did you specifically have a discussion regarding what a good embassador would be?
A **Yes.**
Q And what is a good ambassador?
A **A good ambassador is someone who fulfills the objectives of the program, who does it appropriately. For example, like taking the test because it's a self-assessment, if nothing else, of what one's knowledge base is. These need to be self-directed learners who tries to make the best of it and Mr. Woodward did not. And we were -- because this was the first time we were running the program and we felt he was so disruptive we were thinking about whether we wanted to**

Page 63

**continue the program. If AUA was going to continue sending us students like Mr. Woodward we were not interested in continuing the program.**
Q So Mr. Woodward was so bad that you were thinking about quitting the program all together?
A **Yeah.**
Q And what documentation do you have to support the fact that you were thinking about stopping the program all together?
A **I have no documentation. That's my judgement and I get to decide who we're going to contract with and who we're not. And if someone is going to take up a lot of time like this then it's not worth my faculties time. There are other schools that I can contract with instead.**
Q So you indicated that there were not any other students that were causing problems besides Mr. Woodward; is that right?
A **That's correct.**
Q So basically you wanted Mr. Woodward gone?
A **No. I wanted Mr. Woodward to behave appropriately. I did not want him gone. I wanted him to get on with his career.**
Q Now, you indicate in your memo that you "didn't think he was a good ambassador for AUA, our hospital or the profession he is about to enter."
A **Correct.**
Q So you didn't think that he had the qualifications to even be a doctor, did you?

Page 64

A **I thought he didn't have the professional qualificati[...] to be a physician.**
Q Did he have the academic qualifications?
A **From his exam scores and in hindsight when I see hi[...] rades on the island I question whether he has the academi[...] kills to be a physician.**
Q Now, you say "in hindsight," so you didn't know what his scores were from Antigua?
A **No, I did not.**
Q When did you first learn about the scores?
A **After I got served with papers.**
Q Now, there was an issue as to what his score was for the fifth semester, wasn't there? Was there a fifth semester exam where there was a --

(Off the record interruption)

Q Was there an issue concerning Mr. Woodward's fifth semes[...] grade?

MR. GUNSBERG: You're asking this witness if she knows?

MR. NICOLETTI: If she knows. All the questions are if she knows.

A **No, I'm not aware of it.**
Q Do you have any personal knowledge as to what his fifth semester grade was?
A **I believe I found out a couple of months later. I don[...]**

Page 65

**know what the grade was, but I believe he didn't pas[...] ut I don't know what the grade was. We didn't assign th[...] nal grades.**
Q Who did?
A **The school did. Everything was submitted electroni[...] y and the school decided on the scores who passed and wh[...] idn't. That wasn't our decision.**

MR. GUNSBERG: "Our" being St. Joe?

THE WITNESS: "Ours" being St. Joe's, correct.

Q Did Dr. Yanez have any say over whether there was a class curve applied to the fifth semester exam scores?
A **No, he did not.**
Q Is all that left up to the school then?
A **Correct. The school has several sights that they hav[...] n the fifth semester program in.**

MR. GUNSBERG: I don't think there was a questio[...] Wait for a question.

THE WITNESS: Okay.

Q Your memo indicates,

"We encourage the faculty at AUA to review his entire record to determine if he does meet the qualifications to sit for the boards and begin clinical rotations."

What did you mean by "asking the faculty at AUA to review his entire record"?
A **It was in -- sometime -- in December that I became [...] are of**

Page 66

**Mr. Woodward's history on the island. I had no knowledge of his grades or his performance or anything prior to that. I was fairly well versed in the 12 weeks that Mr. Woodward was with us. As a director of medical education if I saw Mr. Woodward's entire record I would not let Mr. Woodward train at my institution. I wouldn't chose him. There is a huge pool to chose from. I'm not going with this guy.**

Q Well, you set up the program though, why didn't you make that a requirement for determining which students you would accept?

A **Because I have never encountered that before.**

Q Have you since Mr. Woodward implemented that policy or procedure?

A **Yes, I have.**

MR. GUNSBERG: Excuse me. What was the question? You mean since Mr. Woodward left the program has there been a change? Is that the question?

MR. NICOLETTI: Well, I don't know if that was exactly the question, but --

Q After Mr. Woodward do you now look at the academic performance before you decide what student you'll accept?

A **Yes. And I require that the school indicate whether the student has initiated any actions at their school, legal actions.**

MR. NICOLETTI: Could you read that answer back,

Page 67

please?

(Read back of previous answer)

Q Why would you care if a student has initiated any legal actions?

MR. GUNSBERG: Objection; relevance. After the fact isn't relevant.

Q You can go ahead and answer it.

A **I want to know how argumentative they are and I will take a look then at what grievances they have filed against the school to decide whether or not this is somebody that's going to come and cause a lot of problems for us.**

Q And so it is fair for me to assume that prior to your writing the memo on December 17th of 2007, you didn't know whether Steven Woodward had filed any legal actions at AUA or involving AUA?

A **I would say not prior to December 17th, but prior to the beginning of December I was not aware that he had initiated complaints at his school.**

Q Are you aware as to whether or not there were ever any complaints initiated against him at his school prior to December?

A **No.**

Q Have you ever been made aware as to whether there were ever any disciplinary proceedings involving Mr. Woodward?

MR. GUNSBERG: Outside of the conversations with

Pa e 68

counsel, do you have any information from any source otl than me or your lawyer regarding -- not saying that you h information from me, but go ahead. The question has to to information outside of any discussion with me about whether Mr. Woodward had a disciplinary history at AUA.

THE WITNESS: No -- oh, yes, I do.

A **Yes, I do have knowledge of that from a conversat with faculty at AUA.**

Q Who was that conversation with?

A **I believe it was Dr. Cain.**

Q When was that conversation?

A **I believe it was shortly after Thanksgiving, the end November, beginning of December a phone convers on.**

Q And what was the substance of the phone conversation?

A **We were discussing fifth semester in general and p blems students had.**

Q And what was the actual discussion?

A **The discussion was that Mr. Cain told me that this s -- that Mr. Woodward had a history of not being satis l with his experiences provided by AUA. And I believe it's o referenced in -- in hindsight I had some hints to it i e exchange between Mr. Woodward and Dr. Hrehoro n in complaints he had.**

**(Deposition Exhibit 4 marked)**

Q Now, after you wrote the December 17th memo did you ere

Pa e 69

you ever asked again by AUA to provide additional information?

A **No, I was not.**

Q What communications or what knowledge did you gain afte December 17th pertaining to the outcome of what impact, if any, your memo would have had on Mr. Woodward?

A **I sought it. I didn't get it until maybe April of this year, April or May. I had no idea what the outcome w**

Q And what did you seek?

A **I asked representatives of the school what's going o with -- "Has any conclusion been reached relative to l Woodward?"**

Q And who did you seek that information from?

A **I had been seeking it from both Calderon and Hrehor ich, but they took on new positions within the organizatic nd in a conversation with Mr. Simon, you know, he -- I b ve it was Mr. Simon that told me that Mr. Woodward did t complete the fifth semester.**

Q And did he tell you how he didn't complete it?

A **No, he did not.**

Q And how did the communication with Mr. Simon take place? Did you call him or did he call you?

A **I really couldn't recall that. We were talking about t general structure of the program and how many stud s we were going to be taking in the future and reimbursem t and**

Page 70

**contracts and I threw in, "By the way, you know, has any decision been made relative to Steve Woodward?" And he told me that he had not successfully completed the fifth semester.**
Q Did he tell you that he had been dismissed from the school?
A **No, I don't believe he did.**
Q Did you ever find out whether or not he had been dismissed?
A **Yes. I was at a curriculum committee meeting with the faculty in June and I find out he had been dismissed.**
Q You said "with the faculty," who told you that?
A **I believe it was Peter Bell told me, the dean.**
Q And that would have been a faculty committee meeting in Antigua?
A **No, it was in San Juan.**
Q I'm going to show you what I have marked as Exhibit 4 and ask you if you have ever seen that before?
(Witness reviews exhibit)
A **It does have my name. I probably saw it. I don't recall it, but I am copied on it and I read all my emails, so I'm going to say "yes" I saw it.**
Q And what does that appear to be?
MR. GUNSBERG: You mean what does it say?
Q What does it say?
MR. GUNSBERG: Are you asking her to read it into the record?

Page 71

MR. NICOLETTI: No.
MR. GUNSBERG: It says what it says.
Q What's your understanding of that email?
A **Well, my understanding is exactly what it says that the final exams will have a curve of 10 percent applied.**
Q And that email is coming from Dr. Yanez?
A **Yes.**
Q And do you know if it ever became an issues as to whether or not the 10 percent curve would, in fact, be applied?
A **I don't know that. So it looks like Dr. Yanez sent that to some students to explain how AUA is --**
MR. GUNSBERG: There is no question.
THE WITNESS: Okay.
(Counsel and client confer)
Q Do you know whether Steven Woodward was ever allowed to retake a portion of the fifth semester exam?
A **I believe I recall he was.**
Q And what was the reason for that, if you recall?
A **I do not recall why that was.**
Q Do you know whose decision that would have been to allow him to do that?
MR. GUNSBERG: If you know without guessing.
A **I would have to guess.**
Q I don't want you to guess.
(Deposition Exhibit 5 marked)

Pa[illegible]e 72

Q I'll show you what's been marked as Exhibit Number 5. [illegible]e you ever seen that before?
(Witness reviews exhibit)
A **Yes. Not necessarily these numbers, but I am fami[illegible]r with the Scholars 360 print-off sheet.**
MR. GUNSBERG: The question is, "Have you see[illegible] this one?"
A **No, I don't know that I have seen this one.**
Q And where would this -- what is this print-off sheet? Wh[illegible] is Scholars 360?
A **Scholars 360 is the master electronic file that capt[illegible]s the -- all the exam information for AUA.**
Q And what score does that Exhibit 5 indicate as being a fi[illegible] score?
A **Well, the total points were 568, the average was 7[illegible]**
Q Do you know whether that was before or after the applic[illegible]n of the 10 percent curve?
A **No idea.**
Q Do you know if a 10 percent curve should have been app[illegible] to that score?
MR. GUNSBERG: Object to the form. No founda[illegible]n.
A **No idea.**
Q Would that have been Dr. Yanez's decision --
MR. GUNSBERG: Object to the form.
Q -- referencing Exhibit 4?

Pa[illegible]e 73

A **To add 10 percent? No. "AUA has decided to a[illegible]ly 10 percent," so that says to me AUA did it, not Dr. [illegible]nez.**
MR. NICOLETTI: If we can take a break and [illegible] can look through her folder. I'm just about done.
(Off the record)
(Alex Pathenos enters deposition at this poin[illegible])
(Deposition Exhibit 6 and 7 marked)
Q Dr. Zonia, I have pulled some of the documents out [illegible] your -- out of the file that your attorney had handed t[illegible]e. I don't want to call Exhibit 7 your entire file, but it's the vast majority of your file and I would just like you confirm that all of those documents were, in fact, take[illegible] from your file that you had given to your attorney.
A **Yes.**
Q Is that correct?
A **That is correct.**
Q Well, why don't you look through it just to make sure [illegible] didn't sneak any hidden scud missiles in there.
A **Well, these certainly look like all the majority [illegible]he files -- the papers that were removed from my [illegible].**
Q Now, I did notice in Exhibit Number 7 that there was demand for a retraction sent by Steven Woodward. [illegible]ou know what a demand for a retraction is?
A **Yes.**
Q Are you familiar with the document I am referencing [illegible]re?



Page 74

A **Yes, I am.**
Q After you received the demand for retraction what was it you did, if anything?
A **The demand for retraction of my memo to the school was made days or hours after I was served with papers saying that he had made the request for retraction and he had not. I got that after I was served.**
Q Okay. So my question is what did you do, if anything, after you received the demand for retraction?
A **Nothing.**
Q All right. So I guess if you did nothing you didn't take any steps to go back and analyze the memos that we had marked as Exhibit Number 6, I think?
A **I looked at the memo, but I didn't take any actions to retract the memo.**
Q All right. When you looked at Exhibit 6, the memo, did you discuss the memo with anybody upon receiving the demand for retraction?
A **I don't believe I did.**
Q As we sit here today, you still have the opinion that everything stated in your memo, Exhibit Number 6, is completely true and accurate?
A **Yes, I do.**
Q Have you ever been a party to lawsuit before?
A **Yes.**

Page 75

Q You personally, not the hospital? You personally?
A **Yes.**
Q And when was that and under what circumstance was that?
MR. GUNSBERG: Would you like to go outside for a minute?
THE WITNESS: Sure.
(Off the record)
A **Yes. Young as I am, many, many, many years ago a landlord tried to raise my rent in the middle of a lease.**
Q So you sued the landlord?
A **Uh-huh; yes.**
MR. NICOLETTI: Okay. I don't have any further questions. Thank you.
MR. GUNSBERG: I don't have any questions.
(Deposition concluded at 10:43 a.m.)
-0-0-0-

I certify that this transcript, consisting of 75 pages, is a complete, true and correct record of the testimony of Susan Zonia, Ph.D. held in this case on February 3, 2009.

I also certify that prior to taking this deposition, Susan Zonia, Ph.D. was duly sworn to tell the truth.

February 10, 2009

Sheila H. Raymond

Sheila H. Raymond, CER 6932
Network Reporting Corporation
2604 Sunnyside Drive
Cadillac, Michigan 49601-8749

NetworkReporting
1-800-632-2720

**From:** "William Cain" <billcain@comcast.net>
**To:** "'Susan Zonia'" <ZONIAS@trinity-health.org>, <JECMPARK@aol.com>
**CC:** "'Deneen McCall'" <MCCALLDY@trinity-health.org>, "'Jeffrey Yanez'" <YANEZJ@trinity-health.org>, "'Sevrine Barrie'" <Sbarrie@AUAMED.ORG>
**Date:** 12/17/2007 9:36 AM
**Subject:** RE: Planning the grievance hearing

Dear Dr. Zonia and Dr. Calderon;

Your memo, Dr. Zonia's, to Dr. Calderon dated Dec. 17, 2007 is what we needed to continue the committee's work.

Later today, I will meet with Dr. Calderon and Sevrine Barrie to plan distribution of the grievance documents and to arrange a time and places for the hearing. Hopefully, the hearing will get done on Wednesday of this week (Dec. 19).

We will need your help, Dr. Zonia, with hearing arrangements. When I talk to Steve Woodward, I need to tell him when and where he should appear to respond to the grievance and to answer questions from the committee. Please expect a call from me and/or Sevrine this afternoon.

Thank you.

Regards,

Bill Cain

-----Original Message-----
From: Susan Zonia [mailto:ZONIAS@trinity-health.org]
Sent: Monday, December 17, 2007 9:08 AM
To: JECMPARK@aol.com; billcain@comcast.net
Cc: Deneen McCall; Jeffrey Yanez
Subject: RE: Planning the grievance hearing

Here is the memo you requested. Please let me know if you need anything else.

Susan C. Zonia, Ph.D.
Director of Medical Education
St. Joseph Mercy-Oakland
44405 Woodward
Pontiac, Michigan 48341
(248)858.6796
zonias@trinity-health.org

>>> "William Cain" <billcain@comcast.net> 12/15/2007 7:02 AM >>>
Dear Dr. Zonia,

To me, the documents I have received are evidence of absurd behavior. To proceed, we need is a grievance statement (or request for grievance committee hearing). I will distribute your statement to Steve Woodward and to the faculty committee. Then, during the hearing, I will ask Steve Woodward to respond.

A letter or memo from you that states or summarizes the complaint(s) will suffice.

Please feel free to call [(410)-299-5550] or email me at any time.

Thank you.

Bill Cain

William A. Cain, Ph.D.

AUA School of Medicine

Professor and Assistant Dean

Allied Health Professions

---

From: JECMPARK@aol.com [mailto:JECMPARK@aol.com]
Sent: Saturday, December 15, 2007 3:58 AM
To: ZONIA@trinity-health.org; ZONIAS@trinity-health.org
Cc: billcain@comcast.net
Subject: Fwd: Planning the grievance hearing

Dear Susan:

Please read this note from Dr. Cain. You need to write a request to start a Grievance procedure. If you would like, you could say that "according to instructions from VH and myself......" That way you would not have this person in your Office complaining.

J. Ernesto

---

See AOL's top
<http://food.aol.com/top-rated-recipes?NCID=aoltop00030000000004> rated
recipes and easy
<http://body.aol.com/fitness/winter-exercise?NCID=aoltop00030000000003>
ways to stay in shape for winter.

OUR MISSION: We serve together in Trinity Health in the spirit of the Gospel to heal the body, mind, and spirit, to improve the health of our communities and to steward the resources entrusted to us.

**Memo to file**
October 10, 2007

On 10/2/07, Student Doctor Steven Woodward sent an e-mail to Dr. Yanez and Deneen Nicks stating that the Miami program consented to let him transfer into their program. His strongest desire seems to be full attention to enrolling in, and completing, the Kaplan course.

On 10/9/07 at approximately 4:45 pm, Student Doctor Woodward asked to meet with me to discuss his continuation in the AUA-SJMO V Semester Course. He stated that he had spoken with representatives of AUA and that this transfer was not authorized and that the Miami program was not in a position to let him transfer. We spoke about his concerns, which seem to center on completing the Kaplan course. He feels that he will not be ready for Step I without it and claims that "everyone he know that takes it passes".

I explained that we are a partner with AUA and that we are attempting to deliver the curriculum as intended by the school. If he has issues with the plan of the semester, he should voice those concerns to the school, not SJMO. We would take criticism for the content of the lectures we give, but the over-all structure is not under our control.

I told him he could continue with our program, but that I expected him to behave more professionally. His constant criticism of AUA and SJMO was not appreciated, or helpful. He will be allowed to continue with the program for as long as he chooses to remain an appropriately engaged participant.

Susan C. Zonia, Ph.D.
Chief Academic Officer & DIO

DEPOSITION EXHIBIT 2 Zonia 2-3-09 PENGAD 800-631-6989

# American University of Antigua

## Case Presentations - Semester V - St. Joseph Mercy Oakland

STUDENT'S NAME: Steven Woodward

| Components | Points | 01 9/28 2007 | 02 10/19 2007 | 03 11/30 2007 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Chief Complaint:** | | | | | | | | | | | | | | | |
| . Place | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Age | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Sex | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Main complaint | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Duration | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| **Past History** | | | | | | | | | | | | | | | |
| . Previous pathology | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Symptoms progression | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Pertinent negative Symptoms | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| **Physical Exam** | | | | | | | | | | | | | | | |
| . General condition | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Vital Signs | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Positive Findings | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Pertinent negative signs | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| **Assessment** | | | | | | | | | | | | | | | |
| . Working Diagnosis | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Differential Diagnosis | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| **Plan** | | | | | | | | | | | | | | | |
| . Therapeutic | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Diagnostic | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| **Template** | | | | | | | | | | | | | | | |
| . Epidemiology | | | | | | | | | | | | | | | |
| - Age | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| - Sex | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| - Ethnicity | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| - Special Groups | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Symptoms | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Signs | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| . Differential Diagnosis | 3 | ● | ● | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| **Timing < / = 2 minutes** | 21 | | 20 | | | | | | | | | | | | |
| **Preparation** | 6 | | 5 | | | | | | | | | | | | |
| **Clarity** | 4 | | 4 | | | | | | | | | | | | |
| **TOTAL** | 100 | 100 | 98 | 100 | | | | | | | | | | | |

Form DOCS- EVALUATION 01 - 09/01/07 JEC

Yanez Khan Yanez

81

**From:** Jeffrey Yanez (yanezj@trinity-health.org)
**To:** Bulat; Hamed; Chheda; Evans; Hampel; Ozuomba; Chahal; Sibia; Kristen; Woodward
**Date:** Saturday, December 8, 2007 8:39:48 AM
**Cc:** Deneen McCall; Susan Zonia
**Subject:** Final exam "curve"

After reviewing the final exam results AUA has decided to apply a 10% "curve" . AUA requires a 80% score on the final written exam to pass semester V. Your score + 10% = final curve score.
The maximal score with the curve is 95%!
JPY

Scholar360 Page 1 f 1

Home | Profile | Blog | Contacts | Messages
RSS Reader | Calendar
My Classes | All Classes
My Communities | All Communities
My Grades | My Files | Digital Dropbox
Search | Help | Logout

# My Grades

| Item | Date | Available Points | Grade |
|---|---|---|---|
| AUA Online<br>Final Grade: 71 | | | |
| Test - Final Exam - Block 4 (Dermatology, Imaging, Gyn, Psychiatry) | 2007-12-06 | 200 | 142 |
| Test - Final Exam - Block 2B (Opthalmology) | 2007-12-06 | 50 | 43 |
| Test - Final Exam - Block 2A (History and Physical Exam) | 2007-12-06 | 50 | 37 |
| Test - Final Exam - Block 2C (Vocabulary) | 2007-12-06 | 100 | 88 |
| Test - Final Exam - Block 3B (Hemopoietic/Lymphopoietic System) | 2007-12-05 | 50 | 21 |
| Test - Final Exam - Block 3A (Cardiovascular) | 2007-12-05 | 100 | 47 |
| Test - Final Exam - Block 3C (GI System) | 2007-12-05 | 50 | 37 |
| Test - Final Exam - Block 1B (ENT) | 2007-12-03 | 100 | 71 |
| Test - Final Exam - Block 1A (Respiratory) | 2007-12-03 | 100 | 82 |

**Total Points Possible: 800**
**Total Points Earned: 568**
**Current Average: 71**

Terms of Service | Help | Supp

83

PENGAD 800-631-6989
DEPOSITIO
EXHIBIT
5
Zonia
2-3-09



ST. JOSEPH
MERCY OAKLAND

44405 Woodward Avenue
Pontiac, Michigan 48341-5023
248-858-3000

TO: Ernesto Calderon, M.D.
FROM: Susan Zonia, Ph.D.
RE: V Semester
DATE: December 17, 2007

We have been reviewing our experiences with offering the V Semester for the first time. As with any new program, it was not without its hitches and student adjustment issues. However, we found the attitude and demeanor of Steven Woodward to be completely inappropriate and detrimental to the program. Mr. Woodward appeared to have resented every assignment we gave him. But, instead of constructive criticism, he vented his anger in a professional unacceptable manner. For example: he completed his 100 patient log in two weeks and wanted to stop attending the program; he requested a transfer to the Miami program saying that the V Semester was a waste of time and his time would be better spent in a Kaplan course; sabotaging exams by giving the same response to all questions to simply get it over with; requesting early release on virtually a daily basis from his clinical rotation so that he could study for boards, etc. We believe that if he perceived the AUA V Semester curriculum as inappropriate, the professional response would have been to engage in a reasoned dialogue with representatives of the school, not argue with faculty at St. Joseph Mercy Oakland, or openly demonstrate his contempt for the curriculum, and those charged with delivering it.

Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern. We do not feel that he will be a good ambassador for AUA, our hospital, or the profession he is about to enter. We encourage the faculty at AUA to review his entire record, to determine if he does meet the qualifications to sit for the boards, and begin clinical rotations.

DEPOSITION
EXHIBIT
6
Zonia
PENGAD 800-631-6989

A MEMBER OF TRINITY HEALTH

OUR MISSION: We serve together in Trinity Health in the spirit of the Gospel to heal the body, mind and spirit, to improve the health of our communities and to steward the resources entrusted to us.

84

# CLINICAL CLERKSHIP AFFILIATION AGREEMENT
Between
# AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE
And
# St. JOSEPH MERCY-OAKLAND

*THIS AGREEMENT, made the of May, 2007 by and between the, American University of Antigua College of Medicine (hereinafter referred to as "College") and St Joseph Mercy Oakland (hereinafter called "Hospital").*

*WHEREAS, the College of Medicine, is engaged in the education of physicians at American University of Antigua College of Medicine, Antigua*

*WHEREAS, the Hospital, organized under the laws of the State of Michigan with its principal place of business at 44405 Woodward Avenue, Pontiac, Michigan, is providing health care services in appropriate facilities for the implementation of a program of clinical clerkships to improve the educational and clinical opportunities of qualified students*

*NOW, THEREFORE, in consideration of the mutual covenants herein contained, and intending to be legally bound hereby, it is agreed as follows;*

*The goals of the Program are to (1) improve the opportunities for professional training of students of the College: (2) increase the students' exposure to the clinical disciplines in the Hospital: (3) educate the students in such a manner as to maximize the efficiency and success of the students.*

*This Agreement shall take effect for a period of one year from the signing of this Agreement and is subject to annual renewal upon mutual consent. The College has the responsibility for preparing the affiliation clerkship curriculum for implementation by the Hospital, appoint the individuals who will be responsible for supervising and monitoring each clinical discipline and who will implement the clerkship program. The discipline coordinators at the Hospital will receive academic appointments according to the College's criteria and prevailing academic standards, and will be subject to regular review by the College's Committee on Academic Ranking System, and shall receive the same rights, tenure and fringe benefits as clinical faculty staff members of the College. The College assumes responsibility for the continuity of the program both financially and academically.*

*The Hospital clerkship program will include rotations in Internal Medicine, Surgery, Family Medicine, Pediatrics, and Obstetrics and Gynecology and electives*

*The structure of the clerkship program is subject to annual review and modification by the College, provided that such modifications are consistent with the goals and objectives of the program and are in compliance with New York State regulations.*

85

DEPOSITION EXHIBIT 7 Zonia 2-3-09 PENGAD 800-631-6989

*The performance of each student shall be subject to the College's system of evaluation. Such evaluations shall be submitted to the College within thirty (30) from the completion of the rotation and are requirements for graduation.*

*Periodic visits will be made to the Hospital by the representative of the College and appropriate clinical department chairmen and vice-versa. The College's coordinator for clerkships at the hospital or his designate will make periodic reports to the College to assure that the objectives of the program are being fulfilled. The cost of periodic visits will be assumed by the College.*

*The College will maintain student records, updating them as letters of evaluation from the Hospital are received;*

*Either party may terminate this Agreement, with or without cause, upon sixty (60) days prior written notice to the other Party.*

## *INSURANCE AND LIABILITY*

*The College shall at all times maintain or provide professional liability insurance coverage issued on an occurrence basis with limits of not less than $1,000,000 per occurrence and $3,000,000 annual aggregate, and general liability insurance coverage with limits not less than $1,000,000 for personal injury and $100,000 for property damage, in each instance covering the College and any corporation, officer, employee or agent of the College acting within the scope of employment by the College. All insurance maintained hereunder shall be issued from an insurance carrier licensed to do business in the State of New York. The College shall ensure that the Hospital shall receive notice from the College of cancellation or reduction of coverage with respect to any insurance policy maintained hereunder.*

*The College hereby indemnifies and holds harmless the Hospital and its officers, trustees, directors, employees and agents, from and against any and all liabilities, costs, claims, judgments, settlements and expenses, including reasonable attorney's fees, arising out of or in connection with the negligent act or omission of the College or any of its employees, agents or students.*

*The college, at its own expense, must also maintain a Student Accident and Health Insurance policy.*

## *CHOICE OF LAW*

86

*This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to choice of law provisions thereof. Any action commenced by a Party hereto relating to this Agreement shall be brought in the United States District Court for the Southern District of New York or in the Supreme Court of the State of New York, County of New York.*

## *GENERAL*

*The Hospital and the College shall each continue their independent corporate existence and, except as set forth herein, their respective corporate powers shall not be enlarged, impaired, or otherwise affected by this Agreement, they shall continue to be operated under the direction and control of their respective governing boards. Nothing in this Agreement shall impair or modify any existing agreements between any of the parties; or modification of old agreements between any of the parties.*

## *COVENANTS*

*The College hereby agrees:*

*That each student who participates in this program will have the same rights to examinations and credits as those students who participate in the traditional curriculum of the College.*

*That identification and selection of students qualified to participate in the program will be done by a Faculty Committee selected by the Dean; the Hospital shall have the right to either accept or reject the student.*

*That all selected students will have all the necessary physical examinations and immunizations at American University of Antigua prior to the time of rotation. The College shall ensure that, prior to their affiliation assignment, all students shall have such physical examinations and tests (including, but not limited to, a skin test for tuberculosis and, where positive, a chest x-ray) titers to ensure that students are not in the infectious stage of any communicable disease. The College shall advise its students that they are required to provide proof to the Hospital of drug testing that verifies that they are not habituated or addicted to depressants, stimulants, narcotics, alcohol or other drugs or substances which may alter their behavior. Students shall also be immunized against smallpox, diphtheria and tetanus prior to their rotation.*

*The College will ensure that students participating in the Clinical Clerkship program will have appropriate housing.*

*The medical students shall follow all the rules and regulations and policies of the Hospital. Each student at the Hospital shall carry an identification card issued by the Hospital and shall be responsible for the following:*

a. *Conforming to and abiding by the administrative policies, rules, regulations, standards and practices of the Hospital.*

*b. Conspicuously displaying his/her name badge, when engaging in activities at the Hospital.*

*In the event that a student is involved in any situation which requires filing an "incident report" by the Hospital pursuant to the Public Health Law, the College shall be advised of the nature of the situation giving rise to the report and the parties shall discuss the potential impact, if any, on this Agreement, including but not limited to appropriate corrective action to be taken.*

*The hospital agrees to provide support services including counseling for students.*

*College agrees to fund the clinical clerkship program provided to its student in accordance with the provision of exhibit (1) one.*

***IN WITNESS WHEREOF** the parties hereto have executed this Agreement on the day and year first above written.*

Signatures,

Neal S. Simon

AMERICAN UNIVERSITY OF ANTIGUA

St JOSEPH MERCY-OAKLAND

88

JUN. 3. 2008 3:08PM AUA NO. 220 P. 5/6

***EXHIBIT 1***

*College agrees to pay Hospital at the rate of $350 per week per student for all core clinical clerkships provided by Hospital to College's Clinical Students*



AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE

Manipal
INSPIRED BY LIFE

KASTURBA MEDICAL COLLEGE

C/O Greater Caribbean Learning Resources

# FIFTH SEMESTER INTRODUCTION TO CLINICAL MEDICINE

# COURSE SYLLABUS
# 15 CREDITS

**Administrative Office:** 2 Wall Street 10th Fl
New York, NY 10005
**Tel:** 212 - 661-8899 **Fax:** 212 - 661-8864
1-888-AUA-UMED (1-888-282-8633)
**Email:** info@auamed.org www.auamed.org

**Manipal Education & Medical Group**
Manipal 576104 India
**Tel:** 91-820 2571978/79 **Fax:** 01-820 2571982/257062
**Email:** kmc_auamed.@manipal.edu
www.manipal.edu

# TABLE OF CONTENTS

FOREWORD

I. GENERAL .................................................. 4 - 11

A PREREQUISITES .................................................. 4

B. PURPOSE .................................................. 4

C. OBJECTIVES .................................................. 4 - 5

D. THEMES AND FINAL OUTCOMES .................................................. 5

E. COMPONENTS .................................................. 5 - 10

a) Course on History and Physical examination 5
b) In-Hospital Clinical Rotation 6
c) Out-Patient Clinical Rotation 7
d) Basic Sciences - Clinical Correlation Course 8
e) Presentation of Clinical Cases 9
f) Portfolio 9
g) Quizzes and Exams 10

II. ACADEMIC POLICIES .................................................. 10 - 11

III. EVALUATION AND GRADING .................................................. 11

a) Passing Grade Minimal requirements 11
b) Components included in Grade Calculation 12
c) Student Evaluation of Academic Activities 13

IV. BOOKS, LIBRARIES AND ON-LINE RESOURCES .................................................. 12

V. STUDENT RESOURCES AND CONTACTS .................................................. 13

## FOREWORD

### A BRIDGE TO CLINICAL MEDICINE

The purpose of the AUA College of Medicine is to educate excellent physicians who are prepared to deliver effective and compassionate treatment and preventive care to patients and their families. The fifth semester is the beginning of a pivotal time in this process. It encompasses the transition from the basic medical sciences to the clinical disciplines.

This syllabus is carefully designed to provide students with the maximum opportunity to make this transition a productive learning experience. It will serve as the main guide for lectures, practical sessions and definitions of weekly academic goals. The syllabus is complemented by the "Fifth Semester Guidelines" booklet which includes schedules and operational instructions.

The three-fold goal of the fifth semester is a). to help student master the skills of taking a patient's history. b). to develop the art and technique of physical examination and c) to integrate basic science into clinical diagnostics and critical patient evaluation.

The Fifth Semester Course includes lectures, oral and written case presentations, clinical rotations, review of core concepts and facts through quizzes, examinations, clinical discussions and a portfolio that includes the summary and evaluation of students' experiences.

The University strives to offer similar clinical learning opportunities for each student, however exact duplication is impossible. Each student's experience will be slightly different because of the particular characteristics of each practice site. Therefore, students need to be proactive in making their experience as productive as possible. To that end, they will have a variety of resources, including individual counseling.

The teaching and administrative staff has made significant efforts to carefully organize the Fifth Semester Course. The University expects students to respond with punctuality, outstanding professional appearance, and total, full time dedication.

Evaluation of students is based on the actual acquisition of individual skills, development of professional attitudes, efforts to reach the established goals, quizzes and examination scores. Students will have the opportunity to evaluate lectures, practices, and all activities. Their input is critical in developing and advancing the University's academic program.

# I. GENERAL

## A. PREREQUISITES FOR ENROLLMENT INTO 5TH SEMESTER

1. Successful completion of four semesters in Basic Medical Sciences, including Anatomy, Embryology, Histology, Behavioral Sciences, Biochemistry, Genetics, Physiology, Microbiology, Immunology, Pathology, Pharmacology, Biostatistics, Doctor, Patient and Society, and Introduction to Clinical Medicine.

2. Completion of Registration procedures via AUA policies and specific requirements of the Hospital training sites.

3. Commitment to full time involvement in and dedication to the academic activities of the Course.

## B. PURPOSE AND GOAL

The purpose of the course is for students to acquire the necessary clinical skills, to formulate diagnostic hypothesis and to correlate the latter with the fundamental facts and concepts of the Basic Sciences.

The goal of the course is to prepare students to successfully complete subsequent clinical clerkships.

## C. OBJECTIVES

By the end of the course, students will be able to:

1. Obtain comprehensive and relevant health histories through effective communication with patients and families.

2. Carry out full general physical examination of all body systems.

3. Distinguish normal conditions from abnormal symptoms and signs.

4. Understand the role of diagnostic testing in the medical examination process.

5. Collect, logically organize, and document the information related to patients' condition.

6. Formulate working diagnoses expressed as syndromes, specific pathological processes, or diseases.

7. Understand the interaction between physicians and other health professionals.

8. Present in an effective manner clinical cases in both verbal and written form before peers, preceptors and other medical audiences.

9. Identify and learn the links between basic and clinical sciences.

10. Explain symptoms and signs on the basis of physiological, pathological, and biochemical changes occurring in the human body.

11. Start the in-depth study of General Clinical Sciences, including Internal Medicine, Surgery, Pediatrics, Gynecology, Obstetrics, Family Medicine and Psychiatry.

12. Collect clinical data from individual patients related to primary prevention based on life cycles and secondary prevention of prevalent illnesses in the USA.

13. Understand and properly apply the clinical and technical terms used by the medical profession to describe symptoms, signs and syndromes.

## D. THEMES AND FINAL OUTCOMES

The booklet "Fifth Semester Guidelines" includes Schedules, Themes and Final Outcomes by academic activity.

## E. COMPONENTS

The first twelve (12) weeks of the fifteen- week semester are dedicated to lectures and clinical rotations. Students will use the final three (3) weeks for

completing their portfolio, reviewing and studying the course materials, testing, and evaluation activities.

**a) Course on History and Physical Examination**

This course provides an in-depth review of the techniques and methods for the elaboration of clinical histories and the examination of the human body systems. The course consists of twenty (20) core lectures and nine (9) Practical Sessions by experienced specialists.

**b) In-Hospital Clinical Rotation**

The objective of the In-Hospital Clinical rotation is to demonstrate the practical aspects of elaborating clinical histories and performing physical examinations on patients admitted to the Hospital. This is a valuable tool in reinforcing the concepts, theories, techniques and facts presented in Course lectures.

During this rotation the students will engage in proactive learning with the residents and preceptors assigned to them. Students' responsibilities include:

1. Observing residents' work, asking pertinent questions and taking notes in their Journal.
2. Developing a good rapport with patients, attending physicians, nurses and other health professionals
3. Assisting practicing physicians in examining patients when requested.
4. Communicating with patients face-to face, taking clinical histories and observing examination techniques.
5. Accessing and reviewing charts as authorized by physicians and elaborating full write-ups on selected patients. **Due to confidentiality laws and regulations, students cannot use or disclose the names of patients or give other identifying information in the write-up of cases.**

6. Assisting in medical procedures when requested.

7. Participating in case discussions and presentations.

8. Discussing the interpretation of laboratory tests and other diagnostic exams and procedures.

9. Discussing differential diagnoses and treatment plans with the residents and attending-physicians.

10. Attending all available lectures and other academic activities scheduled in the Hospital, including morning rounds, sign-in and sign-out rounds, morning and afternoon lectures.

**c) Out-Patient Clinical Rotation**

During this rotation, students will work in pairs to see patients in the offices of physician-preceptors, who will mentor according to the schedule provided by each Course Director. The physician-preceptors have been in medical practice for several years and will provide students with an exceptional opportunity to observe both the operation of a private practice and the management of patients in an outpatient setting. **Due to confidentiality laws and regulations, students cannot use or disclose patients' names or give other identifying information in writing-up cases during their clinical rotations.**

Under the continuous supervision of the physician-preceptors, students will carry out the following activities:

1. Observing the preceptors performing physical examination of their patients with special attention to the system presented and discussed during the previous week's lecture.

2. Performing portions of the examination demonstrated and allowed by the preceptor.

3. Gathering the necessary information and writing the clinical history of the patients assigned by the preceptor.

4. Identifying new patients and following-up with patients on whom the student wishes to do full write-ups using the formats suggested during the Course or included in the textbook. The preceptor must approve the student's request to use the clinical information contained in the charts.

5. Verbally presenting to the preceptor a minimum of one case per day during the rotation in the preceptor's office.

The Outpatient Rotation Schedule appears in the "Fifth Semester Guidelines" booklet.

**d) Basic Sciences - Clinical Correlation On-line Course**

This On-line based Course is scheduled and managed at the AUA Headquarters in New York. It will help students establish the necessary correlation between Basic Sciences and Clinical Sciences. The case studies will challenge students with both diagnoses and management of relevant clinical cases.

Students will answer an average of 200 questions weekly and a total of 2,000 questions within a three- day testing period assigned by the Course Director. The purpose of the test is to identify gaps in students' knowledge. The On-line Course will provide the correct answers, enabling students to refine study skills, improve basic and clinical science correlations, as well as, provide guidance in addressing individual knowledge needs.

In addition to working on-line individually, students are encouraged to study the questions collectively to optimize academic success. Ultimately, the On-line course is only one of many tools enabling students to successfully meet the challenge of future evaluations. There is no substitute for the assiduous study of texts and the regular attendance of lectures.

Although the University will not factor On-line test scores into the final grade for the fifth semester, each student must answer a minimum of 1600 questions in order to obtain a passing grade.

**e) Presentation of Clinical Cases**

The goal of this component is to develop students' ability to write concise and relevant medical histories and to make concise and well- structured verbal case presentations before peers and teaching staff.

To that end, students need to use and apply the knowledge and skills which they have learned and developed in questioning and examining patients during both the In-patient and Out-patient rotations.

Practicing this valuable skill at every opportunity will guarantee success in future clerkships, obtaining the M.D. degree, and securing a residency position.

f) **Portfolio**

Students will register all their individual academic and practical experiences in a Portfolio which will be submitted at the end of the 11th week of the Course.

This indexed document will include:

1. Fifteen "two minutes" write-ups of clinical cases the students saw during hospital and outpatient rotations, including two respiratory cases, three cardiovascular cases, two GI cases, and one case related to each one of the other body systems. Out of these cases, the student will pick three for verbal presentation.

2. Fifteen written templates of the most significant illness, syndrome or pathological condition affecting the above patients. (The templates are summaries from Medical Textbooks of the most frequent symptoms, epidemiological (risk) factors, and signs that characterize each entity and of the state of the art diagnostic confirmatory tests and treatments).

3. Two full write-ups of hospital admissions of patients that the student has seen and followed up. They include full descriptions of the Admission History and Physical, the Hospital Course, the discharge disposition and a brief clinical discussion of one of the health issues affecting the patient.

4. The form *Clinical Cases Discussed, Observed, and Examined During Fall 2007* which includes the list of all new patients that the student saw during clinical rotations as well as previous patients who presented with new clinical problems.

5. The form *Academic Activities Attended* listing all academic sessions that the students actually attended in and outside the Hospital.

6. The form *Correlation Course Tests Taken* including the number of questions answered and the individual scores.

7. A general student evaluation of the Course and of individual lectures, practical sessions and rotations.

The booklet "Fifth Semester Guidelines" provides detailed suggestions on how to prepare the Portfolio.

**g. Quizzes and Exams**

Quizzes and exams will be important tools in the evaluation and grading of students. The Course also uses them as important learning tools. To that end the teaching staff will routinely discuss with students the quizzes and exam questions as part of the core curriculum of the course. The Course provides ample opportunities to reinforce concepts and facts.

Students will take approximately fourteen (14) quizzes and tests related to the Course lectures and practical sessions. The final written exam will include the same material covered by the quizzes. The practical exam will consist on the interview and examination of a patient at the Preceptors' office.

## II. ACADEMIC POLICIES

**A. Mandatory Attendance and Punctual Arrival at Sites**

AUA/KMC students must attend at least 85% of lectures and practical sessions. The university permits three (3) absences of clinical sessions per student during

the entire semester. **Only the Course Director or the Dean of Clinical Sciences can authorize any deviation from this policy.**

To request an absence from a clinical assignment, students must submit to the Course Director a written request one week prior the requested absence.

**Failure to comply with attendance policy may result in the lowering of the final grade, failing the rotation, or dismissal.**

B. Conduct

The AUA expects students to exhibit the highest level of professional standards, behavior, and integrity. Professional appearance and attitude are essential to a quality doctor-patient relationship.

C) Mandatory Attire

**The attire for males is a dress shirt, tie and trousers** and for **females, a dress, skirt or slacks with blouses. Students must wear white coats and AUA/KMC identification tags when at the Hospital or on its grounds and when seeing patients at any location. Teachers and preceptors will not allow violators to participate in the academic or practical sessions**

D) Disaster Precautions

A Disaster Preparation Booklet includes a safety plan for students attending the Hospital and is available upon request at the Hospital.

## III. EVALUATION AND GRADING

A) Passing Grade Minimal requirements

- Minimal total course grade — 75%
- Minimal lectures attendance — 85% (18 lectures)
- Minimal practical sessions attendance — 85%
- Minimal Hospital lectures and other Academic sessions attendance — 50%*

- Minimal Out-patient sessions attendance 90%
- Minimal Correlation Course questions 80% (1,600)
- Minimal total quizzes score 60%
- Minimal final written exam score 80%
- Minimal final practical exam Score 80%

** During Hospital rotations*

**B) Components included in Grade Calculation**

| Component | Weight |
|---|---|
| Attendance to Course lectures | 10 % |
| Practical session reports | 5% |
| Outpatient Preceptor evaluation | 5% |
| Verbal 2-minutes presentation of clinical cases | 5% |
| Portfolio 1 | 10% |
| Quizzes | 35% |
| Final written Exam | 20% |
| Final Practical Exam | 10% |

**C) Student Evaluation of Academic Activities**

Students will submit an evaluation of every lecture and academic activity in which they have been involved, making suggestions for improvement. The *Fifth Semester Guidelines* booklet includes the respective forms and instructions.

## IV. BOOKS, LIBRARIES AND ON-LINE RESOURCES

1. **Mosby's Guide to the Physical Exam,** 6th Edition, Mosby, 2006 and accompanying CD which is the required textbook.

2. **MKSAP for Students 3** Developed by the American College of Physicians - Clerkship Directors n Internal medicine, 2005 and accompanying CD

3. **Harrison's Principles of Internal Medicine,** 16th Edition, McGraw-Hill, 2005 printing

4. **The on-site Hospital Library** containing collections of updated books, journals, and modern audiovisual equipment.

5. **American College of Physicians/ACP**: Enroll for a free Student Membership on line or by phone at 800-523-1546, extension 2711. Some enrollment benefits, in addition to membership in the largest medical specialty society include the opportunity to explore the internal medicine profession, access to members-only sections of ACP Online, free attendance at scientific meetings, a subscription to *IMpact*, an on-line newsletter for medical students, and discount eligibility to some programs and products.

6. **Exam Master.** The Fifth Semester entry is:

**http://www.exammaster2.com/wdsentry/aua-balt.htm**

## V. STUDENT RESOURCES AND CONTACTS

### A. Student Services Coordinator

Dr. J. Ernesto Calderon, Dean, Clinical Sciences, AUA

| | |
|---|---|
| Office: | 410 636 - 2222 |
| Cellular: | 443 463 - 6182 |
| E-mail: | jecmpark@aol.com |

### B. Academic Counseling

Course Directors (Miami, Baltimore, Pontiac)

Dr. Jorge E. Calderon, Dean, Clinical Sciences

Dr. Victor Hrehorovich, Vice Chancellor and Executive Dean, AUA

Office: 212 661-8899 ext. 119

### C. Psychological Support

The aforementioned faculty is available to provide psychological support and make referrals to specialists.

Papers Served
12/20 between 2:30 - 2. 5 p.m

**Susan Zonia - Re: Request for Telephone Conference**

**From:** Steve Woodward <steve_l_woodward@yahoo.com>
**To:** Susan Zonia <ZONIAS@trinity-health.org>
**Date:** 12/20/2007 4:40 PM
**Subject:** Re: Request for Telephone Conference
**CC:** Paul Nicoletti <paul@nicoletti-associates.com>

1st AND ONLY Request for retraction 2 hours after papers served -

Dear Dr. Zonia,

I demand an immediate and complete retraction of the letter that you sent my school, as stated below.

Steven Woodward

----- Original Message ----
From: Susan Zonia <ZONIAS@trinity-health.org>
To: steve_l_woodward@yahoo.com
Cc: billcain@comcast.net
Sent: Monday, December 17, 2007 4:07:24 PM
Subject: Request for Telephone Conference

Student Doctor Woodward:

'ached is a letter that was sent to AUA today. The faculty would like to speak with you about it at 2:30 on ..dnesday, the 19th. If you would like to receive the call at the hospital, I can arrange that but you will need t et me know. If you wish to take the call from home, please let Dr. Cain (at the e-mail address above) know what num :r to call.

Susan C. Zonia, Ph.D.
Director of Medical Education
St. Joseph Mercy-Oakland
44405 Woodward
Pontiac, Michigan 48341
(248)858.6796
zonias@trinity-health.org

# Susan Zonia - Steven Woodward v. Trinity Health-Michigan

**From:** "Paul J. Nicoletti" <paul@nicoletti-associates.com>
**To:** <billcain@comcast.net>, <steve_l_woodward@yahoo.com>, <yanezj@trinity-health.org>, <nssimon@auamed.org>, <vhrehorovich@auamed.org>, <zonias@trinity-health.org>
**Date:** 12/20/2007 5:25 PM
**Subject:** Steven Woodward v. Trinity Health-Michigan
**Attachments:** TRINITY SUIT.pdf

Enclosed please find a copy of the civil action that was filed this afternoon. I would hope that this ma er could be resolved without the need for costly and protracted litigation.

NICOLETTI & ASSOCIATES, P.C.
Paul J. Nicoletti
39520 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
(248) 203-7800
Fax (248) 203-7801

* * * * * * * * * * *

S Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Reve ue ervice, we inform you that any U.S. federal tax advice contained in this communication (including a attachments) was not intended or written to be used, and cannot be used, by any person for the purp se of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another person any transaction or matter addressed in this communication.

* * * * * * * * * * *

The information contained in this message is intended only for the personal and confidential use of tl designated recipients named above. This message may be an attorney-client communication, and a such would be privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received t s document in error, and that any review, dissemination, distribution or copying of this message is stric prohibited. If you have received this communication in error, please notify us immediately by telephc e and destroy the original message. Thank you.

No virus found in this outgoing message.
Checked by AVG.
Version: 7.5.503 / Virus Database: 269.17.4/1189 - Release Date: 12/18/2007 9:40 PM

ST. JOSEPH MERCY OAKLAND

# Facsimile

44405 Woodward Avenue
Pontiac, Michigan 48341-5023

To: Dr. Calderon / Dr. Hrehorovich/Sevrine

From: Deneen Nicks

Fax: (212) 661-8864

Pages: 2 (Including Cover Page)

Phone: (212) 661-8899

Date: 10/12/07

Re: Medical Student

CC:

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

- Comments:

*** CONFIDENTIAL NOTICE ***

*Confidential statement*: This transmission contains privileged and confidential information intended for the use of the addressee named above. If you are not the intended recipient of this information, you are hereby notified that dissemination or copying of this transmission is strictly prohibited. If you have received this transmission in error please notify us immediately and return the original transmission to the original sender.

A MEMBER OF TRINITY HEALTH

OUR MISSION: We serve together in Trinity Health in the spirit of the Gospel to heal the body, mind and spirit, to improve the health of our communities and to steward the resources entrusted to us.

OUR VISION: Our physicians and staff are the preferred providers of healthcare to our community, demonstrating compassion and excellence in caring for our patients in the Mercy tradition.

OUR VALUES: Respect, Social Justice, Compassion, Excellence, Care of the Poor and Underserved