### University of Antigua School of Medicine
### Course on Physical Diagnosis (September 06 – December 12, 2007)
### Site:   St. Joseph Mercy Oakland Hospital
### Pontiac, Michigan

## SCHEDULE OF LECTURES, PRACTICAL SESSIONS AND QUIZZES

| Date | Hour | Activity | Theme | Lecturer |
|---|---|---|---|---|
| 09/14 | 8:00–9:00A | Dept. of Medicine | Journal Club | Conf. Rm. E |
| 9/14 | 9:00–11:00A | Lecture | Clinical History | Dr. Yanez |
| 9/14 | 11:00–1:00N | Lecture/Practice | Vital Signs and Practice | Dr. Yanez |
| 9/21 | 8:00–9:00 | Dept. of Medicine | Grand Rounds | Conf. Rm. E |
| 9/21 | 900 – 11 00A | Lecture/Practice | HENT Exam and Practice | Dr. Nicola |
| 9/21 | 11:00–1:00 N | Lecture/Practice | Lungs, Respiratory Syst Exam | Dr. Khan |
| 9/28 | 8:00–9:00A | Dept. of Medicine | Morbidity & Mortality | Conf. Rm. E |
| 9/28 | 9:00–10:00A | Lecture | Imaging (I) | Dr. Saber |
| 9/28 | 10:00–11:00A | Lecture | Heart, CV system Exam (I) | Dr. Diaczok |
| 9/28 | 11:00–12:00N | Presentation | Two-minutes case # 1 | Dr. Yanez |
| 9/28 | 12:00–1:00N | Quizzes 1,2 | Clinical HX, VS, Respiratory | Staff |
| 10/5 | 7:00–8:00A | Lecture | Ethics | Conf. Rm. E |
| 10/5 | 9:00–11:00 | Lecture | Heart, CV System Exam (II) | Dr. Yanez |
| 10/5 | 11:00–12 N | Practice | Heart, CV System Exam | Staff Yanez |
| 10/12 | 8:00–9:00 A | Dept. of Medicine | Grand Rounds | Conf. Rm. |
| 10/12 | 9:00–10:00A | Practice | Heart, CV System Exam | Staff |
| 10/12 | 10:00–11:00 A | Lecture | Abdomen, GI System | Dr. Nicola |
| 10/12 | 11:00–12 N | Practice | Heart, CV System Exam | Dr. Yanez |

**Revised 10/08/07 (Per: AUA)**

University of Antigua School of Medicine
Course on Physical Diagnosis (September 06 - December 12, 2007)
Site: St. Joseph Mercy Oakland Hospital
Pontiac, Michigan

## SCHEDULE OF LECTURES, PRACTICAL SESSIONS AND QUIZZES

| | | | | |
|---|---|---|---|---|
| 10/12 | 12:00 – 2:00 | Quiz #3 | Lungs, Respiratory | Staff |
| 10/19 | 8:00-9:00 A | Dept. Of Medicine | Grand Rounds | Conf. Rm. |
| 10/19 | 9:00-10:00A | Lecture | Eyes Exam | Dr. Khan |
| 10/19 | 10:00-11:00 A | Presentation | Two-minutes Case # 2 | Dr. Yanez Kh |
| 10/19 | 11:00-12:00N | Lecture | Hemopoietic, Lymphopoietic | Dr. Nicola |
| 10/19 | 12:00-1:00N | Quiz 4 | Heart, CV System Exam | Staff |
| 10/26 | 8:00-9:00 A | Dept. Of Medicine | Grand Rounds | Conf. Rm. |
| 10/26 | 9:00-10:00A | Lecture | Skin Exam | Dr. Khan |
| 10/26 | 10:00-11:00A | Lecture | Acute Abdomen | Dr. Nicola |
| 10/26 | 11:00-12 N | Quiz 5 | Imaging | Staff |
| 11/2 | 7:00-8:00A | Lecture | Ethics | Conf. Rm. E |
| 11/2 | 8:00-9:00 A | Dept of Medicine | Grand Rounds | Conf. Rm. |
| 11/2 | 9:00-10:00 A | Lecture | Kidney, GU System Exam | Dr. Yanez |
| 11/2 | 10:00-11:00 A | Lecture | Neurological Exam | Dr. Nicola |
| 11/2 | 11:00-12:00N | Practice | Neurological Exam | Dr. Nicola |
| 11/2 | 12:00-1:00 N | Quizzes 6,7 | Eyes, Skin | Staff |
| 11/9 | 8:00-9:00 A | Dept. of Medicine | Grand Rounds | Conf. Rm. |
| 11/9 | 9:00-11:00 A | Lecture/Practice | Breast Exam, GYN/ GU | Dr. Yanez |
| 11/9 | 11 – 1 | Quiz | 9,10 Nephro/ Neuro | |
| 11/16 | 8:00-9:00 A | Dept. of Medicine | Grand Rounds | Conf. Rm. |
| 11/16 | 9:00-10:00A | Lecture | Psychiatry Exam | Dr. Yanez |

Dec m – Clues given
GI – Clues given

Revised 10/08/07 (Per: AUA)

Nephro – clues given
Nephro – clues given

48

*University of Antigua School of Medicine*
*Course on Physical Diagnosis (September 06 - December 12, 2007)*
*Site:   St. Joseph Mercy Oakland Hospital*
*Pontiac, Michigan*

## SCHEDULE OF LECTURES, PRACTICAL SESSIONS AND QUIZZES

| | | | | |
|---|---|---|---|---|
| 11/16 | 10:00–11:00 A | Lecture | Musculo-skeletal exam | Dr. Khan |
| 11/16 | 11:00–12:00 A | Practice | Musculo-skeletal Exam | Dr.Khan |
| 11/16 | 12:00–1:00 N | Lecture | OB/Gyn Exam / Practice | Dr. Yanez |
| 11/16 | 1:00–2:00 N | Quiz 9,10 | Urology, Neurology | Staff |
| 11/19 | 9:00–10:00 A | Lecture | Pediatric Exam | Dr. Yanez. |
| 11/19 | 10:00–12:00 N | Lecture | Health Maintenance / Stats | Dr. Malloy |
| 11/19 | 12:00–1:30 N | Quiz 11,12,13,14 | M-S, Psy, Ped, OB/GYN | Staff |
| 11/30 | 8:00–9:00 | Dept of Medicine | Grand Rounds | Conf. Rm. |
| 11/30 | 9:00–11:00 A | Presentation | Two-minutes # 3 | Dr. Yanez. |
| 11/30 | 11:00–12:00 N | Quiz # 15, 16 | Hemopoietic, Lymph, H-Maint | Staff |
| 11/30 | 12:00–1:00 N | | Portfolio due | Staff |
| 12/7 | 8:00–12 N | Final written exam | Textbook, lectures, Practices | Staff |
| 12/3–12/7 | By appointment with preceptors | Final Practical Exam | Examination of a patient, write-up, case presentation | Preceptors |
| 12/11 | 2:00– 7:00 P | Exam | Shelf-like | On-line |
| 12/14 | 8:00–12 N | Exam | Shelf | Staff |

**( Lectures are in Conference Room C )

**( Lecture on 11/16/07 will be in Conference Room D )



**Revised 10/08/07 (Per: AUA)**

49

*University of Antigua School of Medicine*
*Course on Physical Diagnosis (September 06 - December 12, 2007)*
*Site:   Harbor Hospital*
**ADJUSTED SCHEDULE OF LECTURES, PRACTICAL SESSIONS AND QUIZZES (October 12 and 19, 2007)**

| 10/12 | 7:00-8:00A | Lecture | Imaging - (II) | R. Raza |
| 10/12 | 8:00-9:30A | Lecture, Practice | Heart, CV System Exam | Mardelli |
| 10/12 | 10:00-11A | Quiz # 3 | Lungs, respiratory | Patel, Calderon |
| 10/12 | 11:00-12N | Heart, CV System | Practice - Video | Patel, Calderon |
| 10/19 | 7:00-8:00A | Lecture | Eyes Exam | V. Notarangelo |
| 10/19 | 8:00-9:00A | Practice | Eyes Exam | V. Notarangelo |
| 10/19 | 10:00-11:00A | Lecture | Acute Abdomen | G. Gurfinchel |
| 10/19 | 11:00-12 N | Quiz 4 | Heart, CV System Exam | Patel, Calderon |
| 10/26 | 8:00-10:00A | Lecture | Skin Exam | Patel |
| 10/26 | 10:00-11:00A | Presentation | Two-minutes Case # 2 | Patel |
| 10/26 | 11:00-12 N | Quiz 5 | Imaging | Patel |
| 11/2 | 8:00-9:00 A | Lecture | Kidney, GU System Exam | Kuppusamy |
| 11/2 | 9:00-10:00 A | Lecture | Neurological Exam | Mody |
| 11/2 | 10:00-11:00 A | Practice | Neurological Exam | Mody |
| 11/2 | 11:00-12 N | Quizzes 6,7 | Eyes, Skin | Patel |

50

American University of Antigua College of Medicine
V Semester - Preliminary Clinical Training
Pontiac Michigan – St Joseph Mercy Oakland

## Final Grades by Component - Fall, 2007

| | Code | Attendance 10% | | Prac Session 5% | | Outpatient 5% | | Verbal Pres 5% | | Portfolio 10% | | Quizzes 35% | | Written Ex 20% | | | Practical Ex 10% | | Final | Final Grade Adjusted | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Score | PT | Score | PT | Score | PT | Score | PT | Score | PT | Scol | PT | Score | Curv | PT | Score | PT | | | |
| 1 | Hampel, Nicola | 92 | 9.2 | 92 | 4.6 | 100 | 5.0 | 100 | 5.0 | 100 | 10.0 | 54 | 18.9 | 77 | 81 | 16.2 | 95 | 9.5 | 78 | C | |
| 2 | Jayadeep, Simbia | 100 | 10.0 | 100 | 5.0 | 80 | 4.0 | 100 | 5.0 | 100 | 10.0 | 57 | 20.1 | 80 | 84 | 16.8 | 95 | 9.5 | 79 | C | |
| 3 | Ozuomba, Michael | 100 | 10.0 | 100 | 5.0 | 83 | 4.2 | 100 | 5.0 | 100 | 10.0 | 56 | 19.6 | 74 | 74 | 14.8 | 80 | 8.0 | 77 | F | (2) |
| 4 | Chheda, Vishal | 75 | 7.5 | 75 | 3.8 | 86 | 4.3 | 100 | 5.0 | 100 | 10.0 | 62 | 21.7 | 86 | 90 | 18.0 | 75 | 7.5 | 76 | C | |
| 5 | Bulat, Elizabeth | 100 | 10.0 | 100 | 5.0 | 96 | 4.8 | 100 | 5.0 | 100 | 10.0 | 70 | 24.4 | 84 | 88 | 17.6 | 85 | 8.5 | 83 | B | |
| 6 | Evans, Lekedra | 100 | 10.0 | 100 | 5.0 | 96 | 4.8 | 100 | 5.0 | 100 | 10.0 | 65 | 22.6 | 73 | 77 | 15.4 | 85 | 8.5 | 83 | C(-) | (1) |
| 7 | Woodward, Steve | 100 | 10.0 | 100 | 5.0 | 95 | 4.8 | 100 | 5.0 | 100 | 10.0 | 62 | 21.6 | 71 | 75 | 15.0 | 80 | 8.0 | 80 | F | (3) |
| 8 | Paras, Chahal | 100 | 10.0 | 100 | 5.0 | 92 | 4.6 | 100 | 5.0 | 100 | 10.0 | 58 | 20.4 | 79 | 83 | 16.6 | 80 | 8.0 | 81 | B | (4) |
| 9 | Hamed, Mousa | 100 | 10.0 | 100 | 5.0 | | 0.0 | 100 | 5.0 | 100 | 10.0 | 70 | 24.4 | 87 | 92 | 18.4 | 93 | 9.3 | 82 | B | |
| 10 | Kristen, Nico | 100 | 10.0 | 100 | 5.0 | 68 | 0.0 | 100 | 5.0 | 100 | 10.0 | 68 | 23.9 | 78 | 82 | 16.4 | 80 | 8.0 | 83 | B | (4) |

(1)  Failed Final Exam.  Remedial score 78.  Final Grade: C(-)
(2)  Failed Final Exam.  Has not taken remedial
(3)  Failed Final Exam.  Did take remedial and failed
(4)  Did not have OP rotation.  Toal score / 95
(4)  Did not take OP rotation.  Total Score / 95

Case 2:10-cv-10978-PJD-MJH   ECF No. 212-2, PageID.3950   Filed 04/24/12   Page 6 of 50

**From:** Jeffrey Yanez (YANEZJ@trinity-health.org)
**To:** Steve Woodward
**Date:** Monday, December 10, 2007 6:32:13 AM
**Subject:** Re: Final exam "curve"

noted. I am awaiting AUA's decision.

>>> Steve Woodward <steve_l_woodward@yahoo.com> 12/9/2007 10:25 PM >>>
Dr Yanez,

I don't understand?

My grade was a 537 out of 800.  my average is 67% with the curve it would be a 77%.
Total Points Possible: 800
Total Points Earned: 537
Current Average: 67

I only need 3%, i.e. an extra 23 points overall to equal 560.
My lowest scores were as follows:
Hemopoietic/Lymphopoietic System:  50  21
Cardiovascular: 100 47
I need 23 points from either or both of these exams.

I thought with everything else i.e.:, including my reviews, getting my portfoilio finished, seeing over 174 patients(since I know some that told me they didn't see 100), going to every grand round/ morning report and lecture, I only missed one day when my brother went to the ICU at Henry Ford Hospital.  I not only attended an additional CME; I studied to learn and taught the crycothyrotomy station and made a endoscopy training device for the anesthesia students at U of M.

I haven't mensioned until now, I had a funeral for my aunt last Wednesday I only went to the showing since the funeral service was on Thursday and I needed to study.  She was at Shwartz Funeral home in Flint her name is Elizabeth Schnieder.
Last Tuesday I even rebuilt my old laptop so Paras had a computer she could use for the exam, since hers broke.

So for 3% (or 23 questions), please tell me what I need to do.

Thanks for all your help,

Steve

----- Original Message ----
From: Jeffrey Yanez <yanezj@trinity-health.org>
To: steve_l_woodward@yahoo.com
Sent: Sunday, December 9, 2007 9:10:04 PM
Subject: Re: Final exam "curve"



Check your numbers and math. You need 560 out of 800 questions (with curve).

>>> Steve Woodward <steve_1_woodward@yahoo.com> 12/09/07 5:47 PM >>>
Dr Yanez,

I only need 3%...

Thanks
Steve

----- Original Message ----
From: Jeffrey Yanez <yanezj@trinity-health.org>
To: steve_1_woodward@yahoo.com
Sent: Sunday, December 9, 2007 4:29:11 PM
Subject: Re: Final exam "curve"

I do not have a copy at my home on Sunday PM.

>>> Steve Woodward <steve_1_woodward@yahoo.com> 12/09/07 10:31 AM >>>
Dr Yanez,

They graded my vocabulary test. so I got a 67% overall.

I didn't keep a copy of the words for the vocabulary section.
Can you email me that sheet?

If I could retake anyparts of that exam I would rather retake cardiovascular and hemo/lymph tests.
Those are the two I drew a complete blank on and have the review mat'l for.

Thanks for all your help.

Steve

----- Original Message ----
From: Jeffrey Yanez <yanezj@trinity-health.org>
To: steve_1_woodward@yahoo.com
Sent: Saturday, December 8, 2007 9:56:31 PM
Subject: Re: Final exam "curve"

I am confident that the paper I handed out Friday AM makes 80% a real possibility. All the words from
the definitions are listed. I am waiting to see what AUA states.

>>> Steve Woodward <steve_1_woodward@yahoo.com> 12/08/07 9:15 PM >>>
Dr Yanez,

I appreciate the effort.

S3

If I got 100% on the vocabulary I would get a 72% (not counting the extra 10%)
I would need an 80% on that test to make up the difference.
What was the average on that single test?

Steve


----- Original Message ----
From: Jeffrey Yanez <yanezj@trinity-health.org><~!B*+R^&>To: steve_1_woodward@yahoo.com
Sent: Saturday, December 8, 2007 4:34:53 PM
Subject: Re: Final exam "curve"

AUA (Dr. Calderone) also noted that you scored 0 on the vocabulary and he wondering why or what
happened. I will take up your case with them. The best option for you may be to retake the vocabulary
section ,if I can get them to go for it? Check with me on Monday or so. I am waiting for a decision from
them.

>>> Steve Woodward <steve_1_woodward@yahoo.com> 12/08/07 2:58 PM >>>
Dr Yanez,

I found another problem with my exam.
The exam didn't grade the vocabulary section.
I got a 68% not counting that test.
I typed in all the answers in the space, I didn't put just a letter.
I just found out that we were suppose to put the letter in the space.
Whoever designed that test should have used letters instead of spaces.
That would have really helped narrow down the right answers too.

Are they just giving a straight 10% or are they also dropping the questions that didn't have pictures or
had wrong pictures in the questions?

Thanks

Steve


----- Original Message ----
From: Jeffrey Yanez <yanezj@trinity-health.org><~!B*+R^&>To: Bulat
<elizabethbulat@comcast.net>; Hamed <m.hamed01@gmail.com>; Chheda
<vishal.doctor@gmail.com>; Evans <lakedra_evans@hotmail.com>; Hampel
<n_hampel@hotmail.com>; Ozuomba <ozuomba@hotmail.com>; Chahal <chahalparas@yahoo.com>;
Sibia <jaya18_221@yahoo.com>; Kristen <nicokristen@yahoo.com>; Woodward
<steve_1_woodward@yahoo.com><~!B*+R^&>Cc: Deneen McCall <MCCALLDY@trinity-
health.org>; Susan Zonia <ZONIAS@trinity-health.org><~!B*+R^&>Sent: Saturday, December 8,
2007 8:39:48 AM
Subject: Final exam "curve"

After reviewing the final exam results AUA has decided to apply a 10% "curve" . AUA requires a 80%
score on the final written exam to pass semester V. Your score + 10% = final curve score.
The maximal score with the curve is 95%!

Case 2:10-cv-10978-PJD-MJH   ECF No. 212-2, PageID.3953   Filed 04/24/12   Page 9 of 50

JPY

1                  STATE OF MICHIGAN

2          IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

3    STEVEN WOODWARD,

4         Plaintiff,

5    v                     File No. 07-088103-CZ

6                       HON. SHALINA KUMAR

7    TRINITY HEALTH-MICHIGAN,
a Michigan Nonprofit corporation,

8    SUSAN CATHERINE ZONIA, an individual,
AMERICAN UNIVERSITY OF ANTIGUA

9    A Foreign corporation,

10         Defendants.
_____/

11            DEPOSITION OF DENEEN MCCALL

12     Taken by the Plaintiff on the 3rd day of February, 2009, at

13     322 North Old Woodward Avenue, Birmingham, Michigan, at

14     10:30 a.m.

15    APPEARANCES:

16    For the Plaintiff:     MR. PAUL J. NICOLETTI (P44419)
                           Nicoletti & Associates, PC

17                        39520 Woodward Avenue, Suite 200
                           Bloomfield Hills, Michigan 48304

18                        (248) 203-7800

19    For the Defendant:     MR. DAVID B. GUNSBERG (P24235)
                           Law Office of David B. Gunsberg

20                        322 North Old Woodward Avenue
                           Birmingham, Michigan 48009

21                        (248) 646-9090

22    Also Present:           Alex Pathenos
                           Susan Zonia

23

24    RECORDED BY:          Sheila H. Raymond, CER 6932
                           Certified Electronic Recorder
                           Network Reporting Corporation

25                           1-800-632-2720

**Network**Reporting

**1·800·632·2720**

## Page 2

TABLE OF CONTENTS
                                                    PAGE

Examination by Mr. Nicoletti. . . . . . . . . . . . .3, 35
Examination by Mr. Gunsberg . . . . . . . . . . . . 33, 36

EXHIBIT INDEX
                                                    PAGE

Deposition Exhibit 8 marked. . . . . . . . . . . . . .36
        (Student Evaluation Outpt Rotation-Dr. Breitenboch)
Deposition Exhibit 9 marked. . . . . . . . . . . . . .36
        (Student Evaluation Fall 2007-Dr. Malloy)
Deposition Exhibit 10 marked . . . . . . . . . . . . .30
        (McCall Email 10-10-2007)

## Page 3

1    Birmingham, Michigan
2    Tuesday, February 3, 2009 - 10:46 a.m.
3        REPORTER:  Raise your right hand.  Do you solemnly
4    swear or affirm that the testimony you're about to give will
5    be the whole truth?
6        MS. MCCALL:  Yes.
7            DENEEN MCCALL
8    having been called by the Plaintiff and sworn:
9            EXAMINATION
10   BY MR. NICOLETTI:
11   Q    You're Ms. McCall?
12   A    Yes.
13   Q    First name is Deneen?
14   A    Yes.
15   Q    Deneen, my name is Paul Nicoletti and I'm going to take your
16       deposition today.  Have you ever had your deposition taken
17       before?
18   A    No.
19   Q    I'm going to ask you a series of questions.  If you don't
20       understand any of my questions just let me know and I'll try
21       to clarify it or rephrase the question for you.  Try to
22       answer the court reporter with a verbal response "yes" or
23       "no" as opposed to a nonverbal, like a "uh-huh" as the court
24       reporter can't take that down.
25   A    Okay.

## Page 4

1    Q    I'll remind you from time to time.  And I'm not trying to be
2        rude.  I'm just trying to make a clear record for the court
3        reporter.  Okay?
4    A    Okay.
5    Q    Where are you currently employed, Deneen?
6    A    St. Joseph Mercy Oakland Hospital.
7    Q    And how do you spell your first name?
8    A    D-e-n-e-e-n.
9    Q    And it's M-c-C-a-l-l?
10   A    Yes.
11   Q    And how long have you been employed by the hospital?
12   A    Four and a half years.
13   Q    And what do you do for the hospital?
14   A    I am a coordinator for student services.
15   Q    What does that mean?
16   A    I take care of all the medical students that come in the
17       hospital looking for clinical rotations.
18   Q    And have you been doing the same type of duties for the
19       four and a half years?
20   A    Yes.
21   Q    What did you do before you started working at St. Joe's?
22   A    I lived in Chicago and I was a office manager for a n-for-
23       profit organization.
24   Q    What does that mean?  Is that a hospital?
25   A    No.  I worked with children that are awarded to the ate.

## Page 5

1    Q    Okay.  So what's your educational background?
2    A    High school.
3    Q    So what training prepared you for the position at St Joe's?
4    A    Just having good communication skills, being e to
5        communication and some office skills as far as ing,
6        computer work.
7    Q    Who is your supervisor?
8    A    Donna Hambleton
9    Q    I'm sorry?
10   A    Donna Hambleton.
11   Q    Could you spell the last name, please?
12   A    H-a-m-b-l-e-t-o-n.
13   Q    And what is Donna Hambleton's title?
14   A    She is administrative director.
15   Q    What are her responsibilities?
16   A    I'm not quite sure of all her responsibilities.
17   Q    Have you ever had your deposition taken before?
18   A    No.
19   Q    Have you ever been a party to a lawsuit before?
20   A    No.
21   Q    How long has Donna Hambleton been working at St Joe's?
22   A    I'm not sure.
23   Q    Has she been there at least as long as you have?
24   A    Yes.
25   Q    So in other words she was there before you?

---

### Page 6

1  A  Yes.
2  Q  Now, can you describe the duties of the coordinator of
3     medical services?
4  A  Sure. I deal with the students that's coming from different
5     medical schools that need to come into the hospital to have
6     clinical training so they contact me looking for core
7     rotations where they actually have to go out on the floors
8     with the physicians to be involved in patient care.
9  Q  I would imagine that over the years you have dealt with a
10    lot of medical students?
11 A  Yes.
12 Q  And does the name Steven Woodward stand out?
13 A  Yes.
14 Q  And you said that with a smirk on your face.
15        MR. GUNSBERG: I object to the characterization.
16    It was a smile.
17 Q  It was a smile/smirk. What would you have called it?
18 A  A smile.
19 Q  Okay. And why did you smile when I mentioned Steven
20    Woodward's name?
21 A  Because you asked me did the name stand out.
22 Q  And as opposed to just saying "yes," why did you smile when
23    you said "yes"?
24 A  Because his name stand out.
25 Q  Okay. But usually a smile is when somebody is happy about

---

### Page 7

1     something. You were happy about Steven Woodward, weren't
2     you?
3  A  What do you mean?
4         MR. GUNSBERG: I'm going to object to the form of
5     the question.
6  Q  Well, you liked Steven Woodward, didn't you?
7         MR. GUNSBERG: I'm going to object to relevance.
8     Go ahead.
9  A  I like all my students.
10 Q  Okay. All right. Did you like Steven Woodward more than
11    the ordinary student?
12 A  No, I like all my students the same.
13 Q  Tell me how you first came in contact with Steven Woodward?
14 A  He came from Antigua, American University of Antigua, as a
15    fifth semester student and when Steven Woodward came to St.
16    Joseph we just started the program, fifth semester, for
17    American University of Antigua.
18 Q  Was Steven Woodward in the first set of students that the
19    hospital had started to put through the program?
20 A  Yes.
21 Q  So prior to Steven Woodward's class the program had not been
22    in existence; is that correct?
23 A  Not at St. Joseph.
24 Q  How many students came in Steven Woodward's class?
25 A  It was a group of ten.

---

### Page 8

1  Q  And do you recall who the other students were?
2  A  Not offhand.
3  Q  And what was your -- strike that. What form of
4     communication or relationship did you have with Steven
5     Woodward? Did you have interaction with Steven Woodward on
6     a daily basis?
7  A  Not on a daily basis, no.
8  Q  How often?
9  A  A couple of times, maybe once or twice out of a week.
10 Q  All right. So you came in contact with Steven Woodward once
11    or twice a week for how many weeks?
12 A  15.
13 Q  All right. So that's maybe 30 individual contacts with
14    Steven Woodward. Does that sound about right?
15 A  I'm not sure.
16 Q  Now, what was your first contact with Steven Woodward do
17    you recall it?
18 A  Yes. The entire group had to come and meet with me for
19    orientation.
20 Q  Did they meet with you and anybody else or was it just you?
21 A  The first day it was just me.
22 Q  And how did that go?
23 A  It was fine.
24 Q  And was there some point in time when it wasn't quite
25    fine with Steven Woodward?

---

### Page 9

1  A  Yes. The first week they actually started the rotation.
2  Q  And when was that?
3  A  I'm not quite sure of the date, but it was about two days
4     later.
5  Q  So two days after you first met him?
6  A  Yes.
7  Q  And tell me about it.
8  A  He started complaining about he didn't know how this program
9     was going to help him with passing step one.
10 Q  And what did you say?
11 A  He need to take the issues up with American University
12    Antigua.
13 Q  And what was he complaining about specifically?
14 A  Spending too much time in the hospital and not enough time
15    studying.
16 Q  After two days?
17 A  Yes.
18 Q  Had he even been in the hospital after two days?
19 A  Yes.
20 Q  How much time was he supposed to spend in the hospital?
21 A  I'm not sure.
22 Q  Did you communicate the fact that he was complaining after
23    two days to your supervisor?
24 A  Yes.
25 Q  And your supervisor would have been Donna Hambleton?

---

**Network** *Reporting*

—— *1-800-632-2720*

| Page 10 | | |
|---|---|---|
| 1 | A | Not for that program. |
| 2 | Q | Who would your supervisor have been for this program? |
| 3 | A | Dr. Zonia and Dr. Jeffrey Yanez. |
| 4 | Q | Is there a difference between responsibility for Zonia and |
| 5 | | Yanez, if you know, or are they equal status? |
| 6 | A | I'm not sure. |
| 7 | Q | And so did you relay the fact that Mr. Woodward had |
| 8 | | complained to Dr. Zonia and/or Dr. Yanez? |
| 9 | A | Yes. |
| 10 | Q | And we're talking about the two-day part; right? |
| 11 | A | Yes. |
| 12 | Q | All right.  What did you tell them? |
| 13 | A | I told Dr. Yanez that Steven had already came to me and |
| 14 | | started complaining about the time that he is spending in |
| 15 | | the hospital. |
| 16 | Q | Did you think that that was unusual that he had already been |
| 17 | | complaining? |
| 18 | A | Yes. |
| 19 | Q | And what did Dr. Yanez say? |
| 20 | A | He said that Steve need to take the issues up with American |
| 21 | | University of Antigua. |
| 22 | Q | And did you tell Steven that? |
| 23 | A | Yes. |
| 24 | Q | And did Steve do that? |
| 25 | A | I'm not sure. |

| Page 11 | | |
|---|---|---|
| 1 | Q | All right.  So that was the first complaining episode.  Is |
| 2 | | it fair for me to categorize it like that?  Do you |
| 3 | | understand? |
| 4 | A | Yes. |
| 5 | Q | All right.  What happened after that? |
| 6 | A | He continued to come to my office throughout the 15 weeks |
| 7 | | and complain. |
| 8 | Q | And did he come to your office once or twice a week for the |
| 9 | | whole 15 weeks? |
| 10 | A | Yes. |
| 11 | Q | And did you document or did you memorialize his complaints |
| 12 | | for each and every visit? |
| 13 | A | No. |
| 14 | Q | What did you do in terms of -- he would come to you to |
| 15 | | complain, how did you document or how did you record it or |
| 16 | | did you record it? |
| 17 | A | I did not record it, but as soon as he left out of my office |
| 18 | | I went down and talked to Dr. Yanez. |
| 19 | Q | Every time? |
| 20 | A | Every time. |
| 21 | Q | And the first time -- the first complaint he came to you |
| 22 | | about was about spending too much time in the hospital? |
| 23 | A | Yes. |
| 24 | Q | Was it the same complaint every time? |
| 25 | A | Yes. |

| Page 12 | | |
|---|---|---|
| 1 | Q | Were there ever any other complaints besides that complaint |
| 2 | A | Yes. |
| 3 | Q | What were the other complaints and when did he communi  e |
| 4 | | those to you? |
| 5 | A | I'm not for sure exactly when he communicated them  ut he |
| 6 | | started complaining that the entire program was stup |
| 7 | Q | "The program" being the fifth semester? |
| 8 | A | Yes. |
| 9 | Q | Did he ever say that the AUA program was stupid? |
| 10 | A | I don't recall. |
| 11 | Q | All right.  So when Mr. Woodward said that the program wa |
| 12 | | stupid are those the words he used or is that your |
| 13 | | understanding of what he was trying to communicate? |
| 14 | A | No, those are the words he used. |
| 15 | Q | All right.  And did you communicate those words to Dr. |
| 16 | | Yanez? |
| 17 | A | Yes. |
| 18 | Q | And what did Dr. Yanez say? |
| 19 | A | "He has to take that up with American University of A  igua. |
| 20 | | It's their program." |
| 21 | Q | So in order for me to avoid having to ask you every time |
| 22 | | what Dr. Yanez said, is it fair for me to assume that every |
| 23 | | time you told Dr. Yanez what Steve was complaining about |
| 24 | | that he had the same response, "You have to take it up with |
| 25 | | AUA"? |

| Page 13 | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay.  Did he ever have any different response? |
| 3 | A | Not that I can recall. |
| 4 | Q | So he always said that that's between Steve and AUA? |
| 5 | A | Right. |
| 6 | Q | Okay.  Any other complaints that Steve had that he to  ou |
| 7 | | about? |
| 8 | A | No. |
| 9 | Q | Now, aside from Steven Woodward complaining to yo  nce or |
| 10 | | twice a week for 15 weeks, did you ever have a chance  | 
| 11 | | observe his demeanor?  Do you know what I mean by |
| 12 | | "demeanor"? |
| 13 | A | No. |
| 14 | Q | Did you ever have a chance to observe the way he ha  ed |
| 15 | | himself in the classroom setting or when he was in the |
| 16 | | hospital or when he was in seeing patients? |
| 17 | A | No. |
| 18 | Q | Whose responsibility would that have been? |
| 19 | A | The physician that he was rounding with. |
| 20 | Q | So in terms of your overall observations of Steven Woo  ard |
| 21 | | besides feeling that he complained a lot, -- does that |
| 22 | | pretty much sum up your feelings about him? |
| 23 | | MR. GUNSBERG:  Object to the form of the qu  ion. |
| 24 | | You can answer if you understand. |
| 25 | A | I don't understand what you're saying. |

## Page 14

1  Q  Well, you felt that Steven Woodward complained a lot about
2     the program?
3  A  Yes.
4  Q  Were any of his complaints valid complaints?
5  A  I don't know.
6  Q  Is it fair for me to assume that you never investigated into
7     whether or not any of his complaints were valid complaints?
8  A  No.
9  Q  It's not fair for me to assume that?
10 A  No.
11 Q  All right.  What complaints did you investigate to determine
12    that they were valid?
13 A  Oh, I'm sorry.  Yes, that's fair for you to assume that.
14 Q  That's what I thought you meant to say.  All right.  So you
15    were the conduit.  You just passed Mr. Woodward's complaints
16    along to Dr. Yanez?
17 A  Yes.
18 Q  And Dr. Yanez said, "That's between Steve and the school,
19    don't worry about it"?
20 A  Don't shoot the messenger, yes.
21 Q  Okay.  All right.  Is it fair for me to assume Dr. Yanez
22    never did anything to address Steven Woodward's complaints?
23       MR. GUNSBERG:  Objection; foundation.  Do you
24    know?
25 Q  Do you know?  If you know.

## Page 15

1  A  I don't know.
2  Q  Approximately how many medical students do you think that
3     you have come in contact with over the four and a half
4     years?
5  A  Anywhere between 3- and 400.
6  Q  I would imagine that it's from students from all over the
7     world, ethnically; correct?
8  A  Yes.
9  Q  Does -- strike that.  Are you capable or is it possible for
10    you to voice your opinion as to whether or not that you
11    thought Steven Woodward acted as a professional while he was
12    in the program?
13       MR. GUNSBERG:  Objection as to foundation,
14    qualification and relevance of her opinion, but you can
15    answer if you can.
16 A  Can you say that again?
17 Q  Did he act unprofessional?
18 A  Yes.
19 Q  Why did he act unprofessional?
20 A  Because he constantly complained about the program even
21    after he was told that he need to take the issues up with
22    AUA, that we're just administering AUA's program.
23 Q  So you thought that it was unprofessional of him to tell you
24    about his complaints as opposed to dealing with the school
25    directly?

## Page 16

1  A  I thought it was unfair that he constantly complained to me
2     as opposed to dealing with the school.
3  Q  Now, you said as opposed to dealing with the school.  Do you
4     know if he ever complained to anybody at the school?
5  A  I'm not sure.
6  Q  All right.  But you said "as opposed to dealing with anybody
7     at the school," so obviously you have a frame of mind that
8     he didn't deal with anybody at the school.  Why --
9        MR. GUNSBERG:  Objection to --
10       MR. NICOLETTI:  I didn't finish my question.  Can
11    I finish my question?
12       MR. GUNSBERG:  Go ahead and finish the question.
13 Q  Why do you believe that he didn't voice his complaints to
14    anybody at the school?
15       MR. GUNSBERG:  Objection to foundation.  Assume a
16    fact not in evidence.  You can answer the question.
17 A  Because I felt like if he talked to someone at the school
18    why did he continue to complain to me after I told him he
19    had to talk to the university.
20 Q  Did you ever tell him to stop complaining to you?
21 A  I told him that it was nothing I could do.
22 Q  But did you ever tell him to stop complaining to you?
23 A  Not that I recall.
24 Q  Is it your function as an employee of St. Joe's to interact
25    with students that might have complaints?

## Page 17

1  A  Yes.
2  Q  And so you're not saying that it was inappropriate for him
3     to complain to you.  You're saying that you didn't like the
4     fact that he continued to complain to you?
5  A  Yes.
6  Q  Now, Dr. Zonia wrote a memorandum on December 17th, 2007.
7     Do you recall -- I'll show you what we have marked as
8     Exhibit Number 6.  Have you ever seen that document before?
9  A  Yes.
10 Q  When did you first see that?
11 A  After Dr. Zonia wrote it I had to put a copy in the file.
12 Q  Are you aware as to whether or not Dr. Zonia had a rough
13    draft of something similar to that exhibit before you saw
14    the copy that she handed you to put in the file?
15 A  I don't know.
16 Q  Okay.  Now, she merely handed that document to you to put in
17    the file?
18 A  Yes.
19 Q  Did she have any discussions with you prior to writing that
20    memorandum as to whether or not anything contained with it
21    was true or false?
22 A  Yes.
23 Q  And when did that discussion take place?
24 A  Before the letter was written.
25 Q  How soon before the letter was written?

## Page 18

1   A   I'm not sure.

2   Q   In terms of time frame are we talking a week, two weeks, a

3       month, a year?

4   A   I'm not sure.

5   Q   Tell me about the discussion that you had with Dr. Zonia

6       pertaining to that memorandum?  When was it?  Where was it?

7       How did it take place?

8   A   I talked to her in her office and I was telling her about

9       the constant complaining from Steven Woodward about the

10      program and Dr. Zonia said that she was going to talk to AUA

11      about it and AUA responded to Dr. Zonia asking her to put it

12      in writing.

13   Q   And was that in December of 2007?

14   A   Yes.

15   Q   How many times did you talk to Dr. Zonia about the fact that

16       Steven Woodward complained too much?

17   A   Several.

18   Q   At the time that you talked to Dr. Zonia about Steven

19       Woodward complaining too much did you know that she was

20       working on some type of a memorandum to send to AUA?

21   A   No.

22   Q   When was it that you found out for the first time that she

23       was going to write a memorandum to AUA?

24   A   I'm not for sure of the date.

25   Q   Did she specifically discuss that memo with you before it

## Page 19

1       was sent to AUA?

2   A   I'm not sure.

3   Q   Could you hand me that, please?

4       (Witness hands exhibit to counsel)

5   Q   Did you ever have a discussion with Dr. Zonia about Steven

6       Woodward having a poor attitude or his demeanor being

7       inappropriate or detrimental to the program?

8   A   I'm not sure.

9   Q   Did you ever have a discussion with Dr. Zonia about Mr.

10       Woodward representing -- or I'm sorry -- resenting every

11       assignment that he was given?

12   A   Yes.

13   Q   When was that?  Tell me about that.

14   A   That was in the beginning of the 15 weeks.

15   Q   How much in the beginning?

16   A   At least the first five I can remember.

17   Q   First five what?

18   A   Not the first five.  The first two to three weeks I can

19       remember.

20   Q   The first two to three weeks --

21   A   Of the program.

22   Q   -- that the program had started.  And tell me about his

23       resentment about assignments he was being given?

24   A   He did not want to be on the service.  He did not feel like

25       the academic sessions were any good.  He said that the tests

## Page 20

1       were stupid and they were not helpful to him.

2   Q   And besides that did he say anything else?

3   A   No.

4   Q   Did you ever have a discussion with Mr. Zonia about Mr.

5       Woodward venting his anger in a professionally unacceptable

6       manner?

7   A   Not that I can remember.

8   Q   Did you ever see Mr. Woodward express his anger in a

9       professionally unacceptable manner?

10   A   No.

11   Q   Do you have any personal knowledge whether Mr. Woodward

12       completed his hundred patient log in two weeks?

13   A   Yes.

14   Q   What personal knowledge do you have?

15   A   He came to my office first and said that he finished hi

16      patient log, now do he have to return to the service.

17   Q   Now, you said 150 patient log.  The memo says, 100 patient

18       log.  Why is there a difference, if you know?

19   A   It has changed a lot so I'm not 100 percent sure if his

20      group was 100 or groups after him, but the patient log

21      changes every semester.

22   Q   All right.  So he came to you and said he had completed his

23       100 patient log in two weeks?

24   A   Yes.

25   Q   And what did you say?

## Page 21

1   A   That he needed to talk to Dr. Yanez if he no longer wanted

2       to return to the service.

3   Q   And did he talk to Dr. Yanez about that?

4   A   I'm not sure.

5   Q   Did you ever talk to Dr. Zonia about Mr. Woodward requesting

6       a transfer to the Miami program?

7   A   No.

8   Q   Did Mr. Woodward ever tell you that he thought he was

9       wasting his time in the fifth semester program and that he

10       thought his time would be better spent in a Kaplan course?

11   A   Yes.

12   Q   And when was that?

13   A   Two weeks after he started the program.

14   Q   And what did he say?

15   A   That it was a waste of his time and he can spend his time

16      studying.

17   Q   And what did you say?

18   A   He needed to talk to American University of Antigua.

19   Q   Did you ever talk to Dr. Zonia about Mr. Woodward sabotaging

20       exams by giving the same response to all questions?

21   A   Yes.

22   Q   And when was that?

23   A   I'm not quite sure of the date.

24   Q   What was the conversation that you had?

25   A   Dr. Zonia told me that American University of Antig

Page 22

1 informed her that Steve answered her Exam Master with the
2 same answer and that was not acceptable.
3 Q And did you form an opinion as to whether or not that was
4 acceptable or not?
5 A No.
6 Q Did Dr. Zonia say whether or not that was acceptable?
7 A No.
8 Q Do you have any personal knowledge as to whether or not that
9 is acceptable?
10 A No.
11 Q Do you know whether the Kaplan course teaches that as an
12 exam strategy?
13 A I don't know.
14 Q Do you know anything about the Kaplan course?
15 A I do not.
16 Q Did you ever discuss with Dr. Zonia Mr. Woodward requesting
17 early release on a virtually daily basis from his clinical
18 rotation so he could study for the boards?
19 A I don't remember.
20 Q Do you know whether or not Mr. Woodward -- strike that. Do
21 you recall ever discussing with Dr. Zonia whether Mr.
22 Woodward had ever argued with the faculty at St. Joe?
23 A I'm sorry. Can you repeat that?
24 Q Did you ever discuss with Dr. Zonia whether Mr. Woodward had
25 ever argued with the faculty at St. Joe?

Page 23

1 A No.
2 Q Are you aware of Mr. Woodward ever arguing with the faculty
3 at St. Joe?
4 A No.
5 Q Are you aware as to whether or not Mr. Woodward ever
6 demonstrated his contempt for the curriculum?
7 MR. GUNSBERG: Other than what she has testified
8 about?
9 A What do you mean?
10 Q Did Mr. Woodward ever physically demonstrate that he was
11 that he didn't approve of the program?
12 A Yes.
13 Q And how was that?
14 A He was not on the service a couple of days and when he was
15 paged he never returned the page to let us know in the
16 hospital where he was at.
17 Q And was there ever a problem with his pager that was
18 discovered after that?
19 A Not that I know of.
20 Q In your opinion did Mr. Woodward have poor communication
21 skills?
22 A Yes.
23 Q And why do you say that?
24 A Because if he was told to take his issues up with American
25 University of Antigua I don't understand why he constantly

Page 24

1 came to me to complain about the program.
2 Q So you're assuming that he didn't do that since he was still
3 complaining to you?
4 MR. GUNSBERG: Object to the form of the question.
5 Q Do you understand the question?
6 A No.
7 MR. GUNSBERG: It's a non-sequitur.
8 Q You're assuming that Mr. Woodward never took his concerns up
9 with AUA since he was still complaining to you?
10 A I'm not sure if he took his complaints to AUA. I just
11 didn't understand why he constantly complained to me and I
12 told him there was nothing I can do.
13 Q Have you ever been asked to determine whether or not a
14 student would be an ambassador, a good ambassador, for the
15 medical school from which the student came from?
16 A No.
17 Q Do you know what would make a student a good ambassador?
18 A No.
19 Q Did Dr. Zonia ever discuss whether Steven Woodward would be
20 a good ambassador for AUA?
21 A Not to me.
22 Q Did you ever form an opinion as to whether Steven Woodward
23 met the qualifications to sit for the boards?
24 A No.
25 Q Is that part of your position?

Page 25

1 A No.
2 Q Now, prior to coming here today for your deposition did you
3 have any discussions with anybody pertaining to what
4 questions you might be asked or what answers you might give --
5 that maybe you should give?
6 MR. GUNSBERG: I'm going to object to the form of
7 the question. Did you have any conversations with anybody
8 about your deposition other than me?
9 THE WITNESS: No.
10 MR. GUNSBERG: And I'm going to object to any
11 questions about her conversations with me as privileged.
12 MR. NICOLETTI: Privileged based on what?
13 MR. GUNSBERG: She is an employee of the hospital,
14 Trinity and Trinity is my client. I am acting on their
15 behalf today.
16 Q Prior to coming for your deposition today did you have a
17 chance to review any documentation?
18 A No.
19 Q And when is the last time that you reviewed any
20 documentation concerning Steven Woodward?
21 A The 15th week of the program.
22 Q And that was at the end of the program?
23 A Yes.
24 Q And why did you review documentation at that time?
25 A Because I had to file evaluations into his folder

## Page 26

1  Q   And what evaluations did you put in his folder, if you
2      recall?
3  A   His final practical exam and his two evaluations from the
4      services that he was rounding on.
5  Q   And what's the final practical exam?
6  A   The students are being examined -- tested as far as their
7      medical knowledge for the ears, the eyes, the throat.
8  Q   Now, did you bring any records with you today?
9  A   No.
10 Q   Dr. Zonia says that you have a file for Steven Woodward; is
11     that correct?
12 A   Yes.
13 Q   And where is that file?
14 A   With David Gunsberg.
15 Q   And what is contained in that file?
16 A   His general information about himself, confidentiality
17     papers that he had to sign for the hospital, evaluations
18     that he was evaluated as far as the physicians, some tests,
19     the memo from Dr. Zonia.
20         MR. NICOLETTI: Okay. If we can just take a brief
21     break while I look through this. Do we have Dr. Yanez?
22         MR. GUNSBERG: 11:30.
23         MR. NICOLETTI: Well, it's just that I've got a
24     pretrial at 1:15.
25         MR. GUNSBERG: Let's just make sure on the record

## Page 27

1      that Mr. Nicoletti cancelled the deposition this afternoon
2      for Dr. Nicola scheduled for 2:00 o'clock.
3          REPORTER: Did you want to go off the record?
4          MR. NICOLETTI: Yeah.
5          (Off the record)
6  Q   Ms. McCall, I am looking at the file that you had provided
7      to your attorney and there are two student evaluation
8      outpatient -- there is two forms. One is a student
9      evaluation outpatient rotation and then the other is a
10     inpatient student evaluation. And these are -- do you
11     recognize those?
12 A   Yes.
13         MR. NICOLETTI: I'd like to have those marked as
14     exhibits.
15         MR. GUNSBERG: These are originals.
16         MR. NICOLETTI: Do you want to have copy of those
17     made first then?
18         MR. GUNSBERG: Why don't you ask her about it and
19     then we can mark them? You have them already anyway.
20 Q   Did you ever review those documents?
21 A   Yes.
22 Q   And what are they essentially?
23 A   It's the evaluation from American University of Antigua.
24 Q   And are those from late 2007?
25 A   Yes.

## Page 28

1  Q   And what are the evaluations for? What are they evaluati
2  A   When the student is in the service with the physicia    he
3      physician has to evaluate the student as far as their
4      behavior on the service.
5  Q   And who performed those evaluations?
6  A   Dr. Breitenboch and Dr. Malloy.
7  Q   And what did either of those two doctors say about Steve
8      Woodward? Did they give him a good review or did they g
9      him a bad review?
10         MR. GUNSBERG: I'm going to object. The docur    its
11     say what they say. Are you asking this witness to interpre
12     what they mean?
13 Q   Well, what --
14         MR. GUNSBERG: I object to the foundation and
15     relevance. They say what they say.
16 Q   What was the overall characterization of Steven Woodwa
17     performance? Was it good or was it bad?
18         MR. GUNSBERG: Again, I'll object to asking the
19     witness to characterize what it says. The document says
20     what it says.
21 Q   If you know.
22 A   On the evaluations?
23 Q   Yes.
24 Q   Were they good evaluations or were they bad?
25 A   They were good evaluations.

## Page 29

1  Q   So other than complaining a lot is it fair for me to assum
2      that Steven Woodward was a good student?
3          MR. GUNSBERG: Objection; foundation as to w      her
4      this witness has knowledge of that information.
5  Q   If you know.
6  A   I don't know.
7  Q   In fact Dr. Malloy's evaluation was dated December 5th
8      2007; is that right?
9  A   I'm not sure what date is at the bottom.
10         MR. NICOLETTI: I'd like to mark Dr. Malloy's
11     evaluation as Exhibit 7.
12         REPORTER: 8.
13         MR. NICOLETTI: 8. And we'll mark Dr.
14     Breitenboch's as 9.
15 Q   Are you aware that Dr. Breitenboch said that Steven W    ard
16     was an excellent student?
17 A   No.
18 Q   Does that surprise you?
19 A   Yes.
20 Q   Why does it surprise you, because he complained so m      ?
21 A   Yes, and that's not the impression he left in the m     ical
22     education department.
23 Q   Your answer is based on whose impression, yours or so    ebody
24     else's?
25 A   His -- well, mine.

**Network**_Reporting_

— 1-800-632-2720

## Page 30

```
1   Q    So as far as you're concerned he didn't leave a positive
2        impression?
3   A    No.
4            MR. GUNSBERG:  That was "no," he did not.
5   A    No, he did not.
6   Q    Did he leave a positive impression upon anybody else in your
7        department?
8   A    Not that I know of.
9   Q    So is it fair for me to assume that everybody in your
10       department disliked Steve Woodward?
11  A    I don't know.
12  Q    Did you dislike Steve Woodward?
13  A    No.
14  Q    Do you recall sending an email to Mr. Woodward indicating
15       that you were happy to have Steve at St. Joseph?
16  A    I don't remember.
17           MR. NICOLETTI:  This will be Exhibit 10; is that
18       right?
19           REPORTER:  Yes.
20           (Deposition Exhibit 10 marked)
21  Q    Did you send that email?
22  A    Yes.
23  Q    That email came from your computer?
24  A    Yes.
25  Q    Why is it that that email doesn't seem to track with what
```

## Page 31

```
1        you have testified today?  You don't seem very happy about
2        Steven Woodward today so why was it that that email says
3        that you're happy to have him?
4            MR. GUNSBERG:  Object to the form of the question.
5        It misstates her testimony.  You can answer.
6   A    I'm happy when all the students come to St. Joe's.  I enjoy
7        working with students.
8   Q    All right.  So you send that email to every student?
9   A    I don't remember.
10  Q    Do you recall sending emails to all the students on a
11       regular basis?
12  A    No.
13  Q    So is it fair for me to assume that for you to send an email
14       to a student is out of the ordinary?
15  A    No, it's not out of the ordinary.
16  Q    Okay.  Can I see that email?
17           (Counsel hands exhibit to counsel)
18  Q    This email was sent by you on October 10th of 2007; isn't
19       that correct?
20           MR. GUNSBERG:  Why don't you let her see it?
21           (Counsel hands exhibit to witness)
22  A    Yes.
23  Q    And Dr. Zonia testified that there was a lot happening in
24       terms of Steven Woodward in October of 2007.  Would you
25       agree with that?
```

## Page 32

```
1   A    Yes.
2   Q    And you're indicating in that email that you were pleased
3        with Steven Woodward as of October 2007, aren't you?
4            MR. GUNSBERG:  I'll object to the form of the
5        question.  It misstates the document.
6   Q    Tell me why you sent that to Steven Woodward.
7   A    Because before Steve emailed me he stopped by the o___ e and
8        said he wanted to stay at St. Joseph and he hoped that ___ r
9        feelings didn't change towards him.
10  Q    And so that's your response to that?
11  A    Yes.  My feelings don't change towards the students a___ I am
12       happy to have them in the hospital.  Anyway that I can ___ lp
13       them pursue with their clinicals of the semester is my j___
14  Q    What do you know about Steven Woodward's desire to leave ___
15       Joe's and go to Miami, I guess?
16  A    Yes.  I don't know much about it.
17  Q    Do you know who he asked for permission from or whether
18       permission was granted to leave St. Joe's?
19  A    I'm not sure who he talked to.
20  Q    Did you have anything -- did you have any input concerning
21       his request to leave St. Joe and go to Miami?
22  A    No.
23  Q    And do you have any idea why he wanted to go to Miami?
24  A    No.
25  Q    Were there any other students in Steve Woodward's class tha___
```

## Page 33

```
1        complained as much as he did?
2   A    No.
3   Q    Have there been any other students in any other class ___ that
4        have complained as much as Steve Woodward?
5   A    No.
6   Q    So does Steven Woodward stand out in your mind as ___ ng the
7        biggest complainer in St. Joe history?
8   A    Yes.
9   Q    Does anybody even come close?
10  A    No.
11           MR. NICOLETTI:  I have no further questions.
12           MR. GUNSBERG:  I just have a followup quest___
13           EXAMINATION
14  BY MR. GUNSBERG:
15  Q    Exhibit 10 it looks like that Steve Woodward actually h___
16       emailed you and you were responding to him; is that c___ ect?
17  A    Yes.
18  Q    And Steven Woodward apparently was telling you that ___ was
19       not going to be allowed to transfer to Miami and that A___
20       would not let him transfer?
21  A    Yes.
22  Q    And here he is confirming that he had talked to Dr. Zo___
23       about not being allowed to transfer and that apparently ___ e
24       was going to be allowed to stay at St. Joe; is that corre___
25  A    Yes.
```

## Page 34

| | | |
|---|---|---|
| 1 | Q | Is that what you understood? |
| 2 | **A** | **Yes.** |
| 3 | Q | Were you just trying to reassure him that you had no ill |
| 4 | | feeling towards him? |
| 5 | **A** | **Yes.** |
| 6 | Q | And that was the purpose of your email? |
| 7 | **A** | **Yes.** |
| 8 | Q | Did you have any personal animosity towards Steven Woodward? |
| 9 | **A** | **No.** |
| 10 | Q | All right. And did Steven Woodward complain to you |
| 11 | | consistently and regularly up until the end of the program? |
| 12 | **A** | **Yes.** |
| 13 | Q | And did Steven Woodward tell you that he did not want to be |
| 14 | | at the hospital, that he would rather be home studying or |
| 15 | | words to that effect? |
| 16 | **A** | **Yes.** |
| 17 | Q | And was that a constant complaint of his right up 'til the |
| 18 | | end? |
| 19 | **A** | **Yes.** |
| 20 | Q | And you communicated that to Dr. Zonia and Dr. Yanez? |
| 21 | **A** | **Yes.** |
| 22 | Q | He told you that he thought the fifth semester program was |
| 23 | | stupid? |
| 24 | **A** | **Yes.** |
| 25 | | MR. GUNSBERG: That's all I have. |

## Page 35

| | | |
|---|---|---|
| 1 | | EXAMINATION |
| 2 | BY MR. NICOLETTI: | |
| 3 | Q | Did Steve Woodward, did he pass the fifth semester? |
| 4 | **A** | **I'm not sure.** |
| 5 | Q | Have you ever checked his file to determine -- does his file |
| 6 | | say if he passed fifth semester? |
| 7 | **A** | **It does not. The final grade comes from American University** |
| 8 | | **of Antigua.** |
| 9 | Q | And you wouldn't get a copy for your file? |
| 10 | **A** | **I don't remember getting a copy.** |
| 11 | Q | Were you aware that there were disciplinary proceedings |
| 12 | | against Steven Woodward? |
| 13 | **A** | **Yes.** |
| 14 | Q | When did you become aware of disciplinary proceedings? |
| 15 | **A** | **At the end of his 15 weeks.** |
| 16 | Q | And how did that come about? |
| 17 | **A** | **The American University of Antigua wanted to have a** |
| 18 | | **conference call with Steve at the hospital so I had to** |
| 19 | | **provide a room for him to be able to talk to American** |
| 20 | | **University of Antigua.** |
| 21 | Q | And did that conference call take place? |
| 22 | **A** | **No.** |
| 23 | Q | Why not? |
| 24 | **A** | **I'm not sure.** |
| 25 | | MR. NICOLETTI: No further questions. |

## Page 36

| | | |
|---|---|---|
| 1 | | MR. GUNSBERG: I just have a couple of follow |
| 2 | | EXAMINATION |
| 3 | BY MR. GUNSBERG: | |
| 4 | Q | Did you have access to Mr. Woodward's files and records in |
| 5 | | Antigua? |
| 6 | **A** | **No.** |
| 7 | Q | Did you have any information about whether or not Mr. |
| 8 | | Woodward had had any prior disciplinary actions imposed upon |
| 9 | | him in Antigua? |
| 10 | **A** | **No.** |
| 11 | Q | The disciplinary hearing that you're referring to that |
| 12 | | occurred in December of 2007; is that correct? |
| 13 | **A** | **Yes.** |
| 14 | Q | So when Mr. Woodward came to St. Joe he came with a clean |
| 15 | | slate; is that correct? |
| 16 | **A** | **Yes.** |
| 17 | Q | So this opinion that you formed about him regarding his |
| 18 | | constant complaining that was based solely on his action at |
| 19 | | St. Joe; is that correct? |
| 20 | **A** | **Yes.** |
| 21 | | MR. GUNSBERG: I have nothing else. |
| 22 | | MR. NICOLETTI: I have nothing further. |
| 23 | | (Deposition Exhibits 8 and 9 marked) |
| 24 | | (Deposition concluded at 11:30 a.m.) |
| 25 | | -0-0-0- |

1

2

3

4

5       I certify that this transcript, consisting of 36 pages, is a

6  complete, true and correct record of the testimony of Deneen

7  McCall held in this case on February 3, 2009.

8       I also certify that prior to taking this deposition, Deneen

9  McCall was duly sworn to tell the truth.

10

11

12

13

14

15

16

17

18  February 10, 2009

19                   Sheila H. Raymond, CER 6932

20                  Network Reporting Corporation
2604 Sunnyside Drive
Cadillac, Michigan   49601-8749

21

22

23

24

25                  Page 37

**Network**Reporting

1-800-632-2720

CFO Greater Caribbean Learning Resources

SEMESTER V: PRELIMINARY CLINICAL TRAINING
SITE _Pontiac, Michigan_ - FALL 2007
**STUDENT EVALUATION - OUTPATIENT ROTATION**

DEPOSITION EXHIBIT
8
Mc CA

| Student's Name: | Preceptor's Name: | Dates: From: | To: |
|---|---|---|---|
| Steven Woodward | Dr. Breitenbach | 10/29/07 - | 14:   /07 |

## 1) PLEASE, RATE THE STUDENT FROM A TO F:

**1.0**
**Attendance:** Attended scheduled sessions at your Office

| F | C | B | A | RATE |
|---|---|---|---|---|
| (Missed 3 or more sessions in 6 weeks) | (Missed 2 sessions in 6 weeks) | (Missed 1 session in 6 weeks) | (Attended all scheduled sessions) | A |

## 2) PLEASE, GIVE THE STUDENT A PERCENTAGE SCORE AS FOLLOWS:

| | |
|---|---|
| < 60% | Substandard |
| 60 - <70% | Borderline adequate |
| 70 - <80% | Competent |
| 80 - <90% | Superior |
| 90 - 100% | Outstanding |

**2.1**
**Medical Knowledge:** Demonstrated appropriate **knowledge of basic sciences** and was able to apply it to the clinical situations he/she encountered.

SCORE: 7

**2.2**
**Attitude:** Displayed initiative and positive disposition to learn, **cooperative and constructive** attitude toward the members of team or Group that he/she was assigned to (As opposite to being negative and conflictive)

SCORE: 9

**2.3**
**Learning Skills:** Gradually started to **master proper skills** concerning elaboration of clinical history and examination of the different body systems, analyses of the results, and formulation of working diagnosis.

SCORE: 9

**2.4**
**Communication Skills:** Demonstrates listening skills, interchange medically related information with other members of the team, shows progress in **concisely and effectively** presenting clinical cases both in written and verbal form.

SCORE: 9

**2.5**
**Professionalism:** a) Demonstrated commitment to professional development and solid ethical principles and sensitivity to patients/family and peer diversity; b) showed compassion, respect and honesty; c) Accepted responsibility for his/her acts.

SCORE: 9



38

3. - General observations on the student's performance and suggestions for improvement:

VERY COMPUTER LITERATE.
EXCELLENT STUDENT.

4. - Please, fill the following portion for the students rotating at your Office from March 1
through March 29, 2007.

The student has mastered the following skills:
| | |
|---|---|
| < 60% | Substandard |
| 60 - <70% | Borderline adequate |
| 70 - <80% | Competent |
| 80 - <90% | Superior |
| 90 - 100% | Outstanding |

| Skills | Score | Pointed Suggestions for improvement |
|---|---|---|
| A) Elaboration of solid comprehensive clinical history | 70 | |
| B) Elaboration of focused Clinical History | 80 | |
| a) General examination of the eyes | 80 | |
| b) Examination of HENT and Neck | 80 | |
| c) Examination of Chest and Lungs | 80 | |
| d) Examination of Heart and CV System | 80 | |
| e) Examination of Abdomen | 80 | |
| f) Examination of Breast | 80 | NOT DONE THIS OFFICE |
| g) Examination of Female GU System | | |
| h) Examination of Male GU System | 80 | |
| i) Examination of Nervous System | 80 | |
| j) Gross examination of Mental Condition | 80 | |
| k) Examination of Musculoskeletal System | 80 | |
| l) Examination of Skin | 80 | |
| C) Overall skill to perform comprehensive physical examination | 80 | |
| D) Overall Skill to perform focused Physical examination | 80 | |

4. - Evaluation discussed with student:

_____   11/29/07          _____   11/29/0
Preceptor's Signature     Date        Student's Signature     Date

Form DOCS- EVALUATION 05 - 09/01/07 JEC

39



AMERICAN
... OF MICHIGAN
COLLEGE OF
MEDICINE

*C/O Greater Caribbean Learning Resources*

SEMESTER V: PRELIMINARY CLINICAL TRAINING

## St. Joseph Mercy Oakland Hospital, Pontiac Michigan – Fall 2007

### IN-PATIENT STUDENT EVALUATION - TEAM _____

| Student's Name: **Steven Woodward** | Preceptor's Name: **D. Malloy, M.D.** |
|---|---|

### 1) PLEASE, RATE THE STUDENT FROM A TO F:

**1.0**
**Attendance: Attended academic sessions:** including: a) morning rounds, b) morning case presentations, c) questions/discussion, d) ward rounds, e) morning lectures, f) grand rounds

RATE: **A**

| F | C | B | A |
|---|---|---|---|
| (Missed 3 or more sessions in 2 weeks) | (Missed 2 sessions in 2 weeks) | (Missed 1 session in 2 weeks) | (Attended all scheduled sessions) |

### 2) PLEASE, GIVE THE STUDENT A PERCENTAGE SCORE AS FOLLOWS:

| | |
|---|---|
| < 60% | Substandard |
| 60 - <70% | Borderline adequate |
| 70 - <80% | Competent |
| 80 - <90% | Superior |
| 90 - 100% | Outstanding |

**2.1**
**Medical Knowledge:** Demonstrated appropriate **knowledge of basic sciences** and was able to apply it to the clinical situations he/she encountered..

SCORE: **8**

**2.2**
**Attitude:** Displayed initiative and positive disposition to learn, **cooperative and constructive** attitude toward the members of team or Group that he/she was assigned to (As opposite to being negative and conflictive)

SCORE: **9**

**2.3**
**Learning Skills:** Gradually started to **master proper skills** concerning elaboration of clinical history and examination of the different body systems, analyses of the results, and formulation of working diagnosis.

SCORE: **9**

**2.4**
**Communication Skills:** Demonstrates listening skills, interchange medically related information with other members of the team, shows progress in **concisely and effectively** presenting clinical cases both in written and verbal form.

SCORE: **9**

**2.5**
**Professionalism:** a) Demonstrated commitment to professional development and solid ethical principles and sensitivity to patients/family and peer diversity; b) showed compassion, respect and honesty; c) Accepted responsibility for his/her acts.

SCORE: **9**

40

**2.6**

**Suggestions for Improvement**

Evaluation reviewed with the student:

_____ 12/5/01
Preceptor              Date

_____ 12/5/07
Student                Date

41

**From:** Deneen Nicks (NICKSD@trinity-health.org)
**To:** Steve Woodward
**Date:** Wednesday, October 10, 2007 8:32:29 AM
**Subject:** Re: Miami

Hello,

I am always willing to help the students to the best of my ability. My feelings about you are still the same, "I AM HAPPY TO HAVE YOU AT ST. JOSEPH"

PS... I am counting it down and can't wait to that day gets here.

Deneen

>>> "Steve Woodward" <steve_l_woodward@yahoo.com> 10/9/2007 7:50 PM >>>
Deneen,

AUA would not let me transfer to Miami.

I already spoke with Dr Zonia about my situation and I am allowed to stay at St Josephs.

Thank you for your cooperation and help,

Steve

PS The weekend is getting closer! I know you counting the seconds.



42

| Individual Number | Date | Rm # | Observation |
|---|---|---|---|
| 1 | ▓ | ▓ | ▓ Constipation pain tender inc WBC Fever L pain |
| 2 | ▓ | ▓ | Bladder Spasm, Blood in urine, Older ▓ 192/80, Diverculitis, nc patch for smoking from ICU. Good humor |
| 3 | ▓ | ▓ | Stopped steriods, BM, Dr. performed Resp. Exam Dischrg. |
| 4 | ▓ | ▓ | BF, Diabetic obese, Dr requested bone biopsy, inspected the stump of pt L stump. Requested G.S. drain fluid, Res. review ultrasound, Warm stump observed, absess. Bone Infection from prothetic ulcer.  Bilateral amputee b/l knee |
| 5 | ▓ | ▓ | WF, Nausea, vomiting, diarrhea loose stool no ab. Pain,  Coloscopy F/U Discg |
| | ▓ | ▓ | COPD ▓ Csytoscopy 3L O2 Emphysema Labia mass biopsy swelling in L extremities |
| | ▓ | ▓ | BF R/O bone infection order new prosthetic, drain fluid |
| 6 | ▓ | ▓ | Code Blue Respiratory arrest in hemodialysis, BP 272/122 administered NaHO4 and Narcan |
| 7 | ▓ | ▓ | Admitted 9/15 CAD, HTN, DM T2, Cleared for surgery ▓ F, commuted femur fracture<br>Hx walk fell in kitchen R knee, 0dizzieness, 1.5 hrs to contact EMS, 0 chest SO?B, CAD, 2xstents 2 in each L leg, DMT2, social smoker, BB metformin, gliberide Plavix, Benzocore Chentrix,  80/34 -- 113/68 fluid resusitation PI=56--> 60 95%O2 affebrile |
| 8 | ▓ | ▓ | Admitted 9/8 ▓ w/ abd ascites Alcohol liver disease, Interparitonial Drained 1,500cc/1L/3L/,<br>SOB dificulty breathing, BP 94/, (TIPS requested) portal hepatic stent, affedrile 90 pulse, Resp 18, BP 108/71 100% satO2, caudation, portal gastropathy |
| 9 | ▓ | ▓ | ▓, on respirator possible prophophol related, cardiac arrest revived x 2, Inc WBC, pitting edema, creatin 457, |
| 10 | ▓ | ? | ▓ c/c Abd pain x 3days 7/10, constipation, lasics loop diuretics, CAD, BPH, HTN, L-->R<br>decr. App, decr weight, Admit 9/10 Furosemide(Finasteride), R/O prostate cancer or bladder cancer |
| | ▓ | ▓ | Sick last night cancer localized in bladder?  See board for solution |
| | ▓ | ▓ | Discharge to ECF until Ab theoropy is finished/ new prostthetic some drainage in R leg |
| 11 | ▓ | ▓ | ▓ Dyspnea SOB cough since 2001.  Weakness/cough Rx persistant pneumonia, plural effusion COPD<br>Bronchoscopy w/possible endobronchial, Renal failure AECI, Lasixs |
| 12 | ▓ | ▓ | ▓ replace catheter, knee amputation renal failure 0 fever chills nasea, AV fistula removed ulcer<br>on leg |
| 13 | ▓ | ▓ | ▓ c/c SOB asthma, DMT2, sliding scale, B/L weakness R ear redness fluid congestion<br>2 yr ago hospitalized for asthma congestion non-productive cough 3d x fever chills can't do DM test since on steroids |
| | ▓ | ▓ | Swollen leg ulcer Refused BP order water pill |
| | ▓ | ▓ | Infection anemia decrease in R leg pain from movement neuropathy in L leg decrease fever |
| | ▓ | ▓ | Wheezing, 0 fever, chills, nausea, blood gas schedule some cough, 3/10 ches pain O2 4L |
| | ▓ | ▓ | Dr Malloy ordered a sleep study 0 smoking for 5 days |
| 14 | ▓ | ▓ | ▓ dehydration 0 sign stoke, DM Chief complaint Altered mental status, RMCA infarct AV block Type 1 |
| | ▓ | ▓ | Ordered CT of neck |
| | ▓ | ▓ | No new complaint aspirin plavix anti-platelet warfarin |
| | ▓ | ▓ | Amblitory pills/inhaler asthma discharge 9/25 |

**EXHIBIT 7**

| # | | | |
|---|---|---|---|
| 15 | | | Stable alert Xfer to ECF |
| 16 | | | Rectal bleeding endoscopy scheduled pain in back aortic stenotic murmur |
| 17 | | | Discharge decrease dilantin flagelin klubcella |
| | | | Endoscopy/ultrasound F/A_____ Pt panceratitis, biopsy of lymph nodes |
| | | | Pt has horseness, jaw is sore and R/O papaloma of the neck, Pt legs are down/ (-) cancer of polyp of the throat |
| | | | Pt wants to go home idiopathic ascites |
| | | | Smiling 107 F temp 72/52 WBC increase |
| | | | Discharge pt |
| 18 | | | Cellulitis MRSA |
| 19 | | | Epitaxis condin toxisity warfarin |
| 20 | | | _____ chest pain at rest 2 wks sudden pain pressure unstable angina/ radiating down L arm 0 jaw |
| | | | 0 Nasea, 0 increase BP, Fx heart attack, manager at a hotel |
| 21 | | | _____ T 97.9, BP 149/70 P68 R 16 PO 96% L eye missing R eye macular degeneration |
| 22 | | | _____ back, chest and arm pain x 3days Hep B/C (+)ve 9/10 pain, medication aspirin, Zolof, allergy=0, Alcohol = 0, smoking 3 cigarettes/day |
| | | | Pt stated she was OK and ready to go home has b/l crackles "Bladder cancer |
| | | | Pt needs to see pulmonologist, then discharge |
| | | | PT feels OK Abd bleeding dimentia not allert to Time or place |
| 23 | | | guaiac test neg, pain radiating around back across chest down leg |
| | | | _____ substernal pain |
| 24 | | | WM blood in bowels anemia pt wants to go home 9.6 Hg decr. 8.7 ordered another Hg test |
| 25 | | | _____ c/c SOB, DIB |
| 26 | | | _____ Vancomyosin (acute renal dysfunction) nausea, metalic taste in mouth, 0 rash, 0 ringing |
| | | | surgery in July infection around laminectomy site, cramping in back, need pain med (duadid?) for back pain |
| 27 | | | _____ lung/kidney cough |
| 28 | | | _____ Pt wheezing coughing Card MI (2 stent) SOB chest tightness quit smokign x 3months smoked 58yr /day |
| | | | PT having renal failure from tobramiocine |
| | | | Pt in Posion" position(tied down agitated metabolic cause ordered haldol |
| | | | Eating breakfast Gastritis, protonix vicodin, clinical appointment, pt requesting drugs for heroin addiction (Simboxin) and vicadin, discharge 10/01 |
| 29 | | | PT had stress test, acute bronchospasm, sputum green—> yellow--> yellow froathy |
| | | | _____ Cough w/green sputum and UTI ordered Leviquin |
| 30 | | | _____ c/c diarrhea for 1 yr, thrombocytopenic frequent diarrhea, back surgery, Hx camping 33,000 platelets, alcohol(family member told Dr) Alcohol decrease platelets colonoscopy |
| 31 | | | _____ No Neutrophils anemia, leukemic AMLchemotheropy |
| 32 | | | _____ w/ breast cancer advance metastisis, Xferring to either home or hospice |
| 33 | | | _____ MI chest pain Hx 3rd MI decr S1 and heard S4, asked Pt what could be done to help her stop smoking |
| | | | pt in denial |
| | | | Remove IV diarreha check smear for HUS, PT Hep C +ve diarrhea better |
| | | | Smoking cessation HTN cocain abuse (+) 2 stents |
| 34 | | | _____ Diffuse recurrent abdominal pain vomiting > WBC functional, (-)XR (-)Lab Chronic unknown origin, discharged |
| 35 | | | _____ Fell from her bed trauma to L side arm/leg UTI leviquin |
| 36 | | | _____ Altered mental status x5 days Hepatic encephalopathy alert 0 oriented to time and place. |
| 37 | | | _____ Flank/back pain/SOB, <BS R lung B/L pulmonary nodules Hx prostate cancer 2005, tachycardia smoking 45 yrs(quit 3 yrs ago) |
| 38 | | | _____ Diarrhea, psuedomembrane colitis from drux Rx, metrenizol x 7 days |
| 39 | | | _____ fell from ladder(6ft) L5S1 XR, MRI no hurneation, medication not helping, 10/10 for 2wk |
| | | | 0 allergies, in recovery positiondiminished sensation in R leg, R side arm/leg constipated 1+ daysR side pain sharp pain. |

9

6

4

9

(58 2wk)

12

2

| # | | | Notes |
|---|---|---|---|
| 40 | | | pneumonia cough fever L chest pain inspiration radiating to back on inspiration 7/10 eryth. Sputum L congestion |
| 41 | | | pneumonia walking around ready to go home on vancomiacin, chest pressure |
| 42 | | | Altered mental state depressed mental state, DMT2 may have missed insulin, calcification in vertebral artery and carotids all three daughters noticed < faculties Hx 1 kidney, pace maker, Silver Hoth? Procedure on both legs |
| | | | Woke from sleeping, pt wouldn't follow fingure for neuro exam and wouldn't allow the Dr to check eyes |
| | | | CT ordered for his stomach, still has pain in his stomach |
| | | | Loose normal stool |
| | | | Increasing cell count prepare to discharge |
| | | | Discharged |
| | | | SOB |
| | | | fever cough w/ sputum, chest pain x 2 days on levaquin x 10 days |
| | | | radiologist R/O cardiomegaly |
| 43 | | | Hep C thrombocytopenia ascites pancreas/liver look normal -discharged |
| | | | Intermittent (Acute) coronary Syndrome, c/c chest pain x 2 month 8/10 depression, 40% LAD occlusion, 100% RCA, 40% EF.  Stent scheduled |
| 44 | | | c/c headache + neck pain w/ LOC 6-7/10 CT scan hemotoma pain releaved w/ motrin |
| | | | fell on her porch on the L side of her head.  Contusion/swelling around her L eye |
| 45 | | | Dizziness SOB blood sugar 173 atypical pneumonia |
| 46 | | | pneumonia, pt feels better since breathing Tx |
| 47 | | | cc palpitations since Staturday, taking tecasin for ablatification Tx, pt Hx Tetrology of Fallot.  Repaired at 3yo and 9 yo.  Pt had no problems as a child.  Has atra flutter from scar tissue |
| 48 | | | cc fever and chills, finished chemo 1wk ago, Hx of CLL, prostate cancer, pacemaker and stent , neutorpenia form chemo.  Decreased IV to reduce urination, changed diet from cardio to open. |
| 49 | | | cc seizures discharged |
| | | | Fell at a ECF has UTI |
| | | | Pt moved to 3125 received tecocine for preparation for ablasion |
| | | | Could not go into room b/c of pt condition |
| 50 | | | Code Blue Cardiac Arrest,  multiple recoverys and arrests.  Called |
| 51 | | | cc chest pain, many admissions for sickle cell crisis |
| 52 | | | cc Hyperkalemia and chest pain, admitted by her primary care physician, Hx skin cancer |
| 62 | | | removed central line, discharged |
| 53 | | | cc rash biopsy upper trunk rash started Saturday/ caradid brewery |
| 54 | | | Dyspnea pneumonia / switching to oral antibiotics wheezing upper left fields |
| 55 | | | metastatic renal carcinoma |
| 56 | | | cc Headache " Worse Headache of Life"  photophobia sharp and constant |
| 57 | | | with back pain/ side pain for 7 days |
| 58 | | | skin cancer, ammonium lactate losion for rash |
| 59 | | | cc facial swelling, started as a pimple in the nose started Friday, Hx of RBBB, headache R/O medication and infection |
| 60 | | | cc Chest Pain, on lipitor, mild LV |
| 61 | | | cc Chest Pain (2 stents 2 wks ago) radiating pain to jaw down arm (different pain than before) SOB |
| 63 | | | cc Chest Pain from right side below ribs fX 2 wks ago, shingles and rash Hx of legionair disease |
| 64 | | | nausea, from pain medication Hx of kidney stones, cc inpatient from flank pain |
| 65 | | | cc Chest Pain w/fever pneumonia adinocarcinoma  SOB pneumonia right side pain and chills |
| 66 | | | cc Dizziness and neck pain for one week, had a deffibrilator installed 2 weeks ago 3/10, headache Hx Tetrology of Fallot, blackouts and low energy, neck feels like its collapsing |
| 67 | | | pneumonia, No productive cough D/C today |
| 68 | | | cc Endometriosis refused Tx |

17

6

13

6

3





| # | | | Notes |
|---|---|---|---|
| 69 | ▓ | ▓ | ▓▓▓ cc pneumonia organism, dyspnea sputum thick, aspirated vomit, cough productive/ sweating/aspirated vomit/ nasal aspiration of mat'l/ breathing Rx / I asked if I could help by cleaning the vomit off the pt and was denied. |
| 70 | ▓ | ▓ | ▓▓▓ cc Pyelonephritis (-) preg test / R/O obstruction, no stone found/Bladder infection / weak fever, Back pain meds causing vomiting -- Bladder infection into kidney |
| 71 | ▓ | ▓ | ▓▓▓ cc Femoral vein phlebitis pressure stocking legs reduced size. Try to reduce and prevent clots/ on blood thinner/ excersize |
| | ▓ | ▓ | pt moved |
| | ▓ | ▓ | ▓▓▓ surgery w/ heart issues recovering fluid from surgery and stress |
| | ▓ | ▓ | Pt moved from Rm 3101 to 212, |
| | ▓ | ▓ | Pt is ambulatory, scheduled scope for ureter stone |
| | | | possible narrowing of the ureter |
| 72 | ▓ | ▓ | Pt has some soreness in his legs, he is scheduled to be discharged tomorrow |
| | ▓ | ▓ | ▓▓▓ Cellulitis wound in B/L shins purulant discharge from open wound on the R tibea pain and swelling in the inginal lymph nodes |
| 73 | ▓ | ▓ | ▓▓▓ Diverticultis of colon abdominal distension (alcohol) minimal scarring atelectasis in the L leg fatty liver. 3mm calculus in midpole L kidney/ few diverticula in sigmoid via CT from binge drinking. Fatty infiltration of the liver  cc/ abdominal pain + NV x 1 day |
| | | | Not able to eat but urinating Pt on protonics |
| 74 | ▓ | ▓ | ▓▓▓ cc Abdominal pain R upper pain, Ultra sound on/off pain 9/10 radiating to her back/shoulder murphy positive protonix - acid reflux |
| 75 | ▓ | ▓ | ▓▓▓ cc Chest pain/ unable to afford to stay, Heaviness for one month anteroseptal infarct PVC w/excersize different pain from 2004. Fx of cancer smoking and DM. Has throat and stomach ulcers. |
| | ▓ | ▓ | ▓▓▓ cc unable to walk b/c of pain, Gout in L foot diarrhea pain in R arm - 2 wk w/ pain |
| 76 | ▓ | ▓ | ▓▓▓ polynephritis laminectomy of back developed an abcess cc weakness B/L in legs |
| 77 | ▓ | ▓ | ▓▓▓ "CHF" cc SOB dyspnea ascites fluid overload Tx diarrhea BNP(normal 0-70)496-500 is abnormal |
| 78 | ▓ | ▓ | ▓▓▓ renal failure rash dehydration now UTI frontal headache dizziness urinating a lot |
| | ▓ | ▓ | PO 96% w/ O2 72-84 w/o O2 |
| | ▓ | ▓ | Pt refused Tx, wants to go to a Haspice and die |
| | ▓ | ▓ | Ordered CT w/ contrast to see obstruction |
| | ▓ | ▓ | 3/10 pain ordered NSAID |
| | ▓ | ▓ | decrease in swelling of the lymph nodes |
| | ▓ | ▓ | Need to check cellulitis from IV site, + for esophagial candadia infection, New IV |
| 79 | ▓ | ▓ | R chamber enlarged EF=10% mitral valve and aortic valve enlarged |
| | ▓ | | ▓▓▓ Intermediate coronary syndrome |
| 80 | ▓ | ▓ | ▓▓▓ cc agitation, has Alzhiemers, restrained for walking out of his room naked |
| | ▓ | ▓ | D/C |
| | ▓ | ▓ | Pt's brother agrees w/ hospice for his sister |
| | ▓ | ▓ | No stone found, drink fluid |
| | ▓ | ▓ | Pt vomiting can't eat |
| 81 | ▓ | ▓ | ▓▓▓ cc rectal bleeding, bright red blood in stool started at 3AM x3 came to ER, cramp in lower abdomen 7/10 pain < bowel sounds on L |
| 82 | ▓ | ▓ | ▓▓▓ cc HTN sleep apnea L upper Q pain DMT2 ordered insulin |
| 83 | ▓ | ▓ | Pt not feeling better peeing clear  + NVD |
| 84 | ▓ | ▓ | ▓▓▓ Hglycemia DMT2 > 500 blood glucose |
| 85 | ▓ | ▓ | ▓▓▓ SOB congested |
| | ▓ | ▓ | ▓▓▓ cc Kidney stone calculus Nausea from tomato soup, hasn't slept b/c NV tired |
| 86 | ▓ | ▓ | Protonix for GERD, requested bucket to collect vomit "Dr Hussain wouldn't see the pt" pt consulting from another Dr for a GI scope |
| | ▓ | ▓ | Pt not eating, now has infected colon |
| 87 | ▓ | ▓ | ▓▓▓ cc NVD x 2 days / coffee ground mat'l, diarrhea 4-5 days |
| | ▓ | ▓ | ▓▓▓ cc anemia/ morbidly obese pain 15/10 in right foot, gangrene decub ulcer MRSA culture in ulcer necrosis of toes 1-3 on right foot |

15

9

6

4

5

4

| # | | | Notes |
|---|---|---|---|
| 88 | | | ████ cc pneumonia and hypoxia, ordered throat culture asked if the was black mold in the house |
| | | | diverticulitus improving pt still has abdominal pain |
| | | | Ordered lung biopsy |
| | | | Bronchoscope observation luvage VOLA 95%, pt has CD4=16 The doctor didn't tell us until after the procedure that we would be exposed to respiratory particles and pt infection. He told us that we should have had respiratory protection but was never advised us about this until after the procedure |
| 89 | | | ████ cc left hip fracture bradycardia < breath sounds acute renal failure left lung mass |
| | | | Pain in left leg, pt has 1 lung, pt went into requested transfer to CCU but AF w/ DNR |
| | | | Pt sleeping has JVD she did not move to CCU b/c of DNR order in living will, |
| 90 | | | ████ cc hyperglycemia, pt can't control DM, is morbidly obese, Hx COPD, asthma, acute renal failure, reflex sympathetic dystrophy, DMT2, , lupus, mitral valve prolapse, CHF, herniated disks, hiatel hernia, mifrains, neuropothy, TIA, open surgical ulcer x 1 yr on vaccum |
| 91 | | | ████ cc abdominal pain X 1 week diarrhea, cramping squeezing pain radiating from his abdomin down to his testicles Dx with DMT1 sugar 350 --> 150 |
| | | | Pt is designated with Contact Isolation after over a week of walking around the hospital, pt has C-Dif diarrhea is infectious |
| | | | Pt was notified that he is HIV positive and is infected with PCP |
| | | | Family met with the doctor for advice on hospice and "No one dies alone" |
| | | | redness around stomach wound |
| 92 | | | ████ cc soft tissue pain, pt on chemo for SCLC mets to bone, brain and liver |
| 93 | | | ████ cc Dr recommended that he check himself in, PHx: vagus nerve damaged from surgery, pt has chokes on food, has a change in voice, dry mouth SHx upper 1/3rd of right lung removed |
| 94 | | | ████ cc numbness and tingling in thigh hands and feet, pain started last winter, pt is morbidly obese, feeding tube wound from prior Sx is infected, fat folds are infected |
| 95 | | | ████ cc Tingling numbness in fingers and dizziness IV leaked on left arm Hx of cancer in her neck Dx w/ Menyers disease, had tumors surgically removed |
| 96 | | | ████ cc femur fracture of right hip. Pt on chemotheropy fro Stage 4 SCLC, Hx of left hip femur fracture |
| | | | Abdominal pain, vommited only once, pt stated he has masses on both lungs |
| | | | Reviewed ultrasound, possible hydrocele and varicocele |
| | | | The pt is to be discharged |
| | | | The pt is to be discharged |
| 97 | | | ████ cc SOB, chest pressure in the morning |
| 98 | | | ████ cc Chest pain, many BP medications, trying to consolidate/discontinue medi |
| 99 | | | ████ cc Syncope, collapsed getting out of her car walking to her house. 135/69 la |
| 100 | | | ████ cc SS crisis and pneumonia w/ abdominal pain. Pain started last night abou |

8

9

2

6

5



# Circuit Court

### County of Oakland

**SHALINA KUMAR**
CIRCUIT JUDGE

1200 N TELEGRAPH RD DEPT 404
PONTIAC MI 48341-0404

SIXTH JUDICIAL CIRCUIT
OF MICHIGAN
(248) 858-5280
FAX 248-975-9784
kumars@oakgov.com

*RECEIVED 1 2009*
BY: ---------------------

April 29, 2009

*RECEIVED APR 30 2009*
BY: ---------------------

Paul J. Nicoletti, Esq.
Nicoletti & Associates
39520 Woodward Ave., Ste. 200
Bloomfield Hills, MI 48304

David B. Gunsberg, Esq.
Law Office of David Gunsberg
322 North Old Woodward Ave.
Birmingham, MI 48009

**RE:    Steven Woodward v Trinity Health-Michigan, et al**
**Circuit Court Case No.  2007-646-9090**

Dear Counsel:

Enclosed please find the Opinion and Order that was issued by the Honorable
Shalina Kumar with regard to the above referenced matter.

Very truly yours,

*Jenice R. McGruder*

Jenice R. McGruder
Judicial Assistant to the
HONORABLE SHALINA D. KUMAR

**EXHIBIT**

**EXHIBIT 8**

RECEIVED

MAY 0 1 2009

BY:----------------

RECEIVED

APR 30 2009

BY:---------------

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

STEVEN WOODWARD

Plaintiffs.

v.

Case No. 07-088103 -CZ
Hon. Shalina D. Kumar

TRINITY HEALTH-MICHIGAN
A Michigan non-profit corporation, and
SUSAN CATHERINE ZONIA, an Individual

Defendants.

/

| | |
|---|---|
| NICOLETTI & ASSOCIATES, P.C. | LAW OFFICE OF DAVID GUNSBERG |
| PAUL J. NICOLETTI (P44419) | DAVID B. GUNSBERG (P24235) |
| Attorney for Plaintiff | Attorney for Defendants |
| 39520 Woodward Ave., Ste. 200 | 322 North Old Woodward Ave |
| Bloomfield Hills, MI  48304 | Birmingham, MI  48009 |
| (248) 203-7800 | (248) 646-9090 |

/

## OPINION AND ORDER

At a session of said Court held in the
Courthouse, City of Pontiac, Oakland County,
Michigan, on _____APR 2 9 2009_____

## PRESENT: HONORABLE SHALINA D. KUMAR, CIRCUIT COURT JUDGE

This matter is before the Court on Defendants' Motion for Summary Disposition pursuant to MCR 2.116(C)(10).   Pursuant to MCR 2.119 (E)(3), the Court waives oral argument.

This is a defamation case involving Plaintiff, Steven Woodard, a medical student at American University of Antigua ("AUA"), who alleges that Defendants slandered him by publishing a letter to the AUA faculty that Plaintiff was unprofessional.   During this time period, Plaintiff was a visiting medical student

1

from AUA who had three years of experience prior to his 5th semester at AUA. Plaintiff was cited for unprofessional conduct and used the word "AUSUCKS" as his master program password.   Plaintiff also used the "F word" in letters and emails to school officials.   In addition, school officials have stated that Plaintiff would "grandstand" and was disruptive during class.   During a review exam, Plaintiff used the answer "B" to all questions in order to complete the exam in 10 minutes.   Previously, on November 2, 2006, Mr. Woodward was placed on non-academic probation for engaging in inappropriate behavior against one of his professors, Dr. Somaraju of AUA.   **(See Exh. 3 - Defendant's Motion for Summary Disposition**).   Mr. Woodward was encouraged to seek counseling for anger management at that time.

Despite the evidence of unprofessional behavior, Plaintiff claims that he was defamed when Defendant, Susan Zonia, PHD, wrote to Dr. Ernesto Calderon of AUA wherein she stated:

> "Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern.   We do not feel that he will be a good ambassador for AUA, our hospital, or the profession he is to enter.   We encourage the faculty at AUA to review his entire record, to determine if he does not meet the qualifications to sit for the boards, and begin clinical rotations."   (Exh. 1 Defendant's motion for summary disposition).

Plaintiff claims that he was dismissed from the AUA medical school program due to this letter and, therefore, this lawsuit followed.

Plaintiff alleges in his complaint that Defendants communicated false statements to AUA about Plaintiff's unprofessional behavior.   Plaintiff also alleges that Defendants, Trinity and Dr. Zonia interfered with his contractual

relationship with AUA.  Plaintiff contends that Defendants defamatory statements contained in the December 17, 2007 letter to AUA, led to his dismissal from the 5th semester program at AUA and permanently damaged his ability to complete his medical school program.   Following the completion of discovery, Defendants now seek summary disposition of Plaintiff's Complaint.

A party's motion brought pursuant to MCR 2.116 (C )(10) tests the factual sufficiency of a claim and must be supported by affidavits, depositions, admissions, or other documentary evidence.  *Maiden v. Rozwood, 461 Mich 109 (1999).*  A trial court properly grants summary disposition when no genuine issue regarding material fact exists and the moving party is entitled to judgment as a matter of law.  *West v. Gen Motors Corp 469 Mich 177 (2003).*

The first question presented for this Court is to determine whether there is sufficient evidence necessary to create a question of fact on Plaintiff's claim for defamation.    The Court recognizes that, "a communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Swensen Davis v. Martel, 135 Mich App 632 (1984).*  In order to set forth a prima facie case of defamation, a plaintiff must show (1) defendant made a false statement; (2) defendant published statement to third party; (3) defendant was at least negligent in publishing the statement to third part; (4) either actionability of the statement respective of special harm or existence of special harm caused by publication.    *Colista v. Thomas 241 Mich App 529 (2000).*   In addition, a publication even if false may be protected by a qualified privilege.   "Statements

3

of opinion are not defamatory. In particular generalized statements regarding lack of professionalism." *Swensen Davis, supra.* Truth is a defense to defamation. *Id.*

Plaintiff asserts in this case that the statements made by Dr. Zonia in the December 17, 2007 letter to Dr. Calderon amounted to defamation. However, the Defendants contend that the statement made by Dr. Zonia alone would not have harmed Plaintiff's reputation in the community given the fact that he was placed on probation by AUA in November 2006. Likewise, this Court recognizes that the Plaintiff had a history of unprofessional behavior for which AUA and Trinity were attempting to address through the administrative means.

The Court notes that Dr. Hrehorovich of AUA had previously labeled Plaintiff as unprofessional in late October 2007, nearly 6 weeks prior to Dr. Zonia's letter to Dr. Calderon.

Moreover, in his deposition, Plaintiff admitted that he was cited for unprofessional behavior by AUA. In particular, Plaintiff admitted that he wanted to stop attending the 5th semester program at AUA because it was a waste of time. Plaintiff admitted that he was labeled unprofessional by Dr. Hrehorovich of AUA, that he engaged in emails and used the F-word in communications with AUA faculty.

The Court finds that there is no factual dispute that Plaintiff engaged in unprofessional conduct while in his 5th year at AUA. Accordingly, there can be no claim for defamation due to the fact that Defendants were simply

4

communicating truthful information to AUA. *Colista v. Thomas 241 Mich App 529 (2000)*.

However, even if the December 17, 2007 letter was defamatory, it was protected by a qualified privilege in that Susan Zonia, PhD was the head of the AUA 5th semester program at Trinity and part of her responsibilities were to evaluate students. Defendant Zonia contends that expressing her opinion as to Plaintiff's "professionalism" was well within the "interest" encompassed by her job responsibilities. *See Feaheny v Caldwell, 175 Mich App 291, 437 N.W.2d 358 (1989)*. This Court agrees.

In addition, Defendants point out that Dr. Zonia's publication was limited to Dr. Calderon, the individual in charge of the fifth semester at AUA, who had an interest in determining whether Plaintiff had engaged in unprofessional activity. Furthermore, as demonstrated by the 2006 probation, it was no secret to the faculty at AUA that Plaintiff had engaged in unprofessional conduct prior to receiving the December 17, 2007 letter of Dr. Zonia. The Court finds that Defendant Dr. Zonia was merely communicating her opinions regarding the professional conduct of Plaintiff. Also, Dr. Zonia's letter was supported by substantial documentary evidence of unprofessional conduct of the Plaintiff.

It is significant that in his response brief, Plaintiff attempts to characterize his inappropriate behavior in criticizing Defendants as constructive criticism but this supports Defendants view that Plaintiff engaged in disruptive, inappropriate, and unprofessional behavior. Plaintiff's acknowledgment of his behavior supports Defendant's assertion that Dr. Zonia's letter accusing Plaintiff of being

5

unprofessional was in fact truthful. Accordingly, upon review of the materials presented, and viewing the evidence in a light most favorable to the Plaintiff, the Court finds that there is no genuine issue of material fact remaining as to Plaintiff's claim for defamation against Defendants Trinity and Zonia. MCR 2.116 (C)(10).

Next, as to Plaintiff's claim for intentional interference with a contract, it is alleged that Dr. Zonia and Trinity interfered with the business relationship between Plaintiff and AUA. To state a *prima facie* case of interference with contract, a plaintiff must show: 1) the existence of a contract; 2) breach of the contract; 3) instigation of the breach by an alleged tortfeasor. *Bonelli v Volkwagen of America, Inc., 166 Mich 483, 421 NW 2d 213 (1988).* A third-party must intentionally do an act that is per se wrongful or do a lawful act with malice and that is unjustified in law for the purpose of invading the contractual rights of another. *Feaheny* supra.

In this case, Dr. Zonia, as part of AUA, is a party to the contract in question. *Feaheny*, supra. Plaintiff must show that Zonia acted "to further strictly personal motives". *Id.* The Court's review of the evidence submitted shows that Plaintiff cannot show that Defendants engaged in wrongful acts by publishing the December 17, 2007 letter to AUA. Further, the facts demonstrate that Dr. Zonia's actions were privileged in that she was providing her opinion to Dr. Calderon who was the AUA faculty member in charge of the 5th year program.

6

Furthermore, Plaintiff is unable to demonstrate that he suffered damages as a result of Dr. Zonia's letter being published to AUA. In fact, the AUA committee had sufficient documentary evidence including the 2006 probation, instances of swearing in e-mails to school officials and other unprofessional conduct to justify his dismissal from the 5th semester program. Hence, Plaintiff cannot set forth a prima facie case of intentional interference with a contract. *Bonelli, supra.*

Upon review of the materials submitted, the Court finds that there is no question of fact remaining as to Plaintiff's intentional interference with a contract claim. MCR 2.116 (C )(10). Accordingly, this Court grants Defendants' motion for summary disposition in its entirety as to all remaining claims. *Id.*

**WHEREFORE IT IS HEREBY ORDERED** that Defendants' Motion for Summary Disposition is **GRANTED** pursuant to MCR 2.116(C)(10).

**SO ORDERED**

**THIS IS THE LAST PENDING CLAIM IN THIS MATTER AND THIS ORDER CLOSES THE CASE.**

Dated: APR 2 9 2009

Hon. Shalina D. Kumar

### Proof of Service

I certify that a copy of the above instrument was served upon the attorneys of record or the parties not represented by counsel in the above case by mailing it to their addresses as disclosed by the pleadings of record with prepaid postage on the 29th day of May. 2009.
April

Jenice R. McGruder

7

# STATE OF MICHIGAN

# COURT OF APPEALS

---

STEVEN WOODWARD,

       Plaintiff-Appellant,

v

TRINITY HEALTH-MICHIGAN, SUSAN
CATHERINE ZONIA and AMERICAN
UNIVERSITY OF ANTIGUA COLLEGE OF
MEDICINE,

       Defendants-Appellees.

UNPUBLISHED
January 13, 2011

No. 292172
Oakland Circuit Court
LC No. 2007-088103-CZ

---

Before: GLEICHER, P.J., and ZAHRA and K.F. KELLY, JJ.

PER CURIAM.

Steven Woodward appeals as of right the trial court's grant of summary disposition to Trinity Health-Michigan, Susan Catherine Zonia, and the American University of Antigua College of Medicine (AUA). We affirm.

Woodward was a medical student in his fifth semester of study at AUA. As part of the medical school program, AUA placed Woodward in a clinical experience rotation at St. Joseph Mercy Oakland Hospital (SJMO), which is owned and operated by Trinity Health-Michigan (Trinity). Zonia served as the director of medical education at SJMO, and as a dean for AUA's program at that site. Zonia's duties included oversight of AUA's fifth semester program at SJMO, and the evaluation of student performance. This lawsuit arises from a memorandum authored by Zonia and forwarded to Dr. Ernesto Calderon, an AUA administrator, at Calderon's request. The memorandum described concerns regarding Woodward's demeanor and unprofessional conduct while at SJMO, stating in pertinent part:

> Mr. Woodward's lack of professionalism and poor communication skills are a source of great concern. We do not feel that he will be a good ambassador for AUA, our hospital, or the profession he is to enter. We encourage the faculty at AUA to review his entire record, to determine if he does not meet the qualifications to sit for the boards, and begin clinical rotations.

The record documents numerous specific examples of Woodward's inappropriate conduct while at SJMO, including his demonstrated resentment of assignments, his completion of 100 patient logs in a mere two-week period accompanied by an indication that he did not wish

-1-

 **EXHIBIT 9**

to participate further in the program, statements that the program constituted a waste of time and that he wished to transfer, "sabotaging exams," use of inappropriate language and passwords in communications with AUA, and general lack of respect and disruptive behavior while in classroom settings. Before participating in the SJMO program, Woodward had been placed on non-academic probation at AUA for unprofessional conduct. Woodward's academic performance was also tenuous, as he maintained only a 1.5 grade-point average. Ultimately, AUA initiated proceedings before its grievance and disciplinary committee, and Woodward was dismissed from the medical school. Despite receiving notice of the hearing and having an option to appeal the grievance and disciplinary committee's dismissal recommendation, Woodward elected to not attend the hearing or to pursue any administrative remedies.

Woodward filed a complaint against AUA, setting forth claims for breach of contract and an unspecified invasion of privacy. Additionally, Woodward's complaint asserted claims against Trinity and Zonia for libel per se, intentional infliction of emotional distress based on the alleged libel, and tortious interference with a contractual relationship. AUA filed a motion for summary disposition pursuant to MCR 2.116(C)(8), contending that Woodward had failed to state a claim on which relief could be granted. The trial court granted AUA's subrule (C)(8) motion, rejecting Woodward's contract claim. The trial court also dismissed Woodward's invasion of privacy claim against AUA, finding that Zonia's memorandum had not been publically published. Although the trial court afforded Woodward an opportunity to amend his complaint, he failed to timely submit an amended complaint to the court, or to serve it.

Following discovery, Zonia and Trinity sought summary disposition in accordance with MCR 2.116(C)(10), contending that no genuine issue of material fact existed concerning any of Woodward's remaining claims. The trial court granted defendants' motion, and Woodward now appeals.

This Court reviews de novo the grant or denial of summary disposition. *Ligon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). A motion brought in accordance with MCR 2.116(C)(8) tests the legal sufficiency of the pleadings, which are considered alone and without any additional evidence. *Johnson-McIntosh v Detroit*, 266 Mich App 318, 322; 701 NW2d 179 (2005); MCR 2.116(G)(5). In contrast, a motion brought in accordance with MCR 2.116(C)(10) tests the factual support for a claim and is to be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *The Healing Place at North Oakland Med Ctr v Allstate Ins Co*, 277 Mich App 51, 56; 744 NW2d 174 (2007). "A genuine issue of material fact exists when the record, after drawing all reasonable inferences in favor of the nonmoving party, leaves open an issue on which reasonable minds could differ." *Id.*

Woodward first contends that because defendants failed to plead affirmative defenses, the trial court erred by granting summary disposition in their favor. We find this argument utterly without merit. Fundamentally, Woodward misapprehends the procedural distinction between motions for summary disposition and the pleading of affirmative defenses. Contrary to his allegations on appeal, the trial court granted summary disposition based on Woodward's failure to state a viable claim against AUA, and the absence of a genuine issue of material fact with regard to the claims pertaining to Trinity and Zonia. The failure of these defendants to plead various affirmative defenses did not shift the burden of proof, and lacked any relevance to the disposition of Woodward's claims. This Court has explained:

-2-

[A]n affirmative defense does not controvert the plaintiff's establishing a prima facie case, but . . . denies that the plaintiff is entitled to recover on the claim for some reason not disclosed in the plaintiff's pleadings . . . . [A]n affirmative defense presumes liability by definition. [*Citizens Ins Co of America v Juno Lighting, Inc*, 247 Mich App 236, 241; 635 NW2d 379 (2001) (internal quotation marks and citations omitted).]

Defendants' premised their motions for summary disposition on the inadequacy of Woodward's pleadings and his failure to establish a factual predicate for his claims. Zonia and AUA never conceded Woodward's establishment of a prima facie case for any cause of action pleaded in his complaint. Accordingly, we reject Woodward's claim that unpleaded affirmative defenses barred summary disposition in this case.

Woodward next challenges summary disposition of his claims for breach of contract and an unspecified violation of his privacy. Although Woodward now asserts that his breach of contract action against AUA was based on the student handbook, his pleadings in the trial court belie this argument. Woodward premised his breach of contract claim solely on his payment of tuition, and failed to preserve any argument based on the student handbook. Consequently, we decline to consider this alternative theory on appeal. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005). Similarly, Woodward neither pled nor preserved a due process claim. *Id.*

Despite the deficiency of Woodward's pleadings, we address his contention that AUA violated his rights to substantive due process. Woodward primarily relies on *Regents of the Univ of Mich v Ewing*, 474 US 214; 106 S Ct 507; 88 L Ed 2d 523 (1985). Initially we note that this case is factually distinguishable, as no "state action" exists here; AUA is a private entity. Moreover, Woodward cannot demonstrate that AUA denied him due process. A hearing regarding the allegations against him was scheduled, but Woodward declined to participate and failed to pursue an available administrative appeal. In addition, considerable record documentation complied prior to Zonia's creation of the memorandum supported Woodward's poor academic performance and unprofessional conduct, substantiating sufficient grounds for his dismissal. As noted in *Ewing*, "[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment . . . . [and] they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 225 (footnote omitted).

We note that Woodward's contentions regarding breach of contract are, to an extent, inherently contradictory. He asserts both the existence of an express contract arising from the student handbook, and an implied contract based on his payment of tuition. An implied contract may exist only in the absence of an express contract governing the same subject matter between the parties. *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 194-195; 729 NW2d 898 (2006). Further, this Court has previously declined to find an implied contract based on the payment of tuition. *Cuddihy v Wayne State Univ Bd of Governors*, 163 Mich App 153, 156-158;

413 NW2d 692 (1987). Specifically, this Court observed in *Cuddihy* the improbability "that a graduate student believed that merely by paying . . . tuition fees" that there existed an entitlement to graduation. *Id.* at 158. Woodward cites to and relies on a recent unpublished case from this Court in support of his contract arguments.[1]  Woodward's reliance is unavailing, as his cited authority cites to *Cuddihy* and its progeny, stating that "this Court has implicitly rejected the contention that student handbooks, codes, or other informational material create contracts, expressly or otherwise, between universities and their students." Therefore, we affirm the trial court's grant of summary disposition to AUA on Woodward's breach of contract claim.

Next, we consider the trial court's dismissal of Woodward's claim of invasion of privacy by AUA. As recognized by this Court in *Dalley v Dykema Gossett*, 287 Mich App 296, 306; 788 NW2d 679 (2010),

> Michigan has long recognized the common-law tort of invasion of privacy . . . . Today, the invasion of privacy tort has evolved into four distinct tort theories: (1) the intrusion upon another's seclusion or solitude, or into another's private affairs; (2) a public disclosure of private facts about the individual; (3) publicity that places someone in a false light in the public eye; and (4) the appropriation of another's likeness for the defendant's advantage. [*Id.* (internal citations and quotation marks omitted).]

Once again, we note that Woodward's pleadings lack specificity regarding the actual theory of privacy pursued. Based on our generous construction of Woodward's appellate arguments, we view his claim as one for false light.

This Court has previously found that to establish a viable claim for false-light invasion of privacy, a litigant must demonstrate "a communication broadcast to the public in general or publicized to a large number of people that places the injured party in a light that would be highly offensive to a reasonable person." *Early Detection Ctr, PC v New York Life Ins Co*, 157 Mich App 618, 630; 403 NW2d 830 (1986). Further, the individual accused of having invaded the plaintiff's privacy "must have had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.* A "cause of action [under this theory] cannot succeed if the contested statements are true." *Porter v City of Royal Oak*, 214 Mich App 478, 487; 542 NW2d 905 (1995). "[T]he gravamen of this tort is that a defendant's publication 'attribut[ed] to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position.'" *Battaglieri v Mackinac Ctr for Pub Policy*, 261 Mich App 296, 303-304; 680 NW2d 915 (2004) (citation omitted).

The memorandum which serves as the basis for Woodward's false-light claim was a communication between Zonia and Calderon, who were both affiliated with AUA. This communication was not broadcast to the public. AUA used the document and its content

---

[1] *Lee v Univ of Michigan-Dearborn*, unpublished opinion per curiam of the Court of Appeals, issued May 12, 2009 (Docket No. 284541). Under MCR 7.215(C)(1), this case lacks precedential value.

internally, and for a limited purpose. Further, Jeffrey Yanez, M.D. substantively affirmed the accuracy of the various statements in the memorandum. This evidence regarding the truth of the statements precludes Woodward's successful pursuit of a false-light claim against AUA. *Porter*, 214 Mich App at 487.

We next turn to the grant of summary disposition in favor of Zonia and Trinity on Woodward's claims of libel per se and tortious interference with a contract. "Libel" has been "defined as a statement of and concerning the plaintiff which is false in some material respect and is communicated to a third person by written or printed words and has a tendency to harm the plaintiff's reputation." *Fisher v Detroit Free Press, Inc*, 158 Mich App 409, 413; 404 NW2d 765 (1987). To establish his claim for libel, Woodward must show: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 251; 487 NW2d 205 (1992). "[C]laims of libel must be pleaded with specificity." *Royal Palace Homes, Inc v Channel 7 of Detroit, Inc*, 197 Mich App 48, 52; 495 NW2d 392 (1992).

Woodward has failed to establish the falsity of the challenged statements. In addition, the trial court correctly determined that Zonia's statements were protected by a qualified privilege. "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak v R L Polk Co*, 193 Mich App 1, 15; 483 NW2d 629 (1992) (citation omitted). A qualified privilege may be overcome "only by a showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id.* "General allegations of malice are insufficient to establish a genuine issue of material fact." *Id.*

Woodward has failed to demonstrate that Zonia's statements lacked "good faith." In response to a solicitation from AUA, Zonia prepared and sent the memorandum evaluating Woodward's performance at SJMO. Clearly, AUA and Zonia maintained an "interest to be upheld" regarding the integrity of their program, their affiliation with Trinity, and the proficiency of their students. The content of Zonia's memorandum was "limited in its scope" to a very specific purpose – the evaluation of Woodward's performance in the SJMO program – and was in response to a request from AUA, constituting both a proper occasion and "publication in a proper manner and to proper parties only." *Prysak*, 193 Mich App 15. The trial court correctly determined that the challenged memorandum and its contents were subject to a qualified privilege.

Because he cannot demonstrate that Zonia acted with malice, Woodward is unable to overcome the finding of the existence of a qualified privilege. No record facts suggest that Zonia's comments were false when made, or were made with reckless disregard for their truth or falsity. Rather, the evidence establishes the contrary, that Zonia's statements were based on ongoing concerns voiced by others regarding Woodward's demeanor and conduct. "[S]ubstantial truth is an absolute defense to a defamation claim." *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 33; 627 NW2d 5 (2001). Although Woodward suggests that Zonia did not sufficiently substantiate the various complaints before drafting her memorandum, mere proof

of a failure to investigate, without anything more, is insufficient to establish a reckless disregard for the truth. *Gertz v Robert Welch, Inc*, 418 US 323, 332; 94 S Ct 2997, 41 L Ed 2d 789 (1974).

We also affirm the trial court's dismissal of Woodward's claim of tortious interference with a contract. To establish a claim for tortious interference with a contract it is necessary to show: "(1) a contract, (2), a breach, and (3) and unjustified instigation of the reach by the defendant." *Mahrle v Danke*, 216 Mich App 343, 350; 549 NW2d 56 (1996). "One who alleges tortious interference with a contractual . . . relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or . . . relationship of another." *CMI Int'l, Inc v Internet Int'l Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002) (citation omitted). As Woodward has failed to meet the first and second requirements to establish this claim, any action for tortious interference against Zonia and Trinity cannot be sustained.

Finally, *sua sponte*, we note that neither party addressed, nor did the trial court specifically rule on, Woodward's claim of intentional infliction of emotional distress. Because Woodward has not identified this claim as an issue for appeal, we view it effectively abandoned. *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003). Moreover, based on our review of the record, Woodward could not have sustained this claim even had he vigorously pursued it. To maintain a cause of action for the intentional infliction of emotional distress, four elements must be established: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v Ford*, 237 Mich App 670, 674; 604 NW2d 713 (1999). Specifically, for liability to be imposed "the conduct complained of [must have] been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* We reject that the content of the challenged memorandum or the actions taken subsequent to its development meet this high standard of unacceptable behavior. As Woodward cannot demonstrate extreme or outrageous conduct, his intentional infliction claim lacks merit.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Brian K. Zahra
/s/ Kirsten Frank Kelly

**Subject:**   Re: AUA v Woodward

**From:**   Marilyn_Orem@mied.uscourts.gov (Marilyn_Orem@mied.uscourts.gov)

**To:**   steve_l_woodward@yahoo.com;

**Date:**   Friday, December 23, 2011 9:00 AM

both are set for 1/18/12@10:00-the notice setting hearing on motion for order to show cause for 1/19/12 was an error-it should have been set for 1/18/12 along with the other hearing. I have entered a corrected notice of hearing on the motion for an order to show cause for 1/18/12@10:00 but I am not in the office until 1/5/12 so I cannot mail a copy to you. Sorry for the confusion.

From:   Steve Woodward <steve_l_woodward@yahoo.com>
To:   "Marilyn_Orem@mied.uscourts.gov"
       <Marilyn_Orem@mied.uscourts.gov>
Date:   12/22/2011 05:14 PM
Subject:   Re: AUA v Woodward

My Bad, sorry,
I just want to make sure I don't miss any hearings, I think the next hearing is on January 19th but I'm not 100% sure.

There was a hearing scheduled in January per Docket 185 (Order), I thought it was 1/8(my bad)
Has that hearing for Order 185 now been cancelled for the January 19th hearing? I didn't see that on the last docket 192(?) hearing for the "Motion for Reconsideration".
It seems obvious to me that there isn't going to be a date for Order 185 if there is a hearing for the motion for reconsideration, but I definitely do not want to miss any hearings.

I would drive down to the Court house and check myself, but I'm not in town for the holidays.  So your help is greatly appreciated

Thanks again,

This email and any attachments are intended for the sole use of the named recipient(s) and contain(s) confidential information that may be proprietary, privileged or copyrighted under applicable law. If you are not the intended recipient, do not read, copy, or forward this email message or any attachments. Delete this email message and any attachments immediately.
From: "Marilyn_Orem@mied.uscourts.gov" <Marilyn_Orem@mied.uscourts.gov>

**EXHIBIT 10**

**Subject:** Re: AUA v Woodward

**From:** Eric A Buikema (ebuikema@cardellilaw.com)

**To:** steve_l_woodward@yahoo.com; marilyn_orem@mied.uscourts.gov; kzalewski@cardellilaw.com;

**Date:** Tuesday, January 24, 2012 11:17 AM

Mr. Woodward,

I have reviewed and am satisfied that you've complied with the stipulation to remove your site and its derivatives in their entirety. Consistent with my remarks at the hearing, I have strongly recommended to my client that, so long as you do not choose to exercise an appeal (which is your right) or choose to republish (portions of which may also be your right), that it should, in exchange, refrain from pursuing any claim for money damages or contempt sanction against you.

I believe AUA will accept that recommendation but do not yet have confirmation. Don't read anything into the delay. It is simply a function of busy schedules. Provided of course they agree, I would be happy to reduce that agreement to a written stipulation and order for your review and approval.

On a personal note, you have demonstrated considerable energies in the course of this matter. It is my sincere hope that you can now leave this past behind for good and instead begin to focus those considerable energies on a positive future for yourself.

I will advise shortly with which I believe will be AUA's consent to the above.

Eric A. Buikema, Attorney at Law
Cardelli, Lanfear & Buikema, P.C.
322 West Lincoln Avenue
Royal Oak, Michigan 48067
(248) 544-1100
(248) 544-1191 fax
ebuikema@cardellilaw.com

On 1/20/12 10:03 AM, "Steve Woodward" <steve_l_woodward@yahoo.com> wrote:

Dear Ms. Orem,

I would like to know the status on my case and the outstanding Motions.

Is Judge Duggan going to moot all my outstanding motions?

**EXHIBIT  \\**

I still have not heard back from the Plaintiff or Court concerning shutting down my Website et al, if it meets their approval.

I have not heard back from the Court or the Plaintiff concerning alleged damages.

Thank you for your time,

Steven Woodward

This email and any attachments are intended for the sole use of the named recipient(s) and contain(s) confidential information that may be proprietary, privileged or copyrighted under applicable law. If you are not the intended recipient, do not read, copy, or forward this email message or any attachments. Delete this email message and any attachments immediately.

**Subject:** American University v Woodward - 11-11-11 from Eric Buikema

**From:** Kathryn Zalewski (kzalewski@cardellilaw.com)

**To:** steve_L_woodward@yahoo.com;

**Date:** Friday, November 11, 2011 11:07 AM

<<11-11-11 ltr to woodward - rfp response.pdf>> <<aua's response to rfp - without attachments - 11-11-11.pdf>>

Sincerely,

Kathy Zalewski

Legal Secretary

Cardelli, Lanfear & Buikema, P.C.

322 W. Lincoln

Royal Oak, MI 48067

(248) 544-1100

kzalewski@cardellilaw.com

This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is **strictly prohibited**.  If you received this transmission in error, please contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.

**EXHIBIT 12**

A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA COLLEGE
OF MEDICINE, a foreign corporation,

        Plaintiff,

                                  United States District Court Judge
                                  Patrick J. Duggan, presiding
                                  Michael Hluchaniuk, referral
V                                      Case No.:  2:10-cv-10978

STEVEN L. WOODWARD,

        Defendant.

| | |
|---|---|
| Eric A. Buikema (P58379)<br>CARDELLI, LANFEAR & BUIKEMA, P.C.<br>Attorneys for Plaintiff<br>322 W. Lincoln<br>Royal Oak, MI 48067<br>(248) 544-1100<br>ebuikema@cardellilaw.com | STEVEN L. WOODWARD<br>In Pro Per<br>c/o 7211 Brittwood Lane<br>Flint, MI 48507<br>Steve_L_woodward@yahoo.com |

## CERTIFICATE OF SERVICE

    The undersigned certifies that the Plaintiff's Response to Defendant's Request for Production Pursuant to FRCP 34 with responding documents and this Certificate of Service were served upon Steven L. Woodward, via First Class U.S. mail to Steven Woodward, c/o 7211 Brittwood Lane, Flint, MI  48507 and only Plaintiff's Response to Defendant's Request for Production Pursuant to FRCP 34 and this Certificate of Service, via his email address Steve_L_woodward@yahoo.com, on November 11, 2011.

                                /s/  Eric A. Buikema (P58379)
                                Eric A. Buikema (P58379)
                                Cardelli, Lanfear & Buikema, P.C.
                                322 West Lincoln Avenue
                                Royal Oak, Michigan 48067
                                (248) 544-1100
                                ebuikema@cardellilaw.com

*B*



# Cardelli, Lanfear & Buikema, P.C.

Royal Oak/Detroit Office
322 W. Lincoln
Royal Oak, MI 48067
248 544 1100
248 544 1191 Fax
www.cardellilaw.com

Grand Rapids Office
Grand Rapids, MI 49503
616 285 3800


PRIMERUS

November 11, 2011

Via e-mail Steve_L_woodward@yahoo.com and first class mail

Steven Woodward
c/o 7211 Brittwood Lane
Flint, MI 48507

RE:  American University of Antigua College of Medicine v.
     Steven Woodward
     Case No. 2:10-cv-10978
     Our File No. Misc 3748

Dear Mr. Woodward:

Enclosed please find the following:

- Plaintiff's Response to Defendants Request for Production Pursuant to FRCP 34;
- Proof of Service

The documents being produced are only being sent to you via first class mail.

Regards,

Eric A. Buikema
ebuikema@cardellilaw.com
248-544-1100
248-544-1145 x2050 Direct

EAB/ktz
Enclosure